UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

TYRONE HENDERSON,

      **Plaintiff,**

**v.**                                                      **Civil Action No. 3:12cv97 (REP)**

**CORELOGIC, INC.,** *et al.*

      **Defendants.**

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

Defendants, CoreLogic, Inc. and CoreLogic National Background Data, LLC f/k/a National Background Data, LLC ("NBD", and when combined with CoreLogic, Inc., collectively referred to as "CoreLogic,"), by counsel, and pursuant to Fed. R. Civ. P. 12(b)(6), submit the following memorandum in support of their Motion to Dismiss Count I of Plaintiff's Complaint.

### INTRODUCTION

The Fair Credit Reporting Act ("FCRA") authorizes the sale of public record information by one "consumer reporting agency" ("CRA") to another type of CRA known as "reseller," which, in turn, can supply the information to "users," such as employers considering a job application by a "consumer." Hence, the FCRA contemplates and allows a chain of sale of data, from one CRA to another, before the ultimate sale to a user. During this process, the FCRA, in § 1681k(a), imposes a duty to send a notice to the consumer on the CRA that ultimately supplies public record information to an end user (*i.e.*, prospective employer) that could have an adverse impact on a job applicant.

In this case, Plaintiff has alleged that CoreLogic, a CRA, sold public record information concerning Plaintiff to another CRA, Verifications, Inc., a "reseller." The data was then supplied by Verifications, Inc. to its customer, Interstate Brands Corporation, which used the information in making an employment decision about Plaintiff.

Based on these facts, Plaintiff makes an unprecedented claim against CoreLogic; namely, that when one CRA sells the information to another CRA, which then resells the public record information to a user, that 15 U.S.C. § 1681k(a)(1) requires *both* of the CRAs to send the notice to the consumer, even though it is only the reseller that supplies any information to the user. More specifically, Plaintiff claims that when Verifications, Inc. sold data to Interstate Brands, both CoreLogic and Verifications were required under § 1681k(a)(1) to send entirely duplicate notices to Plaintiff.

Plaintiff's claim against CoreLogic is unprecedented for a reason: the plain language of 15 U.S.C. § 1681k(a) imposes no duty on a CRA which sells information to another CRA to send a redundant § 1681k(a) notice. Section 1681k(a)(1)'s notification requirements are triggered only when consumer information is provided by a consumer reporting agency for "employment purposes" to the "user" of that data. *See id.* The sale at issue here meets neither such criterion for liability.

Furthermore, even if the Court were to conclude that CoreLogic did somehow technically violate § 1681k(a)(1), Plaintiff has failed to allege that any such violation was "willful" as a matter of law, as he cannot show that CoreLogic's conduct was "objectively unreasonable" – the test for willfulness established by the United States Supreme Court for FCRA cases in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 69 (2007). Thus, Plaintiff's conclusory – and factually barred - assertion that CoreLogic "willfully" violated § 1681k(a)(1) under Count I must

be rejected and any claim of "willfulness" under that claim dismissed with prejudice.  And, with no plausible claim of willfulness alleged, and no claim of "actual damages" having been asserted by Plaintiff under Count I, Plaintiff lacks standing to pursue the violation asserted under Count I.

### STATEMENT OF ALLEGATIONS

The allegations of the Complaint, as related to the contentions of this Motion to Dismiss, are as follows.  Plaintiff alleges that CoreLogic, Inc. is the parent company of NBD.  (Compl., ¶ 9).[1]  CoreLogic, Inc. and NBD are "wholesale" data providers to "the background screening industry" that "sell criminal and employment-purposed background checks solely on a wholesale basis."  *Id.* at ¶¶ 10, 12.  CoreLogic, Inc. and NBD "disburse consumer reports to third parties under contract" for compensation.  *Id.* at ¶ 16.

Plaintiff alleges that in August and September 2009, he applied for a job with Interstate Brands Corporation ("Interstate").  *Id.* at ¶ 21.  On November 5, 2009, Interstate engaged the third-party consumer reporting agency and "reseller" Verifications, Inc. ("Verifications") to conduct a background check on Plaintiff.  *Id.* at ¶ 22.  "Immediately thereafter," Verifications ordered a background report from CoreLogic, which was subsequently provided to Verifications.  *Id.* at ¶ 23.  The background report that was furnished by CoreLogic to Verifications regarding Plaintiff allegedly contained a record of a criminal conviction from Pennsylvania.  *Id.* at ¶ 26.  Plaintiff alleges that this conviction was not attributable to him, but rather to an unrelated consumer with a similar name.  *Id.* at 27.

---

[1] "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  Plaintiff disregards this time-honored principle by simply lumping together CoreLogic, Inc. and NBD in his factual allegations.  Indeed, the facts alleged in the Complaint against CoreLogic, Inc. do not even come close to satisfying the rigorous standards set forth by the Supreme Court in *Twombly* and *Iqbal* to plausibly establish how CoreLogic, Inc. violated the FCRA as to Plaintiff.  The evidence will show that CoreLogic, Inc. has been improperly named as a Defendant.  CoreLogic reserves its rights to move for the dismissal of CoreLogic, Inc. as a Defendant on this basis at the appropriate procedural juncture.

Plaintiff alleges that, "[as] soon as Verifications received the CoreLogic report, it placed same within an online consumer report regarding the Plaintiff [that was] provided to [Interstate]." *Id.* at ¶ 28. Plaintiff further alleges that "[w]hile [the] report [provided by Verifications to Interstate] did not contain the details of the Pennsylvania convictions, it did report that the Plaintiff's history has come back with these 'Hits' in a search of his national criminal background." *Id.* Plaintiff contends that, as a result of the consumer report provided to Interstate by Verifications, Interstate withdrew its offer of employment to him. *Id.* at ¶ 29. There is no allegation that CoreLogic ever had any direct or indirect communications with Interstate. *See id.* Rather, the Complaint makes clear that CoreLogic, as a "wholesaler" of information, provided information only to Verifications, which acted as a "reseller" of that data to Interstate. *Id.* at ¶ 20.

