**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

TYRONE HENDERSON,
JAMES O. HINES, JR.,
on behalf of themselves and others
similarly situated,

        Plaintiffs,

v.                                  Civil Action No: 3:12cv97 (REP)

CORELOGIC, INC.,

and

CORELOGIC NATIONAL BACKGROUND DATA, LLC,
f/k/a National Background Data, LLC,

        Defendants.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

    COME NOW the Plaintiffs, TYRONE HENDERSON and JAMES O. HINES, JR., for

themselves and on behalf of all other similarly situated individuals, by counsel, and for their

Memorandum in Support of Plaintiffs' Motion for Class Certification, they state as follows:

**I.      OVERVIEW**

    Mssrs. Henderson and Hines bring a class claim under the federal Fair Credit Reporting Act

("FCRA"), 15 U.S.C. § 1681, *et seq.*, against CoreLogic National Background Data, LLC, f/k/a National

Background Data, LLC ("Defendant" or "NBD") for its sale and furnishing of employment consumer

reports with criminal records from a private database without compliance with the mandatory notice

requirements at § 1681k(a)(1). NBD sold adverse criminal public records for an employment purpose.

Because Defendant's automated database business model is, by definition, not designed to furnish

complete public records, NBD is required to send consumers a written notice under 15 U.S.C. §

1681k(a)(1) "at the time" it furnishes the subject report.  However, it fails to do so. This employment-

purpose provision requiring minimal notice to the consumer that his or her employment is contingent

upon a background check from an otherwise unknown consumer reporting agency was at the heart of the

enactment of the FCRA.  *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414-15 (4th Cir.

2001).[1]

There is nothing either remarkable or unexpected about the allegations and legal claims now

prosecuted in this case.  NBD never provides the notice required by § 1681k(a)(1), nor does it engage in

any other meaningful compliance with the section.  Instead, the Defendant simply asserts that, because it

sells its FCRA reports wholesale, it need not concern itself with this provision.  Its misconduct is

uniform and unvaried; it is the same for every class member.  Thus, Rule 23(b)(3) certification is

appropriate.

## II.      STATEMENT OF FACTS AND PROPOSED CLASS CLAIM

**A.      The Class Representatives' Experiences**

**1.      Tyrone Henderson**

In or around the months of August and September of 2009, Plaintiff Henderson applied for

employment with Interstate Brands Corporation, which was subject to a background check being

conducted.  In November of 2009, Interstate Brands Corporation requested a background report from

Verifications, Inc. ("Verifications").  Verifications then ordered a report (the "NBD Report") from the

Defendant, which it then furnished.

Defendant returned several "hits" attributed to Mr. Henderson, including purported criminal

conviction public records from Westmoreland County, Pennsylvania.  However, the Westmoreland

County records did not belong to Plaintiff Henderson.  The hits instead regarded an unrelated man with

a similar name, but entirely different social security number.  As soon as Verifications received the

NBD report, it placed it within an online consumer report regarding Mr. Henderson provided to the

---

[1] This case is virtually the same as those successfully prosecuted against the Defendants' industry competitors in *Williams v. LexisNexis Risk Mgmt. Inc.*, CIV A 3:06-cv-241, 2007 WL 2439463 (E.D. Va. Aug. 23, 2007) (LexisNexis)[1], *Beverly v. Wal-Mart Stores. Inc.*, CIV A 3:07-cv-00469-RLW (E.D. Va. May 1, 2009)(ChoicePoint) and *Ryals v. Hireright Solutions, Inc.* CIV A 3:09-cv-625-JAG (E.D. Va. Dec. 21, 2011) (HireRight).  Moreover, this case is the same as that resolved in this Court against reseller Verifications, Inc., a reporting agency that purchased and received all of the background checks challenged in that case from this Defendant, NBD.

Plaintiff's prospective employer.  This report was furnished immediately to the employer who, by contract, had access to (and did review) this report even before Defendants had completed additional processes to obtain confirming data from another source. Plaintiff Henderson did not learn that the Defendant had furnished a report regarding him until late 2011, while litigating a collateral case against Verifications.  As a result of the consumer report, Interstate Brands Corporation withdrew its conditional offer of employment.

Later, after being denied employment with Interstate Brands Corporation, the Plaintiff was able to obtain a copy of the actual Westmoreland County criminal records——simply by asking the court clerk.  The records obtained from the Westmoreland County Court itself confirm that they do not belong to the Plaintiff and do not match his social security number.

Plaintiff never received a letter or any other communication from NBD or any other CoreLogic entity when the NBD report was furnished.  Further, Plaintiff never received a letter or any other communication from Verifications "at the time" a report was then furnished to Interstate Brands Corporation.  15 U.S.C. § 1681k(a)(1).

## 2.   **James O. Hines, Jr.**

Plaintiff James O. Hines, Jr. is a 41-year-old, married, father of nine children, and resides in Hayes, Virginia.  He has over twenty years of experience as a physical therapist in Virginia, and has been nominated for and selected for employer awards for excellent service in his field.  Since May of 2011, Plaintiff Hines was employed by a homecare agency in Hampton, Virginia as a physical therapist. However, to supplement his income in order to meet his family's financial obligations, Plaintiff applied for a second job, also as a physical therapy assistant, with CareSouth Homecare Professionals in Newport News, Virginia.  In connection with Plaintiff's application for employment, CareSouth requested and purchased a consumer report regarding Mr. Hines from ADP Screening and Selection Services ("ADP") on or about June 1, 2011.  ADP purchased the consumer report directly from NBD. The consumer report contained inaccurate information concerning Mr. Hines.  In particular, the consumer report contained five pages of information identifying Plaintiff as a "Registered Sex

Offender" in Indiana. Plaintiff has never been to Indiana, nor has he ever been a sex offender, registered or otherwise.

Plaintiff did not receive a letter or any other communication from CoreLogic, NBD or any other CoreLogic entity when the report was furnished.  Plaintiff also never received a letter or any other communication from ADP "at the time" a report was furnished to CareSouth.

In fact, CareSouth only later notified Plaintiff Hines of the derogatory public record information that ADP supplied to CareSouth.  Upon discovering this derogatory and false information, Plaintiff Hines immediately disputed the accuracy of the information that ADP had sold to CareSouth.

On or about June 30, 2011, in response to Plaintiff Hines dispute, ADP wrote to Mr. Hines and notified him that (a) ADP submitted the dispute to NBD; (b) that NBD had notified ADP that a dispute reinvestigation was complete; and, (c) that NBD had notified ADP that "the disputed information has been verified."  As a result of the consumer report, CareSouth refused to hire or approve Mr. Hines for employment.

## B.    NBD's Uniform Process and Procedures

"National Background Data by CoreLogic is the leading wholesale criminal data provider to the background screening industry."[2]  NBD sells criminal employment-purposed background checks solely on a wholesale basis.  In fact, typically consumers are completely unaware that an employment background report originated from the Defendant. Instead, the Defendant "works in the background."[3] As its marketing materials boast:

> National Background Data by CoreLogic® works behind the scenes to quickly deliver clear, consistent criminal background information. . . .  We sell exclusively through a network of carefully selected background screening providers. Which means all your customers see is YOU—and the concise, targeted, easy-to-read reports you deliver to them.

Exhibit "1", NBD 2012 Marketing Materials, CL-H002764.

---

[2] http://www.corelogic.com/solutions/national-background-data.aspx.
[3] https://www.nationalbackgrounddata.net/marketing/about_us.html

There is no meaningful variance in NBD's records gathering.  The Defendant obtains 100% of its reports from an entirely separate and legally distinct wholesale report seller, SafeRent.  Exhibit "2", NBD Responses to Plaintiffs' First Set of Interrogatories, No. 6.  While SafeRent is owned by the same parent company, CoreLogic, Inc., in this litigation and elsewhere, NBD and SafeRent have taken great strides to create and assert this legal separation. Both SafeRent and NBD are acting as FCRA governed "consumer reporting agencies" (or "CRAs").  (Exhibit "3", NBD/SafeRent Reseller Services Agreement, Bates No. 568-81).  The relationship between these entities is contractual.  *Id.*  By the Defendant's admission, "███████████████████████████████████████████ ███████████████████████████████" *Id.*, Bates No. CL-H570.

