**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**TYRONE HENDERSON,** *et al.*

    **Plaintiffs,**

**v.**                                                    **Civil Action No. 3:12cv97 (REP)**

**CORELOGIC NATIONAL**
**BACKGROUND DATA, LLC**

    **Defendant.**

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Alan D. Wingfield (VSB No. 27489)
David N. Anthony (VSB No. 31696)
Timothy J. St. George (VSB No. 77349)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1200
Facsimile: (804) 698-1339
alan.wingfield@troutmansanders.com
david.anthony@troutmansanders.com
tim.stgeorge@troutmansanders.com

*Counsel for Defendant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

FACTS.....................................................................................................................4

    I.      NBD's customers obtain data for a wide variety of purposes. ...............4

    II.     NBD wholesales verbatim government criminal records.......................5

    III.    The government criminal records NBD wholesales are consistently non-uniform. ..............................................................................................6

    IV.    NBD's customers do not identify the specific consumers of interest, a specific purpose of an inquiry, or how the data will be used. ...............6

    V.      NBD provides SSNs associated with criminal records whenever available. .........8

    VI.    Expert analysis concludes class members can be identified only through an extensive case-by-case analysis, if even possible at all.........................9

    VII.   Classwide liability would bankrupt NBD.............................................10

LEGAL STANDARDS ..........................................................................................10

    I.      Class certification requires a "rigorous analysis.".............................10

    II.     A class definition must track the elements of the claim. .....................11

ARGUMENT .......................................................................................................12

    I.      Plaintiffs' class definition is facially overbroad because it does not reflect the many required elements of a properly-pled claim under § 1681k(a)..............12

        A.     Plaintiffs failed to limit their class definition to situations where a SSN was actually available in the "public record.".................................14

        B.     Plaintiffs failed to limit their class definition to individuals who were seeking to "obtain employment," as opposed to other "employment purposes." ........................................................................15

        C.     Plaintiffs define the class based on the return of any criminal record, failing to limit the class to records that are "likely" to adversely affect a consumer's ability to obtain initial employment with a company......................................................................................17

# TABLE OF CONTENTS
(continued)

Page

D. Plaintiffs failed to limit their class definition to results returned to a "user." .................................................................................................18

II. A properly-defined Count I class is not ascertainable. ...........................................19

A. Whether a SSN was part of the "public record" requires a file-by-file review. ..............................................................................................20

B. Whether NBD's customer reported records as to a consumer seeking to "obtain employment" would require file-by-file review. .........22

C. Whether the results returned by NBD were "likely adverse" to a consumer's ability to obtain employment cannot be determined in a systematic way. ..............................................................................................23

1. The fact that NBD's customers frequently use NBD's data as an initial, investigatory tool precludes class certification. .......23

2. Variations in use of records in evaluating applicants prevents certification. ................................................................24

a. State law varies as to whether and how a criminal record can be considered. ...................................................24

b. Employer adjudication criteria vary widely across industries and positions, including as advised under federal law. ......................................................................25

c. The variety of data in public records prevents an objective, formulaic assessment of whether an offense is "likely" to adversely affect an individual's ability to obtain employment. ......................27

i. Varying and non-specific descriptions of offenses permeate the data. .................................27

ii. Varying severity in offenses precludes a systematic assessment of the "likely" adversity of any criminal record returned by NBD. .................................................................29

iii. Variations in disposition information prevent a classwide assessment of the "likely" adversity of a criminal record returned by NBD. .................................................30

# TABLE OF CONTENTS
(continued)

Page

       d.     Plaintiffs' experiences exemplify the wide variation in data in the Multistate Database and in employer adjudication criteria. .......................................................30

    D.     Whether NBD's customers, including ADP, HR Plus, and Verifications, "used" the data returned is not subject to a systematic determination. ........................................32

    E.     NBD's expert concludes that a properly-defined class is not ascertainable. ...............................................32

III.    A Count I class fails for lack of typicality, commonality and predominance..........................................................34

    A.     With Plaintiffs' theory of SSN suppression debunked, whether a given record is "complete and up to date" gives rise to insurmountable individual issues incapable of generating common answers. ....................................35

    B.     If a genuine dispute of material fact exists on the issue, whether NBD's procedures comply with § 1681k(a)(2) requires an individualized inquiry..............................38

    C.     The amount of statutory damages is an individual issue. .........................41

IV.    Plaintiffs are not typical of the proposed class members because there is no evidence that ADP, Verifications, or HR Plus "used" the records returned by NBD within the meaning of the FCRA.............................42

V.    Plaintiffs' attempt to discard claims for actual damages and to represent a class seeking only statutory and punitive damages renders them inadequate and atypical representatives. ............................................43

VI.    Adjudicating this matter as a class action unnecessarily threatens NBD with ██████████, which makes the class action device an inferior method of adjudication. ......................................44

    A.     NBD is threatened with ███████████ an indisputably novel claim. .........................................45

    B.     Plaintiffs have repeatedly proven that individual actions are viable.......46

VII.    Plaintiffs' five-year proposed class period is impermissibly broad. ...................47

**TABLE OF CONTENTS**
(continued)

**Page**

VIII.   Dismissal with prejudice is appropriate because amendment of the class definition to comport with the elements of § 1681k(a) would be futile. ..............49

CONCLUSION ....................................................................................................................49

CERTIFICATE OF SERVICE ...........................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Adair v. EQT Prod. Co.*,
  2013 U.S. Dist. LEXIS 142005 (W.D. Va. June 5, 2013)......................................... 11

*Ahmad v. Old Republic Nat'l Title Ins. Co.*,
  690 F.3d 698 (5th Cir. 2012) ................................................................................. 22

*Allison v. Citgo Petroleum Corp.*,
  151 F.3d 402 (5th Cir. 1998) ................................................................................. 47

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .............................................................................................. 12

*AT&T Mobility LLC v. Concepcion*,
  131 S. Ct. 1740 (2011) .......................................................................................... 46

*Bolin v. Sears, Roebuck & Co.*,
  231 F.3d 970 (5th Cir. 2000) ................................................................................. 12

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
  155 F.3d 331 (4th Cir. 1998) .......................................................................... 44, 48

*Campos v. ChoicePoint, Inc.*,
  237 F.R.D. 478 (N.D. Ga. 2006) ........................................................................... 41

*Colindreas v. QuietFlex*,
  235 F.R.D. 347 (S.D. Tex. 2006) .......................................................................... 44

*Comcast Corp. v. Behrend*,
  133 S.Ct. 1426 (2013) ........................................................................................... 42

*Coopers & Lybrand v. Livesay*,
  437 U.S. 463 (1978) .............................................................................................. 45

*Cruthird v. Boston Police Dep't*,
  2010 U.S. Dist. LEXIS 117390 (D. Mass. Nov. 3, 2010) ...................................... 20

*Dalton v. Capital Associated Indus.*,
  257 F.3d 409 (4th Cir. 2001) ................................................................................. 38

*Deiter v. Microsoft Corp.*,
  436 F.3d 461 (4th Cir. 2006) ................................................................................. 42

*Dekeyser v. Thyssenkrupp Waupaca, Inc.*,
  2012 U.S. Dist. LEXIS 158917 (E.D. Wis. Nov. 6, 2012)....................................................20

*Domonoske v. Bank of Am., N.A.*,
  2010 U.S. Dist. LEXIS 7242 (W.D. Va. Jan. 27, 2010)........................................................49

*Farmer v. Phillips Agency, Inc.*,
  285 F.R.D. 688 (N.D. Ga. Sept. 30, 2012) ....................................................................*passim*

*Fiscella v. Intelius, Inc.*,
  2010 U.S. Dist. LEXIS 57918 (E.D. Va. June 10, 2010) ........................................................6

*Gariety v. Grant Thornton, LLP*,
  368 F.3d 356 (4th Cir. 2004) ...............................................................................................11

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) ...........................................................................................10, 11, 42

*Gonzalez-Bencon v. Doral Bank*,
  759 F. Supp. 2d 229 (D.P.R. 2010) ....................................................................................18

*Gunnells v. Healthplan Servs.*,
  348 F.3d 417 (4th Cir. 2003) ...............................................................................................48

*Haro v. Shilo Inn, Bend LLC*,
  2009 U.S. Dist. LEXIS 65562 (D. Or. July 24, 2009).........................................................35

*Harper v. TransUnion, LLC*,
  2009 U.S. Dist. LEXIS 12760 (E.D. Pa. Dec. 20, 2006)................................................40, 46

*Holman v. Experian Information Solutions, Inc.*,
  2012 U.S. Dist. LEXIS 59401 (N.D. Cal. April 27, 2012)...................................................48

*Houston v. TRW Information Services, Inc.*,
  707 F. Supp. 689 (S.D.N.Y. 1989) ......................................................................................16

*In re Computer Scis. Corp. Secs. Litig.*,
  2012 U.S. Dist. LEXIS 181450 (E.D. Va. Dec. 19, 2012) ...................................................43

*In re Constar Int'l Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009) ................................................................................................10

*Khalif L. v. City of Union City*,
  2012 U.S. Dist. LEXIS 64567 (N.D. Cal. May 8, 2012) ......................................................12

*Lanzarone v. Guardsmark Holdings, Inc.*,
  2006 U.S. Dist. LEXIS 95785 (C.D. Cal. Sept. 7, 2006) .....................................................36

*Lindsey v. Normet*,
    405 U.S. 56 (1972) ..................................................................................... 42

*Loef v. First Am. Title Ins. Co.*,
    2012 U.S. Dist. LEXIS 174313 (D. Me. Dec. 10, 2012) .......................................... 34

*London v. Wal-Mart Stores, Inc.*,
    340 F.3d 1246 (11th Cir. 2003) ....................................................................... 46

*Malack v. BDO Seidman, LLP*,
    617 F.3d 743 (3d Cir. 2010) ........................................................................... 45

*Mann v. TD Bank, N.A.*,
    2010 U.S. Dist LEXIS 112085 (D.N.J. Oct. 20, 2010) ......................................... 12

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012) ........................................................................... 19

*Molina v. Roskam Baking Co.*,
    2011 U.S. Dist. LEXIS 136460 (W.D. Mich. Nov. 29, 2011) ......................... 48, 49

*Muro v. Target Corp.*,
    250 F.R.D. 350 (N.D. Ill. 2007) ...................................................................... 19

*Nat'l Auto. Dealers Ass'n v. FTC*,
    864 F. Supp. 2d 65 (D.D.C. 2012) ............................................................ 18, 43

*Obabueki v. Choicepoint, Inc.*,
    236 F. Supp. 2d 278 (S.D.N.Y. 2002), *aff'd,* 319 F.3d 87 (2nd Cir. 2003) ........... 35

*Oshana v. Coca-Cola Co.*,
    472 F.3d 506 (7th Cir. 2006) .......................................................................... 15

*Owner-Operator Indep. Drivers Ass'n, Inc. v. USIS Commercial Svcs., Inc.*,
    537 F.3d 1184 (10th Cir. 2008) ....................................................................... 36

*Riemer v. Columbia Med. Plan*,
    43 Fed. Appx. 576 (4th Cir. 2002) ................................................................... 42

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007) ...................................................................................... 40

*Scott v. First Am. Title Ins. Co.*,
    276 F.R.D. 471 (E.D. Ky. 2011) ...................................................................... 35

*Sloane v. Equifax Info. Servs.*,
    510 F.3d 495 (4th Cir. 2007) .......................................................................... 46

vi

*Solo v. Bausch & Lomb Inc.*,
   2009 U.S. Dist. LEXIS 115029 (D.S.C. Sept. 25, 2009) ........................................ 19

*Soutter v. Equifax Info Services*,
   2012 U.S. App. LEXIS 24891 (4th Cir. Dec. 3, 2012).................................................*passim*

*Stillmock v. Weis Mkts., Inc.*,
   385 Fed. Appx. 267 (4th Cir. 2010) ........................................................................41, 45, 46

*Supler v. FKAACS, Inc.*,
   2012 U.S. Dist. LEXIS 159210 (E.D.N.C. Nov. 6, 2012)....................................................23

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
   445 F.3d 311 (4th Cir. 2006).........................................................................10, 11, 47

*Turnbow v. Life Partners, Inc.*,
   2013 U.S. Dist. LEXIS 97275 (N.D. Tex. July 9, 2013)......................................................34

*United States v. Tracy*,
   456 Fed. App'x. 267 (4th Cir. 2011) ...............................................................................16

*Wachovia Bank v. Schmidt*,
   388 F.3d 414 (4th Cir. 2004) ...........................................................................................16

*Wal-Mart Stores v. Dukes*,
   131 S. Ct. 2541 (2011) ............................................................................................*passim*

*Williams v. LexisNexis Risk Mgmt., Inc.*,
   2007 U.S. Dist. LEXIS 62193 (E.D. Va. Aug. 23, 2007) (Payne, J.)....................................36

*Williams v. Lockheed Martin Corp.*,
   2011 U.S. Dist. LEXIS 115091 (S.D. Cal. Oct. 5, 2011) .....................................................39

*Wilson v. Flaherty*,
   689 F.3d 332 (4th Cir. 2012) ...........................................................................................18

*Windham v. Am. Brands*,
   565 F.2d 59 (4th Cir. 1977) .............................................................................................11

## OTHER CASES

*Sloan v. S.C. Dep't of Pub. Safety*,
   355 S.C. 321 (2003)..........................................................................................................21

## FEDERAL STATUTES

15 U.S.C. § 1681a(h).............................................................................................................16

