1

**COPY**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| TYRONE HENDERSON and ) | |
| JAMES O. HINES, JR., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case Number: |
| v. ) | 3:12cv 00097 (REP) |
| ) | United States |
| CORELOGIC, INC., ) | District Court |
| ) | Eastern District |
| and ) | of Virginia |
| ) | |
| CORELOGIC NATIONAL BACKGROUND ) | |
| DATA, LLC, f/k/a National ) | |
| Background Data ,LLC, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

DEPOSITION OF
JAMES KENNETH BELL

February 21, 2013
10:39 a.m.

One 10th Street
3rd Floor Conference Room
Augusta, Georgia

Noelani J. Fehr, CCR-B-2829, RPR

EXHIBIT A

1              Was Mr. Hines ever identi --
2              MR. SEARLES: Can you finish the allegation?
3         Q.   (By Mr. St. George)  Even though he's never
4    been to that state.  Mr. Hines was not approved for
5    hire.
6              Was CareSouth ever aware of any possibility
7    that Mr. Hines had been registered as a sex offender
8    in the State of Indiana?
9         A.   No, sir.
10        Q.   I am going to have you turn to paragraph 54.
11   And paragraph 54 reads, plaintiff was notified by
12   CareSouth of the derogatory public record information
13   supplied by CareSouth to ADP.
14             MR. MEEKS: Supplied to CareSouth by ADP.
15   BY MR. ST. GEORGE:
16        Q.   Excuse me.  Supplied to CareSouth by ADP.
17   To your knowledge was plaintiff ever provided with
18   notice of the contents of the information -- I should
19   say Plaintiff Hines, was he ever provided with notice
20   of the contents of the information that was supplied
21   to CareSouth by ADP?
22        A.   Not to my knowledge.
23        Q.   And can I have you look at paragraph 58.  It
24   starts on page ten and continues on to page 11.  It
25   says, as a result of the consumer report CareSouth

James Kenneth Bell                                              2/21/2013

97

1    refused to hire or approve Mr. Hines for hire.  Would
2    you agree with that statement?
3         A.   We offered him employment.
4         Q.   So is it your testimony that that statement
5    is wrong?
6         A.   My testimony is that we offered Mr. Hines
7    employment.
8         Q.   So it is your testimony that Mr. Hines was
9    not refused or disapproved for employment as a result
10   of his consumer report?
11        A.   To the best of my knowledge.
12             MR. ST. GEORGE:  That's all I have, although
13        I would like to take a minute to look at 63 just
14        to see what it is.  Were you provided a copy of
15        this, ma'am?
16             COURT REPORTER:  I don't believe so, no.
17             MR. ST. GEORGE:  Does anybody have an extra
18        copy for the court reporter?
19             COURT REPORTER:  13?
20             MR. ST. GEORGE:  Yes.
21             COURT REPORTER:  Thank you, sir.
22             (Exhibit 13 was marked for identification.)
23        Q.   (By Mr. St. George)  Mr. Bell, do you
24   recognize this document?
25        A.   I do.

                                                                100

 1      A.   Explain material to me.
 2      Q.   We'll drop that term.  That could take a
 3  while.  Would there be differences that could --
 4      A.   I've got some time, sir.
 5      Q.   Would there be differences that -- I'll
 6  define it.
 7      A.   Okay.
 8      Q.   Would potential make a difference one way or
 9  the other on an employment application.  Would be a
10  relevant factor in CareSouth's assessment of a
11  potential employee.  That's how I'll define material
12  if that's okay with you.
13           Would there be material differences in how
14  likely adverse any given criminal record would be
15  based on the nature of the charge itself?
16      A.   I think we would take into account all
17  factors including that in making a decision.
18      Q.   And would the same hold true with the nature
19  of how that charge was disposed of, whether it was
20  dismissed or convicted?
21      A.   That would be a part of our total
22  evaluation.
23      Q.   So would you be able to determine without
24  looking at any particular application or applicant as
25  a whole whether a conviction for a non-barrier offense

1  would likely prevent an applicant from getting a job
2  with CareSouth?
3          MR. SEARLES:  Object to the form,
4      speculation.
5          THE WITNESS:  No.  I think we would have to,
6      again, take a look at it on a case by case basis
7      as we do now, sir.
8      Q.  (By Mr. St. George)  And that's based on
9  your experience as the Senior Vice President for Human
10 Resources at CareSouth?
11     A.  Yes.
12     Q.  Would you be able to determine without
13 looking at any particular application as a whole
14 whether a charge for any offense without a conviction
15 would likely prevent an applicant from getting a job
16 at CareSouth?
17         MR. SEARLES:  Objection to form.
18         THE WITNESS:  Again, it would be a part of
19     the factors that we would look at.
20     Q.  (By Mr. St. George)  Would you have to look
21 at the application as a whole?
22     A.  I think I have to look at the application as
23 a whole.
24     Q.  So is your answer to the question that
25 without looking at the particular application you

                                                              102

1    would not be able to make that determination?
2         A.   Yes.
3              MR. ST. GEORGE:   That's all I have.
4                              EXAMINATION
5    BY MR. SEARLES:
6         Q.   Mr. Bell, I have a few questions.  Let me
7    introduce myself.  My name is David Searles.  I am one
8    of the attorneys for the plaintiffs in this case.
9              Prior to today's deposition did you have any
10   contact with Mr. St. George?
11        A.   I did not.
12        Q.   Do you know whether anybody in your office
13   had any communications with him?
14        A.   Not to my knowledge.
15        Q.   No telephone call?  No E-mails?
16        A.   Not to my --
17        Q.   As far as you know?
18        A.   As far as I know, no, sir.
19        Q.   How were you apprised of their request to
20   take your deposition?
21        A.   This, that we received (indicating).
22             MR. MEEKS:   He is referring to Exhibit --
23             THE WITNESS:   The subpoena, yes.
24        Q.   (By Mr. Searles)  Was that delivered
25   directly to your office or did you get that from