UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

TYRONE HENDERSON, *et al.*

     Plaintiffs,

v.

                                      Civil Action No. 3:12cv97 (REP)

CORELOGIC NATIONAL BACKGROUND DATA, LLC

     Defendant.

## DECLARATION OF DR. MICHAEL C. KEELEY

I, Dr. Michael C. Keeley, pursuant to 28 U.S.C. § 1746, declare and swear as follows:

1.     My name is Dr. Michael C. Keeley.  I submit this declaration in support of CoreLogic National Background Data, LLC ("NBD's") memorandum in opposition to Plaintiffs' Motion for Class Certification.  On July 30, 2013, I served a copy of my expert report, which contained, verbatim, the following analysis and conclusions.  In light of certain intervening stipulations of the parties, as well as Plaintiffs' proposed, revised class definition in their memorandum in support of their Motion for Class Certification, I have excerpted portions of my prior report to account for the status of NBD's arguments and placed my conclusions under oath.

2.     I am an economist and Senior Vice President of Cornerstone Research, an economic and financial consulting firm with seven offices nationwide.  I specialize in economic, financial, and statistical analysis, including the analysis of large data sets.  I earned an S.B. degree in mathematics from the Massachusetts Institute of Technology in 1969, and the University of Chicago awarded me an M.A. degree in economics in 1971 and a Ph.D. degree in economics in 1974.  I specialize in applied micro economics, which involves the study of markets, firms, and the organization of industries, including the organization of firms



participating in labor markets.  Applied micro economics is used to address a variety of public policy issues as well as issues arising in litigation including damages and class certification.

3.   For more than 30 years, I have consulted and served as an expert witness on class certification, damage, liability, and other issues regarding a variety of legal disputes.  Many of these cases have involved analysis of large, complex data sets, including the assessment of what inferences can be drawn from the data, including whether the data can be used to identify members of a proposed class and whether the data are sufficient to determine whether proposed class members were adversely impacted by the alleged conduct, and if so, the magnitude of damages.  I have also addressed liability and damage issues in antitrust cases and have provided testimony on damage issues in intellectual property cases.  I have testified as an expert witness in a number of cases and served as a consultant in others.  In addition to consulting on issues relating to litigation, I have consulted on non-litigation business, economic, and public policy issues.  I have addressed public policy issues regarding various labor issues, energy policy, and financial regulation.

4.   I have provided expert testimony or consulting related to class certification in a number of cases involving issues related to:  compensation, hiring, and labor markets; financial products; pharmaceutical products; semiconductors; medical devices; cigarettes; crude oil markets; and gasoline markets, among others.  Many of these cases involved assessing what types of analysis and what types of conclusions could be drawn from very large, complex data sets.

5.   Before joining Cornerstone Research, I was an Officer at the Federal Reserve Bank of San Francisco.  My responsibilities there included conducting economic and financial research related to the operation of financial markets and the banking system, and the implications for policy and regulatory issues facing the Federal Reserve System, including

regulatory policy addressed to ensuring the solvency of the banking system. Prior to joining the Federal Reserve Bank of San Francisco, I was involved in conducting public policy research involving various labor issues (among other things) at Stanford Research Institute (now called SRI International). Much of my research at SRI involved addressing public policy issues in the labor economics field through empirical analysis of large, complex data sets.

6.      I authored a book dealing with various public policy issues in labor economics and I have published widely in the field of labor economics.[1]  The field of labor economics involves, generally, the study of labor markets, factors affecting the supply of and demand for labor, issues related to firms' hiring, firing, promotion, and retention decisions, factors affecting the search for employment, and other policy-related issues affecting labor supply and demand (e.g., the effects of welfare programs, unemployment insurance, education, training, and taxation on labor supply, compensation, unemployment etc.).

7.      My research has been published in economics and finance journals. Based on citations of my research, I was selected for inclusion in *Who's Who in Economics*. I was also awarded the Garn Prize and I have served as a referee (i.e., reviewer) for many of the major economics and finance journals. Details of my qualifications are provided in the attached copy of my curriculum vitae in Appendix 1. A list of cases in which I have provided testimony since 2009 is provided in Appendix 2.

8.      Cornerstone is being compensated for its work at its standard rates and Cornerstone's  compensation is not dependent on the outcome of this matter.

---

[1] Keeley, Michael C., *Labor Supply and Public Policy:  A Critical Review*, New York, New York:  Academic Press, June 1981.

## II.    Assignment and Materials Considered

9.    I was asked by counsel for NBD[2] to review Plaintiffs' allegations and to address issues related to possible certification of the proposed class defined in Count I of Plaintiffs' claims for relief (the "proposed Count I class").[3]  I have not been asked to address any issues related to any claims other than Count I.  I am an economist, not a lawyer, and I have not been asked to provide any legal opinions.   Instead, I have been asked to assess the types of information contained in the databases at issue, the types of information provided to NBD by Consumer Reporting Agencies ("CRAs") that query the relevant database, and to assess issues related to employers' use of criminal background checks.   (The data at issue in this case were provided by NBD.)  Based on these assessments, I have been asked to determine (1) whether the members of the proposed Count I class can be identified without a case-by-case inquiry or analysis, and (2) whether it is possible to determine whether a proposed Count I class member was injured without a case-by-case inquiry and, if so, the extent or nature of the injury.

10.    In forming my opinions, I have relied on my academic training, my professional experience, and a review of materials relevant to the specific issues raised in this matter.   In particular, I have reviewed Plaintiffs' Amended Class Action Complaint; Defendants' Motion to Dismiss;[4] Plaintiffs' opposition;[5] Defendants' reply;[6] parts of the Fair Credit Reporting Act ("FCRA"); deposition testimony of James Kenneth Bell;[7] produced documents; public materials on background screening; and additional pleadings and publicly available materials.   I have

---

[2] I understand that CoreLogic National Background Data, LLC ("NBD") obtains criminal conviction, arrest, and sex offender data that are supplied to NBD's customers from CoreLogic SafeRent, LLC ("SafeRent"). (See Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories Directed to Defendants, March 4, 2013, p. 14.) Both SafeRent and NBD are subsidiaries of CoreLogic, Inc. (CoreLogic, Inc., Form 10-K for the Fiscal Year Ended December 31, 2012.)

[3] Amended Class Action Complaint, November 30, 2012, ("Amended Complaint"), ¶¶64–67.

[4] Defendants' Memorandum in Support of Their Motion to Dismiss, May 3, 2012, ("Motion to Dismiss").

[5] Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, May 31, 2012, ("Plaintiffs' Opposition").

[6] Defendants' Reply Memorandum in Support of Their Motion to Dismiss, June 15, 2012, ("Defendants' Reply").

[7] Deposition of James Kenneth Bell, February 21, 2013, ("Bell Deposition").

interviewed Mr. Joe Davidson, Senior Director of Data Operations at SafeRent, a subsidiary of CoreLogic, Inc., and my staff has met with him on several occasions.[8]  I have also interviewed Ms. Linda "Lyn" Watts, Operations Manager of NBD.  These types of materials and sources of information are consistent with the type of information that I ordinarily consider and rely on in my work.

11.    I understand that Joe Davidson's primary responsibility is maintaining the "Multistate Database," which is the source database used to populate the results of the CRA customer queries at issue in this case.[9]  I and my staff interviewed Mr. Davidson about the processes for updating the data from the various data sources, the variables included in the database, and the various data fields that can be provided in a query of the database.  Mr. Davidson provided a verbal description of each of the variables included in the database and provided a data file containing all of the unique offense descriptions by state, and a data file containing all of the unique dispositions (e.g., arrested, guilty, not guilty, dismissed, etc.), including a count of the number of records associated with each disposition.  In addition, I and my staff asked Mr. Davidson specific questions about the frequency with which various data fields were populated to corroborate verbal descriptions of the database and I requested examples of query results.[10]  I have been asked to assume that the data and information provided to me by Mr. Davidson are accurate.

12.    A list of the materials I have considered in forming my opinions is provided in Appendix 3.

---

[8] It is common practice to have staff assist on matters such as this one and they operate under my guidance and supervision.

[9] The results of the customer queries also are maintained by Joe Davidson in the "Results Returned Database." (See Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories Directed to Defendants, March 4, 2013, pp. 30-31.)

[10] I understand these same data files, statistics, and query results have been provided to Plaintiffs.

## III.    Plaintiffs' Count I Class Claims

13.    Plaintiffs claim[11] that NBD violated the FCRA (§ 613) 15 U.S.C. § 1681k(a).  My review and discussion of this statute is for contextual purposes only.  I am not providing any legal opinions about the meaning or interpretation of this statute.  Nor am I providing any legal opinions about whether these provisions of the FCRA apply to NBD.

14.    The FCRA (§ 613) 15 U.S.C. § 1681k(a) reads as follows:

> In general.  A consumer reporting agency which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment shall
>
> (1) at the time such public record information is reported to the user of such consumer report, notify the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported; or
>
> (2) maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date.  For purposes of this paragraph, items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported.

15.    Plaintiffs allege that these provisions of the FCRA require NBD to provide notice to the subject consumer at the time a third-party CRA obtained criminal records information from NBD, but that NBD did not do so.[12]  I understand that NBD maintains that is not covered by these provisions of the FCRA.  Nevertheless, below, I address Plaintiffs' claims assuming that these provisions of the FCRA do apply to NBD.

16.    I have been asked to assume that the references to the ability to *"obtain"* employment in the FCRA (§ 613) 15 U.S.C. § 1681k(a) do not encompass other employment

---

[11] In Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, they state that "[t]he Complaint specifically alleges that Defendants complied with neither of these obligations [1681 k(a)(1) or k(a)(2)] when they furnished the employment reports that erroneously ascribed to Mr. Henderson a criminal conviction that the public record showed was not his." (Plaintiffs' Opposition, p. 3.)

[12] Amended Complaint, ¶¶6, 69, 74.

purposes for existing employees, such as promotion, licensure, or retention, etc. I also have been asked to assume that, consistent with the FCRA (§ 613) 15 U.S.C. § 1681k(a), a CRA would be required to provide notice to a consumer if: (1) the report would be "likely to have an adverse effect upon a consumer's ability to obtain employment;" and (2) the CRA did not follow "strict procedures" to ensure the report "is complete and up to date."

17. NBD obtains criminal conviction, arrest, and sex offender data from SafeRent, a wholly-owned subsidiary of CoreLogic, Inc., a holding company that also owns NBD. SafeRent obtains records regarding criminal conviction or arrest directly from the courts or other government sources.[13] SafeRent obtains sex offender data from a third party vendor. NBD provides its CRA customers with search tools to perform queries in the Multistate Database, which is hosted by SafeRent.[14]

18. As part of my assignment, I have been asked to assume that Plaintiffs' Count I class is limited to persons who were the subject of a report that was furnished for the purpose of obtaining employment, consistent with the FCRA (§ 613) 15 U.S.C. § 1681k(a), notwithstanding the fact that Plaintiffs' Count I class definition includes persons who were the subject of a report that was "furnished for an employment purpose," regardless of the particular employment purpose (i.e., it would include reports provided for purposes of retaining employment, promotion, etc.) I also have been asked to assume that Plaintiffs' Count I class is limited to those persons for whom the report is likely to have an adverse effect on the individual's ability to obtain employment, consistent with the text of FCRA (§ 613) 15 U.S.C. § 1681k(a), even though Plaintiffs' definition broadens the scope of the class to include any person that was the subject of a report containing at "least one record of criminal conviction or arrest…" regardless of whether

---

[13] Interview of Joe Davidson, February 5, 2013. For criminal records from Massachusetts, SafeRent uses contractors to physically go to the courts to obtain the records because these data are not available electronically. (Interview of Joe Davidson, February 5, 2013.)

[14] Interview of Joe Davidson, February 5, 2013.

that criminal conviction or arrest is likely to affect the individual's ability to obtain employment. I have been asked to assume that Plaintiffs' Count I class is limited to persons who were the subject of a query and for whom records provided to NBD's CRA customers were not "complete and up to date" at the time the record was provided. I also have been asked to assume that the existence and extent of actual injury suffered by an individual member of Plaintiffs' Count I class is relevant to determining whether a class should be certified.

## IV.  Summary of Conclusions

19.  In summary, it is not possible to determine who is a member of the proposed Count I class based on the Multistate Database or the data submitted to NBD when a CRA queries its database.  Individual inquiry is required to determine who is a member of the proposed Count I class for at least five reasons:

20.  First, NBD does not know, and it cannot be determined without individual inquiry, whether the individual being screened is seeking to obtain employment. CRAs identify in their queries whether the criminal record search is being performed for "employment purposes," but they do not indicate whether the specific employment purpose was to "obtain employment." CRAs are also authorized by NBD to perform queries on behalf of employers for other employment-related purposes, such as retention, reassignment, and promotion.

21.  Second, NBD does not know, and it cannot be determined without individual inquiry, whether the information it sells to a CRA will be provided to the employer requesting the background screening. The data sold to the CRA may not be the same information the CRA provided to the employer. NBD informs and counsels the CRAs, which purchase the criminal data, that it is the CRA's obligation to review the reports obtained from NBD's database and eliminate any false positive results (i.e., an indication that the person committed a crime when in fact he or she did not) and reduce the occurrence of false negatives (i.e., no indication that the

person committed a crime when in fact he or she did).[15]  NBD does not know, and it cannot be

determine absent individual inquiry, which data the CRAs eliminate prior to providing a report to

an employer.[16]

22.     For example, Verifications states that it does not provide any of the criminal

record information obtained from NBD to its clients; rather, it uses the results obtained from

national criminal databases (such as NBD's) to "identify jurisdictions in which a criminal record

search will be conducted.  Those 'from-the-source' results are reported to an employer.  This is

… the best way to use criminal database information to provide an accurate and defensible

background report to an employer."[17]

_____

[15] See NBD Reseller Service Agreement, May 14, 2007 (CL-H004942–74 at CL-H004948); NBD Reseller Service Agreement, January 17, 2012 (CL-H003936–40 at CL-H003937); NBD Reseller Service Agreement, December 4, 2012, (CL-H004221–5 at CL-H004222); NBD Reseller Service Agreement with ADP, September 16, 2005 (CL-H000287–309 at CL-H000293); NBD search results for Tyrone Henderson, November 16, 2011 (CL-H000009–24 at CL-H000024); NBD search results for James Hines, June 7, 2011 (CL-H002721–39 at CL-H002738).

[16] Interview of Joe Davidson, April 4, 2013; Interview of Lyn Watts, April 4, 2013.  See also "Our Positions," Concerned CRAs (http://www.concernedcras.com/about-us-3/).  Concerned CRAs, an industry group composed of a group of CRAs that are worried about the future of the employment background screening industry, recommends that when using criminal records in databases for employment-related screenings "1. Criminal records databases compiled by non-government entities will only be used as indicators of possible records. Prior to making any report to an employer about a criminal record from a database, the CRA will verify the information directly with the reporting jurisdiction. This ensures that employers make decisions based on accurate and up-to-date information. 2. Current or prospective employer clients will be provided information about the limited nature of criminal records databases and the importance of researching each applicant's criminal history in the jurisdictions in which the applicant currently or previously has lived or worked."

[17] "National Criminal Databases and Background Screening," Verifications, Inc., March 1, 2012, p. 4.

████████████████████████████████████████

████████████████████████████████ [18]

23.    Third, NBD does not know, and it cannot be determined without individual inquiry, what criteria the employer will use to assess the individual's suitability for employment and thus whether the information it provides to the CRA would likely have an adverse effect upon an individual's ability to obtain employment (assuming the individual was seeking employment).  Whether any data supplied to the employer were likely to adversely affect (or even affect at all) the consumer's ability to obtain employment requires individual inquiry because different employers have markedly different policies/practices regarding what criteria they use to determine whether to offer employment to an individual with a criminal record.[19]

24.    Fourth, the data that make up the Multistate Database vary greatly in both form and substance depending on from which of the over 300 governmental sources the data are obtained. NBD transmits the data to its customers in a substantively unadulterated form. The varied nature of the data is another reason why an objective and systematic assessment of whether any criminal record is likely to have an adverse effect on a consumer's ability to obtain employment is not possible.

25.    Fifth, I understand that Plaintiffs contend that a record provided to a customer should be considered "up to date" only if the status of a record is confirmed with the

---

[18] NBD search results for Tyrone Henderson, November 16, 2011 (CL-H000009–24); Letter from Interstate Brands Corporation to Henderson, Tyrone Bernett Sr., November 17, 2009 (Corelogic_Hostess_001_000049–73 at Corelogic_Hostess_001_000069–70); NBD Henderson Reconstruction (CL-H002649–52).

[19] It also may be necessary to determine whether the report provided to the employer originated from NBD's database as opposed to another criminal record data provider.  Employers can access data from multiple data sources.  For example, CareSouth accessed criminal background data from ADP, which ADP had purchased from NBD, but CareSouth also purchases criminal background data from Data Facts as an alternative to purchasing from ADP. (Bell Deposition, 49:15–51:15, 86:5–12).  From publicly available resources, I have obtained and reviewed a number of sample background investigation reports from different CRAs and the identity of the wholesaler is not readily apparent in those sample reports.  See, for example, sample screening reports from the following CRAs: IntegraScan (http://www.integrascan.com/sample-background-check); easyBackgrounds (http://www.easybackgrounds.com/resources/sample-reports/); Professional Screening & Information, Inc. (http://www.psibackgroundcheck.com/sample-report.shtml); Accio Data (http://www.acciodata.com/whatyouget/samples/sample2.pdf); DetectFraud (https://www.detectfraud.com/employment_screening_sample.pdf); Verifications, Inc. (http://www.verificationsinc.com/pdf/sample.pdf).

governmental source in a matter of days before the record is provided to a user. Variation exists in how current the data in the Multistate Database are at any point in time. Depending on the source providing the data and the timing of the search query, the records can be "up to date" by a matter of a few days, a few weeks, a month, or in some limited cases more than a month. Individual query-by-query and record-by-record analysis would be required to determine the time period between when a CRA queried NBD's criminal record database and when the data were most recently obtained or confirmed with the governmental source providing the data.

