**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**TYRONE HENDERSON,**
**JAMES O. HINES, JR.**
**on behalf of themselves and others**
**similarly situated,**

      **Plaintiffs,**

**v.**                                                                  **Civil Action No**: **3:12cv97 (REP)**

**CORELOGIC, INC.,**

**and**

**CORELOGIC NATIONAL BACKGROUND DATA, LLC,**
**f/k/a National Background Data, LLC,**

      **Defendants.**


**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

COME NOW the Plaintiffs, TYRONE HENDERSON and JAMES O. HINES, JR, for themselves and on behalf of all other similarly situated individuals, by counsel, and for their Memorandum in Opposition to Defendant's Motion for Summary Judgment, they state as follows:

## OVERVIEW

Defendant made nearly all of the same arguments in support of its Motion to Dismiss that it now offers for Summary Judgment.  (Dkt. No. 7).  This Court already rejected these arguments in its correct conclusion that the allegations stated in the Amended Complaint (and now established by the discovery in this case) stated a legal claim (Dkt. No.  25). The Court can, of course, always reverse its decision. But as the basic arguments asserted on summary judgment are nearly identical to those offered earlier, it should not.[1]

## PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

Defendant's Statement of Facts is largely uncontroversial.  Most of the facts that may be disputed are substantively irrelevant to the present motion and the case generally.  Pursuant to Local Rule 56, Plaintiff has restated only those statements of fact that are disputed and material.  Plaintiff incorporates additional affirmative facts within the text of this brief.

3.      *NBD sells criminal record data gathered from more than 300 governmental sources, which records are regularly updated from those same sources.*  Disputed. Defendant *NBD* does not purchase a single public record from a governmental source. NBD purchases 100% of its data from the databases of either third party CRA SafeRent or an Experian subsidiary, Court Ventures.  *See* Def.'s Responses to Pls.' Interrogatory No. 6; see also Exhibit T.

6.      *NBD would then provide its CRA customer with complete and up-to-date information regarding all the criminal records matching those criteria.*  Disputed.  For example, in nearly every instance, the criminal public records NBD furnishes are not "complete" as they lack the most critical

---

[1] The "law of the case" concept "rests on good sense and the desire to protect both court and parties against the burdens of repeated reargument by indefatigable diehards."  § 4478 Law of the Case, 18B Fed. Prac. & Proc. Juris. § 4478 (2d ed.).

identifying field item—social security number.

7.      *NBD's data is not matched to, and is not represented as being matched to, any particular individual*.  Disputed.  This is a legal argument, denying the applicability of various FCRA provisions to the reports it sells.  As addressed in Part I.A below, the reports sold by NBD were "consumer reports" regarding specific consumers.

8.      *As to Plaintiffs […] (3) NBD returned current and up-to-date criminal records responsive to the CRAs' search criteria, […] and (4) ADP and Verifications were responsible for determining whether those records actually matched to the Plaintiffs, generating consumer reports containing records only germane to the Plaintiffs[.]*  Disputed.  First, as explained with regard to the previous paragraph, NBD does not provide complete criminal public records.  Additionally, this is a legal argument.  NBD does not ask for, receive or in any other way obtain the social security numbers for the subject public records.  In Hines' and Henderson's instances, NBD obtained the SSNs from each respective court but only after the inaccurate and incomplete reports were furnished and then later disputed by the consumers.  Further, under the FCRA, both NBD AND resellers are responsible for accuracy and § 1681k obligations.

10.      *[…]Verifications was authorized to prepare reports from the records and distribute those reports to Verification's customers, defined as the "End-Users" of the data.*  Disputed.  Defendant's own archive shows that Verifications identified itself as the "End-user" of Henderson's report.  Exhibit "K", Bates Nos. CL-H2649-2652; Exhibit "J", Bates Nos. CL-H2674-2678.

12.      *The Verifications ASA further provided that Verifications agreed to filter the wholesale results that it would be receiving in response to its self-selected queries[.]*  Disputed and immaterial.  The contract text speaks for itself and does not provide as NBD suggests.   It is also undisputed that all CRAs involved have accuracy and §1681k obligations.

32.      *SafeRent spends approximately 7,000 man hours per year executing the foregoing quality assurance processes, including through daily internal checks.  Ex. B at ¶ 23.*

Not disputed, but immaterial.  However, the Court should note that NBD's results database  evidences 10

million consumer reports sold (not limited to ADP and Verifications).  This does not include non-NBD

reports such as Tenant screening by SafeRent, but just assuming that number, 7,000 hours devoted that is

only 2.5 second per report sold.

37.     *NBD's systems then returned the requested criminal record information based on ADP's
inputted criteria, which reflected NBD's complete set of criminal records (including all criminal charges
and their dispositions) responsive to ADP's search criteria.* Disputed to the extent that the Defendant is

suggesting that the public records it produced were complete.

38. and 39.     *Pursuant to the ADP contract and the FCRA, ADP applied its own filtering and
matching to the data returned by NBD prior to providing its consumer report to CareSouth. For example,
ADP did not report to CareSouth some of the criminal records that had been returned by NBD.*

Undisputed that VI furnished a report to IBC that included the inaccurate Pennsylvania felony records

provided by NBD.  But this is immaterial.

40.     *NBD did not participate in filtering any of the results transmitted by ADP to
CareSouth.* Disputed.  NBD filtered the data it obtained from SafeRent and chose which data to return..

41.     *After applying its own filtering, ADP prepared and transmitted a consumer report on
Hines to CareSouth, which contained certain records from Indiana about which Hines now complains
in this lawsuit. See Ex. C; Amend. Compl., at ¶ 48.* Undisputed that ADP furnished a report to CareSouth

that included the inaccurate records provided by NBD.  But this is immaterial.

48., 49. and 51.     *For example, Verifications did not report to Interstate Brands some of the
criminal records that had been returned by NBD.* **[…]** *After applying its own filtering, Verifications
prepared and transmitted a consumer report to Interstate Brands, which contained certain records from
Pennsylvania about which Henderson now complains in this lawsuit.* Disputed.  Verifications reported the

"Hit" furnished by NBD immediately to the employer. *See* Am. Compl. ¶¶ 28–30. And Verifications

reported the same inaccurate Pennsylvania felony records provided by NBD. *Id.*

4

<u>**ARGUMENT**</u>

**I. BECAUSE NBD IS A "CONSUMER REPORTING AGENCY" THAT FURNISHES CONSUMER REPORTS THAT CONTAIN ADVERSE PUBLIC RECORDS AND ARE FOR EMPLOYMENT PURPOSES, ITS REPORTS REGARDING HENDERSON AND HINES WERE GOVERNED BY 15 U.S.C. §1681k(a).**

Defendant's arguments can be reduced to two basic assertions:  (1.) FCRA §1681k(a) does not apply to its business model; and (2.) even if the section does apply, NBD need not provide the notices mandated by §1681k(a)(1) because it complies with the provision at §1681k(a)(2).  Plaintiffs' response addresses each in turn.  Both of Defendant's positions are remarkable because they are entirely inconsistent with the positions stated in writing by NBD in its operations and outside this one court case.  They also depend upon a piecemeal statutory analysis that tries to force implied elements into the statute's plain text that are not otherwise found in it.

Count I of the Amended Complaint, which is the subject of this motion, alleges that NBD failed to "timely provide the required FCRA notices to the Plaintiffs" in violation of 15 U.S.C. § 1681k(a)(1) of the FCRA. (Dkt. No. 30 at ¶ 74).  Section 1681k(a) provides, in pertinent part:

> **A consumer reporting agency which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment shall—**
>
> (1) at the time such public record information is reported to the user of such consumer report, notify the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported; or
> (2) maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date.

