**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

TYRONE HENDERSON, *et al.*

     Plaintiffs,

v.                                                                Civil Action No. 3:12cv97

CORELOGIC, INC., *et al.*

     Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION**
**TO STRIKE DECLARATION OF DR. MICHAEL C. KEELEY,**
**AND FOR RELIEF PURSUANT TO FED. R. CIV. P. 37(c)**

Plaintiffs Tyrone Henderson and James O. Hines, Jr., by counsel, hereby move this

Court, pursuant to Rule 37 of the Federal Rules of Civil Procedure and Rule 702 of the Federal

Rules of Evidence, to strike the Declaration of Dr. Michael C. Keeley, and for sanctions.

## INTRODUCTION

In its opposition to Plaintiffs' Motion for Class Certification, the Defendant relies on Dr.

Keeley's "expert" opinion to rebut the Plaintiffs' contention that they have met Rule 23's

ascertainability requirement. Its reliance on Dr. Keeley's opinion is untenable for four reasons.

First, Dr. Keeley is plainly not qualified under Fed. R. Evid. 702 because he is not an expert in

the field about which he would testify.  Second, Keeley is not the author of his disclosed

"expert" report.  Instead, two other Ph.Ds. that work in the same professional expert firm—

neither of whom was disclosed by the Defendant, ghostwrote it. Ghostwritten reports are

unreliable and thus are inadmissible under Federal Rule of Evidence 702. Third, the Defendant

did not disclose documents that Dr. Keeley and the authors of his report considered, as required

by Rule 26.  Keeley refused to disclose or produce the factual documents and information

created by the other Ph.Ds., which would have been not only relevant to the case, but specifically to the determination of whether Keeley himself possessed any individual expertise. Nor could he. Because the report was ghostwritten by other individuals at his expert witness firm, Dr. Keeley was unable to testify as to which, if any, of the scores of documents listed and disclosed pursuant to Fed. R. Civ. P. 26(a)(2) were actually used, considered, or even known to him.  This over-disclosure of documents rendered it impossible for the Plaintiffs to adequately evaluate Dr. Keeley's report or for the Court to evaluate if Dr. Keeley could have offered anything to this case based on his own personal specialized knowledge or expertise. Fourth, and finally, Dr. Keeley's declaration impermissibly seeks to answer a legal question—the standard for application of the Fair Credit Reporting Act, 15 U.S.C. § 1681k(a) and of Fed. R. Civ. P. 23—issues that are solely within the purview of this Court. For all of these reasons, the Plaintiffs respectfully request that this Court strike Dr. Keeley's declaration and impose sanctions on the Defendant for its non-compliance with Rule 26.

## BACKGROUND

The Defendant served its expert witness disclosures on July 30, 2013 naming Dr. Michael Keeley as an expert witness. Although he has no prior Fair Credit Reporting Act experience, Dr. Keeley has previously worked with defense counsel's firm. *See* Dep. of Dr. Michael Keeley, 9:16-19. (attached as Exhibit "A"). Dr. Keeley was hired to testify that class certification could not be met in this case. Although Dr. Keeley insisted that he was hired to conduct an objective assessment of class certification criteria, *see* Ex. "A" at 10:6-8, 10:17-19, 11:15-19, the circumstances surrounding his retention suggest otherwise. Dr. Keeley billed over $300,000 dollars for his expert report. Ex. "A" at 12:4-9, but the Defendant withheld payment on the bill until Dr. Keeley delivered his expert report. Ex. "A" at 162:5-165:13. And Dr. Keeley started

drafting his report a mere three days after he received the first phone call from Defendant's counsel. Ex. "A" at 63:7-66:2. The short time frame in which Dr. Keeley was able to determine his "objective" opinion is remarkable given that he has no prior experience in background reports or the Fair Credit Reporting Act. Ex. "A" at 62:1-16.

Plaintiffs deposed Dr. Keeley on November 20, 2013. Throughout the deposition, he was evasive and was unable to answer several of Plaintiffs' questions, asserting that he doesn't "have a sharp recollection." Ex. "A" at 11:23, 45:8, 54:10-11, 90:16, 112:11, 116:24, 117:11-12, 117:23-24, 166:3, 188:10, 194:10-11, 196:22-23. And, despite his dull memory, there were some questions that he self-objected to and refused to answer. For example, he refused to reveal how much of the $300,000 billed to the Defendant for this case he would receive:

> Q. Sure. And are you an owner of this company that's billing Troutman Sanders; Cornerstone?
> A. I'm a partial owner, yes.
> Q. How much of that 300,000 goes to your pocket?
> A. None of it, directly.
> …
> Q. How much of the $300,000 will end up in your pocket, either directly or indirectly, pre-tax? Try it again.
> A. I think I just answered that question. I'd incorporate, by reference, my previous answer.
> …
> Q. Let me try it this way: How much better off -- roughly, what's your best estimate -- how much better off are you financially -- you, personally -- having brought in and run a, roughly, $300,000 expert witness job for Troutman Sanders in this case?
> A. I think you've asked me almost exactly that same question, or a similar question, and I would incorporate, by reference, my previous answers.
> …
> Q. How much money do you make a year?
> A. That is confidential, a personal thing that I don't --
> Q. We have a protective order in this case. I'll agree it can be designated confidential. How much money do you make a year?
> A. I'm not going to answer that question.
> Q. How much money have you made so far in 2013?
> A. That's personal information.
> Q. How much money did you make in 2012?

A. That's also personal information.

Ex. "A" at 12:10-15:3; *see also* Ex. "A" at 19:10-22:11, 44:1-45:11, 48:1-52:15, 166:1-167:25. Dr. Keeley's refusal to answer is improper, especially considering that information regarding his compensation as an expert in this case is discoverable under Rules 26(a)(2) and 26(b)(4).

Also in his deposition, and as discussed below, Dr. Keeley admitted that he did not perform the majority of the research and drafting of his expert report and that he had not provided copies of the drafts of his reports or the notes that his assistants gave to him during the preparation of the report. After Dr. Keeley's deposition, his expert report was converted into a declaration that the Defendant attached to its opposition to Plaintiffs' Motion for Class Certification. The sole assertion of Dr. Keeley's declaration is that the Plaintiffs' proposed class does not satisfy elements of Rule 23—a question that is purely legal in nature and thus not an appropriate topic for expert testimony. Given that Dr. Keeley's report (and resulting declaration) was ghostwritten by his assistants, that neither Dr. Keeley nor the Defendant has complied with Rule 26(a)(2)'s disclosure requirements that Dr. Keeley's testimony improperly addresses a legal question and not a question of fact, and because Dr. Keeley is not an expert regarding the issues that he seeks to testify about, Plaintiffs are requesting that this Court strike his declaration and levy sanctions in accordance with Rule 37(c)(1).

