**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

TYRONE HENDERSON, *et al.*

      **Plaintiffs,**

v.                                                            Civil Action No. 3:12cv97 (REP)

CORELOGIC, INC., *et al.*

      **Defendants.**

### REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

COME NOW the Plaintiffs, TYRONE HENDERSON and JAMES O. HINES, JR, for themselves and on behalf of all other similarly situated individuals, by counsel, and for their Reply to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification, they state as follows:

### I.      OVERVIEW

The class claim in this case is that Defendant National Background Data, LLC by CoreLogic® ("NBD") violated the Fair Credit Reporting Act ("FCRA"), **15 U.S.C. §1681k(a)(1)** because it never provides notice (either directly or through its resellers) to consumers that it has furnished a report at the time it does so.  (Am. Compl. at ¶64-77, Doc.  30.) As for the §1681k(a)(2) alternative – it does not apply to this Defendant's products.  The §1681k(a)(2) provision was neither drafted nor enacted with database reporting in mind.  Section 1681k(a)(2) cannot apply to a CRA that obtains its records by batch download of criminal records that do not contain the complete information necessary for responsible use of the record.   As the Amended Complaint plainly alleged: "Defendants did not attempt for any consumer to follow the option available at 15 U.S.C. § 1681k(a)(2) … Title 15 U.S.C. § 1681k(a)(2) is thus inapplicable to the consumer reports at issue in this case."  (Am. Compl. at ¶59, Doc.  30).  The Court has previously agreed in a comparable FCRA

case.  *Williams v. LexisNexis Risk Mgmt. Inc.*, CIV A 306CV241, 2007 WL 2439463 (E.D. Va. Aug. 23, 2007) (reasoning "[a]lternatively, the CRA may adopt 'strict procedures' to ensure that such reports are accurate. 15 U.S.C. § 1681k(a)(2). That section of § 1681k is not at issue in this litigation, however.")

All that NBD had to do to comply with the FCRA was to provide the notices it previously drafted in 2007. (Doc. No. 96-12, NBD E-Mail to Resellers Regarding §1681k(a)(1) Notices). A CRA cannot on the one hand sell loose-match records with incomplete identifiers, but not provide consumers a means to learn of and seek correction of inaccuracies.  The § 1681k(a)(1) notice shifts to the consumer the obligation to proactively obtain and seek correction of inaccurate reports.  But NBD's business model is built on concealment, blocking and prevention of direct consumer knowledge, notice and contact.  If NBD mailed or emailed consumers the required notices and informed them that it was an original source of a criminal background check report, NBD would be inundated with consumer disputes, complaints and requests for correction.  It would have to provide copies of consumer reports.  And it would have to begin taking seriously the risk of litigation based on the grossly inaccurate reports it regularly sells.   More simply – NBD would have to begin conducting itself in the manner already required of its competitors to comply with the FCRA.

## II.    DEFENDANT MISINTERPRETS THE STATUTORY TEXT OF §1681k(a)

Defendant asked for and received 50 pages in which to contest Plaintiffs' Rule 23 motion. It crafts its brief around a chart of "Obstacles of Certification" and pages of reconstructed facts. (Def.'s Mem. Opp'n at 2-10)(Doc. 92.)  NBD contests multiple Rule 23 elements – overbreadth of the class definition, ascertainability and typicality - based on several repeated arguments.

Criminal records are always adverse to a job applicant, and therefore whenever a CRA furnishes a consumer report containing a criminal record it must comply with § 1681k(a)(2).  Most of NBD's arguments are really only merits challenges, just the same as it attempted in its Rule

12(b)(6) motion and again on Summary Judgment. Defendant's class certification opposition strategy is to ignore Plaintiffs' theory on liability, reconstruct Plaintiffs' claim as if NBD's view of the liability issues had been adopted and then point out how difficult it would be to obtain certification under that interpretation. But if NBD is wrong on the liability issues, then Plaintiffs' class certification motion would not face the myriad obstacles Defendant suggests. While lengthy, and optically presented to create the illusion of separate challenges to class certification, a significant portion, if not the majority, of Defendant's Opposition to Plaintiff's Motion for Class Certification rests upon a singular statutory misconstruction of §1681k of the FCRA.

Defendant invents a construction of §1681k(a) that ignores, or worse misstates, the text of the statute. The preface to §1681k(a) is not as NBD apparently believes, a case-by-case application dependent upon what eventually happens to a consumer's job application. NBD's construction establishes liability on a recipient's only *after the subjective use* of a consumer report rather than on a consumer reporting agency's ("CRA's") status and conduct prior to and at the time of furnishing the report at issue. This flawed premise is the basis for numbers 2-9 of its "Obstacles" to class certification.[1]   (Def.'s Mem. Opp'n at 2-3.) Once Defendant's singular statutory misconstruction is dismantled, most of the facts asserted by NBD become immaterial and the arguments ineffective where NBD's positions are irrecoverably founded upon this false assumption that the § 1681k(a) preface requires a record-by-record, report-by-report, *post-hoc* determination of whether the statute applied:

> 1.     NBD's arguments that §1681k(a) only applies to reports furnished to "obtain" employment. *See* Def.'s Mem. Opp'n at 2, 15, Argument at § I.A; Obstacle No. 2;

> 2.     NBD's arguments that § 1681k(a) only applies when the specific criminal record or disposition is proven to be dispositive of the employment application of the specific consumer, rather than simply a criminal record that is of the type that is

---

[1] NBD actually offers 14 such "Obstacles", not 15. It has apparently omitted number 8. (Def.'s Mem. Opp'n at 2-4).

likely to have at least some adverse effect on obtaining employment.   *See* Def.'s Mem. Opp'n at 17-19, *Argument* at §§ I.C., II.C.2; Obstacles nos. 3-7; and

3.      NBD's arguments that its criminal records report must have actually been "used" in order to cause the application of § 1681k(a).   *See* Def.'s Mem. Opp'n at 18, 23, 32, *Argument* at §§ I.D., II.C.1., II.D.; Obstacle no. 9.

Naturally, if Defendant's interpretation were correct and every particular adverse criminal record had to be analyzed in the context of each consumer and each specific job application, class certification of a § 1681k(a) claim would be very difficult, if not impossible in this and every instance.    The Court's holdings in *Williams v. LexisNexis Risk Management, Inc.,* would be incorrect, the Fourth Circuit's denial of Rule 23(f) appeal would have been improper, and the near consensus of regulatory and judicial interpretations of §1681k(a) would have to be reconsidered. Civ. No. 3:06cv241, 2007 WL 2439463 (E.D. Va. 2007).   Fortunately, the statute does not textually, grammatically or practically apply as NBD argues.

The preface paragraph in FCRA Section 1681k(a) begins with unambiguous language outlining what type of companies are covered by this subsection of the FCRA:

**(a) In general**

A consumer reporting agency which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment shall—

**(1)** at the time such public record information is reported to the user of such consumer report, notify the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported; or

**(2)** maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date. For purposes of this paragraph, items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported.

15 U.S.C. §1681k(a). Section 1681k(a) governs a consumer reporting agency as it prepares, sells and furnishes a certain category of employment-purpose public record report.  The preface paragraph begins with unambiguous language outlining the type of companies that are covered. First, the CRA must be one that is furnishing a consumer report (any type of consumer report) for employment purposes (any type of employment purposes).[2]   For example, if a CRA sells an employment history report[3] to an employer determining whether to promote an existing employee, it would be governed by and have satisfied the first part of §1681k(a).  It is furnishing a consumer report[4] and doing so for an employment purpose[5].   However, the second half of the § 1681k(a) trigger would not necessarily have been met.  If the reports that the agency regularly compiled and sells do not contain public records – employment history records are not public records – and/or if those records it sells are not the type of public records that are adverse to obtaining employment[6], then that particular agency is not governed by § 1681k(a) notwithstanding the fact that it was selling a consumer report for an employment purpose.

The first paragraph of section 1681k(a) \ sets forth two different coverage criteria necessary to trigger compliance: one transactional,  one definitional.  First, demonstrated by the initial "which" criterion, the CRA must be furnishing a report in connection with a transaction involving employment purposes in order to have to comply.  This criterion is transaction-specific (i.e. the furnishing a consumer report for a particular purpose) sale and applies regardless of the type of company involved.  Thus, even if it is a company that exclusively sells employment background

---

[2] "A consumer reporting agency which furnishes a consumer report for employment purposes …" 15 U.S.C. § 1681k(a).

[3] "An Employment History Check is an attempt to contact previous employers to verify job title, dates of employment, salary, and eligibility for rehire." http://www.employmenthistorycheck.com/index.htm#What last visited March 7, 2014.

[4] 15 U.S.C. § 1681a(d).

[5] 15 U.S.C. § 1681a(h).

[6] For example, "public records" would also include records of birth, property ownership or citizenship.

checks, if it is selling a report on a particular day in connection with a different type of transaction, such as residential leasing or loan eligibility, it is not required to comply.   However, as long as the CRA is furnishing the report for employment purposes of *some* kind, whether for employment eligibility or otherwise, the first criterion is met.

Section 1681k(a)'s second "which" criterion defines the *type* of company that is required to comply. This definitional criterion imposes compliance obligations on certain companies that *generally* compile and report items of information on consumers (i.e. not limited to the particular transaction at issue) which are matters of public record and are likely to have an adverse effect upon *a* hypothetical consumer's ability to obtain employment. *Id*.

The definitional compliance trigger raises one question: is the company a CRA, which on a general or day-to-day basis compiles and reports public record information, which is likely to have an adverse effect upon a consumer's ability to obtain employment? If so, the second criterion is met. It is a coverage criterion.   Thus, section 1681k(a) requires compliance based upon the following two, straightforward questions, which can be readily discerned on a classwide basis:

1.     Are the qualifying consumer reports being furnished for employment purposes generally (not restricted to "obtaining" employment)?; and

2.     Does the CRA furnishing the report generally compile and report public record information, which is likely to have an adverse effect upon consumers' ability to obtain employment (i.e. is it a certain type of company)?

If the answers to both of those questions are yes, compliance with § 1681k(a) is required. Plaintiffs' Motion for Class Certification and analysis herein demonstrate the evidentiary record overwhelmingly, uniformly answer both of these questions for all Class members.

NBD's alternate interpretation is also betrayed by other text in § 1681k(a).  For example, if the second "which" clause was not a categorical description of the types of CRAs required to comply, and instead was a case specific criteria, the actual text within the clause would be even more arbitrarily limiting.  By its text, § 1681k(a) would only be triggered for reports that contained

multiple "items" of information.  15 U.S.C. § 1681k(a) ("… and <u>reports items</u> of information on consumers which are matters of public record …") (emphasis added).  A single adverse public record would be insufficient to trigger the section, which would require more than one item as its trigger.  The section would then also contain superfluous and inconsistent language.  Much of the multi-layered "which clause" structure would add nothing to the section's meaning.  For example, under NBD's interpretation, the section would have more simply stated:  "A consumer reporting agency which furnishes a consumer report [that includes] matters of public record [] likely to have an adverse effect upon a consumer's ability to obtain employment shall […]"  The remainder of the preface would be meaningless. *Wilson v. Flaherty*, 689 F.3d 332, 337 (4th Cir. 2012) (rejecting proposed interpretation of statute that would effectively "read out" certain statutory language).

If a CRA meets the coverage criteria set forth in the first paragraph of FCRA section 1681k(a), then it must do one of two things.  First, under section 1681k(a)(1), it must notify the a consumer of the fact that public record information is being reported at the same time it reports the public record information to the user of such report.  15 U.S.C. §1681k(a)(1); *see also Williams*, 2007 WL 2439463.  Defendant has admitted that it never provided any notice to the Class.  Alternatively, in lieu of sending consumers contemporaneous notice, and if mechanically possible, covered CRAs could elect to "maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date." 15 U.S.C. §1681k(a)(2).  The statutory text in these two alternative "action" sections further informs the Court of the section's meaning.

