```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                     RICHMOND DIVISION

4
   -----------------------------------
5                                     :
   TYRONE HENDERSON, on behalf of     :
6  himself and others similarly       :   Civil Action No.
   situated                           :   3:12CV00097
7                                     :
   vs.                                :
8                                     :   September 19, 2014
   CORELOGIC, INC., et al.            :
9                                     :
   -----------------------------------
10

11

           COMPLETE TRANSCRIPT OF THE ORAL ARGUMENTS
12
             BEFORE THE HONORABLE ROBERT E. PAYNE
13
                UNITED STATES DISTRICT JUDGE
14

15  APPEARANCES:

16  Leonard A. Bennett, Esquire
    Matthew J. Erausquin, Esquire
17  Consumer Litigation Association, PC
    12515 Warwick Boulevard
18  Suite 100
    Newport News, Virginia  23606
19
    Alan D. Wingfield, Esquire
20  David N. Anthony, Esquire
    Scott Kelly, Esquire
21  Troutman Sanders, LLP
    Troutman Sanders Building
22  1001 Haxall Point
    Richmond, Virginia  23219
23

24              Peppy Peterson, RPR
                Official Court Reporter
25            United States District Court
```

1                    P R O C E E D I N G S

2

3          THE CLERK:  Civil action number 3:12CV00097,

4    Tyrone Henderson, on behalf of himself and others

5    similarly situated, versus CoreLogic, Incorporated, et al.

6    Mr. Leonard A. Bennett and Mr. Matthew J. Erausquin

7    represent the plaintiff.  Mr. Alan D. Wingfield, Mr. David

8    N. Anthony, and Mr. Scott Kelly represent the defendants.

9    Are counsel ready to proceed?

10          MR. BENNETT:  Plaintiffs are, Judge.

11          MR. WINGFIELD:  Defendants are, Your Honor.

12          THE COURT:  All right.  We have the motion for

13    partial summary judgment and then the motion to strike,

14    number 118.  I have reviewed the papers.  I'll see if I

15    can help you frame the issue.  It seems to me that the

16    defendants' view of the law is erroneous and the

17    plaintiffs' view of the law is correct.

18          It seems to me that the defendants' own documents

19    prove -- establish, excuse me, a factual issue that

20    forecloses summary judgment if not proves the converse of

21    the theory advanced by the plaintiffs -- by the

22    defendants, excuse me.

23          So I would be inclined to deny the motion for

24    summary judgment, partial summary judgment on Count I.

25    Count II, I would grant the motion for summary judgment

1    because there is no contest as to it, the plaintiffs

2    having never responded to the theories advanced in the

3    motion for summary judgment.

4         At to the motion to strike, I'll tell you about

5    how I feel about that later.  With that background,

6    perhaps it will help frame your arguments and

7    presentations.  Let's proceed, Mr. Wingfield.

8         MR. WINGFIELD:  Your Honor, which order would you

9    like to address; the motion to strike first?

10        THE COURT:  The motion for partial summary

11   judgment, and please speak slowly and clearly.

12        MR. WINGFIELD:  May it please the Court, I am

13   Alan Wingfield, and along with Mr. Anthony representing

14   the defendant CoreLogic NBD here.  Also present here is

15   Ms. Becky Kuehn, vice president and senior regulatory

16   counsel for CoreLogic, and she's actually a member of the

17   bar of this Court as well.

18        Your Honor, you have set forth a tall mountain

19   for me to climb by your comments on where we stand on

20   motion for summary judgment.

21        THE COURT:  Well, I thought it would help frame

22   the discussion, because I always found it helpful to know

23   what the judge was thinking.  That way, I could address

24   what was the point and dissuade the judge of any

25   particular misapprehensions of which he happened to be

1    besieged at the time of the argument, and so that's why --

2    and I learned that technique from judges in Alexandria and

3    find it often to be a helpful one for lawyers, at least --

4    for me if not for the lawyers.

5         MR. WINGFIELD:  Well, reading your comments,

6    reading between the lines of comments, I hear two things

7    in your comments.  One is that you disagree with

8    CoreLogic's position on the law on Count I as stated in

9    our briefs, and you also think that independent of that,

10   some of the evidentiary documents submitted presumably by

11   plaintiff contradict the legal position we're taking

12   today, and that also independently is a second reason why

13   we ought not to be granted summary judgment at this time.

14        So I would like to take it in that order, talk

15   about the legal theory first, and do my best to try to

16   explain our position in a way that the Court at least

17   would find helpful if not convincing.

18        Our oral argument on summary judgment breaks down

19   as follows:  I'd like to briefly touch on the material

20   facts.  I'd like to secondly talk about the text of 1681k.

21   I do actually focus on the text, because this is a

22   statutory construction case.  At least some parts of this

23   argument is an outright interpretation of the statutory

24   text.

25        Once we set the table with those two pieces, the

1   key material facts, statutory text, I'd like to give you

2   my best shot on the legal arguments on Count I which is

3   the breakdown into basically three pieces.

4           One is statutory construction.  It's the first

5   argument that we contend wholesalers aren't subject to

6   1681k at all.  Second argument is that under prevailing

7   case law, a -- any defendant under 1681k could not be

8   liable unless there's a flaw in the information provided,

9   lack of completeness and up to date, that the records

10  provided do not reflect the actual public record, and out

11  of showing of that, no defendant can be liable under

12  1681k, and the third argument is strict procedures.

13          We had a conversation about that on Wednesday.

14  It's the last argument in our outline.  I just want to

15  bring home the fact that the material -- the facts about

16  the procedures are undisputed, and whether that sums up or

17  not into findings as a matter of law that strict

18  procedures are present is an issue of law that can be

19  reached, and there are some case law under EB where courts

20  have reached procedures as a matter of law under

21  moderately similar circumstances, Your Honor.

22          It is under a different statute.  I'll

23  acknowledge that, but it's the same concept, whether or

24  not procedures in question are -- meet a legal standard.

25  If the facts about the procedures are undisputed, then

1    that can be reached as a matter of law.

2            Your Honor, to help frame the issue, and I'd like

3    to hand up to you and Ms. Holloman three -- a

4    demonstrative exhibit which is a little graph showing the

5    structure of what's going on here plus the key statutory

6    text that we're all going to be arguing, so I'd like to

7    hand that up.

8            THE COURT:  Do you have one for the law clerk,

9    too?

10           MR. WINGFIELD:  Yes, sir.  Your Honor, what we've

11   handed to you is three pages.  The first is a little

12   graphic that shows -- a demonstrative exhibit showing what

13   the undisputed facts are about the relationship between

14   NBD and the other parties involved in this sale of data

15   involved in this case.

16           The other two pages are simply verbatim versions

17   of 1681k(a), and then also we'll be pointing out later in

18   the argument that section 1681e text and how that's

19   interpreted is relevant here when addressing 1681k.

20           Moving forward with the undisputed material

21   facts, I would like to walk you through this stream of

22   data here, because that will be framing everything that's

23   happening, so I'll make sure we're all level set on the

24   basic structure here.

25           So you'll see here on this graph that NBD, the

1    defendant, is in the middle of this flow data at the

2    wholesaler line.  NBD's sister company, SafeRent, services

3    NBD's business selling data.  They work together.

4    SafeRent gets its data from -- 90 percent of its data

5    comes from public record sources directly from

6    governments, electronic records obtained from governments,

7    and about ten percent or so or less comes from one vender

8    who supplies sex offender data.

9            NBD's business involves exclusively selling data

10   downstream to other CRAs.  I think there is no dispute

11   here that these CRAs are reseller CRAs, the technical term

12   in the consumer reporting business.  In this case,

13   Verifications and ADP are the two reseller CRAs to whom

14   data was sold by NBD.

15           THE COURT:  In the papers, it looks to me like

16   that Verifications actually does the clearance decisions

17   for Interbake, for the employment decisions.  They

18   actually, I think it's called adjudicate eligibility for

19   employment.  So you are providing in that instance data

20   that's used by the person who actually finds out whether

21   a -- decides whether a consumer whose report it has is

22   eligible for employment.  Is that -- do you dispute that

23   fact?

24           MR. WINGFIELD:  I dispute that Verifications did

25   anything like that with respect to the plaintiff in this

1  case, Mr. Henderson.

2          THE COURT:  Does it generally do that?

3          MR. WINGFIELD:  I didn't pick that up out of the

4  record, Your Honor.

5          THE COURT:  That's what Mr. Bennett alleges, that

6  it actually does that as to Interbake which is the

7  employment -- the Henderson employer.  In other words, it

8  serves as Interbake's agent for making the ultimate

9  decision are you going to get hired or not on the basis of

10  what I have.  That's what's in the briefs.  Either it's

11  right or it's wrong.