Plaintiff alleges that he never received a letter or any other communication from CoreLogic at the time that the CoreLogic report was sent to Verifications in late 2009. *Id.* at ¶ 33. Plaintiff further alleges that he also never received any communication from Verifications at the time that his report was furnished by Verifications directly to Interstate.[2] *Id.* at ¶ 34.

On the basis of these allegations, Plaintiff asserts three claims against CoreLogic. Count I of the Complaint, which is the subject of this motion, alleges that CoreLogic failed to "timely provide the required FCRA notices to the Plaintiff" in violation of 15 U.S.C. § 1681k(a)(1) of the FCRA. *Id.* at ¶ 55. Section 1681k(a) provides, in pertinent part:

> A consumer reporting agency which **furnishes a consumer report for employment purposes** and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment shall—

---

[2] Plaintiff has also filed related actions against Verifications and Interstate, which assert overlapping claims under the FCRA with respect to the claim pled in this action, as well as other FCRA claims. *See* 3:11cv514 (action against Verifications); 3:11cv507 (action against Interstate).

(1) at the time such public record information **is reported to the user of such consumer report**, notify the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported; or

(2) maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date.

*Id.* (emphases added).  Plaintiff asserts this claim on the basis of a putative nationwide class of consumers relative to whom CoreLogic allegedly did not place in the mail "a written notice that [CoreLogic was] furnishing the subject report and containing the name of the person that was to receive the report." *Id.* at ¶ 47.  Without any accompanying factual support, Plaintiff alleges that this violation of § 1681k(a) by CoreLogic was "willful," thereby entitling him to "statutory and punitive damages." *Id.* at ¶ 56.

## STANDARD OF REVIEW

When considering a motion to dismiss, the Court should accept as true all well-pleaded factual allegations and should view the complaint in a light most favorable to the plaintiff.  *See De Sole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991).  Even under Fed. R. Civ. P. 8(a), however, the Court need not accept as true the legal conclusions, unwarranted inferences, unreasonable conclusions, or arguments asserted in the complaint.  *See Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'Ship*, 213 F.3d, 175, 180 (4th Cir. 2000); *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).  Furthermore, a "pleading that offers 'legal conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949

(quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 8(a)(2) (pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A claim is "factually plausible" when the claimant pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950. If any factual allegations remain, the Court then should review them to determine if a plaintiff has stated a plausible claim for relief. *Id.*

Furthermore, "[p]ursuant to Rule 12(b)(1), a claim may be dismissed for lack of subject matter jurisdiction." *Wollman v. Geren*, 603 F. Supp. 2d 879, 883 (E.D. Va. 2009). CoreLogic contends that Plaintiff lacks standing to bring his claim under Count I. "Because standing is an element of subject matter jurisdiction, a defendant's motion to dismiss for lack of standing should be treated under Rule 12(b)(1)." *McInnes v. Lord Balt. Emple. Ret. Income Acct. Plan*, 2011 U.S. Dist. LEXIS 130512, at *4 (D. Md. Nov. 10, 2011). In such a situation, "the burden of proving subject matter jurisdiction falls on the plaintiff." *Wollman*, 603 F. Supp. 2d at 883.

## ARGUMENT

For any potential liability to attach under § 1681k(a)(1), the sale of consumer information at issue must be both to the "user" of that information and for "employment purposes." The sale of data from CoreLogic to Verifications meets neither of these conjunctive requirements for a viable claim under that provision of the FCRA. Thus, for the reasons set forth in detail below, Count I must be dismissed.

Moreover, given the compelling textual argument in favor of dismissal of Count I, as well as the lack of any contrary authority in favor of Plaintiff's misguided position, even if liability

were possible under Count I, no violation of § 1681k(a)(1) can be deemed to have been "willful" as a matter of law, and any such claim must also be dismissed.   Additionally, the lack of any "willful" violation, along with Plaintiff's failure to allege any "actual damages" arising out of Count I, means that Plaintiff has no standing to assert the claims alleged.

I.      **PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER COUNT I, AS CORELOGIC NEVER PROVIDED A CONSUMER REPORT "FOR EMPLOYMENT PURPOSES" TO A "USER."**

Plaintiff's claim under Count I is based on § 1681k(a)(1), which imposes a duty on CRAs to send a notice to the consumer if the information is furnished "for employment purposes" to a "user" and that information is likely to have "adverse impact" on the consumer's "ability to obtain employment."   15 U.S.C. § 1681k(a)(1).   Specifically, § 1681k(a)(1) requires, "at the time such public record information is *reported to the user* of such consumer report," that the CRA reporting such information for employment purposes "notify the consumer of the fact that public record information is being reported by the consumer reporting agency[.]"   *Id.* (emphasis added).

In this case, CoreLogic provided information to Verifications, another CRA that Plaintiff acknowledges was a "reseller" of information, and which provided the data to Interstate.   *See* Compl., ¶ 22.   Thus, to hold CoreLogic liable under § 1681k(a)(1), Plaintiff must establish that CoreLogic was furnishing information to a "user" for "employment purposes."   Plaintiff cannot make either such showing, which would be at odds with the plain language of the FCRA, Federal Trade Commission interpretation of the FCRA, persuasive authority, and the carefully-delineated duties of users and CRAs under the FCRA.   Thus, Plaintiff's claim in Count I must be dismissed.

A.      **Verifications is not a "user" under the FCRA, and therefore CoreLogic was not furnishing information to a "user."**

While the FCRA uses the term "user" repeatedly, there is no express definition of that term in the FCRA.   Context, however, affirms the plain meaning of the term and indicates that a

"user" for purposes of § 1681k is the person who actually *uses* the data in making a credit, employment, or insurance decision affecting the consumer. Verifications falls outside of this meaning of the term "user," and therefore CoreLogic did not furnish a consumer report to a "user" for the purposes of creating potential liability under § 1681k(a)(1).