NBD only sells reports that contain criminal records—its reports do not contain civil public records such as bankruptcies, tax liens and civil judgments. NBD reports are amongst the most incomplete and inaccurate in the industry.  As a recent decision of the Northern District of Georgia offered:

> The evidence shows that National Background Data may not be a very accurate source of public record information. For example, National Background Data will return a criminal history record as a match for a consumer even if the consumer's date of birth differs from the date of birth on the criminal record. Defendant's vice president stated that she did not "feel like [National Background Data performs an] accurate search." Defendant does not know how National Background Data gathers its public record information, or whether the information is obtained secondhand from other private databases or firsthand from governmental entities.  It is undisputed, however, that National Background Data does not obtain the "complete criminal record for every offense."

*Farmer v. Phillips Agency, Inc.*, 285 F.R.D. 688, 693 (N.D. Ga. 2012).[4]  The parties and court in *Farmer* were certainly correct: NBD records purchased from SafeRent almost never include the necessary complete identifying information.

### C.   Plaintiffs' Class Claims Are Brought Under 15 U.S.C. § 1681k(a)(1).

---

[4] As discussed below, *Farmer* is also a helpful and important decision in considering and contrasting the case-by-case and individualized verification process used by Phillips Agency with the purely automated and uniformly incomplete records sold by NBD.

Count I of the Amended Complaint, which is the subject of this motion, alleges that NBD failed to "timely provide the required FCRA notices to the Plaintiff" in violation of 15 U.S.C. § 1681k(a)(1) of the FCRA. *Id.* at ¶ 55.  Section 1681k(a) provides, in pertinent part:

> A consumer reporting agency which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment shall—
> (1) at the time such public record information is reported to the user of such consumer report, notify the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported; or
> (2) maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date.

*Id.* (emphasis added).  Plaintiffs assert this claim on the basis of three similar putative nationwide classes of consumers relative to whom NBD allegedly did not place in the mail "a written notice that [NBD was] furnishing the subject report and containing the name of the person that was to receive the report." Docket No. 30, Amended Complaint at ¶ 47, narrowed as stated *infra*.[5]  Class treatment around these narrowed boundaries—Henderson was the subject of NBD reports through Verifications and HR Plus, and Hines was the subject of the NBD report furnished to ADP—is especially appropriate as there are no material differences within each reseller relationship.  ADP, Verifications and HR Plus each requested the same types of report, using the same search criteria, and for the same FCRA purpose (employment).  Thereafter, NBD refused to provide the required § 1681k disclosures to 100% of each class for the exact same reason.

Defendant freely acknowledges that, during the class period, it never sent the required § 1681k(a)(1) notice.  Exhibit "4", NBD Responses to Plaintiffs' First Set of Interrogatories, No. 3.  In fact, it claims that § 1681k(a) does not even apply to its business.  *Id.*  NBD has based its entire defense

---

[5] Plaintiffs propose certification of the original national class, but narrowed to consumers who were the subject of reports sold to only one of three reseller customers, ADP, Verifications and HR Plus, and only if the report contained a public record that was incomplete because it lacked a social security number.

on this single argument. Because it sells its reports wholesale, it claims an implied exception to the FCRA requirements otherwise detailed in plain statutory text. It could not be more wrong.[6]

The FCRA text at issue in this case is easily dissected into its simple elements. For § 1681k(a) to apply, NBD must be a 'consumer reporting agency.'[7] Then, § 1681k(a) only applies to some CRAs, specifically, those that satisfy two other characteristics: (1) the subject CRA must "furnish[] a consumer report for employment purposes", and (2) for employment purposes "compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment." The question then is simple. Does this section apply to NBD? The answer is yes, NBD is a consumer reporting agency furnishes consumer reports for employment purposes. In order to do so, it compiles and reports adverse public criminal court records. Each of these questions and thresholds is the same for each class member. Section 1681k(a) either applies to NBD or it doesn't. As goes the case for Henderson and Hines, so goes that for all class members.4

The Defendant's defenses in this case are also uniform as to class members. First, NBD offered, "Defendants state that 15 U.S.C. § 1681k is inapplicable to NBD's business, including for the reasons set forth in Defendants' Motion to Dismiss the initial Complaint, which is incorporated herein by reference." (Exhibit "4", NBD Responses to Plaintiffs' First Set of Interrogatories, No. 3). Second, NBD claimed "that the sending by its customers of notices contemplated under 15 U.S.C. §168lk(a)(l) would satisfy the requirements of 15 U.S.C. § 1681k, as applied to NBD." *Id.* However, NBD acknowledged that, "NBD does not obtain or possess records of the sending of notices by Verifications or ADP, and it is seeking discovery of this matter from those entities." No such discovery was ever obtained, as none of the reseller entities has ever once sent a § 1681k(a) notice informing consumers that NBD had created and furnished the underlying background check. In fact, NBD later ended up

---

[6] Of course this critical legal question is not ripe at this Rule 23 posture. Its importance however does highlight the uniquely unquestionable commonality, typicality and predominance arguments for class certification. The more NBD premises its defense on that single question, the more undeniable class certification has to be.
[7] Defendant acknowledges that this element is met in discovery, in its Answer to the Amended Complaint and in contracts and other business documents it has produced in this case.

stipulating, "Defendants further stipulate that they will not oppose Plaintiffs' motion for class certification on the basis of whether any of those same customers may have included the name of either Defendant on any notice that was sent to a consumer pursuant to 15 U.S.C. § 168lk(a)(l)." Docket No. 56, at ¶3.

**D.    NBD and Accessible Third Party Records Allow for Mechanical Identification of Class Members.**

NBD has asserted two categories of class certification obstacles. First, NBD has claimed in this litigation that class membership cannot be ascertained because it does not sell reports regarding specific consumers. It merely sells data, which may or may not regard a particular individual. For example, when Mr. Henderson's employer requested a background report regarding the Plaintiff from Verifications, NBD furnished a report that contained incomplete public records regarding the Plaintiff and as well as Pennsylvania records regarding a similarly named, but different person. NBD asserts that it cannot ascertain whether it should have sent the § 1681k(a)(1) notice to the Plaintiff or to the stranger. But of course, this argument would then make the FCRA meaningless for every report that inaccurately contained an item about some other consumer. It also ignores the text and longstanding interpretations of the statute. For example, courts have found that even furnishing the entirely incorrect report pertaining to another person (as opposed to merely mixing isolated public record items) still triggers FCRA liability for furnishing an inaccurate report regarding the plaintiff consumer. *See, e.g.*, *Neclerio v. Trans Union, LLC*, 3:11-CV-01317 VLB, 2013 WL 6052067 (D. Conn. Nov. 15, 2013); *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662 (7th Cir. 2001).

But the Court again can look to NBD's real world positions to pierce Defendant's manufactured litigation claims. NBD understands that it is not merely selling chunks of data, but rather consumer reports related to specific consumers. Exhibit "5", NBD-ADP Reseller Services Agreement, Bates No. CL-H288. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████   As a result, later in the litigation, NBD stipulated,

> The collective discovery of their customers would produce information sufficient to permit Plaintiffs to identify (including, without limitation, by name, address, date of birth, social security number and other personal identifiers) the individual of interest that was the subject of a particular search query submitted to CoreLogic National Background Data, LLC by its customers.

Docket No. 56, at ¶3.

NBD's second argument, proffered in discovery, challenges its own ability to identify class members by name and address, or to identify which consumers fit into class definition categories. NBD has argued that it cannot identify from its records every class member because (a.) its customers do not search with a SSN or a full first name; (b.) it cannot determine for what purpose the report was sold sufficient to trigger § 1681k(a).