15 U.S.C. § 1681c.................................................................................................................25

15 U.S.C. § 1681g(a) ........................................................................................... 1

15 U.S.C. § 1681k ......................................................................................... 13, 38

15 U.S.C. § 1681k(a) ................................................................................... *passim*

15 U.S.C. § 1681k(a), (a)(2) ............................................................................... 17

15 U.S.C. § 1681n(a)(1)(A) .......................................................................... 41, 46

15 U.S.C. §§ 1681n(a)(2), (a)(3); 1681o(a)(2) ................................................... 46

15 U.S.C. § 1681p ............................................................................................... 48

**OTHER STATUTES**

18 Pa. Cons. Stat. § 9125 .................................................................................... 25

Ariz. Rev. Stat. § 13-904(E) ............................................................................... 25

Ariz. Rev. Stat. § 13-1508 .................................................................................. 29

Cal. Civ. Code § 1786.18 .................................................................................... 25

Cal. Labor Code § 432.7 ..................................................................................... 25

Conn. Gen. Stat. § 46a-80 ................................................................................... 25

Fla. Stat. § 112.011 ............................................................................................. 25

Haw. Rev. Stat. § 378-2.5(a) .............................................................................. 25

Kan. Stat. Ann. § 22-4710(f); n. ......................................................................... 25

Ky. Rev. Stat. §§ 189.338(1)(B); 189.338(5)(A); 189.378(4) ........................... 28

Ky. Rev. Stat. § 335B.020 .................................................................................. 25

La. Rev. Stat. § 37:2950; n. ................................................................................ 25

Mont. Code § 45-6-204 ....................................................................................... 29

N.C. Gen. Stat. § 132-1.10(b) ............................................................................. 21

N.Y. Correct. Law §§ 750 ................................................................................... 25

N.Y. Pen. Law § 160.05; N.Y. ............................................................................ 29

Ohio Revised Code § 1531.29 .......................................................................... 6, 28

Title VII of the Civil Rights Act of 1964 ...............................................................26, 27

Wash. Rev. Code §§ 9.96A.020, 9.96A.030, 9.96A.060 ...........................................25

Wis. Stat. § 111.335 ...................................................................................................25

**RULES**

Alaska R. of Admin. 37.8 ...........................................................................................21

Fed. R. Civ. P. 23........................................................................................................*passim*

Neb. R. Ct. § 6-1464...................................................................................................21

**REGULATIONS**

Ark. Sup. Ct. Adm. Order No. 19 § 7.........................................................................21

**OTHER AUTHORITIES**

18 Oxford English Dictionary (2d ed. 1989)...............................................................16

Manual for Complex Litigation § 21.222, at 270 (4th ed. 2005) ................................11

Merriam-Webster's Collegiate Dictionary (3d ed. 1993)................................17, 18, 21

Oster-Aaland, L., K. Thompson, and E. Thompson, 2010 SURVEY OF NDSU EMPLOYERS .........25

Defendant, CoreLogic National Background Data, LLC ("NBD"), submits this memorandum in opposition to Plaintiffs' Motion for Class Certification.

## INTRODUCTION

Plaintiffs seek certification of a class of more than 1.7 million individuals under Count I, which asserts a claim under 15 U.S.C. § 1681k(a)(1) of the Fair Credit Reporting Act ("FCRA").[1] This action has been litigated for 23 months based on liability and class certification theories that Plaintiffs disclosed in their Complaint and discovery responses. NBD produced 100,000 pages of documents and a database with ███████████████████████████████████ ████████████████████████████████; prepared comprehensive and detailed answers to interrogatories; engaged an expert to analyze class certification issues; took depositions; allowed Plaintiffs' counsel to informally interview NBD's witnesses; and filed a Motion for Partial Summary Judgment – all at significant cost to NBD. This effort has all been based on NBD's right to rely on the Complaint and Plaintiffs' interrogatory answers as framing the case. However, in their Motion for Class Certification, Plaintiffs radically changed the nature of their claims by announcing a new liability theory never disclosed before and proposing a new class definition wrapped around that theory. This dramatic and dilatory change of position reflects the stark fact that 23 months of litigation left Plaintiffs' originally-pled and disclosed liability and class certification theories in tatters, and their case primed for defeat.

What takes this situation beyond any pale is that Plaintiffs' new theory is based on a false assumption. Plaintiffs' refashioned case rests everything on convincing the Court that NBD deliberately "suppresses" Social Security numbers ("SSNs") from criminal records it sells. This contention is not only simply not correct, its falsity is known to the Plaintiffs, as demonstrated by

---

[1] Plaintiffs also pled Count II as a class claim under 15 U.S.C. § 1681g(a). That Count has not been proposed for certification and any such attempt is procedurally barred. *See* Dkt. No. 63.

the declarations submitted by Plaintiffs' (undesignated) expert witnesses from McGladrey, LLP, where they confirm NBD transmits SSNs.[2]  Meanwhile, Plaintiffs' new proposed class definition has so little relationship to the elements of § 1681k(a) that certification should be denied on that basis alone.  Indeed, Plaintiffs' counsel had a similarly simplistic class certification approach to § 1681k(a) – which is to ignore elements of the claim that inherently raise individualized issues – rejected outright by the United States District Court for the Northern District of Georgia.  *See Farmer v. Phillips Agency, Inc.*, 285 F.R.D. 688*, 700 (N.D. Ga. Sept. 30, 2012).  This is not how things should be done in any case, let alone in a case where Plaintiffs ███████████████ ██████████████████████████████████████████████████.

The remainder of this brief lays out the many substantively-fatal defects to the idea that any class action can be certified in this case under § 1681k(a)(1), even if a proper class definition were being pursued.  These arguments are summarized in the following list of 15 questions, the answers to which must <u>all</u> be "yes" before a class can be certified.  In fact, however, the answer to each is a resounding "<u>no</u>":

|   | **FED. R. CIV. P. 23 ISSUE** | **OBSTACLE TO CERTIFICATION** |
|---|---|---|
| 1. | • Overbroad class definition<br>• Ascertainability<br>• Commonality<br>• Typicality<br>• Predominance | Can this Court ascertain when SSNs were absent from a public record when such a claim of "incompleteness" would require a file-by-file review of ████████ of public criminal records? |
| 2. | • Overbroad class definition<br>• Ascertainability<br>• Commonality<br>• Typicality<br>• Predominance | Can this Court ascertain when search queries were submitted for individuals that were seeking to "obtain" initial employment, where NBD has no record of the specific purpose for the "employment purpose" search, including whether it was undertaken for a current employee and hence beyond the scope of § 1681k(a)? |

---

[2] In their Motion, Plaintiffs proffer other factual errors.  For example, Plaintiff Hines asserts, without any support, that his screening report prevented him from getting a job.  Pltfs' Mem. at p. 4.  That allegation is false.  The truth is that nothing in Hines's report prevented him from being hired.  He got the job, but he simply failed to show up for work.  *See* Rule 30(b)(6) Deposition Testimony of CareSouth Homecare Professionals, pp. 96:23-97:11, attached as **Exhibit A**.

| 3. | • Overbroad class definition<br>• Ascertainability<br>• Commonality<br>• Typicality<br>• Predominance | Can a class be certified on the basis of NBD's having returned any one of the ▮▮▮▮▮▮▮▮▮ in the database for any type of offense, no matter how dated or unimportant to an employer, when § 1681k(a) applies only to those criminal records that are "likely" to adversely affect a particular consumer's employment prospects? |
|---|---|---|
| 4. | • Overbroad class definition<br>• Ascertainability<br>• Commonality<br>• Typicality<br>• Predominance | Can this Court ascertain which of the results returned by NBD were "likely" to adversely affect employment when NBD's customers filter the wholesale results they receive from NBD, and where NBD's records cannot establish what records (if any) were sent to the employer? |
| 5. | • Overbroad class definition<br>• Ascertainability<br>• Commonality<br>• Typicality<br>• Predominance | Can this Court ascertain which of the results returned by NBD were "likely" to adversely affect employment when NBD is not made aware of the location of employment of the consumer and varying state laws limit what data can be transmitted to the employer? |
| 6. | • Overbroad class definition<br>• Ascertainability<br>• Commonality<br>• Typicality<br>• Predominance | Can this Court ascertain which of the results returned by NBD were "likely" to adversely affect employment when the myriad employers implicated by the 1.7 million search queries have markedly divergent criteria for whether any particular criminal record will "likely" affect an applicant's job prospects? |
| 7. | • Overbroad class definition<br>• Ascertainability<br>• Commonality<br>• Typicality<br>• Predominance | Can this Court ascertain which of the results returned by NBD were "likely" to adversely affect employment when the database contains more than ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮, many of which require individualized interpretation? |
| 9. | • Overbroad class definition<br>• Ascertainability<br>• Commonality<br>• Typicality<br>• Predominance<br>• Typicality | Can the class be certified without accounting for whether ADP Screening and Selection Services, Inc. ("ADP"), Verifications, Inc. ("Verifications"), or HR Plus, Inc. ("HR Plus") "used" the records returned by NBD to evaluate the class members for employment, given that § 1681k(a)(1) only applies to "users" of those records, and where no evidence exists that any of those three entities made any employment-related decision for either named Plaintiff or any of the proposed class members? |
| 10. | • Commonality<br>• Typicality<br>• Predominance | Can, contrary to recent authority (*Farmer*), the class be certified on an abstract basis as to 1.7 million individuals when an element of proof under § 1681k(a)(2) is that each of the ▮▮▮▮▮▮▮ criminal records sent by NBD were not a "complete and up to date" version of a public record? |

| 11. | • Commonality<br>• Typicality<br>• Predominance | Can the class be certified given that Plaintiffs must show that NBD failed to maintain "strict procedures," when any such disproof would require analysis of NBD's relationship with each of its more than 300 sources of criminal record information, as well as of the exact timing of updates and results for each of the ██████████ records transmitted? |
|-----|-------------------------------------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 12. | • Commonality<br>• Typicality<br>• Predominance | Can a class be certified that seeks statutory damages under the FCRA when the Fourth Circuit recently held that such an analysis is an individualized inquiry that hinges on the specific facts of each class member, and where the $900 difference in the per consumer statutory damages range could affect NBD's proposed liability by over $1.5 billion? |
| 13. | • Adequacy | Are Plaintiffs adequate class representatives when they have abandoned any claim for actual damages for all of the proposed class members, yet have individually sought to recover actual damages in their many other lawsuits? |
| 14. | • Superiority | Is the class action device a superior method of adjudication when, if successful, ████████████ based on an indisputably novel and untested claim? |
| 15. | • Superiority | Is a class action a superior method of adjudication when Plaintiffs have in every way demonstrated that individual actions can be prosecuted, including through their having filed ten other FCRA actions to date in this Court that have resulted in substantial individual recoveries? |

Plaintiffs' prejudicial procedural gamesmanship, the facially-overbroad nature of the proposed class definition, and the inability to certify any class under a proper class definition for reasons of ascertainability, typicality, commonality, predominance, and/or superiority, mandate that Plaintiffs' Motion for Class Certification be denied with prejudice.

## FACTS

### I.  NBD's customers obtain data for a wide variety of purposes.

1.   NBD is a "wholesale criminal data provider to the background screening industry."  NBD sells information to consumer reporting agencies ("CRAs") that have been engaged by employers to provide criminal background screenings.  NBD has no direct contact

with those employers, which are instead clients of the retailer CRAs. *See* Declaration of Linda Watts at ¶ 5, attached as **Exhibit B**.

2.   ███████████████████████████████████████. Ex. B at ¶ 7. Those CRAs in turn sell data to employers in a wide variety of industries, from healthcare to bakeries, and also in a wide variety of jobs ranging from entry level manual labor positions to executives. Ex. B at ¶ 7.

3.   NBD's CRA customers procure search results from NBD in connection with their preparation of reports concerning individuals seeking initial employment, as well as individuals currently employed but under review for purposes of retention, promotion, etc. Ex. B at ¶ 8.

4.   NBD provided its CRA customers with responses to ██████████████████ that contained a criminal record of some sort during the averred class period. *See* Declaration of Joseph Davidson at ¶ 29, attached as **Exhibit C**. ███████████████████████████ ██████████████████████████. Ex. C at ¶ 29.

## II.   NBD wholesales verbatim government criminal records.

5.   NBD supplies government criminal records from a database referred to as the "Multistate Database." Ex. C at ¶ 8. The Multistate Database is owned by CoreLogic SafeRent, LLC ("SafeRent"), a sister company to NBD. Ex. C at ¶ 8. ████████████████████ ██████████████████████████. Ex. C at ¶ 8.

6.   SafeRent receives from its sources, and incorporates into the Multistate Database, more than 300 separate sets of updates of data each month. Ex. C at ¶ 9.

7.   Some items in the Multistate Database are updated every day. Ex. C at ¶ 10. The majority of the records (approximately 85%) are updated no less than monthly. Ex. C at ¶ 10.

8.   SafeRent does not alter the data received from its sources, and it incorporates data into the Multistate Database using the exact text supplied. Ex. C at ¶ 11.

### III. The government criminal records NBD wholesales are consistently non-uniform.

9.      NBD's 300 sources of criminal record data report offenses and dispositions in many different ways; thus, NBD returns data to CRA customers in a consistently non-uniform manner.  Ex. C at ¶ 28.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

12.      ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

13.      The age of the offenses in the Multistate Database vary greatly.  Ex. C at ¶ 33.

### IV. NBD's customers do not identify the specific consumers of interest, a specific purpose of an inquiry, or how the data will be used.