26.     In addition, I have been asked to assess the extent to which individual harm can be determined for members of Plaintiffs' alleged class for Count I. I have concluded that determining whether a consumer has been "injured" under Plaintiffs' theory (and, if so, the extent of the injury) requires individual inquiry. Plaintiffs Mr. Henderson and Mr. Hines claim that the criminal record information provided by NBD was "inaccurate" and that NBD failed to meet the requirement of providing "consumers immediate notice of the furnishing of the employment report and details necessary to preemptively contact the reporting agency to obtain and as appropriate correct information in the furnished report." As a result, both Mr. Henderson and Mr. Hines claim that they were denied employment.[20] Thus, assuming that the members of the proposed Count I class can be identified, from an economic perspective and consistent with Plaintiffs' theory of injury, a proposed Count I class member is adversely impacted (i.e., harmed) only if the report provided to the employer does, in fact, prevent or delay employment for the individual, and this adverse consequence was caused by inaccurate information. If the report provided to the employer includes a criminal record that prevents the individual from being hired, but the information is accurate, from an economic perspective and based on Plaintiffs' theory of injury, there is no harm to the individual due to the alleged conduct. There also would

---

[20] Amended Complaint, ¶¶4–6.

be no harm if, despite the existence of either inaccurate or accurate derogatory information in the report, the information did not affect the consumer's ability to obtain employment.

27. Below, I explain these conclusions in more detail.

## V. Background on the Screening Industry

28. Background checks are conducted for a variety of employment purposes including, but not limited to, the screening of potential job candidates and determining the suitability of employees for retention, promotion, licensure, or reassignment.[21] To cater to the needs of a diversity of information seekers, background screeners offer a variety of screening options including reports on credit histories, sex offender registries, as well as criminal records.[22] The database at issue in this case includes only criminal background data that are provided to CRAs who sell background screening services to employers.[23]

29. A background check intended to screen a "consumer," such as a job applicant or current employee, can include one or many types of checks and the employer can secure reports from one or multiple sources to aid them in their decision. For example, the components of a background screening for job applicants to the Washington Metropolitan Area Transit Authority (WMATA) (in Washington D.C.) or for current employees of the WMATA include a national

---

[21] Exhibit A to NBD Reseller Service Agreement with ADP, March 25, 2008 (CL-H000179–86 at CL-H000185); Exhibit F to NBD Reseller Agreement with ADP, September 16, 2005 (CL-H000287–309 at CL-H000304); Federal Trade Commission Consumer Report Information (CL-H000488–519 at CL-H000498); CareSouth Criminal History Disclosure Statement (CS000033). Post-employment background checks appear to have become common in recent years. See, for example, the results of a survey published by the Society for Human Resources Management in January 2010 ("Background Checking: Post-hire Background Checks," p. 3 (http://www.shrm.org/Research/SurveyFindings/Articles/Pages/BackgroundCheckPosthire.aspx)) and a survey published by EmployeeScreenIQ in 2011 ("Trends in Employment Background Screening," 2011 Results, p. 8 (http://www.employeescreen.com/ESIQ_Trends_2011.pdf)). See also "Background Checks That Never End," Bloomberg Businessweek, March 19, 2006 (http://www.businessweek.com/stories/2006-03-19/background-checks-that-never-end); "Policy on Pre- and Post-Employment Background Checks", University of Maine System Chancellor's Office and Systemwide Services, April 17, 2008 (http://www.maine.edu/pdf/PolicyonPreandPostEmploymentBackgroundChecks.pdf); CareSouth Background Check Policy (CS000069–71 at CS000069).

[22] "Background Screening," Verifications, Inc. (https://www.verificationsinc.com/eng/whatwedo/background_screening.cfm); "Background Checks & Jobs," Portland State University Student Legal Services, p. 3, (http://www.pdx.edu/sls/sites/www.pdx.edu.sls/files/Background%20checks%20presentation.pdf); "Info Brochure," National Association of Professional Background Screeners (http://www.napbs.com/i4a/pages/index.cfm?pageid=3280). See also "Instant Criminal Records & Background Checks," Integrascan (http://www.integrascan.com/); "HireRight On-Demand Solutions & Services," HireRight (http://www.hireright.com/Background-Checks.aspx); "Background Screening Products," Accurate Background (https://www.accuratebackground.com/products.php?sec=17).

[23] Interview of Joe Davidson, April 4, 2013.

search of criminal history, social security number verification, review of driving record, verification of education, employment history and professional licensure, a search of national sex offender databases, a review of the terrorist watch list, and a credit review.[24]

30.    Similarly, after the September 11, 2001 attacks, Verizon Communications initiated an expanded background screening policy. While Verizon previously limited searches to only the county/region/state level, Verizon retained the services of a screening vendor in order to gather information at the national level. In addition to a criminal record search, Verizon also performs verifications of Social Security numbers, reference checks, job history verification, and if applicable to the job, education and driving record checks. In addition, foreign nationals who have been in the United States for fewer than seven years also undergo an international background investigation.[25]

31.    A criminal history investigation as a component of a pre-employment background screening is common. A survey published by the Society for Human Resource Management in July 2012 found that a large percentage of employers conducted criminal background checks on all or some of their job candidates in their efforts to ensure a safe work environment for employees, reduce their legal liability for negligent hiring, and assess the trustworthiness of candidates, among other reasons.[26] Another survey conducted by researchers at North Dakota State University in November 2010 found that a large percentage of companies conduct a

---

[24] "Board Action/Information Summary," Washington Metropolitan Area Transit Authority, May 26, 2011 (http://www.wmata.com/about_metro/board_of_directors/board_docs/052611_Cons5101139BackgrndScreenRevHL.pdf); "Minutes, 1363rd Meeting of the Board of Directors," Washington Metropolitan Area Transit Authority, May 26, 2011 (http://www.wmata.com/about_metro/board_of_directors/board_docs/062311_May262011Minutes.pdf). The WMATA has utilized multiple background screening companies for more than 10 years to ensure that the background information it receives has been sufficiently validated and that it has the flexibility to utilize vendors whose concentration is specialized (for example, some companies may specialize in professional licensure verification, while others focus on criminal history reports).

[25] "Life Goes On," Society for Human Resource Management HR Magazine 47(11), September 1, 2002, (http://www.shrm.org/Publications/hrmagazine/EditorialContent/Pages/0902emprelations.aspx).

[26] "Background Checking: The Use of Criminal Background Checks in Hiring Decisions," Society for Human Resource Management, July 19, 2012, p. 3, 6. (http://www.shrm.org/Research/SurveyFindings/Articles/Pages/CriminalBackgroundCheck.aspx). See also EEOC Enforcement Guidance, Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., April 25, 2012, pp. 6, 34. (http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm).

criminal background check on all or some of their prospective employees.[27]   Similarly, EmployeeScreenIQ, an employment screening company, reports that a large percentage of the respondents in a May 2010 survey that it conducted cited county and national criminal record checks respectively as high priority background checks on their potential hires.[28]

32.   In addition to pre-employment background screening, criminal history investigation is also used as part of post-employment background checking.   A survey published by the Society for Human Resource Management on January 22, 2010 found that 24 percent of employers conducted credit and/or criminal background checks on all or some of their employees after those employees were hired and begun work.[29]   Similarly, EmployeeScreenIQ reports that 22 percent of the respondents to a March 2011 survey conducted a post-hire criminal background screening on their employees.[30]

33.   To aid decision makers in background screening, an industry has developed to conduct criminal history investigations.   According to the National Association of Professional Background Screeners (NAPBS), an association of over three hundred companies engaged in employment and tenant screening, there are over a thousand small to mid-size screening firms and over fifty large-size screening firms in the industry.[31]

34.   A criminal history investigation by a CRA typically involves a search of government agency, court, and other records with the goal of determining whether a "consumer"

---

[27] Oster-Aaland, Laura, Kevin Thompson, and Erika Beseler Thompson, "2010 Survey of NDSU Employers" (http://www.ndsu.edu/fileadmin/alcoholinfo/2010_NDSU_Employer_Survey_Summary.pdf).

[28] "Trends in Employment Background Screening," EmployeeScreenIQ, 2010, p. 6 (http://www.employeescreen.com/ESIQ_2010_Trends.pdf).

[29] "Background Checking: Post-hire Background Checks," Society for Human Resource Management, January 22, 2010, p. 3 (http://www.shrm.org/Research/SurveyFindings/Articles/Pages/BackgroundCheckPosthire.aspx).

[30] "Trends in Employment Background Screening," EmployeeScreenIQ, 2011, p. 10 (http://www.employeescreen.com/ESIQ_Trends_2011.pdf).

[31] "Info Brochure," National Association of Professional Background Screeners, pp. 8, 11. (http://www.napbs.com/i4a/pages/index.cfm?pageid=3280).

has a criminal history.[32]  CRAs can access courthouse source information directly, but they can also use proprietary criminal history databases, such as the database compiled by a data vendor such as NBD, to compile their reports.  These databases contain criminal record information and can be a faster and less expensive means of generating data for consumer reports.[33]  NBD, which describes itself as selling "exclusively through a network of screening companies never direct to the client," is an example of one of the data vendors that sells data to CRAs.[34]

35.    A CRA accesses data from NBD by submitting certain identifying information about the individual being screened in a search query.  NBD's computer system returns to the CRA criminal records that match the query.  The CRA then can review the results and use its own procedures to determine which criminal records relate to the particular individual being screened (as opposed to another individual that may share the same or similar name and birthdate) and conduct further due diligence to compose a report for the employer.[35]  For example, in its agreement with NBD, ADP agreed to "take independent verification of all negative criminal and eviction information" given that "information obtained from public records such as criminal and eviction data is often incomplete, untimely, inaccurate and subject to producing false positives..."[36]

36.    Conducting background checks is vital for many companies because:  (1) pre-employment screenings aid employers in making informed hiring decisions by screening out applicants that might be a danger to the employer's customers or other employees and/or

---

[32] EEOC Enforcement Guidance, Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., April 25, 2012, p. 4 (http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm).
[33] Ernst, Carl R. and Les Rosen, "'National' Criminal History Databases: Issues and Opportunities in Pre-employment Screening," November 26, 2002, p. 7 (http://www.esrcheck.com/file/NationalCriminalHistoryDatabases.pdf).
[34] "Our Clients," NBD (https://www.nationalbackgrounddata.com/marketing/solution_p_n.html); "National Background Data Consumer Relations," NBD (https://www.nationalbackgrounddata.com/marketing/consumer_relations.html).
[35] Ernst, Carl R. and Les Rosen, "'National' Criminal History Databases: Issues and Opportunities in Pre-employment Screening," November 26, 2002, p. 9 (http://www.esrcheck.com/file/NationalCriminalHistoryDatabases.pdf).
[36] NBD Reseller Service Agreement with ADP, September 16, 2005 (CL-H000287–309 at CL-H000289, CL-H000293).

- 15 -

applicants that may be dishonest and engage in nonviolent crimes such as theft; and (2) background checks reduce the likelihood of lawsuits related to negligent hiring, retention, promotion, or supervision, which can have a negative impact on a company's brand, stock equity, and workplace environment.[37]

37.     In 2009, there were 572,000 nonfatal violent crimes (e.g., rape/sexual assault, robbery, and aggravated and simple assault) committed against employees of age 16 or older while they were at work and 521 employees were victims of homicide in the workplace.[38]  Of the workplace violent crimes committed between 2005 and 2009, 21 percent were committed by work associates.[39]    Additionally, according to a survey administered by the National Retail Federation and the University of Florida, nearly half (44 percent) of losses in the retail industry in 2008 were attributable to employee theft, which cost the industry $15.9 billion.[40]

38.     Employers responsible for conducting due diligence in hiring can be sued for hiring an individual they knew or "should have known" was dangerous or unfit for the job.[41] Employers lose more than 70 percent of negligent hiring lawsuits and the average jury plaintiff award is more than $1.6 million.[42]  For instance, in the case of *Beverly v. Diamond*, a mentally disabled woman 55 years of age was raped by a newly hired bus driver who was not required to undergo a background or reference check.   Had a background check been conducted, the employer, Diamond Transportation Services, would have discovered that he was a newly

---

[37] Rosen, Lester, "Safe Hiring Practices and Pre-employment Screening," Presentation for the HR Screener, 2003; Dodge, Garen E., "The Employer's Dilemma:  To Screen or Not to Screen," March 13, 2012 (https://www.uschamber.com/sites/default/files/Dodge%20Presentation.pdf).

[38] Harrell, Erika, "Workplace Violence, 1993-2009," U.S. Department of Justice, March 2011 (http://www.bjs.gov/content/pub/pdf/wv09.pdf).

[39] Harrell, Erika, "Workplace Violence, 1993-2009," U.S. Department of Justice, March 2011 (http://www.bjs.gov/content/pub/pdf/wv09.pdf).

[40] Grannis, Kathy, "Troubled Economy Increases Shoplifting Rates, According to National Retail Security Survey," National Retail Federation, June 16, 2009 (http://www.nrf.com/modules.php?name=News&op=viewlive&sp_id=746).

[41] "Negligent Hiring Practices," Northern Arizona University (http://hr.nau.edu/node/2158).

[42] Dodge, Garen E., "The Employer's Dilemma:  To Screen or Not to Screen," March 13, 2012 (https://www.uschamber.com/sites/default/files/Dodge%20Presentation.pdf).

released convicted felon with prior convictions that included conspiracy to commit robbery, felony robbery, possession of marijuana, reckless driving, and concealment of a firearm. A jury found Diamond Transportation Services negligent in hiring and awarded a verdict of $3 million in compensatory damages for anguish and suffering to "Beverly."[43]

## VI.   NBD's Business Model and Relevant Databases

39.   As mentioned above, the data at issue in this case are provided by NBD, which is a "wholesale criminal data provider to the background screening industry."[44] NBD provides consumer data to CRAs for the purposes of residential screening, employment screening and/or other purposes as permitted under federal, state, and local laws.[45] NBD sells data exclusively to screening companies and does not sell any data to the users of the data, such as employers.[46] NBD currently has about 300 CRA customers.[47]

40.   One of the criminal background search services that NBD offers is Criminal Offender Profile Summary (C.O.P.S.), which is a multi-jurisdictional search tool from a criminal records database that returns criminal offender information.[48] Plaintiffs' allegations only involve the Multistate Database, which contains only criminal background data, including sex-offender data, and the Results Returned Database, reflecting the data that were actually supplied to NBD's CRA customers from the Multistate Database in response to CRA search queries.

41.   The Multistate Database, which can be accessed by NBD's CRA clients through search queries,[49] includes criminal records that are obtained directly from federal, state, and

---

[43] Decision in Beverly v. Diamond, June 1, 1999 (http://www.ca4.uscourts.gov/opinions/Unpublished/982230.U.pdf).

[44] "Not Just a Criminal Check, a Background Solution," NBD (https://www.nationalbackgrounddata.com/marketing/home.html).

[45] "National Background Data Consumer Relations," NBD (https://www.nationalbackgrounddata.com/marketing/consumer_relations.html).

[46] "Our Clients," NBD (https://www.nationalbackgrounddata.com/marketing/solution_p_n.html).

[47] Interview of Joe Davidson, February 5, 2013.

[48] "Instant Criminal Services," NBD (https://www.nationalbackgrounddata.com/marketing/inst_crim_services.html); "National Background Data, Criminal Offender Profile Summary," NBD (CL-H002751).

[49] "Our Company," NBD-National Background Data (https://www.nationalbackgrounddata.com/marketing/about_us.html).

county agencies, as well as sex offender registry data.[50]   Since each agency has developed its

database for its own particular use, there is variation among the agencies in content, structure,

and format of the data they provide.   The data originate from each public-records source and are

processed and incorporated in the Multistate Database.[51]

42.   The CRAs to which NBD sells data in turn provide employers and other users

information on individuals' (usually referred to as "consumers") backgrounds derived from

public records.   These data are used by employers for pre- and post-employment decisions

(initial employment, promotion, reassignment, and retention),[52] and by other users for non-

employment decisions.   For example, in its application to become an "NBD Affiliate" in August

2002, ADP indicated that it would be using the background information for "tenant" and

"insurance" purposes as well as employment purposes.[53]   Similarly, under the September 2005

Reseller Service Agreement with NBD, ADP agreed to use the background information only for

the following purposes:   resident screening, security clearance, volunteer/intern/apprentice

---

[50] "Our Clients," NBD (https://www.nationalbackgrounddata.com/marketing/solution_p_n.html); "Criminal Offender Profile Summary," NBD (https://www.nationalbackgrounddata.com/marketing/ncd_search.html); NBD Database Sources by State (CL-H007709–80).

[51] Interview of Joe Davidson, February 5, 2013. Mr. Davidson also explained that the data are provided in different formats and with different variables, and although variable names are standardized or "normalized," the contents of the various fields are not changed or standardized in any way.

[52] Interview of Lyn Watts, April 4, 2012.  See also Exhibit A to NBD Reseller Service Agreement with ADP, March 25, 2008 (CL-H000179–86 at CL-H000185); Exhibit F to NBD Reseller Service Agreement with ADP, September 16, 2005 (CL-H000287–309 at CL-H000304); Federal Trade Commission Consumer Report Information (CL-H000488–519 at CL-H000498); CareSouth Criminal History Disclosure Statement (CS000033). Post-employment background checks appear to have become common in recent years. See, for example, the results of a survey published by the Society for Human Resources Management in January 2010 ("Background Checking: Post-hire Background Checks," p. 3 (http://www.shrm.org/Research/SurveyFindings/Articles/Pages/BackgroundCheckPosthire.aspx)) and a survey published by EmployeeScreenIQ in 2011 ("Trends in Employment Background Screening," 2011 Results, p. 8 (http://www.employeescreen.com/ESIQ_Trends_2011.pdf)).  See also "Background Checks That Never End," Bloomberg Businessweek, March 19, 2006 (http://www.businessweek.com/stories/2006-03-19/background-checks-that-never-end); "Policy on Pre- and Post-Employment Background Checks," University of Maine System Chancellor's Office and Systemwide Services," April 17, 2008 (http://www.maine.edu/pdf/PolicyonPreandPostEmploymentBackgroundChecks.pdf); CareSouth Background Check Policy (CS000069–71 at CS000069).