*Id.* (emphases added). This FCRA text is easily dissected into its simple elements.  For § 1681k(a) to apply, NBD must first be a "consumer reporting agency".  Then, §1681k(a) only applies to some CRAs, specifically, those that furnish reports that satisfy two other characteristics.  The subject CRA must "furnish[] a consumer report for employment purposes" and for that purpose—the purpose of furnishing an employment consumer report—"compile[] and report[] items of information on consumers which are

matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment."  The question of which of the two alternatives apply - §1681k(a)(1) versus 1681k(a)(2)— logically comes after consideration and application of the section's preamble.  **Simplified, §1681k(a) applies if:**

- **NBD is a consumer reporting agency;**

- **The reports it furnished regarding Henderson and Hines were "consumer reports";**

- **The reports it furnished regarding Henderson and Hines were furnished "for employment purposes"; and**

- **For the purpose of furnishing employment reports, NBD compiles and reports public records that are "likely to have an adverse effect upon a consumer's ability to obtain employment."**

A reasonable jury could find that the reports NBD sold regarding the Plaintiffs satisfy each of these elements.  If so, then the section necessarily applies and the only question remaining is whether NBD complied with either of the statute's requirements described at §1681k(a)(1) and §1681k(a)(2).

## A.   NBD'S "DISTRIBUTION OF DATA" IS THE FURNISHING OF A "CONSUMER REPORT" BY A "CONSUMER REPORTING AGENCY" ABOUT A PARTICULAR CONSUMER.

While NBD goes to considerable effort in its brief to avoid using the words "consumer reporting agency" or "consumer report" to describe itself or its (self-titled) "wholesale distribution of data", it cannot through such contortions avoid these definitions set forth in the statute.  NBD is plainly a consumer reporting agency.  As Defendant's own training materials explain, under the FCRA, a "consumer reporting agency", "is an entity, which, for monetary fees . . . regularly engages in whole or in part, in the practice of assembling or evaluating . . . information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."  Exhibit "A", NBD *Basic FCRA/FACTA Training* June 2007, at Bates CL-H608; *see also* 15 U.S.C. §1681a(f).  Subject to further explanation below that NBD's reports are "consumer reports", Defendant is certainly then a consumer reporting agency.

This point is uncontestable.  In the real world—the one not contrived for this civil action—NBD openly acknowledges that it is an FCRA-governed consumer reporting agency.  Exhibit "B",

SafeRent/NBD Data Licensing Agreement, at CL-H546 ["D. Licensee [NBD] is a Consumer Reporting Agency within the meaning of the FCRA and is a leading provider of database criminal information to the background screening industry"]; Exhibit "C", SafeRent/NBD Reseller Service Agreement, at CL-H568-581 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Exhibit "D", September 21, 2007 Proposed §1681k(a)(1) Form Notice, CL-H2746 (admits the application of the FCRA, and of §1681k(a)(1) specifically); Exhibit "E", NBD /ADP Reseller Service Agreement, March 25, 2008, at CL-H181 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

The second element in §1681k(a), that NBD's "wholesale data distribution" is a "consumer report" is no less obvious.  A "consumer report" includes any "written . . . communication of any information by a consumer reporting agency bearing on a consumer's character, general reputation, [or] personal characteristics which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility" for employment.  Exhibit "A", NBD *Basic FCRA/FACTA Training* June 2007, at CL-H607; *see also* 15 U.S.C. §1681a(d).  "Public record information relating to records of arrest, bankruptcies, or the institution or disposition of civil or criminal proceedings, bears on one or more of these characteristics."  Fed. Trade Comm'n, Forty Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations 20–21 (July 2011).

Even NBD concedes that the reports it sells to its reseller customers are consumer reports containing consumer reporting information.  Exhibit "F", NBD-ADP Reseller Services Agreement, at. CL-H288. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Each access of the [NBD] *Data* Services by Reseller [ADP] shall be considered a

7

procurement of a consumer report for resale by Reseller."; Exhibit "G" SafeRent/NBD Data Licensing

Agreement, at CL-H546 ("Licensee [NBD] hereby certifies and warrants that it: [...] will request, use, or

provide Licensor [SafeRent] Data to, or on behalf of, third parties solely for one or more of the Permissible

Purposes, as defined herein, including [...] for employment purposes (e.g., hiring, promotion, transfer or

security-related issues) regarding a consumer[.]"; Exhibit "A", NBD *Basic FCRA/FACTA Training* June

2007, at CL-H620; CL-H625 ("National Background Data (NBD) is essentially a Reseller of consumer

information and reports. NBD assembles and merges information contained in the database of another

(First Advantage SafeRent) consumer reporting agency or multiple consumer reporting agencies

concerning any consumer for purposes of furnishing such information to any third party[.]"); Exhibit "F",

NBD-ADP Reseller Services Agreement, at CL-H287

;

Exhibit "H", NBD's Standard Reseller Agreement, CL-H2775-78 ("Solution Provider [ADP/Verifications]

may request and NBD may provide to Solution Provider [ADP/Verifications] Consumer Reports ('Report'

or 'Reports') for employment and/or tenant screening purposes only, as defined under the Fair Credit

Reporting Act (15 U.S.C., §1681 et seq., as the same may be amended from time to time, the 'FCRA').

Capitalized terms used in this Agreement but not otherwise explicitly defined shall have the meaning

ascribed to them under the FCRA. Solution Provider [ADP/Verifications] shall be deemed a 'Reseller' of

Consumer Reports.").

Defendant's implied challenge to this conclusion is its assertion that, "the results provided to ADP and

Verifications were not linked to any particular individual [.]"  Def.'s Mem. at 12.  NBD makes this claim

in its Statement of Facts and has half-heartedly attempted to create such a defense in this litigation.  Such a

strategy is not well thought out. NBD is arguing this unpalatable process and sequence:  NBD's reseller

receives an inquiry from an employer about a specific consumer; NBD's procedure elicits only a name and

date of birth from the reseller inquiry; NBD then returns a broad report including not just records that apply

to the applicant consumer—the subject of the search—but also to other unrelated consumers with a similar name and date of birth.  In a credit reporting case—one against Equifax, Experian or Trans Union—this Defendant might as well just confess liability.  That loose match is neither required nor permitted by the FCRA.  But whether or not NBD's reports accurately identify public records belonging to the subject consumer, the reports nonetheless are intended to do just as NBD claims they are not.  The NBD reports **ARE** furnished to answer the question:  "What records do you have with respect to, that regard and that concern this consumer."

In the real world, NBD understands that it is not merely selling chunks of data, but rather consumer reports related to specific consumers.  Exhibit "F", NBD-ADP Reseller Services Agreement, at CL-H288. ███████████████████████████████████████████████████████████████ ███████████; Exhibit "G", SafeRent/NBD Data Licensing Agreement, at CL-H546 ███Licensee [NBD] hereby certifies and warrants that it: [ . . ] will request, use, or provide Licensor [SafeRent] Data to, or on behalf of, third parties solely for one or more of the Permissible Purposes, as defined herein, including [ . . ] for employment purposes (e.g., hiring, promotion, transfer or security-related issues) **regarding** a consumer[ . ]███; Exhibit "A", NBD *Basic FCRA/FACTA Training* June 2007, at CL-H620, CL-H625 ("National Background Data (NBD) is essentially a Reseller of consumer information and reports. NBD assembles and merges information contained in the database of another (First Advantage SafeRent) consumer reporting agency or multiple consumer reporting agencies **concerning any consumer** for purposes of furnishing such information to any third party").