## STANDARD OF LAW

### A.   *Motion to Strike*

When considering a motion for class certification, or an opposition to a motion for class certification, evidence in support of or opposition to such a motion must satisfy evidentiary standards of admissibility. *See Mars Steel Corp. v. Continental Bank, N.A.*, 880 F.2d 928 (7th Cir. 1989); *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 865–68 (S.D. Ohio 2005);

*Richards v. Computer Sciences Corp.*, 2004 WL 2211691 (D. Conn. Sept. 28, 2004); *McElmurry v. U.S. Bank Nat'l Ass'n*, 2004 WL 1675925, at *10 (D. Or. July 27, 2004); *Clark v. Dollar Gen. Corp.*, 2001 WL 878887, at *1–2 (M.D. Tenn. May 23, 2001); *Sjoblom v. Charter Commc'ns, LLC*, 2007 WL 4560541, at *10 (W.D. Wis. Dec.19, 2007); *Threatt v. Residential CRF, Inc.*, 2005 WL 4631399 (N.D. Ind. Aug. 31, 2005); *see also* Fed. R. Evid. 101; 1101.  Recent dictum by the Supreme Court of the United States further suggests that evidence offered in support of a class certification motion must satisfy admissibility requirements. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2553–54 (2011) ("The District Court concluded that Daubert [standards for admission of expert testimony] did not apply to expert testimony at the certification stage of class-action proceedings.  We doubt that is so . . . .") (internal citation omitted).  By analogy, the same is true for evidence offered in opposition to a class certification motion, such as Dr. Keeley's declaration in the present case.

Additionally, Rule 43 provides that, when a motion relies on facts outside the record, the court may rely on affidavits or declarations to render its decision. Fed. R. Civ. P. 43(c); *see Richardson v. Nat'l Post Office Mail Handlers*, 76-0540-5, 1978 WL 1771 (E.D. Va. Oct. 6, 1978).  While Rule 43 does not enumerate the specific requirements of an affidavit or declaration before it can be considered by a court in connection with a motion, at least one major treatise on class actions has compared affidavits offered in support or opposition to a Motion for Class Certification as analogous to Rule 56(e)'s treatment of affidavits in support of a motion for summary judgment. 3 Alba Conte & Herbert Newburg, Newburg on Class Actions § 7:26 (4th ed. 2002). Other courts routinely evaluate Rules 43 and 56 together. *See, e.g.*, *Transo Envelope Co. v. Murray Envelope Co.*, 227 F. Supp. 240, 242 (D.N.J. 1964). Accordingly, Rule 43 declarations must set out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters addressed in the affidavit. Fed. R. Civ. P. 56(c)(4). *See also Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); *Rohrbough v. Wyeth Labs. Inc.*, 916 F.2d 970, 975 (4th Cir. 1990); *Maryland Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1252 (4th Cir.), *cert. denied*, 502 U.S. 939 (1991); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).

Federal Rule of Civil Procedure 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must . . . set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Similarly, Federal Rule of Evidence 702 requires that an expert witness may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a *fact* in issue. Federal Rule of Evidence 1101 provides that the Federal Rules of Evidence apply to all proceedings before the United States district courts, which would include a motion for class certification. *See Lewis v. First Am. Title Ins. Co.*, 265 F.R.D. 536, 544 (D. Idaho 2010).

The Fourth Circuit has routinely held that affidavits that do not meet the requirements of Rule 56 may be disregarded by the trial court and even stricken. *See, e.g.*, *Mascone v. Am. Physical Soc'y, Inc.*, 404 F. App'x 762, 765 (4th Cir. 2010); *Evans*, 80 F.3d at 962; *Cline v. Harmon*, 2012 WL 3822189, at *2 (S.D.W. Va. Sept. 4, 2012). Because Dr. Keeley is not an expert in the matters at issue in this case, and because Dr. Keeley seeks to testify regarding a legal question and not a factual issue, his declaration should be stricken.

**B.     *Motion for Sanctions under Rule 37(c)(1)***

A defendant cannot be permitted to use documents and evidence that it has refused to disclose and provide pursuant to Rule 26(a) and Rule 26(e). Unlike conventional discovery, a

party's disclosure obligations are "self-executing." If a party does not properly and timely

comply with Rule 26(e), it may not use the evidence it failed to disclose or supplement in a

timely fashion. Fed. R. Civ. P. 37(c). *Barksdale v. E & M Transp., Inc.*, 3:10CV140, 2010 WL

4534954 (E.D. Va. Oct. 27, 2010) (finding that the court "must impose sanctions" under Rule

37(c)(1) where there was no harmless error or substantial justification). Rule 37(c)(1) provides in

pertinent part:

> Failure to Disclose, to Supplement an Earlier Response, or to Admit. – (1) Failure
> to Disclose or Supplement. If a party fails to provide information or to identify a
> witness as required by Rule 26(a) or (e), the party is not allowed to use that
> information or witness to supply evidence on a motion, at a hearing, or at a trial,
> unless the failure was substantially justified or is harmless. In addition to or
> instead of this sanction, the court, on motion or after giving an opportunity to be
> heard: (A) may order payment of the reasonable expenses, including attorney's
> fees, cause by the failure; (B) may inform the jury of the party's failure; and (C)
> may impose other appropriate sanctions, including any of the orders listed in Rule
> 37(b)(2)(A)(i)-(vi).

Exclusion of evidence is the only appropriate remedy for a party's complete failure to

disclose it. "[Rule] 37(c)(1) 'provides that a party who fails to [provide information or] identify a

witness as required by Rule 26(a) or (e) is not allowed to use that [information or] witness to

supply evidence on a motion.'" *Bland v. Fairfax County, Va.*, 1:10CV1030 JCC/JFA, 2011 WL

1660630 (E.D. Va. May 3, 2011) (quoting *Hoyle v. Freightliner, LLC*, 650 F.3d 321 (4th Cir.

2011). This is consistent with the Advisory Committee notes to the 1993 Amendment of Fed. R.

Civ. P. 37(c), which explains:

> Subdivision (c). The revision provides a self-executing sanction for failure to
> make a disclosure required by Rule 26(a), without need for a motion under
> subdivision (a)(2)(A).Paragraph (1) prevents a party from using as evidence any
> witnesses or information that, without substantial justification, has not been
> disclosed as required by Rules 26(a) and 26(e)(1). This automatic sanction
> provides a strong inducement for disclosure of material that the disclosing party
> would expect to use as evidence, whether at a trial, at a hearing, or on a motion,
> such as one under Rule 56.