The FCRA does not offer any unique guidance for many of the terms in §§ 1681k(a)(1) and (2), but the Court does not need to go far to define its common meaning. *Johnson v. MBNA Bank Am., N.A.*, 357 F.3d 426, 430 (4th Cir. 2004)(referring to the dictionary to determine the meaning of the word "investigation" in the FCRA).  The definition of maintain is "to keep in an existing

state[.]"[7]   The relevant definition of "insure" is: "to make certain especially by taking necessary measures and precautions."[8]   To "design" is "to create, fashion, execute, or construct according to plan; to conceive and plan out in the mind; to have as a purpose."[9]   Each of these terms constructing § 1681k(a)(2) assume a status and process in place before a specific report or record is actually furnished.   To "maintain" procedures is to have them in an existing state at the time the report is furnished.   Procedures that are "designed" are ones that have been planned and created, as opposed to applied or followed idiosyncratically and contemporaneously.   And procedures would "insure" completeness of records if the CRA has taken necessary <u>precautions</u>, another confirmation of § 1681k(a)(2) assumes pre-report determination of the section's applicability, as "precaution" is "a measure taken beforehand to prevent harm or secure good."[10]

Both alternatives - § 1681k(a)(1)'s obligation to provide the consumer notice "at the time" the report is furnished to the user, and § 1681k(a)(2)'s command that the CRA have "designed" strict procedures to insure that the CRA does not report incomplete or out of date records – presume pre-report compliance conduct.   The section is preventative, not reactive.   Either the CRA has designed such strict procedures before it furnishes the report or it must provide the notice at the time it does so.[11],[12]

---

[7] http://www.merriam-webster.com/dictionary/maintain last viewed January 2, 1014.

[8] http://www.merriam-webster.com/dictionary/insure last visited March 8, 2014.

[9] http://www.merriam-webster.com/dictionary/design last viewed January 2, 1014.

[10] http://www.merriam-webster.com/dictionary/precaution?show=0&t=1394478456 last visited March 8, 2014.

[11] This language contrasts with the "accuracy" and "reasonable procedures" section of the FCRA, § 1681e(b).   That provision expressly requires a standard of contemporaneous conduct in the manner a specific consumer report is created.   15 U.S.C. § 1681e(b) ("Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.")   There is not a requirement that the CRA routinely or systematically, or even preventively follow a reasonable procedure.   Instead, the CRA only violates the § 1681e(b) provision if it fails to follow such procedure <u>for that specific</u> consumer report

[12] NBD cites various § 1681e(b) cases at different points in its brief.   For reasons already stated herein as well as in Plaintiffs' opposition to Defendant's Motion for Summary Judgment, these cases are inapplicable.

Contrary to Defendant's reading, §§ 1681k(a)(1) and (2)'s language is squarely and specifically directed toward regulating what procedures and/or actions a CRA had in place at a point in time prior to issuing reports containing public records, and necessarily means that any violation of the statute occurs *prior to receipt* by the user.   Thus, if a CRA furnishes public record information for employment purposes without such a procedure in place, it violates the FCRA at that exact point in time, regardless of what happens after or in connection with the sale of the report. Since any violation of FCRA section 1681k(a)(2) necessarily occurs prior to the sale of any report, liability cannot be and is not dependent upon what, if anything the recipient of that information did with it. As long as the CRA at issue falls within the initial coverage paragraph of section 1681k(a), its mere failure to have such a policy in place will violate the FCRA (unless of course it elects to send notice to consumers).

Defendant's reading also make no sense for another reason.  If Defendant's interpretation were true, CRAs with the potential to be governed by the section would have to await a *post hac* review to determine if the subject notice was required or if strict procedures needed to have been designed.  The CRA could never know whether or not § 1681k(a) even applied to it until after it would have completed the conduct that could have violated the FCRA, a law with serious penalties, both private and regulatory.  From both a semantic and practical perspective, the "public record information likely to have an adverse effect" qualifier must refer to a certain, objective type or category of public record that is both discernible and knowable by the CRA <u>before it furnishes</u> the data.  The nature and type of public record data covered by section 1681k(a) cannot depend upon how it was used or interpreted subsequent to delivery by the CRA.  Otherwise, the CRA would have no way of knowing whether it was complying with the law.  The statute would be unconstitutional on void for vagueness grounds (which no court has ever found and defendant has never argued).  A constitutionally valid statute gives actors covered by the statute reasonable notice of proscribed

conduct. *Schliefer by Schliefer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 2010). Such statutes provide adequate advance notice of what constitutes permissible behavior. *Id.* (suggesting that a valid statute provides "prior warning" that conduct is prohibited). The boundaries of permissible conduct set out in a valid statute ***do not require reference to later actions by a third party***. *City of Chicago v. Morales*, 527 U.S. 41, 58-59 (1999)(emphasis added). As such, the "likely to have" qualifying language is presumed to communicate to covered CRAs a specific and knowable type of data (e.g. criminal records) so that CRAs can comply before reporting it to a third party. If Defendant's argument were correct, and liability under § 1681k depended upon how the recipient of the public record information responded to or used the data, a CRA could never assure compliance because it would never know until after the fact whether the information it reported was of the type contemplated by the statute.

Contrary to Defendant's multiple iterations of the same argument, how a particular recipient of the criminal public record sold by Defendant choose to interpret or respond to it - whether it denied the job, made the applicant submit more documentation, or disregarded it altogether - does not change whether the public record information initially reported was of the nature or type that was "likely to have an adverse effect" on a hypothetical consumer's employment. As set forth in Plaintiffs' memoranda at Doc. Nos. 70, 92, criminal records are always adverse to a job applicant.

Consistent with the a prior interpretation espoused by the Plaintiffs, and inconsistent with the *post hoc* idiosyncratic interpretation hoped for by Defendant, judicial and governing FTC authority has uniformly interpreted "likely to have an adverse effect" describes a category and type of public record – such as the criminal records NBD sells. Nearly everyone interpreting this section - including the Defendant - has reached this same conclusion. The FTC has taken that position, explaining, "a criminal history that indicates that the consumer has been convicted would be adverse to the consumer's ability to obtain employment, and would be covered by Section 613 [§1681k]."

Letter of Helen Foster to John Allan (May 5, 1999), FTC Informal Staff Letter, 1999 WL 33932149 (F.T.C.) at 1;[13] *Id.* ("If the type of public record information being compiled and reported to employers by screening services is of a variety that is likely to adversely impact the consumer's ability to obtain employment, the screen[ing] service must" comply with §1681k(a).).

Defendant also misstates the statutory text by suggesting that it requires that the subject public record actually cause an adverse employment action.   The phrase "likely to have an adverse effect" is differently stated than and can be contrasted with other FCRA provisions that require that the adverse public record actually be "used in whole or in part" in making the adverse decision. *See e.g.* 15 U.S.C. §§1681b(b)(3); 1681m(a).   An "adverse" effect is simply one that would be "unfavorable" or "in a contrary direction."[14]   "The FCRA does not define adverse public record information, but the Act does mention certain types of information that, by implication, meet this standard:  'items of public records relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments.'"  *Fair Credit Reporting*, 8th Ed., National Consumer Law Center, 2013. NBD also shares this same interpretation of the "likely to have adverse effect" term, explaining to its reseller clients, "Specifically, this section of the FCRA addresses background screenings conducted which contain information 'which are matters of public information and are likely to have an adverse effect upon a consumer's ability to obtain employment'. The FCRA requires this letter to be sent at the time any information which may be considered adverse is reported."  (Pls' Mem., Ex. L, NBD E-Mail to Resellers Regarding §1681k(a)(1) Notices, September 21, 2007, CL-H2740-2741) (Emphasis added).

---

[13] *Williams v. Telespectrum, Inc.*, CIV.A.3:05CV853, 2007 WL 6787411 (E.D. Va. June 1, 2007) ("The FTC provides informal staff opinion letters guiding interpretation of the FCRA. Congress has granted the FTC the authority to prescribe trade regulations and other rules in regulation of the FCRA. Pub.L. No. 106–102 (codified in relevant part at 15 U.S.C. §§ 6801–6809 and §§ 6821–6827)."

[14]  http://www.merriam-webster.com/dictionary/adverse last viewed on February 7, 2014.

NBD's challenges to class certification fail at the foundation level.  There is little left to address regarding Defendant's purported "Obstacles to Class Certification," nos. 2-9.

III.    **VERY FEW MATERIAL FACTS ARE DISPUTED**

Plaintiffs do not repeat all that has been established in their opening brief (Pls' Mem. Supp. Class Cert.)(Doc. 72) or in their opposition to Defendant's Motion for Summary Judgment (Pls' Opp'n both of which are adopted in this Reply.   However, it is appropriate to make two observations.   First, notwithstanding the "rigorous burden" that must be met to support class certification, this is not a summary judgment motion governed by Local Civil Rule 56 ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.")[15]

Second, while certain facts are properly determined at this posture, the Court would consider them only for the purpose of deciding whether a class would be properly certified.   A Rule 23 motion is not the proper posture to litigate the merits of a case.   The Court should "inquire no further into the merits than is necessary to determine the likely contours of this action should it proceed on a representative basis." *Fisher v. Virginia Elec. & Power Co.*, 217 F.R.D. 201, 211 (E.D. Va. 2003). The merits of plaintiffs' claims are not a relevant consideration at the certification stage. *Thorn v. Jefferson-Pilot Life Ins. Co.,* 445 F.3d 311, 319 (4th Cir. 2006); *Harris v. Rainey*, Civ. No. 5:13CV077, 2014 WL 352188 (W.D. Va. Jan. 31, 2014) ("The likelihood of the plaintiffs' success on the merits ... is not relevant to the issue of whether certification is proper.").

The most remarkable aspect of Defendant's proffered "facts" is how little NBD has to say regarding Plaintiffs' own briefing and the exhibits, declarations and proof of facts therein. Largely ignoring the facts alleged and established in Plaintiffs' opening memorandum, NBD offers its

---

[15] Plaintiffs have not structured this Reply to affirmatively engage NBD with all of its itemized paragraphs of "facts," most of which are immaterial.  Nearly all of the "facts" recited by NBD have already been addressed in the opening brief.  The remaining "facts" are addressed herein or at the appropriate place as applied in argument.

alternate "factual" reality in support of its opposition arguments.   Contrary to its NBD's continued attempts at misdirection, Plaintiffs note again that NBD does not obtain <u>any</u> of its criminal records from governmental sources.   Instead, it buys them all from third party SafeRent.   Similarly, it does not itself or by its agent verify or update any records.   Not a day before furnishing a report, or a month, year or decade.   NBD resells exactly what SafeRent provides it.   (Pls' Mem. Support Class Cert. at 5)(Doc. 72.)   Defendant's defense really ends there.   Its suggestion that SafeRent follows certain verification procedures or that SafeRent updates its data periodically has nothing to do with NBD's own obligations to comply with § 1681k(a).   At no time and in no place in this litigation has NBD even tried to explain how the possibility that SafeRent itself follows certain procedures can immunize NBD indirectly from its own FCRA duties.   Plaintiffs can conceive of different ways that NBD may have argued such indirect compliance, and if these had been argued Plaintiffs would have responded.   But that of course is Defendant's duty, not Plaintiffs.   The pending argument on this motion and on summary judgment is a theoretical one that could occur if and when Plaintiffs' bring an action against SafeRent.   But the motions and defenses otherwise have no value to NBD in this case.

NBD concedes that it cannot defend this motion by a claim that any of its reseller customers, or itself, ever provided a notice for NBD as otherwise required by § 1681k(a)(1). (Pls' Mem. Supp. Class Cert. at 7-8.)

NBD also concedes in its opposition brief Plaintiffs' facts and argument that the reports it furnishes are "consumer reports" regarding particular consumers: that its many contracts, procedures, training manuals and other internal documents explain and acknowledge this reality, one that was not manufactured just for this litigation. (Pls' Mem. Supp. Class Cert. at 7-8.) And NBD cannot and does not contest that the Parties have stipulated for this litigation that the identity of the class members about whom the reports were furnished is objectively available from the

reseller entities ADP, Verifications and HR Plus in the event this class is certified. (Pls' Mem. Supp. Class Cert. at 7-8; Disc. Report, Stip. & Order ¶ 3, Doc. 56.) NBD also does not dispute the McGladrey testimony that class members and their addresses could be easily identified from the information currently available. (Pls' Mem. Supp. Class Cert. at 10-11.)