12          MR. WINGFIELD:  Your Honor, I don't have --

13          THE COURT:  That's one question.  The next

14  question is, is the same thing true as to ADP.  It looks

15  to me like it is, but I can't tell for sure.

16          MR. WINGFIELD:  May it please the Court, there's

17  nothing in the complaint that alleged that Verifications

18  or ADP were acting as an adjudicator.  I apologize -- if

19  there's record cites to show that they provided

20  adjudication services with respect to Mr. Henderson or Mr.

21  Hines, I didn't see it in the record.  We took the

22  position in our briefs that it was undisputed fact that

23  there was no adjudication, so if the Court finds --

24          THE COURT:  Page 14 of the plaintiff's brief, "In

25  the case of Henderson, there is an additional factual

1    reason why NBD's arguments fail.  Verifications was not

2    merely the 'user' but also the 'end user.'  Defendants'

3    own archive shows that Verifications identified itself as

4    the 'End-user' of Henderson's report.

5          "Minnesota-based Verifications' disclosure of

6    itself as the end-user and the user makes sense, as

7    Verifications is also hired by its employer customers to

8    'adjudicate' the applicant based upon the consumer report

9    using the employer's provided hiring rules."  Page 14.

10          MR. WINGFIELD:  Yes, Your Honor.  Where we split

11    difference is there's no evidence that those kinds of

12    services were provided here with respect to Mr. Henderson

13    or Mr. Hines.

14          THE COURT:  What difference does that make?

15          MR. WINGFIELD:  It makes all the difference in

16    the world.

17          THE COURT:  As to whether the statute applies to

18    you?

19          MR. WINGFIELD:  As to the named plaintiffs.

20    That's -- this is summary judgment as to the named

21    plaintiffs.  This is not a summary judgment against some

22    hypothetical class.  We're moving summary judgment against

23    the named plaintiffs' claims, and I respectfully submit

24    that there is no evidence in the record that Verifications

25    or ADP provided those kinds of services as to Mr.

1    Henderson or Mr. Hines.

2              I'd be happy, after the hearing, to send in, you

3    know, our analysis of the record on this point.  It does

4    seem quite important, but it was our fundamental analysis

5    and the position we took in our briefs is that it was an

6    undisputed fact.

7              THE COURT:  They cited Exhibit K.  Unfortunately,

8    nobody gave me Exhibit K.

9              MR. WINGFIELD:  We have a record here with us.

10             THE COURT:  Does anybody have Exhibit K?  Excuse

11   me.  That's yours.  I want the plaintiffs'.  I don't know

12   what K is because of the system.  I think it's tab 11.  I

13   believe that's right.

14             MR. WINGFIELD:  Your Honor, I'll be happy to hand

15   up what the parties have agreed is supposed to be

16   Plaintiffs' Exhibit K to complete the record.

17             THE COURT:  Is it CLH002649?

18             MR. WINGFIELD:  Correct.

19             THE COURT:  I have it.

20             MR. WINGFIELD:  Through 52.

21             THE COURT:  Through what?  Through 52?  That's

22   what they say shows it.

23             MR. WINGFIELD:  So what this is is a paperwork --

24             THE COURT:  Excuse me.  Do you agree that that

25   statement on page 14 is correct but it is not correct as

1  to Mr. Henderson?  Is that your point?

2      MR. WINGFIELD:  Whether or not ADP --

3      THE COURT:  No.  Do you agree that the statement

4  is correct but that it is simply not correct as to Mr.

5  Henderson?

6      MR. WINGFIELD:  My belief is that Verifications

7  does provide some of these services for other of its

8  customers.

9      THE COURT:  So the answer to that question is

10  yes.

11      MR. WINGFIELD:  That's my personal belief not

12  based on --

13      THE COURT:  Based on the record.

14      MR. WINGFIELD:  Based on this record, no.  I just

15  believe based on my knowledge of Verifications, they

16  probably do some of that services.  Many of these reseller

17  CRAs do provide those services, so it would be typical

18  that at least one line of its business would do this kind

19  of thing.  So that's my belief.  It's not based on the

20  record here.  It's just my understanding of how the

21  business works.

22      THE COURT:  And you say that exhibit, K, does

23  not -- which is tab 11 -- I don't know why we have

24  different numbers and all that stuff so it's hard to find.

25  They cite K and then the tab is 11, but it needs to be

1  sorted out so people can find it readily.

2          MR. WINGFIELD:  It may be.

3          THE COURT:  Do you believe that Exhibit K shows

4  that, as to Verifications, it does what is asserted on

5  page 14 of the plaintiffs' reply brief?

6          MR. WINGFIELD:  It does not prove that.

7          THE COURT:  What does it show, in your judgment?

8          MR. WINGFIELD:  It does show that if you

9  cherry-picked through the documents in the case, you'll

10  find various instances where Verifications was identified

11  as a user of data.

12          So like for here, an example in K, this describes

13  various data fields that would be associated with

14  Verifications' dealing with NBD, and it talks about

15  identifying the party requesting information, here,

16  Verifications, as being a user using that word.

17          We take the position that that is not an FCRA use

18  of the word "user."  It's not an admission.  It is

19  semantics.  We're just cherry-picking through documents to

20  try to pick out, you know, use of words in various

21  contexts.

22          THE COURT:  It may be cherry-picking.  I thought

23  that's what, in part, lawyers engaged in regularly, was to

24  find the pertinent evidence, the cherry that goes in the

25  pie.  So there's nothing inherently wrong with

1   cherry-picking, it seems to me, so long as the cherry

2   picked proves the point that is sought to be made.

3          MR. WINGFIELD:  When I say cherry-pick, I mean

4   picking out isolated words outside the context of their

5   use and meaning.  Taking out of context, I guess --

6          THE COURT:  Well, was anybody deposed about this

7   document?

8          MR. WINGFIELD:  Not to my knowledge.  No, no one

9   was deposed about this knowledge.  We're just looking at

10  this piece of paper at this point.  But the evidentiary

11  facts, I think, are what we focus on, and either the

12  record supports it or not, that Verifications actually did

13  this adjudication for Mr. Henderson in this case or not.

14  That's the key.

15         I submit there's no evidence he actually did that

16  here.  Maybe in another context they did it.  Maybe use of

17  the word "user" tended to cover that potential activity at

18  Verifications.  The record is not very explicit on this

19  point, but what is explicit is there's nothing in the

20  record about -- to show that Verifications actually did

21  this adjudication.  Same for ADP, and that's what's

22  important.

23         I think the Court -- where the Court is going

24  here is picking up on -- I submit is picking up on one of

25  the three key legal reasons why we say 1681k does not

1    apply to a wholesaler, because I think -- it appears to be

2    that we're all in agreement now that there needs to be a

3    user to whom NBD is selling data as one of the requisites

4    to triggering 1681k.  So we have to figure out whether

5    Verifications and ADP is a user.

6              Our briefs pointed out that really the universal

7    authority, as far as our legal search shows, indicates

8    that to be a user, there must be a decision-making use of

9    the data.  Presumably --

10             THE COURT:  You would agree that if Verifications

11   uses it to adjudicate the person's eligibility for

12   employment or any of its customers, it then is a user,

13   would you not?

14             MR. WINGFIELD:  Two points.  The user potentially

15   as to the specific transactions involved in that

16   adjudication, not --

17             THE COURT:  No, the answer to that question is

18   very simple:  Yes or no, you don't agree.

19             MR. WINGFIELD:  I don't agree with the premise of

20   the question.

21             THE COURT:  Why?

22             MR. WINGFIELD:  Because it doesn't matter to Mr.

23   Henderson or Mr. Hines whether Verifications, in doing

24   some other line of business or some other consumers,

25   adjudication services.  What we're looking at here are the

1    plaintiffs, Mr. Henderson and Mr. Hines.  If there is no

2    use as to their information, then there's no claim under

3    the statute.

4         THE COURT:  So your point is to be a user under

5    the statute, you have to be a user as to this particular

6    plaintiff in this case.

7         MR. WINGFIELD:  Yes, sir.  That's our position.

8    And we argued the consumer --

9         THE COURT:  You said there's a universe of

10   authority out there.  I didn't read too much to find that

11   there was a big universe.  It looks like there's one case.

12        MR. WINGFIELD:  Well, in the FCRA world, you

13   know, it's not like the federal securities laws or the

14   antitrust laws.  It is -- you know, Mr. Bennett and us are

15   busy creating law around the country.  Sometimes it's more

16   authority or not.