### 1. The provisions of the FCRA.

As a threshold matter, there is no express requirement in the FCRA, whether in § 1681k(a)(1) or elsewhere, requiring a CRA selling data to a reseller to provide notice to the consumer under that provision. Plaintiff thus seeks to read into the statute a requirement that has no firm basis in its text. This result should be avoided. *See, e.g., Dugdale v. Nationwide Mut. Fire Ins. Co.*, No. 4:05cv138, 2006 U.S. Dist. LEXIS 17471, at *12 (E.D. Va. Feb. 14, 2006) ("[T]his court declines to read into the statute words that are not there.").

The other provisions of the FCRA also bear out this conclusion in numerous provisions. For example, 15 U.S.C. § 1681b(b)(1) of the FCRA requires that "users" certify to the CRA from which a report for employment purposes is obtained, that the user has provided certain disclosures to the consumer, and that "the consumer has authorized in writing . . . the procurement of the report by that person." *Id.* In short, that section contemplates direct contact between the user and the consumer, such as a potential employer/employee relationship, where consent may be obtained from the consumer. As the Complaint makes clear, only Interstate had any direct contact with Plaintiff. (Compl., ¶ 9). Thus, Verifications, as a "reseller," had no such contact with Plaintiff such that its provision of these required assurances under the FCRA to CoreLogic would have even been possible. (*See* Compl., ¶ 34).

Likewise, 15 U.S.C. § 1681m imposes requirements on "users taking adverse actions on basis of information contained in consumer reports." *Id.* Again, this section contemplates a

direct link between the consumer and the user of the information, the latter of which is in a position to take adverse action – including employment decisions – against the consumer. Verifications was not in a position to take any action – adverse or otherwise – against Plaintiff, neither has Plaintiff alleged that Verifications has taken such action.  Thus, it was not a "user."

Notably, Plaintiff does not allege any direct contact between CoreLogic and Interstate,[3] and the lack of any direct contact between CoreLogic and Interstate underscores the illogical, practical implications of imposing potential liability on CoreLogic under § 1681k(a)(1). CoreLogic would be in no position to actually assess whether any of the information it provided to Verifications would ultimately be reported to Interstate, and it would therefore be unable to determine whether any such information would have an "adverse impact" on Plaintiff's "ability to obtain employment."  There is no allegation that CoreLogic was privy to any restrictions imposed by Interstate (such as any direction to include or exclude certain records from the report), such that CoreLogic would know whether the information it provided would ultimately be transmitted to Interstate, and not just filtered out by Verifications.  And, given the widely-divergent state laws regarding whether certain information can even be reported to a prospective employer in that state, *see, e.g.*, California Civil Code § 1786.16(a) (limiting the provision of certain background data to information generated within seven years preceding the request), CoreLogic would not know whether the information that it provided to Verifications would have an "adverse impact" on Plaintiff's employment prospects.

Returning to the text of the FCRA, the same result is compelled by the language of § 1681c(1)(h)(1)(B), which provides: "No prospective user of a consumer report or of a credit score generated using the information in the file of a consumer that includes an extended fraud alert in accordance with this section may establish a new credit plan or extension of credit . . . . "

---

[3] In fact, Plaintiff alleges that NBD does not sell directly to the client.  (Compl., ¶ 12).

*Id.*  Again, the language of the FCRA contemplates that the "user" be in a position to take some form of action against the consumer.  *See id.*; *see also* 15 U.S.C. § 1681h(e) ("no consumer may bring any action or proceeding in the nature of defamation . . . based on information disclosed by a user of a consumer report to or for a consumer *against whom the user has taken adverse action*.") (emphasis added).  Plaintiff's Complaint makes no allegation that Verifications took an adverse action against Plaintiff, presumably because Verifications, as a reseller of data, was not in such a position.

Furthermore, the terms "consumer reporting agency" and "user" have distinct meanings and responsibilities under the FCRA.  Prior to the provision's amendment in 1996, 15 U.S.C. § 1681n provided that civil liability could be imposed on "[a]ny consumer reporting agency *or user* of information which willfully fails to comply with any requirement imposed under this title."  *Id.* (emphasis added).  This disjunctive provision was later amended into its current form to also subject "furnishers" of consumer information to civil liability through the use of the more-inclusive term "person."  *See, e.g., Ayers v. Equifax Info. Servs.*, No. 3:03cv551, 2003 U.S. Dist. LEXIS 23271, at *11 (E.D. Va. Dec. 16, 2003) ("Prior to amendment in 1996, sections 1681n and 1681o permitted suit against a consumer reporting agency or a user of information, but not against a furnisher.  After the statute was amended, 'any person' could be sued . . . . [S]ince credit reporting agencies and users were already liable to consumers, Congress intended, by the amendment language 'any person,' to enlarge the statute to include furnishers.").  Nonetheless, the clear statutory distinction between "users" and "credit reporting agencies" previously specified in § 1681n underscores that Plaintiffs' conflation of these terms under § 1681k(a)(1) is improper and contrary to what Congress intended.  *See also Boatner v. Choicepoint Workplace Solutions, Inc.*, 2010 U.S. Dist. LEXIS 44264, at *7 (D. Or. May 6,

2010) ("[T]he FCRA imposes different responsibilities based on whether a party is a user . . . or CRA" and a user's duty is largely independent of the duties of the CRA. This statutory scheme, which allocates independent obligations among the many parties involved in the consumer credit reporting process, shows no legislative intent to hold . . . CRAs liable for the actions of users.").