These assertions have now already been practically, if not formally, abandoned. As the stipulations cited earlier provide, both parties agree that class membership could be determined from third party discovery to ADP, Verifications and ADP. Docket No. 56, at ¶3. In fact, formal discovery would be unnecessary as NBD's contracts require its reseller customers to maintain the full set of reports and related consumer data for at least five years and to produce it to NBD on demand. Exhibit "6", NBD Form Reseller Service Agreement, at § 4(g), Bates Nos. CL-2771-2774.

NBD has also produced detailed and representative archives of the fields and values it sold to Verifications and ADP regarding Henderson and Hines. NBD's records reveal the following as to Henderson and Hines, but as well to the more general question of what data fields are archived by NBD for class members: (a.) Both the "user" and the "end-user" are identifiable; (b.) NBD records whether a report was furnished for an employment purpose; (c.) resellers provide NBD a complete Date of Birth by which to identify the consumer; (d.) users provide NBD generational suffixes as part of the last name search variable; (e.) NBD records whether or not the product furnished is the incomplete "COPS" product, or something else; (f.) NBD does not include the SSNs for the individual public records furnished in its report. In fact, it does not even include such a field; and (g.) NBD has an assigned set of

identifiers for each class member that was the subject of one of its reports.  Exhibit "9", Bates Nos. CL-H2649-2652; Exhibit "10, Bates Nos. CL-H2674-2678.

Additionally, as a result of Defendant's "we cannot identify class members" assertion, Plaintiffs sought and obtained a mirrored copy of NBD's "Results Returned" database containing all of the information generated as a result of a NBD customer search.  Docket No. 49.  By agreement, the database is held and analyzed by the Class Administrator that also processed and maintains the class list information from the *Henderson v. Verifications* settlement. Exhibit "7", Declaration of Frank Barkan, at ¶2.   The database



Exhibit "8", Declaration of Thomas Burtner, at ¶ 4.  The database is easily searched or culled to just those reports furnished (a.) to the same reseller (ADP, Verifications or HR Plus) and using (b.) the same search matching rule, (c.) the same NBD "COPS" product or report type, and (d.) the same employment-purpose.  *Id*. at ¶¶ 6, 7, 11-14, 18-21.  The NBD database can also be easily searched to include only those class members about whom an NBD report was sold that contained an incomplete criminal record—one without a social security number.  *Id*. at ¶ 5.[8]

Upon its mechanical review of the NBD database, McGladrey "has been able to identify a subset of this database and pinpoint the number and characteristics of specific reports sold to the following customers: (a.) Verifications, Inc., (b.) ADP, Inc., [and] (c.) HR Plus[.]"  Exhibit "7", Declaration of Frank Barkan, at ¶ 4.  ████████████████████████████████████

---

[8] The NBD database also establishes that the classes now pled as to ADP, Verifications and HR Plus "COPS" reports furnished for an employment purpose and containing incomplete criminal public records are large and more than sufficient to meet Rule 23(a)'s numerosity threshold.  Exhibit "8", Declaration of Thomas Burtner, at ¶¶ 5, 11-13.  And it established that Henderson and Hines were members of these respective classes, having been the subject of such reports during the class period.  *Id*. at ¶ ¶15, 18-21

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████ *Id.*

The NBD data is sufficient to mechanically identify class members. As McGladrey explained, "Given the prevalence of 'date of birth' as a consistently populated field, McGladrey could identify unique social security numbers and current addresses and thereby create a class list for nearly all of the individuals in the CoreLogic case by using the information already contained in the Results Returned database." *Id.* at ¶6. Any outlier consumer entries that may not be immediately identified within the NBD database can be mechanically identified using common, readily available third party information. *Id.* For the lone reseller that does not include a full first name—Verifications—McGladrey already possesses the class data and list from the previous *Henderson v. Verifications* settlement. *Id.* at ¶5. McGladrey's employee explained that these mechanical processes,

> would be sufficient for McGladrey to uniquely identify these class members for nearly all of the subjects of the criminal records reports listed in the CoreLogic Results Returned Database. To the extent that a handful of ambiguities thereafter remain, the identity of these individuals could be conclusively determined by obtaining other personal identifiers from third parties.

*Id.* at ¶ 7.

NBD's alternate argument—the lack of proof that its report was furnished verbatim to the employer—is similarly meritless. It would depend upon a misunderstanding of § 1681k(a) and a misstatement of the facts. First, there is no requirement in the statute that NBD's report be provided verbatim (or otherwise) to an employer before § 1681k(a)(1) would govern. The Parties have already litigated this question in Defendant's Rule 12(b)(6) motion, the denial of which resolved this question as to the law of the case. § 4478 Law of the Case, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.) (The "Law of the Case" doctrine is "a matter of practice that rests on good sense and the desire to protect both court and parties against the burdens of repeated reargument by indefatigable diehards."). Still, as with its other litigation positions, NBD's challenge here contradicts its real world facts. For example, its reseller contracts all acknowledge that the FCRA information NBD sells to ADP, Verifications, HR Plus and

11

others is to be used solely for resale and delivery to the employer or end-user. Exhibit "5", NBD-ADP

Reseller Services Agreement, Bates No. CL-H289.  ("Reseller represents and warrants that it will

request the Data Services and the Consumer information therein from NBD solely and exclusively for

·resale to End-Users."); *Id.* ("Reseller will, in reselling the Data Services, use commercially reasonable

efforts to faithfully transmit NBD Data accurately and in its entirety, except to the extent as may

otherwise be permitted by this Agreement, to eliminate "false positives" as determined by the Reseller

or as agreed to by NBD in writing.").  Defendant understands that its data will be resold to the end-user

and not simply discarded by its reseller user.  NBD's direct reseller customers contractually agree that

they, "will request Reports, resell Reports, and/or information contained therein, and use the Services

solely for resale by Solution Provider to its authorized End-Users and solely for said End-Users'

authorized use for the following "Permissible Purpose," as the term is defined under the FCRA:

employment and/or tenant screening."  Exhibit "6", NBD Form Reseller Service Agreement, at § 4(b),

Bates Nos. CL-2771-2774.

Additionally, in the case of Verifications, the reseller acts as both a "user" and an "end-user".

Defendant's own archive shows that Verifications identified itself as the "End-user" of Henderson's

report.[9]  Exhibit "9", Bates Nos. CL-H2649-2652; Exhibit "10", Bates Nos. CL-H2674-2678.

**E.      15 U.S.C. § 1681k(a)(2) is Inapplicable to NBD and this Case.**

In its litigation positions to date, Defendant has suggested that, "NBD will also contend that it

maintains strict procedures to ensure that the data it supplies to its customers is complete and up to date,

and that the data is accurate, meaning that no notice was required even if 15 U.S.C. § 1681k applies to

NBD."  Exhibit "4", NBD Responses to Plaintiffs' First Set of Interrogatories, No. 3.  But this provision

cannot possibly apply to this CRA Defendant.  Defendant's "strict procedures" litigation afterthought

does not apply to NBD's automated gathering and sale of incomplete database public records lacking in

---

[9] Minnesota-based Verification's disclosure of itself as the end-user and the user makes sense, as Verifications is also by
its employer customers to "adjudicate" the applicant based upon the consumer report using the employer's provided
hiring rules. "Consistent with its advertisements, VI [Verifications] controls virtually every step in the background
check and adverse employment action process for its clients, including IBC."  *Tyrone Henderson, et al v. Interstate
Brands Corporation,* Civil NO. 3:11cv-00507-REP, Docket No. 13, at ¶19.

nearly every instance necessary identifiers such as a social security number.  It is a position taken not on the merits, but with the objective of manufacturing individualized issues NBD hopes can help it oppose Rule 23(b)(3) predominance.

Section 1681k(a)(2) allows a governed CRA to avoid sending the otherwise mandatory notice if it, "maintain[s] strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date."  Database CRAs that obtain their public records in bulk do not attempt this path as it is almost always inapplicable to such a business model.  The present case confirms why.  NBD obtains its criminal records from its sister CRA, SafeRent.  But SafeRent relies only on the bulk acquisition of court records and thus does not seek to or ever obtain the "complete" public record.  *Poore v. Sterling Testing Sys., Inc.*, 410 F. Supp. 2d 557, 572 (E.D. Ky. 2006) ("A reasonable juror could conclude that this item was not complete and that this item did not reflect the current public record status of the DUI conviction since the report did not include the actual name, birthdate or social security number of the person who was convicted of the crime.").  In fact, many courts will not even sell the complete record to bulk buyers.  In particular, in nearly every public record SafeRent and NBD obtain by bulk acquisition, the originating court does not include the social security number (or "SSN").  ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████  "Exhibit "11",

NBD/SafeRent Criminal Records Sources, Bates No. CL-H10795.