14.      NBD does not know the identity of the consumer of interest to NBD's CRA customers.[3]  Ex. B at ¶ 9; Ex. C at ¶ 20.  The CRA customers select the criteria by which they desire to gather information from the Multistate Database, which allow searches based (at a minimum) on variations of the consumer's first name, last name, and date of birth.  Ex. C at ¶ 20. NBD is not provided with data that would allow it to match a given record to a specific

---

[3] Despite the parties' recognition of the process used by NBD, whereby NBD returns *all* records responsive to its customers' self-selected search criteria, Plaintiffs continue to contend that NBD returns results for a "specific consumer."  Pltfs' Mem. at p. 8.  Such a claim was rejected in *Fiscella v. Intelius, Inc.*, 2010 U.S. Dist. LEXIS 57918, at *10 (E.D. Va. June 10, 2010), and it has no factual support.

individual.  Ex. B at ¶ 9.  Instead, once search criteria are submitted, NBD returns *all records* in the Multistate Database responsive to that query.  Ex. C at ¶ 20.

15.     NBD requires that its CRA customers certify that they have a permissible purpose for seeking criminal record information, which can include an "employment purpose."  Ex. B at ¶ 12; Ex. C at ¶ 22.  However, NBD is not informed of the *specific* "employment purpose" behind the request, such as whether the background screening is for the purpose of evaluating a *prospective* employee, or for an employment purpose for a *current* employee, such as retention, promotion, evaluation, licensure, etc.  Ex. B at ¶ 12; Ex. C at ¶ 22

16.     NBD also is not made aware of what information is ultimately transmitted by the retailer CRA to the employer.  Ex. B at ¶ 16.  Many of NBD's customers use the data gathered from NBD only as an initial investigatory tool to begin their search process.  Ex. B at ¶ 16.  Indeed, NBD's contracts instruct its customers that, due to the wholesale nature of the data being provided by NBD, additional filtering by the retailer CRA is both necessary and appropriate.  Ex. B at ¶ 16.

17.     In fact, comparing the results returned by NBD to ADP and Verifications, *see* Ex. C at ¶ 40 (Exhibit 1), 42 (Exhibit 2), to the background screening reports that were later prepared by ADP and Verifications demonstrates that ADP and Verifications filtered the records that they received from NBD before transmitting their background screening reports to the putative employers for both named Plaintiffs.  **Exhibit D** (the report transmitted by ADP, which omits certain Nevada-related offenses that had been returned by NBD in response to the inputted search criteria); **Exhibit E** (the report transmitted by Verifications, which omits certain Virginia-related offenses from Chesterfield County that had been returned by NBD in response to the inputted search criteria).

18.     For criminal record searches, NBD is not made aware of the state in which the consumer in question is employed or is seeking employment.  Ex. B at ¶ 13; Ex. C at ¶ 23.

19.     NBD is not made aware of the criteria used by the employer(s) to assess the import of any criminal records returned.  Ex. B at ¶ 17; Ex. C at ¶ 27.

**V.     NBD provides SSNs associated with criminal records whenever available.**

20.     SafeRent's policy and practice is to always request that its sources of criminal record information provide SafeRent with any SSNs that have been included within any criminal file.  Ex. C at ¶ 34.  Pursuant to that standard policy, SafeRent has been able to secure the transmission of full or partial SSNs only from a certain number of its sources.[4]  Ex. C at ¶ 34.

21.     The great majority of SafeRent's sources do not make available the SSN of the offender as a part of the information that is made public and thereafter sent to SafeRent.  Ex. C at ¶ 35.  These policies apply to records sent to SafeRent electronically, as well as to records that SafeRent's employees physically retrieve from courthouses.  Ex. C at ¶ 35.

22.     Whenever SafeRent is able to procure a SSN, that information is entered into the Multistate Database and linked to the relevant record.  Ex. C at ¶ 36.

23.     When NBD's customers submit a search query using any of NBD's search "logics," NBD returns all records from the Multistate Database responsive to that specific search query, along with any SSNs that are included within the responsive record(s).  Ex. C at ¶ 37.

---

[4] When SSNs are provided by its sources, NBD often only receives truncated SSNs.  Ex. C at ¶ 38.  In all instances, however, NBD returns truncated SSNs consisting of the last four digits of the SSN.  Ex. C at ¶ 38.  The last four digits of a SSN alone provide a 9,999 to 1 chance of a correct match.  Truncating SSNs is also consistent with best industry privacy practices and regulatory guidance.  *See* FTC, "Security in Numbers and ID Theft," at pp. 8-9 (Dec. 2008); *see also* Government Accountability Office, "Social Security Numbers – Internet Resellers Provide Few Full SSNs, but Congress Should Consider Enacting Standards for Truncating SSNs," at p. 19 (May 2006).

**VI.     Expert analysis concludes class members can be identified only through an extensive case-by-case analysis, if even possible at all.**

22.     Attached hereto as **Exhibit F** is the Declaration of Michael C. Keeley, Ph.D.,[5] a Massachusetts Institute of Technology and University of Chicago trained economist with over 30 years of experience in applied micro economics.  Ex. F at ¶ 2.  His fields of expertise include labor economics – the study of labor markets, factors affecting the supply and demand, issues related to hiring, firing, and promotion decisions, factors affecting hiring, and other favors affecting labor supply and demand.  Ex. F at ¶¶ 3-7.  He has extensive experience in analysis of large, complex data sets, including the inferences that can be drawn from such data.  Ex. F at ¶ 3.

23.     At the request of NBD's counsel, Dr. Keeley evaluated whether members of a class under § 1681k(a)(1) can be identified without a case-by-case inquiry, as well as whether it is possible to determine whether a class member was injured, and, if so, the extent or nature of the injury, without a case-by-case inquiry.[6]  Ex. F at ¶ 9.  Dr. Keeley and his staff, consisting of two other employees with a Ph.D. in economics, analyzed the information in the Multistate Database, interviewed personnel who build and operate the database, and conducted research into the marketplace for criminal background checks and the impact of criminal background reports on the workings of the labor market.  Ex. F at ¶ 10.  Based on his experience and expertise, and based on the information gathered from the discovery in this case and other public/reliable sources accepted in the discipline, Dr. Keeley concluded in his report that a Count

---

[5] The conclusions in the attached declaration were timely disclosed verbatim to Plaintiffs on July 30, 2013 in NBD's expert designation.  Those conclusions that remain germane to NBD's opposition in light of the shifted positions taken by Plaintiffs in their opening Motion have been placed into a sworn declaration for purposes of setting forth Dr. Keeley's testimony here.

[6] NBD's counsel asked Dr. Keeley to assume that a Count I class could only be defined by the elements of the cause of action under § 1681k(a).  In other words, consistent with the text of the statute, Dr. Keeley assumed that a proper class definition would be limited to instances where the information was requested to consider an application to "obtain employment," and the nature of the information was "likely to have an adverse effect upon a consumer's ability to obtain employment."  Ex. F at ¶¶ 13-18.

I class cannot be ascertained without extensive individualized inquiries as to each class member. *See* Ex. F at ¶¶ 19.

24.    Dr. Keeley's specific conclusions are included in the body of the argument below.

## VII.    Classwide liability would bankrupt NBD.

25.    Plaintiffs seek an award of statutory damages of between $100-$1,000 on behalf of a class of at least 1.7 million consumers.  Hence, Plaintiffs seek a judgment of between $170 million and $1.7 billion, plus punitive damages and attorneys' fees.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

## LEGAL STANDARDS

## I.    Class certification requires a "rigorous analysis."

Plaintiffs casually assert "there is nothing either remarkable or unexpected" about their motion. Pltfs' Mem. at p. 2.  To the contrary.  For any class action, and especially for a proposed class of 1.7 million individuals, certification is "an especially serious decision" with enormous consequences. *In re Constar Int'l Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009).  A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."   *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2550 (2011).   Courts, therefore, "must" perform a "rigorous analysis" before certifying a class. *Id.* at 2551; *see also Soutter v. Equifax Info Services,* 2012 U.S. App. LEXIS 24891, at *9 (4th Cir. Dec. 3, 2012).

"[I]n case after case," courts have stressed that "it is *not the defendant* who bears the burden of showing that the proposed class *does not comply* with Rule 23, but that it *is the plaintiff* who bears the burden of showing that the class *does comply* with Rule 23." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006) (emphases in original); *accord Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).  Plaintiffs must prove every element of

Rule 23(a) – "numerosity of parties, commonality of factual or legal issues, typicality of claims and defenses of class representatives, and adequacy of representation" – and one of three subparts of Rule 23(b). *Thorn*, 445 F.3d at 318. Rule 23 requires, *inter alia*, Plaintiffs to demonstrate that their claim depends upon a common contention. *Dukes*, 131 S. Ct. at 2551. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

In making the Rule 23 determination, a court may not "simply . . . accept the allegations of a complaint at face value." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004). It is often "necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160. Therefore, courts cannot certify a class "merely on the assurance of counsel that some solution will be found." *Windham v. Am. Brands*, 565 F.2d 59, 70 (4th Cir. 1977).

## II.   A class definition must track the elements of the claim.

Plaintiffs seek certification of a class under 15 U.S.C. § 1681k(a)(1), the text of which is set out in their opening brief. Pltfs' Mem. at p. 6. Plaintiffs, however, spend essentially no time detailing the required elements of a claim under the statute. This invites major error.

"Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the 'best notice practicable' in a Rule 23(b)(3) action." MANUAL FOR COMPLEX LITIGATION § 21.222, at 270 (4th ed. 2005). "Thus, as a preliminary matter, the court must consider the definition of the class when determining the appropriateness of class certification." *Adair v. EQT Prod. Co.*, 2013 U.S. Dist. LEXIS 142005, at *92-93 (W.D. Va. June 5, 2013) (internal citations omitted).

Consideration of class certification, therefore, must proceed on a "claim-by-claim basis" by reference to the elements of and remedies for each claim. *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 976 (5th Cir. 2000). In *Souter*, the Fourth Circuit approached the certification analysis by "reviewing the elements of Souter's *prima facie* case and the facts supporting those elements and examining 'the extent' to which those facts 'would also prove the claims of the absent class members.'" 2012 U.S. App. LEXIS 24891, at * 11 (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006)).

If a class definition does not track the elements of the claim, then, by definition, it is overbroad. *Khalif L. v. City of Union City*, 2012 U.S. Dist. LEXIS 64567, at *18 (N.D. Cal. May 8, 2012) ("In short, plaintiffs have failed to define [a class] . . . in which membership is properly related to the merits of plaintiff's claims. This flaw is fatal . . . ."); *Mann v. TD Bank, N.A.*, 2010 U.S. Dist LEXIS 112085, at *39-40 (D.N.J. Oct. 20, 2010) ("Plaintiffs' proposed class definition is over inclusive because it ignores legal complications associated with class membership . . . [including] because it includes [persons] that have no legal right to recovery."). Indeed, an overbroad definition raises serious constitutional concerns, as it would frustrate a defendant's right to present all available defenses and facilitate the granting of relief to individuals entitled to nothing. *See Dukes*, 131 S. Ct. at 2551 (Rule 23 cannot be interpreted to "abridge, enlarge or modify any substantive right"); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997) ("Rule 23's requirements must be interpreted in keeping with Article III constraints").

## ARGUMENT

### I.    Plaintiffs' class definition is facially overbroad because it does not reflect the many required elements of a properly-pled claim under § 1681k(a).

NBD contends § 1681k(a) does not apply to its wholesale activities in the first instance. But if the statute does apply, all of its elements must be accounted for in the class definition.

Section 1681k(a) governs "items of information" that: (1) "are matters of public record"; (2) "likely to have an adverse effect"; (3) "upon a consumer's ability to obtain employment."  15 U.S.C. § 1681k.  Section 1681k(a)(2) specifies a fourth element of the claim by allowing a CRA to comply with either subjection (a)(1), which requires the sending of a notice to a consumer meeting the foregoing criteria when such records are sent to a "user," or with subsection (a)(2), whereby the CRA can "maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date."  *Id.*

Ignoring these four elements of the claim taken directly from the statutory text, Plaintiffs instead seek to certify a class consisting of whenever: (1) ADP, Verifications, or HR Plus submitted a search query; (2) where the search query was marked as being for any type of "employment purpose"; (3) where any criminal record, no matter its substance, was returned to one of those three entities; and (4) where the criminal record(s) sent by NBD did not contain a SSN.  Pltfs' Mem. at pp. 6 n.6, 18.

For the reasons detailed below, the proposed definition is facially overbroad (and any proper class definition cannot be certified).  Plaintiffs' class definition fails to comport with the elements of a claim under § 1681k(a) in at least four ways: (1) the class definition is not limited to instances where SSNs were present in the "public record"; (2) it does not limit its scope to individuals seeking to "obtain employment," as opposed to the many other types of permissible "employment purposes" under the FCRA; (3) it is not limited to encompass only instances where the criminal records returned by NBD were "likely" to have an adverse effect on a consumer's employment prospects; and (4) it is not limited to instances (if any) where NBD's retailer CRA's customer "used" the records for the purpose of evaluating the consumer.

13

### A. Plaintiffs failed to limit their class definition to situations where a SSN was actually available in the "public record."