[53] NBD Affiliate Application, August 30, 2002 (CL-H000152–65 at CL-H000159).

screening, and determining an individual's suitability for business and credit transactions as well as employment decisions.[54]

43.     Based on the proposed Count I class definition, the specific queries at issue in this matter are only those that were performed for "employment purposes," as indicated by the CRA when performing the query.[55] Even if a query is identified as being for an employment purpose, as discussed above, it could be to determine whether a job candidate is suitable to be hired, or whether an existing employee is suitable for continued employment or to be promoted. In other words, the employment purpose identified by the CRA customer could relate to a screening that is being conducted on either an existing employee or prospective employee.

44.     As mentioned above, NBD does not itself provide data directly to employers, and no one from NBD interprets the data, but NBD instead sells the data to third-party CRAs.[56] NBD also actively informs and counsels its CRA clients that the data provided do not necessarily pertain to a particular individual and instead reflect literal matches of data to the CRA's search query, the terms of which are specified by the CRA.[57]

---

[54] Exhibit F to NBD Reseller Service Agreement with ADP, September 16, 2005 (CL-H000287–309 at CL-H000304). See also the March 2008 Reseller Service Agreement between NBD and ADP where the parties agreed that ADP could use the background information for residential screening as well as employment screening (CL-H000179–85 at CL-H000185).

[55] When a CRA such as ADP submits a specific query for information, it identifies the "permissible purpose" of that query. "Notice to Users of Consumer Reports: Obligations of Users Under the FCRA," NBD (http://www.corelogic.com/landing-pages/asset_upload_file950_16795.pdf).

[56] Plaintiffs admit that NBD sells data solely on a wholesale basis. (Amended Complaint, ¶14).

[57] For example, one form contract used by NBD states that "… there will be instances where identifying information appears to match the applicant on which a Report is sought, which information may not pertain to the applicant, and that [the customer] will take, or cause it's End-Users to take, independent verification of the information contained in the Report to ensure that it pertains to the applicant before any adverse action is taken against the applicant." NBD Reseller Service Agreement, February 24, 2009 (CL-H006518–27 at CL-H006525). Another contract states that "…information obtained from public records such as criminal and eviction date is often incomplete, untimely, inaccurate and subject to producing false positives…there will be instances where no criminal information is reported with regard to persons who in fact have criminal records…" NBD Reseller Service Agreement, May 14, 2007 (CL-H004942–74 at CL-H004948). Similarly, another contract states, "…there will be instances where no criminal information is reported with regard to persons who in fact have criminal records…there will be instances where identifying information appears to match the applicant on which a Report is sought, which information may not pertain to the applicant…" NBD Reseller Service Agreement, January 17, 2012 (CL-H003936–40 at CL-H003937). Also, the contract between NBD and ADP states, "…information obtained from public records such as criminal and eviction date is often incomplete, untimely, inaccurate and subject to producing false positives…there will be instances where no criminal information is reported with regard to persons who in fact have criminal records…." NBD Reseller Service Agreement with ADP, September 16, 2005 (CL-H000287–309 at CL-H000293).

45.     The NBD product is "self-serve."  That is, a CRA will contract with NBD to access the Multistate Database and will pay NBD for that access.[58]  Records from the Multistate Database that match the criteria provided by the CRA are then transmitted to the CRAs by computerized systems.  NBD's employees have no active role in this process.  Consistent with it being the CRA's responsibility to interpret the data, NBD's customer agreement with Verifications states that:

> NBD does not warrant that any of the public records contained in the National Background Directory,[TM] or as reported by any public agency or court in their original form, are correct, complete, current, properly attributed, properly recorded, properly filed, properly docketed, legible, or otherwise accurate or usable for affiliate's intended purpose.[59]

46.     In its customer agreement with ADP, NBD states that the CRA agrees to "take independent verification of all negative criminal and eviction information" given that "information obtained from public records such as criminal and eviction data is often incomplete, untimely, inaccurate and subject to producing false positives..."[60]  The language included in either the Verifications or ADP customer agreements is substantively included in every reseller services agreement NBD has with its CRA clients.[61]

47.     Additionally, at the time that a search is undertaken by one of NBD's customers, NBD provides the following disclaimer along with the results:  "Because mis-identifications may occur when trying to identify a particular person, based solely on name and other identifiers,

---

[58] See, for example, the following NBD Reseller Services Agreements: CL-H002887–93 at CL-H002893; CL-H094016–40 at CL-H094028; CL-H094041–65 at CL-H094053; CL-H094078–102 at CL-H094090.

[59] NBD Affiliate Services Agreement with Verifications, Inc., March 17, 2003 (CL-H002887–93 at CL-H002887). See also NBD Reseller Service Agreement, May 14, 2007 (CL-H004942–74 at CL-H004948); NBD Reseller Service Agreement, January 17, 2012 (CL-H003936–40 at CL-H003937); NBD Reseller Service Agreement, December 4, 2012 (CL-H004221–5 at CL-H004222); NBD Reseller Service Agreement with ADP, September 16, 2005 (CL-H000287–309 at CL-H000293); NBD search results for Tyrone Henderson, November 16, 2011 (CL-H000009–24 at CL-H000024); NBD search results for James Hines, June 7, 2011 (CL-H002721–39 at CL-H002738).

[60] NBD Reseller Service Agreement with ADP, September 16, 2005 (CL-H000287–309 at CL-H000293).

[61] NBD Reseller Services Agreements (CL-H002946–7699).  Of over 300 NBD Reseller Services Agreements reviewed, one agreement was unreadable and another was missing the relevant page.  All other agreements contained the language.

extreme care must be exercised in the review and use of the information available through this site."[62]

48.     Since the vast majority of criminal records in the Multistate Database do not contain social security numbers (i.e., less than ten percent),[63] judgment is required by the third-party CRA and the employer to determine if the data supplied by NBD likely pertain to the individual being screened.  For example, if the employer provides to the CRA additional identifying information about the individual being screened, the CRA can compare the applicant's physical characteristics, such as height, race, and gender to the physical characteristics of the offender (if provided by the record source), or can compare information about the applicant's residence and employment history with any periods of incarceration for the offender.  Thus, it is the CRA that must interpret the data obtained from the Multistate Database, including whether the data are properly attributed to the individual upon which the search is being conducted.

49.     By providing criminal background data on a wholesale basis, NBD and other similar firms provide valuable efficiencies to the background screening industry.  NBD provides data from a large number of government entities to a large number of CRAs.  If each CRA had to obtain these data independently, each would have to basically replicate the functions and costs of NBD.  Likewise, if NBD had to provide the matching and notification functions that CRAs provide, NBD would basically be in the same business as the CRAs—it would not be providing data on a wholesale automated basis; rather, it would have to be a vertically integrated firm and it

---

[62] Search results for query conducted by Verifications (CL-H000032–38 at CL-H000038).

[63] Interview of Joe Davidson, April 4, 2013 and CoreLogic_Henderson Cornerstone, April 9, 2013 (CL-H092992–5).  Given that only a relatively small percentage of the records in the NBD database contain a unique identifier of an individual, such as a social security number, even if the CRA includes the social security number in its query, the records provided without a social security number do not necessarily match the individual about whom the user is seeking information.  (I have been asked to assume the validity of these figures for the purposes of this report and, if asked, will independently verify their validity.)  See also Holloran, Robert W., William J. Bollinger, and Sharron K. Goodman, "National Background Data, LLC Standards for Development and Use of Criminal History Databases," National Background Data, LLC, April 23, 2003 (https://www.nationalbackgrounddata.net/publicsiteforms/pages/pdf/criminal_database_standards_nbd.pdf).

would make little economic sense to sell the data to CRAs. Imposing large, redundant regulatory requirements would be tantamount to restructuring the background industry to replace it with an organizational structure that would be very inefficient, resulting in higher costs to users and society as a whole. The end result would likely be fewer background checks being conducted.

**VII.    Determining Who Is a Member of the Count I Class and Determining Who Was Adversely Impacted Requires Individual Inquiry**

50.    As mentioned above, Plaintiffs claim that NBD violated the FCRA (§ 613) 15 U.S.C. § 1681k(a). I understand that NBD maintains that it is not subject to this provision of the FCRA. Nevertheless, putting this legal issue aside, below I show why it is not possible to determine who is a member of the proposed Count I class without individual inquiry, and why Plaintiffs cannot establish impact of the alleged violation by using common evidence.

**A.    Individual inquiry is required to determine who is a member of the proposed Count I class.**

51.    Given the nature of NBD's systems, the varying data included in the Multistate Database from many sources, and the divergent criteria by which employers assess an individual's criminal history, it is not possible to identify members of the proposed Count I class without individual inquiry. The Results Returned Database cannot be used to identify individuals who were the subject of a report sold to a third-party CRA, nor can it be used to determine whether the report pertained to an individual seeking employment, and if it did, whether it likely would have had an adverse effect on the individual's ability to obtain employment.

**i.    Individual inquiry is required to determine whether the data requested by a third-party CRA are related to an individual trying to "obtain employment."**

52.    CRAs identify in their queries whether the criminal record search is being performed for "employment purposes." While NBD does maintain this information, the data *do not* indicate whether the specific employment purpose was to "obtain employment."

53.     As discussed above, the Multistate Database also can be used, and is used, for other employment purposes relative to current employees, such as retention, reassignment, and promotion,[64] and NBD does not know, nor do its data files indicate, whether the query was performed for an initial employment decision, as opposed to an employment decision for a current employee.[65]   Only individual inquiry of the CRA, or perhaps the employer, could determine whether the criminal records were obtained for purposes of evaluating an individual trying to obtain employment.

### ii.    Individual inquiry is required to determine whether the data requested by a third-party CRA would be "likely to have an adverse effect upon a consumer's ability to obtain employment."

54.     It is not possible to determine from NBD's records whether the data requested by a third-party CRA would be "likely to have an adverse effect upon a consumer's ability to obtain employment," as I have been asked to assume is required by FCRA (§ 613) 15 U.S.C. §1681k(a) (assuming that the data were obtained for the purposes of evaluating an individual seeking employment).   As a result, the proposed Count I class members cannot be identified based on a review of NBD's data.   While NBD does keep a record of the data it provided to the CRA based on the CRA's query, it rarely receives information from the CRA about the data ultimately provided to the employer.[66]   As a result, NBD's records cannot be used to determine whether the data it provided to a CRA were likely to have an adverse effect on an individual's ability to

---

[64] Interview of Lyn Watts, April 4, 2013. See also Exhibit A to NBD Reseller Service Agreement with ADP, March 25, 2008 (CL-H000179–86 at CL-H000185); Exhibit F to NBD Reseller Service Agreement with ADP, September 16, 2005 (CL-H000287–309 at CL-H000304); Federal Trade Commission Consumer Report Information (CL-H000488–519 at CL-H000498); CareSouth Criminal History Disclosure Statement (CS000033). Post-employment background checks appear to have become common in recent years. See, for example, the results of a survey published by the Society for Human Resources Management in January 2010 ("Background Checking: Post-hire Background Checks," p. 3 (http://www.shrm.org/Research/SurveyFindings/Articles/Pages/BackgroundCheckPosthire.aspx)) and a survey published by EmployeeScreenIQ in 2011 ("Trends in Employment Background Screening," 2011 Results, p. 8 (http://www.employeescreen.com/ESIQ_Trends_2011.pdf)).  See also "Background Checks That Never End," Bloomberg Businessweek, March 19, 2006 (http://www.businessweek.com/stories/2006-03-19/background-checks-that-never-end); "Policy on Pre- and Post-Employment Background Checks," University of Maine System Chancellor's Office and Systemwide Services, April 17, 2008 (http://www.maine.edu/pdf/PolicyonPreandPostEmploymentBackgroundChecks.pdf); CareSouth Background Check Policy (CS000069–71 at CS000069).

[65] Interview of Joe Davidson, April 4, 2013.

[66] Interview of Joe Davidson, April 4, 2013; Interview of Lyn Watts, April 4, 2013.

- 23 -

obtain employment because: (a) NBD does not know what information was provided to the employer; (b) employers vary in terms of the criteria they use to screen applicants and may use different criteria depending on the particular employment position; and (c) the data obtained by NBD from hundreds of federal, state, and local jurisdictions contain a multitude of different offenses preventing any formulaic assessment of the nature and severity of the offenses. Since NBD cannot identify those records that are likely to have an adverse effect on an individual's ability to obtain employment, members of the proposed Count I class cannot be identified even assuming the query related to a consumer seeking to obtain employment.

a). **NBD's records do not indicate what data are provided by the CRA to the employer.**

55. NBD's records do not indicate whether the data provided by NBD to a CRA are the same data that were provided to the employer. As discussed above, NBD contractually requires CRAs to review the data obtained from NBD to eliminate any "false positives" and ensure that the report provided to the employer only contains information about the particular individual being screened.[67] NBD also informs and counsels its CRA clients that the data provided by NBD do not necessarily pertain to a particular individual and instead reflect matches based on the CRA's search query, the terms of which are specified by the CRA. For example, one form contract[68] used by NBD provides:

> [T]here will be instances where identifying information appears to match the applicant on which a Report is sought, which information may not pertain to the applicant, and that [the customer] will take, or cause it's End-Users to take, independent verification of the information contained in the Report to ensure that it pertains to the applicant before any adverse action is taken against the applicant.

---

[67] NBD Reseller Service Agreement with ADP, September 16, 2005 (CL-H000287–309 at CL-H000289).

[68] NBD Reseller Service Agreement, February 24, 2009 (CL-H006518–27 at CL-H006525). See also NBD Reseller Service Agreement, May 14, 2007 (CL-H004942–74 at CL-H004948); NBD Reseller Service Agreement, January 17, 2012 (CL-H003936–40 at CL-H003937); NBD Reseller Service Agreement, December 4, 2012, (CL-H004221–5 at CL-H004222); NBD Reseller Service Agreement with ADP, September 16, 2005 (CL-H000287–309 at CL-H000293); NBD search results for Tyrone Henderson, November 16, 2011, (CL-H000009–24 at CL-H000024); NBD search results for James Hines, June 7, 2011 (CL-H002721–39 at CL-H002738).

56.     Additionally, when returning results to a customer's query, NBD contractually requires the customer that additional care must be taken "[b]ecause mis-identifications may occur when trying to identify a particular person, based solely on name and other identifiers."[69]

57.     Because NBD provides data on a wholesale basis to CRAs, who then use that data to generate reports for their clients, the data provided by NBD cannot be used to identify whether the query results are likely to adversely affect the ability of the individual being screened to obtain employment.   It is not possible to determine whether a record is or is not likely to adversely affect an applicant's ability to obtain employment without knowing whether the record was provided to the employer.

      **b).     The criteria used to screen applicants vary across employers, and for a given employer, for different employment positions.**

58.     Even if the particular records provided to the employer were known, different employers have different standards and practices for deciding whether to hire someone on the basis of his or her conviction records.   For instance, the Equal Employment Opportunity Commission ("EEOC") requires employers to demonstrate the business necessity of their background checking standards and publishes guidelines that state a company must consider "the nature of the job's duties (e.g., data entry, lifting boxes), identification of the job's essential functions, the circumstances under which the job is performed (e.g., the level of supervision, oversight, and interaction with co-workers or vulnerable individuals), and the environment in which the job's duties are performed (e.g., out of doors, in a warehouse, in a private home)."[70] Moreover, if an applicant does have a criminal background, the employer is required to consider

---

[69] Search results for query conducted by Verifications (CL-H000032–38 at CL-H000038).

[70] EEOC Enforcement Guidance, Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., April 25, 2012, p. 16 (http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm).   For example, in *El v. SEPTA* (2007) the Third US Circuit Court of Appeals allowed the rigorous background checking policy of SEPTA (the Southeastern Pennsylvania Transportation Authority), because "the nature of the position at issue—paratransit driver-trainee with unsupervised access to vulnerable adults—required the employer to exercise the utmost care."   (EEOC Enforcement Guidance, Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., April 25, 2012, pp. 11–2 (http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm)).

the nature and gravity of the offense and the time elapsed since the conviction or completion of sentence.[71]

59.     In addition, state laws vary regarding the types of offenses an employer may consider when making employment decisions.[72]  For example, California labor code states that "nor shall any employer seek from any source whatsoever, or utilize, as a factor in determining any condition of employment ... any record of arrest or detention that did not result in conviction."[73]  In addition, in California, CRAs can report criminal convictions only for seven years, while I understand that the FCRA does not place limits on the period that CRAs can report criminal convictions.[74]  Also, California employers are prohibited from using certain marijuana-related convictions in their employment decisions if the convictions are more than two years old.[75]  Colorado law prevents an individual's felony conviction from serving as an "automatic bar" to public employment.   Similarly, Florida law states that public employment cannot be denied "solely because" of a conviction.  Florida, Louisiana, New Mexico, and Washington have passed laws preventing public employers from considering felony convictions in employment decisions unless the convictions relate to the positions sought.   Arizona, Connecticut, and Kentucky have extended this qualification to any conviction and Hawaii, Kansas, New York, Pennsylvania, and Wisconsin have further extended their laws to encompass the private sector.[76]  As a result of these different statutes, it is not possible without individual inquiry to determine the effect of a criminal record on the ability to obtain employment.

---

[71] EEOC Policy Statement on Issue of Conviction Records, February 4, 1987.

[72] NBD generally is not made aware by its CRA customers of the state where the consumer is seeking employment, such that NBD's systems could account for such variations in assessing whether a criminal record was likely to affect a consumer's ability to obtain employment. (See NBD search results for James Hines, June 7, 2011 (CL-H002721–39 at CL-H002721) (identifying only the state of residence of the ultimate employer (Florida), but not the state where Mr. Hines was seeking employment (Virginia)).)

[73] California Labor Code §432.7.

[74] California Civil Code §1786.18; FCRA (§ 605) 15 U.S.C. § 1681c.

[75] California Labor Code §432.8.

[76] "Overview of State Laws That Ban Discrimination By Employers," Legal Action Center (http://www.lac.org/toolkits/standards/Fourteen_State_Laws.pdf).