NBD's written instructions to its reseller users also acknowledge and describe its report results as regarding a specific consumer applicant.  Exhibit "I", NBD Website Training Guide, CL-H2851-2885.  The "Applicant" is defined as "The person who is being screened for employment or other purposes."  *Id.* at CL-H2853.  The report ordering process requires the user to input and select by specific "Applicant Information."  *Id.* at CL-H2876 and *in passim.*

Defendant's suggestion that because it includes records in a report that do not actually belong to the

consumer about whom the end-user and reseller inquiry is made, the report does not somehow regard that consumer.  As stated above, NBD's contention is factually incorrect.  NBD states its intention that the reports regard specific individuals.  But Defendant's claim should also be rejected because it depends upon a misreading of the statute's text and insertion of qualifiers not actually present in the text of the FCRA. Section 1681k(a) does not require that the report's contents actually belong to the subject consumer. Instead, the provision governs whenever the consumer reporting agency "reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment."

The consumer reporting agency's connection of the public record items to the subject consumer does not have to be accurate in order to constitute a consumer report regarding the subject consumer.  For example, in Mr. Henderson's instance, NBD furnished a report regarding him that included criminal conviction records that were not accurately attributed to him.  Nevertheless, the inclusion of those inaccurate records occurred in <u>his</u> report.  Defendant's position would create a new defense to every identity theft FCRA case.  Or every case in which the consumer claimed that a credit account did not belong to him.  It would render the gross mis-matching of data into an innocent consumer's credit report entirely lawful.  In each instance, the CRA could argue that the offending and inaccurately attributed record was not regarding a particular consumer, and certainly not the innocent consumer.  This, of course, is not what the FCRA permits. In considering another Verifications report obtained from NBD, the Court rejected this and a range of defense to a consumer's claims that a violative consumer report had been furnished. *Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 334 (D. Conn. 2009) ("Unlike in *Henson,* however, there is no indication of court error in the present case. Rather, the record shows that the defendants erred in attributing accurate court records to the wrong individual. And while requiring a consumer reporting agency to 'go beyond the face of court records to determine whether [those records] correctly report the outcome of the underlying action' may be too much to ask, *requiring a consumer reporting agency to correctly determine which public records belong to which individual consumers is not*. Consequently, the

court rejects Verifications' argument[.]") (emphasis added).  Courts have consistently found that even furnishing the entirely incorrect report pertaining to another person (as opposed to merely mixing isolated public record items) still triggers FCRA liability for furnishing an inaccurate report regarding the plaintiff consumer.  *See e.g., Neclerio v. Trans Union, LLC*, 3:11-CV-01317 VLB, 2013 WL 6052067 (D. Conn. Nov. 15, 2013); *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662 (7th Cir. 2001).

The fact that NBD is furnishing its consumer reports regarding specific identifiable consumers was obvious enough that in this very litigation, NBD has stipulated,

> The collective discovery of their customers would produce information sufficient to permit Plaintiffs to identify (including, without limitation, by name, address, date of birth, social security number and other personal identifiers) *the* individual of interest that was *the subject* of a particular search query submitted to CoreLogic National Background Data, LLC by its customers.

Docket No. 56, at ¶3 (emphasis added).

## B.  NBD'S "CONSUMER REPORTS" ARE FURNISHED FOR "EMPLOYMENT PURPOSES".

Given the state of discovery and the limited FCRA purposes permitted for furnishing consumer reports, NBD's claim that its "sale of governmental records to Verifications and ADP was not for 'employment purposes'" is remarkable.  The Plaintiffs' reports were certainly furnished for employment purposes—the only "permissible purpose" of which NBD could possibly avail itself.

NBD attempts to keep the Court focused solely upon §1681k(a) as it contorts its text.  As soon as the Court attempts to snap the FCRA back together using NBD's construction of this section,  the statute's carefully interwoven pieces fall back apart.  If NBD's reports are "consumer reports", they are governed by the entirety of the FCRA, and there must be a permissible purpose for their sale. 15 U.S.C. §1681b ("[A]ny consumer reporting agency may furnish a consumer report under the following circumstances and no other . . . .").  Exclusively for this litigation, NBD argues that it did not furnish its consumer reports for an employment purpose.  In response the obvious question must be:  Then for what purpose did it furnish them?  The available options are at 15 U.S.C. §1681b.  Extension of credit?  Response to government subpoena?  Insurance eligibility?  A commercial business transaction initiated by the consumer?  Collection

of child support?  Obviously, it was none of these.  15 U.S.C. §1681b.  NBD's litigation team is trying so

hard to avoid liability in this single case that Defendant would apparently prefer to confess an intentional

violation of this alternate section, impermissibly furnishing every single report it has sold.

Fortunately for NBD, its real world positions rescue it from its litigation excesses.  The

Defendant's internal report records, contracts and compliance documents all establish "employment

purposes" as the basis for its reports.  The most dispositive of Defendant's documents is its contract with

NBD's sister company SafeRent from whom it buys all of its consumer reports.  Exhibit "G",

SafeRent/NBD Data Licensing Agreement, at CL-H546. ███████████████████████

███████████████



*Id*.  In its Reseller Agreements with ADP and Verifications, NBD narrows the stated FCRA purposes for

furnishing reports to ADP and Verifications to employment and tenant screening:

> Solution Provider [ADP/Verifications] may request and NBD may provide to Solution
> Provider Consumer Reports ("Report" or "Reports") for employment and/or tenant
> screening purposes only, as defined under the Fair Credit Reporting Act (15 U.S.C., §1681
> et seq., as the same may be amended from time to time, the "FCRA").

Exhibit "H", ADP/Verifications/Standard Reseller Agreement, at CL-H2775-2778.  This is not merely

theoretical, but in fact confirmed as to the Hines and Henderson reports.  NBD's archive of the actual

consumer report requests made by ADP regarding Hines and by Verifications regarding Henderson were

produced in discovery. ████████████████████████████████

████████████████████████████████████ Exhibit "J", NBD Hines

Request Archive, at CL-H002674; Exhibit "K", NBD Henderson Request Archive, at CL-H002649.  "If a

CRA provides a report with the expectation that the report will be used for one of the statute's listed

purposes, the report is a consumer report under the Act; the ultimate use to which it is put is irrelevant."

*Fair Credit Reporting*, 7th Ed., National Consumer Law Center, 2010 at 35 (*citing Comeaux v. Brown*

*& Williamson Tobacco Co.*, 915 F.2d 1264 (9th Cir. 1990); *Pappas v. Calumet City*, 9 F. Supp. 2d 943 (N.D. Ill. 1998); *Zeller v. Samia*, 758 F. Supp. 775 (D. Mass. 1991)).

Defendant argues that because neither ADP nor Verifications—the initial resellers that received the subject reports—were to take the actual employment action or make the employment decision, the reports could not have been furnished by NBD for employment purposes. *See* Def.'s Mem. at 17, 19–21. First, as established above, the Court does not need to theorize as to why ADP and Verifications obtained the reports—the Defendant's documents state that they were furnished by NBD for employment purposes. At a minimum, a reasonable jury could find as much. Second, for the reasons stated and explained below (regarding NBD's "use" argument), the question is not whether ADP or Verifications themselves are to make the employment use, but rather whether they obtained the reports for an "employment purpose." NBD reads into this a requirement not in the statute that the recipient must be the entity rendering the employment decision. To the extent that ADP and Verifications (and NBD for that matter) are resellers, the "permissible purpose" and "use" of the report travels and extends from reseller through to the originating consumer reporting agency. Thus, in Henderson's instance, Verifications as a reseller had a permissible purpose to obtain the consumer report—an employment purpose. It requested the report from NBD, which then had the same permissible purpose—an employment purpose—for which to obtain the report from SafeRent. And SafeRent then had the same permissible purpose to furnish the report to NBD. All three consumer reporting agencies thus complied with the permissible purpose requirements at 15 U.S.C. § 1681b.