The only exceptions in Rule 37(c) are for circumstances in which the failure to disclose was with "substantial justification" or in which the failure to disclose was "harmless." *Barksdale*, 2010 WL 4534954, at *3. Neither of these limited exceptions applies in this case.

The Advisory Committee Notes offer examples under which these conditions might apply, which courts have consistently done since their adoption. *See e.g.*, *Scott v. GMAC Mortgage, LLC*, Civ. No. 10CV24-NKM (W.D. Va. Apr. 14, 2011) (the court found GMAC's conduct to be egregious and accordingly ordered sanctions for failure to timely comply with discovery, including the sanction of entry of default and award of attorney fees.) They include instances in which the omission was limited, for a witness otherwise known to both parties, or when the negligent party was a pro se litigant. *Id.*; *accord Barksdale*, 2010 WL 4534954 at *3-4. None of these apply in the present case. The Advisory Committee Notes further explain that:

> Limiting the automatic sanction to violations "without substantial justification," coupled with the exception for violations that are "harmless," is needed to avoid unduly harsh penalties in a variety of situations: *e.g.*, the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party; or the lack of knowledge of a pro se litigant of the requirement to make disclosures. In the latter situation, however, exclusion would be proper if the requirement for disclosure had been called to the litigant's attention by either the court or another party.

One of the cases which is most frequently cited on this issue, even outside this District and Circuit, is *Rambus, Inc. v. Infineon Tech. AG*, 145 F. Supp.2d 721 (E.D. Va. 2001)(Payne, J.). In the Court's detailed analysis of the appropriate standard and remedy under Rule 37(c), the Court considered the severity of the exclusion remedy and determined the standard by which the remedy should be enforced. The Court applied the *Burlington Insurance* test to consider the following five factors: (1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure the surprise; (3) the extent to which allowing the

testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness

before trial; and (5) the importance of the testimony. 145 F. Supp. 2d at 726, 727-734.

Importantly, there is no "bad faith" element, and even an innocent omission cannot constitute

"substantial justification." *Southern States Rack & Fixture v. Sherwin-Williams Co.*, 318 F.3d at

596; *Scott v. GMAC*, 3:10CV24-NKM, at 11-12. As Judge Payne explained in *Rambus*,

> [T]he plain language of the rule contains no requirement for bad faith or callous
> disregard of the discovery rules. In fact, the rule is rather harsh in that it
> automatically imposes the preclusion sanction unless the non-complying party can
> show that there is substantial justification for the failure to make the disclosure,
> and that the failure was harmless.

145 F. Supp.2d at 727.

## ARGUMENT

### A.   *Dr. Keeley is not qualified to testify as an expert witness.*

Federal Rule of Evidence 702 governs expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will
>> help the trier of fact to understand the evidence or to determine a fact in
>> issue;
>
>> (b) the testimony is based on sufficient facts or data;
>
>> (c) the testimony is the product of reliable principles and methods; and
>
>> (d) the expert has reliably applied the principles and methods to the facts
>> of the case.

Fed. R. Evid. 702.  As this Court has previously stated: "It is axiomatic that one must be deemed

an 'expert' in order to testify under Fed. R. Evid. 702, which provides that a witness can be

qualified as an expert by 'knowledge, skill, experience, training, or education.'" *Piankatank*

*River Golf Club, Inc. v. Selective Way Ins. Co.*, CIV.A. 3:08CV606, 2009 WL 1321512, at *4

(E.D. Va. May 11, 2009) (internal citations omitted).  In order for an individual to be qualified as an expert, the purported expert must have satisfactory knowledge, skill, experience, training, or education on the particular issues in the case.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); *see also Kopf v. Skyrm,* 993 F.2d 374, 377 (4th Cir.1993) (finding that an expert's qualifications must be "on the issue for which the opinion is proffered").  "The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas."  *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) (collecting cases in which proposed expert witnesses' qualifications did not apply the issues in the case).  In fact, whether a witness is qualified as an expert is a case-by-case determination based on the nature of the opinion offered. *See Piankatank*, 2009 WL 1321512 at *4.  Therefore, while experience may be crucial for the qualification of one type of expert witness, the qualification of another type of expert opinion may rest upon the level and extent of training received. *Id.*

Even if an expert is deemed qualified based on knowledge, skill, experience, training, or education, a court must still find that the expert testimony is relevant and reliable.  In *Westberry v. Gislaved Gummi AB*, the Fourth Circuit held that expert testimony is admissible under Rule 702 if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue.  178 F.3d 257, 260 (4th Cir. 1999); *see also Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592 (1993).  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court of the United States held that Rule 702 of the Federal Rules of Evidence charges the "trial judge [with] the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). The first prong of the *Daubert*

inquiry requires an examination into whether the reasoning or methodology underlying the expert's proffered opinion is reliable—that is, whether it is supported by adequate validation to render it trustworthy. *Daubert*, 509 U.S. at 590. The second prong of the inquiry requires an analysis whether the opinion is relevant to the facts at issue. *Id.* at 591–92. The Supreme Court then extended *Daubert* to apply not only to "scientific" knowledge, but to all expert testimony. *See generally Kumho Tire*, 526 U.S. 137. Thus, an expert's testimony is admissible under Rule 702 if it rests on a reliable foundation and is relevant. *Kumho Tire*, 526 U.S. at 150–53.

In *Daubert*, the Supreme Court set forth a list of non-exclusive factors that courts may use in assessing the reliability of scientific expert testimony. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. at 593–94. The advisory committee notes to Rule 702 concisely summarize the *Daubert* factors as follows:

> The specific factors explicated by the Daubert Court are (1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

Fed. R. Evid. 702 advisory committee note.

With regard to the relevance inquiry under *Daubert*, expert testimony must further "assist the trier of fact to understand the evidence or to determine a fact in issue. . . . Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. The *Daubert* Court went on to state that "'an additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"

*Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.

1985)).  The district court has "wide discretion" in determining whether expert testimony would

"assist the trier of fact."  *Sun Yung Lee v. Clarendon*, 453 F. App'x 270, 277-278 (4th Cir. 2011).

Given the potential persuasiveness of expert testimony, proffered evidence that has a greater

potential to mislead than to enlighten should be excluded.  *See United States v. Dorsey,* 45 F.3d

809, 815–16 (4th Cir. 1995).  Nothing in either *Daubert* or the Federal Rules of Evidence

requires a district court to admit opinion evidence that is connected to existing data only by the

*ipse dixit*[1] of the expert.  *ePlus, Inc. v. Lawson Software, Inc*., 764 F.Supp.2d 807, 813 (E.D. Va.