Defendant makes two general and unexplained claims that dispute facts established in Plaintiffs' memorandum. First, NBD asserts: "NBD is not informed of the *specific* "employment purpose" behind the request, such as whether the background screening is for the purpose of evaluating a *prospective* employee, or for an employment purpose for a *current* employee, such as retention, promotion, evaluation, licensure, etc. Ex. B at ¶ 12; Ex. C at ¶ 22." (Def.'s Mem. Opp'n at 15)(Doc. 91). In support of this assertion, Defendant carefully wordsmiths two general paragraphs in its clients' declarations, which though from two different employees, are almost verbatim. The paragraphs offered in the declarations – one from NBD and one from SafeRent – carefully parse:

> 12. NBD requires that its customers certify that they have a permissible purpose for seeking criminal record information, which can include an "employment purpose." However, NBD is not informed of the specific "employment purpose" behind the request, such as whether the background screening is for the purpose of evaluating a prospective employee, or rather for an employment purpose relative to a current employee (e.g., retention, promotion, evaluation, licensure, etc.). (Decl. of Linda Watts ¶12, attached as Ex. B to Def.'s Mem. Opp'n.)
>
> 22. NBD requires that its customers certify that they have an "employment purpose" for seeking criminal record information. However, NBD is not informed of the specific employment purpose behind the request, such as whether the background screening is for the purpose of evaluating a prospective employee, or rather for an employment purpose relative to a current employee (e.g., retention, promotion, evaluation, licensure, etc.). (Decl. of J. Davidson ¶ 22, attached as Ex. C to Def.'s Mem. Opp'n.)

First, these (obviously attorney-written) statements are objectively false, which is why NBD does not try to address the documents and details provided in Plaintiffs' Memorandum in Support of Class Certification. (Pls' Mem. at 9-12; Exs. 9, 10). The only report type at issue in the present

14

motion and case is NBD's "COPS" report type.   NBD sells its "COPS" product for "pre-employment" purposes, and its "CrimWatch" product for the retention and promotion purposes. (Pls' Mem. at 9-12; Exs. 9, 10).   The "Results Returned" database[16] identifies whether the "6" code was provided as the user's permissible purpose. (Pls' Mem. at 9-12; Ex. 8). Defendant's carefully worded declarations and brief text are designed to be technically true, even if misleading. Defendant's text and declarations do not technically conflict with the evidence Plaintiffs offered. NBD does sell some products to some users for other employment purposes.   But, it just does not sell the "COPS" reports at issue in this case to the resellers relevant to this motion (ADP, Verifications and HR Plus) for any purpose other than "pre-employment."   NBD does not claim otherwise because it would not be truthful.[17]   NBD's own internal procedure manuals also confirm that the "6" code recorded in the "results returned" database for each furnished consumer report is limited to "pre-employment screening." The "results returned" database evidence offered in Plaintiffs' opening memorandum confirms that 100% of the ADP, Verifications and HR Plus reports were sold for that pre-employment purpose.

In its opposition "facts," Defendant disputes the Plaintiffs' proof that NBD uniformly omits the SSN field from the public records it includes in its furnished reports.   (Def.'s Mem. Opp'n at 8, ¶ 23).   Defendant claims: "When NBD's customers submit a search query using any of NBD's search "logics," NBD returns all records from the Multistate Database responsive to that specific search query, along with any SSNs that are included within the responsive record(s).  Ex. C at ¶ 37." (Def.'s Mem. Opp'n at 8, ¶ 23).  The "testimony" it offers to support this claim is paragraph 37

_____

[16] Nearly all of Defendant's "evidence" or information is offered regarding the separate and largely irrelevant "Multistate" database.  The multistate database contains every conceivable piece of information gathered from SafeRent and others whether ever to be used or not.  The "Results Returned" database contains the user searches, and the records and reports actually made and furnished.

[17] If a party fails to produce evidence that is under that party's control and reasonably available to that party and not reasonably available to the adverse party, then you may infer that the evidence is unfavorable to the party who could have produced it and did not. 3 Fed. Jury Prac. & Instr. § 104.26 (5th ed.), 3 Fed. Jury Prac. & Instr. § 104.26 (5th ed.)

of the Davidson Declaration.  Mr. Davidson of course does not work for NBD.  Instead, he works for SafeRent and actually handles the "multistate" database, which is used to maintain SafeRent's underlying original records before they are furnished to NBD and then its reseller customers. (Davidson Decl. ¶¶ 1, 6-10, 13-16.)  The supporting paragraph Defendant cites in its brief states: "37. When NBD's customers submit a search query using any of NBD's search "logics," NBD always returns all records from the Multistate Database responsive to that specific search query, along with any Social Security numbers included within the responsive record(s)."   (Davidson Decl. ¶ 37).  Further, in ¶ 39, SafeRent's employee claims, "39.  If the Multistate Database contains a record is associated with a Social Security number, a populated value appears in a designated field- labeled "SSN" - for the results that are returned to NBD's customer."  (Davidson Decl. ¶ 39).

However, while SafeRent is correct that there is such a SSN field in the "results returned" database, that database is only NBD's internal system.  There is zero support for the Davidson ¶ 39 claim that there <u>ever</u> exists a SSN field in the reports actually furnished to resellers and end-users. In fact, the Plaintiffs have already provided the internal full file format used by Defendant.  (Pls' Mem., Exs. 20, 23).   And Plaintiffs have received and reviewed the report formats actually furnished to the resellers regarding Henderson and Hines.  Plaintiffs have received in discovery the set of public records produced by NBD, with a separate column for each field within each record. (Pls' Mem. Exs. 9, 10).  None of these templates, reports or columns even contain a field within the respective public records to reveal and report a SSN.[18]  One explanation could be that NBD is again playing lawyerly with its words.  Sure, NBD sells a report that can contain such a field, but just not the "COPS" report product at issue in this case.   Maybe it includes such a field in its "CrimWatch"

---

[18] Plaintiffs repeat the same point earlier made – the Defendant's failure to produce any document to evidence that there is ever such a field in the NBD actually furnishes must be construed against NBD.  If there were such a document, it would have been very easy to produce it amongst the "more than 100,000 pages" NBD boasts at having produced.  In fact, not even a template or similar generic form containing such a field has ever been disclosed or produced.

reports or something sold to resellers for other purposes.  But 100% of the reports produced by NBD and reviewed by Plaintiffs and their counsel in this case do not have such a field.  The fact that Defendant spends such minimal effort and space in its brief dealing with this really critical issue says quite a bit.  NBD cannot fire its weapon if there is no ammunition available to fire.

As Plaintiffs point out in their opening memorandum, NBD's omission of the SSN field is not reasonably explained as occurring merely because a particular record does not have a SSN value.  (Pls' Mem. at 14-15.)   When various other values are missing from a NBD public record, the Defendant still includes the respective field, such as Sex, DOB, Race, Hair Color, Eye Color, Height, Weight, Alias, etc.  (Pls' Mem., Exs. 20, 23). Defendant's report format does not even contain a place in the records sections to add a, SSN field. (Pls' Mem., Exs. 20, 23).   Visually, there is no space or place to put a SSN field.

Regardless, even if Defendant's misdirection were somehow correct such that there could be a field in some records and some reports that included a SSN, this would not be material to this case and putative class.   The failure to reveal to the reseller the lack of a SSN itself renders the reporting of the record incomplete.   The class defined in the pending motion is one in which the NBD "COPS" reports include records that do not disclose a SSN.   Plaintiffs' allegation on the merits, though not properly addressed as a Rule 23 issue, is that Defendant's failure to disclose in the reports it furnishes that such records do not include a SSN is itself the furnishing of an incomplete public record.   Defendant's witness remarkably concedes, "[I]f no Social Security number is associated with any of the records that are responsive to the customer's query, as occurred with respect to the search queries challenged by Plaintiffs, no 'SSN' field will be present on the results returned."  (Def.'s Mem. Opp'n, Ex. C at ¶ 39).

Beyond these factual exchanges, there is little in Defendant's motion that poses a material factual controversy.  Of course NBD sells records from different courts.  And of course different

states have different disposition or sentencing categories.   Shoplifting may be a felony at $500 in one state, or $200 in another.   Some states may have a first offender drug disposition, while others do not.   As meaningfully, some states begin with the letter "V" and others something else.   But these differences are irrelevant to the issues presented in this case.   This is not *Souter*.   As explained in Plaintiff's opening brief and uncontested in NBD's response, Defendant has expressly admitted that its FCRA procedures remained uniform during the class period.   And neither party disagrees that SSNs are rarely included in the automated batch transmissions from the court clerks to SafeRent.   (Pls' Mem. at 13; Def.'s Mem. Opp'n at 8, ¶ 21).   Regardless of how "non-uniform" NBD reports types of criminal convictions, sentences or dispositions, it does not and cannot deny that it treats the SSN field or omission of such a field associated with a criminal record any differently in one record or one report, or one employer, or one job or by any other differentiation. The component of Defendant's reporting that is material to the pending motion is entirely uniform.

However, NBD does add a new and important fact that supports Plaintiffs' motion. Plaintiffs argue that the SSN is a necessary component of a criminal public record in order to confidently match a record to a particular consumer.   Surprisingly, Defendant offers and argues further support for this point in its note 4.   Providing just the last 4 digits of a SSN would render this component of the record complete because, "The last four digits of a SSN alone provide a 9,999 to 1 chance of a correct match." (Def.'s Mem. Opp'n at 8, n.4, citations omitted).   A criminal record that is reported without at least the last 4 SSN digits is certainly incomplete, omitting this necessary match component.

## IV.   DR. KEELEY'S TESTIMONY IS UNHELPFUL

NBD has attached a declaration from a man employed by the professional witness company, Cornerstone Research.   It paid well over $300,000 to buy that declaration.   But it bought the declaration as one signed by a person who is more unqualified to render the purported opinion than

nearly any supposed expert this Court may have considered.  He has no background in consumer reporting or background checks.  He believes that you can manufacture expert skill and credentials by doing internet research about the FCRA and background check industry after being retained to create the expert declaration itself.  Keeley had not even read a consumer report until this case and could name only the NBD, ADP and Verifications as actual CRAs doing business in the nation.   In fact, he cited as a foundation for his background check expertise the fact that Cornerstone had used his own background check in determining whether he should be hired.  Keeley also never knew of, let alone reviewed the "results returned" database at issue in this case.  He never visited NBD or SafeRent.  He meaningfully spoke to only one of its employees, and did so less than 3 times after a basic introduction call.   That is not to say that no one spoke to or met with NBD.  In fact, the two Ph.D. authors of "Keeley's" report worked with the NBD and SafeRent facility, gathered factual background and information.  These more primary Cornerstone opinion writers are the ones that actually found, read and integrated the numerous internet documents from which the Keeley report was manufactured.  They wrote the report.  And certainly they billed NBD substantially more for Keeley's report than did its figurehead author.

Keeley's declaration is also simply an effort by his client, NBD, to place an "expert" sheen on Defendant's legal arguments, a type of expertise (legal) that he lacks and which he could not offer the Court regardless.

But all of these points are better left, and already separately detailed in Plaintiffs' Objection and Motion to Exclude filed contemporaneously with this Reply.  For the present motion, nothing Keeley offers is material to class certification.  The "expert" arguments actually offered and used by NBD in its opposition are the same addressed above that assume an erroneous idiosyncratic interpretation of the § 1681k(a) preface.  *Supra* at § II.  Keeley simply repeats the NBD sidetracks regarding supposed individualized questions as to (a.) whether a consumer report was for the

purpose of obtaining employment; (b.) what criminal history criteria an employer uses to evaluate

an application; and (c.) whether a consumer was actually denied a job because of an NBD report.

(Def.'s Mem. Opp'n at 32-33).   These are not elements of a § 1681k(a) claim and are not relevant to

any Rule 23 threshold.

## V.   NBD'S "INDIVIDUALIZED ISSUES" ARE IMMATERIAL TO THE CLASS DEFINITION OR § 1681k(a) CLAIM

As addressed above, most of Defendant's arguments are founded upon an incorrect and

impossible construction of § 1681k(a)'s statutory text.   NBD asserts the same set of arguments in

two sections of its brief and claims some bearing on multiple Rule 23 elements.   Plaintiffs address

at this point these general arguments from both sections of the response.