17        THE COURT:  The answer is there's only one case

18   that you cite that I know of.  Is that correct or wrong?

19   Am I reading the brief wrong?

20        MR. WINGFIELD:  There's actually about three

21   cases.  The main one we cite is the *NADA* case.

22        THE COURT:  D.C. District Court case?

23        MR. WINGFIELD:  And what we found particularly

24   significant about the *NADA* case is that it adopted the

25   FTC's position on what constitutes use of a consumer

1  report, and the FTC, at least until the merger with the

2  CFPB, was the primary federal government agency

3  responsible for the FCRA, and Mr. Bennett has cited many

4  times to this Court pronouncements of the FTC as at least

5  persuasive authority about how we ought to go about

6  interpreting the FCRA.

7          And so we're here in a situation where the FTC

8  has some very highly articulated briefing in the *NADA*

9  case, explained in much more detail --

10         THE COURT:  *NADA*, as I understand it, deals with

11  an entirely different section of the law than we're

12  dealing with here.  Am I right or wrong about that?

13         MR. WINGFIELD:  Entirely different -- it's not a

14  1681k issue.  It's another part of the FCRA.

15         THE COURT:  Under 1681m(h); is that right?

16         MR. WINGFIELD:  Correct, Your Honor.  It's about

17  delivery of a notice, very similar to this, though.  It's

18  discussing the legal obligation to deliver notices to

19  consumers, but the word "use" and "uses" and "users" in

20  the FCRA is ubiquitous throughout the FCRA.

21         We suggest that a logical approach to

22  interpreting the use is to come up with an interpretation

23  of that word that applies throughout the FCRA correctly.

24         THE COURT:  But the *NADA* case really turned on

25  deference under the *Chevron* principle to the FTC's view of

1   things.  That's not involved here, is it?

2            MR. WINGFIELD:  Oh, to the contrary, because we

3   are using *NADA* as a vehicle to show you what the FTC's

4   most recent and most highly articulated interpretation of

5   the word is.

6            THE COURT:  To the contrary means that somehow

7   the FTC's interpretation is involved here.  What FTC

8   interpretation controls this case?

9            MR. WINGFIELD:  It is the interpretation as

10  stated in the *NADA* case and the FTC's briefing.  Most of

11  the FTC's interpretation, and all due respect to Becky

12  Kuehn who actually comes from the FTC, has background

13  there, is very cursory.

14           THE COURT:  I know, but the problem is that in

15  that case, *NADA*, it was against the FTC, and so FTC

16  prevailed because its interpretation was entitled to

17  deference.  The deference principle doesn't apply here,

18  does it?

19           MR. WINGFIELD:  It does not.

20           THE COURT:  That's what I was trying to ask and

21  didn't --

22           MR. WINGFIELD:  You're correct.  We're offering

23  the FTC position as persuasive authority.

24           THE COURT:  I understand.

25           MR. WINGFIELD:  I say also while -- how far you

 1   can take the FTC interpretation of FCRA today, very much

 2   debated, so I'm not arguing there's a legally binding

 3   requirement upon you under *Chevron* or whatever to follow

 4   it.

 5           We're saying this is a single best authority that

 6   exists on this issue, and absent some reason to diverge

 7   from it, the law ought to be followed.

 8           THE COURT:  Is your client a consumer reporting

 9   agency?

10           MR. WINGFIELD:  We have not disputed that.

11           THE COURT:  So for purposes, you are.  Do you

12   furnish consumer reports?

13           MR. WINGFIELD:  Once again, for purposes of this

14   motion, we're not disputing that.

15           THE COURT:  Do you furnish consumer reports for

16   employment purposes?

17           MR. WINGFIELD:  No.

18           THE COURT:  I understand there are only two

19   purposes under your contracts for which you can provide

20   them.  One is for employment purposes.  The other is for

21   what?

22           MR. WINGFIELD:  The contracts mainly talk about

23   employment purposes.

24           THE COURT:  What other purposes could you use,

25   supply this consumer report for other than for employment

1  purposes under your contract with the people you buy from

2  and you sell to?

3  MR. WINGFIELD:  Again, the contracts make clear

4  that the employment purpose that is being spoken of is the

5  customers of the reseller CRAs is being spoken of.  If you

6  look at the contracts, they clearly talk about --

7  THE COURT:  That, however, was not the question

8  that I asked, and that is, what purposes could there be

9  for your providing this that is permissible under the law,

10  available under the law, and permissible under your

11  contract?

12  MR. WINGFIELD:  What's permissible under the

13  contract is there is a general permission for one CRA to

14  sell data to another CRA.  And the idea is that as long as

15  the data stays within CRAs, then it's being protected by

16  the FCRA, and it will not come out of the CRA's at the end

17  of the distribution channel unless there's that ultimate

18  permissible purpose.

19  But the sale of data from one CRA to another is

20  legally authorized as a general matter and divorced and

21  not required to be supported by any specific use purpose

22  other than simply the CRAs selling data, one to the other,

23  for general business purposes.

24  THE COURT:  On page 12 of the brief, it says that

25  in your agreements, that you will request, use, or provide

1  data for one or more of the permissible purposes as

2  defined herein including consumer inquiries in connection

3  with credit transaction initiated by consumer.  We don't

4  have that here; right?

5          MR. WINGFIELD:  Not in this fact pattern, no.

6          THE COURT:  Or for employment purposes.  We have

7  that here.  Now, that's what it says in your contract, and

8  under the law, the only certain purposes for which these

9  things can be used, and they are, as I understand it,

10  insurance eligibility, extension of credit, response to

11  government subpoena, commercial business transactions

12  initiated by the consumer, collection of child support.

13          None of those was involved here, so what's left,

14  it seems to me was, for an employment purpose, and the law

15  -- your own papers seem to show that.  If they don't prove

16  that dispositively, they at least raise a fact issue as to

17  that question which, in my judgment, would preclude

18  summary judgment.  What's wrong with that?

19          MR. WINGFIELD:  Because the actual facts show

20  that it was not supplied to the reseller CRAs for an

21  actual employment purpose.

22          THE COURT:  But that's a fact issue.  That's a

23  fact issue.  You say, well, it wasn't supplied, but the

24  law says there are a limited number of purposes.  The only

25  one of those purposes you can comply with is employment

1   purpose, and your contract limits you to a couple of three

2   purposes, and only one is employment purposes.  Now, the

3   jury could take that information and the argument that you

4   say -- the facts that you say constitute the other side of

5   the point and decide against you.

6          They could decide for you, too, but could decide

7   against you just as well, and I don't understand how you

8   could conclude otherwise.  Help me with that.

9          MR. WINGFIELD:  Once again, it's context, Your

10  Honor.  This is also no good turn goes unpunished.  We, as

11  a CRA, have obligations to police the people to whom we

12  sell data.  So one way we do it is make sure we only sell

13  to CRAs who have -- FCRA has privacy and accuracy duties

14  as one general thing.

15         Another one is, put controls on their use of the

16  data, make sure they promise to us that they're only going

17  to resell it to people for one of the permissible purposes

18  under the FCRA.

19         THE COURT:  Well, then you know precisely what

20  it's going to be done for, because your contract says that

21  that's what it's going to be done for, and, in fact,

22  that's what it is done for.  How on earth can you say you

23  don't comply with the four employment purposes part of

24  that statute?

25         MR. WINGFIELD:  Your Honor, we're going around in

1    circles here, and I apologize.  Let me just make one more

2    crack at it.  When we are -- in our little chart, when

3    we're selling data from one CRA to another, the FTC has

4    said that that sale of data does not require any specific

5    permissible purpose.  We're allowed to sell data to

6    another CRA regardless.

7          THE COURT:  But that's not what your business

8    model is.  You are selling it for that purpose.  That's

9    what you are doing.  You talk about context.  Let's take

10   the context of your agreements, context of the things that

11   you actually do, all of which can be proved at trial.

12   That's the context.

13         The context in the abstract that was discussed by

14   the FTC, it seems to me, doesn't apply here.  The context

15   that applies is your business model, what you are doing

16   and how you are doing it.  And the jury can find those

17   things as a matter of fact, it seems to me, if you dispute

18   it.

19         MR. WINGFIELD:  Well, Your Honor, on two of my

20   three points, I'm obviously sort of beating my head

21   against the wall, but I would like to talk about the third

22   point.

23         THE COURT:  Help me with the evidence to the

24   contrary, but these are the points -- I'm not making these

25   points.  These are the points that are being made in the

1    briefs of your opponent, and I'm trying to figure out

2    what's wrong with their points.  They seem sound to me.