2.      **Persuasive judicial authority confirms the result required by the FCRA.**

Consistent with the provisions detailed above, the courts interpreting the definition of "user" under the FCRA, including those within the Fourth Circuit, make plain that a "user" of information is the entity that has the authority to take some action affecting the consumer's interests. For instance, in *Lema v. Citibank, N.A.*, 935 F. Supp. 695 (D. Md. 1996), the court considered an allegation that the "defendants reported information obtained through their transactions with plaintiff to a consumer reporting agency." *Id.* at 698. Because there was no allegation that the defendants themselves took any adverse action against the plaintiff, the court held that the defendants are "not users of information for purposes of the FCRA." *Id.*; *compare Austin v. Bankamerica Service Corp.*, 419 F. Supp. 730, 731, 733 (N.D. Ga. 1974) (a defendant who denied the plaintiff credit on the basis of information obtained in a consumer report was a "user" for purposes of the FCRA).

Similarly, in *Alvarez Melendez v. Citibank*, 705 F. Supp. 67 (D.P.R. 1988), the court held that a defendant who merely furnished information to third parties regarding plaintiff's credit history "was not a user of consumer reports for the purpose of establishing civil liability under the FCRA." *Id.* at 69. The same result was reached in *Jones v. Smith-McKinney Co.*, No. 04-cv-80, 2004 U.S. Dist. LEXIS 29761 (E.D. Ky. Nov. 18, 2004), where the court held as follows: "Plaintiff has not alleged that McClish denied credit or increased rates as a result of information contained in a consumer report. Based upon these facts, the plaintiff has not alleged facts which

establish liability [as a user] under the FCRA." *Id.* at *23-24. And, in sharp contrast, no court has ever embraced the interpretation of the FCRA advanced by Plaintiff under Count I.

Plaintiff has not alleged that Verifications took, or was in any position to take, any direct action against Plaintiff due to the information that was contained in his consumer report. Thus, under the above authority, Verifications was not a "user" under the FCRA. Count I must be dismissed.

### 3.    Federal Trade Commission guidance also demonstrates that Verifications was not a "user" of consumer information.

The conclusion demanded by both the text of the FCRA and persuasive authority is buttressed by the interpretative guidance provided by the Federal Trade Commission ("FTC"). In interpreting the FCRA,[4] the FTC has confirmed that a CRA must notify the consumer only when such information "is provided to an employer or potential employer," indicating that "user" refers to the employer that ultimately uses the information to make its employment decision. *See* Federal Trade Commission, "40 Years of Experience with the Fair Credit Reporting Act, an FTC Staff Report with Summary Interpretations," at 81 (July 2011), available at http://www.ftc.gov/os/2011/07/110720fcrareport.pdf (hereinafter, "FTC, 40 Years of Experience, at __"), attached as **Exhibit A**. Consistent with this view, the FTC requires that CRAs that provide reports for employment purposes must notify consumers under § 1681k(a)(1), "even if they are merely resellers of consumer reports obtained from other CRAs." *Id.* at 81. This requirement ensures that any CRA – whether it is a reseller or not – that provides a consumer report to a user of that information must comply with § 1681k, and thus guarantees that one CRA

---

[4] The FTC's interpretation of its regulations is "controlling unless plainly erroneous or inconsistent with the regulation[s] or there is any other reason to doubt that they reflected the [FTC's] fair and considered judgment." *Pliva, Inc. v. Mensing*, 131 S. Ct. 2567, 2575 (2011).

will always have a duty to send the required notice.[5]  No similar requirement is imposed on the CRAs who provide such reports to a reseller, and with good reason – such a notice would be completely redundant of the notices that already *must* indisputably be sent by the CRA dealing directly with the user.

In short, Verifications was reseller, not a user, under the FCRA, and therefore CoreLogic had no duty under § 1681k(a) to provide notice to the Plaintiff, as CoreLogic was not furnishing information to a "user."  Therefore, Count I must be dismissed.

### B.    CoreLogic did not provide information for an "employment purpose."

Another reason why the FCRA does not impose the notice requirement on CRAs supplying reports to resellers is because such reports are not provided to the reseller for an "employment purpose," as is required to trigger § 1681k(a).  As the FTC explains, "[a] CRA may furnish a consumer report to another CRA, so that the second CRA can sell such reports to subscribers with a permissible purpose."  FTC, 40 Years of Experience, at 41.  Thus, the FTC does not look to whether the second CRA itself has permissible purpose, but whether the second CRA is ultimately providing reports to end users with a permissible purpose.[6]  The fact that the FTC treats CRA-to-CRA sales in this manner demonstrates that the FTC recognizes that such transactions are not for "employment purposes," which would itself be a permissible purpose under the FCRA.  15 U.S.C. § 1681b(a)(3)(b).

---

[5] Indeed, in a related action, Plaintiff has pled an identical claim under § 1681k(a)(1) against Verifications.  *See* 3:11cv514 (Dkt. No. 20, Count I), attached as **Exhibit B**.

[6] The FCRA does require that consumer reports to users only issue for certain permissible purposes.  15 U.S.C. § 1681b(a).  Thus, the FTC explains that the CRA providing information to another CRA "must comply with FCRA requirements to implement reasonable policies and procedures to limit the distribution of consumer reports to those with permissible purposes."  *Id.* at 41.  Thus, even though the CRA-to-CRA exchange itself does not fall under any permissible purpose under 15 U.S.C. § 1681b(a), that transaction is nonetheless permissible as long as the supplying CRA ensures that the subsequent user of the consumer report is operating under a permissible purpose.

Other provisions of the FCRA also counsel strongly in favor of the proposition that the sale by a CRA to a reseller is not for an employment purpose. For example, as described above, a user that seeks to obtain a consumer report for "employment purposes" must certify to the CRA that it has made the required disclosures to the consumer and obtained the consumer's consent. *See* 15 U.S.C. § 1681b(b)(1). Therefore, if, unlike the FTC's interpretation, the reseller's acquisition of the data from the wholesaler CRA was considered an employment purpose, then the reseller also would need to make disclosures to and obtain consent from the consumer – purely redundant steps that would already have been taken by the employer.