NBD/SafeRent's contracts with the originating court sources themselves refute NBD's litigation claim that it had strict procedures in place to insure that it only reported complete public records.  *See, e.g.*, Exhibit "12" Arizona Supreme Court, Administrative Office of the Courts Data Dissemination Agreement, ¶ 5(c.), Bates No. CL-H10000.  ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████  In every discovered instance the court source warned Defendant that the public records provided were incomplete.  *See, e.g.*, Exhibit "12"

Arizona Supreme Court, Administrative Office of the Courts Data Dissemination Agreement, ¶7(d), Bates No. CL-H10001-10002; Exhibit "13", Indiana Supreme Court Division of State Court Administration User Agreement, at ¶8, Bates Nos. CL-H10056-10068; Exhibit "14", at §V, CL-H10069-10077.   In every instance, the court source also fully disclaims NBD's contrived illusion of completeness. Exhibit "15", Superior Court of New Jersey Electronic Access Program Subscriber Agreement, at p.4, Bates Nos. CL-H10078-10084; Exhibit "16", Oregon Department of Corrections Access Agreement, at ¶ 8.1, Bates Nos. CL-H10085-10089; Exhibit "17", West Virginia Circuit Express Service Agreement, Bates Nos. CL-H10100-10102; Exhibit "18", Cook County Illinois Data Dissemination Agreement, Bates Nos. CL-H10043-10044.

The items of public record information NBD furnishes in its reports uniformly omit information regarding the social security number. Exhibit "8", Declaration of Thomas Burtner, at ¶5.  Even if both the public court source and the private SafeRent source provide this field in the public record sold in the report to NBD, the Defendant omits *the field* entirely from the public record information in its "COPS" reports it furnishes to its customers.  The simple fact is that the NBD consumer reports do not even include a field for this necessary item in the public records included in a report.

At the very least, if this information is not available to NBD, Defendant could so advise the user and end-user of this fact.  While NBD does do this for some less critical and rarely used fields (e.g. "Hair Color", "Eye Color", "Height" and "Weight")[10], it has no comparable field for SSN for the individual public records furnished in its primary "COPS" report.  *Id.*[11] NBD characterizes these incomplete report fields as its "easy-to-read format" designed to save its customers' staff "time from interpreting cryptic criminal background reports."  Exhibit "19", Criminal Offender Profile Summary marketing material, Bates No. CL-H2751.

---

[10] See e.g. Exhibit "20", Hines' NBD Consumer Report output, Bates Nos. 2721-2739.
[11] The SSN field contained in the COPS report is solely within the "Report Inputs" that are used to start a search for a consumer.  There is not such a field for the actual public records furnished from the search.The last page of the document was generated by NBD internally using the "COPS Plus" product, with the "Plus" being the inclusion of NBD's "AIM" address locator product.  ADP did not purchase that product, but it also would not reveal a SSN field or value for any of the criminal public record items.

This omission is huge.  There is no single identifier that is more important in narrowing and matching a search to a specific consumer.  Defendant acknowledges this fact—that omission of SSN makes a correct match less likely.  And while NBD claims to warn its user-customers to be careful to confirm the match of the furnished criminal public records to the consumer, it does not reveal to the reseller-user (a.) whether there was a SSN associated with the public record, and if so (b.) the SSN the source made available for that record.  Certainly a NBD business model that claims its dependence upon the later discretion of its reseller-user in sorting through NBD information for its accuracy and completeness must arm its customer with this basic knowledge.  There is a great difference between NBD's silent omission of the field and an alternative explanation that, "This specific item of public record information was not reported with a SSN" or "This item of public record information was reported with only the following last four digits of a SSN."

There is simply no way that a public record item can be "complete" without the inclusion of the social security number.  Though the FCRA does not define the word "complete", it should hardly have to given its plain meaning.  The Court should, "construe the term in accord with its ordinary or natural meaning. *Chapman v. United States,* 500 U.S. 453, 461–62, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). Webster's Dictionary defines the term 'complete,' as 'having all necessary parts.' Webster's Collegiate Dictionary 235 (10th ed.1998)."  *Poore v. Sterling Testing Sys., Inc.*, 410 F. Supp. 2d 557, 572 (E.D. Ky. 2006).[12]

The problem is, that NBD does not obtain and use the complete public record (including its related social security number) until a consumer makes a dispute.  Thereafter, it obtains the SSN manually from the respective court and implements NBD's "Social Exclusion" procedure.  Exhibit "21", *Social Exclusion on a NBD Criminal Case*, Bates No. CL-H483-486.  This is what happened with Mr. Henderson's inaccurate public records.  After Henderson disputed, NBD manually obtained the

---

[12] Complete: "having all necessary parts: not lacking anything", http://www.merriamwebster.com/dictionary /complete (last visited December 18, 2013); "having all the necessary or appropriate parts. http://www.oxforddictionaries.com/us/definition/american_english/complete (last visited December 18, 2013).

complete public record from Pennsylvania, and noted in his file, "Documentation from Westmoreland County PA Police and Clerk of the Court offices show a SSN number which does not match that provided by the consumer. Sent to Consumer Relations to have the NBD SSN Exclusion invoked on CR-0000027-07, CP-65-CR-0000541-2007, 766CR8901245F, and CP65-CR-0004581-2004."  Exhibit "22", Consumer Relations Remarks, Bates No. CL-H2521.  See also Exhibit "23", Internal Henderson Report Showing Manual Corrections, Bates No. CL-H2569-2577.  NBD is also able to manually obtain SSN's from other courts, such as the Virginia courts reported for Mr. Hines.[13]  Exhibit "24", Consumer Relations Remarks, Bates No. 2673; Exhibit "25", Bates No. CL-H2711-2712.

None of these structural limitations are fatal to NBD's business model.  All it would have had to do is provide the notice mandated at § 1681k(a)(1).  This is the option designed by the legislature for circumstances like NBD's where it cannot or does not manually review public records – where it can only obtain incomplete public records. What is worse is the fact that NBD has long known this.   NBD understood its exposure and legal obligations in 2007.  When it began its sale of these incomplete public record reports, it had a compliant 15 U.S.C. §1681k(a)(1) notice letter.  Exhibit "26", September 21, 2007 NBD § 1681k(a)(1) Form Letter, CL-H2746.  Even now, NBD boasts that it makes "available by electronic link to its customers, including Verifications and ADP, a draft form of notice under 15 U.S.C. § 168lk(a)(l) that those employment background screening customers could then use to prepare a notice to a consumer at the time that a consumer report containing potentially adverse information was supplied by the customer to a user."  Exhibit "4", NBD Responses to Plaintiffs' First Set of Interrogatories, No.3.

NBD's contract with ADP provides the truthful background to the present litigation.  Defendant's admissions in the document belie many of the positions now contrived to oppose this case.  In the real world, NBD never claims that it has "strict procedures" in place *a priori* or otherwise to assure that its furnished criminal records are complete.  First, SafeRent, NBD's related source expressly disclaims the

---

[13] Amazingly, even with its manual search providing a SSN from the Gloucester General District Court, NBD could not get its reporting correct.  Id.

existence of any such completeness or accuracy process or procedure in the reports. Exhibit "3",

NBD/SafeRent Reseller Services Agreement, at ¶15, Bates No. CL-H568-581. NBD's contracts with

Verifications, ADP and other reseller users also include this "no assurance of completeness" term and

language. Exhibit "27", NBD/Verifications Affiliate Services Agreement, Bates No. CL-H2887-2893

("Reseller acknowledges and agrees that (i) Reseller and its End-Users will use the Data Services at

their own risk and peril [and] information obtained from public records such as criminal and eviction

date is often incomplete, untimely, inaccurate and subject to producing false positives[.] … Reseller

acknowledges that consumer information is secured by and through fallible sources, both human and

otherwise, and that for the fee charged, NBD and/or its Affiliates cannot guaranty the accuracy or

completeness of the Consumer information furnished."); Exhibit "5", NBD-ADP Reseller Services

Agreement, at ¶15, Bates No. CL-H293-294 (similar disclaimers). See also Exhibit "28", NBD Form

Reseller Service Agreement, at ¶7, Bates Nos. CL-H2775-2778. (similar disclaimers).