Plaintiffs' proposed class is defined in their brief by the alleged failure of NBD to transmit a SSN with the criminal records returned to three of NBD's customers: HR Plus, ADP, and Verifications. Pltfs' Mem. at p. 6 n.6. Plaintiffs contend that NBD "uniformly" suppresses SSNs as part of the results it returns, and thus NBD cannot be said to be transmitting "complete" information for purposes of complying with § 1681k(a)(2). *Id.* at 14. That factual premise is *completely wrong*.

Although SSN information is only made available by a distinct minority of NBD's sources, NBD *always* requests such information, and it *always* returns a value for SSNs within an assigned field when such information was included in the records that were sent to SafeRent. Ex. C at ¶¶ 34-37. Indeed, Plaintiffs' own declarants at McGladrey, LLP acknowledged that the "Results Returned" database of records sold by NBD included a "SSN" field for the return of SSNs, Pltfs' Mem. at Ex. 8-A, and that it also contained ███████████████████████ ████████ where NBD returned SSNs in response to the search queries of its customers. *Id.* at Ex. 8 ¶ 5. The absence of SSNs in the records returned in response to the two queries conducted by ADP and Verifications, which is apparently the basis for Plaintiffs' misguided factual contention regarding SSNs, was not the result of any systematic practice of suppression by NBD. Ex. C at ¶¶ 40-43. Instead, it was the result of nothing more than the fact that none of the criminal records that were returned for those specific search queries contained SSNs. Ex. C at ¶¶ 40-43.

Given that NBD does not suppress SSNs, class certification becomes impossible. Section 1681k(a)(2) only requires the inclusion of "complete" items of "public record information." *Id.* Put another way, under the broadest possible reading of the statute, NBD can only be required to include information that has been made a part of the "public record." *Id.* Hence, even assuming

that the inclusion of SSNs is required for "completeness" under § 1681k(a)(2),[7] the proposed class definition is overbroad because it is based on a glaring and unjustified assumption. Namely, Plaintiffs contend that a class should be certified covering every instance that NBD failed to report a SSN, but *without ever accounting* for whether the public record court file being sold by NBD contained a SSN.

To avoid an overbroad class definition, a class definition based on the failure to report SSNs would have to be amended to require the existence of a SSN in the public record that was then not reported by NBD. *See, e.g., Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-15 (7th Cir. 2006) (because the plaintiff's proposed class definition could include people who were not allegedly deceived by the challenged misrepresentation, the Seventh Circuit affirmed the district court's holding that the class was improper). (And, because NBD transmits *all* of the SSNs that it receives from its public record sources and engages in *no* suppression of SSNs, that required amendment is fatal to any attempt to certify a class, as it will require a file-by-file review of ███

███████████████████████.)

**B.**   **Plaintiffs failed to limit their class definition to individuals who were seeking to "obtain employment," as opposed to other "employment purposes."**

Plaintiffs seek to certify a class consisting of every instance where NBD reported results for a search query that was marked by HR Plus, Verifications, or ADP as being performed for "employment purposes." Pltfs' Mem. at p. 18. A class covering any employment purpose is contrary to the plain text of the statute, which only relates to searches conducted for consumers seeking to "obtain employment," which is a far narrower subset of the many types of "employment purposes" specified under the FCRA.

---

[7] Because it relates to the merits of Count I, NBD will demonstrate in its reply memorandum in support of its Motion for Partial Summary Judgment that such personal identifiers are not governed by 15 U.S.C. § 1681k(a) in the first instance.

"Congress is presumed to have used words according to their ordinary meaning unless a different use is clearly indicated." *United States v. Tracy*, 456 Fed. App'x. 267, 270 (4th Cir. 2011).  And, it is established that "different terms conjunctively used in the same statute should be given different meanings." *Wachovia Bank v. Schmidt*, 388 F.3d 414, 420 (4th Cir. 2004).

With these principles in mind, although 15 U.S.C. § 1681k(a) relates to reports issued for "employment purposes," the requirements of § 1681k(a) are triggered only for reports with respect to consumers who are in the process of "*obtaining* employment," *i.e.*, consumers seeking *initial* employment.  *See* 18 OXFORD ENGLISH DICTIONARY at p. 1002 (2d ed. 1989) (defining "obtain" as "to acquire, get"); *accord Houston v. TRW Information Services, Inc.*, 707 F. Supp. 689, 694 (S.D.N.Y. 1989) ("[S]ection 1681k(a)(2) does not apply because Houston was not applying for employment.").  The purpose of "obtaining employment" is, however, only a small subset of the wide range of "employment purposes" for which consumer reports may be obtained under the FCRA.  *See* 15 U.S.C. § 1681a(h) ("The term 'employment purposes' when used in connection with a consumer report means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee.").  Most of those specified employment purposes have no relation to an individual's first "obtaining" employment, as is required to trigger § 1681k(a).

Failing to even acknowledge this critical distinction in their brief, let alone address it, Plaintiffs seek to certify a class covering any instance where NBD's CRA customer informed NBD that criminal records were being sought for "employment purposes."  Pltfs' Mem. at p. 18. Hence, Plaintiffs' class definition is overbroad and must be narrowed to include only individuals who were seeking to "obtain" initial employment at the time the search query was submitted to NBD.  (That required narrowing will defeat certification, as detailed below.)

16

**C.** **Plaintiffs define the class based on the return of any criminal record, failing to limit the class to records that are "likely" to adversely affect a consumer's ability to obtain initial employment.**

Plaintiffs further seek to define the class to cover any instance where a search query by HR Plus, Verifications or ADP conducted a search query that resulted in the return of *any* of the ████████████████████ criminal records in the Multistate Database. *See* Pltfs' Mem. at p. 18. That definition is facially overbroad, as another independent requirement for the application of § 1681k(a) is that the information sent must be "likely adverse" to a consumer's ability to obtain employment. The applicability of § 1681k(a) therefore turns on the nature of the information returned on a particular applicant. This requirement comes from Congress's use of the word "likely," which requires a "high probability" of adversity, as opposed to the word "potentially," which would be much broader. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at p. 674 (1993) ("likely" means "having a high probability of occurring or being true: very probable").

Plaintiffs fail to mention this required element of Count I in their class definition, instead asserting that NBD's status as "a consumer reporting agency [that] furnishes consumer reports for employment purposes" that consist of "court records" is sufficient to invoke § 1681k(a), *regardless* of the nature of the criminal records (a so-called "hit") that are reported by NBD in response to a search query. *See* Pltfs' Mem. at p. 7. That reading is incorrect under the text of the statute, which provides that it only regulates information "likely to have an adverse effect upon *a consumer's* ability to obtain employment." 15 U.S.C. § 1681k(a), (a)(2). The statute also uses the terms "such consumer report" and "the consumer," *see id.*, which underscores that it focuses on the nature of the records returned as to a single, specific consumer; not the general activities of the entity transmitting results for an abstract base of individuals. Fundamentally, Plaintiffs' approach seeks to read the word "likely" out of the statute, which is not allowed. *See,*

*e.g., Wilson v. Flaherty*, 689 F.3d 332, 337 (4th Cir. 2012) (rejecting proposed interpretation of statute that would effectively "read out" certain statutory language).

This individualized approach required by § 1681k(a) compels the rejection of Plaintiffs' class definition.  (And, for the many reasons set forth below, the required "likelihood" that any criminal record be adverse to "a consumer's" employment prospects renders the class incapable of certification, including because: (1) ██████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████; (2) NBD's customers engage in filtering and exclusion of the data returned by NBD; (3) state laws limit the transmission of criminal record information; and (4) employers in different industries vary greatly on whether any one criminal record will likely affect an employment decision, including as to different jobs within the same employer.)

### D.    Plaintiffs failed to limit their class definition to results returned to a "user."

Plaintiffs' proposed class definition makes no mention whatsoever of how HR Plus, ADP, or Verifications used the records returned by NBD.  Pltfs' Mem. at p. 18.  A claim under § 1681k(a)(1) only exists, however, where the information at issue was transmitted to a "user" of that information.  The plain meaning of the word "use" is "to put into action or service." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at p. 1301 (1993).  This definition has been adopted by both the FTC and the judicial decisions to consider the term under the FCRA.  *See, e.g., Nat'l Auto. Dealers Ass'n v. FTC*, 864 F. Supp. 2d 65, 74 (D.D.C. 2012) (adopting the interpretation of "use" that required both "action and implementation"); *Gonzalez-Bencon v. Doral Bank*, 759 F. Supp. 2d 229, 237 n.4 (D.P.R. 2010) ("A user of a consumer report is a person that takes action on the basis of information contained in consumer reports.").

Despite the text of the statute and this regulatory guidance, Plaintiffs' class definition does not account for the nature of any action taken (or not taken) by the recipient of NBD's

records.   Hence, it is overbroad and must be amended to include only situations where the retailer CRA *used* the results returned to make an employment-related decision for the consumer. (Such amendment, however, would render Plaintiffs atypical class representatives, as NBD does not sell data to users, and there is no evidence in the record that ADP, Verifications, or HR Plus made any employment-related decision for either Plaintiff, and it would also generate uncommon issues.)  *Muro v. Target Corp.*, 250 F.R.D. 350, 356 (N.D. Ill. 2007) ("[T]o certify and represent a class, a representative plaintiff must first be a member of that class.").

## II.      A properly-defined Count I class is not ascertainable.

"It is well-accepted that class action suits brought pursuant to Rule 23(b)(3), where individual damage claims are likely, must concern a class that is currently and readily ascertainable based on objective criteria."[8]  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012).  As courts in this circuit have consistently held, a class should not be certified "unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."  *Solo v. Bausch & Lomb Inc.*, 2009 U.S. Dist. LEXIS 115029, at *4 (D.S.C. Sept. 25, 2009).   Hence, if determining class membership would require a person-by-person adjudication, the class should not be certified. *Marcus*, 687 F.3d at 593 ("If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate.").

---

[8] Given the liberties taken by Plaintiffs in their brief regarding the nature of the stipulations agreed to by NBD, *see* Pltfs' Mem. at pp. 8-11, clarification is warranted.  NBD stipulated only that extensive third-party discovery could ultimately reveal the identity of the consumer that was the subject of the employer's background screening request.  (*See* Dkt. No. 56 pp. 1-2.)  (NBD also stipulated that it would not defend class certification on the basis that one of its retailer CRA customers included NBD's name on any notice that the customer sent out under § 1681k(a).  *Id.*)  Any contention that NBD stipulated to anything further than those two basic facts is false, as is the claim that NBD "agreed" to the legal conclusion "that class membership could be ascertained from third party discovery to ADP, Verifications, and ADP [sic]." Pltfs' Mem. at p. 9.  NBD in no way stipulated to Plaintiffs' ability to globally ascertain any of the many factual issues that are the subject of this section of its opposition.

As detailed above, Plaintiffs' proposed class definition is overbroad and untethered from the elements of a § 1681k(a) claim in multiple ways. And, if amended by Plaintiffs to try and track the elements of § 1681k(a), each of those required boundaries on the class definition would give rise to a class that is not ascertainable.

A. **Whether a SSN was part of the "public record" requires a file-by-file review.**

Even assuming that under § 1681k(a), the absence of a SSN from a criminal record transmitted by NBD could support a claim for a violation of § 1681k(a), such absence provides the basis for a proper class only if NBD failed to transmit a SSN that was actually a part of the "public record" by the governmental source. 15 U.S.C. § 1681k(a). Plaintiffs tried to overcome this inherently-individualized inquiry regarding which SSNs are a part of the public record by advancing the fictional premise that NBD always receives and always actively suppresses SSNs. As detailed above, that assertion is false, which prevents certification.

NBD's active solicitation of SSNs, and its transmission of SSNs whenever they are made available, *see* Ex. C at ¶¶ 34-37, means that NBD failed to transmit such information *only* when it was not a part of the "public record," which alone defeats any claim under § 1681k(a). *Id.* (governing only reporting of "items of information on consumers which are matters of *public record*") (emphasis added). Indeed, consistent with the meaning of the term, courts have held that SSNs that are not made available by courts for external dissemination are not part of the "public record." *See, e.g.*, *Dekeyser v. Thyssenkrupp Waupaca, Inc.*, 2012 U.S. Dist. LEXIS 158917, at *4 (E.D. Wis. Nov. 6, 2012) ("Rule 5.2 of the Federal Rules of Civil Procedure lists the type of information that should not be part of the public record. This includes individuals' SSNs . . . ."); *Cruthird v. Boston Police Dep't*, 2010 U.S. Dist. LEXIS 117390, at *32 (D. Mass. Nov. 3, 2010) ("Defense counsel shall consult with the docket clerk to ensure confidential information is sealed on the docket and to substitute a redacted version for the public record.");

*Sloan v. S.C. Dep't of Pub. Safety*, 355 S.C. 321, 324-25 (2003) ("The legislature specified SSNs, photographs, signatures, or digitized images from a driver's license or personal identification card are not public records."); *see also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at p. 11836 (3d ed. 1993) (defining "public" as "accessible or visible to all members of the community").