60.     Moreover, different industries may institute different standards for potential employees based on the state of employment due to differing state laws.  For example, in Michigan, "a person convicted of any felony related to drug manufacture or distribution cannot work in nursing homes, regardless of how much time has passed" and home health care providers in Virginia cannot by law hire people that have committed certain "barrier crimes."[77] Alaskan law requires that all Alaska Department of Health and Social Services ("DHSS") employees and employees of all companies affiliated with and licensed by the DHSS pass stringent background checks, which include restriction from employment for five years for reckless endangerment and permanent restriction from employment for arson.[78]

61.     A survey conducted by North Dakota State University illustrates differences in criteria across industries.  Twenty-six (26) percent of respondents in the construction industry reported that they have a policy prohibiting a person with a felony from being hired, while 80 percent of respondents in retail, merchandising, and sales sectors prohibit a person with a felony from being hired.  No respondents in the manufacturing, agriculture, and construction industries have policies that prohibit hiring a candidate with a misdemeanor while 25 percent of respondents in accounting, banking, and finance sectors do.[79]

62.     Different standards also can exist within a single organization for different types of positions.  In its guidelines for an effective background check policy, Colorado Division of

---

[77] Aukerman, Miriam, "Criminal Convictions as a Barrier to Employment," Michigan Bar Journal, November 2008, p.33; Bell Deposition, 52:8–19.  See also the CareSouth Homecare Professionals Criminal History Disclosure Statement, which states that Virginia law prohibits licensed home care organizations from employing individuals who have been convicted of the barrier crimes of murder, abduction for immoral purposes, assault and bodily wounding, sexual assault, pandering, escape from jail, taking indecent liberties with children, failure to secure medical attention for injured child, crimes against nature involving children, incest, robbery and carjacking, arson, delivery of drugs to prisoners, felonies by prisoners, abuse and neglect of children, abuse/neglect of an incapacitated adult, obscenity offenses, and any equivalent offenses in another state (CS000033). When asked at his deposition whether or not CareSouth would be able to "determine without looking at any particular application or applicant as a whole whether a conviction for a non-barrier offense would likely prevent an applicant from getting a job with CareSouth," Mr. James Kenneth Bell, Senior Vice President of Human Resources, stated that "No. I think we would have to...take a look at it on a case by case basis as we do now..."  (Bell Deposition, 8:24–9:4, 100:23–101:7).
[78] "Barrier Crimes Matrix for the Barrier Crimes Listed in AAC 10.905," January 5, 2007 (http://dhss.alaska.gov/ocs/Documents/BarrierCrimeMatrix.pdf).
[79] Oster-Aaland, Laura, Kevin Thompson, and Erika Beseler Thompson, "2010 Survey of NDSU Employers" (http://www.ndsu.edu/fileadmin/alcoholinfo/2010_NDSU_Employer_Survey_Summary.pdf).

Human Resources states that "Disqualifying information is identified based upon the nature of the background check(s) conducted and upon the duties performed in the job and the associated risks. ...  Examples of disqualifying criteria include embezzlement or fraud conviction of an accountant applicant; sexual assault conviction against a supervisory candidate; drunk driving convictions against an individual who would be required to operate a state motor vehicle."[80] Similarly, as part of its vendor hiring policy, Trinity University, located in Texas, requests that "For any individuals who will have access to residence halls or other secure areas a criminal background check is required.  This group includes, but is not limited to residence hall assistants, supervisors and counselors; Physical Plant and janitorial staff; food services, concessions, and auxiliary services personnel.  Any individuals who have a criminal history may not be assigned to Trinity University if such assignment would involve access to residence halls or secure areas," and "[a]ny individuals who have a criminal history including but not limited to embezzlement, fraud, money laundering, theft or others [sic] acts indicating dishonesty may not be assigned to Trinity University if such assignment would involve access to financial information, social security numbers, confidential or proprietary information."[81]

63.    The Society for Human Resource Management ("SHRM") surveys its members about their background checking practices.  Based on a 2009 survey, SHRM reported that 20 percent of respondents performed criminal background checks to comply with applicable state laws for particular positions.[82]  Other reasons include:  to ensure a safe work environment (61 percent), to reduce legal liability for negligent hiring (55 percent), to reduce or prevent theft,

---

[80] "Technical Assistance-Background Checks," Division of Human Resources in the Department of Personnel and Administration, February 14, 2011 (http://www.colorado.gov/cs/Satellite?blobcol=urldata&blobheader=application%2Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1251691765389&ssbinary=true).

[81] Sample Vendor Background Agreement, Trinity University (http://web.trinity.edu/Documents/hr_docs/Vendor%20Background%20Check%20Agreement.pdf).

[82] "Background Checking: Conducting Criminal Background Checks," Society for Human Resource Management, January 22, 2010, p. 7 (http://www.shrm.org/Research/SurveyFindings/Articles/Pages/BackgroundCheckCriminalChecks.aspx).

embezzlement, or other criminal activity (39 percent), and to assess the overall trustworthiness of the job candidate (12 percent).[83]   Variation across employers in the reasons they perform a background check also can affect the offenses that are likely to influence a hiring decision.  This same survey highlights that whether or not an offense is likely to affect an individual's ability to obtain employment depends on the nature and severity of the offense and that different employers evaluate offenses differently.[84]  Further, how much time has elapsed since the court record was generated might be a consideration for some employers.[85]  The length of time since the offense, regardless of whether it resulted in a conviction or not, is very influential for 56 percent of respondents and somewhat influential for 39 percent of respondents; and the individual's age at the time of the offense is very influential for 31 percent of respondents and somewhat influential for 50 percent.[86]



---

[83] "Background Checking: Conducting Criminal Background Checks," Society for Human Resource Management, January 22, 2010, p. 7 (http://www.shrm.org/Research/SurveyFindings/Articles/Pages/BackgroundCheckCriminalChecks.aspx).  Percentages do not total to 100 percent because respondents were asked to select their top two reasons.

[84] "Background Checking: Conducting Criminal Background Checks," Society for Human Resource Management, January 22, 2010, p. 6 (http://www.shrm.org/Research/SurveyFindings/Articles/Pages/BackgroundCheckCriminalChecks.aspx).

[85] While Federal FCRA guidelines allow CRAs to report criminal conviction information going beyond seven years, certain states (California, Montana, New Mexico, and Nevada) restrict employers to only using the last seven years of criminal record information for making hiring decisions.  Other states allow employers to obtain criminal records older than seven years only if the employee earns or is expected to earn above a particular annual income threshold amount (e.g., $75,000 in Colorado, Maine, and Texas, $25,000 in New York, and $20,000 in Washington, Kansas, Maryland, New Hampshire, and Massachusetts). ("Criminal Background Checks for Employment Purposes," National Association of Professional Background Screeners (http://www.napbs.com/files/public/Learn_More/White_Papers/CriminalBackgroundChecks.pdf); "Consumer Reporting Agency Limitations," pp. 18–9 (http://www.northcarolina.edu/hr/initiatives/2013-RFP/Sterling_Bid.pdf)).

[86] "Background Checking: Conducting Criminal Background Checks," Society for Human Resource Management, January 22, 2010, p. 6 (http://www.shrm.org/Research/SurveyFindings/Articles/Pages/BackgroundCheckCriminalChecks.aspx).

████████████████████████████████████████████████████

██████████████████████████████████████

65.    These data indicate that whether any particular criminal record obtained from NBD by a CRA, and reported by the CRA to an employer is likely to affect an individual's ability to obtain employment can depend on factors such as the state, the employer, the prospective employment position, the nature and severity of the offense, whether the offense resulted in a conviction, the amount of time that has elapsed since the offense, and the age of the individual at the time of the offense.[88]   Would a misdemeanor or felony traffic conviction for failure to yield right-of-way five years ago prevent a grocery store from hiring a cashier?  Would an arrest for domestic abuse seven years ago that did not result in a conviction prevent the grocery store from hiring a warehouse worker?  Only that particular grocery store can answer those questions and its answer would not necessarily be the same as another grocery store's.

       **c).    The wide variation in the data provided by federal, state, and local jurisdictions prevents an objective, formulaic assessment of whether an offense is likely to adversely affect an individual's ability to obtain employment.**

66.    Over the alleged class period, the Multistate Database contained well over ████

████████████████████████.[89]  These criminal records, which are received from over 300 public-record sources, are not altered by NBD.  As a result, the extensive variation in the data received from these sources appears in equal measure in the information transmitted to CRAs in response to a search query.  Therefore, even if the records provided to the employer were known,

---

[87] Interstate Bakeries Corporation Adjudication Criteria, October 21, 2010 (Corelogic_Hostess_001_002529–35 at Corelogic_Hostess_001_002533–5).  Interstate Brands Corporation is a subsidiary of Interstate Bakeries Corporation (Interstate Bakeries Corporation, Form 10-K for the Period Ended May 31, 2008).

[88] For example, National Retail Federation states that "Prior criminal convictions do not immediately disqualify a candidate from employment.  Several factors are taken into account when considering individuals for employment including the age at the time of the offense, date of the offense, seriousness and nature of the violation, rehabilitation of the individual and relevance of the crime to the job." ("Background Screening: Protecting Retailers and Consumers," National Retail Federation, October 2011, p. 18 (http://www.nrf.com/modules.php?name=News&op=viewlive&sp_id=1201&parent_id=950&peer_rev=0&nrf_or=1%20)).

[89] Disposition Descriptions – HinesDispos.xls (CL-H092989).

the information included in the court records cannot be evaluated objectively and formulaically to identify those records that are likely to have an adverse effect on an individual's ability to obtain employment. This is true for at least two discrete reasons.

67.   First, conduct that constitutes a crime in one state does not necessarily constitute a crime in another state or it constitutes a crime of different severity. As a result, it is not possible simply to identify every offense that is a felony and every offense that is a misdemeanor to assess the nature and severity of the crime. For example:

a).   Laws governing possession of marijuana vary from state to state. For example, the possession of one ounce of marijuana for personal use is considered a misdemeanor in Texas and Georgia, the possession of this quantity in Colorado or Washington is not a crime, and in Oregon it is a felony. At the same time, possession of two ounces of marijuana for personal use is considered a felony in Georgia but a misdemeanor in Texas.[90]

b).   Underage drinking laws vary from state to state. While in six states (Louisiana, Nebraska, Nevada, New Jersey, Oklahoma, and South Carolina) underage consumption of alcohol is allowed without parental consent on private, non-alcohol-selling premises, 29 other states require parental consent on private, non-alcohol-selling premises.[91]

c).   The same conduct can be considered a misdemeanor or a felony depending on the state in which it was committed. In Indiana, a second DUI within five years of a previous DUI offense will be considered a felony. In Alabama, it is the fourth DUI offense within five years

---

[90] Texas Penalties, NORML (http://norml.org/laws/item/texas-penalties-2?category_id=888); Georgia Penalties, NORML (http://norml.org/laws/item/georgia-penalties?category_id=853); Colorado Penalties, NORML (http://norml.org/laws/item/colorado-penalties?category_id=848); Washington Penalties, NORML (http://norml.org/laws/item/washington-penalties-2?category_id=893); Oregon Penalties, NORML (http://norml.org/laws/item/oregon-penalties-2#mandatory).

[91] "40 States that Allow Underage (under 21) Alcohol Consumption," ProCon.org (http://drinkingage.procon.org/view.resource.php?resourceID=002591).

that becomes a felony.  In six states, Pennsylvania, Maryland, Colorado, Maine, New Jersey, and Rhode Island, as well as in the District of Columbia, DUIs are not felonies.[92]

d).     State laws also vary in terms of what specific conduct constitutes a particular offense.  As a result, a crime described in the same way in the data, actually may constitute a different crime, depending on the state in which it was committed.  For instance:



---

[92] "DUI Felony Laws," Mothers Against Drunk Driving (http://www.madd.org/laws/law-overview/DUI_Felony_Overview.pdf).

[93] What constitutes burglary within a particular state also may vary over time.  For example, in Florida, for offenses committed on or before July 1, 2001, "burglary" is defined as "entering or remaining in a dwelling, a structure, or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain."  After July 1, 2001, it can also be considered burglary even with "licensed or invited entry" a criminal remains in a "dwelling, structure, or conveyance:  (a) surreptitiously, with the intent to commit an offense therein; (b) after permission to remain therein has been withdrawn, with the intent to commit an offense therein; or (c) to commit or attempt to commit a forcible felony."  (The 2012 Florida Statutes (http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&Search_String=&URL=0800-0899/0810/Sections/0810.02.html); Possible Source Inputs - HinesOff – 2.csv (CL-H007705)).

[94] Arizona Revised Statute §13-1508 (http://www.azleg.gov/FormatDocument.asp?inDoc=/ars/13/01508.htm&Title=13&DocType=ARS).

[95] Montana Code Annotated 2011 §45-6-204 (http://data.opi.mt.gov/bills/mca/45/6/45-6-204.htm).

[96] Possible Source Inputs - HinesOff – 2.csv (CL-H007705).

███████████████████████████████████████████████████

███████████████████

iii).    State legislatures have also reclassified various crimes since the beginning of the proposed Count I class period in 2007.   For example, in 2009, Montana legislators passed legislation that increased the threshold for felony theft from $1,000 to $1,500.[98]  Similarly, since 2011, the threshold dollar amount needed for felony theft in Illinois was increased from $300 to $500.[99]

68.    Second, in addition to variation across states in what constitutes a crime and the severity of a crime, there is also substantial variation in content, structure, and format of the ████ ██████████████████ received from the hundreds of different jurisdictions that are incorporated in the Multistate Database.   The court records are not standardized by the hundreds of jurisdictions that provide data, and the nature and severity of the offense is not reported in a systematic or objective manner.   In addition, in responding to CRA queries, NBD does not change any values included in the public-record data.[100]  As a result, the same offense may be described numerous different ways.

69.    As discussed above, employers consider different types of crimes differently when making employment decisions.   Survey data show that employers are more likely to consider a candidate with a drug or alcohol conviction than other nonviolent offenses, and least

---

[97] New York Crimes Arranged in Alphabetical Order, New York Arraignments (http://www.new-york-arraignments.com/allcrimesalpha.htm); N.Y. PEN. LAW § 160.05: NY Code - Section 160.05: Robbery in the Third Degree (http://codes.lp.findlaw.com/nycode/PEN/THREE/J/160/160.05); N.Y. PEN. LAW § 160.15: NY Code - Section 160.15: Robbery in the First Degree (http://codes.lp.findlaw.com/nycode/PEN/THREE/J/160/160.15).

[98] Johnson, Kevin, "Some States Rethink Felony Property Crimes," USA Today, October 30, 2011 (http://usatoday30.usatoday.com/news/washington/story/2011-10-30/states-rethink-felony-property-crimes/51008424/1).

[99] Schenk, Mary, "Law Changes Value Level for Felony Theft," The News-Gazette, January 1, 2011 (http://www.news-gazette.com/news/courts-police-and-fire/2011-01-01/law-changes-value-level-felony-theft.html).

[100] Interview of Joe Davidson, April 4, 2003.

likely to consider a candidate who has a prior conviction for a violent crime.[101]  As a result, in

order to identify members of the proposed Count I class based on NBD's data, it is necessary to

be able to distinguish between categories of crimes.  However, as detailed below, inconsistencies

in the data transmitted by NBD make this impossible absent individual inquiry.



---

[101] One survey indicates that on average employers are willing to hire a candidate with a previous violent offense 9.2% of the time, a previous property offense 40.2% of the time, and a previous drug offense 45.8% of the time.  (Lawrence, Sarah, "Reaching a Higher Ground:  Increasing Employment Opportunities for People with Prior Convictions," Berkeley Center for Criminal Justice, November 2010 (http://www.law.berkeley.edu/files/FINAL_Emply_Opps_Full_Report(2).pdf)).  Similarly, employers indicate that they would disqualify a candidate for a felony conviction of violent crime 85% of the time, felony convictions of theft and dishonesty 84% of the time, and felony convictions of drug and alcohol offenses 62% of the time ("Employment Screening Practices & Trends: The Era of Heightened Care and Diligence," EmployeeScreenIQ, 2013 (http://www.employeescreen.com/Survey_Report_2013.pdf)).

[102] Possible Source Inputs - HinesOff – 2.csv (CL-H007705).

[103] Possible Source Inputs - HinesOff – 2.csv (CL-H007705).



72.     Additionally, as detailed above, the disposition of any given criminal record is highly-relevant to assessing whether a criminal record likely would affect a consumer's ability to obtain employment.  Yet, ███████████████████████████████████

---

104 Possible Source Inputs - HinesOff − 2.csv (CL-H007705).

105 Kentucky Codes and Violations
(http://www.kentuckystatepolice.org/violation_codes/Condensed_Version_Violation_Codes_9_30_04.txt).

106 "Offense Code Index for Traffic Violations," Michigan Department of State Court Manual, March 31, 2013
(http://www.michigan.gov/documents/OffenseCode_73877_7.pdf).

107 Examples of failure to yield the right of way offenses seen in the data include "Fail to Yield ROW," "Failure to stop or yield,"
and "MOV-FAIL TO YIELD RIGHT OF WAY (169-20-S3)" (Possible Source Inputs - HinesOff − 2.csv (CL-H007705)).

108 Possible Source Inputs - HinesOff − 2.csv (CL-H007705).

██████████████████████████████████████████

██████████████████████████████████████████

████████████████ As a result, whether an offense would rise to the level of being influential to an employer's decision-making process requires individual inquiry, along with the ability to actually determine the disposition of the criminal record.

73.    In summary, NBD does not have the information in its records necessary to determine whether any particular report that it provided to a CRA was likely to affect an individual's ability to obtain employment.  NBD's records do not reflect the identity of the individual being screened, the employment position, the criteria used by the employer to assess the candidate, or the data that were reported by the CRA to the employer.  In addition, the data transmitted by NBD to CRAs are obtained from hundreds of different jurisdictions, and it is not possible to objectively or systematically assess the nature and severity of the offense from NBD's records.  As a result, no objective or systematic process can be used to identify those records that are likely to have an adverse effect on an individual's ability to obtain employment.

**B.    Individual inquiry is required to determine the impact of NBD's alleged violation of the FCRA on the proposed Count I class members.**

74.    I understand that Plaintiffs seek statutory damages and that the magnitude of statutory damages may depend on whether an individual actually was injured and, if so, the magnitude of actual injury.  If actual injury is a factor in determining statutory damages, however, as I describe below in more detail, determining whether or not a proposed Count I class member was injured and, if so, the extent of that injury requires individual inquiry.