Section 1681k(a)'s actual use of the phrase "employment purpose" is also in a context different than NBD's interpretation suggests. The relevant text actually reads, "A consumer reporting agency which furnishes a consumer report for employment purposes . . . ." 15 U.S.C. §1681k(a). There is no specific recipient mandated or even implied in this clause. The consumer reporting agency's relationship to the person that will make the actual employment use is not restricted. Instead, the key part of this provision is the purpose for which NBD furnishes the report, not the purpose to which the Reseller itself may put it.

13

NBD incorrectly redrafts the FCRA into a new statute which would instead state, "A consumer reporting agency which furnishes a consumer report *that will be used* for employment purposes *by the person to whom it is furnished by that consumer reporting agency . . . .*"

In support of its explanation as to why ADP/Verifications could not have obtained the reports for "employment purposes", NBD misinterprets the text and application of 15 U.S.C. §1681a(h), which defines "employment purpose."  Defendant suggests that because that definition contains the word "used", a consumer report is not furnished for an employment purpose unless it is actually used for that purpose. Thus NBD is arguing that the permissible purpose of the report is not initially determined, but instead must wait for the employer or end-user to make a dispositive use of the report.  NBD's position would be that an employer that obtains a background check consumer report as part of an employment application process, but in the end does not use the report to make that hiring decision will not have obtained the report for an employment purpose.

Of course then its conduct would become—after the fact—unlawful, as well would the CRA's furnishing of the report without such a lawful purpose. This is a silly position. The actual term "employment purpose" could never mean as NBD prays because as soon as the Court inserts it into any of the places in the statute where it is applied, Defendant's interpretation doesn't make sense.

In the case of Henderson, there is an additional factual reason why NBD's arguments fail. Verifications was not merely the "user", but also the "end user." ███████████████████ ████████████████████████████████████████ Exhibit "K", NBD Henderson Request Archive, at CL-H2649-2652; Exhibit "J", NBD Hines Request Archive, at CL-H2674-2678. Minnesota-based Verification's disclosure of itself as the end-user and the user makes sense, as Verifications is also hired by its employer customers to "adjudicate" the applicant based upon the consumer report using the employer's provided hiring rules. "Consistent with its advertisements, VI [Verifications] controls virtually every step in the background check and adverse employment action process for its clients, including IBC."  *Tyrone Henderson, et al v. Interstate Brands Corporation,* Civil No. 3:11cv-00507-REP,

Docket No. 13, at ¶19. When a consumer reporting agency "adjudicates employees based on a rubric set out by the member employer and classifies the employees as competitive or noncompetitive" as the employer's agent, the CRA is governed by both the employment provisions for users and as a consumer reporting agency. *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 848 F. Supp. 2d 532, 542 (E.D. Pa. 2012).

In claimed support of its argument, NBD relies on *Owner-Operator Indep. Drivers Ass'n, Inc. v. USIS Commercial Servs., Inc.*. 537 F.3d 1184, 1192 (10th Cir. 2008). In that case, USIS affirmed a District Court decision at trial finding that a membership of trucking companies could compile and share their actual work experiences with subject consumers without the employment histories becoming FCRA governed "consumer reports." *Id.* To find utility in the decision, NBD must excerpt a sentence in the appellate opinion making a general statement summarizing the issues considered in the court below. There is no explanation or even sufficient information to place that sentence in context. It is telling that Defendant must attempt reliance upon an inapposite case rather than the statute's text. And to the extent the un-cited district court case would have concluded as NBD hopes, it would be plainly wrong and contrary to the statute's text.

## C.   NBD COMPILES AND REPORTS PUBLIC RECORDS THAT ARE "LIKELY TO HAVE AN ADVERSE EFFECT UPON A CONSUMER'S ABILITY TO OBTAIN EMPLOYMENT."

Defendant also challenges the applicability of §1681k(a) because, it argues, "[T]he provision of records by NBD to ADP and Verifications at the wholesale level, before that filtering by the CRA occurs, cannot be said to be "likely" to "adversely affect" "a consumer's" ability to obtain employment at the time of NBD's reporting." Def.'s Mem. at 13. Implicit in this position are multiple incorrect assumptions.

First, NBD incorrectly reads the "likely to adversely effect" phrase within §1681k(a). It suggests that this trigger is a case-by-case question and that §1681k(a) would only apply if the specific report sold regarding the specific consumer actually was determined by a fact finder to be likely to effect that applicant's employment. This subjective reading is incorrect. The phrase "*likely* to adversely affect" is a categorical description. It means a *type* of public record. The text of the phrase leaves no doubt that this is

so. The consumer reporting agency could not otherwise know if and when to send the notice required at §1681k(a)(1), a notice that is required before the employer has even seen the governed report.

Nearly every person interpreting this section—including the Defendant—has reached this same conclusion. Some public records—such as the criminal records NBD sells—are categorically "likely to have an adverse effect." The FTC has taken that position, explaining, "a criminal history that indicates that the consumer has been convicted would be adverse to the consumer's ability to obtain employment, and would be covered by Section 613 [§1681k]." Letter of Helen Foster to John Allan (May 5, 1999), FTC Informal Staff Letter, 1999 WL 33932149 (F.T.C.), 1;[2] Id. ("If the type of public record information being compiled and reported to employers by screening services is of a variety that is likely to adversely impact the consumer's ability to obtain employment, the screen[ing] service must" comply with §1681k(a).).

The phrase is differently stated than and can be contrasted with other FCRA provisions that require that the adverse public record actually be "used in whole or in part" in making the adverse decision. See e.g. 15 U.S.C. §§1681b(b)(3); 1681m(a). An "adverse" effect is simply one that would be "unfavorable" or "in a contrary direction." Merriam-Webster, Inc., *Adverse*, http://www.merriam-webster.com/dictionary/adverse (last visited Feb. 7, 2014). "The FCRA does not define adverse public record information, but the Act does mention certain types of information that, by implication, meet this standard: 'items of public records relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments.'" *Fair Credit Reporting*, 7th Ed., National Consumer Law Center, 2010 at 153, *citing* 15 U.S.C. § 1681k(a)(2). NBD also shares this interpretation of the "likely to have adverse effect" term, explaining to its reseller clients, "Specifically, this section of the FCRA addresses background screenings conducted which contain information 'which are matters of public information and are likely to have an adverse effect upon a consumer's ability to obtain employment'. The FCRA requires this letter to

---

[2] *Williams v. Telespectrum, Inc.*, CIV.A.3:05CV853, 2007 WL 6787411 (E.D. Va. June 1, 2007) ("The FTC provides informal staff opinion letters guiding interpretation of the FCRA. Congress has granted the FTC the authority to prescribe trade regulations and other rules in regulation of the FCRA. Pub.L. No. 106–102 (codified in relevant part at 15 U.S.C. §§ 6801–6809 and §§ 6821–6827).")

be sent at the time any information which may be considered adverse is reported."  Exhibit "L", NBD E-

Mail to Resellers Regarding §1681k(a)(1) Notices, September 21, 2007, CL-H2740-2741.

In this case, it is undisputed that NBD furnished reports regarding Hines and Henderson that

contained adverse criminal records.  Henderson was reported to be a convicted felon.  *See* Am. Comp. ¶¶

28–29. Hines was reported to be a convicted sex offender with other criminal convictions. *See* Am.