2011), quoting from *Kumho*, 526 U.S. at 157.  The trial court's function at this "gatekeeping"

stage is to focus on principles and methodology used by the expert, not on the validity of the

expert's conclusions.  *ePlus*, 764 F.Supp.2d at 812, relying on *Daubert,* 509 U.S. at 594–95.

Dr. Keeley lacks sufficient knowledge, skill, experience, training, or education regarding

computer databases, the background screening industry and employers' usage of background

screening reports to be qualified as an expert on these topics. Dr. Keeley is not a lawyer and has

no legal training. Ex. "A" at 61:14-16.  He had not read the Fair Credit Reporting Act until

retained by NBD's attorneys to provide an opinion.  *Id*. at 62:7-9 (Q. In fact, you hadn't even

read the Fair Credit Reporting Act text until you were retained by Troutman Sanders to provide

an opinion in this case, right? A. I think that's right. Yes.").  NBD is the first background check

screening company that he has ever consulted for.  *Id*. at 62:13-16.  He even admitted in his

deposition that he learned about the subject of his expert report as he was writing it: "Q.  Is it

---

[1]     "*Ipse dixit* is defined to mean: "he himself said it" or "she herself said it" or "something asserted but not proved" *Black's Law,* New Pocket Edition, 1996; "he himself said it" or "an assertion without proof;" *Dictionary.com;* and "an unproven assertion resting on the bare authority of some speaker;" or a "dogmatic statement," *Oxford English Dictionary.*" *ePlus, Inc.*, 764 F.Supp.2d at 813.

true or not true that you have no expertise, no expert expertise, in the consumer reporting industry and field? A.  I think that's a little broad statement.  I've certainly learned a lot about it in the course of my consulting in this case." *Id*. at 85:5-10.  Furthermore, Dr. Keeley was unable to name any consumer-reporting agency other than the three he had learned of in this case.  *Id*. at 86:8–87:21.  He admitted he had no expertise in background checks and that industry.  *Id*. at 99:8–100:7.  He was not aware that the Fair Credit Reporting Act places restrictions on the access to a consumer's report:  "Q. You assume I couldn't pull your credit report, right? A. Yeah. Actually, less -- seems like a lot of people pull credit reports all the time, but I'm not sure exactly what the restrictions are on that." *Id*. at 128:22–129:1.  Prior to being retained for this case, he had not researched or ever studied how employers use background reports, *id*. at 100:22–102:10, and his knowledge of background reports was limited to how he had seen his own consulting firm use one for his own job application.  *Id*. at 132:11-24. In fact, Dr. Keeley's information about the use of background reports for employment purposes came from Internet research performed and summarized by other Cornerstone Ph.D.s solely for the purpose of this matter.  *Id.* at 100:22-102:10, 84:4-10, 72:22-73:8, 75:23-76:22, 106:16-107:3.  Prior to reviewing the consumer reports concerning the two named Plaintiffs, provided to him by NBD's lawyers, Dr. Keeley had never even read a consumer report.  *Id*. at 150:24–151:14.

Nor is Dr. Keeley qualified to opine on the requirements of class certification, as he is not familiar with Rule 23:

> Q. By the way, have you, in 2013, rendered an expert witness opinion in which you suggest in that opinion that a class could be identified in a class certification fight?
> A. I would have to look. That's not always -- the issue of whether the class is ascertainable doesn't arise in all class certification matters, but it does arise in some. So . . .
> Q. I'm not talking about ascertainability right now. Okay? I'm asking you about identifying the class.

A. I'm sorry. Maybe, could you explain a little bit -- could you repeat your
question? Maybe I missed the thrust of it.
Q. Sure. You understand the difference between identifiability and
ascertainability, don't you?
A. I guess – I'm not sure. I think you need to explain the distinction between
those terms.
Q. I don't. I'm asking you. You're the one that's the supposed expert. Do you
believe there's any difference, in a class certification context, between
identifiability and ascertainability?
A. Usually, I would focus on ascertainability. I'm not sure -- I guess I haven't
heard the term "identifiability" as distinct from ascertainability.

Id. at 60:14-61:13.

Dr. Keeley is also not qualified to render an expert opinion regarding the capabilities of

NBD's database system, because he lacks the requisite knowledge experience, skill, training, or

education regarding both computer databases generally and Defendant's system specifically. He

has had no formal education on computer technology in over forty years, and has no special

technical knowledge or experience with computers. Id. at 23:20-24:7, 28:1-11, 32:9-37:19. He

agreed that he is not qualified to provide any expert opinion regarding database administration.

Id. at 28:12-18. His testimony revealed he has no particular technical or computer knowledge.

Id. at 32:9–37:19. With regard to what he thought of as the NBD database, the AS/400, Dr.

Keeley testified:

Q. Do you have any idea what AS/400 pertains to?
A. I'm not absolutely sure. My best estimate would be that it relates to a
database system, which would primarily be software that would run on a certain
type of hardware or servers.
Q. Right. But you don't know?
A. I haven't explored the details of that, no.

Id. at 34:4-11. In fact, the AS/400 is not a database. Instead, it is simply a common computer

system. See http://en.wikipedia.org/wiki/AS/400 (last visited Mar. 10, 2014). Furthermore, Dr.

Keeley had no interaction with the NBD databases about which he opines in his declaration. Id.

at 37:6-40:13. The only personal "data gathering" that Dr. Keeley conducted regarding the

Defendant's database consisted of three telephone conversations with an employee of the

Defendant, Joe Davidson (that he doesn't "precisely" remember) and by browsing Defendant's

publically available website:

> " [A:] And maybe third, just to restate, at least what I primarily had said in
> previous answers to that same question, was my knowledge about the technical
> aspects of the database would primarily come from Mr. Davidson.
> Q. Who else besides Mr. Davidson? You say primarily. That implies there's some
> other source.
> A. Well, I felt, as I think I'd answered in some previous similar questions, there
> are, you know, at least the CoreLogic website. And I can't recall specifically.
> We'd have to dig out those documents. I know it talks to some extent about the
> database. I don't think it talks about what software or hardware is used, but I'm
> not sure. But at least that would be one other thing that comes to mind. I've
> looked at other documents. My colleague, Kate Lee, had spent more time with
> Mr. Davidson, actually, at seeing him operate the system, seeing him make
> inquiries, sat there with a computer monitor. I joined via phone but wasn't able to
> do that. So I've also talked with her about what she learned and her visits with
> Mr. Davidson.
> Q. Now, how many times have you been to a CoreLogic or SafeRent facility?
> A. I have not been to one.
> Q. How many times have you logged into a CoreLogic or SafeRent website that
> proprietary access was given to you for?
> A. I do not have access. So I have not logged in.
> Q. And how many times have you spoken with Mr. Davidson?
> A. I believe three times.
> Q. And when were those three times?
> A. I don't have a precise recollection.