### A.   Plaintiffs' claim does not depend on the availability to NBD of the SSN in a court record.

NBD opens its brief with the odd statement that, "Plaintiffs' refashioned case rests

everything on convincing the Court that NBD deliberately 'suppresses' Social Security numbers

("SSNs") from criminal records it sells."   (Def.'s Mem. Opp'n at 1).   And, of course, this is untrue.

In fact, NBD's violation of the FCRA has nothing to do with an allegation that it <u>deliberately</u>

<u>suppresses</u> SSNs.   Instead, Plaintiffs' claim is very simple – Section § 1681k(a)(2) cannot apply to

the records NBD furnishes and Defendant fails to provide the mandatory § 1681k(a)(1) notice to

consumers "at the time it furnishes" its criminal record reports.   Because the records NBD reports

(a.) do not include the SSN field, and/or (b.) do not contain a SSN value, they are by definition not

complete public records when reported by NBD.   Furnishing such incomplete records is of course

not unlawful.   Many public records, particularly these days, are incomplete.   Court's do not reveal

the SSN, truncated or otherwise, in automated batch deliveries.   And of course these incomplete

records can still be included in a background check.   However, a CRA doing so simply needs to

provide the short notice mandated by § 1681k(a)(1).   Because automated batch criminal records

today rarely include a SSN, these types of reports do not fit under § 1681k(a)(2).

NBD argues that that Plaintiffs' class definition requires a determination whether an SSN is delivered by the court or state source to SafeRent and then NBD without a SSN.  NBD suggests, "To avoid an overbroad class definition, a class definition based on the failure to report SSNs would have to be amended to require the existence of a SSN in the public record that was then not reported by NBD." (Def.'s Mem. Opp'n at 15).  Defendant makes a similar argument as to ascertainability. (Def.'s Mem. Opp'n at 20-21). Their argument is solely a merits issue with no relevance to class certification.  <u>Plaintiffs' proposed class would consist of only those consumers who were subject to NBD's background checks containing these adverse criminal records that Defendant's "results returned" database confirms were reported by NBD without a SSN.</u>  This is a liability and merits issue and not one as to ascertainability, typicality or class overbreadth.  The class can be objectively determined from NBD's own database, and Plaintiffs' supporting declarations from McGladrey confirm this uncontested fact.

Instead, what NBD is really arguing is that under the FCRA, § 1681k(a)(2), its criminal records are "complete" so long as NBD faithfully reports exactly what the original state or court source electronically made available to it.   Put another way, NBD incorrectly believes that § 1681k(a)(2)'s requirement that procedures be in place to insure that it only reports complete public records means the same thing as if the statute stated that a CRA's procedures must insure that it reported completely the publicly available records; that the adjective "complete" modifying "public record information" is really an adverb modifying "is reported."  15 U.S.C. § 1681k(a)(2).  The statutory text assumes that it is possible to report complete public records as well as incomplete public records.  If all public records were themselves by definition complete, the use of the modifier would be redundant. This textual assumption is in fact the case.  Almost every agreement provided by a court source and governing NBD (SafeRent actually) advises NBD that the public records provided in the batch delivery are not complete.   (*See* Pls' Mem. in Opp'n to Def.'s Motion Summ.

J. at 26-28 & exhibits).   All of NBD's contracts confirm it internally has actual knowledge or at least a belief that the subject criminal records are not complete and do not comply with § 1681k(a)(2). (*See* Pls' Mem. in Opp'n to Def.'s Motion Summ. J. at 26-28.)  The FTC has agreed.

NBD argues that a "public record" consists of only that information a court-source will sell to SafeRent.   It cites two inapplicable federal decisions that use the words "public record" in a different and wholly inapplicable context.   Defendant argues that the term "public record" is more correctly ignored as a phrase and considered by its separate parts, "public" and "record" in a way to mean "publically available" records.   In support for its position, NBD defines the word "public", which it points out means "accessible or visible to all members of the community." (Def.'s Mem. Opp'n at 21).   Based on NBD's interpretation, nearly anything can be a "record," defined as "the state or fact of being recorded"; [19] an obituary, an Internet posting.   This, of course, is not an accurate interpretation or definition.

A more reasoned, and correct, definition is of a record that is recorded with a public – governmental – institution such as an agency.   Plaintiff has detailed some examples of "adverse public records" above in accordance with use of the term by the FTC and others.   *Supra* at § II.   But the term "public record" is not one that is difficult to research.   The Federal Rules of Evidence also define the term to mean "an official record [or] a document that was recorded or filed in a public office as authorized by law" and "A record or statement of a public office[.]"  Fed. R. Evid. 1005, 803(8).   So does Black's Law Dictionary: "A register of the legal transactions, proceeding, rules and statutes, laws and regulations that is kept on file to be able to be referred to if needed."[20]

Uniformly, the phrase "public record" describes a type of record – one filed with a public agency.   For example, Virginia defines the term to mean:

---

[19] http://www.merriam-webster.com/dictionary/record last viewed March 8, 2014.
[20] http://thelawdictionary.org/public-record/ last visited March 8, 2014.

[A]ll writings and recordings that consist of letters, words or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostatting, photography, magnetic impulse, optical or magneto-optical form, mechanical or electronic recording or other form of data compilation, however stored, and regardless of physical form or characteristics, prepared or owned by, or in the possession of a public body or its officers, employees or agents in the transaction of public business. Records that are not prepared for or used in the transaction of public business are not public records.

Va. Code Ann. § 2.2-3701.   California defines it, "[A]ny writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics."  Cal. Gov't Code § 6252.  Florida and Indiana have similar provisions.  Fla. Stat. Ann. § 119.011 (West); Ind. Code Ann. § 5-14-3-2 (West).[21]

Ordinary use of the phrase "public record" in the context of restrictions placed on dissemination of all or part of the record also confirm that the phrase means where it is created or maintained (public) rather than simply a record that is fully and entirely open to all members of the public.   For example, the Florida statute that defines "public record" also provides redacted information is still part of a public record. Fla. Stat. Ann. § 119.011. The Iowa statute provides, "The following public records shall be kept confidential, unless otherwise ordered by a court, by the lawful custodian of the records, or by another person duly authorized to release such information [… includes SSN in some records]."  Iowa Code Ann. § 22.7 (West).  In fact, a "public record" may be entirely confidential and restricted against public access.  Nev. Rev. Stat. Ann. § 378.300 (West); Tenn. Code Ann. § 10-7-508 (West); Ind. Code Ann. § 5-14-3-6.5 (West); Or. Rev. Stat. Ann. § 192.502 (West).

In fact, even the state laws that permit the electronic delivery of public records to SafeRent and others (as in this case) often prohibit the disclosure to SafeRent of "confidential public records."   *See e.g*. Ind. Code Ann. § 5-14-3-3.5 (West) ("(d) A contract required by this section

---

[21] Plaintiffs cite these statutes because they came up first within counsel's Westlaw search pages. They were not cherry-picked.

must provide that the person and the third party will not engage in the following:   […] (3) Disclosure of confidential public records.").

Plainly here, the Virginia statute ends this discussion, providing, "Except as otherwise provided in this chapter, the first five digits of a social security number contained in a public record shall be confidential and exempt from disclosure under the Freedom of Information Act (§ 2.2-3700 et seq.)."   Va. Code Ann. § 2.2-3815 (West).   The SSNs that courts such as Virginia's do not disclose to SafeRent and NBD are still part of a "public record."

Beyond these facts, even if NBD could somehow win the argument that when a SSN is excluded from a record delivered by a court to SafeRent/NBD, it cannot win that its <u>omission of whether or not a SSN was provided with the record</u> also renders the public record information incomplete.   Defendant never discloses to its reseller users that it does not have an associated SSN with the record information.   NBD's does not make a single argument in opposition to this fact and liability argument.

Thus Plaintiffs' explanation of the case remains in tact.   Section § 1681k(a)(2) can only apply to a CRA that has procedures designed to insure that the public records it sells are complete – that they have all of their "necessary" components.   NBD has offered throughout this litigation and even in footnote 4 to its opposition brief that at least a truncated SSN is necessary to allow for matching certainty of a public record to a specific consumer.   Because NBD does not receive this confidential or redacted part of the public records it obtains, it cannot insure that each record it furnishes is a complete public record.   And every member of the class pled in Plaintiffs' motion was the subject of a NBD report that included these incomplete public records.   All of these elements can be determined by an easy sort and search of NBD's "results returned" database.   Because NBD can never comply with § 1681k(a)(2), it is inapplicable to its criminal records ("COPS") reports and

to this case.   Since NBD refused to provide the required § 1681k(a)(1) notice to 100% of the putative class, certification should be an obvious decision.

**B.     Plaintiffs' claim does not depend on an individual determination of whether a report was furnished for the purpose of "obtaining" employment or likely to adversely effect a particular class member's job application.**

Plaintiffs have addressed this argument[22] in multiple ways at length above.  *Supra* at § II. Section 1681k(a)(2) does not apply to NBD's sale of uniformly incomplete public records information.  The only purpose for which ADP, Verifications and HR Plus reports are requested and used is for "pre-employment" – obtaining a new job.  *Supra* at § III.  And the word "obtain" is used in the context of a phrase that describes an *a priori* category of public record information, rather than an individual *post hoc* determination.  *Supra* at § II.

The same is true for Defendant's alternate wording of the position, its claim that each class member would need to prove that the specific records information NBD furnished would likely effect their own personal job application.   Plaintiffs have addressed this trigger and text at length above, *supra* at § II, as well as in their opening memorandum and opposition to Summary Judgment.  Records that are "likely to have an adverse effect" include all of the criminal records that NBD sells.  All of these are adverse "hits."   None are favorable.   And each is as described by the FTC and even this Defendant as constituting the "likely to have adverse effect" trigger.  This is true whether a specific criminal conviction would disqualify a specific consumer for a specific job with a specific employer.

Defendant suggests that the sex offender and felony drug conviction records it furnished regarding Hines and Henderson, respectively, were not the types of records that were likely to have an adverse effect on a consumer's employment.  This position is so incredible and contrary to the

---

[22] Plaintiffs consider Defendants' arguments as NBD has structured them in its brief at *Argument* §§ I.B., I.C., II.B., and II.C.

statutory text, FTC opinion, and maybe as importantly, basic reason. (While immaterial, Plaintiffs' note that neither Hines nor Henderson were hired after NBD's furnishing of false criminal records.)

### C.    Section 1681k(a) applies whether or not NBD's report was furnished to an End-User.

NBD also asserts a number of argumentative variations on the same theme: because the Plaintiffs cannot establish on a classwide basis that the NBD reports of class members were actually "used" to make an employment decision, a class cannot be certified. (Def.'s Mem. Opp'n at §§ I.D., II.C.1., II.D., and IV.)  This was also addressed above. *Supra* § II.  Further, Plaintiffs' argument is detailed more fully in their Summary Judgment argument. (Pls' Mem. Opp'n. Summ. J. at 15-17)(Doc. 92.) NBD's argument is founded on its erroneous assumption that determining whether § 1681k(a) applies to it will require a *post hoc* consideration of whether the consumer's report was actually "used."

NBD's argument is difficult to understand if taken in the context of the actual statutory text. First, it contends, "A claim under § 1681k(a)(1) only exists, however, where the information at issue was transmitted to a "user" of that information." (Def. Mem. at 18).  But of course is Defendant's interpretation of § 1681k(a)(1) were correct – that it would apply only when the report the CRA was furnishing went to a user who would make the actual employment decision, then this section would not apply to NBD.   But neither the preface or § 1681k(a)(2) are conditioned upon "use" or furnishing the report to a "user."  So if NBD were correct, then it could never sell the incomplete criminal records in its reports.  This would be so because – by its account – it does not provide reports to "users" and this § 1681k(a)(1) cannot be used, and as established above, its incomplete records do not satisfy § 1681k(a)(2).  This argument – "use" and "user" - is meaningless to this debate.   If NBD is correct, the case continues to rise and fall on the question of whether its inability to report complete criminal records violates the statute.