3              MR. WINGFIELD:  Our position is, is that the

4    statements in contracts in other documents that the

5    distribution channel of information is going to be

6    ultimately used for employment purposes talking about the

7    employer's use of the data --

8              THE COURT:  But the statute doesn't say that.  If

9    Congress had wanted so to limit the requirements of the

10   statute, it could have said for use by -- for employment

11   purposes by the prospective employer, or it could have

12   said for use by prospective employers.

13             MR. WINGFIELD:  Well, Your Honor, the FCRA

14   requires a lot of interpretation.  I mean, this Court has

15   been experiencing the FCRA at least since 2007 to my

16   knowledge, and I don't know what opinions you may have

17   been forming about the FCRA as a general matter, but I

18   certainly generate a lot of opinions --

19             THE COURT:  I would like -- my opinion as a

20   general matter is I would like to have not so many of

21   these things on the docket.

22             MR. WINGFIELD:  Well, there's a reason why

23   there's so many on the docket, is because the FCRA in many

24   ways is impenetrable.  Congress has not answered many of

25   these questions.  The FTC has come forward and provided

1   gap-filling guidance on certain issues like the ability of

2   one CRA to sell data to another.  The FTC has stepped

3   forward, filled that gap, answered the question.  The FTC

4   has come forward and provided workable definitions of what

5   a user is.

6          The courts are doing the same thing over the

7   years through case law, and in the meanwhile, we live in

8   areas of deep ambiguity where people are taking their best

9   shots at compliance efforts on pain of being hailed into a

10  class action case, and --

11         THE COURT:  Congress contemplated that this was a

12  statute that would largely be enforced by the people who

13  were -- whose rights were offended by it and that

14  certainly they should know -- they knew or should have

15  known that, and I think the history is they did know that

16  class actions could be available to do that.

17         MR. WINGFIELD:  Fair point.

18         THE COURT:  That's not the fault of the

19  plaintiffs.  That's the fault of Congress.

20         MR. WINGFIELD:  I'm not accusing the plaintiffs.

21  I'm accusing Congress.

22         THE COURT:  Go to Congress and get them to

23  straighten it out.  I don't have any of their powers and

24  don't want them.

25         MR. WINGFIELD:  Well, I would like to talk about

1    my third point.

2            THE COURT:  All right.

3            MR. WINGFIELD:  Before I leave, I'll just say

4    that we believe the material controlling facts are what

5    actually happened with the actual relationship of the

6    parties actually in this case.  We believe the contracts

7    are compliance terms to make sure that data is not coming

8    out of this FCRA-regulated channel in an impermissible way

9    by somebody else to whom we're providing the data.  We're

10   trying to control that, make sure they're going to comply

11   with the FCRA, and the Court doesn't read those contracts

12   the same way.

13           My third argument still stands which is the "a

14   consumer" argument that in order for 1681k to be

15   triggered, that that report that NBD sold has to be about,

16   quote, a consumer, end quote, a discernible individual, a

17   specific person, and here, Your Honor, we're going to be

18   talking about Judge Spencer's decision --

19           THE COURT:  Wait a minute.  It doesn't say that,

20   though.  It says, "a consumer reporting agency which

21   furnishes a consumer report for employment purposes and

22   which for that purpose is compiled and reports items of

23   information on consumers which are matters of public

24   record and are likely to have an adverse effect upon a

25   consumer's ability to obtain employment."

1          Now, are you saying that the "a consumer" you are

2     talking about is the "a consumer's ability to obtain

3     employment"?

4               MR. WINGFIELD:  No.  What I'm saying is --

5               THE COURT:  What is the "a consumer" argument?  I

6     don't understand it in view of the clear terms of the

7     statute.  The statute says what it says and uses those

8     terms in certain ways, but I don't see that it says -- I'm

9     not even sure what you are saying.  Help me with what your

10    argument is.

11              MR. WINGFIELD:  Let me back up.  We got a little

12    bit sidetracked --

13              THE COURT:  On the "a consumer" part of it.

14              MR. WINGFIELD:  So we'll talk about what actually

15    happened in this case on selling of data.

16              THE COURT:  Let's talk about the statute first.

17              MR. WINGFIELD:  Okay, the statute first.  Our

18    position is, is that the sale of data that we sell has to

19    be about a specific consumer.

20              THE COURT:  What part of the statute says that?

21              MR. WINGFIELD:  Well, first of all, right there

22    you have "a consumer."

23              THE COURT:  Where?

24              MR. WINGFIELD:  "Likely to have an adverse effect

25    upon a consumer's ability to obtain employment."

 1              THE COURT:  So it's the "a consumer's ability"

 2      language that you are fastening your argument on on the

 3      statutory interpretation.

 4              MR. WINGFIELD:  And then if you go down to

 5      k(a)(1), it talks about this notification requirement

 6      notifying, quote, the consumer, end quote.  So we -- our

 7      position is, is that this statute is not triggered unless

 8      the sale of data is about a specific individual consumer.

 9              Our position is the sale of date that NBD did to

10      both Verifications, ADP in this situation was not about a

11      specific individual consumer.  It was a bulk sale of data

12      done in a specific way.  Moreover, we point this Court to

13      *Intelius* decision by Judge Spencer cited in the briefs,

14      discussed extensively in the briefs addressing a very

15      similar issue on another portion of the FCRA.

16              THE COURT:  Yeah.  It's another statute, and it

17      is a different fact pattern.

18              MR. WINGFIELD:  Well, I disagree.  I think the

19      fact pattern is quite analogous, quite analogous.

20      Intelius sold data by the internet by general searching of

21      name and date of birth, and that's exactly what --

22              THE COURT:  Just a minute.  The point that

23      *Intelius* turns on is this language:  "A file is defined as

24      all of the information on that consumer recorded and

25      retained by consumer reporting agency regardless of how

the information is stored.  Here, Fiscella" -- that's the

plaintiff -- "has not and cannot, on these facts, claim

that Intelius created a file on Fiscella that contains

disputed information that requires investigation," and it

goes on to say, "Under the FCRA, he may ask for a

reinvestigation in connection with his file, and he may

pursue his claim in court if the request he makes in

connection with his file is not honored, but the report he

purchased or the information Intelius has at its disposal

in connection with all individuals named Edward Fiscella

is not collectively a file on this plaintiff."

Now, that's a wholly different issue than what we

have here.

MR. WINGFIELD:  Different statute, different

words, but very much the same pattern.

THE COURT:  I know, but if you want to change the

statute, go to Congress, I think.  You're asking for a

fundamental revision of the statute.

MR. WINGFIELD:  I am not, sir.  I'm asking for

this Court to enforce the use of, in the first paragraph

of 1681k(a), the words "a consumer," and k(a)(1)

subparagraph about the consumer, and then k(a)(2), again,

it uses the phrase "a consumer."  The clear contemplation

of the statute is that this Section 1681k would apply only

when there's a report about a specific consumer.  Very

1  similar to *Intelius*.

2       THE COURT:  But you do give reports about

3  specific consumers.  You just give reports about a whole

4  lot of specific consumers, and your theory seems to be

5  that because -- let's just say there are 50, that that's

6  not about a specific consumer.

7       Well, another way to look at that is it's about

8  50 specific consumers, because each of them have a name

9  and a birth date, and you all are charged with knowledge

10  that in many instances, there are plenty of people who

11  have the same first and last name and the same birth dates

12  in this country.

13       MR. WINGFIELD:  Certainly.  We are wholesalers.

14  Just like *Intelius*, we sell data that way, to users who

15  know that's what they're getting.  We are -- in the same

16  way there is no file about a consumer being created by

17  this kind of sale of data based on first, last name, and

18  date of birth.

19       Here, same thing.  There's no report about a

20  specific consumer.  There's no report, because it's not

21  about a specific person.  It's a turn of results based on

22  first and last name and date of birth.

23       THE COURT:  So your best argument seems to be the

24  practical one that would keep some -- there would be

25  confusion if you had to give notices to everybody who had

1    the same first and last name.  That seems to be a very

2    heavy argument in your brief.  Am I interpreting your

3    brief right?

4             MR. WINGFIELD:  Yes.  We believe that the

5    plaintiff's theory would create unnecessary and actually

6    counterproductive compliance steps by wholesalers like us.

7    It would be a great burden to wholesalers.  There's no

8    benefit or actually a negative benefit at a great cost.

9    So it doesn't make sense.  It's not -- that interpretation

10   statute cannot hold water, because it doesn't make sense.