In fact, Plaintiff's strained reading of § 1681k(a)(1) builds in several redundant steps to the consumer reporting process under that provision that are not contemplated by the express terms of the FCRA or FTC regulations and guidelines. To wit, under Plaintiffs' theory, each time that a user sought a consumer report for an employment purpose, every CRA that had ever touched the information contained in that report – from the moment that information had been retrieved from the public record – would have to obtain consent from the consumer and ensure that certain disclosures had been provided to the consumer. Assuming all of these CRAs had successfully accomplished that purported duty, each of them would then have to send an identical notice under § 1681k to the consumer, notwithstanding the fact that the information in each report could vary. Indeed, there is no conceptual limit to the number of redundant notices that would be required under the interpretation of the FCRA advanced by Plaintiff in Count I. This result should be avoided. *See, e.g., Flint v. California*, 594 F. Supp. 443, 447-48 (E.D. Cal. 1984) (declining to interpret 42 U.S.C. § 2000e-5(f)(1) to require notice of right to sue from both the Equal Employment Opportunity Commission and the United States Attorney General, because such a reading would require "redundant notices" and "the words of the statute and

common sense suggest another and better reading of the statute"); *United States v. Carroll*, 105 F.3d 740, 744 (1st Cir. 1997) ("[S]tatutes should be construed in a commonsense manner, honoring plain meaning, and avoiding absurd or counterintuitive results.")

Not only would this extremely redundant conception of FCRA notice, disclosure, and consent requirements bring the entire process of consumer reporting to a crawl, but as noted above, such redundancies are at odds with the specialized and contrasting duties of the various constituents of the credit reporting process. Plaintiff's position would render all CRAs "users" and destroy the carefully-compartmentalized statutory treatment of CRAs under the FCRA. Plaintiff's claim under § 1681k(a)(1) must be dismissed.

## II.        THERE WAS NO WILLFUL VIOLATION OF § 1681K(A)(1).

The FCRA provides that civil liability can only be imposed against a defendant in two circumstances. The first avenue for liability is found in 15 U.S.C. § 1681n – "Civil liability for willful noncompliance." That provision states that "[a]ny person who willfully fails to comply" with the FCRA is subject to actual or statutory damages, and potentially punitive damages. *Id.* The second avenue for relief is provided in 15 U.S.C § 1681o – "Civil liability for negligent noncompliance." According to that provision, "[a]ny person who is negligent in failing to comply" with the FCRA may be subject to actual damages only. *Id.* Importantly, these are the only two avenues through which a defendant may be found civilly liable for an FCRA violation.

Here, Plaintiff has not alleged that he suffered any actual damages as a result of the alleged violation of § 1681k(a)(1), and only asserts a claim for a "willful" violation. In light of the foregoing statutory arguments, and as interpreted by the authority below, regardless of the Court's determination of whether CoreLogic committed any technical violation of § 1681k(a)(1), any such violation was not "willful" as a matter of law.

A.     **In the wake of *Safeco*, the Complaint fails to plausibly allege that CoreLogic willfully violated § 1681k(a)(1).**

Although Plaintiff makes conclusory allegations of willfulness throughout the Complaint, he fails to plausibly allege willfulness with respect to Count I.   Recently, the Supreme Court established a very high and objective threshold on what a plaintiff must show in order to prevail on a willfulness claim under the FCRA – a burden Plaintiff has failed to meet.   *See Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007).

In *Safeco*, the Supreme Court considered whether the defendant insurance companies willfully violated the FCRA by not providing adverse action notices to applicants whose insurance premium rates were higher than those offered to other applicants with the best possible credit scores.   *Id.* at 65.   The FCRA requires insurance companies to provide adverse action notices to applicants whose charge for insurance was "increased" based in whole, or in part, on consumer report information.   *Id.*; *see also* 15 U.S.C. §§ 1681m(a), 1681a(k)(1)(B)(i).   Because the word "increased," as used in the FCRA's definition of "adverse action" for insurance purposes, was undefined, the Court interpreted the term to mean that an applicant receives a higher insurance premium rate based, in whole or in part, on the applicant's consumer report.   *Safeco*, 551 U.S. at 68.   For one of the defendant insurers, Safeco, the Court explained that if Safeco had used the applicants' consumer reports to charge a higher premium rate, Safeco would have taken adverse action, and it would have been an FCRA violation for Safeco to have failed to provide the affected applicants with an adverse action notice.   *Id.*

The Court then considered the standard for whether a defendant "willfully" violates the FCRA, including whether "willfulness" also includes "recklessness."   *Id.* at 52.   While it held that the former encompassed the latter, the Court also concluded that this willfulness standard is not met "unless the action is not only a violation [of the FCRA] under a reasonable reading of the

statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.  In order to overcome this hurdle, it is the plaintiff's burden to prove that a defendant's attempts to comply with the FCRA were "objectively unreasonable." *Id.*  Consequently, the "a violation does not cross the willfulness threshold just because a defendant's interpretation is erroneous; it must instead be 'objectively unreasonable.'" *Long v. Tommy Hilfiger U.S.A., Inc.*, 2012 U.S. App. LEXIS 1269, at *12 (3d Cir. Jan. 24, 2012) (citing *Safeco*, 551 U.S. at 69); *see also Singleton v. Domino's Pizza, LLC*, 2012 U.S. Dist. LEXIS 8626, at *33-34 (D. Md. Jan. 25, 2012) ("[U]nless the defendant's interpretation of the statute is objectively unreasonable, a plaintiff will be unable to show that the defendant willfully violated the FCRA.").

In other words, to prevail on an FCRA claim of willfulness, the plaintiff must allege that the defendant's conduct created an "unjustifiably high risk" of violating the statute. *Safeco*, 551 U.S. at 70.  To this end, in *Safeco*, the Court discussed two factors that are pertinent in analyzing whether a company's interpretation of the FCRA is "objectively unreasonable."  First, the Court considered the clarity of the statutory text with respect to the challenged conduct.  Specifically, the Court held that if a company's reading of the FCRA "has a foundation in the statutory text," *e.g.*, if the relevant statutory provision is "less-than-pellucid," that fact favors a finding that the company acted reasonably and not willfully.  *Id.* at 69-70; *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 978 (2002) (defining "pellucid" as: "extremely easy to understand; readily intelligible or comprehensible; completely lacking in ambiguity or turgidity.")