NBD even goes further in its real world acknowledgment of § 1681k(a)(1)'s applicability. It

contractually demands of its reseller customer's compliance with the section it on its own choses to

ignore. For example, its contracts with ADP and Verifications provides in relevant part:

> **c. FCRA § 613.[14] Complying with the requirements of FCRA § 613 when Public Record information is provided to End-Users for employment purposes.** If Affiliate provides potential adverse information obtained from The National Background Directory to an End-User, the Affiliate will notify the Consumer of the fact that the Public Record information is being reported by the Affiliate (as a CRA), together with the name and address of the person to whom such information is being reported, as required by FCRA § 613(a)(l).

Exhibit "5", NBD-ADP Affiliate Services Agreement, at ¶11(c), Bates No. CL-H290 (titled

"Compliance with Law", and subtitled, "FCRA § 613"); Exhibit "27", NBD/Verifications Affiliate

Services Agreement, at ¶11(c), Bates No. CL-H2887-2893 (same).

Similarly, in addressing a comparable California statute's requirements that are nearly identical to

those in § 1681k(a), the NBD/ADP contract states:

---

[14] Section 613 is the Section of the Act itself, while § 1681k is its United States Code codification.

Reseller further certifies that it will advise all End-Users of the Data Services … (ii) that for employment purposes, Reseller must disclose to the Consumer before requesting a consumer report that a consumer report regarding the Consumer has been requested and offer to the Consumer a free copy of the report. **Reseller hereby acknowledges that reports provided under this Agreement, except for county criminal searches, do not comply with California Civil Code§ 1785.18, as the same may be amended from time to time, for use in employment screening**.[15]

Exhibit "5", NBD-ADP Reseller Services Agreement, Bates No. CL-H290-291 (emphasis added).  The language of the cited California provision tracks almost exactly the text of §1681k(a)(2) such that NBD's contract plainly means as well that, "**Reseller hereby acknowledges that reports provided under this Agreement, do not comply with [FCRA § 1681k(a)(2)] for use in employment screening**."[16]

### III.   THE PROPOSED AMENDED CLASS DEFINITION

Plaintiffs' Amended Complaint suggested three class definitions: a broad national class, and two sub-classes limited to reports sold to Verifications and to ADP.  Docket No. 30, at ¶¶65-67.  Discovery has revealed that the national class would contain as many as 10,000,000 consumers.  It would also – correctly or not – expose the class to various defense challenges based upon differences between resellers.  Accordingly, Plaintiffs now seek certification only upon a narrowed class definition, or alternately three classes[17] as follows:

All natural persons residing in the United States (a) who were the subject of a report sold by NBD to Verifications, ADP or HR Plus, (b) where NBD's Results Returned database indicates that it was furnished for an employment purpose (Code 6), (c) where NBD's Results Returned database showed that the report contained at least one adverse criminal record "Hit", (d) within five years next preceding the filing of this action and during its pendency.

Excluded from the class definition are any employees, officers, directors of Defendants, any attorney appearing in this case, and any judge assigned to hear this action.

---

[15] The "county searches" are a different NBD product that is not the subject of this litigation.  All of the reports sold in this case were database reports – NBD's "COPS" product.

[16] The two statute sections are presented side by side as Exhibit "29".

[17] If the Court determines that a Class may be certified as to ADP, Verification or HR Plus, but not one or the other two of these, it may amend the class definition accordingly.

Beyond the proposal suggested by the Plaintiffs herein, the Court retains its discretion to adapt or modify the class definition to resolve typicality, predominance or other defense concerns it concludes have merit. Fed. R. Civ. P. 23(c)(1)(C) gives District Courts broad discretion to modify the class definition until there is a decision on the merits. *See* 2 H. Newberg and A. Conte, *Newberg on Class Actions* § 6.14 (4th ed. 2006) ("broad discretion [under Rule 23] to modify the definition of the class even after certification.")

## ARGUMENT

### IV.    PLAINTIFFS' CLAIM SATISFIES EACH OF THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(a) and RULE 23b(3).

Federal courts have long regarded "consumer claims" as "particularly appropriate for class resolution." *see* Amchem Prods. v. Windsor, 521 U.S. 591, 625 (1997); In re Mexican Money Transfer Litig., 267 F.3d 743, 747 (7th Cir. 2001); Cavin v. Home Loan Ctr., Inc., 236 F.R.D. 387, 395-96 (N.D. Ill. 2006) ("[c]onsumer claims are among the most commonly certified for class treatment").  As set forth below, there is no basis for regarding this case any differently.

### A.    The Class Satisfies Rule 23(a).

### 1.    The Class is Sufficiently Numerous to make Joinder Impracticable.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Talbott v. GC Servs., Ltd. Pshp., 191 F.R.D. 99, 102 (W.D.Va. 2000). Where the class numbers 25 or more, joinder is usually impracticable.  Cypress v. Newport News General & Nonsectarian Hosp. Assn, 375 F.2d 648, 653 (4th Cir. 1967).  In this case, the proposed class is more than sufficiently numerous to make joinder impossible. All three proposed reseller groups have at least thousands of class members.

### 2.    An Ascertainable and Identifiable Class Exists.

"Though not specified in the Rule, establishment of a class action implicitly requires both that there be an identifiable class and that the plaintiff or plaintiffs be a member of such class. 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 1760, pp. 115 *et seq.* (2d ed. 1986)."

19

In re A.H. Robins Co., Inc., 880 F.2d 709, 728 (4th Cir. 1989) *abrogated on other grounds by* Amchem

Products, Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).  This necessity is

sometimes referred to as ascertainability – the requirement that the class description be "sufficiently

definite so that it is administratively feasible for the court to determine whether a particular individual is

a member."  FPP § 1760, 7A Fed. Prac. & Proc. Civ. § 1760 (3d ed.).

 The ascertainability requirement is at this early stage only a theoretical burden.  "[T]he class

does not have to be so ascertainable that every potential member can be identified at the commencement

of the action. … If the general outlines of the membership of the class are determinable at the outset of

the litigation, a class will be deemed to exist." FPP § 1760, 7A Fed. Prac. & Proc. Civ. § 1760 (3d ed.).

In fact, "Where the plaintiff has demonstrated that the class of persons he or she wishes to represent

exists, that they are not specifically identifiable supports rather than bars the bringing of a class action,

because joinder is impracticable."  Doe v. Charleston Area Med. Ctr., Inc., 529 F.2d 638, 645 (4th Cir.

1975) (citing cases under both Rule 23(b)(2) and 23(b)(3)).  A class like this one is ascertainable

because it is "defined by the activities of the defendant[.]"  Alliance to End Repression v. Rochford, 565

F.2d 975, 978 (7th Cir. 1977); see also Lewis v. Tully, 96 F.R.D. 370, 376 (N.D. Ill. 1982) *on

reconsideration,* 99 F.R.D. 632 (N.D. Ill. 1983) ("a class that is defined by the contested practices of the

defendant is sufficiently ascertainable.").  Membership is determined by whether or not NBD furnished

a specific derogatory criminal records report for an employment purpose regarding that consumer.