In fact, the absence of SSNs from a majority of NBD's sources reflects the fact that such information is often not collected, and, when it is collected, is generally redacted from the public record pursuant to rule, statute, regulation, order, and/or policy directive. *See, e.g.,* Ark. Sup. Ct. Adm. Order No. 19 § 7 ("The following information in case records is excluded from public access and is confidential absent a court order to the contrary . . . (4) SSNs . . . ."); *accord* Alaska R. of Admin. 37.8; Ark. Sup. Ct. Adm. Order No. 19 § 7; Cal. R. Ct. 2.507; Supreme Court of Colorado, Chief Justice Directive 05-01 § 4.60(e) (Apr. 27, 2005); Neb. R. Ct. § 6-1464; Ohio Lake Cty. Gen. Div. LR 2.06(A); Ore. U.T.C.R. 2.100(a)-(b); N.J. R. Ct. 1:38-7(e); N.C. Gen. Stat. § 132-1.10(b); Vt. Pub. Acc. Ct. Rec. Rule 6(b).   Fundamentally, therefore, this Court would need to conduct a file-by-file review to determine whether the SSN had been redacted from the "public record" at the time that a record was returned by NBD without a SSN.   A file-by-file review is necessary because NBD's policy is to provide SSNs whenever available, so the effort would be to find anomalies.   However, such an individualized inquiry across ███████ ████████████████████████ precludes an ascertainable class.

Contrary to the text of the statute, Plaintiffs may contend that NBD has a duty not just to transmit the complete "public record" version of government records, but also is responsible for all information in paper court files, redacted or not.   The premise of that contention is false, given that NBD transmits the complete electronic "public records" that its sources provide.   Put another way, the relevant public record is the electronic record published by the public record

sources.   In any event, any showing that a SSN was present in the paper court file would also require a file-by-file review.   The complete absence of a SSN in the physical court file is not simply theoretical.   To use but one of what will be an untold number of like examples, some of the criminal records that were gathered directly from the Pennsylvania clerk by Plaintiff Henderson lacked a SSN.   *See* **Exhibit H** (the records retrieved from the courthouse by Henderson and then sent to NBD).   Another example consists of courts that collect SSNs but then redact them from the public record.   *See* **Exhibit I**.   Clearly, NBD cannot be held liable under a theory of "completeness" for failing to report a data point that was *not* even present in the public record.   Absent any suppression by NBD, however, determining which SSNs exist in the public record could only be made through a painstaking file-by-file review of ▮▮▮▮▮▮▮

▮▮▮.   Class certification is, therefore, inappropriate.   *See Ahmad v. Old Republic Nat'l Title Ins. Co.*, 690 F.3d 698, 705 (5th Cir. 2012) (denying certification where "the jury will have to engage in file-by-file review to determine whether individual plaintiffs had original mortgages covered by title insurance and met the other R-8 criteria").

### B.      Whether NBD's customer reported records as to a consumer seeking to "obtain employment" would require file-by-file review.

While NBD's customers can indicate that they are seeking criminal record information for certain purposes, including "employment purposes," NBD is not made aware of and does not track the *specific* employment purpose for which a report is sought, *e.g.*, obtaining employment versus evaluating an existing employee.   Ex. B at ¶ 12; Ex. C at ¶ 22.   And, NBD processes record requests not only for individuals that are seeking initial employment, but for current employees as well.   Ex. B at ¶ 8.   Only individual inquiry of the CRA and/or the ultimate employer could determine whether the records returned by NBD concerned an individual trying to *obtain* employment.

NBD's records would not, therefore, allow a sorting of reports into those that were used for purposes of initial hires, as opposed to *other* employment purposes. Instead, it would require a file-by-file review of third party data. Count I fails for reasons of ascertainability. *See, e.g., Supler v. FKAACS, Inc.*, 2012 U.S. Dist. LEXIS 159210, at *4-9 (E.D.N.C. Nov. 6, 2012) (where "defendant called debtors using multiple autodialer machines but did not record which autodialer called which debtor," and "only one of defendant's autodialers was leaving the allegedly illegal messages," it was "not administratively feasible to identify members of the putative class besides plaintiff . . . . Thus, because of the administrative impossibility of identifying class members, the court finds that certification of the class proposed by plaintiff is not warranted.").

### C.       Whether the results returned by NBD were "likely adverse" to a consumer's ability to obtain employment cannot be determined in a systematic way.

Plaintiffs fail to describe the investigation and subsequent filtering of records that is routinely conducted by NBD's retailer CRA customers before records are reported to employers. Yet, such filtering, as well as the (also unmentioned) exceptional diversity of data at issue, gives rise to a class that is not ascertainable, since § 1681k(a) regulates only the transmission of criminal records that are "likely adverse" to initial employment prospects.

### 1.       The fact that NBD's customers frequently use NBD's data as an initial, investigatory tool precludes class certification.

It is not possible to determine from NBD's records whether the information NBD sold to HR Plus, ADP, or Verifications "likely" would have had an adverse effect on a consumer's ability to obtain employment because the data provided by NBD to the customer may not have been the same information provided to the employer. NBD informs and counsels the CRAs that purchase criminal data that it is the CRA's obligation, including under the FCRA, to review the results obtained and to then eliminate any "false positive" results (*i.e.*, those criminal records returned that do not relate to the person about whom the CRA is preparing a report). Ex. B at ¶

16.  Consistent with those instructions, NBD does not know what data its CRA customers will eliminate prior to providing a report to an employer.  Ex. B at ¶ 16.  Nor is NBD privy to any filtering restrictions imposed by employers (such as any direction from the employer to the retailer CRA to include/exclude certain records from the report).  *See* Ex. B at ¶¶ 16-17.  Thus, NBD does not know whether the information it provided would be transmitted to the employer, and not just prospectively filtered out by its customer.  *See* Ex. B at ¶ 16.

In trying to preempt this argument, Plaintiffs state "there is no requirement in the statute that NBD's report be provided verbatim (or otherwise) to an employer before § 1681k(a)(1) would govern."  Pltfs' Mem. at p. 11.  Plaintiffs' straw man argument misses the point, which is that it is not possible to assess whether a record is likely to adversely affect an applicant's ability to obtain employment without knowing whether any record will be provided to the employer.  Therefore, the widespread filtering that occurs (and which is required of NBD's customers under the FCRA) with respect to the records returned by NBD prevents the Court from assessing whether any type(s) of records returned by NBD were "likely" to affect employment.

### 2.   Variations in use of records in evaluating applicants prevents certification.

Employers and state laws greatly differ as to whether any particular criminal conviction can prevent an individual from obtaining employment.  In an attempt to avoid the type of individual analysis that is fatal to certification, however, Plaintiffs, through their proposed class definition, take the overly-simplistic position that *any* criminal charge, arrest, and/or conviction is "likely" to affect employment prospects, thereby triggering § 1681k(a).  That is incorrect.

### a.   State law varies as to whether and how a criminal record can be considered.

NBD is not made aware of the state where the consumer is seeking employment.  Ex. C at ¶ 23.  Yet, state laws vary regarding the offenses an employer may consider when making decisions.  For example, California law provides that no employer shall "seek from any source

whatsoever, or utilize, as a factor in determining any condition of employment . . . any record of arrest or detention that did not result in conviction." *See* Cal. Labor Code § 432.7.  Also in California, CRAs can report convictions only for seven years, while the FCRA does not place any limits on reporting convictions.  *Compare* Cal. Civ. Code §1786.18; 15 U.S.C. § 1681c.

Similarly, Florida law dictates that public employment cannot be denied "solely because" of a conviction.  Fla. Stat. § 112.011.  Florida, Louisiana, New Mexico, and Washington have laws preventing public employers from considering any felony convictions in employment decisions unless the conviction specifically relates to the position sought.  *See* Fla. Stat. § 112.011; La. Rev. Stat. § 37:2950; N.M. Stat. §§ 28-2-3 through 28-2-6; Wash. Rev. Code §§ 9.96A.020, 9.96A.030, 9.96A.060.  Arizona, Connecticut, and Kentucky have extended this qualification to any conviction, and Hawaii, Kansas, New York, Pennsylvania, and Wisconsin have further extended their laws to encompass the private sector, in addition to the public sector. *See* Ariz. Rev. Stat. § 13-904(E); Conn. Gen. Stat. § 46a-80; Ky. Rev. Stat. § 335B.020; *see also* Haw. Rev. Stat. § 378-2.5(a); Kan. Stat. Ann. § 22-4710(f); N.Y. Exec. Law § 296(15); N.Y. Correct. Law §§ 750 through 753; 18 Pa. Cons. Stat. § 9125; Wis. Stat. § 111.335.  As a result of these different statutes, it is not possible without individual inquiry to determine the effect of a criminal record on a consumer's ability to obtain employment, as that same record may itself be automatically filtered out under governing law.

### b. Employer adjudication criteria vary widely across industries and positions, including as advised under federal law.

The variations across states are exponentially multiplied across employers.  An academic survey illustrates the differences in criteria across industries.  Only 26 percent of respondents in the construction industry reported a policy prohibiting a person with a felony from being hired, while 80 percent of respondents in retail and sales sectors prohibit such a hiring.  *See* Oster-

Aaland, L., K. Thompson, and E. Thompson, 2010 SURVEY OF NDSU EMPLOYERS, *available at* www.ndsu.edu/fileadmin/alcoholinfo/2010_NDSU_Employer_Survey_Summary.pdf).  Also, no respondents in the manufacturing, agriculture, and construction industries have policies that prohibit hiring a candidate with a misdemeanor, while 25 percent of respondents in accounting, banking, and finance sectors do.  *See id.*

Varying standards also can exist within the same organization for different types of positions, including over time and depending on the status of the labor market and the economy. Another study further indicates that whether any particular criminal record is likely to affect an individual's ability to obtain employment depends on factors such as the state of employment, the employer, the prospective employment position sought, the nature of the offense, whether the offense resulted in a conviction, the amount of time that has elapsed since the offense, and the age of the individual at the time of the offense.  "*Background Checking: Conducting Criminal Background Checks*," Society for Human Resource Management, January 22, 2010, *available at* (shrm.org/Research/SurveyFindings/Articles/Pages/BackgroundCheckCriminalChecks.aspx); *see also* Ex. F at ¶¶ 58-65 (detailing the wide variations in employer adjudication criteria across industries, employers, and/or positions); **Exhibit J** (adjudication criteria of CareSouth Homecare Professionals ("CareSouth")); **Exhibit K** (markedly-different adjudication criteria of Interstate Brands Corporation ("Interstate Brands")).

The fact that employers set different criteria for different position is not surprising given the EEOC's guidance on the consideration of criminal data.  In addition to setting forth factors that businesses should consider in determining whether a particular type of record is relevant to a position, the EEOC advises that businesses undertake an individualized assessment: "the use of individualized assessments can help employers avoid Title VII liability by allowing them to consider more complete information on individual applicants or employees."  "Enforcement

Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964," *as amended*, 42 U.S.C. § 2000e *et seq*, April 25, 2012, *available at* http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm#VB9.

Thus, unlike Plaintiffs' class definition, it cannot be said that *any* report of any type of conviction/charge from *any* date with *any* type of disposition "likely" precludes employment for *all* positions within *any* company.  Rather, that inquiry is fact-specific, generating a class whose members are not ascertainable.

> **c.     The variety of data in public records prevents an objective, formulaic assessment of whether an offense is "likely" to adversely affect an individual's ability to obtain employment.**

Even if NBD knew what records were provided by the employer, and also knew the employers' policies on how the records would be evaluated, the wide variation in the information included in the records cannot be evaluated formulaically to identify those records that are likely to have an adverse effect on an individual's ability to obtain employment.

> **i.     <u>Varying and non-specific descriptions of offenses permeate the data.</u>**

Over the alleged class period, ███████████████████████████████████

████████████████████ Ex. C at ¶ 8.  The substance of those criminal records, which were received from more than 300 public-record sources, is not altered by NBD.  Ex. C at ¶ 11. Hence, the extensive variation in the data received from these sources appears in equal measure in the information transmitted by NBD to its CRA customers in response to a search query.



██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████

As discussed above, employers consider various types of crimes differently when making employment decisions.  As a result, to identify members of the proposed Count I class based on NBD's data, it is necessary to be able to distinguish among categories of crimes.  Fundamentally, however, the varying offense descriptions in the data transmitted by NBD make it impossible to

systematically assess the nature and the severity of the crime, let alone whether the crime would "likely" affect a consumer's employment prospects.

ii.     **Varying severity in offenses precludes a systematic assessment of the "likely" adversity of any criminal record returned by NBD.**

In addition to the varying offense descriptions, state laws also vary significantly in terms of what specific conduct constitutes a particular offense. ███████████████████

████████████████████████████████████████████████████████████

███████████████████████████ Arizona law describes one type of "burglary" as knowingly possessing a deadly weapon or explosives while committing any theft. *See* Ariz. Rev. Stat. § 13-1508.  In Montana, however, to constitute "burglary," someone must merely enter an "occupied structure."  Mont. Code § 45-6-204.  Because a "Burglary" offense can signify a different act, depending on the state (and time period) in which it was committed, burglary may be considered a violent (or potentially violent) crime in a state that requires the entered structure is occupied, but a potentially non-violent crime in another state.

████████████████████████████████████████████████████████████

████████████████████████ Ex. C at ¶ 30.  However, state definitions of "robbery" can include crimes of different severity that may be significant to an employer.  To use but one example, New York's penal code includes three degrees of robbery, ranging from a class B violent felony to a class D non-violent felony.  N.Y. Pen. Law § 160.05; N.Y. Pen. Law § 160.15.  As a result, crimes described in the exact same way in the Multistate Database may constitute different substantive crimes, depending on the state where they were committed.

All of these state-by-state variations prevent an objective assessment of how an employer in any given state would view any reported offense, especially in view of the fact that many of the results returned by NBD include records from numerous states.

### iii. Variations in disposition information prevent a classwide assessment of the "likely" adversity of a criminal record returned by NBD.