75.    Plaintiffs Mr. Henderson and Mr. Hines claim that the criminal record information provided by NBD was "inaccurate," and that NBD failed to meet the requirement of

---

[109] Disposition Descriptions – HinesDispos.xls (CL-H092989).
[110] Disposition Descriptions – HinesDispos.xls (CL-H092989).

providing "consumers immediate notice of the furnishing of the employment report and details necessary to preemptively contact the reporting agency to obtain and as appropriate correct information in the furnished report."[111]  As a result, both Mr. Henderson and Mr. Hines claim that they were denied employment.[112]

76.     The impact, if any, of NBD's alleged violation of the FCRA (§ 613) 15 U.S.C. § 1681k(a) can be determined only with individual evidence.  (By "impact," I mean whether an individual was harmed.)  If the individual was harmed, the extent of that harm or economic damage also can only be determined with individual evidence.  Assuming the members of the proposed Count I class could be identified, from an economic perspective and consistent with Plaintiffs' theory of injury, a proposed Count I class member is adversely impacted only if the report provided to the employer does, in fact, prevent or delay employment for the individual, and this adverse consequence was based on inaccurate information.  If a report is provided to an employer that is likely to affect an individual's ability to obtain employment, but in fact does not, there is no injury.  Similarly, if a report is provided to an employer that includes an offense, such as a murder conviction, that prevents the individual from being hired, if the information is accurate, from an economic perspective, there is no injury to the individual deriving from NBD's alleged conduct.

> **i.     Only employers or their agents can determine whether the data provided caused an adverse impact to a proposed Count I class member.**

77.     As discussed above, NBD's data files do not indicate whether the data provided by NBD to a CRA are the same data that were provided by the CRA to the employer.  Even if the data provided to the employer are identified, however, only the employer to whom NBD data were supplied, or the employer's agent making employment decisions, can judge whether a

---

[111] Amended Complaint, ¶¶4–6.

[112] Amended Complaint, ¶¶4–6; Prayer for Relief.

particular court record had an adverse impact on an applicant's ability to obtain employment with that employer.

78.     First, an employer performing a background check of a prospective employee may obtain several different types of reports in addition to criminal history, such as reports on credit histories, academic backgrounds, employment histories, checks on references, and information about professional license statuses.[113] If the applicant was not hired as a result of the background check performed, it will be necessary to prove that it was the result of the criminal background check and not some other information obtained about the applicant that caused the employer to not hire the individual.  Even if a job applicant had some criminal background and was not hired, there are a myriad of other reasons the employer might decide not to hire him or her:  the individual might not have the licenses he or she claimed, the individual might not have had the educational degrees he or she claimed, the individual might not have the job experience or training he or she claimed, etc.   In fact, employers participating in a June 2010 study conducted by the Society for Human Resource Management ranked a favorable criminal background check sixth among the factors that impact the final decision to hire one candidate over another.  "Good fit" with the company, previous relevant work experience, having skills needed for the job, a good interview, and a favorable reference/employment history check ranked higher.[114]  Therefore, only the employer can know whether a particular criminal record had an adverse effect on the individual's ability to obtain employment with that employer, when considered in the context of the individual's overall qualifications.  It would also be necessary to

[113] "Background Screening," Verifications, Inc. (https://www.verificationsinc.com/eng/whatwedo/background_screening.cfm); "Background Checks & Jobs," Portland State University Student Legal Services, p. 3, (http://www.pdx.edu/sls/sites/www.pdx.edu.sls/files/Background%20checks%20presentation.pdf); "Info Brochure," National Association of Professional Background Screeners  (http://www.napbs.com/i4a/pages/index.cfm?pageid=3280).  See also "Instant Criminal Records & Background Checks," Integrascan  (http://www.integrascan.com/); "HireRight On-Demand Solutions & Services," HireRight (http://www.hireright.com/Background-Checks.aspx); "Background Screening Products," Accurate Background (https://www.accuratebackground.com/products.php?sec=17).
[114] "SHRM Research Spotlight: Credit Background Checks," Society for Human Resource Management, September 2010 (http://www.shrm.org/research/surveyfindings/articles/documents/ccflier_final.pdf).

show that the criminal record was in error for it to have adversely affected the employment of the individual under consideration.[115]

79.     Employers may use background checks to screen potential employees based on past alcohol use, drug use, theft/larceny, assault, driving record, education, employment, work eligibility, or financial responsibility, depending on the nature of the job sought.   In addition, as discussed above, different employers may institute different standards for potential employees based on the state of employment due to differing state laws and in some industries, state law indicates the appropriate background checking guidelines.

80.     The EEOC recommends among its best practices for employers who consider criminal record information to eliminate policies that automatically exclude from employment people with criminal records regardless of other factors.[116]   In fact, research assessing employer hiring considerations reveals that some employers are willing to hire individuals with prior convictions and some are not.[117]   Some employers are willing to hire an applicant with prior convictions depending on job-related factors and other characteristics of the applicant.   Only individual inquiry of the employer could determine the importance of a prior conviction in its decision of whether to hire an individual.

81.     Job-related factors influencing the hiring decision can include the type of industry, the specific position, and the economic climate.   While in some industries employers are barred from hiring people with prior convictions (e.g., social services, health services), some employers are wary of hiring applicants with prior convictions for positions that require

---

[115] I understand that NBD maintain that if the report is accurate, it is not necessary to provide notice to the individual being screened.  Even if notice were required, however, if the report is accurate, it is unclear whether providing notice to the individual would have any effect on that individual's ability to obtain employment.  For example, an individual can provide further explanation to the prospective employer about a prior arrest or conviction regardless of whether or not notice was sent.

[116] EEOC Enforcement Guidance, Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., April 25, 2012, p. 25 (http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm).

[117] Lawrence, Sarah, "Reaching a Higher Ground:  Increasing Employment Opportunities for People with Prior Convictions," Berkeley Center for Criminal Justice, November 2010 (http://www.law.berkeley.edu/files/FINAL_Emply_Opps_Full_Report(2).pdf).

significant interaction with customers.[118]   However, persons with convictions are more often considered for positions that lack a high degree of customer interaction, such as in construction, manufacturing, and transportation.   One study found that 61 percent of the manufacturing firms and 21 percent of the construction companies surveyed reported conducting criminal background checks on prospective employees for all positions.   Of the manufacturing companies, 47 percent reported having a policy prohibiting persons convicted of a felony from being hired.   For the construction companies this number was lower at 26 percent.   Both sectors reported not having any policy in place for misdemeanor convictions.[119]   The economic climate can also impact an employer's decision.   In tight labor markets, some employers are more willing to hire people with prior convictions.[120]

82.   Individual characteristics are also relevant in the hiring decision.   Employers may take into account the type of offense, time since release from prison, and prior work experience. Surveys reveal a willingness by employers to consider hiring individuals with misdemeanor offenses (as often as 85 percent of the time) and less readiness to hire when convictions involve more serious violent crimes.[121]   Length of time since release from prison also can impact the hiring decision with some employers preferring lengthier periods of time.   Prior work experience showing job-readiness and a positive track record can also be considered by some employers.[122]

---

[118] Lawrence, Sarah, "Reaching a Higher Ground:  Increasing Employment Opportunities for People with Prior Convictions," Berkeley Center for Criminal Justice, November 2010
(http://www.law.berkeley.edu/files/FINAL_Emply_Opps_Full_Report(2).pdf).
[119] Oster-Aaland, Laura, Kevin Thompson, and Erika Beseler Thompson, "2010 Survey of NDSU Employers"
(http://www.ndsu.edu/fileadmin/alcoholinfo/2010_NDSU_Employer_Survey_Summary.pdf).
[120] Lawrence, Sarah, "Reaching a Higher Ground:  Increasing Employment Opportunities for People with Prior Convictions," Berkeley Center for Criminal Justice, November 2010
(http://www.law.berkeley.edu/files/FINAL_Emply_Opps_Full_Report(2).pdf).
[121] Lawrence, Sarah, "Reaching a Higher Ground:  Increasing Employment Opportunities for People with Prior Convictions," Berkeley Center for Criminal Justice, November 2010
(http://www.law.berkeley.edu/files/FINAL_Emply_Opps_Full_Report(2).pdf).
[122] Lawrence, Sarah, "Reaching a Higher Ground:  Increasing Employment Opportunities for People with Prior Convictions," Berkeley Center for Criminal Justice, November 2010
(http://www.law.berkeley.edu/files/FINAL_Emply_Opps_Full_Report(2).pdf).

83.     Moreover, an employer may offer job candidates the opportunity to explain offenses reported in their criminal background checks.   For example, in a letter to Mr. Henderson, Interstate Brands Corporation stated that "[a] preliminary decision has been made not to give your application further consideration.  This preliminary decision was based, either in whole or in part, on the information contained in your Consumer Report. … If we do not hear from you within 3 days, our preliminary decision will become final and you will not be considered for employment at Interstate Brands Corporation."[123]   In addition, according to a survey conducted by the Society for Human Resource Management, 58 percent of employers reported offering job candidates, in certain circumstances, the opportunity to explain adverse results from a criminal background check prior to making their hiring decisions.[124]  Similarly, a survey conducted by EmployeeScreenIQ found 61 percent of the respondents gave job candidates this opportunity.[125]  Even if a job applicant had some criminal background that would have prevented him or her from obtaining employment, if the information were accurate, the applicant would not be impacted if he was given an opportunity to prove that the information was inaccurate.   Only the CRA and/or the employer can know whether a particular criminal record caused the applicant not to be hired.

84.     Mr. Hines' and Mr. Henderson's individual circumstances also demonstrate that individual inquiry is required to determine impact.   The criminal records from the Multistate Database that were transmitted to ADP based on the search criteria in ADP's query included records the ADP inaccurately matched to Plaintiff Hines and provided to CareSouth, Plaintiff

---

[123] Interstate Brands Corporation Letter to Tyrone Henderson, November 17, 2009 (Corelogic_Hostess_001_001925).

[124] "Background Checking: The Use of Criminal Background Checks in Hiring Decisions," Society for Human Resource Management, July 19, 2012, p. 9 (http://www.shrm.org/Research/SurveyFindings/Articles/Pages/CriminalBackgroundCheck.aspx).

[125] "Employment Screening Practices & Trends: The Era of Heightened Care and Diligence," EmployeeScreenIQ, 2013, p. 13 (http://www.employeescreen.com/Survey_Report_2013.pdf).

Hines' prospective employer.[126]  Similarly, the criminal records from the Multistate Database that were transmitted to Verifications based on the search criteria in Verifications' query included records that Verifications inaccurately matched to Plaintiff Henderson and provided to Interstate Brands, Plaintiff Henderson's prospective employer.[127] ███████████████

████████████████████████████████████████████████████████████

85.     Even if an individual is adversely impacted, determining the magnitude of the economic damages or harm that result, if any, also requires individual inquiry.  The magnitude of economic damages, for example, would depend on, among other things, how long it took the individual to find alternative employment, the wage earned in the alternative employment, and the wage that would have been paid had the individual been hired by the original employer.  Again using Mr. Hines and Mr. Henderson as examples, Mr. Hines was offered the position at CareSouth whereas Mr. Henderson was not offered the position at Interstate Brands.  Moreover, the magnitude of damage experienced by Mr. Henderson, if any, depends on facts and circumstances particular to Mr. Henderson.

**ii.     Only individual inquiry can determine the extent to which criminal records pertaining to a given data request are current.**

86.     Whether and the extent to which the data requested by a third-party CRA are current and whether they are interpreted properly can only be determined by individual inquiry.  As discussed above, the Multistate Database consists of criminal records from hundreds of government sources.  When one or more criminal records are transmitted to a CRA by NBD's systems in response to a search query, the amount of time since the criminal record was last

---

[126] Amended Complaint, ¶¶45–51.

[127] Amended Complaint, ¶¶23, 28–30, 33.

[128] Bell Deposition, 84:9–24, 97:6–11; Emails between Ken Bell, John Thomas, and Susan Kitchens, June 23, 2011 and July 1, 2011 (CS000074–77).

[129] Interstate Brands Corporation Letter to Tyrone Henderson, December 18, 2009 (Corelogic_Hostess_001_001925).

updated in the Multistate Database (or confirmed to be the most up-to-date) depends on when the query was performed relative to the update cycle for the specific originating source.

87.    As detailed above, with the sole exception of sex offender information, which itself is gathered by a national vendor that works directly with governmental sources, the information transmitted by NBD to its CRA customers is received directly from state and federal sources (e.g., departments of corrections and courthouses).   NBD does not alter any records received from those sources.   Thus, the records returned by NBD are the current records of these governmental sources themselves, only placed into NBD's databases.

88.    The majority (over 85 percent) of the government sources whose data are included in the Multistate Database provide monthly updates of their criminal records and these records are processed and incorporated in the Multistate Database within a matter of days; the remaining sources provide daily, weekly, quarterly, or semi-annual updates.[130]

89.    For example, in the Multistate Database, data from Virginia's Administrative Office of the Courts are updated monthly, data from North Carolina's Administrative Office of the Courts are updated daily, data from the San Diego Superior Court Index are updated weekly, and data from the Rhode Island Department of Corrections are updated quarterly.[131]   As a result, whether any particular criminal record in the Multistate Database is up-to-date at the time a query is submitted depends on when the query was made relative to when the criminal records in the Multistate Database were last updated, which could be a matter of days or weeks (or in some situations even months) depending on the originating source of the criminal record.

---

[130] Interviews of Joe Davidson, February 5, 2013, April 4, 2013 and July 25, 2013.  Mr. Davidson also indicated that it is the owner of the source data, not NBD or SafeRent, who determines the frequency of the update.  See also SafeRent Database Sources by State (CL-H007709–80).

[131] CL-H007776, CL-H007752, CL-H007717, CL-H007768, and CL-H007750 (selected pages from SafeRent Database Sources by State).

90.    In addition, the likelihood that a record is up-to-date also depends on the amount of time that has spanned since the offense.[132] The more dated the offense, the more likely that the associated criminal record in the Multistate Database reflects the most up-to-date information. For example, a record reflecting a traffic violation from five years ago is less likely to have changed in any way since the most recent update cycle, which for the majority of sources is every month.

91.    In addition to factors related to the update cycle for the hundreds of different sources of criminal records from across the country, NBD also identifies four other basic types of disputes that may arise in an individual's criminal history background check that relate to the accuracy of the information in the source record itself:[133]

- The offense record applies to the individual, but contains inaccuracies (for example, incorrect sentence, disposition, or charges);

- The offense record has been expunged, but it is still in the public records that NBD received;

- The offense record applies to someone else with the same name and personal identifiers; and

- The individual was a victim of identity theft.

92.    It is important to recognize that NBD's systems transmit to the CRA the data that are requested, which depend on search criteria specified by the third-party CRA. Depending on these criteria, a search query may only return records that all can be readily attributed to only one individual, or it may return records that require further investigation. Records may also be returned from a number of different jurisdictions, and the dates of the offenses returned can vary by many years. And, depending on the source, that data returned by NBD may be weeks or only

---

[132] Interview of Joe Davidson, February 5, 2013.

[133] Holloran, Robert W., William J. Bollinger, and Sharron K. Goodman, "National Background Data, LLC Standards for Development and Use of Criminal History Databases," National Background Data, LLC, April 23, 2003, pp. 3–4 (https://www.nationalbackgrounddata.net/publicsiteforms/pages/pdf/criminal_database_standards_nbd.pdf).

days old.  As mentioned above, NBD informs and contractually requires its CRA customers that interpretation of that data should be done by the third-party CRA and the employer.  NBD does not have the information necessary to interpret the data.  For these reasons, individual inquiry would be required to determine the extent to which the data provided associated with any given data request were current and properly attributed to a given individual.

93.     I am voluntarily making this declaration of my own free will.  I declare under penalty of perjury that the foregoing is true.

DATED: February 10, 2014

Dr. Michael C. Keeley

Appendix 1

## MICHAEL C. KEELEY, Ph.D.
### Senior Vice President

**Cornerstone Research**
mkeeley@cornerstone.com

| Business | Home |
|---|---|
| 1000 El Camino Real • Menlo Park, CA  94025 | 2290 Stockbridge Avenue • Woodside, CA  94062 |
| 650.470.7120 • fax 650.324.9204 | 650.368.7944 • fax 650.364.4185 |

### ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 1974 | **University of Chicago**<br>*Ph.D., Economics* | Chicago, Illinois |
| 1971 | **University of Chicago**<br>*M.A., Economics* | Chicago, Illinois |
| 1969 | **Massachusetts Institute of Technology**<br>*S.B., Mathematics* | Cambridge, Massachusetts |

### RANGE OF EXPERIENCE

Expert in economics, econometrics, and finance.  Provided consulting and expert testimony in antitrust, intellectual property, breach of contract, product misrepresentation, transfer pricing, and securities matters.  Testified in over 20 trials.  Provided business consulting on pricing, auction design, and strategy.  Provided public policy analysis on energy, labor, economic development, welfare reform, and banking issues.  Has industry experience in telecommunications, insurance, banking, oil & gas, medical device, health care, pharmaceutical, computer software and hardware, automotive, internet, chemical, financial, agriculture, bio-technology, and real estate industries among others.  Has published in the areas of labor economics, banking, and finance among other areas.

### PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| 1989 – Present | **Cornerstone Research**<br>*Senior Vice President* | Menlo Park, California |

Developed the firm's antitrust practice.  Cases involved issues of alleged price fixing, monopolization, predatory pricing, price discrimination, tying, and mergers and acquisitions.

Developed the firm's intellectual property practice.  Addressed issues of damages in patent, copyright, trade secret, and trade dress infringement matters, commercial success in a patent liability matter and the economics of technology sharing agreements.

Testified in several prominent cases, such as *Monsanto v. DuPont*, the Long Beach crude oil price fixing case, the Mercedes-Benz tying cases, *Verizon v. Cox*, *Verdin v. R & B Falcon et al.*, *Aguilar v. Atlantic Richfield et al.*, and the *AMD v. Intel* litigation. Served as the expert in a number of other antitrust and intellectual property matters.