Comp. ¶ 48.

NBD argues that Plaintiffs cannot prove that the adverse information in the reports Defendant

furnished were ultimately included in the reports ADP and Verifications delivered to the end user

employers, and therefore that the criminal records NBD reported may not have been the cause of the

adverse employment decisions.  Defendant thus claims that the NBD records and reports were not "likely to

have an adverse effect" on the Plaintiffs' employment.  As considered just above, this argument incorrectly

applies the "likely to have adverse effect" term as a subjective and case-by-case inquiry.  Instead, the

question is simply, were the criminal records contained in the NBD reports the type, variety or category of

record that is ordinarily considered adverse.

Further, NBD's argument—the lack of proof that its report was furnished verbatim to the

employer—is similarly meritless.  It would depend upon a misunderstanding of §1681k(a) and a

misstatement of the facts.  First, there is no requirement in the statute that NBD's report be provided

verbatim (or otherwise) to an employer before §1681k(a)(1) would govern.  Second, as with its other

litigation positions, NBD's challenge here contradicts its real world facts.  For example, its reseller

contracts all acknowledge that the FCRA information NBD furnishes its reports to ADP, Verifications, HR

Plus and others to be used solely for resale and delivery to the employer or end-user. Exhibit "F", NBD-

ADP Reseller Services Agreement, at CL-H289.  ▓Reseller represents▓ and warrants▓ that it will request the

▓Data Services and the Consumer▓ information▓ therein▓ from NBD▓ solely and exclusively for▓ resale to End▓-

▓User▓ ▓.  Defendant understands that its data will be resold to the end-user and not simply discarded by

its reseller user.  NBD's direct reseller customers contractually agree that they, "will request Reports, resell

Reports, and/or information contained therein, and use the Services solely for resale by Solution Provider to its authorized End-Users and solely for said End-Users' authorized use for the following "Permissible Purpose," as the term is defined under the FCRA: employment and/or tenant screening."  Exhibit "M", NBD Form Reseller Service Agreement, at § 4(b), at CL-2771-2774; Exhibit "F", NBD-ADP Reseller Services Agreement, Bates No. CL-H287 ███████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████; Exhibit "N" ADP Contract, September 2005 ██████5e. Each access of the Data Services by Reseller shall be considered a procurement of a consumer report for resale by Reseller."; Exhibit "O" ADP Contract, November 1, 2002 at 1, CL146; Exhibit "P" Verifications Contract, CL-H2887-2893 █████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Additionally, as established above, in Henderson's case, the Reseller itself was the "end-user" that adjudicated his employer application.

NBD also cites *Fiscella v. Intelius, Inc.*, 3:10-CV-186, 2010 WL 2405650 (E.D. Va. June 10, 2010).[3] *Fiscella* is of no help to NBD. Defendant grossly misstates the case facts and Judge Spencer's decision in trying to find some basis for its application.  In *Fiscella*, The consumer purchased a report on himself (before and without any involvement of counsel) through a "people finder" service.  His copy listed his name and a DUI record of another person with the same name.  Fiscella then wrote to dispute the item and Intelius refused to investigate.  The consumer brought suit under the FCRA alleging a violation

---

[3] The case was dismissed without prejudice at the Rule 12(b)(6) stage, though based on Judge Spencer's decision, Fiscella and his counsel did not seek to amend.

of 15 U.S.C. § 1681i(a) for the failure to investigate.  *See* 15 U.S.C. §1681i(a) ("[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer . . . .")  Judge Spencer heard argument from both sides as to whether or not the FCRA applied and whether or not a "consumer report" was involved.   The Court dismissed the case because Fiscella could not establish that the item he disputed was actually in a "consumer file" at Intelius. Fiscella was not alleging that a consumer report inaccurately contained the mismatch.  In fact, contrary to NBD's mischaracterizations of the case, the Court stated:

> Resolving this Motion does not, however, require evaluating whether the Report had to be published, whether the Report is a "consumer report" under FCRA, or whether Intelius is a "consumer reporting agency" as to Fiscella under FCRA. Rather, a common sense reading of the plain language of the statutory provision provides a clear answer.
> A consumer reporting agency's duty to reinvestigate is triggered when "information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly." 15 U.S.C. § 1681i. A "file" is defined as "all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored." Id. § 1681a(g). Here, Fiscella has not—and cannot on these facts—claim that Intelius created a "file" on Fiscella that contains disputed information that requires a reinvestigation.

*Fiscella v. Intelius, Inc.*, 3:10-CV-186, 2010 WL 2405650 (E.D. Va. June 10, 2010).

## D.   WHETHER OR NOT VERIFICATIONS AND ADP ARE "USERS" IS IMMATERIAL TO FCRA GOVERANCE[4]

NBD next argues that §1681k(a) cannot apply to it because it could not be responsible under §1681k(a)(1) for making the disclosures to the consumer because of the manner in which this

---

[4] Defendant also urges that the enforcement of the FCRA as written "would lead to destructive outcomes" and points out that the Plaintiffs could and have just as well sued other responsible consumer reporting agencies—Verifications and ADP. Plaintiffs are unsure what this is to mean for this case.  NBD is the primary source—the origin of the inaccuracies that have tarred Plaintiffs as a felon and a sex offender.  And given that NBD was the inaccurate source in two of the most harshly critical decisions in this field,[4] it can hardly argue that its services could not be improved.  Further, all it would have had to do is provide the notice mandated at §1681k(a)(1).  This is the option designed by the legislature for circumstances like NBD's where it cannot or does not manually review public records—where it can only obtain incomplete public records.  In fact, even now, NBD boasts that it makes "available by electronic link to its customers, including Verifications and ADP, a draft form of notice under 15 U.S.C. § 168lk(a)(l) that those employment background screening customers could then use to prepare a notice to a consumer at the time that a consumer report containing potentially adverse information was supplied by the customer to a user." Exhibit "T", NBD Responses to Plaintiffs' First Set of Interrogatories, No. 3

subsection uses the word "user."   NBD is incorrect. Section 1681k(a)(1) requires a governed CRA to "notify the consumer of the fact that public record information is being reported by the consumer reporting agency reporting agency" and to do so "at the time such public record information is reported to the user of such consumer report[.]" The CRA must also disclose "the name and address of the person to whom such information is being reported."  In the case of a Reseller the FTC has already explained this process.   In a well-publicized consent decree filed in *F.T.C. v. TRW Inc.*, 784 F. Supp. 361, 364 (N.D. Tex. 1991), the agency detailed TRW's required compliance.  TRW's employment reports were nearly always furnished to a Reseller "subscriber", just as NBD today.  The FTC instructed that whenever TRW (predecessor to Experian) provided a "consumer report for employment purposes",

> and such Consumer Report contains public record information that is likely to have an adverse effect upon a Consumer's ability to obtain employment, either;
> a. Maintain strict procedures designed to insure that public record information that is likely to have an adverse effect on a Consumer's ability to obtain employment is complete and up-to-date as provided in § 613(2) of the FCRA; or
> **b. At the time such public record information is reported to the Subscriber, notify the Consumer of the Subscriber's name and address and that:**
> **i. Such public record information was included in the Consumer Report that was provided to the Subscriber;**
> **ii. The Subscriber intended to resell the Consumer Report for Employment Purposes to another Person;** and
> iii. The Consumer may contact the Subscriber to learn the name and address of the Person to whom the Subscriber resold such Consumer Report for Employment Purposes[.]

Id.  A FTC position taken as an enforcement action and consent decree is a decision of the Commission and a persuasive statement of the FTC view of the law.