*Id.* at 37:16-38:24. Dr. Keeley's declaration merely parrots information supplied by his

ghostwriter PhDs. and by NBD.  *Id.*  It is clear from Dr. Keeley's testimony that he is not

qualified to render an expert opinion on either class certification or the Defendant's database. For

this reason, his declaration offered in support of the Defendant's opposition to Plaintiff's Motion

for Class Certification should be stricken.

**B.      *Dr. Keeley's Expert Report and Declaration was impermissibly ghostwritten.***

"Ghost writing a testifying expert's report is the preparation of the substantive writing of

the report by someone other than the expert purporting to have written it." *Trigon Ins. Co. v.*

*U.S.*, 204 F.R.D. 277, 291 (E.D. Va. 2001); *see also Long-Term Capital Holdings, LP v. United States*, 01-CV-1290(JBA), 2003 WL 21269586, *4 (D. Conn. May 6, 2003). Although non-testifying experts may provide limited assistance in the preparation of an expert report, it is clear that "if opinions expressed in an expert report are not the opinions of the expert, the expert will not be able to satisfy the requirements of Fed. R. Evid. 702 . . . that the report be based on the expert's own valid reasoning and methodology." *Trigon*, 204 F.R.D. at 294; *Long-Term Capital*, 2003 WL 21269586 at *4. Furthermore, "Preparing the expert's opinion from whole cloth and then asking the expert to sign it if he or she wishes to adopt it conflicts with Rule 26(a)(2)(B)'s requirement that the expert 'prepare' the report. Preparation implies involvement other than perusing a report drafted by someone else and signing one's name at the bottom to signify agreement." *Estate of LaFarge ex rel. Blizzard v. Kyker*, 1:08CV185, 2011 WL 6151595, at *6 (N.D. Miss. Dec. 12, 2011) (citing *Manning v. Crockett,* 1999 WL 342715, at *3 (N.D. Ill. May 18, 1999); *see also Trigon*, 204 F.R.D. at 293; *Minnesota Lawyers Mut. Ins. Co. v. Batzli*, CIV. 3:09CV432, 2010 WL 670109, at *2 (E.D. Va. Feb. 19, 2010); *Crowley v. Chait*, 322 F. Supp. 2d 530, 543 (D. N.J. 2004); *DirecTV, Inc. v. Henley*, 2005 U.S. Dist. LEXIS 46847, at *2-3 (W.D. Tex. Jan. 31, 2005). And although an expert witness is permitted to use assistants in formulating his expert opinion, an expert report that is "merely a conduit for the opinion of a non-testifying expert" must be excluded. *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 266 (W.D.N.Y. 2013) (citing *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,* 285 F.3d 609, 612 (7th Cir. 2002)); *see also Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007); *Weitz Co. v. Lloyd's of London,* 2007 WL 7131908, at *3–4 (S.D. Iowa 2007). An expert is required to substantially participate in the preparation of the report and should "use his own knowledge and expertise, exercise his own independent judgment, and have some input

into the substance of the report, even if he has some assistance in the preparation thereof."
*DirecTV*, 2005 U.S. Dist. LEXIS 46847 at *2-3 (citing *Manning*, 1999 WL 342715 at *3-4.).
However, when any individual other than the testifying expert provides more than editorial
assistance, *i.e.*, the substantive opinions in the report, the expert report is considered "ghost-
written". *Trigon*, 204 F.R.D. at 295.

It is indisputable that Dr. Keeley's expert report was impermissibly ghostwritten.[2]
During his deposition, Dr. Keeley admitted that the bulk of the time that his firm spent on the
case was performed by other Cornerstone employees—Dr. Kathryn ("Kate") Lee, Dr. Omus
Celmanbet, Christy Corfias, and Hoda El-Ghazaly.  *See* Ex. "A", 67:16-70:4. In fact, Dr.
Keeley's work only accounts for a small percentage of the total work that Cornerstone billed for
in February 2013 (when it performed the bulk of the work in this case). Ex. "A", 70:1-11 ("There
are time entries for these five Cornerstone employees. And, roughly, if I'm estimating this, about
157 hours of billed time, and a half of which were yours. Is that a fair description? A. Certainly,
16 and a half are mine. Let me see. I think that's about right. Q. And so, another way to put it is,
roughly 16 and a half out of 157 hours were conducted in your office, and the rest of the work
was performed in the Washington office of Cornerstone, correct? A. Yes. I think that's
correct."). Dr. Keeley admitted during his deposition that he did not perform much of the
research referenced in his expert report, but instead understood that other Cornerstone employees
were to conduct the research. Ex. "A" 71:9-17 ("A. Certainly, we were doing a lot of research
during this period. Q. By "we" you mean people that are employed by Cornerstone besides
yourself? A. Correct. Well, and myself also. But certainly, other people were doing more than I

---

[2] Dr. Keeley's Expert Report is attached as Exhibit "B".

was during this period."). Instead, Dr. Keeley would merely discuss research that the other

Cornerstone employees conducted:

> Well, I don't necessarily try to be that specific in my time details, but I do have a number of "review case materials," "work with teams." When I say "work with teams," for example, that means, generally, have discussions with team. They'll present results of research, or I will ask them to be conducting research on particular issues. They will eventually show that to me, and which I would call "reviewing case materials." So . . . generally, I would ask others to literally do the -- acquire the research, but -- but then, show me the results and we could discuss that.

Ex. "A", 71:18-72:9.

In fact, Dr. Keeley admitted throughout his deposition that Dr. Lee conducted most of the

work for the Defendant in this case. Dr. Lee was the only Cornerstone employee to examine the

CoreLogic database in person. Ex. "A", 29:21-20:20. He readily admitted that Dr. Lee was the

primary contact with CoreLogic during the analysis of the Defendant's database:

> I've looked at other documents. My colleague, Kate Lee, had spent more time with Mr. Davidson, actually, at seeing him operate the system, seeing him make inquiries, sat there with a computer monitor. I joined via phone but wasn't able to do that. So I've also talked with her about what she learned and her visits with Mr. Davidson.

Ex. "A" at 38:5-11. In fact, Dr. Keeley did not even have remote access to the Defendant's

database:

> Q. Now, how many times have you been to a CoreLogic or SafeRent facility?
> A. I have not been to one.
> Q. How many times have you logged into a CoreLogic or SafeRent website that proprietary access was given to you for?
> A. I do not have access. So I have not logged in.