Defendant's defense to the certification motion is also predicated on its argument that a Reseller cannot be a "user" in the context of § 1681k(a)(1).   But no authority has ever found as NBD demands – that this provision cannot apply to the furnishing of the report to a reseller.   This is not a controversial point.   Section 1681k(a)(1) requires a governed CRA to "notify the consumer of the fact that public record information is being reported by the consumer reporting agency reporting agency" and to do so "at the time such public record information is reported to the user of such consumer report[.]" The CRA must also disclose "the name and address of the person to whom such information is being reported."   In the case of a Reseller the FTC has already explained this process. In a well-publicized consent decree filed in *F.T.C. v. TRW Inc.*, 784 F. Supp. 361, 364 (N.D. Tex. 1991), the agency detailed TRW's required compliance.   TRW's employment reports were nearly always furnished to a Reseller "subscriber", just as NBD today.   The FTC instructed that whenever TRW (predecessor to Experian) provided a "consumer report for employment purposes,"

> and such Consumer Report contains public record information that is likely to have an adverse effect upon a Consumer's ability to obtain employment, either;
> a. Maintain strict procedures designed to insure that public record information that is likely to have an adverse effect on a Consumer's ability to obtain employment is complete and up-to-date as provided in § 613(2) of the FCRA; or
> **b. At the time such public record information is reported to the Subscriber, notify the Consumer of the Subscriber's name and address and that:**
> **i. Such public record information was included in the Consumer Report that was provided to the Subscriber;**
> **ii. The Subscriber intended to resell the Consumer Report for Employment Purposes to another Person;** and
> iii. The Consumer may contact the Subscriber to learn the name and address of the Person to whom the Subscriber resold such Consumer Report for Employment Purposes[.]

*Id*.   A FTC position taken as an enforcement action and consent decree is a decision of the Commission and a persuasive statement of the FTC view of the law.

Defendant needs to ignore the plain language of § 1681k(a)(1) in order to make its argument, disregard the ordinary meaning of the word "user," and instead must explain that its argument that Verifications is not a "user" of the information is based on a proposition that

Congress actually used the word "user" to mean no more than the "end user (i.e., prospective employer)" and to exclude all other users. This blatant modification of the statutory language is especially egregious because Congress actually employed the term "end-user" or "end user" several different times in the FCRA but not in § 1681k as Defendants would have preferred. *See* § 1681e(e)(1)(A), § 1681e(e)(1)(B), § 1681e(e)(2)(A)(i), § 1681e(3), § 1681e(3)(A), § 1681g(a)(3)(A), and § 1681g(a)(3)(C)(i). Congress's differentiation between the terms "user" and "end user" within the statute thus negates the basis for Defendants' argument. *Soliman v. Gonzales*, 419 F.3d 276, 283 (4th Cir. 2005) ("where Congress includes particular language in one section of a statute but omits it in another provision of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion")(quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987)).

Defendant's construct of limiting the term "user" to only the "end user" is therefore contrary to the plain language of the FCRA and is an admission that for Defendant to prevail the word "user" in § 1681k must denote something other than its ordinary meaning.

The question is not whether ADP or Verifications themselves are to make the employment use, but rather whether they obtained the reports for an "employment purpose." NBD reads into this a requirement not in the statute that the recipient must be the entity rendering the employment decision. To the extent that ADP and Verifications (and NBD for that matter) are resellers, the "permissible purpose" and "use" of the report travels and extends from reseller through to the originating CRA. Thus, in Henderson's instance, Verifications as a reseller had a permissible purpose to obtain the consumer report – an employment purpose. It requested the report from NBD, which then had the same permissible purpose – an employment purpose – for which to obtain the report from SafeRent. And SafeRent then had the same permissible purpose to furnish the

report to NBD.    All three CRAs thus complied with the permissible purpose requirements at 15 U.S.C. § 1681b.

Section 1681k(a)'s actual use of the phrase "employment purpose" is also in a context different than NBD's interpretation suggests.    The relevant text actually reads, "A consumer reporting agency which furnishes a consumer report for employment purposes[...]"    15 U.S.C. §1681k(a).   There is no specific recipient mandated or even implied in this clause.    The CRA's relationship to the person that will make the actual employment use is not restricted.    Instead, the key part of this provision is the purpose for which NBD furnishes the report, not the purpose to which the Reseller itself may put it.   NBD incorrectly redrafts the FCRA into a new statute which would instead state, "A consumer reporting agency which furnishes a consumer report *that will be used* for employment purposes *by the person to whom it is furnished by that consumer reporting agency* […]."

Consistent with its other litigation positions, NBD's challenge here contradicts its real world facts.   For example, as detailed in Plaintiff's opposition to summary judgment, Defendant's reseller contracts all acknowledge that the FCRA information that NBD furnishes in its reports to ADP, Verifications, HR Plus and others is to be used solely for resale and delivery to the employer or end-user. (Pls' Mem. Opp'n Summ. J.  at 17).

Finally, Defendant hardly responds to Plaintiffs' evidence and argument that Verifications actually was not just the "user," but also the "end-user" for its employer clients, adjudicating the employment decision as employer's agent and not solely engaged as a CRA. (Pls' Mem. at 12, n. 9)(Doc. 72).  *See Goode v. LexisNexis Risk & Information Analytics Group, Inc.*, 848 F.Supp.2d 232, 540-41(E.D. Pa. March 22, 2012).   NBD limits its response to a footnote that apparently is only based on its rhetoric that the Employer pleading detailing the Verifications adjudication was

not collaborated.  But NBD ignores entirely the documentary evidence that its own archives and "results returned" database identify Verifications as not just the "user," but the "end-user."

## VI.    PREDOMINANCE

### A.  The Amount of Statutory Damages is Not a Predominant Individual Issue.

To make its argument that statutory damages predominate as an individual issue, NBD actually ignores the governing decision in *Stillmock v. Weis Mkts., Inc.*, 385 Fed. Appx. 267, 273 (4th Cir. 2010), and cites instead the special concurrence – the reasoning of which is so different from the majority holding, it is the equivalent of a dissent.  Not one court has found that the amount of statutory damages have such an individualized nature as to predominate over the core common issues in FCRA class litigation.  And every court to dispose of such an opposition argument – including this Court and the Fourth Circuit – have found just the opposite.[23]

Inasmuch as the issues of liability are established as common to the class, NBD can defeat certification under Rule 23(b)(3) only by showing that individual issues relating to each class member's entitlement to damages predominate over that issue.  But it cannot make that showing. Class members would not be required to prove causation or actual damages in order to obtain statutory damages. Accordingly, far from raising any individual questions, the statutory damages determination is itself an issue that is largely common to the classes as a whole, and the availability of such damages would "weigh[] in favor rather than against class certification *In re Napster Copyright Litig.*, 2005 WL 1287611, *11 (N.D. Cal. June 1, 2005). As the governing Fourth Circuit *Stillmock* opinion explained in reversing denial of certification in a FCRA case:

> Where, as here, the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner, the

---

[23] Beyond the FCRA cases, NBD also cites *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1433 (2013).  It does so presumably because (a.) it was a Supreme Court decision, (b.) it mentions the word "damages", and (c.) the SCOTUS found that a class should not be certified.  It has no meaningful application to this case other than possibly drawing an effective contrast with cases like Comcast where the plaintiff seeks unliquidated, subjective and widely varying actual damages with a FCRA case where statutory damages are determined by a limited set of elements and are fixed between $100 and $1,000 without proof of causation of actual monetary harm.

> individual statutory damages issues are insufficient to defeat class certification under Rule 23(b)(3).

385 Fed. Appx. at 273.  In fact, in *Stillmock*, the Fourth Circuit considered and rejected the exact full set of arguments NBD now proffers.[24]  385 F. App'x at 273.  As *Stillmock* explained, the solitary, individual component in determining the amount of statutory damages (between $100 and $1,000) is the number of violations suffered by each respective consumer.  *Id.*  This is a simple determination – each consumer report that the Defendant furnished during the period in which its credit reporting was inaccurate is a violation of §1681k(a).  Accordingly, Plaintiff's statutory damage claims raise no individual questions in relation to the amount of damages.  The remainder of considerations are common questions determined by the Defendant's conduct.  Accordingly, Plaintiffs' FCRA statutory damage claims raise no predominant individual questions in relation to the amount of damages.  *See, e.g.*, *Acosta v. Trans Union, LLC*, 240 F.R.D. 564, 571 (C.D. Cal. 2007) (noting that any distinction among claims of class members relating to the damages they suffered "is immaterial here where the FCRA awards statutory damages"); *Bonner v. Home123 Corp.*, 2006 U.S. Dist. LEXIS 54418, at *18-19 (N.D. Ind. Aug. 4, 2006) ("Each class member . . . need not prove individual actual damages or provide proof of causation to obtain statutory damages [under the FCRA]."); *White v. Imperial Adjustment Corp.*, 2002 U.S. Dist. LEXIS 26610, at *56-57 (E.D. La. 2002) (finding predominance requirement met where "focal point of these proceedings will undoubtedly be the defendants' course of conduct in" allegedly failing to maintain reasonable procedures to prevent improper dissemination of credit reports in violation of FCRA); *In re Farmers Ins. Co., FCRA Litig.*, 2006 U.S. Dist. LEXIS 27290, at *38-39 (W.D. Okla. Apr. 13,

---

[24] In *Stillmock*, and within this text citation, the Fourth Circuit also found that "willfulness" is a common question that itself would predominate over any modest individual component to the statutory damage determination.  Plaintiffs address this separate defense argument immediately below.

2006) (finding predominance requirement met in action seeking statutory damages for defendants' alleged violation of FCRA).[25]

In the only FCRA class case to reach a jury verdict, the United States District Court for the District of Oregon considered the question of what factors a jury would consider in determining the amount of statutory damages. *Ashby v. Farmers Ins. Co. of Oregon*, 592 F. Supp. 2d 1307, 1318 (D. Or. 2008).   The most important factor in determining the amount of a statutory-damages award to class members is the importance and value of the rights and protections conferred on the public by FCRA's notice requirements. Any individualized harm to each class member is irrelevant.    The court instructed the jury:

> The law does not provide any fixed standard by which you are to determine the amount of statutory damages within this range. The law does require that the amount of statutory damages you award be reasonable. Thus, you must apply your own considered judgment in determining the amount of statutory damages per Class member to award and, in doing so, you should consider the nature of the consumer interest Congress sought to protect in imposing the FCRA notice requirement as I have already instructed you.

*Ashby*, 01-CV-1446 (D. Or. June 22, 2009)(Doc. 589 at 17-18.)   This class instruction comports with nearly all cases to have considered this question.   With the additional factor for a class in which consumers may have incurred multiple violations, the addition of that factor would certainly not predominate over the otherwise class questions involved.

**B.      Willfulness is a Class Issue and Will Not Predominate**

---

[25] *See also Baker v. G.C. Servs. Corp.*, 677 F.2d 775, 781 (9th Cir. 1982) (holding that "statutory damages are available [under the Fair Debt Collection Practices Act] without proof of actual damages"); *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 393 (N.D. Ill. 2006) (Each class member need not prove individual actual damages or provide proof of causation to obtain statutory damages under the FCRA.) ; *Ashby v. Farmers Ins. Co.*, 2004 U.S. Dist. LEXIS 21053 at *14 (D. Or. Oct. 18, 2004) (same); *Braxton v. Farmer's Ins. Group*, 209 F.R.D. 654, 661 (N.D. Ala. 2002) (same).

[25] *See also Six Mexican Workers*, 904 F.2d at 1306 ("concerns . . . about the impermissible circumvention of individual proof requirements are not at issue where the underlying statute permits awards without a showing of actual damage"); *Hernandez v. Midland Credit Mgmt.*, 236 F.R.D. 406, 412 (N.D. Ill. 2006); *Wollert v. Client Services, Inc.*, 2000 U.S. Dist. LEXIS 6485, at *5-6 (N.D. Ill. Mar. 24, 2000).

NBD also argues briefly that the determination of whether a defendant's FCRA violation was "willful" is a predominant individual issue. Def.'s Mem. Opp'n at 40. It offers almost no analysis or legal support for this claim. NBD is incorrect.