11   I'd be happy to talk more about those practical

12   consequences.

13            Remember, Your Honor, under the statutory regime,

14   when the report actually is used for an employment

15   decision by employer or by an employer's agent, there's

16   going to be a notice sent.

17            THE COURT:  How about this case:  How about a

18   consumer having the ability to say, look, fellow, as to

19   me, you are wrong.  I don't know which Robert Payne you've

20   got, but as to me, you're wrong.  Now, set your records

21   straight and don't use my name anymore, and don't do that

22   in what you are doing.

23            MR. WINGFIELD:  That is perfectly legitimate --

24            THE COURT:  I'm not the Robert Payne.  I don't

25   have any convictions at all, and I don't ever want you

1  saying that I do.  What's wrong with the statute being

2  interpreted in a way that allows -- requires you to give

3  the consumer notice that his name has been used in that

4  fashion and him to come back to you and say, stop that?

5      MR. WINGFIELD:  The FCRA gives him, the consumer,

6  that right.  The FCRA speaks to how to do that.  It's not

7  this way, though.

8      THE COURT:  But what's wrong with interpreting

9  the statute to do it that way and stopping this at the

10  source so that my name will never be used again if I am

11  that consumer in this way?  What's wrong with that?

12      MR. WINGFIELD:  Because it's totally unworkable.

13      THE COURT:  Of course it's workable.  All you

14  have to do is get a name from me, and it says Robert E.

15  Payne, [BIRTH DATE], I give you my address, and you go

16  check the records, and you take that Robert E. Payne out

17  of what you do forever, because I don't have any criminal

18  record, and then you have to -- is it going to cost you a

19  little bit of money to do something?  Yeah.  Are you going

20  to have to change your business model?  Yeah.  But at that

21  juncture, the law doesn't protect your business model.

22      MR. WINGFIELD:  So, Your Honor, what happens when

23  a different Robert E. Payne, perhaps even the same date of

24  birth, which often happens, applies for a job as a van

25  driver for a handicapped van driver service, and an

1    employer, as the law requires him to do under a Fourth

2    Circuit decision, wants to do a background check, make

3    sure that person isn't a criminal, have a criminal

4    background, particularly a sex offender history.

5           So they come to us, but you, meanwhile, told us,

6    I don't want you ever to say anything bad about me, my

7    name.  So we've taken out all the Robert E. Paynes, your

8    date of birth, out of the database --

9           THE COURT:  Just mine.  Not everybody else.  Just

10   mine.  You can go back and take mine out.

11          MR. WINGFIELD:  You are not entitled to -- it

12   actually is about you, you're not entitled to make us take

13   it out.

14          THE COURT:  Of course not.  I'm saying if it

15   doesn't apply.  If I prove I don't have a criminal record,

16   you have to get it out of there.  What you are doing is

17   this:  You're starting the pebble rolling downhill and

18   getting it into the hands of somebody who now is being

19   told, well, Payne has a criminal record, and when he

20   applies for this job, that's there.  What's wrong with

21   making you do it right the first time?

22          MR. WINGFIELD:  A common issue in court, in law

23   is imposing a duty on a party most able to effectively

24   address a problem.  In this case, it's not us.  It's the

25   reseller or the employer, particularly the reseller.

```
 1            We provide unmatched records.  Under our
 2    contracts -- you've been reading our contracts.  Those
 3    same contracts make it absolutely clear it's the duty of
 4    the people to whom we sell to figure out whether those
 5    records apply to you or somebody else.
 6            THE COURT:  You mean under your contract.
 7            MR. WINGFIELD:  Under the contract and the law.
 8    We tell them, here is these bulk records you've asked for,
 9    it's your duty to figure out which ones actually apply to
10    the applicant.  The other people closer to the job
11    applicant, they're in a better position to get information
12    about who the person really is, person better able to call
13    the employer and get more information to help them match.
14            We had very little information upstream.  The
15    reseller has all that information, much better opportunity
16    to get the information than we do.  The burden ought to
17    fall on them to do the match.
18            THE COURT:  That's Congress's responsibility.
19    All right, let me hear from Mr. Bennett.
20            Take his last argument first, Mr. Bennett.  It
21    seems to me to have some merit to it.  I'm not sure I
22    agree with it, but I think he is making a good point.
23            MR. BENNETT:  Yes, sir.  Again, it's a
24    legislative point.  That is the point, is Congress should
25    amend the statute to excuse an upstream CRA --
```

1              THE COURT:  Excuse me.  That isn't what he was

2    saying.  That's what I said.

3              MR. BENNETT:  Yes, sir.

4              THE COURT:  What he was saying is the law doesn't

5    require him to do it.  Where in the structure of the

6    statute it is required to be done is when the rubber meets

7    the road and the data that he provides, his client

8    provides, actually gets into the hands of some prospective

9    employer, and then at that juncture, the consumer has the

10   right to -- a specific consumer has the right to know that

11   he has been reported as having this impediment to

12   employment, and that consumer then has the right to go

13   back to the prospective employer and say, hey, that's

14   really wrong, it's not me.

15             MR. BENNETT:  Yes, sir, and that is how you end

16   up with a dozen Tyrone Henderson cases on your docket, all

17   derived, or many of them, derived from data that had its

18   origin here.  It is literally legal whack-a-mole where

19   Tyrone Henderson -- the HR-plus data in the case pending

20   here came from NBD.  The Verifications data came from NBD.

21   There was other data regarding Tyrone Henderson that came

22   from NBD that predates the statute and wasn't filed.

23             The origin, the problem isn't the connivery of

24   Tyrone Henderson but having to chase to find -- instead of

25   simply tying to take cough medicine to make the cough go

1  away for the moment or suppress it, to actually come to a

2  solution at its core, where is the bad data actually at

3  its core coming from.  There are --

4        THE COURT:  Wait a minute.  That brings him back

5  to the point then that there's really nothing they can do

6  about it.  They're entitled to sell the data, they say,

7  under the FTC's interpretation of it, and they are

8  entitled to sell this data, and it's not their

9  responsibility to do anything other than make sure that

10 the data they do sell is complete.

11       MR. BENNETT:  Well, the problem that Mr. -- the

12 problem with Mr. Wingfield's argument in that regard is

13 he's tying those two statements together.  The first

14 statement is they're entitled to sell the data.  The

15 second regards what they must do if they sell the data.

16       There is no doubt that the Federal Trade

17 Commission would have to -- anyone who could read the

18 statute has to believe that a company like NBD, a CRA like

19 NBD is entitled to sell to a reseller and has a

20 permissible purpose, and that reseller then to a user, and

21 I apologize.  I have my phone -- it's on mute -- or on

22 wireless, but I have 1681e and 1681e(a) and e(e) which are

23 really important.  They are in the briefs, but 1681e(a)

24 uses the word "user" in the way I'm going to explain.

25       1681e(e) uses a different phrase missing from

1  this chart which is end-user, and they are two different

2  things obviously.  You don't put user and end-user in the

3  same statute and render the word end hyphen meaningless

4  otherwise under statutory construction.

5       1681e(a) says that every consumer -- the relevant

6  part, every consumer reporting agency shall maintain

7  reasonable procedures designed -- or these

8  procedures shall require -- are designed to --

9       THE COURT:  Start again.

10      MR. BENNETT:  Yes, sir.  "Every consumer

11 reporting agency shall maintain reasonable procedures

12 designed to avoid violations of 1681c of this title"  --

13 that's the don't publish old data -- "and to limit the

14 furnishing of consumer reports to the purposes listed

15 under Section 1681b of this title, employment purpose, for

16 example.  These procedures shall require that prospective

17 users of the information identify themselves, certify the

18 purpose for which the information is sought, and certify

19 that the information shall be used for no other purpose.

20      "Every consumer reporting agency shall make a

21 reasonable effort to verify the identity of a new

22 prospective user and the uses certified by such

23 prospective user prior to furnishing such user a consumer

24 report."

25      1681e within the same section e, little e -- that

1   was a -- says, the title is "Procurement of Consumer

2   Report For Resell.  One, disclosure:  A person may not

3   procure a consumer report for purposes of reselling the

4   report or any information in the report unless the purpose

5   discloses to the consumer reporting agency that originally

6   furnishes the report, A, the identity of the end-user of

7   the report or information, and B, each permissible purpose

8   under Section 1681b of this title for which the report is

9   furnished to the end-user of the report or information."

10           THE COURT:  So does that mean that NBD has to

11  make Verifications disclose that it is going to have this

12  data go to Interbake, for example?