Second, the Court evaluated the amount of relevant judicial or agency guidance available to the company to aid its efforts to interpret the relevant FCRA provision.  In particular, the Court stressed that it was "not a case in which the business subject to the Act had the benefit of

guidance from the courts of appeals or the Federal Trade Commission (FTC) that might have warned it away from the view it took.  Before these cases, no court of appeals had spoken on the issue, and no authoritative guidance has yet come from the FTC."  *Id.* at 70.  This "dearth of guidance," along with the FCRA's "less-than-pellucid statutory text," persuaded the *Safeco* Court to conclude that "Safeco's reading [of the FCRA] was not objectively unreasonable, and so *falls well short* of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability."  *Id.* (emphasis added).

The *Safeco* Court summed up its guidance on the FCRA willfulness issue as follows: "Where, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator.  Congress could not have intended such a result for those who followed an interpretation that could reasonably have found support in the courts, whatever their subjective intent may have been."  *Id.* at 70 n.20. And, under such circumstances, the Court held that there was "no need for [the Ninth Circuit] to remand the case for factual development" because evidence concerning the "subjective bad faith" of the defendant was irrelevant when "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation."  *Id.*; *see also Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314, 1319 (11th Cir. 2009) ("What matters under *Safeco* is the text of the Act and authoritative interpretations of that text.") (citations omitted).[7]

---

[7] In this sense, the inquiry under *Safeco* is highly-akin to the analysis of whether a state official is subject to qualified immunity from an asserted violation of constitutional rights under 42 U.S.C. § 1983.  *See, e.g., Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994) ("Qualified immunity shields a governmental official from liability for civil monetary damages if the officer's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").  In that context, it is settled that the issue of immunity can be decided on a motion to dismiss so that the court is not burdened with a costly and wasteful litigation process.  *See Hunter v. Bryant*, 502 U.S. 224 (1991). Likewise, the inquiry is one of "objective legal reasonableness," which is a question of law for the court

**B.     The application of *Safeco* to the allegations pled under Count I.**

When conducting an analysis parallel to the one conducted by the Court in *Safeco*, it is

evident that Plaintiff cannot carry his burden to demonstrate that any violation by CoreLogic

under Count I was "objectively unreasonable" and/or involved an "unjustifiably high risk" of

violating the FCRA.  *See, e.g., Fuges v. Southwest Fin. Servs.*, 2011 U.S. Dist. LEXIS 134779, at

*17-18 (E.D. Pa. Nov. 21, 2011).

In the present case, like in *Safeco*, the term "user" of consumer information is not defined

anywhere in the FCRA.  *See* 15 U.S.C. § 1681a.  Also, like in *Safeco*, no judicial decisions, let

alone any decisions from any binding "court of appeals, *id.* at 70, have considered the issue of

whether a consumer reporting agency that is independently contracted to provide consumer data

to a reseller of that data is providing data to a "user" of that information such that the notification

requirements of § 1681k(a)(1) are then triggered.  Both of these facts counsel strongly against a

finding of willfulness.  *See, e.g., Goode v. LexisNexis Risk & Info. Analytics Grp.*, 2012 U.S.

Dist. LEXIS 39863, at *27-28 (E.D. Pa. Mar. 23, 2012) (finding no willful violation, "especially

given that no court of appeals had spoken on the issue") (citing *Safeco*).  Indeed, this "dearth of

guidance," *Safeco*, 551 at 70, is also confirmed by the "FTC, 40 Years of Experience" report,

which summarizes literally hundreds of cases, formal agency interpretations, and FTC opinion

letters.  Nothing in the 110-page report comes close to suggesting anything that "might have

warned [CoreLogic] away from" the overly-rigid and hyper-technical stance of the FCRA

advanced in Count I of the Complaint.  *Safeco*, 551 U.S. at 70.  Furthermore, for the reasons set

---

to decide.  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); see also *Brown v. Mitchell*, 327 F. Supp. 2d
615, 649 (E.D. Va. 2004) ("clearly established" means that, in light of preexisting law, "the unlawfulness
of the official's conduct was reasonably and objectively apparent").  And, a defense of qualified
immunity may not be rebutted by evidence regarding a defendant's intent.  *See Harlow v. Fitzgerald*, 457
U.S. 800, 812 (1982).  All of these stringent principles similarly counsel in favor of the dismissal of
Plaintiff's FCRA claim here.

forth in section I, *supra*, CoreLogic's interpretation of the term "user" in § 1681k(a)(1) has a strong (if not compelling) foundation in the statutory text.

Fundamentally, *none* of the objective indicia that the Court in *Safeco* used to determine whether a willful violation of the FCRA is plausible are present here based on the "pellucid" text of the FCRA. Based on these facts, and as set forth by the Court in *Safeco*, in no way can CoreLogic's alleged actions amount to an "objectively unreasonable" interpretation of § 1681k(a)(1). Therefore, the allegations of "willfulness" under Count I must be dismissed with prejudice. *See, e.g., Fuges*, 2011 U.S. Dist. LEXIS 134779, at *17-18 ("Here, given the FCRA's lack of clarity regarding whether the Act even covers companies such as Defendant Southwest Financial Services, as well as the stunning paucity of guidance on the pertinent issues, no reasonable jury could conclude that Southwest acted objectively unreasonably in determining that the FCRA does not apply to its activities, in particular to its current owner reports such as the one at issue in this matter."); *Simonoff v. Kaplan, Inc.*, 2010 U.S. Dist. LEXIS 125414, *26 (S.D.N.Y. Nov. 29, 2010) (granting a motion to dismiss due to a lack of willfulness because the defendant's interpretation of the FCRA was not objectively unreasonable, in part, because it "did not have guidance from the courts of appeals nor from the FTC that might have discouraged it from interpreting the statute as it did").