 NBD has primarily resisted an ascertainability stipulation on the grounds that it believes Plaintiffs

could not use its database to identify all such persons.  The Court has already properly dispensed with

these opposition claims:

> The degree of precision that Equifax attempts to place on Soutter in ascertaining class
> members simply is not required in order to certify a class. A "class does not have to be
> so ascertainable that every potential member can be identified at the commencement of
> the action," because " '[t]o place such a burden on plaintiffs would seem harsh and
> unnecessary [and] make the maintenance of class actions ... very difficult, if not
> impossible....' " Wright, Miller & Kane, *supra*, § 1760 (quoting *Fischer v. Kletz,* 41
> F.R.D. 377, 384 (S.D.N.Y.1966)). Soutter's proposed class definition sets forth objective
> parameters with which a class can be ascertained and identified: either an individual has
> had a Virginia judgment, or not; either an individual has had that judgment modified,

satisfied, vacated, appealed, dismissed or otherwise extinguished, or not; either NBD reported the judgment, or it did not; and either NBD reported the update to the judgment, or it did not.

Soutter v. Equifax Info. Services, LLC, 2011 WL 1226025 (E.D. Va. Mar. 30, 2011) *rev'd and remanded on other basis,* 11-1564, 2012 WL 5992207 (4th Cir. 2012).

As detailed above, membership within the now narrowed class definitions is simple to both ascertain and identify.  Use of such digital search tools, accompanied by manual review, is a proper method of class identification. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532 (6th Cir. 2012); *see also In re Wal-Mart Stores, Inc. Wage and Hour Litig.* (N.D.Cal. Feb. 13, 2008) 2008 WL 413749 at *6, 7); 1 McLaughlin on Class Actions § 4:2 (9th ed.) *citing Dunnigan v. Metropolitan Life Ins. Co.*, 214 F.R.D. 125, 136 (S.D. N.Y. 2003) ("Several courts have clarified that the defendant may have to assist the plaintiff in ascertaining the identity of putative class members, and that administrative burden necessary to identify class members ordinarily does not constitute an inability to identify class members.").  Such a process is particularly well-suited to a database business like Defendant's, whose very purpose is to gather, distill, and report information.

NBD's attack on the accuracy of its own database and reports would be remarkable for another reason.  Defendant relies on that data every day for its consumer reporting, required by law to strive for "maximum possible accuracy."  15 U.S.C. § 1681e(b).  When a defendant treats records as accurate for its own business purposes, courts do not look favorably on arguments they are not accurate enough to define a class.  *See e.g. Herrera v. LCS Fin. Svcs Corp.*, 274 F.R.D. 666, (N.D. Cal. 2011) ("What was ascertainable to Ocwen in the course of adhering to its own policy is ascertainable for the purposes of identifying members of the class."). NBD cannot now reasonably claim that what is sufficiently reliable for the purpose of FCRA-compliant consumer reports is not sufficiently reliable for the purpose of identifying the class.

### B.     There Are Questions Of Law and Fact Common To The Class.

Rule 23(a)(2) requires that there be a common question of law or fact.  Commonality requires that there be at least one question of law or fact common to the members of the class.  Jeffreys v.

<u>Communications Workers</u>, 212 F.R.D. 320, 322 (E.D.Va. 2003); <u>Central Wesleyan College v. W.R.</u>

<u>Grace & Co.</u>, 143 F.R.D. 628, 636 (D.S.C. 1992), *aff'd* 6 F.3d 177 (4th Cir. 1993) (stating that

commonality "does not require that all, or even most, issues be common, nor that common issues

predominate, but only that common issues exist.")  More recently, the Fourth Circuit has restated the

standard for commonality, based upon the Supreme Court's clarification of the concept:

> Commonality is generally established when a Plaintiffs' claims have "questions of law
> or fact common to the class." Fed.R.Civ.P. 23(a)(2). As the Supreme Court recently
> clarified, in order to satisfy the commonality requirement, the plaintiff must
> "demonstrate that the class members 'have suffered the same injury,' " *Wal–Mart
> Stores, Inc., v. Dukes,* ——U.S. ——, ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374
> (2011) (quoting *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct.
> 2364, 72 L.Ed.2d 740 (1982)), and that the claim "depend[s] upon a common
> contention" that "is capable of classwide resolution—which means that determination of
> its truth or falsity will resolve an issue that is central to the validity of each one of the
> claims in one stroke," *id.*

<u>Gray v. Hearst Communications, Inc</u>., 444 F. App'x 698, 700-01 (4th Cir. 2011).

"Rule 23(a)(2) 'does not require that all, or even most issues be in common.' A single common

question will satisfy Rule 23(a)(2)'s commonality requirement." (Citations omitted.) <u>Adair v. EQT Prod.</u>

<u>Co.</u>, 1:10-CV-00037, 2013 WL 5429882 (W.D. Va. Sept. 5, 2013) *report and recommendation adopted*

*as modified sub nom. Hale v. CNX Gas Co., Inc.*, 1:10CV00059, 2013 WL 5429901 (W.D. Va. Sept. 30,

2013).  The commonality requirement requires that the classes present dispositive questions which will

propel the case through the system.  See <u>Stott v. Haworth</u>, 916 F.2d 134, 145 (4th Cir.1990); <u>Lienhart v.</u>

<u>Dryvit Systems, Inc.</u>, 255 F.3d 138, 146 (4th Cir. 2001).  The commonality requirement of Rule 23(a)(2)

is satisfied if "common questions [are] dispositive and overshadow other issues." <u>Id.</u>  "'Minor

differences in the underlying facts of individual class members cases do not defeat a showing of

commonality where there are common questions of law.'" <u>DiFelice v. U.S. Airways, Inc</u>., 235 F.R.D.

70, 78 (E.D. Va. 2006).

There are really very few material issues in the case that are not common.  As was forecast by

NBD's early Motion to Dismiss, and likely now in its Summary Judgment motion, the core questions in

the case are really legal questions that would be answered in common for all class members.  The truly

dispositive question in this case is:  *Does 15 U.S.C. § 1681k(a) apply to NBD?*  Defendant argues that it

does not; that NBD is a wholesaler CRA.  The second dispositive question is: *Was NBD's position that*

*it was not governed by 15 U.S.C. § 1681k(a) objectively unreasonable*; *was its violation of the FCRA*

*willful*?  Further, even damage remedies in this case present common questions.  *What is the proper*

*measure of statutory damages and punitive damages pursuant to 15 U.S.C. § 1681n*?

### C.    The Claims Of The Named Plaintiffs Are Typical Of Those Of All Other Class Members.

As the Fourth Circuit panel explained in <u>Soutter v. Equifax Info. Servs., LLC</u>:

"[[T]]he essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.' " <u>Deiter</u>, 436 F.3d at 466 (quoting <u>Broussard v. Meineke Discount Muffler Shops, Inc.</u>, 155 F.3d 331, 340 (4th Cir.1998)). While Soutter's claim need not be "perfectly identical" to the claims of the class she seeks to represent, typicality is lacking where "the variation in claims strikes at the heart of the respective causes of action." <u>Id</u>. at 467.
To determine if Soutter has shown typicality, we compare her claims and Equifax's defenses to her claims with those of purported class members by reviewing the elements of Soutter's prima facie case and the fact supporting those elements and examining "the extent" to which those facts "would also prove the claims of the absent class members." <u>Id</u>.

498 F. App'x 260, 264 (4th Cir. 2012).  Typicality is not Defendant's issue in this case.  The claims of

Henderson, Hines and each member of the three proposed classes are almost fully typical.

Unlike in <u>Soutter</u>, Defendant concedes the temporal uniformity of its conduct, acknowledging in

response to Plaintiffs' contention Interrogatory.  Plaintiffs asked:

21. If you contend that the Defendants' procedures have varied in any material manner over time or by any other classification such that the Plaintiffs' facts would not be typical of the facts as to a group of other class members, state in detail the time period(s) during which such procedure(s) varied or other classification, how they varied and why this variance was material, and identify all documents that describe same.[18]

In relevant part, and without later supplementation, NBD answered:

Defendants have not yet identified that their procedures for acquiring and inputting data have varied over time in a manner such that the variation, standing alone, would result in Plaintiffs' facts not being typical of the facts of the other class members under Counts I or II, but this contention is subject to a further understanding of Plaintiffs' contentions and an investigation of the facts, as applied to more than 300 sources of information over

---

[18] Exhibit "30", Defendant's Responses to Plaintiffs' First Set of Interrogatories, No. 21.