As detailed above, the disposition of the varying offenses reported by NBD is a relevant data point in assessing whether a record would "likely" affect a consumer's ability to obtain employment under § 1681k(a). ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████ Ex. C at ¶ 32.  Without any ability to systemically decode such dispositions, there can be no objective assessment of potential adversity of any given record.

### d. Plaintiffs' experiences exemplify the wide variation in data in the Multistate Database and in employer adjudication criteria.

The Court need not look any further than the reports of the Plaintiffs and their putative employers at Interstate Brands and CareSouth as proof of the foregoing conclusions.  For one, consistent with their contractual promises to NBD, as well as their undisputed legal obligations under the FCRA, ADP and Verifications applied their own filtering and matching to the data returned by NBD and eliminated some records that had been returned by NBD.  *Compare* Ex. D; Ex. E; Ex. C at ¶ 40 (Exhibit 1), 42 (Exhibit 2).

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

Using entirely different criteria, CareSouth (Hines's potential employer) lists only 18 of the most serious felonies enumerated under a special Virginia code provision for employment in the healthcare sector (so-called "barrier crimes") as precluding employment with CareSouth, and only for *convictions* of those crimes.  Ex. J.  All convictions or charges for all other crimes are to be evaluated by CareSouth in its "discretion and judgment."  *Id.*  NBD was also not made aware of those adjudication criteria at the time it provided records to ADP.  Ex. B at ¶ 17; Ex. C at ¶ 27.

Consistent with the above, CareSouth's Vice President of Human Resources testified that, among other factors, the following variables would bear on whether an applicant was likely to be denied employment based on the return of a criminal record: (1) the nature of the offense; (2) the recency of the offense; (3) the disposition of the offense; (4) the overall qualifications of the applicant; (5) the circumstances surrounding the offense; and (6) the employment position applied for by the consumer.  Fundamentally, this led him to testify to the following conclusion:

Q.     So would you be able to determine *without looking at any particular application or applicant as a whole* whether a conviction for a non-barrier offense would *likely prevent* an applicant from getting a job with CareSouth?

A.     No.  I think we would have to, again, take a look at it *on a case by case basis as we do now, sir.*

Ex. A pp. 100:23-101:7.  This reality forecloses certification of the proposed class in the context of a statute triggered by the "likely" outcome of each consumer's employment application.

31

**D.    Whether NBD's customers, including ADP, HR Plus, and Verifications, "used" the data returned is not subject to a systematic determination.**

Finally, the issue of whether ADP, Verifications, or HR Plus "used" the records that were returned by NBD, as is required by the text of § 1681k(a)(1), is not an issue that is capable of classwide adjudication.   To be absolutely clear, there is *no evidence* that any of those entities made any sort of employment-related decision for any of the class members.   To the contrary, the screening reports transmitted by ADP and Verifications contain no employment decision or recommendation for either Plaintiff.[9]   *See* Ex. D; Ex. E.   (Plaintiffs also conducted no discovery of HR Plus during the discovery period.)   And, even if ADP, Verifications, or HR Plus actually made an employment decision for any putative class members, there is no evidence that such a practice was systemic or even common, nor does NBD have any records or knowledge of such use.   Thus, this issue presents yet another individualized inquiry.

**E.    NBD's expert concludes that a properly-defined class is not ascertainable.**

NBD's retained expert, Dr. Keeley, has independently reviewed the nature of NBD's business and the databases, as well as researched the affect of criminal records on the labor market.   Based on that extensive research and review, he stated as follows in his report:

- It is not possible to ascertain without individualized inquiry whether a given criminal record provided by NBD was for the specific purpose of seeking to "obtain employment."   Dr. Keeley notes that while NBD collects information

---

[9] The mere fact that Verifications identified itself as a "user" on NBD's search form in 2009 does not mean that the *legal issue* under the FCRA is somehow resolved relative to the prevailing judicial and subsequently-articulated FTC interpretation of that term, especially when there is no evidence in the record to suggest that ADP, Verifications, or HR Plus made any employment-related decision for either Plaintiff.   Plaintiffs go so far as to suggest that a third-party *complaint* from another related proceeding against Interstate Brands demonstrates that Verifications acted in such a capacity for all 154,000 Verifications class members.   *See* Pltfs' Mem. at p. 12 n. 9.   Such a citation and wild extrapolation reveals the lack of any actual evidence on that point.   Even more, consistent with the record, that third-party complaint makes clear, just three paragraphs after the one cited by Plaintiffs, that it was *Interstate Brands* that made the employment decision as to Plaintiff Henderson.   *See* 3:11cv507, Dkt. No. 13 ¶ 22 ("Once [Verifications] completes the background check, it sends the report to [Interstate Brands].   [Interstate Brands] then reviews the report" and makes the "potentia[l] disqualification" decision).   Plaintiffs cannot seek to certify a 1.7 million member class through such non-evidence and misrepresentations.

from its customers that a given inquiry is for an "employment purpose," the data does not indicate whether that employment purpose is considering a consumer's effort to "obtain employment." Ex. F at ¶¶ 20, 52-53.

- It is not possible to ascertain without individualized inquiry whether a given criminal record provided by NBD to its customer was, in turn, reported to the employer requesting the background screening. Dr. Keeley noted that NBD counsels its customers to verify whether a given record actually concerns the individual of interest to the employer, that such further filtering and investigation is prevalent in the industry, and that NBD does not know what records are verified and reported or simply deleted by the customer. Ex. F at ¶¶ 21-22, 55-57.

- It is not possible to ascertain without individualized inquiry what criteria the employer will use to assess an individual's suitability for employment and thus whether the information provided by NBD to the CRA would likely have an adverse effect upon an individual's ability to obtain employment. Dr. Keeley noted that different employers have markedly different policies/practices regarding what criteria they use to determine whether to offer employment to an individual with a criminal record. The same variations exist under state laws, which often limit what types of criminal record can even be considered by employers. Dr. Keeley also found that NBD's data varies greatly, which prevents any systematic assessment of the adversity of any of the records returned. Therefore, identifying whether a given report would likely have an adverse effect upon an individual's ability to obtain employment requires a case-by-case assessment whether a specific record as reported would likely have an adverse effect under a specific employer's criteria. Ex. F at ¶¶ 23-24, 58-73.

- It is not possible to ascertain without individualized inquiry whether, under Plaintiff's theory a consumer was "injured," *i.e.*, harmed by a given report, and, if so, the degree of injury. Dr. Keeley noted that under Plaintiffs' theory, a plaintiff suffers "injury" by the report of inaccurate adverse information when the Plaintiff is denied an effective opportunity to correct the information. Dr. Keeley concluded that if a report provided to an employer includes a criminal record that prevents the individual from being hired, but the information is accurate, then there is no economic harm from the alleged conduct. Also, Dr. Keeley notes that hiring decisions are driven by a multitude of factors, such that any given criminal record may not have affected the hiring decision. Therefore, Dr. Keeley concludes that an individualized inquiry is required to determine the impact of any report on the hiring decision. Ex. F at ¶¶ 26, 74-92.

*See also generally* Ex. F. Based on these conclusions, which are independently confirmed by the foregoing facts, it is Dr. Keeley's expert opinion that no class could be certified in this action absent extensive individualized inquiry.

## III.    A Count I class fails for lack of typicality, commonality and predominance.

"[T]he Supreme Court's recent decision in [*Dukes*] has transformed the Rule 23(a)(2) commonality standard from a 'low bar' to a far more searching inquiry." *Loef v. First Am. Title Ins. Co.*, 2012 U.S. Dist. LEXIS 174313, at *13 (D. Me. Dec. 10, 2012) (citations omitted).  To satisfy commonality under Rule 23(a)(2), a plaintiff needs to identify a common question; to satisfy the predominance standard of Rule 23(b)(3), however, that common question must "predominate" over individual ones.  *See* Fed. R. Civ. P. 23.  Under either rubric, *Dukes* clarified raising a common "question" is not enough.  The chief concern is "the capacity . . . to generate common answers" that have the capacity to resolve "each of the claims in one stroke."  *Dukes*, 131 S. Ct. at 2551.[10]

As detailed above, Plaintiffs' class definition is deficient in numerous ways, and any amendment to cure those defects would give rise to a class that is not ascertainable.  In addition to posing dispositive ascertainability problems, however, the elements of § 1681k(a) also give rise to a class where there is no common method for generating common answers.  *See, e.g., Dukes*, 131 S. Ct. at 2552-55 (because the proof of discrimination would be individualized as to the circumstances of each store manager's decisions, there was no meaningful commonality between the particular experiences of the class members who "wish[ed] to sue about literally millions of employment decisions at once"); *Turnbow v. Life Partners, Inc.*, 2013 U.S. Dist. LEXIS 97275, at *29-30 (N.D. Tex. July 9, 2013) ("[A] file-by-file review is required here to answer the question posed: was LPI's use of Dr. Cassidy's estimates a breach of its fiduciary

---

[10] As noted by the Fourth Circuit in *Souter*, "typicality tends to merge with commonality, insofar as both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  2012 U.S. App. LEXIS 24891, at *10 (internal citation omitted).  Therefore, the many reasons above as to why commonality is lacking also disprove the alleged typicality of the named Plaintiffs.

and/or contractual duties . . . .  Because Plaintiffs, who carry the burden to affirmatively prove that the Rule 23 requirements are met, have not proffered a class-wide method to answer question 1, the Court concludes that it cannot be deemed a common question."); *Scott v. First Am. Title Ins. Co.*, 276 F.R.D. 471, 480 (E.D. Ky. 2011) (finding "commonality" lacking because "there is no common method for ascertaining those members falling within the class parameters," including because the court would "need to conduct an individualized inquiry of each borrower's refinance transaction to determine whether a particular borrower . . . paid a premium that exceeded the rate amount on file").

### A. With Plaintiffs' theory of SSN suppression debunked, whether a given record is "complete and up to date" gives rise to insurmountable individual issues <u>incapable of generating common answers.</u>

As set forth in its Motion for Partial Summary Judgment, all courts to have reached the issue have held that showing that the information transmitted is not "complete and up to date" is an element of § 1681k(a).  *E.g.*, *Farmer,* 285 F.R.D. at 700; *Haro v. Shilo Inn, Bend LLC*, 2009 U.S. Dist. LEXIS 65562, at *8-9 (D. Or. July 24, 2009) ("[A]bsent a showing that the information obtained from OJIN was inaccurate or incomplete by omitting final disposition of the charge, plaintiff's claim under § 1681k(a) must fail."); *Obabueki v. Choicepoint, Inc.*, 236 F. Supp. 2d 278, 283-84 (S.D.N.Y. 2002), *aff'd,* 319 F.3d 87 (2nd Cir. 2003) (same).

The consequence of this required element is that it precludes class certification.  Indeed, *Farmer* addressed <u>*this precise issue*</u> with respect to a proposed § 1681k(a) class (asserted by the same Plaintiffs' counsel here) that is, in all respects, identical to Count I, holding:

> [I]t will be necessary to conduct a highly individualized inquiry into the content of each consumer's report . . . .  To sustain a claim, each consumer will need to prove that the adverse information in the report defendant furnished about that consumer was either incomplete or not up to date.  This will entail an individual inquiry into the contents of each consumer report issued by defendant.  The scope of this individual inquiry will require a variety of evidence specific to each case—such as the production of the actual up-to-date version of the public record at the

> time the report was issued . . . .  [This] will require the presentation of significant amounts of new evidence for each putative class member.  Thus, it is clear that the predominance requirement is not met and this class cannot be certified.

*Id.* at \*48-49.  This is consistent with the decisions of this Court and others nationwide, which have held that FCRA provisions that require a finding of inaccuracy are not capable of class certification.  *Williams v. LexisNexis Risk Mgmt., Inc.*, 2007 U.S. Dist. LEXIS 62193, at \*4 (E.D. Va. Aug. 23, 2007) ("Asserting a § 1681e(b) claim for [an] entire class would render the class-action device useless . . . because it would require an assessment of whether or not each class member's report was, in fact, inaccurate.") (Payne, J.).[11]

To *answer* the "common" questions that Plaintiffs claim to be present in the context of a statue that requires showing records that are not "complete and up to date," the Court will have to review "literally millions of [results] at once" to determine whether these results returned were incomplete.  *Dukes*, 131 S. Ct. at 2552.  This is inherently an individual issue.  *See, e.g.*, *Owner-Operator Indep. Drivers Ass'n, Inc. v. USIS Commercial Svcs., Inc.*, 537 F.3d 1184, 1194 (10th Cir. 2008) ("the accuracy of each individual's [report], an essential element of a § 1681e(b) claim, required a particularized inquiry"); *Lanzarone v. Guardsmark Holdings, Inc.*, 2006 U.S. Dist. LEXIS 95785, at \*13-14 (C.D. Cal. Sept. 7, 2006) ("Because the Court would have to address each of these issues on a one by one basis for all of the officers in the proposed class,

---

[11] Plaintiffs bravely cite *Farmer* as somehow supporting their case, but they ignore its holding that claims under § 1681k(a), like those under § 1681e(b), are not amenable to class treatment.  Plaintiffs also point to language in *Farmer* where the defendant's employees at The Phillips Agency discussed the nature of information returned to its subsidiary, Deverus, by NBD, which was then cited by the court.  *See* Pltfs' Mem. at p. 5.  Like all of NBD's customers, Deverus received records that matched exactly to their search queries; the results were not linked to a specific consumer.  Ex. B at ¶ 19.  Deverus was also trained to be aware of the nature of its self-selected queries.  Ex. B at ¶ 19.  Additionally, no testimony of any NBD witness was ever placed into the record in *Farmer*, nor did NBD produce any documents in connection with that case.  *See* Ex. B at ¶¶ 20-21.  Therefore, the statements regarding the nature of NBD's data in *Farmer* were based on a one-sided (and obviously-biased) record and a distortion of the services provided by NBD, which remains a market leader with many customer relationships.