Served as an expert or consultant regarding class certification in a number of cases in the financial, pharmaceutical, medical device, chemical, oil and gas, and high tech industries, as well as in cases involving labor markets.

**PROFESSIONAL EXPERIENCE (CONT.)**

Managed a number of prominent cases, including the *High Fructose Corn Syrup Antitrust Litigation,* the *Lotus v. Borland* copyright litigation, and the Wyoming Tight Sands Antitrust Cases, in which affiliated experts served as the testifying experts. Responsible for defining the scope of research and analysis, managing project teams, coordinating work with attorneys and experts and presenting research findings.

Consulted on issues of auction design and bidding strategy. Work has included consulting on the PCS spectrum auctions and helping to design and administer an auction in the petrochemical industry. Also, assisted a firm in the petrochemical industry on contract negotiation strategy.

Provided public policy analysis on energy issues.

Consulted or testified in a variety of other types of cases, including securities fraud, breach of contract, fraudulent conveyance, usury, piercing the corporate veil, transfer pricing and wrongful termination.

Cases have involved a variety of industries, including telecommunications, oil and gas, automotive, chemical, health care, pharmaceutical, software, semi-conductor, banking, insurance and retailing.

| | | |
|---|---|---|
| 1983 – 1989 | **Federal Reserve Bank of San Francisco** | San Francisco, California |

*Research Officer*

Contributed to the development of the Bank's policy on regulatory, banking and financial issues.

Conducted research and published articles on banking and financial regulation and deregulation. (See **Journal Articles** and **Weekly Letters**.)

Analyzed the competitive effects of bank mergers and acquisitions in conjunction with the Bank's regulatory activities.

| | |
|---|---|
| 1983 – 1989 | **Michael C. Keeley, Consulting** |

*Sole Proprietor*

Provided expert testimony and litigation consulting. Work involved primarily economic and statistical analysis of damage claims.

| | | |
|---|---|---|
| 1975 – 1983 | **SRI International** | Menlo Park, California |

*Manager, Antitrust Economics Consulting Group*

Started up and managed SRI's Antitrust Economics Consulting Group, which provided economic research, statistical analysis and expert testimony.

*Project Director and Principal Investigator, The Labor-Market Evaluation of the Employment Opportunity Pilot Projects (EOPP)*

Developed study design and was awarded a multi-million dollar contract to conduct an evaluation of EOPP. Managed in-house staff and two sub-contracting firms.

*Principal Investigator of a Study of the Labor-Market Performance of Small Business*

Developed study plan and was awarded funding to analyze turnover, new hiring, and flows between large and small business.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Vice President**

---

**PROFESSIONAL EXPERIENCE (CONT.)**

**SRI International (cont.)**
*Senior Economist, Regulatory Economics Program*
Conducted series of published studies of market-oriented approaches to regulation
funded by the Presidential Task Force on Regulatory Relief.  (See **Government
Publications**.)
*Task Leader of Studies of the Seattle and Denver Income Maintenance Experiment*
Developed new approach for evaluating the behavioral effects and costs of alternative
welfare programs.  (See **Books and Monographs, Journal Articles** and **SRI
Publications**.)

1982 – 1983    **University of Santa Clara**            Santa Clara, California
*Visiting Associate Professor*
Taught courses in managerial economics and microeconomics in the Graduate School of
Business and Department of Economics.

1976 – 1977    **University of Santa Clara**            Santa Clara, California
*Lecturer*
Taught courses in managerial economics in the Graduate School of Business.

1973 – 1975    **General Electric, TEMPO, Center for Advanced Studies**
*Economist*
Developed economic-demographic simulation models and conducted research on the
relationships between economic and demographic variables.  Research culminated in
book on economic development.  (See **Books and Monographs** and **Journal Articles**.)

**AWARDS AND SERVICES**

Four-year full fellowship, University of Chicago; selected for inclusion in Who's Who in Economics,
Who's Who in the West, Who's Who in Finance and Industry, and the International Biographical
Dictionary; reviewer for the National Science Foundation, the Hoover Institution and the Pacific
Institute; invited speaker for the Garn Institute, the Cato Institute, the Lowe Institute, Urban Land
Institute, the National League of Cities, the Chicago Bank Structure Conference, the Municipal
Finance Officers Association, The Law and Society Association, and the Bank Administration
Institute; awarded the Garn prize for paper on bank risk-taking.

**REFEREEING ACTIVITY**

Referee for:  *American Economic Review; The Journal of Political Economy; The Journal of
Economic Literature; The Journal of Law and Economics; The Journal of Banking and Finance; The
Journal of Financial Services Research; The Journal of Money, Credit and Banking; Demography;
Economic Inquiry; International Economic Review; The Quarterly Journal of Economics; The
Review of Economics and Statistics; The Journal of Human Resources; Public Finance Quarterly;
Behavioral and Brain Sciences; Economic Development and Cultural Change; Land Economics;
Eastern Economic Review;* and *Federal Reserve Bank of San Francisco's Economic Review.*

**MICHAEL C. KEELEY, Ph.D.**
**Senior Vice President**

---

## PUBLICATIONS

### Books and Monographs

*Labor Supply and Public Policy: A Critical Review*, New York, New York: Academic Press, June 1981, 196 pp.

*Population, Public Policy, and Economic Development*, ed., New York, New York: Praeger, 1976, 259 pp.

### Journal Articles

"Uniform Gasoline Price Regulation: Consequences for Consumer Welfare," with K. Elzinga, *International Journal of the Economics of Business*, Volume 10, No. 2, July 2003, pp. 157-168.

"Infringement: Valuing IP for Damages," *les Nouvelles*, Volume XXXIV No. 4, December 1999, pp. 172-175.

"Deposit Insurance, Risk and Market Power in Banking," *American Economic Review*, Volume 80, 1990, pp. 1183–1200.

"A Reexamination of Mean-Variance Analysis of Bank Capital Regulation," with F. Furlong, *Journal of Banking and Finance*, Volume 14, 1990, pp. 69–84.

"Capital Regulation and Bank Risk-Taking: A Note," with F. Furlong, *Journal of Banking and Finance*, Volume 13, 1989, pp. 883–891.

"Estimating the Fisher Effect and the Stochastic Money Growth Process," with M. Hutchinson, *Economic Inquiry*, Volume XXVII, April 1989, pp. 219–239.

"The Stock Price Effects of Bank Holding Company Security Issuance," *Economic Review*, Federal Reserve Bank of San Francisco, Winter 1989, pp. 3–19.

"Bank Capital Regulation in the 1980s: Effective or Ineffective," *Economic Review*, Federal Reserve Bank of San Francisco, Winter 1988, pp. 3–20.

"Bank Capital Regulation and Asset Risk," with F. Furlong, *Economic Review*, Federal Reserve Bank of San Francisco, Spring 1987, pp. 20–40.

"Policy Coordination and Financial Intermediaries: The 1986 Fall Academic Conference of the Federal Reserve Bank of San Francisco," with C. Walsh, *Economic Review*, Federal Reserve Bank of San Francisco, Winter 1987, pp. 31–46.

"The Effects of Experimental Negative Income Tax Programs on Marital Dissolution: Evidence from the Seattle and Denver Income Maintenance Experiments," *International Economic Review*, Volume 28, No. 1, February 1987, pp. 241–257.

"Deposit Rate Deregulation and the Demand for Transactions Media," with G. Zimmerman, *Economic Review*, Federal Reserve Bank of San Francisco, Summer 1986, pp. 47–62.

"Bank Regulation and the Public Interest," with F. Furlong, *Economic Review*, Federal Reserve Bank of San Francisco, Spring 1986, pp. 55–71.

"The Regulation of Bank Entry," *Economic Review*, Federal Reserve Bank of San Francisco, Summer 1985, pp. 5–13.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Vice President**

**Journal Articles (cont.)**

"Determining Geographic Markets for Deposit Competition in Banking," with G. Zimmerman, *Economic Review*, Federal Reserve Bank of San Francisco, Summer 1985, pp. 25–45.

"Job Search for the Duration of Unemployment," with P.K. Robins, *Journal of Labor Economics*, July 1985, pp. 337–362.

"Competition for Money Market Deposit Accounts," with G. Zimmerman, *Economic Review*, Federal Reserve Bank of San Francisco, Spring 1985, pp. 5–27.

"Cyclical Unemployment and Employment:  Effects of Labor-Force Entry and Exit," *Economic Review*, Federal Reserve Bank of San Francisco, Summer 1984, pp. 5–25.

"The Economics of Firm Size:  Implications from Labor-Market Studies," *Economic Review*, Federal Reserve Bank of San Francisco, Winter 1984, pp. 5–21.

"A Review of the Evidence on Labor-Supply Response from the Income Maintenance Experiments," *Social Science Forum*, Volume 4, No. 1, 1981–1982, pp. 23–37.

"The Effects of a Negative Income Tax on Migration," *The Journal of Human Resources*, Volume VI, No. 4, Fall 1980, pp. 480–498.

"The Effects of a Negative Income Tax on Fertility," *The Journal of Human Resources*, Volume VI, No. 4, Fall 1980, pp. 675–694.

"Experimental Design, The Conlisk-Watts Assignment Model, and the Proper Estimation of Behavioral Response," with P.K. Robins, *The Journal of Human Resources*, Volume VI, No. 4, Fall 1980, pp. 695–706.

"An Analysis of the Age Pattern of First Marriage," *International Economic Review*, Volume 20, No. 2, June 1979, pp. 421–438.

"Work Incentives and the Negative Income Tax," with P.K. Robins, *Challenge*, Volume 22, No. 1, March/April 1979, pp. 52–56.

"The Estimation of Labor-Supply Models Using Experimental Data," with P.K. Robins, R.G. Spiegelman and R.W. West, *The American Economic Review*, Volume 68, No. 5, December 1978, pp. 873–887.

"The Economics of Family Formation:  An Investigation of the Age of First Marriage," *Economic Inquiry*, April 1977, pp. 238–250.

"A Comment on an Interpretation of the Economic Theory of Fertility," *Journal of Economic Literature*, Volume XIII, No. 2, June 1975, pp. 461–468.

**Chapters in Books**

"Potential Damages Facing Auditors in Securities Fraud Cases," with William H. Beaver and James K. Malernee, in *Accountants' Liability:  The Need for Fairness*, Washington, D.C.:  National Legal Center for the Public Interest, 1994.

"Interest on Business Checking Accounts," in *Readings in Money, the Financial System and Monetary Policy*, N.Y.:  Prentice Hall, 1990.

"Troubled Banks and Thrifts," in *Financial Institutions and Markets in a Changing World*, Business Publications, Fall 1989.

**Chapters in Books (cont.)**

"Reforming Deposit Insurance," in *Financial Institutions and Markets in a Changing World,* Business Publications, Fall 1989.

"A Cashless Society?" in *Macroeconomics,* Guildford, Conn.: Dushkin Publishing Group, Inc., Fall 1989; Also in *Readings in Money, the Financial System and Monetary Policy,* N.Y.: Prentice Hall, 1990.

"The Thrift Insurance Crisis," with J. Neuberger, in *Financial Institutions and Markets in a Changing World,* Business Publications, Fall 1989.

"International Coordination of Regulation: Comment," in *Proceedings of a Conference of Governing Banking's Future,* The Cato Institute, 1989.

"Regulating Bank Capital," with F. Furlong, in *Macroeconomics,* Guildford, Conn.: Dushkin Publishing Group, Inc., Fall 1988.

"Money and the Fisher Effect," with M. Hutchinson, in *Macroeconomics,* Guildford, Conn.: Dushkin Publishing Group, Inc., Fall 1988.

"Bank Capital Regulation: Effective or Ineffective?" in *Proceedings of a Conference on Bank Structure and Competition,* Federal Reserve Bank of Chicago, 1988.

"Uniting Investment and Commercial Banking," with R. Pozdena, in *Current Readings on Money, Banking and Financial Markets,* edited by James Wilcox, Boston, Mass.: Little, Brown & Co., 1988.

"Interest Checking," with G. Zimmerman, in *Current Readings on Money, Banking and Financial Markets,* edited by James Wilcox, Boston, Mass.: Little, Brown & Co., 1987.

"Regulation of Bank Entry," in *Financial Institutions and Markets in a Changing World, Business Publications,* Spring 1986.

"The Search for Financial Stability," with F. Furlong, in *The Search for Financial Stability: The Past 50 Years,* Federal Reserve Bank of San Francisco, 1986.

"Competition for Money Market Deposit Accounts," with G. Zimmerman, in *Proceedings of a Conference on Bank Structure and Competition,* Federal Reserve Bank of Chicago, 1985.

"Unemployment vs. Employment," in *Macroeconomics 85/86,* edited by John Pisciotta, Guildford, Conn.: Dushkin Publishing Group, Inc., 1985.

"The Design of Social Experiments: A Critique of the Conlisk-Watts Assignment Model," with P. Robins, in *Research in Labor Economics,* Volume 3, edited by Ronald G. Ehrenberg, Greenwich, Conn.: JAI Press, 1980.

"A Design for Evaluating the Labor-Market Effects of the Employment Opportunity Pilot Projects," with J. Bishop, G. Farkas, E. Stromsdorfer and P. Robins, in *Evaluation Studies Review Annual,* Volume 5, edited by Ernst W. Stromsdorfer and George Farkas, Beverly Hills, Calif.: Sage Publications, 1980, pp. 759–800.

"The Design of an Income Maintenance Experiment," Chapter I, with R.G. Spiegelman and R.W. West, in *A Guaranteed Annual Income: Results from an Income Maintenance Experiment,* edited by P. Robins, R.G. Spiegelman, S. Weiner, and J.G. Bell, New York, New York: Academic Press, 1980, pp. 3–32.

**Chapters in Books (cont.)**

"Migration," Chapter XI, in *A Guaranteed Annual Income: Results from an Income Maintenance Experiment*, edited by P. Robins, R.G. Spiegelman, S. Weiner, and J.G. Bell, New York, New York: Academic Press, 1980, pp. 241–262.

"The Demand for Children," Chapter XVI, in *A Guaranteed Annual Income: Results from an Income Maintenance Experiment*, edited by P. Robins, R.G. Spiegelman, S. Weiner, and J.G. Bell, New York, New York: Academic Press, 1980, pp. 207–220.

"Migration as Consumption: The Impact of Alternative Negative Income Tax Programs," in *Research in Population Economics*, Volume 2, edited by Julian Simon and Julie DaVanzo, Greenwich, Conn.: JAI Press, 1979, pp. 401–432.

"A Neoclassical Analysis of Economic-Demographic Simulation Models," Chapter I, in *Population, Public Policy, and Economic Development*, Praeger, edited by M.C. Keeley, 1976, pp. 25–45.

**Other Publications**

"An Economic Evaluation of the California Energy Commission's 2005 Integrated Energy Policy Report and an Alternative Blueprint for California Transportation Fuel Policy," Sacramento, California: California Chamber of Commerce, May 10, 2006.

**Cornerstone Research Publications**

"Estimating Damages in Patent Infringement Cases: An Economic Perspective," 1999.

"Stock Trading Behavior and Damage Estimation in Securities Cases," with William H. Beaver and James K. Malernee, 1993.

"Bank Charter Values and Risk Taking," 1990.

**Weekly Letters, Federal Reserve Bank of San Francisco**

"Reforming Deposit Insurance," April 21, 1989.

"The Thrift Insurance Crisis," with J. Neuberger, March 31, 1989.

"Banks' Cost of Capital," March 17, 1989.

"Bank Charter Values and Risk," February 24, 1989.

"States Take the Lead," with G. Zimmerman, September 9, 1988.

"Corporate Separateness," with B. Bennett, June 3, 1988.

"A Cashless Society?" April 15, 1988.

"Legislation to Expand Bank Powers," (with B. Bennett), March 19, 1988.

"Troubled Banks and Thrifts," January 29, 1988.

"Bank Capital Regulation in the Early 1980s," January 22, 1988.

"Subordinated Debt as Bank Capital," with F. Furlong, October 23, 1987.

**Weekly Letters, Federal Reserve Bank of San Francisco (cont.)**

"Money and the Fisher Effect," with M. Hutchinson, August 7, 1987.

"A Deposit Insurance Puzzle," with F. Furlong, July 3, 1987.

"Uniting Investment and Commercial Banking," with R. Pozdena, June 19, 1987.

"Regulating Bank Capital," with F. Furlong, May 22, 1987.

"Interest Checking and M1," with G. Zimmerman, November 21, 1986.

"Interest Checking," with G. Zimmerman, November 14, 1986.

"Monetary Policy in a Deregulated World," August 22, 1986.

"Bank Runs," with F. Furlong, July 25, 1986.

"Are Banks Special?" with F. Furlong, July 18, 1986.

"Interest on Business Checking Accounts?" May 2, 1986.

"The Health of Banks and Thrifts," February 21, 1986.

"Geographic Deposit Competition," with G. Zimmerman, September 1985.

"Bank Entry and Deregulation," August 1985.

"Interest Sensitivity of MMDAs," with G. Zimmerman, June 1985.

"The Big Switch," with G. Zimmerman, June 1985.

"Western Banking Turnaround," with G. Zimmerman, April 1985.

"Unemployment vs. Employment," September 1984.

"Deregulation and Bank Profitability," with G. Zimmerman, July 1984.

"Interest–Rate Deregulation," January 1984.

**Government Publications**

"Monetary Incentives:  A Practical Guide to the Use of Fees, Subsidies and Cost Internalization as Regulatory Techniques," with J. Daly, U.S. Government publication, 1981.

"Marketable Rights in Regulatory Programs:  A Practical Guide," with D. Downing, U.S. Government publication, 1981.

**SRI Publications**

"Earnings Mobility, Program Participation, and the Labor-Supply Response to a Negative Income Tax Program," with H.S. Wai, Research Memorandum, 1981.

"A Simultaneous Model of the Marital Stability and Labor-Supply Response to a Negative Income Tax Program," Research Memorandum, 1980.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Vice President**

**SRI Publications (cont.)**

"Labor-Supply Response to a Permanent Negative Income Tax Program," with H.S. Wai, Research Memorandum, 1980.