As with TRW, there is no meaningful impediment for NBD's compliance under §1681k(a)(1).  In fact, even now, NBD boasts that it makes "available by electronic link to its customers, including Verifications and ADP, a draft form of notice under 15 U.S.C. § 168lk(a)(l) that those employment background screening customers could then use to prepare a notice to a consumer at the time that a consumer report containing potentially adverse information was supplied by the customer to a user." Exhibit "T", NBD Responses to Plaintiffs' First Set of Interrogatories, No. 3

NBD's related argument is that the ADP and Verifications contracts dictate that the Reseller is not

the "user".  But this is factually untrue.  Each of the contracts at issue – produced and attached in each of Plaintiffs' filings, use the term "end-user".[5]   In fact, NBD signed the same contract with its source, SafeRent and NBD, placing itself in the same "it's the Reseller's job to comply" position it claims is restricted to ADP and Verifications.

Defendant needs to ignore the plain language of § 1681k(a)(1) in order to make its argument.  It disregards the ordinary meaning of the word "user" and instead must explain that its argument that Verifications is not a "user" of the information is based on a proposition that Congress actually used the word "user" to mean no more than the "end user (i.e., prospective employer)" and to exclude all other users. This blatant modification of the statutory language is especially egregious because Congress actually employed the term "end-user" or "end user" several different times in the FCRA but not in § 1681k as Defendants would have preferred.  *See* § 1681e(e)(1)(A), § 1681e(e)(1)(B), § 1681e(e)(2)(A)(i), § 1681e(3), § 1681e(3)(A), § 1681g(a)(3)(A), and § 1681g(a)(3)(C)(i).  Congress's differentiation between the terms "user" and "end user" within the statute thus negates the basis for Defendants' argument. *Soliman v. Gonzales*, 419 F.3d 276, 283 (4th Cir. 2005) ("where Congress includes particular language in one section of a statute but omits it in another provision of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion") (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987)).

Defendant's construct of limiting the term "user" to only the "end user" is therefore contrary to the plain language of the FCRA and is an admission that for Defendant to prevail the word "user" in § 1681k must denote something other than its ordinary meaning.

Defendant's argument dead ends on an alternate basis.  As established above, Verifications was

---

[5] NBD mocks Plaintiffs' Rule 12(b)(6) position in which Plaintiff explained the content of the Verifications-NBD contract.  NBD surmises that Plaintiffs must have been "guessing" as to such contract text.  NBD would be incorrect.  Plaintiffs' counsel had, but could not use the document at that stage because it was governed by the Protective Order in another case.   Defendant's present effort to describe the contract terms different is not caused by any change in knowledge as to its contents, but rather by NBD's misstatements as to the contract text.

also an "end user" of the report furnished to it by Defendants.

In contrast to the list of other terms expressly defined in the FCRA [§ 1681a(a)-(x)], Congress did not choose to define the term "user." A word that "is not specifically defined in the statute…should carry its ordinary dictionary meaning." *Babcock v. BellSouth Advertising and Publishing Corp.*, 348 F.3d 73, 77 (4th Cir. 2003). Thus, "user" means "a person or thing that uses," and "use" as a verb in turn means "to employ for some purpose" or "to avail oneself of." Webster's New Universal Unabridged Dictionary, 2097 (1996). Rather than examine the term in the plain meaning of § 1681k(a)(1), Defendant looks to other provisions of the FCRA purportedly to show that the term "user" there applies only to the prospective employer. Examples that Defendant cites include the adverse action provisions of § 1681b(b) and § 1681m, with which Defendant contends that only the prospective employer can possibly comply. Even if it were true that a CRA or reseller could not comply with these provisions, that showing would still have no bearing on § 1681k(a)(1). However, Defendants fail to acknowledge that under the facts presented in *Goode v. LexisNexis Risk & Information Analytics Group, Inc.*, --- F.Supp.2d ----, 2012 WL 975043, *3-8 (E.D. Pa. March 22, 2012), a case which Defendants actually cite for another purpose (Defs. Mem. p. 19), the CRA that furnished the employment report there also qualified as a person "using a consumer report for employment purposes" who was required to send specified notices to the consumer.

Congress's decision to write § 1681k(a)(1) to require the dual notice – or even multiple notices under other circumstances – is cogent and compelling. Consumers must know the source of the information maintained about them, and no CRA has the right to conceal its role as the repository of that information. The dual notice requirement in no way is "completely," "purely," or "extremely redundant;" it is not even "redundant," and Defendants' misinformed and hyperbolic presentation cannot mask § 1681k(a)(1)'s salutary role within the statutory scheme.

## II.   A REASONABLE JURY COULD FIND THAT NBD DID NOT COMPLY WITH § 1681k(a) WITH RESPECT TO HENDERSON AND HINES

Assuming the Court concludes that NBD furnished reports regarding Henderson and Hines that were for an employment purpose and contained adverse criminal records, then to avoid liability Defendant

must have complied with 15 U.S.C. §§1681k(a)(1) or 1681k(a)(2).

## A.   NBD CONCEDES NON-COMPLIANCE WITH §1681k(a)(1)

NBD admits that it has not, since at least 2007, provided the notices required at §1681k(a)(1).  Def.'s Mem. at 22, n.4.  Not to Henderson or Hines, nor any other consumer.  Thus, Defendant must attempt to argue the applicability of the manual verification section, §1681k(a)(2), to NBD, a Reseller CRA that does not go to the court houses and meticulously or contemporaneously verify records, but instead buys its reports—in bulk—from an automated database source (SafeRent).

## B.   NBD DOES NOT FOLLOW "STRICT PROCEDURES" TO ENSURE THAT ITS REPORTS ARE ACCURATE AND COMPLETE.

### 1.   The FTC and NBD Agree that 1681k(a)(2) cannot apply to a database driven CRA.

Outside of this case, the view of the FTC, and even Defendant's own industry has been that §1681k(a)(1) applies to CRAs that sell reports from a stored database, while §1681k(a)(2) applies for CRAs that perform contemporaneous manual verifications at the actual courthouse.  NBD's argument is novel and would be the first time known to counsel that a database seller has even attempted such a compliance argument.   For example, the FTC has long believed:

> We conclude that a CRA does not comply with Section 613(2) of the FCRA when it furnishes consumer reports for employment purposes that include negative public record information from stored data, without first verifying whether the information is complete and up to date.

1999 WL 33932149 (F.T.C.).  In fact, outside this litigation, Defendant has always shared this view. In the real world, NBD never claims that it has "strict procedures" in place *a priori* or otherwise to assure that its furnished criminal records are complete.  In fact, in their governing contract SafeRent and NBD expressly disclaims such completeness or accuracy process or procedure.  Exhibit "C", NBD/SafeRent Reseller Services Agreement ¶15, at CL-H568-581. NBD's contracts with Verifications, ADP and other reseller users also include this "no assurance of completeness" term and language.  Exhibit "P", NBD/Verifications Affiliate Services Agreement, at CL-H2887-2893 "Reseller acknowledges and agrees that (i) Reseller and its End-Users will use the Data Services at their own risk and peril [and] information obtained from public records such as criminal and eviction date is often incomplete, untimely, inaccurate and subject to

████████████ ████████████ ████████ Reseller acknowledges that consumer ████████ is secured by and through fallible sources, both human and otherwise, and that for the fee charged, NBD and/or its Affiliates cannot guaranty the accuracy or completeness of the Consumer information furnished."; Exhibit "F", NBD-ADP Reseller Services Agreement ¶15, at CL-H293-294 (similar disclaimers). *See also* Exhibit "H", NBD Form Reseller Service Agreement ¶7, at. CL-H2775-2778. (similar disclaimers).