Ex. "A", 38:12-19. Dr. Keeley also stated that Dr. Lee had performed more work in the case than

he had—" Q. But -- now, let me ask you a question. Again, isn't it true that Katherine Lee did

more work in drafting your expert witness report than did you? A. I think it's likely she billed

more time on the case." Ex. "A", 84:4-8. He even admitted that it was "likely" that she had

drafted the bulk of the expert witness report:

> Q. She did more of the actual ascertainability typing, or drafting, rather, of this
> report than did you, right?
> A. Well, I don't know about ascertainability analysis, but she -- she -- we could
> look through her time details. I haven't specifically done that, but I wouldn't be
> surprised if she billed more time than I did.
> Q. She drafted more words in your expert witness report that made it into the final
> than did you, correct?
> A. Not necessarily. Because -- she put -- maybe put more time in. I think that's
> likely.

Ex. "A", 82:17-83:4. Dr. Lee's and the other Cornerstone employees' involvement in the

preparation of Dr. Keeley's expert report clearly exceeds the editorial assistance permitted by the

cases that have examined this issue. *See Trigon*, 204 F.R.D. at 295.

This situation is analogous to one recently addressed by the Southern District of Iowa. In

*Weitz Co., LLC v. Lloyd's of London*, the Court examined an expert report ghostwritten by the

expert's assistant. In that case, the expert testified that, as in this case, his assistant performed the

research, conducted the analysis, and drafted the report. *Weitz Co.*, 2007 WL 7131908 at *1. The

Court observed that "[b]ecause of [the expert witness's] complete lack of involvement in the

underlying research and analysis, there is no basis in the record for the court to conclude that the

principles and methodology behind the opinions set forth in the November 17, 2005 report are in

fact reliable", *id.* at *4 and held that the expert report did not comply with Fed. R. Civ. P.

26(a)(2)(B) and Fed. R. Evid. 702. *Id.*

Plaintiffs urge this Court to hold Dr. Keeley's report to the same standard. Ghostwritten

reports, including Dr. Keeley's, are unreliable. One judge observed that "the inherent deception

involved in such "ghost-writing" taints the proposed expert testimony to a degree that its

reliability may be questioned." *O'Hara v. Travelers*, 2:11-CV-208-KS-MTP, 2012 WL 3062300

(S.D. Miss. July 26, 2012).  Such is the case here. Dr. Keeley did not conduct any of the analysis

and research or personally observe the CoreLogic database that is the subject of the report.

Instead, and as discussed above, he relied on Dr. Lee—a non-testifying expert—to conduct the

analysis, and several other Cornerstone employees to conduct the research. Ex. "A" at 29:21-

30:24, 38:5-19; 67:20-22; 68:23-24. He did not even draft the majority of his report, instead

allowing his other employees to fill in large sections of the report. *Id.* at 80:4- 81:3.  In truth, it

was Dr. Keeley that provided the "editorial assistance" to expert report that was written by Dr.

Lee and the other Cornerstone employees.  All of these facts establish that his report was

ghostwritten, rendering it unreliable and noncompliant with the rules of this Court, and it should

be stricken.

**C.**     ***Because the Defendant did not comply with Rule 26, it should be prohibited from using Dr. Keeley's "expert" testimony.***

Federal Rule of Civil Procedure 26(a)(2)(B) requires that each party disclose the identity

and report of any witness who is retained to provide expert testimony. Fed. R. Civ. P.

26(a)(2)(A) & (B). The report submitted along with the identifications must contain the data or

other information *considered* by the witness in forming the opinions in the report. Fed. R. Civ. P.

26(a)(2)(B); *see also NutraSweet Co. v. X–L Engineering Co.,* 227 F.3d 776, 785–86 (7th Cir.

2000); *Salgado ex rel. Salgado v. General Motors Corp.,* 150 F.3d 735, 741 n. 6 (7th Cir. 1998);

*In re Pioneer Hi–Bred Int'l, Inc.,* 238 F.3d 1370, 1375–76 (Fed. Cir. 2001); *Fid. Nat. Title Ins.*

*Co. of New York v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 750 (7th Cir. 2005). The parties

are under a duty to supplement the information contained in any such reports. Fed. R. Civ. P.

26(e)(1). A party that fails, without substantial justification, to disclose information required by

Rule 26(a) or 26(e)(1), is not permitted to use as evidence at trial any information not so

disclosed. *See* Fed. R. Civ. P. 37(c)(1); *see also Sharpe v. United States*, 230 F.R.D. 452, 456

(E.D. Va. 2005); *Mems v. City of St. Paul, Department of Fire & Safety Services,* 327 F.3d 771, 779–80 (8th Cir. 2003); *Ortiz–Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico,* 248 F.3d 29, 34–36 (1st Cir. 2001); *Fid. Nat. Title Ins.*, 412 F.3d at 750. The Defendant's expert disclosures are deficient for two reasons—first, they have withheld the substantial research documents created by the undisclosed Ph.D.s that formed nearly the sole basis for Keeley's report and opinion.  And second, Defendant and Keeley grossly over-disclosed the documents that Dr. Keeley considered when drafting his expert reports and thus Dr. Keeley could not testify as to which of the scores or more of documents identified he had actually reviewed, read, or considered during the preparation of the expert report.

In Defendant's Expert Witness Disclosures, Dr. Keeley listed 119 documents that he allegedly considered when drafting his expert witness report. However, in his deposition, Dr. Keeley testified that he did not consider many of these documents when drafting his report. This over-disclosure of documents made it impossible for the Plaintiffs to determine what documents to challenge or consider in their deposition of Dr. Keeley and their reply brief regarding their Motion for Class Certification. For example, in his deposition, Dr. Keeley admitted that he had not read all of the documents listed in his expert report:

> Q. You tell me which of these – let's start with the general list -- which of these documents have you actually put your own personal Michael Keeley eyes on? Not a summary, not a recollection explained or provided or detailed by Cornerstone employees, but that you personally have read.
> A. I'm not sure I can recall everything, but I believe I've read all the legal pleadings. I've read the deposition of Mr. Bell.
> Q. Did you read that cover to cover, or was there a summary provided to you?
> A. I read that cover to cover. You know, I don't have -- to the extent that the -- the -- I have read all, or at least almost all, of the documents cited in my footnotes.[3] Now, I don't – it's a little difficult for me to recall these by how they're described here under produced documents.

---

[3] The documents identified in Keeley's "footnotes" are a small fraction of those that he disclosed.