Again, in *Stillmock* the Fourth Circuit has already resolved this question. Whether a defendant's FCRA violation was "willful" is necessarily and almost entirely a common question. *Stillmock*, 385 F. App'x at 273. Similarly, this Court has already addressed this question in a nearly identical §1681k context in *Williams v. LexisNexis*:

> LexisNexis argues that a "willfulness" claim requires individual proof. It bases this argument on the Supreme Court's recent decision in *Safeco Insurance Co. v. Burr,* No. 06-84 (June 4, 2007).
> …
> Accepting *arguendo* LexisNexis' characterization that *Safeco* requires a tiered inquiry, the Court nonetheless fails to see why recklessness requires inquiry into individual circumstances. … LexisNexis adopted a standard procedure [.] The Plaintiffs' class allegations charge that these standard procedures violated the FCRA, and that, in adopting these procedures, LexisNexis willfully violated the FCRA. It is not readily apparent how an inquiry directed at LexisNexis' state of mind in adopting standard procedures is affected by any particular case in which those standard procedures were applied.

*Williams*, 2007 WL 2439463, at *6. This Court is not alone in reaching this conclusion that "willfulness" is a predominant issue and rejecting the exact same Equifax argument. *See Gillespie v. Equifax Info. Servs., LLC*, 05 C 138, 2008 WL 4614327 (N.D. Ill. Oct. 15, 2008) ("Equifax also argues that individualized proof of willfulness will be required and will predominate over common questions. But willfulness will not turn, as Equifax asserts, on whether class members can show that Equifax deliberately tried to harm them in particular. Rather, it turns on whether Equifax knowingly or recklessly disregarded its statutory obligations under FCRA. *See Safeco,* 551 U.S. at 53-59. That is plainly a common issue in this case, not an individual one, as it concerns a standardized practice that Equifax used. In short, willfulness is perfectly suitable for class-wide proof in this case."); *Summerfield v. Equifax Info. Servs. LLC*, 264 F.R.D. 133, 142-43 (D.N.J. 2009) ("As such, although willfulness is necessarily a fact-bound inquiry, individual issues will not predominate because the

Defendant's conduct was consistent with its own policy and practice from one consumer to the next. … Nothing about Plaintiffs' behavior or conduct impacts the case; it is Defendant's actions that are judged."); *Chakejian v. Equifax Info. Servs. LLC*, 256 F.R.D. 492, 500 (E.D. Pa. 2009) ("[T]he relevant inquiry in this case is what Equifax's state of mind: what information Equifax disclosed or failed to disclose to customers with respect to its reinvestigation procedures, and whether it knew, or consciously disregarded the fact that those disclosures were misleading. To prove willfulness here, a consumer-by-consumer inquiry is not necessary."); *Harris v. Experian Info. Sols., Inc.*, et al. Civ.No. 6:06-CV-01808-GRA, Doc. 118 (D.S.C. May 29, 2008) ("Whether each Defendant acted willfully or negligently is one that is the same for each class member."); *Clark v. Experian Info. Sols., Inc.*, Civ.No.8:00-1217-24, 2002 WL 2005709 (D.S.C. June 26, 2002).

## VII.   ADEQUACY

NBD challenges Plaintiffs' adequacy to serve as class representatives because they are not seeking actual damages for Defendant's violation of 1681k.   Defendant argues that there is a conflict between Plaintiffs and unnamed class members because the Plaintiffs do not seek to prove actual damages and instead are prosecuting their FCRA claims for statutory and punitive damages. 15 U.S.C. § 1681n.  After significant briefing and argument in *Williams*, this Court has rejected the exact same argument Defendant now makes. *Williams*, 2007 WL 2439463, at *4.

First, NBD's setup and assumptions are flawed.   It attempts a comparison between this case and others in which the settling Defendant paid to resolve actual damage allegations.   But in each such case, including the *Henderson v. Verifications, Inc.* settlement cited in Defendant's opposition, the damage fund was created to compensate class members not only for the CRA's violation of §1681k – primarily a process and notice provision – but also for their release of claims under the accuracy FCRA section, §1681e(b).  In fact, a more correct comparison also exists – the *Williams* case itself.  In *Williams*, LexisNexis did not negotiate a release of the separate accuracy rights and

did not pay an actual damages fund.  Further, there is a material difference between the damages that can be obtained in a compromised settlement versus the damages that could be proven at trial both in amount and in causation.

Defendant has failed to articulate even a theory as to what measurable damages would exist. It does not offer a suggestion as to how the evidenced measure of caused actual damages would be greater than available statutory damages. The Fourth Circuit has already considered such a theory and rejected it.  In *Gunnells v. Healthplan Servs., Inc*., addressing a comparable adequacy argument, the Court of Appeals refused to engage in invited conjecture, explaining, "To defeat the adequacy requirement of Rule 23, a conflict 'must be more than merely speculative or hypothetical.'" 348 F.3d 417, 430-31 (4th Cir. 2003) (citing 5 MOORE'S FEDERAL PRACTICE § 23.25[4][b][ii] (2002)). The mere assertion by a defendant that some additional remedy or damage measure is "abandoned" is an inadequate substitute for proof that such unrecovered damages actually exist.  *Id.*

The Seventh Circuit's analysis in *Murray v. GMAC Mortg. Corp.*, is among the best-reasoned and oft-cited cases on this question. The Seventh Circuit Court of Appeals rejected an argument of the district court that is almost identical to that made by NBD:

> [W]hile statutory damages require willful conduct, introducing the "easier" negligence theory would preclude class treatment. Common questions no longer would predominate, and an effort to determine a million consumers' individual losses would make the suit unmanageable. Yet individual losses, if any, are likely to be small-a modest concern about privacy, a slight chance that information would leak out and lead to identity theft. That actual loss is small and hard to quantify is why statutes such as the Fair Credit Reporting Act provide for modest damages without proof of injury.

434 F.3d 948, 952-953 (7th Cir. 2006).  The Court should follow *Murray*'s reasoning here as it properly did in *Williams*. Nearly every court to consider this question has accepted a statutory damages FCRA class and ruled similarly.[26]

---

[26] *See, e.g.*, *Asbury v. People's Choice Home Loan, Inc.,* 2007 WL 809531 (N.D. Ill. March 12, 2007); *Campos v. ChoicePoint, Inc.*, 237 F.R.D. 478 (N.D.Ga. 2006); *Murray v. Sunrise Chevrolet, Inc.*, No. 04 C 7668, 2006 WL 862886, at *3 (N.D. Ill. March 30, 2006); *Cavin v. Home Loan Center, Inc.*, 236 F.R.D. 387,

This raises the same irony considered by the Seventh Circuit in *Eggleston v. Chicago Journeyman Plumbers Local Union No. 130*:

> [I]t is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified. When it comes, for instance, to determining whether "the representative parties will fairly and adequately protect the interests of the class," […] it is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house.

657 F.2d 890, 895 (7th Cir. 1981).   In truth, there can be no conflict as the real decision is between pursuing class litigation for statutory and punitive damages or, instead, not pursuing any claim at all.  There is likely no interest by class members to *individually* litigate.

Where there are meaningful actual damages and proof of causation from such a process or notice violation, the Class member could opt-out. Defendant attempts to preempt this argument in its citation to an inapposite decision out of the Southern District of Texas.  However, the Court should more properly follow the decisions in this Circuit and District. *See Gunnells*, 348 F.3d at 430-32 (" Rule 23(c)(2) permits members of a class maintained under section (b)(3) to opt out of the class, providing an option for those Plaintiffs who wish to pursue claims against TPCM requiring more individualized inquiry. Thus, rhetoric aside, Plaintiffs with only direct claims are not being "[j]amm[ed]," "sacrificed" or "caught" in any class action against their will.").  This is also the conclusion of the Seventh Circuit.  *Murray*, 434 F.3d at 952-53; *see also Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894 (7th Cir. 1999).  As the *Murray* court explained, "Only when all or almost all of the claims are likely to be large enough to justify individual litigation is it wise to reject class treatment altogether."[27]  434 F.3d at 952-53.

---

392 (N.D. Ill. 2006); *Murray v. New Cingular Wireless Servs., Inc.*, 232 F.R.D. 295, 302–03 (N.D. Ill. 2005); *Murray v. Cingular Wireless II, LLC*, 242 F.R.D. 415, 418 (N.D. Ill. 2005); *Murray v. Cingular Wireless II, LLC*, 242 F.R.D. 415, 420 (N.D. Ill. 2005).

[27] Alternately, this Court has rejected Defendant's contention that later pursuit of actual damages would be improper "claim-splitting."  *Gunnells*, 348 F.3d at 430-32 ("[T]he dissent's argument seems premised on the false assumption that under the district court order the Plaintiffs' direct claims would be barred by the rule

Plaintiffs' position has remained consistent as they have pled and advocated their accuracy damage claims only on an individual basis.  "The fact that the named Plaintiffs have claims in addition to those asserted on behalf of the class does not render representations inadequate." National Consumer Law Center, *Consumer Class Actions*, Fifth Ed., 2002, p.116.  "[T]he fact that individual plaintiffs may have interests which go beyond the interest of the class, but are at least co-extensive with the class interest, will not defeat the class."  *First Am. Corp. v. Foster*, 51 F.R.D. 248, 250 (N.D. Ga. 1970).   In fact, the Fourth Circuit has even rejected such arguments when the separate individual claims held by some class members were against the named Plaintiffs. *Gunnells,* 348 F.3d at 430-431.  The Court stated:

> Specifically, [Defendant] TPCM argues that the named plaintiffs constitute inadequate class representatives because they purportedly lack sufficient knowledge, and because alleged insurmountable conflicts exist within the class. TPCM also contends that the interest of certain individual class members in pursuing individual litigation defeats any argument that a class action provides a superior vehicle for adjudication of the claims. These arguments also fail.

*Id.*

However, in the present case, Plaintiffs prosecute two FCRA claims that, while important and meaningful, cannot be liquidated into actual damages.  These claims are not based upon mere "technical" rights.  The requirements in the FCRA reflect a legislative decision and balance, enacted over thirty years ago, that measures our priorities and the interests we value.  Still, as Defendant happily concedes in its causation arguments, some FCRA rights, including those specifically before the Court in the Count II and Count IV Class claims, are not readily provable and cannot be reduced into a monetary measure of actual damages.  For example, the §1681k(a)(1) claim requires a simultaneous notice that the Defendant is furnishing an employment report.  This provision and option lacks the fully prophylactic benefit of §1681k(a)(2)'s "Accuracy" and "Strict Procedures"

---

against claim-splitting. But a class action, 'of course, is one of the recognized exceptions to the rule against claim-splitting.'").

requirement and there is not a rational way for the Court to apportion or even determine a compensatory damage figure for a violation of the "at the time" notice requirement. Similarly, Plaintiffs do not allege that NDB will not conduct a reinvestigation if the consumer fills out its form and provided two forms of ID, one government issued. It will. But these added demands are unlawful under the FCRA and delay past the point of initial dispute in a manner that Congress forbade. Still, again, it is not possible to derive a liquidated measure of economic damages for such delay and added hassle or frustration. Defendant concedes as much and contradicts its own position in its challenge to Plaintiffs proof of "causation" of actual damages. (Def.'s Mem. Opp'n at 14-17).

*Clark v. Equifax* was premised on the high damage and direct benefit of a §1681e(b) claim. 2002 WL 2005709. However, in FCRA cases where the consumer's right is violated, but significant actual damages are unavailable or cannot be proven, a statutory damages class is ideal. 15 U.S.C. §1681n. The Defendant attempts, but cannot distinguish the Seventh Circuit's opinion and analysis in *Murray,* cited favorably by this court and many others.[28]

> Refusing to certify a class because the plaintiff decides not to make the sort of person-specific arguments that render class treatment infeasible would throw away the benefits of consolidated treatment. Unless a district court finds that personal injuries are large in relation to statutory damages, a representative plaintiff must be allowed to forego claims for compensatory damages in order to achieve class certification. When a few class members' injuries prove to be substantial, they may opt out and litigate independently.

434 F.3d at 952-953.[29]

---

[28]For example, when a defendant made the Lexis-Nexis argument in a more recent case, the District Court:

> The opinion in Murray is so squarely against PCHL's position that its argument to the contrary runs afoul of Fed.R.Civ.P. 11(b)(2), which requires counsel to make only those legal contentions that are supported by the law or a nonfrivolous argument for the modification of the law. Fed.R.Civ.P. 11(b)(2); *see also* L.R. 83.53.3(a)(3) (requiring counsel to disclose authority directly adverse to its position and not disclosed by opposing counsel).