13           MR. BENNETT:  Yes.

14           THE COURT:  Is that a fair interpretation, I mean

15  an accurate interpretation of that law, of the facts of

16  this case?

17           MR. BENNETT:  Yes, sir.  And there you see the

18  basis, the reason it's legal for NBD to sell to the

19  reseller.  It still must have a permissible purpose.  That

20  permissible purpose is the derivative purpose for which

21  the report is provided to the end-user.  NBD knows that.

22  It must by law know that.  It must, in the contracts, the

23  block quotes and the text that we include in our

24  opposition brief know that.

25           This defendant requires its user customers,

1    resellers, to tell it all this information that makes it

2    more than practical for the defendant to do this.

3            While we're still on the policy issues that Mr.

4    Wingfield raised --

5            THE COURT:  More than practical for the defendant

6    to do what?

7            MR. BENNETT:  To send the notice to the

8    customer -- to the consumer, rather.

9            THE COURT:  So they send the notice to 50 Robert

10   Paynes.  And they don't know whether it's Robert E. Payne

11   or not.  They just know it's Robert Payne and my birthday.

12   They send a notice to all 50 of those people who show up

13   as being reported.  What good does that do?

14           MR. BENNETT:  Judge, there is a stipulation --

15           THE COURT:  And why would Congress require such a

16   thing?

17           MR. BENNETT:  That isn't what happens.  It is

18   regarded -- the report is requested regarding a consumer.

19           THE COURT:  Which report?

20           MR. BENNETT:  Let's take Tyrone Henderson's

21   report.

22           THE COURT:  I'm not talking about that.  I'm

23   talking about what they do.  They buy from the courthouse

24   the records, and they accumulate those records, and then

25   their customer, Verifications, says, do you have anything

1  in your records -- by punching in the buttons on the

2  computer, do you have anything in your records about

3  Robert Payne, [BIRTH DATE], and then they spew out all

4  they've got to Verifications; right?

5  MR. BENNETT:  Yes, sir.

6  THE COURT:  At that point, why would Congress

7  have required NBD to have provided notice to all 50 of

8  those Robert Paynes that their information had been

9  requested and that it showed a conviction?

10  MR. BENNETT:  It doesn't require that.

11  THE COURT:  That's what you say -- you're saying

12  they have to give notice.

13  MR. BENNETT:  No, Judge.  They have to give

14  notice to the subject of the consumer report.  They don't

15  have to give notice --

16  THE COURT:  Mr. Bennett, they can't give subject

17  to the computer report if they know, according to Mr.

18  Wingfield, if they only know that person's first and last

19  name and his or her birth date.  They would then have to

20  give notice to all of those people to give notice to one,

21  to the one who was the subject of the request by

22  Verifications.  And that's what you're going -- I mean

23  that's what they didn't do.  What is it -- why would

24  Congress require them to do all of that when

25  Verifications, if they are the ones deep-sixing the --

1    considering the application or Interbake, as the

2    prospective employer, is charged by the statute with the

3    duty to put the notice out in the hands of Robert Payne

4    who is the person being considered for employment?

5         MR. BENNETT:  So, the first is, the statutory

6    text says that the consumer reporting agency that

7    furnishes the report is governed by 1681k.  It doesn't

8    pick one versus another.  They are mutual duties.  As a

9    practical matter, this defendant could certainly be part

10   of a joint notice.  Earlier in its history, it was

11   providing draft 1681k(a)(1) notices to its customers to

12   tell them to send it.

13        THE COURT:  But that was to send it to the person

14   whom the end-user knew was the subject of the employment

15   application, and they had more detail about who it was.

16        MR. BENNETT:  So the defendant could -- and it

17   has rights under its contracts -- could insist that

18   Verifications send its notice for it so that Verifications

19   could send a notice that says, we have furnished a report.

20   That report is resold from a report furnished by National

21   Background Data.  Boom.  1681(a)(1) is complied with.

22        And on top of that, the defect that isn't a

23   legislative defect, it's not a drafting or an

24   interpretation problem, it is the fact that the defendant

25   chooses willfully to remain blind as to which Robert Payne

1    and the address for the Robert Payne or otherwise.

2            In the discovery, however, and it's at page 11 of

3    our brief, we reference docket number 56.  Docket number

4    56, we had discovery challenges, disputes --

5            THE COURT:  You are getting into digressions.

6    What do you have?  What does it say?

7            MR. BENNETT:  Docket number 56 was a stipulation

8    that says that collective discovery of their customers

9    would produce the information sufficient to permit the

10   plaintiffs to identify the individual ventures that are

11   subject of the report, and separately we cite in our brief

12   the defendant's contracts require that its customers keep

13   the information regarding and maintain the information

14   regarding the identity of those consumers.

15           So it certainly --

16           THE COURT:  That isn't what this says.

17           MR. BENNETT:  That is the stipulation I've just

18   read.

19           THE COURT:  There's a stipulation right above the

20   heading of B on your page.

21           MR. BENNETT:  It is, Your Honor.

22           THE COURT:  It says, "The collective discovery of

23   their," meaning NBD, "customers would produce information

24   sufficient to permit plaintiffs," that's you, "to identify

25   (including without limitation by name, address, date of

1   birth, Social Security number and other identifiers) the

2   individual of interest that was the subject of the

3   particular search query submitted to CoreLogic National

4   Background Data, LLC, by its customers."

5            MR. BENNETT:  Yes, sir.

6            THE COURT:  So they have stipulated that they

7   know -- that by review of their data, they know this

8   information.

9            MR. BENNETT:  Yes, sir.  And similarly, if you

10  take the practical issue, Verifications receives, in your

11  analogy, ten Robert Payne records.  The same arguments

12  would apply to Verifications.  If the defendant's view or

13  interpretation of what we're advocating, which is

14  incorrect, but if we were advocating that -- and the Court

15  were to find that the meaning of our argument is that

16  every single Robert Payne that is -- about whom a record

17  is included in Tyrone Henderson -- or in the other Robert

18  Payne's report, must receive a notice, the impractical

19  interpretation or obligation would remain for

20  Verifications, even more so because all of its data is

21  derived from NBD which derives it from SafeRent.

22           THE COURT:  Are you saying that the contract

23  between NBD and Verifications requires Verifications to

24  send notices on behalf of NBD if NBD requests that such

25  notices be sent, or absolutely?

1      MR. BENNETT:  It requires that the furnisher --

2  it tries to delegate the responsibility of compliance with

3  1681k(a), these sections of the contracts --

4      THE COURT:  Get back to my question.  You know so

5  much about the law that you don't need to tell me all

6  about it.  I just want to get the little part of it I know

7  about.

8      MR. BENNETT:  The contract does not say -- the

9  current contracts do not say, Verifications, you must send

10  a 1681k(a)(1) letter on our behalf.  They do not say that.

11  They could say that, and the problem is resolved, Mr.

12  Bennett's interpretation of the statute makes no sense.

13  It certainly does.  There's this very easy correction.

14      THE COURT:  All right.

15      MR. BENNETT:  The other -- I'm going back up

16  through the arguments.  Mr. Wingfield cites the *NADA* case,

17  and the Court is correct.  It dealt with a totally

18  different issue, but what even Mr. Wingfield wasn't

19  challenged for is where in the governance provision of

20  this 1681k(a) does the word "user" appear?

21      User is not an element of being governed by

22  1681k(a).  The word "user" appears simply in the k(a)(1)

23  sentence which says, "At the time such public record

24  information is reported to the user of such consumer

25  report, notify the consumer of the fact," which means if

1  it is that Mr. Wingfield's correct that end-user and user

2  somehow mean exactly the same thing and they're only

3  end-user, that is the user is the entity that makes the

4  decision, he doesn't deny that there's a user.  He just

5  simply said, it's not our user, it's Verifications' user.

6          THE COURT:  Verifications is a user.

7          MR. BENNETT:  It is.

8          THE COURT:  Is your point.

9          MR. BENNETT:  It is my point.

10         THE COURT:  And his point is that the user means

11 Interbake.

12         MR. BENNETT:  Correct.  And, respect to Mr.

13 Wingfield, if we look at what we apparently mistakenly

14 marked as Exhibit K from earlier, this computer screen --

15         THE COURT:  It's tab 11.

16         MR. BENNETT:  Tab 11, Mr. Wingfield says, well,

17 we understand that it uses -- it characterizes

18 Verifications as the user.  That's not what it says.  It

19 characterizes Verifications as the end-user.

20         THE COURT:  Where does it do that on this tiny,

21 tiny page?

22         MR. BENNETT:  Yes, sir.  This is the record --

23         THE COURT:  Now I've got something to magnify it

24 if you'll just tell me where it is.