**C.     The judicial finding of a lack of any "willful" violation of § 1681k(a)(1) is appropriate at this juncture.**

Although Plaintiff may attempt to argue that dismissal of Counts I for a failure to plead willfulness is premature at the 12(b)(6) stage, numerous authorities have reached the opposite conclusion. While, in certain legal contexts, "the question of willfulness is an issue of fact for the jury, . . . those cases usually involve questions of fact as to what the defendant knew at the time of the alleged violation. That is not an issue in this case." *Goode*, 2012 U.S. Dist. LEXIS

39863, at 28 n.10.  As established by *Safeco*, the question of willfulness in the context of the FCRA violation alleged here "turns on whether the law was clear at the time of the alleged violation."  *Id.*  Thus, the issue is timely at the motion to dismiss stage.  *Id.* (dismissing claim of a willful violation of § 1681k(a)(1) on defendant's motion to dismiss).

For example, in *Long v. Tommy Hilfiger U.S.A., Inc.*, the plaintiff filed an action against the defendant alleging that the defendant's printing of a partially-redacted expiration date on his on his receipt (*i.e.*, "EXPIRY:04/##") willfully violated the FCRA prohibition against publishing the expiration date at the point of sale.  2012 U.S. App. LEXIS 1269, at *2.  On the defendants' motion to dismiss, the district court concluded that "(1) printing the month of expiration, standing alone, did not constitute the printing of an 'expiration date' under the statute, and (2) in any event, [plaintiff] could not recover because the alleged violation was not 'willful.'"  *Id.*  The Third Circuit affirmed the district court's dismissal of the plaintiff's willfulness claims on a motion to dismiss.  In doing so, the court stated that "[i]n light of *Safeco*, we conclude that Hilfiger's interpretation of the statute is not 'objectively unreasonable' and, thus, that Long has not stated a claim for a willful violation of FACTA."  2012 U.S. App. LEXIS 1269 at *13.

Similarly, in *Shlahtichman v. 1-800 Contacts, Inc.*, 615 F.3d 794 (7th Cir. 2010), the Seventh Circuit affirmed the dismissal of a willfulness claim under under Rule 12(b)(6), holding:

> We note finally that even if we have construed the statute too narrowly, dismissal of [plaintiff's] complaint was nevertheless appropriate because [defendant] did not willfully violate the statute. [Plaintiff] has alleged no actual injury . . . and has instead sought the statutory damages that are authorized for willful violations of the truncation requirement . . . .  To date, there has been no contrary opinion from a court of appeals or federal agency suggesting that the company's understanding of the statute is wrong; and even if its construction of the statute turns out to be mistaken, it is objectively reasonable nonetheless for all of the reasons we have discussed. Consequently, if [defendant] did violate the statute by including the expiration date of [plaintiff's] credit card in the receipt it emailed to him, it did not do so knowingly or recklessly.

*Id.* at 803-04; *see also Simonoff*, 2010 U.S. Dist. LEXIS 125414, *26 (granting a motion to dismiss FCRA claim due to a lack of willfulness); *Goode*, 2012 U.S. Dist. LEXIS 39863, at *36 ("Plaintiffs have failed to plead sufficient facts to demonstrate that such violation was willful").

As shown by the cases above, Count I of the Complaint should be dismissed at this stage of the litigation because Plaintiff has failed to plausibly allege that CoreLogic willfully violated the FCRA, and any such claim under Count I must be dismissed with prejudice.

**D.      Plaintiff's conclusory allegations of willfulness are legally insufficient.**

Although academic in light of the foregoing, Plaintiffs' claim for a "willful" violation of the FCRA fails for yet another reason.  As noted above, in the Complaint, without any factual support, Plaintiff alleges that the alleged violation of § 1681k(a)(1) by CoreLogic was "willful." (Compl., ¶ 56).  "To survive a motion to dismiss under *Twombly*, a complaint alleging gross negligence and/or punitive damages must contain facts sufficient to show that the applicable standards for recovery are plausibly met."  *Stotesbury v. Pirate Duck Adventure, LLC*, No. 3:11-cv-18, 2011 U.S. Dist. LEXIS 98130, at *10-11 (D.V.I. Aug. 30, 2011).  Plaintiff's claim for punitive damages here, which is bereft of any facts, woefully fails to even attempt to satisfy this burden.  Hence, the alleged willful violation of § 1681k(a)(1) must be dismissed.  *See, e g., Odor v. Wal-Mart Stores East*, No. 10-287, 2011 U.S. Dist. LEXIS 82571, at *5 (E.D. Ky. July 7, 2011) (dismissing claim for punitive damages because the "Plaintiff fail[ed] to provide any facts to state a plausible claim that Defendant acted with any level of malice or ill will").

**III.     THE COURT MAY PROPERLY DISMISS COUNT I FOR FAILURE TO PLEAD ACTUAL DAMAGES NECESSARY FOR A CLAIM OF NEGLIGENT VIOLATION OF § 1681K(A)(1).**

With no plausible claim of willful misconduct present, Count I must also be dismissed for an additional reason.   Under Count I, Plaintiff seeks only punitive and statutory damages.

(Compl., ¶ 56).  While a claim for actual damages is alleged under other counts of the Complaint (*i.e.*, Count III), no such demand is made under Count I.