> a six-year period. Defendants reserve their rights to supplement their response in this regard as discovery continues in this action.

Id. And of course NBD did not later supplement this response to suggest any material differences or variance in its procedures because there are none. The contracts NBD produced with Verifications and ADP and its form agreements have not materially changed during the class period. It has continued to receive its data directly from SafeRent, which has continued to receive it from the same court sources from the beginning of the class period to the end of it.

But most importantly, unlike in Soutter, the elements of the Plaintiffs' claims under 15 U.S.C. § 1681k(a)(1) do not lend themselves to material differences between class members. The core question as to commonality also spotlights the typicality case – is NBD governed by the FCRA generally, and by 15 U.S.C. § 1681k(a) specifically. The individual variances that could exist between members of a broader class simply do not exist in the class to which Plaintiffs have narrowed the case. There are only three sets of reports furnished by NBD that matter now – those furnished to ADP, Verifications and HR Plus. And of these, only the "COPS" reports sold with a "06" (pre-employment screening) purpose are at issue. And narrowed further, only those containing a derogatory criminal record that was reported by NBD without its social security number are at issue. All of this administratively determinable sorting leaves the case boiled down to the few threshold elements detailed within the commonality discussion. Nearly all of Defendant's merits defense will come down to the single question of whether or not it was legally required to provide a notice to class members when it furnished an employment purpose consumer report containing its adverse criminal records.

### D.    Henderson and Hines Adequately Represent Each Class.

The final component of Rule 23(a) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This prerequisite is met when: "(1) the named plaintiff[s] [have] interests common with, and not antagonistic to, the Class' interests; and (2) the plaintiff[s'] attorney is qualified, experienced and generally able to conduct the litigation." In

24

re Southeast Hotel Properties Ltd. Pushup Investor Legit., 151 F.R.D. 597, 607 (W.D.N.C.1993);

Wiseman v. First Citizens Bank & Trust Co., 212 F.R.D. 482, 489 (W.D.N.C. 2003).

"The burden is on the defendant[] to demonstrate that the representation will be inadequate."

Johns v. Rozet, 141 F.R.D. 211, 217 (D.D.C. 1992); see also In re Southeast Hotel Properties Ltd. P'ship

Investor Litig., supra at 607; Lewis v. Curtis, 671 F.2d 779, 788 (3rd Cir. 1982); Trautz v. Weisman,

846 F. Supp. 1160, 1167 (S.D.N.Y. 1994). NBD cannot possibly satisfy that burden since both

components of the "adequacy'" test are plainly met here.

Plaintiffs do not have any interests antagonistic to those of the proposed classes and are prepared

to pursue this litigation vigorously to redress the wrongs alleged. Both the named Plaintiffs and the

proposed classes share identical interests in establishing Defendant's liability.  To establish liability, all

members of the proposed class seek the same findings on the common questions of law and fact.  No

apparent or even imagined antagonism exists between the named Plaintiff and the members of the

putative class.

Plaintiffs' counsel are amongst the most experienced FCRA and consumer class action attorneys

in the nation and have been approved as Class counsel in multiple cases before this Court.  Soutter v.

NBD Info. Services, LLC, 3:10CV107, 2011 WL 1226025 (E.D. Va. Mar. 30, 2011) rev'd and

remanded on other basis, 11-1564, 2012 WL 5992207 *10 (4th Cir. Dec. 3, 2012). Exhibit "31",

Declaration of Leonard Bennett.

## V.     PLAINTIFFS' CLAIM SATISFIES THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(b)(3).

Under Fed. R. Civ. P. 23(b)(3), an action that satisfies the threshold prerequisites for

certification may be maintained as a class action if the court finds that: (1) "the questions of law or fact

common to the members of the class predominate over any questions affecting only individual

members"; and (2) "a class action is superior to other available methods for the fair and efficient

adjudication of the controversy."  Plaintiffs' claim satisfies those requirements.

**A.      Common Questions Of Law Or Fact Predominate Over Individual Ones.**

Rule 23(b)(3)'s predominance inquiry does not require Plaintiff to "show that the legal and factual issues raised by the claims of each class member are identical." In re Napster, 2005 U.S. Dist. LEXIS 11498, at *28.  Rather, the focus of that inquiry is on whether the proposed classes are "sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623.  Thus, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." Hanlon, 150 F.3d at 1022.  "This standard is met . . . where there exists generalized evidence that proves or disproves an element of the class member's claim on a simultaneous, class-wide basis." White, 2002 U.S. Dist. LEXIS 26610, at *58.

Rule 23(b)(3) requires that the questions of law or fact common to all members of the class predominate over questions pertaining to individual members.  Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 142 (4th Cir.2001); Simmons v. Poe, 47 F.3d 1370, 1380 (4th Cir. 1995). The predominance requirement tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.  Gariety v. Grant Thornton, LLP, 368 F.3d 356, 362(4th Cir. 2004)(citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623_24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)); Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 142 (4th Cir.2001). This criterion is normally satisfied when there is an essential common factual link between all class members and the defendants for which the law provides a remedy.  Talbott v. GC Servs., Ltd. Pshp., supra, 191 F.R.D. at 105 citing Halverson v. Convenient FoodMart, Inc., 69 F.R.D. 331 (N.D. Ill. 1974).

The uniformity of NBD's database is remarkable in that it is actually less manual and less individualized than that of LexisNexis considered by the Court and the Fourth Circuit on appeal in Williams v. LexisNexis Risk Mgmt. Inc., CIV A 306CV241, 2007 WL 2439463 (E.D. Va. Aug. 23, 2007).[19]  For example, "LexisNexis adopted a standard procedure not to send notices simultaneously

---

[19] Farmer provides an effective "predominance" contrast between a database case such as Williams (and thus one) and one in which a frontline reporting agency conducts in person manual record review.   For example, unlike in this case or

with the access it gave to Plaintiffs' employers."  Id.  The evidence in the case showed that these letters were sent with varied degrees of delay.  In contrast, in this case, NBD never sends its § 1681k(a) notices.  There is no individualized question.  Further, as the Court found in <u>Williams</u>, the Plaintiffs' §1681k(a)(1) claim, " is entirely independent of the accuracy of the report."  <u>Id</u>.  Even if the Court were to reconsider its rulings in <u>Williams</u> and denying NBD's Motion to Dismiss in this case, and permit consideration of whether the §1681k(a)(2) "strict procedures" could apply, there still would not be a single individualized issue.  As explained *supra*, NBD's criminal records for class member reports are never complete.  They do not ever contain the necessary identifiers, particularly the SSN.  Further, as will likely be addressed more fully opposing summary judgment, the question of whether a CRA follows §1681k "strict procedures" is not an idiosyncratic case-by-case inquiry.  Unlike FCRA §1681e(b), which is report by report determined ("Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure …"), §1681k(a)(2) considers whether the CRA "maintained"[20] procedures that were "designed"[21] to be "strict"[22] enough "to insure that whenever[23] public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date."  Every material term suggests two things:  (a.) it is determined as an objective, established threshold, and (b.) there is no margin for error.  The procedures must be designed to prevent the furnishing of any incomplete public record.  The question of course is not whether the procedures actually work – whether they breakdown in a way that ends up allowing such incomplete record to be furnished.  Instead, the question is, were the challenged procedures designed to prevent such incompleteness.   Given the documents and evidence detailed

---

<u>Williams</u>, "[Phillips] has a small network of private researchers, usually located within a specific state or jurisdiction, to obtain state-specific records. The private researchers will typically go directly to county courthouses to retrieve physical copies of certain public records, such as criminal convictions. Additionally, defendant's staff will sometimes perform research themselves, such as calling a state department of motor vehicles to obtain information about a consumer's driving history."  <u>Farmer v. Phillips Agency, Inc</u>., 285 F.R.D. 688, 693 (N.D. Ga. 2012).

[20] To "maintain" is "to keep in an existing state."  http://www.merriam-webster.com/dictionary/maintain last viewed January 2, 1014.