Plaintiff cannot meet his burden under Rule 23(b)(3).").  Finding incompleteness in one report will do nothing "to drive the resolution of the litigation" as a whole.  *Dukes*, 131 S. Ct. at 2551.

Plaintiffs try to circumvent this individualized issue by contending that NBD systematically fails to transmit "complete" files because of its alleged universal suppression of SSNs.  Pltfs' Mem. at p. 15 ("There is simply no way that a public record item can be 'complete' without the inclusion of a SSN.").  As set forth above, Plaintiffs' factual contention is false.  *See* Ex. C at ¶¶ 34-37.  Plaintiffs' basis for avoiding the conclusion dictated by *Farmer* is meritless.

Plaintiffs also spend a significant portion of their brief claiming that SafeRent's contracts with its sources of information disclaim the "completeness" of the information being provided by the source.  *See* Pltfs' Mem. at pp. 13-14.  That is wrong.  Rather, those contracts provide only a boilerplate disclaimer of any warranty of completeness for ongoing *liability* purposes.  *See* Pltfs' Mem. at Ex. 12 (CL-H010002); Ex. 13 (CL-H010062); Ex. 14 (CL-H010072); Ex. 15 (CL-H010082); Ex. 16 (CL-H010088); Ex. 17 (CL-H010100); Ex. 18 (CL-H010044).  Indeed, such a generic disclaimer of warranty in the contract is itself often accompanied by representations that the information being transmitted "is data that is of public record, that is kept in the Clerk's ordinary course of business," *see* Ex. 18 (CL-H010044), that the data has "been prepared by the Circuit Courts from original sources and data believed to be reliable," *see* Ex. 17 (CL-H010100), and that such information is coming directly from the governmental source's "database."  *See, e.g.*, Ex. 16 (CL-H010086).  Nor would such high-level disclaimers, even if they stood for the proposition that incomplete records were perhaps occasionally being transmitted, *globally* prove "incompleteness" for each of the ███████████ criminal records in question.

███████████████████████████████████████████████

███████████████████. Ex. C at ¶ 7.  And, although attempting to plead a wide-ranging class across *all* of SafeRent's sources, Plaintiffs cite a mere seven contracts out of SafeRent's over 300

sources of information.   Thus, the disclaimers of warranty highlighted by Plaintiffs have no application whatsoever as to the vast majority of the records at issue.[12]

All told, Plaintiffs' proffered bases for systematically showing that NBD's data is not "complete and up to date" all fail.  What is left is the exact same type of individualized inquiry the court in *Farmer* recognized is incapable of class certification.

### B.   If a genuine dispute of material fact exists on the issue, whether NBD's procedures comply with § 1681k(a)(2) requires an individualized inquiry.

Under § 1681k(a)(2), no liability is possible unless Plaintiffs establish that NBD failed to maintain "strict procedures" to insure that the data supplied is "complete and up to date."  *Id.* And, it is the plaintiff that bears the burden of disproving the existence of "strict procedures" for purposes of establishing liability under § 1681k(a).  *Dalton v. Capital Associated Indus.*, 257 F.3d 409, 416-17 (4th Cir. 2001).

Plaintiffs assert that this element of a § 1681k claim can be satisfied on a classwide basis because NBD's "reports do not even include a field for [SSNs] in the public records included in a report," meaning that NBD cannot "claim that it had strict procedures in place to insure that it only reported complete public records."  Pltfs' Mem. Opp. at pp. 13, 14.  As explained above, that contention has no basis in fact.  NBD does not deliberately "suppress" SSNs, and it provides them in a designated field when available.  Ex. C at ¶ 37.  Having exposed as fiction Plaintiffs' contentions regarding NBD's transmission of SSNs, as well as Plaintiffs' basis for disproving NBD's compliance with, § 1681k(a)(2), the Court will need to evaluate whether NBD's

---

[12] The same is true with respect to NBD's contract with Verifications, where NBD disclaimed any warranty of completeness for liability purposes.  Plts' Ex. 27 (CL-H0028887, ¶ 6).  Contrary to Plaintiffs' claims that such a passage was an acknowledgement of the transmission of "incomplete" data, *see* Pltfs' Mem. at p. 17, that paragraph is merely a reminder that, although NBD itself is transmitting the complete public records made available to it, those public records may themselves lack certain identifying information, and is also a reminder that further investigation is needed by Verifications to eliminate "false positives when [it] uses a broad selection criteria" for searching.  *See id.* (CL-H002888, ¶ 11(b)).

procedures for data intake and transmission qualify as "strict" procedures under § 1681k(a)(2) as to the results returned for each of the 1.7 million queries put at issue by the class definition.

As noted in NBD's Motion for Partial Summary Judgment on this issue, approximately 85 percent of the governmental sources whose data are included in the Multistate Database provide monthly updates of their criminal records. Ex. C at ¶ 10. The remaining sources provide either daily, weekly, quarterly, or semi-annual updates.[13] Ex. C at ¶ 10. Once it is received by SafeRent, all the criminal record information is subject to the same extensive quality-assurance, auditing, and maintenance processes. Ex. C at ¶¶ 12-18. In the event that summary judgment is not granted on the issue, this issue is not a common issue "capable of classwide resolution . . . in one stroke," *Dukes*, 131 S. Ct. at 2551, because NBD's updating procedures varied over the 300 sources of the records reported. The Court may not extrapolate from Plaintiffs' claims on a classwide basis because each class member's claim would depend on the circumstances of how NBD reported information to its CRA customers, including the sources implicated by the records and/or the age of the records relative to the updating cycles.[14]

---

[13] For example, the data from Virginia's Administrative Office of the Courts are updated monthly, data from North Carolina's Administrative Office of the Courts are updated daily, and data from the San Diego Superior Court Index and the Pennsylvania court system are updated weekly. Ex. C at ¶ 10. Moreover, even when a source provides updates on a less-than-daily basis, if the record had been generated at the very end of an update cycle, the record itself may only be a day old at the time of its transmission to SafeRent.

[14] Plaintiffs invoke the terms of a 2005 contract between ADP and NBD for the claim that NBD's reports do not comply with § 1681k(a)(2). Pltfs' Mem. at p. 18. As a threshold matter, that contract was six years old and had been supplanted at the time that ADP conducted the search at issue for CareSouth. *See id.* Therefore, it has no relevance to this case. Additionally, the contract is entirely consistent with NBD's position that § 1681k(a) does not apply to it in the first instance. If, however, § 1681k(a) does apply to NBD, this court must assess compliance by reference to the facts in the record, and not accompanying descriptions of law in outdated contracts with third parties. *Williams v. Lockheed Martin Corp.*, 2011 U.S. Dist. LEXIS 115091, at *6-7 (S.D. Cal. Oct. 5, 2011) ("The relevant concern is the job duties actually performed by NDCAs, not how they are described in third party contracts.").

Ex. C at ¶¶ 12-18.

The court in *Farmer* recognized this same issue, holding that given the "broad range" of defendants' data sources, under § 1681k(a)(2), "the court would need to determine the source of each piece of adverse information in a consumer's report and then evaluate the quality of that source.  This will necessarily entail individualized inquiry for many reports, even if some of the record sources may be common to many potential class members and thus susceptible to classwide proof."  285 F.R.D. at 702-03; *accord Harper v. TransUnion, LLC*, 2009 U.S. Dist. LEXIS 12760, at *8 (E.D. Pa. Dec. 20, 2006) (assessment of the reasonableness of a defendant's procedures under § 1681e(b) "will require highly individualized proofs").

Likewise, in *Soutter*, the Fourth Circuit addressed variations in data collection methods within a CRA's procedures, where "LexisNexis used . . . at least three different means of collecting" records.  2012 U.S. App. LEXIS 24891, at *12-13 (E.D. Va. Dec. 3, 2012).   The Fourth Circuit held, given that variation, that "proof that Equifax's behavior was unreasonable because of the manner in which LexisNexis collected data from the Richmond General District Court in Soutter's case does not 'advance' the claim of a class member whose judgment was from a circuit court in 2010."  *Id.*  Here, there are not three methods of collection, there are *more than 300*.

Even more, to recover the statutory or punitive damages sought under Count I, Plaintiffs must prove that NBD *willfully* failed to "maintain strict procedures designed to insure . . . that [a consumer's report] is complete and up to date."  15 U.S.C. § 1681k(a)(2); *id.* § 1681n(a).  Plaintiffs will have to show, for every class member, that whichever procedure NBD used as to an individual search query was so clearly unreasonable that NBD acted knowingly or recklessly in failing to meet its obligations under the FCRA in the context of sources and records that varied across the class period.  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57, 68 (2007).  Such an analysis would create even more individualized issues.

40

### C.     The amount of statutory damages is an individual issue.

Statutory damages are sought for each class member under Count I.[15]   Amend. Compl., at ¶¶ 75, 77.  However, upon a finding of liability, the amount of statutory damages any given class member should receive is an individual issue.  This measure will vary for each consumer based on class-member-specific considerations, within the statutory range of $100 to $1,000.  *See* 15 U.S.C. § 1681n(a)(1)(A).

Statutory damages are awarded on a "per consumer" basis, and not "per violation." *Stillmock v. Weis Mkts., Inc.*, 385 Fed. Appx. 267, 273 (4th Cir. 2010).  This "places the focus on the characteristics of individual class members, rather than on the defendant's conduct that is common to the entire class." *Id.* at 277 (Wilkinson, J., concurring).  Therefore, setting statutory damages is an individual issue.  *Campos v. ChoicePoint, Inc.*, 237 F.R.D. 478, 486 n.20 (N.D. Ga. 2006) (individual issues precluding class certification included "the determination of the proper amount of statutory damages to impose for each violation").

In *Souter*, the Fourth Circuit held that calculating statutory damages focuses on the individual circumstances of the putative "class members."  *See* 2012 U.S. App. LEXIS 24891, at *13 ("[B]ecause statutory damages are intended to address harms that are small or difficult to quantify, evidence about particular class members is highly relevant to a jury charged with this task.").  For that reason, statutory damages "typically require an individualized inquiry" into the amount of alleged harm suffered by the consumer.  *Id.*  Generally, therefore, "businesses deserve at least the opportunity to argue that certain individuals should receive statutory damages at the low end of the range." *Stillmock*, 385 Fed. App'x at 277.  That is especially true when the class proposed to be certified is massive, with the $900 difference in the per-consumer statutory range affecting the requested liability to the order of over 1.5 billion dollars.

---

[15] Plaintiffs seek only statutory and punitive damages for Count I; no actual damages are claimed.

Fundamentally, as the Supreme Court recently emphasized, to claim, as Plaintiffs do, that "any method of [damages] measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be . . . would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1433 (2013). As the Supreme Court also recently made clear, the mere fact that the individualized issues in a case are the defendant's burden to prove rather than the plaintiff's should not alter the certification analysis. "[A] class cannot be certified on the premise that [the defendant] will not be entitled to litigate its . . . defenses to individual claims." *Dukes*, 131 S. Ct. at 2561. This holding has underpinnings in due process, which guarantees a defendant's right to present "every available defense." *Lindsey v. Normet*, 405 U.S. 56, 66 (1972). There is no principled basis to pick a single statutory damages amount and then award that number to every class member, especially given that the Fourth Circuit has clarified that "evidence about particular class members is highly relevant" to that inquiry. *Soutter*, 2012 U.S. App. LEXIS 24891, at *13.

## IV. Plaintiffs are not typical of the proposed class members because there is no evidence that ADP, Verifications, or HR Plus "used" the records returned by NBD within the established meaning of the term under FCRA.

The typicality requirement ensures a representative "possess[es] the same interest and suffer[s] the same injury as the class members." *Falcon*, 457 U.S. at 156. To satisfy the requirement, a "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of [her] own individual claim." *Deiter*, 436 F.3d at 466-67. Instead, the representatives must show no "meaningful differences" between their claims and the class. *Id.* at 467. Hence, a "litigant must be a member of a class which he or she seeks to represent at the time the class action is certified," *Riemer v. Columbia Med. Plan*, 43 Fed. Appx. 576, 578 (4th Cir. 2002), and "typicality of the class representative may be defeated

if the class representative is subject to unique defenses. *In re Computer Scis. Corp. Secs. Litig.*, 2012 U.S. Dist. LEXIS 181450, at *30 (E.D. Va. Dec. 19, 2012).

As detailed above, compelling authority, including the most recent interpretation by the FTC of the term "use" under the FCRA, dictates that a "user" of consumer information is an entity that takes action on a consumer's employment application, and not simply an entity that does nothing more than resell information in its own consumer report. *See Nat'l Auto. Dealers Ass'n*, 864 F. Supp. 2d at 74. Assuming a proper class definition that incorporates this definition of "use," Plaintiffs are atypical class representatives subject to a unique defense in that there is no evidence that ADP, Verifications, or HR Plus actually "used" the records returned by NBD to make any employment-related decision.[16]  *See* Ex. D; Ex. E.

## V. Plaintiffs' transparent attempt to discard their claims for actual damages and to represent a class seeking only statutory and punitive damages renders them inadequate and atypical representatives.