"The Effects of a Negative Income Tax Program on Work in the Home: A Study of Nonmarket Time," with K. Yaeger, Research Memorandum, 1980.

"The Effects of Alternative Negative Income Tax Programs on Marital Dissolution," Research Memorandum, 1980.

"Taxes, Transfers, and Subsidies and the Demand for Children: The Impact of Alternative Negative Income Tax Programs," Research Memorandum No. 65, June 1979.

"The Destination Choices and Earnings of Migrants: The Impact of Negative Income Tax Programs," Research Memorandum No. 64, May 1979.

"Final Report: Design of the Labor-Market Impacts of the Employment Opportunity Pilot Projects," with John Bishop and George Farkas, co-principal investigators, prepared for the U.S. Department of Labor, December 1979.

"The Design of Social Experiments: A Critique of the Conlisk-Watts Assignment Model," with P.K. Robins, Research Memorandum No. 57, December 1978.

"The Impact of Income Maintenance on Fertility: Preliminary Findings from the Seattle and Denver Income Maintenance Experiments," Research Memorandum No. 49, February 1978.

"Impact of Income Maintenance on Geographical Mobility: Preliminary Analysis and Empirical Results from the Seattle and Denver Income Maintenance Experiments," Research Memorandum No. 47, October 1977.

"An Interim Report on the Work-Effort Effects and Costs of a Negative Income Tax Using Results of the Seattle and Denver Income Maintenance Experiments: A Summary," with P.K. Robins, R.G. Spiegelman and R.W. West, Research Memorandum No. 41, June 1977.

"The Labor-Supply Effects and Costs of Alternative Negative Income Tax Programs: Evidence from the Seattle and Denver Income Maintenance Experiments, Part II: National Predictions Using the Labor Supply Response Function," with P.K. Robins, R.G. Spiegelman and R.W. West, Research Memorandum No. 39, May 1977.

"The Labor-Supply Effects and Costs of Alternative Negative Income Tax Programs: Evidence from the Seattle and Denver Income Maintenance Experiments, Part I: The Labor Supply Response Function," with P.K. Robins, R.G. Spiegelman and R.W. West, Research Memorandum No. 38, May 1977.

"The Estimation of Labor-Supply Models Using Experimental Data: Evidence from the Seattle and Denver Income Maintenance Experiments, Part II: National Predictions Using the Labor Supply Response Function," with P.K. Robins, R.G. Spiegelman and R.W. West, Research Memorandum No. 29, August 1976.

# Appendix 2

# Michael C. Keeley, Ph.D. Prior Testimony Since 2009

I have given expert testimony in written testimony, expert reports or declarations, depositions and/or at trial since 2009 as indicated below.  I have indicated in bold the party by whom I was retained.

*2013:  **Apple Inc. and Apple Sales International** v. Motorola Mobility LLC* (expert report)

— United States District Court Southern District of California, Case No. 3:12-cv-00355-GPC-BLM

— Gibson, Dunn and Crutcher LLP, 200 Park Avenue, New York, NY 10166

— Matter alleging anticipatory breach of contract by repudiation related to Motorola's license agreements with Qualcomm.  Assessment of the economic considerations involved in granting a permanent injunction and/or order of specific performance.

*2013:  In Re:  Checking Account Overdraft Litigation:  Dolores Gutierrez v. **Wells Fargo Bank, N.A.,** Martinez v. **Wells Fargo Bank, N.A.,** and Zankich, et al. v. **Wells Fargo Bank, N.A.** (declaration, deposition)

— United States District Court Southern District of Florida, S.D. Fla. Case No. 1:09-cv-23685, D. Or. Case No. 3:09-cv-01329-ST, S.D. Fla. Case No. 1:09-cv-23834, D.N.M. Case No. 6:09-cv-01072-GBW-ACT, S.D. Fla. Case No. 1:09-cv-23186-JLK, W.D. Wash. Case No. C-08-1476-RSM

— Covington & Burling, LLP, One Front Street, 35th Floor, San Francisco, CA 94111

— Matter alleging Wells Fargo's posting order was unfair, unreasonable, or in bad faith. Assessment of issues pertaining to class certification.

*2013:  In Re:  Checking Account Overdraft Litigation:  Garcia, et al. v. **Wachovia Bank, N.A.,** and Spears-Haymond v. **Wachovia Bank, N.A.** (declaration, deposition)

— United States District Court Southern District of Florida, S.D. Fla. Case No. 1:08-cv-22463-JLK, S.D. Fla. Case No. 1:09-cv-21680-JLK, N.D. Cal. Case No. 3:08-cv-4610

— Covington & Burling, LLP, One Front Street, 35th Floor, San Francisco, CA 94111

— Matter alleging Wachovia's posting order was unfair, unreasonable, or in bad faith. Assessment of issues pertaining to class certification.

*2013:  In re Methyl Tertiary Butyl Ether Products Liability Litigation (MDL No. 1358); New Jersey Department of Environmental Protection, et al. v. **Atlantic Richfield Company, et al.** (expert report, deposition)

— United States District Court, Southern District of New York, MDL No. 1358, Case No. 08 Civ. 00312 (SAS)

— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105

— Matter alleging groundwater contamination resulting from MTBE.  Assessment of whether Chevron and Texaco owned or supplied gasoline containing MTBE to four trial sites of focus.  Also, assessment of Chevron and Texaco's wholesales sales of gasoline potentially containing MTBE in New Jersey during the 1986-2006 period.

*2012: Brandeis University and GFA Brands, Inc. v. **Keebler Co., et al.** (expert report, deposition)
— United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 12-CV-1509
— Mayer Brown, 71 South Wacker Drive, Chicago, IL 60606
— Patent infringement matter. Assessment of plaintiff's damage claims.

*2012: Cedric Brady, et al. v. **Conseco Life Insurance Company** (expert reports, deposition)
— United States District Court for the Northern District of California San Francisco Division, Case No. 3:08-CV-05746-SI
— Skadden, Arps, Slate, Meagher & Flom, One Beacon Street, Boston, MA 02108
— Breach of contract matter. Assessment of factors affecting the cost of life insurance and whether resumption of cost-of-insurance charges constitutes recoupment. Assessment of opposing expert's analysis.

*2012: Masimo Corporation v. **Philips Electronics North America Corporation, et al.** (expert reports, deposition)
— United States District Court for the District of Delaware, C.A. No. 09-80-LPS-MPT
— Mayer Brown LLP, 1999 K Street, N.W., Washington DC 20006
— Patent infringement matter. Assessment of the Masimo's damage claims and assessment of the analysis of Masimo's damage expert.

*2012: William Murr v. **Midland National Life Insurance Company** (declaration, deposition)
— United States District Court Southern District of Iowa, Central Division, Case No. 4:10-cv-369
— Reed Smith, 101 Second Street, Suite 1800, San Francisco, CA 94105
— Proposed class action alleging breach of contract in the administration of Midland's fixed deferred annuities. Assessment of whether impact and damages can be established with common evidence and whether there are conflicts among proposed class members.

*2012: **Philips Electronics North America Corporation** v. Masimo Corporation (expert report, deposition)
— United States District Court for the District of Delaware, C.A. No. 09-80-LPS-MPT
— Mayer Brown LLP, 1999 K Street, N.W., Washington DC 20006
— Patent infringement matter. Assessment of Philip's damages.

*2012:*  ***Monsanto Company and Monsanto Technology LLC** v. E.I. du Pont de Nemours Company and Pioneer Hi-Bred International, Inc.* (deposition, trial)
— United States District Court, the Eastern District of Missouri, Eastern Division, Case No. 4:09CV00686 ERW
— Winston & Strawn LLP, 333 S. Grand Avenue, Los Angeles, CA 90071-1543;  Husch Blackwell Sanders, 190 Carondelet Plaza, St. Lewis, MO 63105
— Patent infringement and breach of contract matter.  Assessment of Monsanto's damages.

*2012:*  *Crescenta Valley Water District v. **Exxon Mobil Corporation, et al.*** (declaration)
— Superior Court of the State of California for the County of Merced, Case No. 148451
— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105
— Matter alleging groundwater contamination resulting from MTBE.  Declaration in conjunction with a motion to exclude plaintiff's expert.

*2011:*  ***Monsanto Company and Monsanto Technology LLC** v. E.I. du Pont de Nemours Company and Pioneer Hi-Bred International, Inc.* (expert report)
— United States District Court, the Eastern District of Missouri, Eastern Division, Case No. 4:09CV00686 ERW
— Winston & Strawn LLP, 333 S. Grand Avenue, Los Angeles, CA 90071-1543;  Husch Blackwell Sanders, 190 Carondelet Plaza, St. Lewis, MO 63105
— Patent Infringement and breach of contract matter.  Assessment of Monsanto's damages.

*2011:*  *City of Fresno v. **Chevron U.S.A., et al.*** (expert report)
— United States District Court Southern District of New York, No. 04 CV-04973 (SAS)
— Arnold & Porter LLP, 44th Floor, 777 South Figueroa St., Los Angeles, CA 90017-5844
— Matter alleging groundwater contamination resulting from MTBE.  Assessment of plaintiff's claim that MTBE was a defective product based on a cost-benefit analysis conducted by plaintiff's expert.

*2011:*  *Avmed, Inc. v. **Sheridan Healthcorp., Inc.*** (declarations, expert report, deposition)
— In the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, Case No.: 06-002992(07)
— Dewey & LeBoeuf, 1301 Avenue of the Americas, New York, NY 10019-6092
— Antitrust matter alleging that Sheridan's charges were set anti-competitively.  Assessment of plaintiff's and plaintiff's experts' claims regarding liability issues and damages.

*2011: In the Matter of the Binding Arbitration between Dr. Sining Mao, **Western Digital Corporation**, et al. and Seagate Technology, LLC* (arbitration testimony)
— American Arbitration Association, Case No. 65 460 00129 07
— Irell & Manella, LLP, 1800 Avenue of the Stars, Suite 900, Los Angeles, CA 90067
— Matter alleging misappropriation of Seagate trade secrets in the hard disk drive industry. Assessment of the validity of the damage analysis conducted by Seagate's damage expert.

*2011: Orange County Water District v. **Unocal Corp., et al.*** (expert report, deposition)
— United States District Court Southern District of New York, Case No. 04 CIV. 4698 (SAS)
— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105
— Matter alleging groundwater contamination resulting from MTBE. Assessment of plaintiff's claim that MTBE was a defective product based on a cost-benefit analysis conducted by plaintiff's expert.

*2011: City of Merced Redevelopment Agency v. **Exxon Mobil Corp., et al.*** (expert report, deposition)
— United States District Court Southern District of New York, Case No. 08 CIV. 06306 (SAS)
— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105
— Matter alleging groundwater contamination resulting from MTBE. Assessment of plaintiff's claim that MTBE was a defective product based on a cost-benefit analysis conducted by plaintiff's expert.

*2011: City of Merced v. **Chevron U.S.A., Inc., et al.*** (expert report, deposition)
— Superior Court of the State of California in and for the County of Merced, Case No. 148451
— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105
— Matter alleging groundwater contamination resulting from MTBE. Assessment of plaintiff's claim that MTBE was a defective product based on a cost-benefit analysis conducted by plaintiff's expert.

*2011: Crescenta Valley Water District v. **Exxon Mobil Corporation, et al.*** (deposition)
— Superior Court of the State of California County of Los Angeles, Case No. 07 Civ. 9453 (SAS)
— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105
— Matter alleging groundwater contamination resulting from MTBE. Assessment of plaintiff's claim that MTBE was a defective product based on a cost-benefit analysis conducted by plaintiff's expert.

*2010:* *In the Matter of the Binding Arbitration between Dr. Sining Mao,* **Western Digital Corporation,** *et al. and Seagate Technology, LLC* (expert report)
— American Arbitration Association, Case No. 65 460 00129 07
— Irell & Manella, LLP, 1800 Avenue of the Stars, Suite 900, Los Angeles, CA 90067
— Matter alleging misappropriation of Seagate trade secrets in the hard disk drive industry. Assessment of the validity of the damage analysis conducted by Seagate's damage expert.

*2010:* *Crescenta Valley Water District v.* **Exxon Mobil Corporation,** *et al.* (expert report)
— Superior Court of the State of California County of Los Angeles, Case No. EC 044232
— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105
— Matter alleging groundwater contamination resulting from MTBE. Assessment of plaintiff's claim that MTBE was a defective product based on a cost-benefit analysis conducted by plaintiff's expert.

*2010:* *Jack Branning, et al. v.* **Apple Computer, Inc.** (declaration)
— Superior Court of the State of California County of Santa Clara, Case No. 1-05-CV-045719
— Latham & Watkins LLP, 140 Scott Drive, Menlo Park, CA 94025-3656
— Proposed class action in which plaintiffs allege that in conjunction with the development of the Apple retail stores, Apple planned secretly to drive Apple specialists and other resellers out of business by undermining them in various ways. Assessment of issues related to class certification.

*2010:* *Clarke and Rebecca Wixon, et al. v.* **Wyndham Resort Development Corp.,** *et al.* (expert reports, deposition)
— In the United States District Court for the Northern District of California, Case No. C 07 2361 JSW
— Troutman Sanders, LLP, Bank of America Plaza, Suite 5200, 600 Peachtree Street, N.E., Atlanta, GA 30308
— Class action in which plaintiffs allege that defendants engaged in conduct that harmed members of a timeshare organization, WorldMark. Assessment of issues related to liability.

*2010: Kaiser Foundation Health Plan, et al. v. **Pfizer, Inc.** et al.* (trial)
— In the United States District Court for the District of Massachusetts, No. 04-10981-PBS, MDL No. 1629
— Skadden Arps Slate Meagher & Flom LLP, 4 Times Square, New York, NY 10036
— Kaiser alleged that defendants engaged in promotion of Neurontin for certain indications and/or for certain dosage levels that were not approved by the FDA. Assessment of plaintiffs' experts' reports on impact and damages.

*2010: Cedric Brady, et al. v. **Conseco Life Insurance Company*** (declarations)
— United State District Court for the Northern District of California San Francisco Division, Case No. 3:08-CV-05746-SI
— Skadden Arps Slate Meagher & Flom LLP, One Beacon Street, Boston, MA 02108
— Proposed class action alleging Conseco failed to administer properly certain life insurance policies and proposed to change the administration of the policies in a manner inconsistent with the policies. Assessment of whether plaintiffs' claims could be resolved with common evidence or whether individual inquiry would be required.

*2009: Jeanette M. Peterman, et al. v. **North American Company for Life and Health Insurance**, et al.* (deposition)
— Superior Court of the State of California for the County of Los Angeles, No.: BC 357194
— Reed Smith LLP, 101 Second Street, Suite 1800, San Francisco, CA 94105
— Proposed class action alleging incomplete disclosures in the sale of fixed index annuities. Assessment of the validity of plaintiffs' claims.

*2009: Richard B. Clark, et al., v. **AdvanceMe, Inc.*** (declaration)
— United States District Court, Central District of California, Western Division, Case No. CV-08-3540 VBF (FFMx)
— Strook & Strook & Lavan LLP, 2029 Century Park East, Los Angeles, CA 90067-3086
— Proposed class action alleging that AdvanceMe's purchases of future credit card receivables are in fact loans that violate California's usury laws. Assessment of whether there is class conflict, whether it is possible to compute an ex ante interest rate associated with AdvanceMe's contracts, and assessment of the validity of the plaintiffs' expert's analysis.

*2009:  In Re **Midland National Life Insurance Co.** Annuity Sales Practices Litigation*
(declaration)
— United States District Court, Central District of California, Western Division, MDL No.
07-1825 CAS(MANx)
— Reed Smith, LLP, 101 Second Street, Suite 1800, San Francisco, CA 94105
— Proposed class action alleging incomplete disclosures in the sale of fixed index
annuities.  Assessment of the validity of the damage and impact methods and
calculations of plaintiffs' expert.  Declaration pertaining to defendant's motion to
exclude the testimony of plaintiffs' expert.

*2009:  In Re Flash Memory Antitrust Litigation; Indirect Purchaser Actions (*retained by the
**Defendants***) (declaration, deposition)*
— In the United States District Court for the Northern District of California, Oakland
Division, Case No. C07-0086 SBA (N.D. Cal)
— Proposed antitrust class action, alleging collusion regarding Flash memory.  Assessment
of whether impact and damages can be proved using common evidence.

*2009:  In Re Flash Memory Antitrust Litigation; Direct Purchaser Actions (*retained by the
**Defendants***) (declaration, deposition)*
— In the United States District Court for the Northern District of California, Oakland
Division, Case No. C07-0086 SBA (N.D. Cal)
— Proposed antitrust class action, alleging collusion regarding Flash memory.  Assessment
of whether impact and damages can be proved using common evidence.

*2009:  Ormco Corporation v. **Align Technology, Inc.** (declaration)*
— In the United States District Court for the Central District of California, Case No. SACV
03-16 CAS (ANx)
— Paul, Hastings, Janofsky & Walker, 55 Second Street, San Francisco CA 94105 and
Townsend and Townsend and Crew, 379 Lytton Avenue, Palo Alto, CA 94301
— Patent matter.  Assessment of economic factors related to Ormco's request for an
injunction.

*2009:  Clarke and Rebecca Wixon, et al. v. Wyndham Resort Development Corp., et al.* (expert report, deposition)
— In the United States District Court for the Northern District of California, Case No. C 07 2361 JSW
— Troutman Sanders, LLP, Bank of America Plaza, Suite 5200, 600 Peachtree Street, N.E., Atlanta, GA  30308
— Proposed class action in which plaintiffs allege that defendants engaged in conduct that harmed members of a timeshare organization, WorldMark.  Assessment of whether common evidence can be used to address plaintiffs' claims of causation, impact, and damages, and assessment of the validity of the report of plaintiffs' expert.

*2009:  Elizabeth Judy and Stephen Brown, et al. v. Pfizer, Inc., and Warner-Lambert, Inc.* (expert reports, deposition)
— In the Circuit Court of the City of St. Louis State of Missouri, Cause No. 042-01946
— Davis Polk & Wardwell, LLP, 450 Lexington Ave., New York, NY  10017
— Proposed class action in which plaintiffs allege that defendants engaged in false or misleading promotion of Neurontin for certain indications and/or for certain dosage levels that were not approved by the FDA.  Assessment of whether common evidence can be used to address plaintiffs' claims of causation, impact, and damages, and assessment of the validity of plaintiffs' expert's declaration.