NBD even goes further in its real world acknowledgment of § 1681k(a)(2)'s applicability. It contractually demands of its reseller customers a level of compliance with § 1681k(a)(1) that NBD on its own ignores. Its contracts with ADP and Verifications provide in relevant part:



Exhibit "F", NBD-ADP Affiliate Services Agreement, at ¶11(c), at CL-H290 ████████████ ████████████████████████ (emphasis added); Exhibit "P", NBD/Verifications Affiliate Services Agreement, at ¶11(c), Bates No. CL-H2887-2893 (same).

Similarly, in addressing a comparable California statute's requirements that are nearly identical to those in § 1681k(a), the NBD/ADP contract states:



Exhibit "F", NBD-ADP Reseller Services Agreement, at CL-H290-291 (emphasis added). The language of the cited California provision tracks <u>exactly</u> the text of §1681k(a)(2) such that NBD's contract plainly

---

[6] "§613" is the Section of the Act itself, while § 1681k is its United States Code codification.

[7] The "county searches" are a different NBD product that is not the subject of this litigation. All of the reports sold in this case were database reports—NBD's "COPS" product.

means as well that, "**Reseller hereby acknowledges that reports provided under this Agreement, do not comply with [FCRA § 1681k(a)(2)] for use in employment screening**."[8]

2.     **The Processes Cited by NBD Do not Ensure Completeness and Accuracy.**

NBD's Statement of Facts offers a series of boasts—most of them more appropriately belonging to third party CRA SafeRent—to support its claim that it follows "strict procedures" to ensure the completeness and accuracy of its reporting.  Def.'s Mem. at 25; Def,' Statement of Facts, ¶¶  25, 26, 42, and 52. ("The records housed in the Multistate Database are continually updated."); ¶ 28 ("[E]very  update is  reviewed to ensure that the data remains in its expected format."); ¶¶ 27, 29, 31. ("During each step of the process, SafeRent does not alter the data, and it is placed into the Multistate Database using the exact text in which it was supplied."); ¶ 32. ("SafeRent spends approximately 7,000 man hours per year executing the foregoing quality assurance processes, including through daily internal checks.").  **Put more directly, NBD claims that <u>its</u> strict procedures consist of the fact that a <u>third party</u>**:

- **SafeRent continually receives automated downloads from different court sources across the country;**

- **SafeRent ensures that the automated updates are formatted correctly to integrate into its own database;**

- **SafeRent does not add to or alter the data received by automated batches; and**

- **SafeRent spends 7,000 man-hours reviewing its internal systems.**

But none of this effort is designed to ensure the accuracy, completeness or currency of the court data SafeRent purchases.  The issue is not the frequency of what SafeRent buys, but rather its completeness and content.  The fact that SafeRent spends 7,000 man-hours reviewing the correctness of the formatting in its database (really a technical "data formatting" exercise) is immaterial to the question of the completeness of the records it chooses to purchase.  And the fact that it does not "alter" or otherwise improve upon the incomplete records it can obtain by automated means and batch uploads is exactly the point of Plaintiffs'

---

[8] The two statute sections are presented side by side as Exhibit "34".

argument that 15 U.S.C. §1681k(a)(2) is inapplicable to NBD.  It must alter them through manual review in order to rely upon §1681k(a)(2). *Farmer v. Phillips Agency, Inc.*, 285 F.R.D. 688, 693 (N.D. Ga. 2012); *Moore v. First Advantage Enter. Screening Corp.*, 4:12 CV00792, 2013 WL 1662959 (N.D. Ohio Apr. 17, 2013).

   **3.     SafeRent's Court Sources Expressly Warn and Disclaim that the Automated Records Batches are Incomplete, Inaccurate and Unreliable.**

   Defendant relies upon three cases that are not helpful to it or to the Court.  *See* Def.'s Mem. at 24. Two of NBD's cases are actually brought under 15 U.S.C. §§1681e(b) and 1681i(a). *Quinn v. Experian Solutions*, 02 C 5908, 2004 WL 609357 (N.D. Ill. Mar. 24, 2004)[9] and *Henson v. CSC Credit Servs.,* 29 F.3d 280, 285 (7th Cir. 1994).  They have nothing to add as to the §1681k(a) claim.  A "strict procedures" claim is different in both degree and substance. *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 417 (4th Cir. 2001); *Equifax v. FTC,* 678 F.2d 1047, 1049 n.4 (11th Cir.1982) (noting that the distinction between strict and reasonable procedures is "clearly not without significance").  However, NBD's third case is certainly relevant. In *Moore v. First Advantage Enter. Screening Corp.*, the Northern District of Ohio District Court considered a case in sharp contrast to this one.  In *Moore*, the CRA, First Advantage, actually went belong the database to create its report.  The CRA also contacted the court clerk directly to obtain manual copies of the criminal files.  However, "in light of the discrepancy between the database search results and the East Tex report, […] First Advantage […] spoke with personnel from the Angelina County District Court about Case Number CR–18774. An experienced Court clerk incorrectly advised First Advantage that Plaintiff had been convicted in Case Number CR18774." *Moore v. First Advantage Enter. Screening Corp*., 4:12 CV00792, 2013 WL 1662959 (N.D. Ohio Apr. 17, 2013).  The court dismissed the case finding that such reliance on the Court clerk was in keeping with 'strict procedures.')  And had NBD contacted the Pennsylvania and Virginia clerks as part of its "strict procedure" compliance, instead of only upon an after the fact dispute process, it could make the same argument.  As to Henderson of course it

_____

[9] Quinn actually has nothing to do with "court judgment documents".  The paraphrase is misleading and mistaken.

would not have needed to.  As soon as NBD did contact the Pennsylvania clerk, it confirmed that the subject felony rerecords did not belong to the Plaintiff.

In contrast to the presumptive reliability of the court clerk in *Moore*, SafeRent's contracts with the originating court sources themselves refute NBD's litigation claim that it had strict procedures in place to insure that it only reported complete public records. In every discovered instance the court source warned SafeRent that the public records provided were incomplete and unreliable.  *See, e.g.*, Exhibit "U" Arizona Supreme Court, Administrative Office of the Courts Data Dissemination Agreement, ¶7(d), at CL-H10001-10002; Exhibit "V", Indiana Supreme Court Division of State Court Administration User Agreement, at ¶8, CL-H10056-10068; Exhibit "W", at §V, CL-H10069-10077.



Exhibit "U" Arizona Supreme Court, Administrative Office of the Courts Data Dissemination Agreement, ¶7(d), Bates No. CL-H10001-10002; *See also e.g.*, Exhibit "V", Indiana Supreme Court Division of State Court Administration User Agreement, at ¶8, CL-H10056-10068 (including nearly identical language). The North Dakota Bulk Data Access Agreement similarly warns that the bulk information is not complete and requires a similar disclaimer in all of NBD's reports:

[SafeRent] agrees to provide a disclosure statement to each user, subscriber, customer, client or other third party at the time any data or information from the Records is provided [that states]:



Exhibit "W", at §V, CL-H10069-10077.   In every instance, the court source also fully disclaims NBD's

contrived illusion of completeness. Exhibit "X", Superior Court of New Jersey Electronic Access Program

Subscriber Agreement, at p.4, Bates Nos. CL-H10078-10084 ███████████████████████████

██████████████████████████████████████████████████████████████████████████████

███████████████████; Exhibit "Y", Oregon Department of Corrections Access Agreement, at ¶ 8.1, Bates

Nos. CL-H10085-10089 (similar disclaimer); Exhibit "Z", West Virginia Circuit Express Service

Agreement, Bates Nos. CL-H10100-10102. █████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████; Exhibit "AA", Cook County

Illinois Data Dissemination Agreement, Bates Nos. CL-H10043-10044. █████████████████████

████████████████████████████████████████; Exhibit "BB", National

Association of System Administrators Bulk Data Extraction Agreement, Bates Nos. CL-H10045-10055

██████████████████████████████████████████████████████[10])

## C.    NBD'S REPORTS REGARDING HENDERSON AND HINES WERE INCOMPLETE AND INACCURATE.

Defendant somehow summons the audacity to assert that its reporting regarding Henderson and

Hines was accurate and complete.  Def.'s Mem. at 29.  It claims,

> There is no dispute that the results that NBD returned to ADP and Verifications reflected the
> existing public record status of the listed convictions and charges at the time of reporting.
> […]. The "complete and up to date" nature of the records is not changed because the results
> contained criminal records of more than one person.