Ex. "A", 104:5-21.  Dr. Keeley did not find or read most of the documents listed in his report:

"But I think, without taking the time to read each one of these, generally speaking, these would be publicly available materials that I asked my staff to research and locate. And I didn't personally do the research to locate these." Ex. "A", 112:18-23.  In fact, he didn't even draft or edit the document list contained in his expert report:

> Q. Well, you -- you put this list together, right?
> A. Well, it was produced -- put it together -- it was put together under my direction. Yes.
> Q. By whom? There are two different things. Under your direction is not what I'm asking you. I'm talking about Michael Keeley, yourself. Are you the person that edited this?
> A. I didn't personally type this up, if that's what you're asking. No.
> Q. But did you edit it? That's what I just asked you.
> A. Did I -- well, I reviewed it. I don't believe I edited it.
> Q. And who typed it?
> A. I think, my -- my assistant. I'm actually not sure. Usually, she plays a part in this. Would be Kristina Lemons.

Ex. "A", 104:22-105:14. Additionally, he could not identify which documents he had reviewed when drafting his expert report:

> Q. Now, can you sit here -- as you're sitting here today, can you tell me which of the produced documents you, yourself, have actually read, in the category "produced documents"?
> A. I think the answer would be similar to my previous answer; would be, we would have to, essentially, look to see if they are cited in my report, and if they are, I've read them. If they're not, I probably have not."

Ex. "A", 108:10-18. In fact, Dr. Keeley admitted his over-disclosure of documents and that he listed materials that were "available to him", rather than only the ones that he "considered", as required by Rule 26, and that irrelevant documents were included in his document disclosure nonetheless:

> Q. [U]nder publicly available materials, Page 3 of of Appendix 3 of Exhibit 1, your first is a website that has Accio, A-c-c-i-o, data sample background report. And what stood out for you about that document?

A. I would have -- I would have to look and see if that's cited. I don't specifically recall that. I would have to look and see if it's cited in my report. I recall these -- at least, generally, what I do in preparing documents considered is, even things I'm not citing or necessarily relying on, I give -- at least, my understanding of the federal rules is, I'm supposed to show all of the material that was available to me, not just what I actually cited or looked at. So -- but I – we'd have to look at my report and see if that's cited, and then I can, perhaps, tell you more. I don't -- from that name alone, I don't recall.

Q. Well, there's a lot more available to you if you type "background check" into Google. I mean, you've had a lot more available than just these, if you believe the federal rules require you to list every conceivable document that would be available to you. Boy, that would be a burden for a plaintiff, and the plaintiff's lawyer that faced that might have to resort to judicial help, if you overidentify documents. You haven't done that, though, right?

A. Not to my -- I mean, they're available to me in the sense that my staff located them, reviewed them. Maybe at the end of the day we decided it wasn't that relevant and didn't cite it.

Ex. "A", 113:21-114:24.

And in fact, there were some documents that he considered, but did not disclose, such as the documents from his assistants concerning research that they had conducted for him: "But it appears that you also received written documents that contain factual information, that became part of your report, from other employees that work at Cornerstone. And that's correct, right? A. Yeah. Under my direction, they were conducting research and providing me the results of that research. Sure." Ex. "A", 75:5-11.[4] Prior to Dr. Keeley's deposition, this research had not been disclosed to the Plaintiffs. And, to date, neither the Defendant nor Dr. Keeley has provided it. Additionally, he admitted that there are more detailed notes regarding his office's interactions with the Defendant that were not disclosed or produced in discovery:

Q. With respect to those interviews and meeting notes, do you know who wrote them?
A. I'm actually not sure. My best guess would be Kate Lee.
Q. And they -- they included factual information that was provided to you, that

---

[4] The Plaintiffs also requested this information on January 28, 2013 in their First Set of Requests for Production of Documents to Defendants, Request Nos. 13 and 14. It has not been produced as of the date of this filing.

was considered for your report?
A. Yes. They were -- well, at least summaries of, essentially, what I learned in these interviews. Written summaries. I don't know that there's anything different than what's already disclosed at my report, but probably more detail.

Ex. "A", 110:5-16.

Additionally, Dr. Keeley admitted that there were several drafts of his report written by the other Cornerstone Ph.Ds. *See* Ex. "A" at 78:11, 80:4-81:9, 84:12.  These "drafts" are not draft reports otherwise protected by Fed. R. Civ. P. 26(b)(4)(B).  They were not Keeley's "drafts".  Instead, they were documents containing the "the facts or data considered by the witness in forming" his eventual "expert" opinion.  Fed. R. Civ. P. 26(a)(2)(B)(ii).  These documents were documents that Keeley himself did not draft and thus they must be disclosed and are discoverable. *Trigon*, at 283; *B.C.F. Oil, 171 F.R.D.* at 62; *Hewlett–Packard* 116 F.R.D. at 536); *W.R. Grace,* 2000 WL 1843258 at *10. The scope and work product protections available to an expert witness and his principal have changed in 2010.  Fed. R. Civ. P. 26(b)(4). However, even the most sensitive work product considered by the new Rule—attorney–expert collaboration—requires the disclosure of and excludes as "work product" documents that:

> (ii.) identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed; or

> (iii) identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed.

Fed. R. Civ. P. 26(b)(4)(C).  For Dr. Keeley, the documents and communications that "identif[ied] facts or data" that Keeley considered, and/or "indentif[ied] assumptions" upon which the expert relied came from the undisclosed Ph.D.s, including Dr. Lee, at Cornerstone. If Troutman Sanders had provided these documents to Dr. Keeley, there would have been no work-product protection. Under the same line of reasoning, there certainly cannot be any such work-

product protection for facts, data, assumptions, and documents that Dr. Keeley received from his non-lawyer Ph.D. assistants.

Accordingly, both Dr. Keeley and the Defendant have materially failed to comply with Rule 26's requirement that a purported expert identify the data, documents or other information *considered* by the witness in forming the opinions in the report. Fed. R. Civ. P. 26(a)(2)(B). Their over-disclosure of irrelevant documents and refusal to disclose documents that Dr. Keeley used and/or considered to draft his report have significantly prejudiced the Plaintiffs. Dr. Keeley's supposed testimony should be excluded pursuant to Fed. R. Civ. P. 37(c)(1), 26(a)(2) and 26(e).