*Asbury v. People's Choice Home Loan, Inc.,* 2007 WL 809531 (N.D.Ill. March 12, 2007).

The FCRA class claim is based on its unlawful access of class members' consumer reports. The debt collection and related individual claims for which proof of actual damages above $1,000 is at least conceivable are based upon separate misconduct. None of these claims is excluded, waived, or later precluded by a class member's recovery of his or her FCRA remedy.

In *Williams*, the defendant made the same argument NDB that the class representatives' collateral prosecution of their separate non-class claims created a potential conflict. The court rejected the argument: "[P]laintiffs argue that the assertion of related individual claims does not make them unfit representatives because, while the adequacy prerequisite requires that the class representatives' claims be coextensive with the class members', it does not require that they be identical. Plaintiffs' argument is correct[.]" 2007 WL 2439463, at *4-5.

In contrast to the holding in *Williams* and the facts in this case, Defendant's authority is cited wholly out of context. Each of the decisions cited by Defendant to support its adequacy challenge considered circumstances in which the specific claim pursued as a class included or could have included additional relevant remedies that would be waived if not then pursued. Further, the Fourth Circuit has rejected Defendant's contention that later pursuit of actual damages in separate claims would be improper "claim-splitting." *Gunnells*, 348 F.3d at 430-32.

Defendant's contention is that the named Plaintiffs would somehow become disinterested in her recovery under the FCRA because she will also have recovered actual damages under the FDCPA or by other individual claims. Essentially, NDB is claiming that the lessened marginal utility of an additional dollar to one class member would put that class member in conflict with a person who has recovered less money and who would have a greater marginal utility for the next dollar. While perhaps the basis for an interesting Law and Economics debate, there is not a single case that would so extend the "actual conflicts" bar of Rule 23(a)'s adequacy of representation requirement. The recovery of an additional $1,000 in statutory damages has $1,000 of value to

Plaintiff just as it does to the putative class members who have not retained counsel for their individual claims (even if they have them). No apparent or even imagined antagonism exists between Plaintiff and members of the proposed class. And, at any rate, "any conflicts that may be presently discovered will likely pale in comparison to the issues unifying the class." *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 645 (N.D. Cal. 1987).

In contrast, in nearly every case to consider a FCRA putative class claim in which actual damages were less substantial – cases that were not premised on an allegation of an inaccurate credit report – the court rejected the Defendant's argument and sustained or certified a statutory damages class. *Murray*, 434 F.3d at 952-53.

Plaintiffs are prosecuting here an FCRA claim that, while important and meaningful, cannot be liquidated into actual damages. Some FCRA rights, including those specifically in this class claim, are not readily reduced into a monetary measure because the injury results from a violation of the class members' intangible, though important, privacy rights. A statutory damages class is ideal in this type of FCRA case. 15 U.S.C. § 1681n; *Murray*, 434 F.3d at 952-953; *see also Williams*, 2007 WL 2439463, at *4-5 (adopting the reasoning that class representatives were adequate where they pled only their statutory damages claims and their claims were co-extensive with that of the class, they did not need to be identical).

The Fourth Circuit has also considered Defendant's theory and rejected it. *Gunnells,* 348 F.3d at 430-31, (addressing a comparable adequacy argument, refusing to engage in invited conjecture, explaining, "[t]o defeat the adequacy requirement of Rule 23, a conflict 'must be more than merely speculative or hypothetical."). The mere assertion by a defendant that some additional remedy or damage measure is "abandoned" is an inadequate substitute for proof that such unrecovered damages actually exist. *Id.* In truth, there can be no conflict as the real decision is between pursuing class litigation for statutory and punitive damages or, instead, not pursuing any

claim at all.  *See Gunnells*, 348 F.3d at 426 ("First, it appears likely that in the absence of class

certification, very few claims would be brought against TPCM, making 'the adjudication of [the]

matter through a class action . . . superior to no adjudication of the matter at all.'") (emphasis

added).  There is likely no interest by class members to litigate individually. The Court of Appeals

reasoned:

> Thus, class certification will provide access to the courts for those with claims that would be
> uneconomical if brought in an individual action. As the Supreme Court put the matter, "[t]he
> policy at the very core of the class action mechanism is to overcome the problem that small
> recoveries do not provide the incentive for any individual to bring a solo action prosecuting
> his or her rights." *Amchem*, 521 U.S. at 617, 117 S.Ct. 2231 (citation omitted).

*Gunnells*, 348 F.3d at 426.

In the event that any class members hereafter allege their suffering of actual damages, the

solution is not to abandon the tens of thousands of consumers who could not or would not make

such a claim.  Instead, Rule 23 permits such persons to opt-out of the class and pursue their

individual claims for actual damages.  The Fourth Circuit has found the protection not just relevant,

but sufficient.  *Gunnells*, 348 F.3d at 430-32 (noting that, with Rule 23(c)(2) opt out rights,

"rhetoric aside, Plaintiffs with only direct claims are not being "[j]amm[ed]," "sacrificed" or

"caught" in any class action against their will."); *see also Murray*, 434 F.3d at 952-53 ("Only when

all or almost all of the claims are likely to be large enough to justify individual litigation is it wise to

reject class treatment altogether.")

## VIII.  SUPERIORITY

As noted in Plaintiffs' opening brief, "[T]here is a strong presumption in favor of a finding

of superiority" in a statutory damages FCRA case where, as here, "the alternative to a class action is

likely to be no action at all for the majority of class members." *Cavin v. Home Loan Center, Inc.*,

236 F.R.D. 387, 396 (N.D. Ill. 2006).  This presumption is rooted in the policy "at the very core of

the class action mechanism"—namely, "overcom[ing] the problem that small recoveries do not

provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Thus, as Judge Easterbrook noted in *Murray v. GMAC Mortgage*, "Rule 23(b)(3) was designed for situations such as [low-provable damage FCRA cases], in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate."  *Murray v. GMAC Mortgage,* 434 F.3d at 953.  The question of whether a class action is superior should inure to the benefit and protection of the plaintiffs, where integration of many small claims can be aggregated into a powerful unity in conformity with the purpose of Rule 23(b)(3).  *Bateman v. Am. Multi-Cinema, Inc*., 623 F.3d 708, 721 (9th Cir. 2010).

Defendant argues that adjudication of this matter as a class action is inferior for two reasons. First, it asserts that exposure to potential damages threatens the Defendant with financial ruin. (Def.'s Mem. at 44-45).  Second, NBD argues that class treatment is not superior because individual class members are already allowed to attempt individual litigation to recover $100 to $1,000 in statutory damages.   Both of these positions evidence a genuine lack of understanding of the Rule 23(b)(3) "superiority" element.  Superiority does not test whether class treatment would be the superior option *for the defendant*.  It would rarely be so.   Instead, the question is whether class treatment would be superior for the class and for the judicial system generally.   In fact, in every instance in which class certification is good for a class of plaintiffs, in adversarial and zero-sum litigation it will by definition be inferior choice for the respective defendant.

Further, NBD suggests that the Court compare the choice of litigating the uniform claims of hundreds of thousands of class members in one class action case against the choice of Henderson and Hines pursuing their claims individually.  This is an incorrect and false choice.  *Cavin*, 236 F.R.D. at 396. One class case would be more expensive and burdensome to one individual case. But that is not the comparison.  Instead, the measure is one class case for hundreds of thousands of

consumers versus hundreds of thousands of individual lawsuits. The contradictory but necessary assumption of that argument—no matter how untrue—is that NBD's exposure would be at least as great against a series of individual claims. One District Court rejected this argument for that reason alone:

> While these cases [Parker and Trans Union] are doubtlessly correct to note that a punitive and grossly excessive statutory damages award violates the Due Process Clause, it is far from clear why class actions should be singled out for heightened scrutiny under such a theory.

*In re Napster Copyright Litig.*, 2005 WL 1287611, *11; *see also Pirian v. In-N-Out Burgers*, 2007 WL 1040864 (C.D. Cal. 2007); s*ee also Gunnells*, 348 F.3d at 426, (holding "[f]irst, it appears likely that in the absence of class certification, very few claims would be brought against TPCM, making "the adjudication of [the] matter through a class action ... superior to no adjudication of the matter at all.") (emphasis added)

A.   **NBD's fear of a financially annihilating verdict is an inadequate reason to ignore the text of the FCRA and established rules that support class certification.**

Defendant's arguments have been rejected in this District in a comparable FCRA decision that survived Rule 23(f) appeal. *Williams*, 2007 WL 2439463, at *9. NBD's "policy" argument regarding the magnitude of potential FCRA damages is one properly left to Congress. Murray, 434 F.3d 948. Even if an excessive verdict is obtained, the Court retains the option of remittitur to prevent a constitutionally excessive result here as in any other setting. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 721 (9th Cir. 2010).

Instead of arguing the established Superiority factors related to class member interest in controlling individual prosecutions, the existence of other related litigation, the desirability of concentrating the litigation in the forum, and manageability, the Defendant has presented the court with an alternate universe of elements and reasoning that has already been rejected by this and other courts. *Williams,* 2007 WL 2439463, at * 9. The reasoning of Defendant's superiority challenge is

actually much simpler (and ironic): because NBD's violation of the FCRA was so extensive and impacted so many consumers, any litigation that provided adequate redress as envisioned by Congress would significantly impact its finances.   Its argument is not based upon any language in either the FCRA or Rule 23.

Largely before, and certainty since, *Williams*, federal courts have uniformly rejected Defendant's superiority argument.   In addition, no Court of Appeals has ever found as Defendant asks, with published decisions from the Seventh and Ninth Circuits and the Fourth Circuit's rejection of the defendant's Rule 23(f) petition in *Williams*.   *Murray*, 434 F.3d at 953-954; *Bateman*, 623 F.3d at 721.   In *Asbury*, the court issued an order excoriating the defendant's argument as "frivolous" with a Rule 11 caution. 2007 WL 80953.   The Seventh Circuit reasoning was simple – Congress makes the laws.   Judge Easterbrook explained:

> The reason that damages can be substantial, however, does not lie in an "abuse" of Rule 23; it lies in the legislative decision to authorize awards as high as $1,000 per person, 15 U.S.C. § 1681n(a)(1)(A), combined with GMACM's decision to obtain the credit scores of more than a million persons.
> ****
> The district judge sought to curtail the aggregate damages for violations he deemed trivial. Yet it is not appropriate to use procedural devices to undermine laws of which a judge disapproves. *(citations omitted)* Maybe suits such as this will lead Congress to amend the Fair Credit Reporting Act; maybe not. While a statute remains on the books, however, it must be enforced rather than subverted. An award that would be unconstitutionally excessive may be reduced, *see State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), but constitutional limits are best applied after a class has been certified.

*Murray*, 434 F.3d at 953-54 (emphasis added).   Three years later, the Ninth Circuit comprehensively analyzed all of the same issues and determined that even where class treatment would render defendant's liability ruinous and pressure it into settlement, such considerations are not appropriate reasons to deny class certification under Rule 23(b)(3).  *Bateman*, 623 F.3d at 721. The reasoning of these now non-controversial decisions was based in part on the reality that if an

adverse verdict and award of ruinous statutory damages were returned, the court had the more appropriate remedy of remittitur by which to avoid any constitutionally excessive verdict.

All of these issues were directly addressed by this Court in *Williams*, 2007 WL 2439463, at *9. In adopting the Seventh Circuit's position from *Murray*, this court has reasoned:

> Indeed, Congress created two separate sets of remedies to provide relief from CRAs' violations of the FCRA. If a CRA was found to have violated the statute negligently, a plaintiff could recover actual damages only. However, if a CRA was found to have violated a statute willfully, <u>Congress provided that a plaintiff could recover both statutory and punitive damages, regardless of any actual damages the plaintiff may have suffered</u>. Furthermore, <u>Congress could have, but did not, forbid class actions based on statutory and punitive damages alone. Provided that these remedies are constitutional, the Court must enforce them.</u> For these reasons, the Court finds LexisNexis' position unpersuasive. The damages awarded against it in either class action, if any, may turn out to be excessive, but, as the *Murray* decision suggests, that is an issue with which the Court may not deal at this time.