25         MR. BENNETT:  Top left.

1            THE COURT:  User ID, end-user.

2            MR. BENNETT:  End-user.  That was the code which

3   in discovery -- and they don't deny is Verifications, Ink.

4            THE COURT:  End-user state is Minnesota.

5            MR. BENNETT:  And then permissible purpose, and

6   we cite the different manual that points this out,

7   permissible purpose, 06, while you have the magnifying

8   glass, that is NBD's permissible purpose for employment

9   purpose.

10           THE COURT:  So the record shows that.  Now, his

11  point as to this is that, okay, let's give you all of

12  that.  There's no evidence in the record that any of this

13  was ever done by Verifications as to Mr. Henderson or

14  anybody else who is a named plaintiff.

15           MR. BENNETT:  Well, that record --

16           THE COURT:  Did it, or does the record show that

17  this process was followed as to Mr. Henderson?

18           MR. BENNETT:  Yes, sir.  That very document is

19  the evidence that that's true for Verifications.

20           THE COURT:  All right, now, his other point, I

21  guess, is that your argument on page -- excuse me, 14 of

22  your brief, that Verifications actually -- you say,

23  "Minnesota-based Verifications disclosure of itself as the

24  end-user and the user makes sense, as Verifications is

25  also hired by its employer customers to 'adjudicate' the

1   applicant based upon the consumer report using the

2   employer's provided hiring rules."  Was that done as to --

3   he says that wasn't done here as to Mr. Henderson.

4           MR. BENNETT:  It was absolutely done.

5           THE COURT:  Does the record show that?

6           MR. BENNETT:  Well, we have cited from the

7   litigation that took place between Verifications and

8   Interstate Brands --

9           THE COURT:  I keep calling it Interbake.  I don't

10  know why.

11          MR. BENNETT:  Which LeClair Ryan and Ms. Kuehn's

12  former firm litigated this very issue, and the documents

13  that were discovered and were produced to the defendant in

14  this case as well as the party allegations made in that

15  case confirm that.  There is --

16          THE COURT:  Confirm what?

17          MR. BENNETT:  That Verifications adjudicated.

18  The report that Verifications furnished said Mr. Henderson

19  is not eligible.  That's why he didn't get the job.

20          THE COURT:  How about ADP?  Does ADP do the

21  adjudication, too, and does it make a difference if they

22  don't?

23          MR. BENNETT:  It does not make a difference.  We

24  don't know whether ADP did, but it does not make a

25  difference.  ADP is listed as having obtained the report

1   for the employment purpose in a similar chart as we've

2   just described.

3            THE COURT:  All right.

4            MR. BENNETT:  And on top of that, if you look at

5   the statute, the -- we've had some discussion about what

6   the Federal Trade Commission thinks, and there's an

7   indictment of our use of the informal opinions of the

8   Federal Trade Commission.

9            The defendant suggests the *NADA* case which, if

10  you read it, like the *Fiscella* case, facially has no

11  application here, but we do cite at page 20 an actual

12  consent order that the Federal Trade Commission negotiated

13  and entered disposing of a prosecution against Experian,

14  and -- I apologize.  We didn't include the citation in

15  here but certainly can provide it, when the -- call Ms.

16  Kuehn.  The Federal Trade Commission --

17           THE COURT:  What?  What are you saying?  Call

18  Kuehn?

19           MR. BENNETT:  I'm sorry.  The Federal Trade

20  Commission --

21           THE COURT:  Does all this have something to do

22  with the fact that you didn't put the cite in here?

23           MR. BENNETT:  It does.

24           THE COURT:  I don't need that.  I have to tell

25  you, the concept of digression drives me crazy, because I

1    get my mind focused on where you start, and then you

2    digress, apologize, and then go call somebody as a

3    witness.  By that time, I haven't got the first idea what

4    you are talking about.  So don't do that to me.

5              MR. BENNETT:  Yes, sir.  The Federal Trade

6    Commission prosecuted TRW, which then became Experian, in

7    part -- and has a long list of requirements to comply with

8    the Fair Credit Reporting Act to which Experian, under the

9    consent order would have to abide, and I bolded the B

10   which references Experian having resold or sold to

11   resellers its consumer reporting information, and the FTC

12   took the position -- and the FTC votes as a commission,

13   votes on these orders.

14             These are amongst the most persuasive ways that

15   the Federal Trade Commission can speak, and the Federal

16   Trade Commission believed that for Experian or TRW to

17   comply with these provisions, it would have to notify the

18   consumer of the subscriber's name and address when it was

19   reported -- when the subscriber was the reseller.

20             When it sold the report to the reseller, TRW

21   would have to notify the consumer of that.  That is to

22   comply with 16 -- what is 1681k, 613.  And that is what --

23   if the Court wants to look --

24             THE COURT:  Is there a cite to that?

25             MR. BENNETT:  It's --

1    THE COURT:  Is that the 784 F. Supp. 361?

2    MR. BENNETT:  Yes, sir.

3    THE COURT:  All right.

4    MR. BENNETT:  The question of a consumer -- Mr.

5  Wingfield provided the statute but doesn't diagram it.  It

6  actually does not say what he says.  As the Court was

7  already discussing in its dialogue --

8    THE COURT:  I have a copy of the statute in front

9  of me.  Not one that he provided but one that came out of

10  the U.S. Code Annotated®.

11    MR. BENNETT:  Yes, sir.  So 1681k(a) uses

12  different language regarding consumer than k(a)(1).  k(a),

13  as the Court already pointed out, describes generally

14  types of information on consumers, plural, and upon a

15  consumer's ability to obtain employment, but (1) refers to

16  a report regarding the consumer.  You notify the consumer

17  which is certainly different -- and for obvious reasons

18  it's different, because (a) is a classification of a type

19  of CRA and a triggering event.  (1) is the only part that

20  speaks to the actual consumer.  And so the suggestion that

21  the defendant --

22    THE COURT:  That just means that at such time --

23  at such time -- excuse me, at the time such public record

24  is reported to Verifications, the consumer, whoever that

25  person is, Henderson or Payne, has to be notified of the

1  fact that the public record is being reported by NBD

2  together with a name and address of the person to whom it

3  was reported, i.e., Verifications.  Is that how that

4  statute reads in your view?

5          MR. BENNETT:  Yes, sir.

6          THE COURT:  All right.

7          MR. BENNETT:  I believe our briefing is

8  comprehensive.  I'd be happy to answer any other

9  questions.

10         THE COURT:  Thank you.  Let's get to the motion

11  to strike here.  Do you have anything else you want to say

12  about that motion that you haven't said?

13         MR. WINGFIELD:  Your Honor, we need to be

14  respectful of time, but there are two other major parts of

15  our brief and our argument that we have not even touched

16  yet, particularly the holdings of the three courts that in

17  order to have a claim under 1681k(2), you need to show a

18  defect in the data.

19         THE COURT:  You are not charged in the complaint

20  with a violation of 1681k(2), and that's got nothing

21  whatsoever to do with whether you violated 1681k except to

22  the extent that it's an alternative way for you to get

23  out, and that's how it fits in; right?

24         MR. WINGFIELD:  Correct.

25         THE COURT:  So you want summary judgment on your

1    defense.  You raised the defense that you complied with

2    k(1)(a)(2).

3           MR. WINGFIELD:  Our view is that under the *Dalton*

4    decision, Fourth Circuit decision in *Dalton*, under Section

5    1681e should apply here, and it's actually the plaintiff's

6    burden to prove both the violation of (1) and (2).  He has

7    to prove we violated both parts of 1681k.

8           So it's not our burden.  It's actually part of

9    the plaintiff's case technically procedurally, but if we

10   complied with (2), it doesn't matter whether we complied

11   with (1) or not.  In fact, it doesn't matter whether or

12   not the statute applies to us --

13          THE COURT:  I'm not familiar with the *Dalton*

14   case.  I better go read that.  It doesn't make any sense

15   under the statute.  You've got two duties, two things

16   under the statute.  You have to do two things.  You have

17   to do at the time of, et cetera, give the notice, or you

18   have to do this.  He says you didn't give the notice.

19   Then it seems to me it's up to you to say, well, that may

20   be true, but we did maintain strict procedures.

21          MR. WINGFIELD:  So under the *Dalton* case, the

22   Court was addressing a very similar statute --

23          THE COURT:  It wasn't addressing 1681k(2), was

24   it?

25          MR. WINGFIELD:  It was not.

1          THE COURT:  No.

2          MR. WINGFIELD:  Our position is it's not part of

3    the defendant's case.  It's part of the plaintiff's case.