Without an allegation of actual damages, Plaintiff cannot succeed as a matter of law on a claim of a negligent violation of § 1681k(a)(1), even if one were attempted to be asserted upon amendment.  *See Banga v. NCUA*, 2009 U.S. Dist. LEXIS 93449, at *6 n.5 (N.D. Cal. Oct. 6, 2009) ("Although FCRA also provides for a cause of action based on a negligent violation, such cause of action requires a showing of actual damages."); *Pintos v. Pac. Creditors Ass'n,* 2011 U.S. Dist. LEXIS 41630, at *7 (N.D. Cal. Apr. 13, 2011) ("[F]or negligent violations, a consumer may recover only actual damages and reasonable attorneys' fees.").  Given the fact that actual damages are a *necessary element* of a claim for negligent violation of the FCRA, Plaintiff cannot prevail as a matter of law on any claims of negligence.[8]  Since Plaintiff is left without any claim for a willful violation of the FCRA, as well as any claim for actual damages that could plausibly support a claim for a negligent violation of Count I, that Count must be dismissed with prejudice.

## IV.    PLAINTIFF'S FAILURE TO ALLEGE AN ACTUAL INJURY-IN-FACT DEPRIVES THE COURT OF ARTICLE III JURISDICTION OVER COUNT I.

In this same vein, although Plaintiff cannot recover on Counts I because he has failed to plausibly allege a willful violation of the FCRA or the actual damages necessary to support a finding of negligence, Plaintiff's Complaint must also be dismissed because of a more basic deficiency.  Namely, Plaintiff's failure to allege an injury-in-fact strips the Court of subject matter jurisdiction over Count I.

---

[8] Given the entirely technical nature of the claim in Count I, it would be surprising indeed if Plaintiff could, consistent with the strictures of Fed. R. Civ. P. 11, make any claim of actual harm.  In any event, the phrase "actual damages," or anything of a similar import, appears nowhere in Count I.

Article III of the United States Constitution provides that "judicial power" extends only to "cases" and "controversies." U.S. Const. Art. III, § 2. The Supreme Court enforces this requirement by requiring that litigants have "standing to invoke the authority of a federal court." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). To have standing, a plaintiff must allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* Here, Plaintiff's Complaint has failed to allege a "personal injury," otherwise known as an "injury-in-fact" for the violation pled under Count I.

In order for an injury-in-fact to satisfy the Article III standing requirements, it must be "concrete in both a qualitative and temporal sense." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). That is to say, the injury must be "distinct and palpable" and not "conjectural" or "hypothetical." *Id.* Importantly, a litigant does not develop an injury-in-fact purely because Congress authorizes a plaintiff to bring a suit based on a statutory violation. *Raines v. Byrd,* 521 U.S. 811, 820 n.3 (1997) ("Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."). "For 'although Congress may expand the definition of what constitutes an injury, essentially by expanding the list of rights people enjoy, it may not eliminate the constitutional case or controversy requirement.'" *Morant v. Vaughn*, No. 2:08cv155, 2009 U.S. Dist. LEXIS 129417, at *10-11 (E.D. Va. Jan. 8, 2009). "The 'proper analysis of standing focuses on whether plaintiff suffered an actual injury, not on whether a statute was violated.'" *Id.* at *11.[9]

---

[9] Although the Supreme Court stated in *Warth v. Seldin,* 422 U.S. 490, 500 (1975), that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing," subsequent cases have shown that Article III standing is not solely a statutory question. As clarified by the Supreme Court in *Lujan*, the statement in *Warth* refers to "Congress' elevating to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law," not the creation of *de facto* injuries out of thin air. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992) (emphasis in original). For Article III standing, there must exist *some injury-in-fact*, separate and apart from the injury ordained by Congress.

Here, as discussed above, Plaintiff has failed to allege an actual injury under Count I. Plaintiff has pled no actual damages in his Complaint under Count I, nor has he pled a manner in which he was injured by the alleged violation of § 1681k(a)(1).  While the FCRA may grant plaintiffs the right to recover statutory damages, it cannot supplant the Constitution's requirement of an injury-in-fact.  Since Plaintiff has failed to allege a distinct and palpable injury aside from the violation of the statute itself, he has failed to present a case or controversy sufficient to invoke Article III jurisdiction.  Therefore, Count I must be dismissed.

### CONCLUSION

WHEREFORE, Defendants, CoreLogic, Inc. and CoreLogic National Background Data, LLC f/k/a National Background Data, LLC, respectfully request that the Court enter an Order: (1) dismissing Count I of the Complaint with prejudice; and (2) granting CoreLogic any other relief the Court deems appropriate.

**CORELOGIC, INC. and CORELOGIC
NATIONAL BACKGROUND DATA, LLC f/k/a
NATIONAL BACKGROUND DATA, LLC**

By:/s/ Timothy J. St. George_____
          Of Counsel

Alan D. Wingfield (VSB No. 27489)
David N. Anthony (VSB No. 31696)
Timothy J. St. George (VSB No. 77349)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia  23219
Telephone: (804) 697-1200
Facsimile:  (804) 698-1339
alan.wingfield@troutmansanders.com
david.anthony@troutmansanders.com
tim.stgeorge@troutmansanders.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of May 2012, I filed a true and correct copy of the foregoing on the Court's Electronic Case Filing System, which will send a notice of electronic filing to:

>Leonard A. Bennett, Esq.
>Susan M. Rotkis, Esq.
>CONSUMER LITIGATION ASSOCIATES, P.C.
>763 J. Clyde Morris Blvd, Suite 1A
>Newport News, VA 23601
>Telephone:  (757) 930-3660
>Facsimile:  (757) 930-3662
>Email:  lenbennett@cox.net
>
>Dale W. Pittman, Esq.
>THE LAW OFFICE OF DALE W. PITTMAN, P.C.
>The Eliza Spotswood House
>112-A West Tabb St.
>Petersburg, VA 23803
>Telephone:  (804) 861-6000
>Facsimile:  (804) 861-3362
>dale@pittmanlawoffice.com
>
>*Counsel for Plaintiff*

>/s/Timothy J. St. George
>Timothy J. St. George (VSB Bar No. 77349)
>TROUTMAN SANDERS LLP
>1001 Haxall Point
>Richmond, Virginia  23219
>Telephone:  (804) 697-1254
>Facsimile:  (804) 698-6013
>tim.stgeorge@troutmansanders.com