[21] To "design" is to create, fashion, execute, or construct according to plan; to conceive and plan out in the mind; to have as a purpose."  http://www.merriam-webster.com/dictionary/design last viewed January 2, 1014.

[22] "Strict" most appropriately means "inflexibly maintained or adhered to." http://www.merriam-webster.com/dictionary/strict last viewed January 2, 1014.

[23] "Whenever" at any or every time that

above, NBD cannot credibly claim that it maintained any procedures that it had designed to do what its

contracts and disclaimers shout they were not designed to so – insure completeness.

Damages questions also will not predominate the overwhelming common issues.  Class

members would not be required to prove causation or actual damages in order to obtain statutory

damagesAs the Fourth Circuit explained in reversing denial of certification in a FCRA case:

> Where, as here, the qualitatively overarching issue by far is the liability issue of the
> defendant's willfulness, and the purported class members were exposed to the same risk
> of harm every time the defendant violated the statute in the identical manner, the
> individual statutory damages issues are insufficient to defeat class certification under
> Rule 23(b)(3).

Stillmock v. Weis Markets, Inc., 09-1632, 2010 WL 2621041 (4th Cir. 2010).

Even the amount of recovered statutory damages between $100 and $1,000 and the amount of

awarded punitive damages will simply depend on the number of violations suffered by each respective

consumer.  Id. at *6.  This is a simple determination – each consumer report that the Defendant

furnished during the period in which failed to comply with 15 U.S.C. § 1681k(a)(1).

**B.**     **The Class Action Device Is Superior To Other Available Methods For Adjudicating These Controversies.**

Finally, the Court must determine whether a class action be superior to other methods for the fair

and efficient adjudication of the controversy under Fed. R. Civ. P. 23(b)(3).  Lienhart v. Dryvit Systems,

Inc., 255 F.3d 138, 142 (4th Cir.2001); In re A.H. Robins Co., Inc., 880 F.2d 709, 713 (4th Cir. 1989).

The factors to be considered in determining the superiority for the class mechanism are: (1) the interest

in controlling individual prosecutions; (2) the existence of other related litigation; (3) the desirability of

concentrating the litigation in the forum; and (4) manageability.  Hewlett v. Premier Salons Int'l, Inc.,

185 F.R.D. 211, 220 (D.Md.1997); Newsome v. Up_To_Date Laundry, Inc.,  219 F.R.D. 356, 365

(D.Md. 2004).

Efficiency is the primary focus in determining whether the class action is the superior method

for resolving the controversy presented.  Talbott, 191 F.R.D. at 106 citing Eovaldi v. First Nat'l Bank,

57 F.R.D. 545 (N.D. Ill. 1972).   In examining these factors, it is proper for a court to consider the

"...inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." Citifinancial v. Logan Furniture Mart, Inc., 503 F.2d 1161, 1164 (7th Cir. 1974). As the Court explained in finding class treatment superior in Williams, "The proposed classes involve at least hundreds, perhaps thousands, of proposed class members pursuing identical, fairly small claims for relief, who, if required to proceed individually, probably would not assert their claims. The class action device therefore appears to be a superior means of resolving their disputes." Williams v. LexisNexis Risk Mgmt. Inc., CIV A 306CV241, 2007 WL 2439463 (E.D. Va. Aug. 23, 2007) (citation omitted).

Class litigation is not only the most efficient means of adjudicating these disputes; it is the only means. Separately litigating the common issues that bind the two classes, whether in hundreds or hundreds of thousands of individual lawsuits would be a practical impossibility—even assuming it were economically feasible for consumers to pursue these claims on their own. Furthermore, even if just a small fraction of the classes were to bring individual suits, the adjudication of common issues in a single proceeding would be infinitely more efficient than would be the separate adjudication of thousands of individual claims.[24]

The reality, however, is that the alternative to class treatment in these cases is not hundreds of thousands, or even hundreds, of individual actions. "As courts have repeatedly recognized, the statutory damages available under the FCRA are 'too slight to support individual suits.' " E-Loan, 2006 U.S. Dist. LEXIS 62654, at *28; see also In re Farmers, 2006 U.S. Dist. LEXIS 27290, at *44; White, 2002 U.S. Dist. LEXIS 26610, at *52; Braxton, 209 F.R.D. at 662. Moreover, even if that were not the case, the large majority of class members would never think to bring individual claims because they are unaware their rights have been violated—having little lay knowledge of the complex blanket of FCRA protections. See, e.g., Bonner, 2006 U.S. Dist. LEXIS 54418, at *22 ("[M]any of the persons in these

---

[24] See, e.g., White v. E-Loan, 2006 U.S. Dist. LEXIS 62654, at *28 (N.D. Cal. Aug. 18, 2006) ("given that thousands of consumers may have suffered identical injury, a class action is certainly the most efficient way to adjudicate disputes over those consumers' rights"); Cavin, 236 F.R.D. at 396; Bonner, 2006 U.S. Dist. LEXIS 54418, at *21; White, 2002 U.S. Dist. LEXIS 26610, at *53 ("the piecemeal approach is rife with shortcomings, not the least of which is the possibility of inconsistent adjudications with regard to an identical course of conduct").

classes may be unaware that the form letter sent by Defendants may violate the FCRA, and a class action suit may help to safeguard their rights."); White, 2002 U.S. Dist. LEXIS 26610, at *58 ("Because . . . individual putative class members may not be aware of the violation of their [FCRA] rights, it appears improbable that the putative class members would possess the initiative to litigate their claims individually.").  This is especially true with regard to NBD, which hides itself as the wholesale source of the reports sold through other reseller brands and businesses.  In fact, despite the huge volume of reports actually sold by NBD – literally millions - during the class period from 2007 into 2013, only One Hundred (100) consumers have ever found their way to NBD to request a copy of their consumer file. Exhibit "32", Defendant's Responses to Plaintiffs' First Set of Interrogatories, No. 24.  With nearly all of the class members ignorant even of NBD's dominant role in the background check function, and little common knowledge as to the substantive requirements of the FCRA, it is likely that only Henderson and Hines will recover if a class is not certified.

As Judge Easterbrook noted in Murray v. GMAC Mortgage, "Rule 23(b)(3) was designed for situations such as [those involving FCRA statutory damage claims for impermissible use], in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate." 434 F.3d at 953; see also Bonner, 2006 U.S. Dist. LEXIS 54418, at *21-22.  In short, absent class action treatment, "there is unlikely to be any meaningful enforcement of the FCRA by consumers whose rights have been violated[.]"  E-Loan, 2006 U.S. Dist. LEXIS 62654, at *28.  There simply is no other practical means for this Class to challenge a practice that stands in clear violation of federal law.  "The desirability of providing recourse for the injured consumer who would otherwise be financially incapable of bringing suit and the deterrent value of class litigation clearly render the class action a viable and important mechanism in challenging fraud on the public."  6 H. Newberg and A. Conte, Newberg on Class Actions § 21:30 (4th ed. 2003).

## VI.    CONCLUSION

The proposed class meets the requirements of Rule 23(a) as well as Rule 23(b)(3).  On this basis, the Plaintiffs respectfully move that the Court grant their Motion for Class Certification.

Respectfully submitted,

**TYRONE HENDERSON, et al.**
*on behalf of themselves and others*
*similarly situated*

_____/s/_____
Leonard A. Bennett, Esq.
VSB #37523
Attorney for Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
lenbennett@cox.net


**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of January 2014, I will file the foregoing pleading electronically using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

David Neal Anthony
Troutman Sanders LLP
Troutman Sanders Bldg
1001 Haxall Point
Richmond, VA 23219
Email: david.anthony@troutmansanders.com

Timothy James St. George
Troutman Sanders LLP
Troutman Sanders Bldg
1001 Haxall Point
Richmond, VA 23219
Email: tim.stgeorge@troutmansanders.com

*Counsel for Defendants*

_____/s/_____
Leonard A. Bennett, Esq.
VSB #37523
Attorney for Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.

31

763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
lenbennett@cox.net