Plaintiffs do not seek actual damages in Count I, even though they claim actual damages under their individual claims in Count III-V based on the same pattern of conduct. See Amend. Compl., at ¶¶ 75, 77, 94, 99, 103. This strategic attempt to avoid pleading actual damages only with respect to their class claim under § 1681k(a)(1) is a transparent effort to jettison claims Plaintiffs would otherwise contend are viable in an effort to support class certification. Indeed, in the recently settled action by Henderson against Verifications, an "actual damages" settlement fund of $750,000 was created for class members whose claim under § 1681k(a) resulted in "tangible injury" to the consumer. 3:11cv514 (Dkt. No. 39-1 p. 13).

Accordingly, despite Plaintiffs' attempt to prosecute the class without an actual damages claim, the class will inevitably include individuals who claim actual damages, and who will have

---

[16] Indeed, there is no evidence that has been produced in discovery that any of those three entities ever made any employment-related decision for any of the proposed class members.

interests quite different from Plaintiffs. "[B]asic due process requires" that Plaintiffs "possess undivided loyalties to absent class members" to be an adequate class representative, and any "conflict in remedial interests" renders their representation inadequate under Rule 23(a)(4). *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 339 (4th Cir. 1998). But, Plaintiffs cannot avoid such a conflict here.

Proof of actual damages would be inherently individualized, which is presumably why Plaintiffs sought to gerrymander individuals with claims for actual damages out of the class and to limit each class member's recovery to statutory damages only. Assuming *arguendo* that Plaintiffs' claims are typical of the proposed class (as they allege to be), the class members would have also suffered actual damages, all of which are being waived by the self-serving election to pursue only statutory damages here. Such a "conflict in remedial interests" renders representation inadequate. *Id.*

Nor can Plaintiffs avoid this conclusion because class members with actual damages can opt out of the class. Class certification precedes the opt-out process, and the named plaintiff must be adequate and typical, even on the assumption that no class member will opt out. *See Colindreas v. QuietFlex*, 235 F.R.D. 347, 376 (S.D. Tex. 2006) ("Providing class members notice and opt-out opportunity may alert class members that they can pursue individual damages claims, but are not a substitute for the adequate, conflict-free representation required under Rule 23(a)(4)."). Any need to rely on class members with claims for actual damages to opt out underscores that Plaintiffs are neither typical nor adequate representatives of the class.

## VI. Adjudicating this matter as a class action ███████████████████████████████████████████, which makes the class action device an inferior method of adjudication.

To justify certification, Plaintiffs must prove that the class mechanism is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

23(b)(3).  Superiority requires that use of a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Superiority also "requires the court to find that the objectives of the class-action procedure really will be achieved."  *Stillmock*, 385 F. App'x at 274.  "The court must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy . . . and to assume the risk of prejudice" to putative class members not before it.  *Id.*

    **A.**    <u>**NBD is threatened with ███████████████ an indisputably novel claim.**</u>

Count I presses a novel claim that raises myriad factual and legal issues.  Yet, Plaintiffs seek class treatment for Count I while seeking statutory and punitive damages on behalf of 1.7 million or more as-yet-unidentified consumers, which threatens NBD with devastating liability of more than **_$1.7 billion_**.  *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978) ("Certification of a large class may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense.").  ████████████████████████████████████████████ ██████████████████████████████ Ex. G at ¶¶ 4-6.

Allowing novel claims carrying enormous aggregated statutory damages to proceed as a class action creates enormous settlement pressure and threatens to ensure that the merits of novel claims such as Plaintiffs' never are tested.  *Stillmock*, 385 Fed. Appx. at 281 (concurrence) ("[T]here is a serious concern with forcing these defendants to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability.").

The class action mechanism is not a tool to force settlements on defendants who "may seek to settle early and often to avoid litigation costs and the risk of getting hit with a large verdict at trial."  *Malack v. BDO Seidman, LLP*, 617 F.3d 743, 755 (3d Cir. 2010).  Such

"exponential expansion of statutory damages through the aggressive use of the class action device" could never have been contemplated by the drafters of the FCRA or Rule 23. *Stillmock*, 385 Fed. App'x at 276; *see also AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1756 (2011) (class actions entail "risk of '*in terrorem*' settlements"); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 (11th Cir. 2003) (doubting whether plaintiff could demonstrate superiority when "defendants' potential liability would be enormous and completely out of proportion to any harm suffered by the plaintiff").

### B.     Plaintiffs have repeatedly proven that individual actions are viable.

The class action mechanism is not superior here because individual suits under the FCRA are a practical and realistic alternative to a sprawling and novel class action. For instance, rather than limiting plaintiffs to actual damages, Congress provided the alternative of statutory damages within a $100-$1,000 range, anticipating that amounts will vary with consumer-specific evidence. 15 U.S.C. § 1681n(a)(1)(A). Congress further incentivized individual FCRA actions by authorizing attorneys' fees for plaintiffs in "any successful action" brought under the FCRA and providing for punitive damages on top of statutory damages for willful violations. 15 U.S.C. §§ 1681n(a)(2), (a)(3); 1681o(a)(2); *Harper*, 2009 U.S. Dist. LEXIS 12760, at *10 ("I am further persuaded by defendant's argument that the FCRA, by providing for the award of attorneys' fees, already provides an incentive for the putative class members to bring individual claims.").

Taken together, these remedies ensure "[t]here is no shortage of incentives for consumers to bring individual suits" and render FCRA cases "'essentially costless' to winning plaintiffs." *Stillmock*, 385 Fed. App'x at 282 (Wilkinson, J., concurring). Indeed, not only are individual FCRA actions "costless" for consumers, they may produce substantial recoveries.[17] Courts,

---

[17] For example, the Fourth Circuit has affirmed a jury award of $150,000 in damages in an individual FCRA action. *Sloane v. Equifax Info. Servs.*, 510 F.3d 495, 507 (4th Cir. 2007).

including the Fourth Circuit, have consistently held that the availability of punitive or statutory damages and fee shifting can demonstrate the viability of "individual actions in the absence of a class action." *Thorn*, 445 F.3d at 328 n.20; *see also, e.g.*, *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 420 (5th Cir. 1998) (statutory damages and attorney's fees "eliminate[d] financial barriers that might make individual lawsuits unlikely"). In these circumstances, the FCRA's scheme ensures that individual suits are a meaningful alternative to class actions.

Indeed, the litany of civil actions that have been filed by Henderson and Hines in this Court demonstrate the feasibility of FCRA individual actions as an appropriate means of redress. *See* 3:11cv507; 3:11cv514; 3:12cv109; 3:12cv589; 3:12cv730; 3:13cv29; 3:13cv578; 3:14cv82 (all involving Henderson); 3:13cv104 (Hines individual action against ADP).

"Chief among the justifications for [the class action] device is its efficiency: It . . . saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated *in an economical fashion*." *Thorn*, 445 F.3d at 318 (emphasis added). There is nothing "economical" about proceeding here by a class action. As explained above, even deciding who is in the class will require substantial work. From there, things will only get more complicated, for the Court will have to engage in an individual review of 1.7 million search results, cross-matched against ███████████████████, just to define who is in the class. This task would be as incomprehensibly taxing as it is inconsistent with the demanding requirements of Rule 23.

## VII.    Plaintiffs' five-year proposed class period is impermissibly broad.

Apart from the substantive inability to certify any class in this action, the proposed class definition in Count I suffers from an incurable procedural defect. The proposed class alleges FCRA violations that occurred "within five years next preceding the filing of this action and during its pendency[.]" Plts' Mot. at p. 18. In so pleading, Plaintiffs invoke the FCRA's

limitations provision, while ignoring the qualifier for the invocation of that five-year provision.

Specifically, the FCRA sets forth a "hybrid" limitations period, with the statute providing:

> An action to enforce any liability created under this title may be brought . . . not later than the earlier of – (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation that is the basis for such liability occurs.

15 U.S.C. § 1681p.  Plaintiffs' proposed class period thus overlooks the fact that an individual's discovery of an alleged violation shortens the limitations period to two years from the date of discovery.  *Id.*  Accordingly, certification of any five-year class should be denied.

The Fourth Circuit has noted that even when the limitations period analysis has the mere potential for giving rise to individual inquiries, class certification is erroneous.  As the court in *Broussard* held when reversing a decision to certify a class, if a defendant's statute of limitations defense "may depend on facts peculiar to each plaintiff's case," such as what each class member "knew about Meineke's operation . . . and when he knew it," then "class certification is erroneous."  155 F.3d at 339.

In a subsequent decision, *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 438 (4th Cir. 2003), the court emphasized the categorical nature of its holding in *Broussard*:

> [W]e have *flatly held* that "when the defendants' affirmative defenses . . . may depend on facts peculiar to each plaintiff's case, class certification is erroneous." *Broussard*, 155 F.3d at 342 . . . .  *Although it is difficult to determine with any precision*, it appears that here the Agents' affirmative defenses are not without merit and would require individualized inquiry *in at least some cases*.

*Id.* (emphases added).  In short, class certification is improper even when a statute of limitations defense "may depend" on individual facts "in at least some cases."  *Id.*

Consistent with this authority, courts have rejected five-year FCRA classes due to the two-year discovery period.  *E.g.*, *Molina v. Roskam Baking Co.*, 2011 U.S. Dist. LEXIS 136460, at *3, 13-14 (W.D. Mich. Nov. 29, 2011); *Holman v. Experian Information Solutions, Inc.*, 2012

U.S. Dist. LEXIS 59401, at *42-43 (N.D. Cal. April 27, 2012) (limiting proposed FCRA class to two years because to assess "liability to . . . more than 4,000 putative class members whose credit reports were disclosed more than two years before January 12, 2011, would require a determination of whether the class member . . . learned of Experian's disclosure."); *Domonoske v. Bank of Am., N.A.*, 2010 U.S. Dist. LEXIS 7242, at *13 n.3 (W.D. Va. Jan. 27, 2010) ("The two year period was chosen because the statute of limitations for any violation of the FCRA is the earlier of two years from the date the plaintiff discovers the violation or five years from the date of the violation."). Thus, if somehow certified, the class must be limited to two-years.[18]

## VIII. Dismissal with prejudice is appropriate because amendment of the class definition to comport with the elements of § 1681k(a) would be futile.

No doubt Plaintiffs will request leave to amend Count I in light of the foregoing deficiencies. But, as set forth above, amendment would be futile because each element of the class claim pled under § 1681k(a)(1) requires individualized analyses, so such a claim is not amenable to class treatment. The same is true as to Plaintiffs' status as atypical and inadequate representatives, as well as the superiority of individual litigation under the circumstances here.

## CONCLUSION

WHEREFORE, Defendant, CoreLogic National Background Data, LLC, respectfully requests that the Court: (1) deny Plaintiffs' Motion for Class Certification with prejudice; and (2) grant NBD any other relief the Court deems appropriate.

---

[18] Even if discovery of an alleged violation is unlikely, such a concern is irrelevant. *See Molina*, 2011 U.S. Dist. LEXIS 136460, at *14. Of course, Plaintiffs themselves fully demonstrate discovery within the five year period is possible – Hines brought suit less than one-and-a-half years after an alleged violation. *See, e.g.*, Amend. Compl., ¶ 46.

**CORELOGIC NATIONAL BACKGROUND DATA, LLC f/k/a NATIONAL BACKGROUND DATA, LLC**


By:/s/ David. N. Anthony
                    Of Counsel

Alan D. Wingfield (VSB No. 27489)
David N. Anthony (VSB No. 31696)
Timothy J. St. George (VSB No. 77349)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia  23219
Telephone: (804) 697-1200
Facsimile:  (804) 698-1339
alan.wingfield@troutmansanders.com
david.anthony@troutmansanders.com
tim.stgeorge@troutmansanders.com

*Counsel for Defendant*

50

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of February 2014, I filed a true and correct copy of the foregoing on the Court's Electronic Filing System, which will send a Notice of Electronic Filing to:

Leonard A. Bennett, Esq.
Susan M. Rotkis, Esq.
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd, Suite 1A
Newport News, VA  23601
Telephone:  (757) 930-3660
Facsimile:  (757) 930-3662
Email:  lenbennett@cox.net
*Counsel for Plaintiffs*

Dale W. Pittman, Esq.
THE LAW OFFICE OF DALE W.
PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb St.
Petersburg, VA  23803
Telephone:  (804) 861-6000
Facsimile:  (804) 861-3362
Email: dale@pittmanlawoffice.com
*Counsel for Plaintiffs*

David A Searles, Esq.
DONOVAN SEARLES LLC
1845 Walnut St., Ste 1100
Philadelphia, PA  19103
Telephone: 215-732-6067
Facsimile: 215-732-8060
*Counsel for Plaintiffs*

James Arthur Francis, Esq.
FRANCIS & MAILMAN PC
Land Title Building
100 S Broad Street, 19th Floor
Philadelphia, PA  19110
Telephone: 215-735-8600
Facsimile: 215-940-8000
Email: jfrancis@consumerlawfirm.com
*Counsel for Plaintiffs*

Janelle E. Mason, Esq.
Matthew J. Erausquin, Esq.
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Rd
Suite 600
Alexandria, VA 22314
Telephone:  (703) 273-7770
Facsimile: (888) 892-3512
Email: janelle@clalegal.com
Email: matt@clalegal.com
*Counsel for Plaintiffs*

/s/ David N. Anthony
David N. Anthony (VSB Bar No. 31696)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia  23219
Telephone:  (804) 697-1254
Facsimile:  (804) 698-6013
david.anthony@troutmansanders.com