*2009:  City of New York v. Amerada Hess Corporation., et al.* (retained by **Chevron**) (expert reports)
— United States District Court, Southern District of New York, MDL No. 1358
— King & Spalding LLP, 1100 Louisiana, Suite 4000, Houston, TX 77002-5213
— Matter alleging groundwater contamination resulting from MTBE.  Assessment of whether Chevron was in the geographic market of focus for gasoline containing MTBE and if so, Chevron's market share.

*2009: In Re Neurontin Marketing and Sales Practices Litigation* (retained by **Pfizer and Warner-Lambert Company**) (expert report, deposition)

— In the United States District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981

— Davis Polk & Wardwell, LLP, 450 Lexington Ave., New York, NY  10017

— Proposed class action in which plaintiffs allege that defendants engaged in promotion of Neurontin for certain indications and/or for certain dosage levels that were not approved by the FDA.  Assessment of plaintiffs' experts' reports on aggregate impact and damages.

# Appendix 3
## Documents Considered by
## Michael C. Keeley, Ph.D.

| Document Title, Bates Numbers | Document Date |
|---|---|
| **Legal Pleadings** | |
| Amended Class Action Complaint | November 30, 2012 |
| Defendants' Answer to Amended Complaint | December 17, 2012 |
| Defendants' Memorandum in Support of Their Motion to Dismiss, with Exhibits A and B | May 3, 2012 |
| Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss | May 31, 2012 |
| Defendants' Reply Memorandum in Support of Their Motion to Dismiss | June 15, 2012 |
| Order Denying Defendants' Motion to Dismiss | June 27, 2012 |
| Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories Directed to Defendants | March 4, 2013 |
| Defendants' Supplemental Responses to Plaintiffs' First Set of Interrogatories Nos. 2, 4, 12, 21, and 24 | April 5, 2013 |
| **Depositions** | |
| Deposition of James Kenneth Bell | February 21, 2013 |
| **Produced Documents** | |
| CareSouth Background Check Policy CS000069-71 | |
| CareSouth Criminal History Disclosure Statement CS000033 | |
| CoreLogic, Database Sources by State CL-H007709-80 | February 1, 2013 |
| CoreLogic_Henderson Cornerstone CL-H092992-5 | April 9, 2013 |
| CoreLogic, "National Background Data, Criminal Offender Profile Summary," CL-H002751 | |
| Emails between Ken Bell, John Thomas, and Susan Kitchens, June 23, 2011 and July 1, 2011 CS000074-7 | |
| Fax from A. Wynn, National Background Data by CoreLogic, to R. Small, with Background Screening on T. Henderson CL-H000048-76 | November 17, 2011 |
| Federal Trade Commission Consumer Report Information CL-H000488-519 | |

| Document Title, Bates Numbers | Document Date |
|---|---|
| HinesDispos.xls<br>CL-H092989 | |
| HinesMultiHits.xls<br>CL-H092990 | |
| HinesUniHits.xls<br>CL-H092991 | |
| Interstate Bakeries Corporation Adjudication Criteria<br>Corelogic_Hostess_001_002529–35 | October 21, 2010 |
| Interstate Brands Corporation Letter to Tyrone Henderson<br>Corelogic_Hostess_001_001925 | November 17, 2009 |
| Letter from Interstate Brands Corporation to Henderson, Tyrone Bernett Sr.<br>Corelogic_Hostess_001_000049–73 | November 17, 2009 |
| Letter from W. Morley, ADP Screening and Selection Services, to J. Hall, National Background Data, re Termination of Reseller Service Agreement of March 25, 2008, with Attached Agreement<br>CL-H000179-86 | December 15, 2011 |
| National Background Data, LLC Affiliate Services Agreement with Verifications Inc.<br>CL-H002887–93 | March 17, 2003 |
| National Background Data Website Overview Training Guide<br>CL-H092951 | |
| NBD Affiliate Application<br>CL-H000152-165 | August 30, 2008 |
| NBD Henderson Reconstruction<br>CL-H002649–52 | |
| NBD Reseller Agreement with ADP<br>CL-H000287-309 | September 16, 2005 |
| NBD Reseller Service Agreement<br>CL-H003936–40 | January 17, 2012 |
| NBD Reseller Service Agreement<br>CL-H004221–5 | December 4, 2012 |
| NBD Reseller Service Agreement<br>CL-H004942–74 | May 14, 2007 |
| NBD Reseller Service Agreement<br>CL-H006518-27 | February 24, 2009 |
| NBD search results for James Hines<br>CL-H002721–39 | June 7, 2011 |
| NBD search results for Tyrone Henderson<br>CL-H000009–24 | November 16, 2011 |
| Possible Source Inputs – HinesOff – 2.csv<br>CL-H007705 | |

| Document Title, Bates Numbers | Document Date |
|---|---|

Results for query conducted by Verifications
CL-H000032–38

XML Configuration List
CL-H007708

Produced Documents
CL-H000001–94134; CoreLogic_Hostess_001_000001–2535; CS000001–77;
Verifications 000001–2544; ADP SASS 0000001–31

**Interviews and Meeting Notes**

Interviews of Joe Davidson on February 5, 2013, April 4, 2013 and July 25, 2013

Interview of Lyn Watts on April 4, 2013

**Publicly Available Materials**

Accio Data Sample Background Report,
http://www.acciodata.com/whatyouget/samples/sample2.pdf

Accurate Background, "Background Screening Products,"
https://www.accuratebackground.com/products.php?sec=17

Aukerman, Miriam, "Criminal Convictions as a Barrier to Employment - How
Attorneys Can Help People with Records Get a Second Chance," Michigan Bar
Journal, November 2008

"Barrier Crimes Matrix for the Barrier Crimes Listed in AAC 10.905,"    January 5, 2007
http://dhss.alaska.gov/ocs/Documents/BarrierCrimeMatrix.pdf

Bloomberg Businessweek Magazine, "Background Checks that Never End,"    March 19, 2006
http://www.businessweek.com/stories/2006-03-19/background-checks-that-never-end

Concerned CRAs, "Our Positions," http://www.concernedcras.com/about-us-3/

"Consumer Reporting Agency Limitations,"
http://www.northcarolina.edu/hr/initiatives/2013-RFP/Sterling_Bid.pdf

CoreLogic, "Criminal Offender Profile Summary,"
https://www.nationalbackgrounddata.com/marketing/ncd_search.html

CoreLogic, "Instant Criminal Services,"
https://www.nationalbackgrounddata.com/marketing/inst_crim_services.html

CoreLogic, "National Background Data Consumer Relations,"
https://www.nationalbackgrounddata.com/marketing/consumer_relations.html

CoreLogic, "Not Just a Criminal Check, a Background Solution,"
https://www.nationalbackgrounddata.com/marketing/home.html

CoreLogic, "Notice to Users of Consumer Reports: Obligations of Users Under the
FCRA," http://www.corelogic.com/landing-pages/asset_upload_file950_16795.pdf

CoreLogic, "Our Clients,"
https://www.nationalbackgrounddata.com/marketing/solution_p_n.html

CoreLogic, "Our Company,"
http://www.corelogic.com/downloadable-docs/about-corelogic-4-2012.pdf

| Document Title, Bates Numbers | Document Date |
|---|---|
| CoreLogic, "Our Company," https://www.nationalbackgrounddata.com/marketing/about_us.html | |
| DetectFraud Sample Screening Report, https://www.detectfraud.com/employment_screening_sample.pdf | |
| Dodge, Garen E., "The Employer's Dilemma:  To Screen or Not to Screen," https://www.uschamber.com/sites/default/files/Dodge%20Presentation.pdf | March 13, 2012 |
| easyBackgrounds.com Sample Profile Information, http://www.easybackgrounds.com/resources/sample-reports/ | |
| EmployeeScreenIQ, "Trends in Employment Background Screening – 2010 Results," http://www.employeescreen.com/ESIQ_2010_Trends.pdf | |
| EmployeeScreenIQ, "Trends in Employment Background Screening, 2011 Results," http://www.employeescreen.com/ESIQ_Trends_2011.pdf | |
| EmployeeScreenIQ, "Employment Screening Practices & Trends:  The Era of Heightened Care and Diligence," http://www.employeescreen.com/Survey_Report_2013.pdf | |
| Ernst, Carl R., and Les Rosen, "'National' Criminal History Databases - Issues and Opportunities in Pre-employment Screening," http://www.esrcheck.com/file/NationalCriminalHistoryDatabases.pdf | November 26, 2002 |
| Grannis, Kathy, "Troubled Economy Increases Shoplifting Rates, According to National Retail Security Survey," National Retail Federation, http://www.nrf.com/modules.php?name=News&op=viewlive&sp_id=746 | June 16, 2009 |
| Harrell, Erika, "Workplace Violence, 1993-2009," U.S. Department of Justice, http://www.bjs.gov/content/pub/pdf/wv09.pdf | March, 2011 |
| HireRight, "HireRight On-Demand Solutions & Services," http://www.hireright.com/Background-Checks.aspx | |
| Holloran, Robert W., William J. Bollinger, and Sharron K. Goodman, "National Background Data, LLC Standards for Development and Use of Criminal History Databases," https://www.nationalbackgrounddata.net/publicsiteforms/pages/pdf/criminal_database_standards_nbd.pdf | April 23, 2003 |
| IntegraScan Detailed Background Check - Sample Report, http://www.integrascan.com/sample-background-check | |
| Integrascan, "Instant Criminal Records & Background Checks," http://www.integrascan.com | |
| Johnson, Kevin, "Some States Rethink Felony Property Crimes," USA Today, Available at http://usatoday30.usatoday.com/news/washington/story/2011-10-30/states-rethink-felony-property-crimes/51008424/1 | October 30, 2011 |
| Keeley, Michael C., *Labor Supply and Public Policy:  A Critical Review*, New York, New York:  Academic Press, June 1981 | |

| Document Title, Bates Numbers | Document Date |
|---|---|

Lawrence, Sarah, "Reaching a Higher Ground: Increasing Employment Opportunities for People with Prior Convictions," Berkeley Center for Criminal Justice, November 2010, http://www.law.berkeley.edu/files/FINAL_Emply_Opps_Full_Report(2).pdf

Mothers Against Drunk Driving, "DUI Felony Laws," April 2011, http://www.madd.org/laws/law-overview/DUI_Felony_Overview.pdf

National Association of Professional Background Screeners, "Criminal Background Checks for Employment Purposes," http://www.napbs.com/files/public/Learn_More/White_Papers/CriminalBackgroundChecks.pdf

National Association of Professional Background Screeners, "Info Brochure," http://www.napbs.com/i4a/pages/index.cfm?pageid=3280

"National Criminal Databases and Background Screening," Verifications, Inc., March 1, 2012

National Retail Federation, "Background Screening - Protecting Retailers and Consumers" http://www.nrf.com/modules.php?name=News&op=viewlive&sp_id=1201&parent_id=950&peer_rev=0&nrf_or=1%20

New York Arraignments, "New York Crimes Arranged in Alphabetical Order," http://www.new-york-arraignments.com/allcrimesalpha.htm

NORML Webpage - "Colorado Penalties," http://norml.org/laws/item/colorado-penalties?category_id=848

NORML Webpage - "Georgia Penalties," http://norml.org/laws/item/georgia-penalties?category_id=853

NORML Webpage - "Oregon Penalties," http://norml.org/laws/item/oregon-penalties-2#mandatory

NORML Webpage - "Texas Penalties," http://norml.org/laws/item/texas-penalties-2?category_id=888

NORML Webpage - "Washington Penalties," http://norml.org/laws/item/washington-penalties-2?category_id=893

Northern Arizona University, "Negligent Hiring Practices," http://hr.nau.edu/node/2158

Oster-Aaland, Laura, Kevin Thompson, and Erika Beseler Thompson, "2010 Survey of NDSU Employers," http://www.ndsu.edu/fileadmin/alcoholinfo/2010_NDSU_Employer_Survey_Summary.pdf).

"Overview of State Laws That Ban Discrimination By Employers," http://www.lac.org/toolkits/standards/Fourteen_State_Laws.pdf

Portland State University Student Legal Services, "Background Checks & Jobs", http://www.pdx.edu/sls/sites/www.pdx.edu.sls/files/Background%20checks%20presentation.pdf

Confidential

| Document Title, Bates Numbers | Document Date |
|---|---|
| ProCon.org, "40 States that Allow Underage (under 21) Alcohol Consumption," http://drinkingage.procon.org/view.resource.php?resourceID=002591 | March 20, 2013 |
| Professional Screening & Information Sample Background Investigation Report, http://www.psibackgroundcheck.com/sample-report.shtml | |
| Rosen, Lester, "Safe Hiring Practices and Pre-employment Screening," Presentation for the HR Screener, 2003 | |
| Sample Vendor Background Agreement, http://web.trinity.edu/Documents/hr_docs/Vendor%20Background%20Check%20Agreement.pdf | |
| Schenk, Mary, "Law Changes Value Level for Felony Theft," News-Gazette, Available at http://www.news-gazette.com/news/courts-police-and-fire/2011-01-01/law-changes-value-level-felony-theft.html | January 1, 2011 |
| Society for Human Resource Management Presentation - "Background Checking: Conducting Criminal Background Checks," http://www.shrm.org/Research/SurveyFindings/Articles/Pages/BackgroundCheckCriminalChecks.aspx | January 22, 2010 |
| Society for Human Resource Management Presentation - "Background Checking: Post-hire Background Checks," http://www.shrm.org/Research/SurveyFindings/Articles/Pages/BackgroundCheckPosthire.aspx | January 22, 2010 |
| Society for Human Resource Management, "Life Goes On," http://www.shrm.org/Publications/hrmagazine/EditorialContent/Pages/0902emprelations.aspx | September 1, 2002 |
| Society for Human Resource Management, "SHRM Research Spotlight: Credit Background Checks," http://www.shrm.org/research/surveyfindings/articles/documents/ccflier_final.pdf | September 2010 |
| Society for Human Resource Management Presentation - "SHRM Survey Findings: Background Checking – The Use of Criminal Background Checks in Hiring Decisions," http://www.shrm.org/Research/SurveyFindings/Articles/Pages/CriminalBackgroundCheck.aspx | July 19, 2012 |
| "State Laws and Their Impact on Use of Criminal Records for Employment Purposes," http://hr.4act.com/documents/State_Laws_and_Their_Impact_on_Use_of_Criminal_Records_for_Emplo.pdf | |
| Technical Assistance and Background Checks, prepared by the Division of Human Resources in the Department of Personnel and Administration, http://www.colorado.gov/cs/Satellite?blobcol=urldata&blobheader=application%2Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1251691765389&ssbinary=true | February 14, 2011 |
| University of Maine Policy on Pre- and Post-Employment Background Checks, http://www.maine.edu/pdf/PolicyonPreandPostEmploymentBackgroundChecks.pdf | April 17, 2008 |
| Verifications Inc., "Background Screening," http://www.verificationsinc.com/eng/whatwedo/background_screening.cfm | |

| Document Title, Bates Numbers | Document Date |
|---|---|
| Verifications Inc. Sample Background Investigation Report, http://www.verificationsinc.com/pdf/sample.pdf | |
| Washington Metropolitan Area Transit Authority, "Board Action/Information Summary" re Background Screenings, http://www.wmata.com/about_metro/board_of_directors/board_docs/052611_Cons510 1139BackgrndScreenRevHL.pdf | May 26, 2011 |
| Washington Metropolitan Area Transit Authority, "Minutes of the 1363rd Meeting of the Board of Directors,"http://www.wmata.com/about_metro/board_of_directors/board_docs/06231 1_May262011Minutes.pdf | May 26, 2011 |

**SEC Filings**

CoreLogic, Inc., Form 10-K for the Fiscal Year Ended December 31, 2012

Interstate Bakeries Corporation, Form 10-K for the Period Ended May 31, 2008

**Laws and Opinions**

2012 Florida Statutes, http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&Search_Stri ng=&URL=0800-0899/0810/Sections/0810.02.html

Arizona Statute 13-1508, "Burglary in the First Degree; Classification," http://www.azleg.gov/FormatDocument.asp?inDoc=/ars/13/01508.htm&Title=13&Doc Type=ARS

California Civil Code 1786.18

California Labor Code, Section 430-435, http://www.leginfo.ca.gov/cgi-bin/displaycode?section=lab&group=00001-01000&file=430-435

| | |
|---|---|
| Decision in Beverly v. Diamond, http://www.ca4.uscourts.gov/opinions/Unpublished/982230.U.pdf | June 1, 1999 |
| Equal Employment Opportunity Commission Policy Statement on the Issue of Conviction Records under Title VII of the Civil Rights Act of 1964, as Amended, 42 U.S.C. § 2000e et seq. (1982), www.eeoc.gov/policy/docs/convict1.html | February 4, 1987 |
| Equal Employment Opportunity Commission Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.  Available at http://www.eeoc.gov/laws/guidance/arrest_conviction.cfm | April 25, 2012 |

The Fair Credit Reporting Act, (§ 605) 15 U.S.C. § 1681c

Kentucky Codes and Violations, http://www.kentuckystatepolice.org/violation_codes/Condensed_Version_Violation_C odes_9_30_04.txt

Montana Code Annotated 2011, Section 45-6-204 - Burglary, http://data.opi.mt.gov/bills/mca/45/6/45-6-204.htm

"N.Y. PEN. LAW § 160.05: NY Code - Section 160.05: Robbery in the Third Degree," http://codes.lp.findlaw.com/nycode/PEN/THREE/J/160/160.05

Confidential

| Document Title, Bates Numbers | Document Date |
|---|---|
| "N.Y. PEN. LAW § 160.15: NY Code - Section 160.15: Robbery in the First Degree," http://codes.lp.findlaw.com/nycode/PEN/THREE/J/160/160.15 | |
| "Offense Code Index for Traffic Violations," from the Michigan Department of State Court Manual, http://www.michigan.gov/documents/OffenseCode_73877_7.pdf | March 31, 2013 |