*Id.*  This is certainly not the law.  Not as to §1681e(b)'s accuracy provisions.  And even as certainly, not as

to §1681k(a)(2).  Regarding another Verifications report, which necessarily would have originated with

NBD, the Connecticut United States District Court rejected NBD's exact argument—and as to

---

[10] Indiana Court Administrative Rule 9 prohibits the disclosure of a full 9-digit social security number.

§1681k(a)(2):

> Adams does not contend that the criminal conviction records Verifications obtained were
> themselves inaccurate or outdated. Rather, she argues that Verifications inaccurately
> attributed to the records to her. Thus, in this case, the fact that Verifications "used the most
> accurate and up to date source" is irrelevant. Further, for the reasons noted above, a
> reasonable jury could find that, in inaccurately attributing the Virginia convictions to
> Adams, Verifications did not "maintain strict procedures designed to insure that ... [the
> information it reported was] complete," and therefore violated section 1681k. 15 U.S.C. §
> 1681k. Consequently, Verifications is not entitled to summary judgment as to Count Six.

*Adams v. Nat'l Eng'g Serv. Corp.*, 620 F. Supp. 2d 319, 334–35 (D. Conn. 2009)

Plaintiffs have already established in their brief supporting the Motion for Class Certification that

NBD cannot comply with §1681k(a)(2) for any class member, themselves included, because it does not

obtain complete public records through SafeRent's automated batch purchase processes. *See* Dkt. No. 72,

at 15–16.[11]  As SafeRent relies only on the bulk acquisition of court records and thus does not seek to or

ever obtain the "complete" public record. *Poore v. Sterling Testing Sys., Inc.*, 410 F. Supp. 2d 557, 572

(E.D. Ky. 2006) ("A reasonable juror could conclude that this item was not complete and that this item did

not reflect the current public record status of the DUI conviction since the report did not include the actual

name, birthdate or social security number of the person who was convicted of the crime."). In particular, in

nearly every public record SafeRent and NBD obtain by bulk acquisition, the originating court does not

include the social security number (or "SSN"). "Exhibit "CC", NBD/SafeRent Criminal Records Sources,

Bates No. CL-H10795.

This omission is huge.  There is no single identifier that is more important in narrowing and

matching a search to a specific consumer.  Defendant acknowledges this fact—that omission of SSN makes

a correct match less likely.  And while NBD claims to warn its user-customers to be careful to confirm the

match of the furnished criminal public records to the consumer, it does not reveal to the reseller-user (a.)

whether there was a SSN associated with the public record, and if so (b.) the SSN the source made

available for that record.  Certainly a NBD business model that claims its dependence upon the later

---

[11] For the sake of page limit brevity, Plaintiffs do not cut and paste or entirely repeat the facts and argument
stated in their Class Certification brief, but do adopt the evidence and argument therein as if restated in full.

discretion of its reseller-user in sorting through NBD information for its accuracy and completeness must arm its customer with this basic knowledge.

There is simply no way that a public record item can be "complete" without the inclusion of the social security number.  Though the FCRA does not define the word "complete", it should hardly have to given its plain meaning.  The Court should, "construe the term in accord with its ordinary or natural meaning. *Chapman v. United States,* 500 U.S. 453, 461–62, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). Webster's Dictionary defines the term 'complete,' as 'having all necessary parts.' Webster's Collegiate Dictionary 235 (10th ed.1998)."  *Poore v. Sterling Testing Sys., Inc.*, 410 F. Supp. 2d 557, 572 (E.D. Ky. 2006).[12]

NBD does obtain the SSN manually from the respective court and implements NBD's "Social Exclusion" procedure when a consumer makes a dispute.  Exhibit "DD", *Social Exclusion on a NBD Criminal Case*, Bates No. CL-H483-486.  This is what happened with Mr. Henderson's inaccurate public records.  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ Exhibit "EE", Consumer Relations Remarks, Bates No. CL-H2521.  See also Exhibit "Q", Internal Henderson Report Showing Manual Corrections, Bates No. CL-H2569-2577.  NBD is also able to manually obtain SSN's from other courts, such as the Virginia courts reported for Mr. Hines. Exhibit "R", Consumer Relations Remarks, Bates No. 2673; Exhibit "S", Bates No. CL-H2711-2712.

---

[12] Complete: "having all necessary parts: not lacking anything", http://www.merriam-webster.com/dictionary/complete (last visited Dec. 18, 2013); "having all the necessary or appropriate parts. http://www.oxforddictionaries.com/us/definition/american_english/complete (last visited Dec. 18, 2013).

In this instance, because of NBD's lack of any reasonable procedure, let alone a strict procedure to eliminate mismatched identities and avoid attributing incomplete criminal records to an innocent consumer, both Henderson and Hines suffered NBD's willful mixing of a stranger's records into their consumer reports.  Notwithstanding its rhetoric, NBD cannot find many if any decisions blessing such a poor system and procedure.  The Northern District of Georgia shared its indictment of NBD:

> The evidence shows that National Background Data may not be a very accurate source of public record information. For example, National Background Data will return a criminal history record as a match for a consumer even if the consumer's date of birth differs from the date of birth on the criminal record. Defendant's vice president stated that she did not "feel like [National Background Data performs an] accurate search." Defendant does not know how National Background Data gathers its public record information, or whether the information is obtained secondhand from other private databases or firsthand from governmental entities.  It is undisputed, however, that National Background Data does not obtain the "complete criminal record for every offense."

*Farmer v. Phillips Agency, Inc.*, 285 F.R.D. 688, 693 (N.D. Ga. 2012).

## CONCLUSION

For the reasons stated here, Plaintiffs submit that genuine issues of material fact remain and this Court should deny the Defendant's Motion for Summary Judgment.

.                                                          Respectfully submitted,
                                                           **TYRONE HENDERSON** and
                                                           **JAMES O. HINES, JR.**, *on behalf of*
                                                           *themselves and others similarly situated*


                                                           By_____/s/_____
                                                                   Of Counsel

Matthew J. Erausquin, VSB No. 65434
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:     (703) 273-7770
Fax:     (888) 892-3512
matt@clalegal.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of February, 2014, I have filed the foregoing electronically using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

David N. Anthony
Timothy J. St. George
Alan D. Wingfield
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23218-1122
Tel:     804-697-5410
Fax:     804-698-5118
david.anthony@troutmansanders.com
tim.stgeorge@troutmansanders.com
alan.wingfield@troutmansanders.com

John C. Lynch
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Tel:     757-687-7765
Fax:     757-687-1504
john.lynch@troutmansanders.com

*Counsel for the Defendant*

_____/s/_____
Matthew J. Erausquin, VSB No. 65434
*Counsel for the Plaintiffs*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:     (703) 273-7770
Fax:     (888) 892-3512
matt@clalegal.com