**C.** **Dr. Keeley's expert report is also not admissible because it addresses a legal question that is solely within the purview of this Court.**

It is well established that legal questions are not the proper subject of expert witness reports and testimony. *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002); *Forest Creek Assoc. v. McLean Savs. and Loan Ass'n*, 831 F.2d 1238, 1242 (4th Cir. 1987); *Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 366 (4th Cir. 1986); *Piankatank*, 2009 WL 1321512; *Sun Yung*, 453 F. App'x at 278; *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir.1997); *Anderson v. Suiters,* 499 F.3d 1228, 1237 (10th Cir. 2007); *North River Ins. Co. v. Reinsurance Corp.,* 197 F.Supp.2d 972, 981 (S.D. Ohio 2002); Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise." Expert testimony on an ultimate issue is therefore excludable under Rule 702 if it does not aid the jury. *Kopf,* 993 F.2d at 377–78 (stating that while "[a]n opinion is not objectionable simply because it embraces an ultimate issue to be decided by the trier of fact . . . such an opinion may be excluded if it is not helpful to the trier of fact under Rule 702") (internal

quotation omitted). Expert testimony that merely states a legal conclusion is less likely to assist the jury in its determination. *Barile*, 286 F.3d at 760; *see also Woods,* 110 F.3d at 1220 ("It is, therefore, apparent that testimony offering nothing more than a legal conclusion—i.e., testimony that does little more than tell the jury what result to reach—is properly excluded under the Rules."); Weinstein's Federal Evidence § 704.04[2][a] (2d ed. 2001) ("The most common reason for excluding opinion testimony that gives legal conclusion is lack of helpfulness . . . The testimony supplies the jury with no information other than the witness's view of how the verdict should read."). "The best way to determine whether opinion testimony contains legal conclusions, 'is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.'" *Barile*, 286 F.3d at 760 (citing *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir.1985)); *see also Lecureux,* 110 F.3d at 1220 ("It is also appropriate to exclude 'ultimate issue' testimony on the ground that it would not be helpful to the trier of fact when the terms used by the witness have a separate, distinct and specialized meaning in the law . . . ") (emphasis and citation omitted)). To determine when a question posed to an expert witness calls for an improper legal conclusion, the district court should consider first whether the question tracks the language of the legal principle at issue or of the applicable statute, and second, whether any terms employed have specialized legal meaning. *Barile*, 286 F.3d at 760 (citing *Torres,* 758 F.2d at 151).

The Defendant relies on Dr. Keeley's expert report and declaration to support its argument that the Plaintiffs' class is not ascertainable. Specifically, it cites to his declaration to establish the following:

- "NBD does not know, and it cannot be determined without **individual inquiry**, whether the individual being screened is seeking to obtain employment." Decl. of Dr. Keeley ¶ 20 (Dkt. No. 91.6) (emphasis added); *see also* Def.'s Opp. to Mot. Class Certification, 32; *see generally* Ex. "B".

- "NBD does not know, and it cannot be determined without **individual inquiry**, whether the information it sells to a CRA will be provided to the employer requesting the background screening." Decl. of Dr. Keeley ¶ 21, (Dkt. No. 91.6) (emphasis added); *see also* Def.'s Opp. to Mot. Class Certification, 33; *see generally* Ex. "B".

- "NBD does not know, and it cannot be determined without **individual inquiry**, what criteria the employer will use to assess the individual's suitability for employment and thus whether the information it provides to the CRA would likely have an adverse effect upon an individual's ability to obtain employment." Decl. of Dr. Keeley ¶ 23 (Dkt. No. 91.6) (emphasis added); *see also* Def.'s Opp. to Mot. Class Certification, 33; *see generally* Ex. "B".

- "I have concluded that determining whether a consumer has been 'injured' under Plaintiffs' theory (and, if so, the extent of the injury) requires **individual inquiry**. Decl. of Dr. Keeley ¶ 26, (Dkt. No. 91.6) (emphasis added); *see also* Def.'s Opp. to Mot. Class Certification, 33; *see generally* Ex. "B".

In conclusion, the Defendant asserts, "it is Dr. Keeley's expert opinion that no class could be certified in this action absent extensive individualized inquiry." But whether or not the class is ascertainable and can be certified is exactly the type of legal question that is solely within the purview of this Court and not a proper topic for an expert witness report. As discussed in Plaintiffs' Motion for Class Certification, Rule 23 requires that a class must be sufficiently ascertainable in order to be certified by a court. Ascertainability is generally described as the requirement that the class description be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1760. Many of the courts that have examined this issue have judged the ascertainability of a class based on whether the putative class members can be readily identified or if their identification would require an "individualized" inquiry or determination. *See Cuming v. S. Carolina Lottery Comm'n*, 3:05-CV-03608-MBS, 2008 WL 906705 (D.S.C. Mar. 31, 2008) ("In order to determine which of these individuals has standing to sue, the court would have to conduct potentially thousands of

**individualized inquiries** to determine whether the ticket had been purchased after the top prize had been awarded.") (emphasis added); *Luedke v. Delta Airlines,* 155 B.R. 327, 332 (S.D.N.Y.1993) (certification denied because it would require "an unmanageable number of **individualized, somewhat subjective determinations** of the validity" of the potential claims) (emphasis added); *In re Phenylpropanolamine (PPA) Products Liab. Litig.*, 214 F.R.D. 614, 616 (W.D. Wash. 2003) ("Here, the court finds that **individualized factual inquiries** required for identification of the proposed class would render this case unmanageable.") (emphasis added); *Solo v. Bausch & Lomb Inc.*, MDL NO. 1785, 2009 WL 4287706, \*7 (D.S.C. Sept. 25, 2009) ("the court finds that determining the membership of plaintiffs' proposed class would require countless **factual inquiries into the individual circumstances** of potential class members") (emphasis added). It is no mistake that Dr. Keeley's language is the exact language used by courts across the country when evaluating ascertainability of a class. Instead, Dr. Keeley (and his assistants) tracked the legal language of the legal principal at issue and has impermissibly presented an "expert" opinion on a legal question. This is clearly not permitted by Fed. R. Evid. 702. Accordingly, this Court should strike Dr. Keeley's declaration and disregard the Defendant's reliance on the declaration in its opposition to the Plaintiffs' Motion for Class Certification.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Strike the declaration of Dr. C. Michael Keeley should be granted, and Defendant should be precluded from using Dr. Keeley's declaration and report as a sanction pursuant to Rule 37(c)(1).

Respectfully submitted,
**TYRONE HENDERSON** and
**JAMES O. HINES, JR.**, *on behalf of themselves and others similarly situated*

By_____/s/_____
Of Counsel

Casey S. Nash, VSB No. 84261
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:     (703) 273-7770
Fax:     (888) 892-3512
casey@clalegal.com
*Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of March, 2014, I have filed the foregoing electronically using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

David N. Anthony
Timothy J. St. George
Alan D. Wingfield
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, VA 23218-1122
Tel:    804-697-5410
Fax:    804-698-5118
david.anthony@troutmansanders.com
tim.stgeorge@troutmansanders.com
alan.wingfield@troutmansanders.com

John C. Lynch
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Tel:    757-687-7765
Fax:    757-687-1504
john.lynch@troutmansanders.com

*Counsel for the Defendant*

_____/s/_____
Casey S. Nash, VSB No. 84261
*Counsel for the Plaintiffs*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel:    (703) 273-7770
Fax:    (888) 892-3512
casey@clalegal.com