2007 WL 2439463, *9 (emphasis added).

In its opposition, the Defendant relies on the special concurrence in *Stillmock*. 385 F.App'x at 276. The special concurrence is not the holding of the Fourth Circuit. When the Fourth Circuit has cited *Stillmock*, it has not favorably adopted or cited any part of the corporate-death analysis. In fact, the panel decision in *Stillmock* reversed and remanded a District Court denial of class certification where this same superiority challenge was made in defense of that denial. The Defendant avoids citation to any of the other on-point cases from this circuit, district and division, including the majority opinion in *Stillmock* adopting *Murray v. GMAC's* reasoning that a representative plaintiff can forego compensatory damages in order to seek statutory damages and achieve class relief. *Id*. at 273.

The Court should also not consider the Defendant's argument given the actual facts on the record. There is no disclosed or viable evidence that the class size will actually be 1.7 million. Further, Defendant's claim of limited net worth is unsupported by admissible and disclosed evidence and is incorrect as a matter of law. First, the Defendant's declarant has never been

disclosed pursuant to Fed. R. Civ. P. 26(a)(1), and therefore his testimony is inadmissible at a hearing, at trial or on a motion.[30]   Second, it is the financial health of CoreLogic – the parent company – and not its subsidiary NBD that is determinative of the Defendant's ability to pay a judgment. *U.S. v. Mun. Auth. of Union Twp.*, 150 F.3d 259, 268 (3d Cir. 1998). By its own financial statements, at the end of 2013, CoreLogic had a net worth in excess of $1 Billion.  Defendant has also disclosed its Chartis insurance policy that provides substantial insurance coverage.

There is also no evidence in the record regarding Defendant's vulnerability to improper settlement pressure. Nearly every party in every case faces some incentive to settle.  NBD, informed of the Plaintiffs' claims and arguments, faced settlement pressure at every step of the litigation, including its unsuccessful motion to dismiss.  It faced settlement pressure before the filing of the present motions. Pressure to settle is already present, and if the case is certified, it would remain properly so.  And on the otherwise, to offset that pressure is that faced by the Plaintiffs and their counsel, each absorbing financial burden and risk that while not comparable in raw gross dollars is certainly comparable in impact, pressure and settlement leverage.

NBD's argument is also ironic as it diametrically contradicts its second basis for challenging superiority.  Defendant claims that class treatment of class member claims would be to financially burdensome.  And yet its second position is that consumers would likely bring their own claims drawn by the allure of a $100 statutory damage recovery.  If this second position were true – that individual litigation by the class would be just as effective and potent for the same set of class members – such wave of individual cases would be far more likely to financially devastate NBD. Just its defense costs alone would overwhelm the comparable gross risk of class litigation.    It would be spending tens or hundreds of thousands of dollars each defense for hundreds of thousands of consumers.  There is no question that the Defendant has failed to cite to any cognizable authority

---

[30] Plaintiffs are separately moving for the sanction of preclusion of an undisclosed witness pursuant to Fed. R. Civ. P. 37(c)(1).

in this circuit, district and division that commands the result it urges in finding that a class action is not a superior method for adjudicating this case.  The analysis begins and ends with the superior method of efficiency, consistency and fairness for the class members and the court, not for the convenience of the defendant.

**B.    Individual litigation is inferior because class members could not and would not bring individual cases.**

NBD's second position – that "Plaintiffs have repeatedly proven that individual actions are viable" – continues Defendant's erred application of Rule 23(b)(3) superiority.    Defendant's assertion that "individual suits under the FCRA are a practical and realistic alternative to a sprawling and novel class action" is incongruous with the law, logic and reality:

> Weis Markets' argument is without merit. First, the low amount of statutory damages available means no big punitive damages award on the horizon, thus making an individual action unattractive from a plaintiff's perspective. Second, there is no reasoned basis to conclude that the fact that an individual plaintiff can recover attorney's fees in addition to statutory damages of up to $1,000 will result in enforcement of FCRA by individual actions of a scale comparable to the potential enforcement by way of class action.

*Stillmock*, 385 F. App'x at 274-75.

First, as offered above, if individual cases were attractive to class members and were in fact brought, both NBD and the judicial system would be overwhelmed.    Nothing illustrates the propriety of certifying the class in this case more than envisioning the practical effect of what would happen if the Defendant's position were accepted. Even if only a fraction of the injured consumers were aware of the Defendant's violations and could identify it, and find a lawyer to prosecute their claims, the court will be mindful of the litigation that takes place at every step from the filing of the complaint to the presentation of a case on its merits to a jury. Clerk's offices would receive new complaints based on the same facts against this very Defendant, with perhaps hundreds more to follow.  Each class member would begin their effort to collect $100 to $1,000 by paying filing and service fees of $500.    Each judge would be assigned his or her share of cases, and each judge

would consider whether and how to assign pre-trial matters to the magistrate judges or obtain consent to magistrate jurisdiction in each case. The Defendant would immediately file new motions to dismiss, regardless of whether they would be well-founded. Nonetheless, Defendant would churn out the same arguments in each case thus causing new dispositive motions to be added to the court's docket.

The Defendant would protract and oppose the discovery, necessitating motions practice to rule on the same objections to the same discovery requests in every case. The Defendant will insist on a protective order that enables it oppose the use of the exact same documents, depositions, and answers to interrogatories in every single case, thus requiring replication of discovery. Some of the cases will settle. Some will proceed. Cross-motions for summary judgment will be filed. For cases that are not resolved by compromise or dispositive motion, a jury trial. Jury trials require preparation by the litigants and the court, as well as preparation, expense and inconvenience of scheduling jurors. Then, there is the trial itself. It doesn't end with a verdict because the Defendant will file post-trial motions, including for a new trial and regardless of the amount of the jury's award to the plaintiff, they will move for a remittitur. Ultimately, the Defendant will appeal the jury verdicts and damages awards. All while, each identical cause of action will be subject to inconsistent outcomes, but that won't keep the appeals from being taken.

Still, the truth is actually not as NBD suggests. Individual litigation of claims against NBD under 15 U.S.C. §1681k is not viable through individual actions. It is absurd to suggest that any more than a marginal number of individual consumers would or could pursue a federal lawsuit to seek their $100 to $1,000 statutory recovery. Even if a small fraction of the putative class made such an attempt, let's assume 1% of the purported 1.7 million person class, there are not a sufficient number of consumer plaintiff's attorneys to handle even a fraction of the 17,000 potential cases. In fact, there are perhaps only a few dozen attorneys who have ever litigated, let alone tried, an

individual FCRA case.  The real reason, of course, that NBD would be a proponent of individual litigation is that it believes that few, if any, individual consumers would pursue such claims – the very reason that the Supreme Court stated in *Amchem* that the class action mechanism is so vital. 521 U.S. at 625.  This court has rejected this superiority challenge for just that reason:

> The proposed classes involve at least hundreds, perhaps thousands, of proposed class members pursuing identical, fairly small claims for relief, who, if required to proceed individually, probably would not assert their claims. The class action device therefore appears to be a superior means of resolving their disputes.

*Williams*, 2007 WL 2439463, at *9.

Defendant's argument is largely based on the fact that Tyrone Henderson has himself filed this and other cases.  Defendant's reliance on Henderson as the lone example of consumer prosecution of these §1681k violations really proves Plaintiffs' point.  *But for Henderson*, there would be no such cases.  Even to this day, Plaintiffs' counsel have still not found any other such cases ever prosecuted against NBD.  Yet, NBD claims that it has engaged in the same violation alleged in the Class Complaint against 1.7 million individuals.

This case proves how difficult it is to bring a complex FCRA case against a giant corporation that operates in secret and takes every precaution to hide itself from the consumers about whom it is collecting and disseminating information. In this particular case there never will be individual actions because class members will never learn that NBD is the actual originating CRA. As previously established, consumers do not even know that an employment report originated from Defendant as NBD boasts that it "works in the background."[31]

## IX.    Statute of Limitations applicable to the facts of this case make the class period five years under 15 U.S.C. § 1681p.

In this case there is no meaningful statute of limitations defense that would force the

---

[31] https://www.nationalbackgrounddata.net/marketing/about_us.html; *see also* Pl's Mem. Supp. Class Cert., Ex. 1.

narrowing of the class.  The five-year statute of limitations is proper because a diligent plaintiff is not expected to learn of a violation where the defendant deliberately hides itself from view and refuses to provide consumers with notice of their rights.  The FCRA limitations provision in not a common law discovery rule: it does not run "until a consumer learns information which appears to be normally within the province of the bank or credit reporting agency and not easily discovered by the consumer."  *Broccuto v. Experian Info. Sols., Inc.*, 2008 WL 1969222 (E.D. Va. May 6, 2008).  Even if a class member could have discovered that NBD was the actual original CRA selling its "in the background" reports, it could not have discovered the underlying rules, procedures and policies within NBD sufficient to understand and discover the existence of a FCRA violation.   The courts will not presume a violation was discovered absent a showing ***by the defendant*** about "*how* a reasonably diligent plaintiff would have discovered the violations."  *Drew v. Equifax Info. Servs., LLC*, 690 F.3d 1100, 1110 (9th Cir. 2012).  Finally, even that would not have been sufficient as the allegation in the case is that NBD willfully violated the statute.  The FCRA is not a strict liability statute and even mere knowledge that a right has been withheld is not a sufficient basis.   The consumer would also need to have discovered that the violation was willfully committee.  *Id*.

This exact argument was also litigated in a comparable employment report FCRA case, as well as other federal courts. *Hall v. Vitran Express, Inc*. Civ. No. 1:09CV00800 (N.D. Oh. Oct. 29, 2010)("simply because these applicants were provided certain information by USIS about their consumer report, does not mean that they had notice of Vitran's violations of the FCRA. The critical issue in this litigation is whether Vitran met its obligations under the FCRA.").

## CONCLUSION

For all the foregoing reasons, the Defendant's opposition to Plaintiff's Motion for Class Certification is without merit.  The Plaintiff's Motion for Class Certification should be granted.

Respectfully Submitted,

Tyrone Henderson, James Hines,
on behalf of themselves and others
similarly situated,

_____/s/_____

Leonard Anthony Bennett (VSB #37523)
Susan Mary Rotkis (VSB # 40693)
CONSUMER LITIGATION ASSOCIATES, PC
763 J. Clyde Morris Blvd. Suite 1-A
Newport News, Virginia 23601
757-930-3660
757-930-3662 (FAX)
lenbennett@clalegal.com
srotkis@clalegal.com

Matthew James Erausquin (VSB # 65434)
Janelle E. Mason (VSB # 82389)
CONSUMER LITIGATION ASSOCIATES, PC
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
matt@clalegal.com
janelle@clalegal.com

Dale W. Pittman (VSB #15673)
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb St.
Petersburg, VA 23803
Telephone:  (804) 861-6000
Facsimile:  (804) 861-3362
dale@pittmanlawoffice.com

James Arthur Francis (*pro hac vice*)
David A Searles (*pro hac vice*)
FRANCIS & MAILMAN PC
Land Title Building
100 S Broad Street, 19th Floor
Philadelphia, PA  19110
Telephone: 215-735-8600
Facsimile: 215-940-8000
jfrancis@consumerlawfirm.com
dsearles@consumerlawfirm.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

This 10th day of March, 2014, I filed the foregoing document in this case using the CM/ECF system, which will then send a Notice of Electronic Filing (NEF), to the following counsel of record:

Alan D. Wingfield (VSB No. 27489)
David N. Anthony (VSB No. 31696)
Timothy J. St. George (VSB No. 77349)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia  23219
Telephone: (804) 697-1200
alan.wingfield@troutmansanders.com
david.anthony@troutmansanders.com
tim.stgeorge@troutmansanders.com

*Counsel for Defendants*

_____/s/_____

Leonard Anthony Bennett (VSB #37523)
Susan Mary Rotkis (VSB # 40693)
CONSUMER LITIGATION ASSOCIATES, PC
763 J. Clyde Morris Blvd. Suite 1-A
Newport News, Virginia 23601
757-930-3660
757-930-3662 (FAX)
lenbennett@clalegal.com
srotkis@clalegal.com