4          THE COURT:  Well, if it is, they say there's a

5    fact issue there, and it looks to me like there is.  So

6    why don't you --

7          MR. WINGFIELD:  Fact issue that it was --

8          THE COURT:  That you didn't maintain strict

9    procedures designed to ensure whenever public record

10   information which is likely to have an adverse effect on a

11   consumer's ability to obtain employment is reported, it is

12   complete, and up to date.

13         MR. WINGFIELD:  Our position is we provided a

14   complete and up-to-date verbatim version of the electronic

15   court record --

16         THE COURT:  What is the state of the record that

17   you say renders it undisputed that you meet the

18   requirements of that sentence?

19         MR. WINGFIELD:  We have record evidence that the

20   specific items in dispute here are reported today as they

21   exist in the official government records, have been the

22   same the entire period of time, that when we reported it,

23   it was a verbatim-at-the-time rendition of what was in the

24   electronic business record.

25         THE COURT:  Let me hear from them on that.  Where

1   is the fact dispute on that, that they did not maintain

2   strict procedures designed to ensure that whenever public

3   record information which is likely to have an adverse

4   effect on the consumer's ability to obtain employment is

5   reported, it is complete and up to date?  They say, look,

6   it's always been the same.

7        MR. BENNETT:  The data is clearly incomplete.  It

8   does not identify the person about whom the records

9   pertain.  That is the entire argument that Mr. Wingfield

10  ended his previous round with, that is, we don't know who

11  this information pertains to, and the reason is because it

12  isn't complete and up to date.

13       What the *Dalton* case did say of relevance,

14  because it didn't get into what k requires, it just simply

15  said, well, it violates 1681e(b).  We don't know what k

16  requires, but it certainly is an even higher threshold,

17  and *Dalton* held that -- the actual language was that in

18  the vast majority of these cases, it will be a jury

19  question as to whether or not the procedures were

20  reasonable and then said, and strict, well, that must be

21  even more so.

22       In this case, the evidence is that the defendant

23  said that Mr. Hines was a sex offender when he wasn't, and

24  that Mr. Henderson was a felon with drug convictions in

25  Pennsylvania, which he wasn't, and only after they lost

1　their job opportunities and then the defendant was forced

2　to comply with the reinvestigation after the fact it went

3　and obtained the complete record which showed that the

4　Social Security numbers for both didn't match or that they

5　didn't belong to these gentlemen.  Mr. Hines is not a sex

6　offender.  Mr. Henderson is not a felon.

7　　　　　THE COURT:  So you're saying because they didn't

8　identify the person, they weren't complete?

9　　　　　MR. BENNETT:  Yes, sir.

10　　　　　THE COURT:  Which person?

11　　　　　MR. BENNETT:  They didn't identify the person

12　about whom the record pertained.  The entire defense --

13　　　　　THE COURT:  Well, they did.  They did identify --

14　　　　　MR. BENNETT:  Well, they did --

15　　　　　THE COURT:  They said it was Mr. Henderson.

16　　　　　MR. BENNETT:  They represented in the report that

17　it was Mr. Henderson.  They didn't provide the complete

18　and updated information by which any reader of that report

19　would have known --

20　　　　　THE COURT:  How did they not do that?

21　　　　　MR. BENNETT:  They included records that didn't

22　have identifying information and that weren't current to

23　Verifications and ADP and then thereby --

24　　　　　THE COURT:  Wait a minute.  So it wasn't complete

25　because it lacked identifying information.

1          MR. BENNETT:  Yes, sir.

2          THE COURT:  Where is that alleged in your

3   complaint?

4          MR. BENNETT:  Multiple places.  Social Security

5   number is alleged four places.

6          THE COURT:  Well, it is alleged four places, but

7   not in the way you are talking about.  That is the term

8   Social Security is mentioned.  I don't think you've pled

9   what you are talking about is what I'm saying.

10          You have to be somewhere, don't you?

11          MR. BENNETT:  I do, Judge.

12          THE COURT:  I've got to do the other thing.  I'll

13   take you -- I've got to hear the other argument, and you

14   have to leave at noon?

15          MR. BENNETT:  I have to be there at 1:15.

16          THE COURT:  I said do you have to leave at noon?

17          MR. BENNETT:  Yes, sir.

18          THE COURT:  Come back -- when is your party over?

19          MR. BENNETT:  Well, it's 1:15 is the child

20   assembly.  My kid was picked to lead the class with the

21   flag --

22          THE COURT:  When is it over?

23          MR. BENNETT:  Probably at 2:30 or 3:00.

24          THE COURT:  You can come back this afternoon?

25          MR. BENNETT:  Yes, sir.

```
 1              THE COURT:  How long does it take you to get back
 2   here?
 3              MR. BENNETT:  If I leave at -- well, they are out
 4   at 2:10.
 5              THE COURT:  Where are you coming from?
 6              MR. BENNETT:  Newport News.
 7              THE COURT:  You're never going to get back at
 8   that hour.  Give me my book.  Yes, Mr. Anthony.
 9              MR. ANTHONY:  I was just going to say if it's
10   possible, I have an obligation for my daughter at 4:30
11   this afternoon I'd like to make, but I will certainly
12   accommodate that.  I thought we'd be done by noon, but I
13   will do whatever the Court wants to do.
14              THE COURT:  I would, too, but I don't think that
15   his son is any more important than your daughter.  If I
16   made a decision on that basis, I would be properly
17   chastised and maybe impeached.
18              MR. ANTHONY:  We certainly would want to
19   accommodate as best we can.
20              THE COURT:  I know, but the question is how late
21   do I want to work tonight, and the answer is not late
22   because I have something to do after you all can get back
23   here that also involves a child's birthday.
24              So, this is in part where the rubber meets the
25   road about the whole case, and it implicates the motion to
```

1  strike because you are saying that the reason it's not

2  complete is that it did not contain identifying data,

3  identifying data that would permit the -- to the

4  specific -- to the person about whom the inquiry was

5  really directed; right?

6       MR. BENNETT:  Well, we are alleging 1681k(2) is

7  inapplicable because the type of report that is sold is

8  not the report that fits into that shoe.

9       THE COURT:  We'll get all of that.  So, look,

10  sorry, I thought we could get this done today, and I was

11  more ambitious than I thought.  Would you like to do this

12  on Monday, gentlemen?  What does your schedule show on

13  Monday?

14       MR. BENNETT:  I can make it.

15       THE COURT:  How about you?  Do you all have the

16  capacity to check your schedules?

17       MR. ANTHONY:  I am doing so right now, Your

18  Honor.  Just give me one moment.

19       THE COURT:  It used to be so easy when you pulled

20  your calendar out of your briefcase and flipped to the

21  month.

22

23       (Discussion off the record.)

24

25       THE COURT:  I'm sorry.  Can you do it in the

1  afternoon?  I'm not sure what you are saying.  I'm just

2  trying to get a time.  We don't have to do it that day.

3  We can do it on the 24th in the afternoon.  We can do it

4  on the 25th in the afternoon.

5          MR. ANTHONY:  25th is fine with us, Your Honor.

6          THE COURT:  How about you, Mr. Bennett?  1:30.

7          MR. BENNETT:  Yes, sir, I can do it.

8          THE COURT:  1:30.

9          MR. ANTHONY:  That works for the defendants, Your

10 Honor.

11         THE COURT:  Have you all been to see Judge Novak?

12         MR. ANTHONY:  I don't believe that we have had --

13 we have not had a formal settlement conference with Judge

14 Novak.

15         THE COURT:  Are you going to proceed with the

16 settlement conference, or are you going to proceed with

17 private mediation?  You need to think about that -- you

18 need to get on one of those two schedules.

19         MR. ANTHONY:  Yes, sir.

20         THE COURT:  I understand the arguments, and I

21 still want to hear some more about them, and I've got some

22 concerns, but I have a feeling that this is a case that

23 ought to be resolved by compromise as soon as it can be.

24         MR. ANTHONY:  We will certainly discuss it with

25 our client again, Your Honor.

```
1              THE COURT:  Both of you.

2              MR. BENNETT:  Yes, sir.

3              THE COURT:  All right.  I will see you on the

4  25th at the appointed hour.  Thank you very much.  I

5  appreciate it.

6

7                   (End of proceedings.)

8

9

10         I certify that the foregoing is a correct

11 transcript from the record of proceedings in the

12 above-entitled matter.

13

14

15 _____/s/_____           _____
   P. E. Peterson, RPR                Date
16

17

18

19

20

21

22

23

24

25
```