# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**TYRONE HENDERSON,** *et al.*

    **Plaintiffs,**

**v.**                                                    **Civil Action No. 3:12cv97 (REP)**

**CORELOGIC NATIONAL**
**BACKGROUND DATA, LLC**

    **Defendant.**

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

Alan D. Wingfield (VSB No. 27489)
David N. Anthony (VSB No. 31696)
Timothy J. St. George (VSB No. 77349)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia  23219
Telephone: (804) 697-1200
Facsimile:  (804) 698-1339
alan.wingfield@troutmansanders.com
david.anthony@troutmansanders.com
tim.stgeorge@troutmansanders.com

*Counsel for Defendant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

FACTS ...............................................................................................................................4

    I.      NBD provides wholesale access to a database of public criminal records............5

    II.     NBD's customers access the database for current and prospective employees across a wide variety of jobs .................................................................5

    III.    The database contains exact criminal record data made available by government sources and is frequently updated........................................................6

    IV.    The criminal record in the database is are immensely varied...............................6

    V.     NBD's customers do not identify the specific consumers of interest, the specific purpose of an inquiry, or how the data will be used by employers...........7

    VI.    NBD's systems return SSNs whenever available..................................................8

    VII.   Expert analysis concludes class members can be identified only through an extensive case-by-case analysis, if even possible at all .........................................9

    VIII.  Classwide liability would bankrupt NBD..............................................................9

LEGAL STANDARDS ........................................................................................................10

    I.      Class certification requires a "rigorous analysis."................................................10

    II.     A class definition must track the elements of the claim .......................................11

ARGUMENT .....................................................................................................................12

    I.      Plaintiffs' class definition is facially overbroad ..................................................12

          A.     Whether any given item is "complete and up to date" gives rise to insurmountable individual issues incapable of generating common answers ......................................................................................................13

               i.     Incompleteness and staleness are prerequisites to a claim under § 1681k(a)........................................................................13

               ii.    Plaintiffs' bases for asserting that NBD's data is "incomplete" all fail....................................................................15

                        a.     Plaintiffs' attempt to circumvent the element of "incompleteness" through demonstrably false statements regarding SSNs fails ......................................15

                        b.     Plaintiffs' additional arguments regarding the "incompleteness" of the data are all without merit...........17

          B.     Plaintiffs failed to limit their class definition to results returned to a "user." ..................................................................................................19

# TABLE OF CONTENTS
(continued)

Page

C. Section 1681k(a) requires individualized adjudication of whether a record is "likely adverse" to a consumer's ability to obtain initial employment ...................................................................................... 20

    i. The prefatory text of § 1681k(a) requires a case-by-case analysis ..................................................................................... 22

    ii. The subsections of § 1681k requires a case-by-case analysis ...... 23

    iii. Plaintiffs' position is contrary to FTC authority and caselaw, would lead to absurd results, and would require the Court to rewrite § 1681k(a) ................................................ 25

D. Plaintiffs failed to limit their class definition to individuals who were seeking to "obtain employment," as opposed to other "employment purposes." ....................................................................... 26

II. A properly-defined Count I class is not ascertainable ......................................... 28

A. Whether each item of data is "incomplete" would require a file-by-file review ..................................................................................... 28

B. Whether NBD's customer reported records as to a consumer seeking to "obtain employment" would require file-by-file review ......... 31

C. Whether NBD's customers, including ADP, HR Plus, and Verifications, "used" the data returned is not subject to a systematic determination ......................................................................... 31

D. Whether the results returned by NBD were "likely adverse" to a consumer's ability to obtain employment cannot be determined in a systematic way ....................................................................................... 32

    i. The fact that NBD's customers frequently use NBD's data as an initial, investigatory tool precludes class certification ........ 33

    ii. Variations in the "use" of records prevents certification ............. 34

        a. State law varies as to whether and how a record can be considered ................................................................... 34

        b. Employer adjudication criteria vary widely across industries and positions, including as advised under federal law ....................................................................... 35

        c. The variety of data in public records prevents an objective, formulaic assessment of whether an offense is "likely adverse." ............................................... 35

            1. Varying/non-specific offense descriptions permeate the data ................................................. 35

# TABLE OF CONTENTS
### (continued)

**Page**

        2.    Varying severity in offenses precludes a systematic assessment of the "likely" adversity of any data returned by NBD ...............36

        3.    Variations in disposition information prevent a classwide assessment of the "likely" adversity of data returned by NBD .........37

    iii.    Plaintiffs' experiences exemplify the wide variation in data in the Multistate Database and in employer adjudication criteria .........................................................................................37

  E.    A rigorous analysis concludes that a properly-defined class is not ascertainable ........................................................................38

III.    A Count I class fails for lack of typicality, commonality and predominance ......39

  A.    If a genuine dispute of material fact exists on the issue, whether NBD's procedures comply with § 1681k(a)(2) requires an individualized inquiry ..............................................................................39

    i.    SafeRent's electronic collection of governmental data, as opposed to going to the courthouse, does not negate NBD's compliance with § 1681k(a)(2) .....................................................40

    ii.    The data collection and updating policies at issue are divergent and would require an individual assessment of records ..............................................................................................42

  B.    The amount of statutory damages is an individual issue ..........................43

  C.    Plaintiffs have not demonstrated they are typical of the proposed class members ..........................................................................45

  D.    Plaintiffs' transparent attempt to discard their claims for actual damages and to represent a class seeking only statutory and punitive damages renders them inadequate and atypical representatives ..........................................................................45

IV.    Adjudicating this case as a class threatens NBD ████████████ ████████████████, which makes the class action device an inferior method of adjudication ..........................................................................46

  A.    NBD is ██████████████ because of an indisputably novel claim ..........................................................................46

  B.    Plaintiffs have repeatedly demonstrated that individual actions are viable ..........................................................................47

V.    Plaintiffs' five-year proposed class period is impermissibly broad ....................48

**TABLE OF CONTENTS**
(continued)

**Page**

VI.   Dismissal with prejudice is appropriate because amendment of the class
      definition to comport with the elements of § 1681k(a) would be futile ...............50

CONCLUSION .....................................................................................................................50

Defendant, CoreLogic National Background Data, LLC ("NBD"), by counsel, submits this memorandum in opposition to Plaintiffs' Renewed Motion for Class Certification.

## INTRODUCTION

Plaintiffs seek certification of a class of more than 1.7 million individuals under Count I, which asserts an indisputably novel claim under 15 U.S.C. § 1681k(a)(1) of the Fair Credit Reporting Act ("FCRA"). Plaintiffs' class definition, however, has so little relationship to the elements of § 1681k(a) that certification should be denied on that basis alone. Indeed, Plaintiffs' counsel's similarly simplistic certification approach to § 1681k(a) – which also ignored the elements of the claim that inherently raise individualized issues – was recently rejected outright. *Farmer v. Phillips Agency, Inc.*, 285 F.R.D. 688 (N.D. Ga. 2012).

As detailed in NBD's pending Motion for Partial Summary Judgment, the factual record shows that ADP Screening and Selection Services ("ADP"), Verifications, Inc. ("Verifications"), and HR Plus, Inc. ("HR Plus") conducted searches of a database using NBD's interface. NBD's system then returned all available public record data responsive to the search queries, reflecting everything from minor traffic citations to felonies. Those three consumer reporting agency ("CRA") customers then applied their own processes to determine which (if any) of that data to include in the reports they prepared for employers. NBD did not know the identity of the subject consumer or the employer, did not know the nature of the employment, and did not know whether the consumer was applying for new employment or being reviewed by an existing employer. Also, neither NBD nor the three CRAs participated in any employment decisions.

Under these facts, Plaintiffs' assumption that every search result returned from NBD's database was provided to a "user" and was "likely adverse" to "a consumer's" ability to "obtain employment," all of which are required for the statute to apply, is unwarranted. Any question as to these elements must be resolved on an individual basis.

Based on the statute's plain text, the transmittal of public record information cannot trigger any § 1681k(a) obligation unless the information: (1) is "incomplete" and not up to date; (2) is "likely adverse"; (3) is sent to a "user"; and (4) is sent concerning a consumer seeking to "obtain employment."  Plaintiffs class definition, however, accounts for none of these elements of the claim, tacitly admitting that a properly defined class could not be certified.  To certify the class that has been proposed here, the Court would have to answer each and every one of the following questions in the affirmative:

- Can, contrary to recent authority (*e.g.*, *Farmer*), a class be certified on an abstract basis as to 1.7 million individuals when an element of proof under § 1681k(a) is that all of ███████████████████████ sent by NBD was not a "complete and up to date" version of a public record?

- Can the class be certified without accounting for whether ADP, Verifications, or HR Plus "used" the records returned by NBD to evaluate the class members for employment, where no evidence exists that any of those three entities made any employment-related decision for anyone?

- ██████████████████████████████████████████████████████████████████████ ██████ no matter how dated or unimportant to an employer, when § 1681k(a) applies only to those criminal records that are "likely" to adversely affect a particular consumer's employment prospects?

- Can this Court ascertain which of the results returned by NBD were "likely" to adversely affect employment when NBD's customers filter the wholesale results they receive from NBD, and where NBD's records cannot establish what records (if any) were sent to the employer?

- Can this Court ascertain which of the results returned by NBD were "likely" to adversely affect employment when NBD is not made aware of: (1) the location of the consumer and varying state laws limit what data can be transmitted to the employer; and (2) the markedly-divergent adjudication criteria of the myriad employers implicated by the 1.7 million search queries?

- Can this Court ascertain when search queries were submitted for individuals that were seeking to "obtain" initial employment, where NBD has no record of the specific purpose for the "employment purpose" search, including whether it was for a current employee and beyond the scope of § 1681k(a)?

2

The answer to all of these discrete questions is "no."

These numerous ascertainability issues created by the improper class definition also each present individual inquiries that preclude class certification.  In addition, there are many other individual inquiries that preclude class certification under the facts here.  For instance:

- The massive proposed class cannot be certified against the requirement that each proposed class member prove that NBD failed to maintain "strict procedures" under § 1681k(a)(2), since any such proof would require analysis of the exact timing of updates and results for each of the ███████ transmitted from each of NBD's over ███████████████; and

- A class cannot be certified that seeks statutory damages under the FCRA since the Fourth Circuit recently held that such an analysis is an individualized inquiry that hinges on the specific facts of each class member, and where the $900 difference in the statutory damages range could affect NBD's liability by over $1.5 billion.

None of those issues is capable of classwide resolution under the facts here.

Even if the numerous dispositive issues raised above could be overcome, the facts of this case, whereby annihilating damages are sought by recidivist Plaintiffs on a novel theory of liability, also prevent class certification for the following reasons:

- The Plaintiffs are inadequate class representatives since they have abandoned any claim for actual damages for all of the proposed class members, yet have individually recovered substantial actual damages in their other lawsuits;

- A class action an inferior method of adjudication since Plaintiffs have demonstrated that individual actions can be prosecuted, including through filing fourteen other FCRA actions to date in this Court that have resulted in substantial individual recoveries; and

- The class action device an inferior method of adjudication when, if successful, it would bankrupt NBD based on an indisputably novel claim.

No class should be certified under those facts.

At bottom, the facially-overbroad nature of the class definition, and the inability to certify any class under a proper class definition for reasons of ascertainability, typicality, commonality, predominance, and/or superiority, mandate that Plaintiffs' motion be denied with prejudice.

## FACTS

The facts of NBD's operations with respect to the proposed class members are straightforward and well-documented.  ADP, Verifications, and HR Plus input search criteria (*e.g.*, a first name, a last name, and a date of birth) into an electronic interface, which prompted NBD's database to return raw data responsive to the search criteria.  NBD functioned much like a PACER criminal case search based on a name and dates, where the data returned is intended and understood to respond to a query rather than provide information about a specific individual.  The CRAs used these search results as a first step in their background screening processes, to cast a sufficiently broad search to ensure that potentially applicable records were not omitted.[1]  Pursuant to their FCRA obligations and their contracts with NBD, they then applied their own review processes to each set of results and matched and/or discarded certain data before preparing consumer reports and providing them to the end-user employers.

Trying to mask the plethora of issues set forth below that make this case incapable of class certification, Plaintiffs mischaracterize this action as being "the same" as eight prior actions.  (Pltfs' Mem. at p. 2 n.3.).  It is not.  In this case, Plaintiffs claim that NBD – a wholesaler of data that has no contact with employers, and which provides data only to its CRA customers – has a notice obligation under § 1681k(a)(1) that is entirely-redundant of the same notice obligation of its CRA customers.  None of those eight prior actions presented this issue because ***none involved a data wholesaler like NBD***.  One of those cases was against an employer (Wal-Mart), and the seven others were against background screening company CRAs that provided consumer reports directly to the employers, including the screening companies

---

[1] The proclivity of recidivist criminals to manipulate their identity alone gives rise to the need for these types of wholesale search techniques.  *See, e.g.*, Center for Identity Management and Information Protection, *Hiding in Plain Sight? A Nationwide Study of the Use of Identity Manipulation by Registered Sex Offenders* (February 2015) (finding that roughly 42% of offenders in the National Sex Offender Registry have multiple names, social security numbers, dates of birth, or other identity indicators, and that nearly 17% of criminal offenders attempt to manipulate their identities).

relevant here – ADP, Verifications, and HR Plus.  *Id.*  No court within the Fourth Circuit or elsewhere, has ever applied § 1681k(a) to require the sending of unnecessary, redundant and confusing notices to consumers by a data wholesaler, as proposed here.  With this context in mind, the actual *evidence* germane to this motion follows.

### I.  NBD provides wholesale access to a database of public criminal records.

1.      NBD is a "wholesale criminal data provider to the background screening industry."  *See* Declaration of Linda Watts at ¶ 6, attached as **Exhibit A**.  NBD makes available to its CRA customers a searchable database of criminal records that is referred to as the "Multistate Database."  *See* Declaration of Joseph Davidson at ¶ 8, attached as **Exhibit B**.  The CRAs, who have been engaged by employers to provide criminal background screenings, execute computerized searches in the Multistate Database as a first step in their process.  NBD has no contact with those employers, which are instead clients of the retailer CRAs (*e.g.*, ADP, Verifications, and HR Plus).  Ex. A at ¶ 6.  Nor do NBD employees have contact with the CRAs during the search process.  Ex. A at ¶ 6.  Instead, the CRAs input their search criteria through an electronic portal and receive their search results in seconds.  Ex. B at at ¶ 4.

### II.  NBD's customers access the database for current and prospective employees across a wide variety of jobs.

2.      During the alleged class period, NBD's CRA customers prepared and sold reports to employers in a variety of industries, from healthcare to bakeries, and for jobs ranging from manual labor to executives.  Ex. A at ¶ 7.  Those customers executed searches for individuals seeking initial employment, as well as for individuals currently employed but under review for purposes of retention, promotion, reassignment, and licensure.  Ex. A at ¶ 8.

3.      NBD provided its CRA customers with responses to ███████ search queries that contained criminal data during the class period.  *See* Ex. B at ¶ 29.  Those ███████ query responses included ███████████████████████████.  Ex. B at ¶ 29.

**III.** **The database contains exact criminal record data made available by government sources and is frequently updated.**

4.      The Multistate Database is housed with CoreLogic SafeRent, LLC ("SafeRent"), a sister company to NBD, and it contains more than ███████████████████████████.

Ex. B at ¶ 8. ████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████. Ex. B at ¶ 10.

5.      SafeRent does not alter the data received from its sources, and it incorporates data into the Multistate Database using the exact text supplied.  Ex. B at ¶ 11.

**IV.** **The criminal record in the database is are immensely varied.**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

10.      The age of the offenses in the Multistate Database vary greatly.  Ex. B at ¶ 33.

## V.   NBD's customers do not identify the specific consumers of interest, the specific purpose of an inquiry, or how the data will be used by employers.

11.     NBD does not know the identity of the consumer of interest to NBD's CRA customers.  Ex. A at ¶ 9; Ex. B at ¶ 20.  The CRA customers select the criteria by which they desire to gather data from the Multistate Database, which allow searches based (at a minimum) on variations of the consumer's first name, last name, and date of birth.  Ex. B at ¶ 20.  NBD is not provided with information that would allow it to match a given record to a specific individual.  Ex. A at ¶ 9.  Instead, once search criteria are submitted, NBD returns data in the Multistate Database responsive to that query, displaying all publicly available information about the public record item(s) returned.  Ex. B at ¶ 20.[2]

12.     While NBD's CRA customers can certify in a drop-down text box they have been engaged by an employer for an "employment purpose," NBD is not informed of the *specific* "employment purpose" behind the employer's request, such as whether the screening is for the purpose of evaluating a *prospective* employee, or for an employment purpose for a *current* employee, such as retention, promotion, evaluation, licensure, etc.  Ex. A at ¶ 12.

13.     NBD also is not made aware of what data returned to its CRA customer is assembled into a consumer report by the CRA and ultimately transmitted to the employer.  Ex. A at ¶ 16.  Consistent with the terms of their contracts and NBD's training, NBD's CRA customers use the data gathered from NBD as an initial investigatory tool to begin their search process.  Ex. A at ¶ 16.  For example, after receiving its initial search results from NBD during its screening of Plaintiff Henderson, Verifications engaged another vendor, Advanced Background Checks, Inc. ("ABC"), to conduct an in-person courthouse search in Westmoreland County, Pennsylvania and to research any criminal records in Pennsylvania.  **Exhibit C**.  Indeed, NBD's contracts instruct

---

[2] Despite the fact that NBD returns *all* records responsive to its customers' search criteria, Plaintiffs continue to contend that NBD returns results for a "specific consumer."  (Pltfs' Mem. at p. 8.)  That claim was rejected in *Fiscella v. Intelius, Inc.*, 2010 U.S. Dist. LEXIS 57918, at *10 (E.D. Va. June 10, 2010).

its customers that, due to the wholesale nature of the data being provided, independent research and filtering by the customer is necessary.  Ex. A at ¶ 16.

14.     Comparing the results returned by NBD to ADP and Verifications, *see* Ex. B at ¶¶ 40 (Exhibit 1), 42 (Exhibit 2), to the consumer reports that were later prepared by ADP and Verifications, *see* **Exhibits D & E**, demonstrates that very little of the data returned by NBD appeared in the reports prepared and transmitted by ADP and Verifications to the employers. Those reports also do not reflect any employment decision for either Plaintiff.  *See id.*[3]

15.     NBD also is not made aware of the state in which the consumer in question is employed or is seeking employment, nor is NBD made aware of the criteria to be used by the employer(s) to assess the import of any criminal records ultimately provided.  Ex. B at ¶ 23, 27.

## VI.     NBD's systems return SSNs whenever available.

16.     SafeRent's policy and practice is to always request that its sources of criminal record data provide SafeRent with any SSNs that have been included within any criminal file. Ex. B at ¶ 34.  Whenever SafeRent is able to procure a SSN, that information is entered into the Multistate Database and linked to the relevant criminal record.  Ex. B at ¶ 36.  However, due to legal restrictions, SafeRent has been able to secure the transmission of full or partial SSNs only from a minority of its sources.  Ex. B at ¶ 34.

17.     The great majority of SafeRent's sources do not make the offender's SSN available as a part of the information that is made public and thereafter sent to SafeRent.  Ex. B at ¶ 35.  These policies apply to records sent to SafeRent electronically, as well as to records that SafeRent's employees physically retrieve from courthouses.  Ex. B at ¶ 35.

---

[3] Plaintiffs further assert that Hines's ADP report prevented him from getting a job.  (Pltfs' Mem. at p. at 4.)  That is false.  The truth is that nothing in Hines's ADP report prevented him from being hired.  He got the job, but failed to show up for work.  Rule 30(b)(6) Deposition Testimony of CareSouth Homecare Professionals, pp. 96:23-97:11, attached as **Exhibit F**.

18.     When NBD's customers submit a search query using any of NBD's ███████ search "logics," NBD's systems return the data from the Multistate Database responsive to that specific search query, along with any SSNs that are included within the responsive data.  Ex. B at ¶ 37.

**VII.   Expert analysis concludes class members can be identified only through an extensive case-by-case analysis, if even possible at all.**

22.     Attached hereto as **Exhibit G** is the Declaration of Michael C. Keeley, Ph.D.,[4] a Massachusetts Institute of Technology and University of Chicago trained economist with over 30 years of experience in applied micro economics.  Ex. G at ¶ 2.  His fields of expertise include labor economics – the study of labor markets, factors affecting the supply and demand, issues related to hiring, firing, and promotion decisions, factors affecting hiring, and other favors affecting labor supply and demand.  Ex. G at ¶¶ 3-7.  He has extensive experience in analysis of large, complex data sets, including the inferences that can be drawn from such data.  Ex. G at ¶ 3.

23.     Dr. Keeley evaluated whether members of a class under § 1681k(a)(1) can be identified without a case-by-case inquiry, as well as whether it is possible to determine whether a class member was injured, and, if so, the extent or nature of the injury, without a case-by-case inquiry.  Ex. G at ¶ 9.  Based on his expertise, and based on the information gathered from the discovery in this case and other public/reliable sources accepted in the discipline, Dr. Keeley concluded that a Count I class cannot be ascertained without extensive individualized inquiries.

**VIII.   Classwide liability would bankrupt NBD.**

19.     Plaintiffs seek an award of statutory damages of between $100-$1,000 on behalf of a class of at least 1.7 million consumers.  ████████████████████████████████ ███████████████████████████.  Declaration of James Harris at ¶¶ 4-6, attached as **Exhibit H**.

---

[4] The conclusions in the attached declaration were timely disclosed verbatim to Plaintiffs on July 30, 2013 in NBD's expert designation.  They have been placed into a sworn declaration here.

## LEGAL STANDARDS

### I.   Class certification requires a "rigorous analysis."

Plaintiffs casually assert "there is nothing either remarkable or unexpected" about their motion. (Pltfs' Mem. at p. 2.)  Not so.  For any class action, and especially for a proposed class of 1.7 million individuals, class certification is "an especially serious decision."  *In re Constar Int'l Sec. Litig.*, 585 F.3d 774, 780 (3d Cir. 2009).  Courts, therefore, "must" perform a "rigorous analysis" before certifying a class.  *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Soutter v. Equifax Info Services,* 2012 U.S. App. LEXIS 24891, at *9 (4th Cir. Dec. 3, 2012).

Courts cannot "simply accept the allegations of a complaint at face value in making class action findings" because "if courts could only consider the pleadings, then parties would have wide latitude to inject frivolous issues to bolster or undermine" the Rule 23 requirements. *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004).  Thus, "Rule 23 does not set forth a mere pleading standard.   A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  *Thompkins v. Key Health Med. Solutions, Inc.*, 2015 U.S. Dist. LEXIS 35470, at *28-29 (M.D.N.C. Mar. 23, 2015).

"[I]n case after case," courts have stressed "it is *not the defendant* who bears the burden of showing that the proposed class *does not comply* with Rule 23, but that it *is the plaintiff* who bears the burden of showing that the class *does comply* with Rule 23." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321 (4th Cir. 2006) (emphases in original); *accord Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).  Plaintiffs must prove every element of Rule 23(a) and one of three subparts of Rule 23(b).   *Thorn*, 445 F.3d at 318.   Plaintiffs' alleged common contentions "moreover, must be of such a nature that it is capable of classwide resolution –

which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551.

Finally, courts "must definitively determine that the requirements of Rule 23 have been satisfied, even if that determination requires the court to resolve an important merits issue." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 361 (4th Cir. 2014).  There are many such merits issues here.

## II.        A class definition must track the elements of the claim.

Plaintiffs seek certification of a class under 15 U.S.C. § 1681k(a), the text of which is set out in their opening brief.  (Pltfs' Mem. at p. 6.)  As a starting point, Plaintiffs must propose a class definition that comports with this statute.  However, as set forth below, Plaintiffs have failed this basic requirement because their class definition omits four of the elements required to state a claim under the statute.  Class certification should be denied on this basis alone.

"Defining the class is of critical importance because it identifies the persons entitled to relief, bound by a final judgment, and entitled under Rule 23(c)(2) to the 'best notice practicable' in a Rule 23(b)(3) action." MANUAL FOR COMPLEX LITIGATION § 21.222, at 270 (4th ed. 2005). "Thus, as a preliminary matter, the court must consider the definition of the class when determining the appropriateness of class certification." *Adair v. EQT Prod. Co.*, 2013 U.S. Dist. LEXIS 142005, at *92-93 (W.D. Va. June 5, 2013) (internal citations omitted).

If a definition does not track the elements of the claim then it is overbroad and cannot be certified. *See, e.g.*, *Khalif L. v. City of Union City*, 2012 U.S. Dist. LEXIS 64567, at *18 (N.D. Cal. May 8, 2012) ("In short, plaintiffs have failed to define [a class] . . . in which membership is properly related to the merits of plaintiff's claims.  This flaw is fatal . . . ."); *Mann v. TD Bank, N.A.*, 2010 U.S. Dist LEXIS 112085, at *39-40 (D.N.J. Oct. 20, 2010) ("Plaintiffs' proposed class definition is over inclusive because it ignores legal complications associated with class membership.").  Indeed, an overbroad definition raises serious constitutional concerns, as it

11

would frustrate a defendant's right to present all defenses and facilitate the granting of relief to individuals entitled to nothing. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997).

Consideration of class certification, therefore, must proceed on a "claim-by-claim basis" by reference to the elements of and remedies for each claim. *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 976 (5th Cir. 2000). In *Souter*, the Fourth Circuit approached the class certification analysis by "reviewing the elements of Souter's *prima facie* case and the facts supporting those elements and examining 'the extent' to which those facts 'would also prove the claims of the absent class members.'" 2012 U.S. App. LEXIS 24891, at * 11. Plaintiffs fail this requirement.

## ARGUMENT

### I.   Plaintiffs' class definition is facially overbroad.

Plaintiffs have pled a claim under § 1681k(a) and thus must account for all of its elements in the proposed class definition.[5] Plaintiffs have failed to do so.

Section 1681k(a) governs "items of information" that: (1) "are matters of public record"; (2) "likely to have an adverse effect"; (3) "upon a consumer's ability to obtain employment." Section 1681k(a)(2) specifies further elements of the claim by allowing a CRA to comply with subjection (a)(1) or subsection (a)(2), whereby the CRA can "maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date." *Id.*

Ignoring these elements, Plaintiffs instead seek to certify a class concerning any time that ADP, Verifications, or HR Plus submitted a search query; the search query was marked as being for any type of "employment purpose"; and any criminal record data, no matter its substance, was returned to one of those three entities. (Pltfs' Mem. at p. 15.)

---

[5] NBD contends § 1681k(a) does not apply to its wholesale activities under the undisputed facts of this case, and it has moved for summary judgment on that basis, as well as for other reasons. The granting of summary judgment will moot this motion for class certification.

Plaintiffs' class definition fails to comport with the elements of § 1681k(a) in four ways:

- It is not limited to situations (if any) where NBD reported an "incomplete" and not "up to date" record;

- It is not limited to instances (if any) where NBD's CRA's customer "used" the records for the purpose of evaluating the consumer.

- It is not limited to instances where the criminal records returned by NBD were "likely adverse" to the employment decision; and

- It is not limited to individuals seeking to "obtain employment," as opposed to the other types of "employment purposes" under the FCRA.

Each of these deficiencies independently defeats class certification.

**A. Whether any given item is "complete and up to date" gives rise to insurmountable individual issues incapable of generating common answers.**

Plaintiffs' class definition requires only that NBD have returned data to one of its three CRA customers. It says nothing about the results. Thus, the proposed class definition is flawed. There is no claim under § 1681k(a) unless the results returned were stale and "incomplete."

**i.     Incompleteness and staleness are prerequisites to a claim under § 1681k(a)_.**

As set forth in NBD's Motion for Partial Summary Judgment, every court to have reached the issue has held that showing that the information transmitted is not "complete and up to date" is an element of § 1681k(a). *Farmer,* 285 F.R.D. at 700; *Haro v. Shilo Inn, Bend LLC,* 2009 U.S. Dist. LEXIS 65562, at *8-9 (D. Or. July 24, 2009) ("[A]bsent a showing that the information obtained from OJIN was inaccurate or incomplete by omitting final disposition of the charge, plaintiff's claim under § 1681k(a) must fail."); *Obabueki v. Choicepoint, Inc.*, 236 F. Supp. 2d 278, 283-84 (S.D.N.Y. 2002), *aff'd,* 319 F.3d 87 (2nd Cir. 2003) (same).

In this case, that element precludes class certification. Indeed, relying extensively on the Fourth Circuit's FCRA statutory analysis in *Dalton v. Capital Associated Indus.*, 257 F.3d 409 (4th Cir. 2001), the court in *Farmer* addressed *this precise issue* with respect to a proposed §

1681k(a) class (asserted by the same Plaintiffs' counsel here) that is, in all respects, identical to

Count I, holding:

> [E]ach consumer will need to prove that the adverse information in the report
> defendant furnished about that consumer was either incomplete or not up to date.
> This will entail an individual inquiry into the contents of each consumer report
> issued by defendant.  The scope of this individual inquiry will require a variety of
> evidence specific to each case—such as the production of the actual up-to-date
> version of the public record at the time the report was issued . . . .  [This] will
> require the presentation of significant amounts of new evidence for each putative
> class member.  Thus, it is clear that the predominance requirement is not met and
> this class cannot be certified.

285 F.R.D. at 703.[6]   That is consistent with the decisions of this Court, which have held in

analogous contexts that FCRA provisions that require a finding of inaccuracy are not generally

capable of certification.  *Williams v. LexisNexis Risk Mgmt., Inc.*, 2007 U.S. Dist. LEXIS 62193,

at *4 (E.D. Va. Aug. 23, 2007) ("Asserting a § 1681e(b) claim for [an] entire class would render

the class-action device useless . . . because it would require an assessment of whether or not each

class member's report was, in fact, inaccurate.") (Payne, J.).

SafeRent seeks and obtains all publicly-available criminal record data from its sources,

and NBD's system then returns all data responsive to its CRA customers' search queries.  *See*

Ex. B at ¶¶ 8-20.  NBD does not alter the data, such that Plaintiffs could claim "incompleteness"

by virtue of SafeRent/NBD's deletion of data.  *See id.*  Indeed, all of the search results implicated

by Plaintiffs' claims contained the full list of data points enumerated under § 1681k(a), including

---

[6] Plaintiffs bravely cite *Farmer* as somehow supporting their case, but they ignore its holding that claims
under § 1681k(a), like those under § 1681e(b), are not amenable to class treatment.  Plaintiffs also point
to language in *Farmer* where the defendant's employees at The Phillips Agency discussed the nature of
information returned to its subsidiary, Deverus, by NBD, which was then cited by the court.  (*See* Pltfs'
Mem. at p. 5.)  Like all of NBD's customers, Deverus received records that matched exactly to their
search queries; the results were not linked to a specific consumer.  Ex. A at ¶ 19.  Deverus was also
trained to be aware of the nature of its self-selected queries. Ex. A at ¶ 19.  Additionally, no testimony of
any NBD witness was ever placed into the record in *Farmer*, nor did NBD produce any documents in
connection with that case.  *See* Ex. A at ¶¶ 20-21.  Therefore, the statements regarding the nature of
NBD's data in *Farmer* were based on a one-sided (and obviously-biased) record and a distortion of the
services provided by NBD, which remains a market leader with many customer relationships.  *Farmer*
also concerned the activities of a traditional CRA (Deverus/Phillips Agency), not a wholesaler like NBD.

the offender, the filing date, the court, the charge, the disposition, and the disposition date.  *See* Ex. B at ¶¶ 40 (Exhibit 1), 42 (Exhibit 2).  The data had also been recently updated.  Ex. B at ¶¶ 8-9.  The data was complete and up to date.[7]

ii.     **Plaintiffs' bases for asserting that NBD's data is "incomplete" all fail.**

Recognizing the devastating impact of the *Farmer* decision and like cases on certification under these facts, as well as the necessarily-individualized nature of the "completeness" inquiry, Plaintiffs are forced to try and manufacture some basis to claim that the results returned by NBD are globally incomplete across 1.7 million consumer.  All such efforts fail.

a.  **Plaintiffs' attempt to circumvent the element of "incompleteness" through demonstrably false statements regarding SSNs fails.**

Plaintiffs first try to overcome the issue by contending that NBD systematically fails to transmit "complete" files due to its alleged suppression of SSNs.  (Pltfs' Mem. at p. 11) ("Even if both the public court source and the private SafeRent source provide this field in the public record sold in the report to NBD, the Defendant omits the field entirely . . . .").  As set forth above, and as known to Plaintiffs, that contention is utterly false.  *See* Ex. B at ¶¶ 34-37.  Although SSN information is only made available by a minority of NBD's sources due to various laws and/or regulations, NBD *always* requests SSNs, and it *always* returns SSNs to its customers when SSNs were included in the data previously sent to SafeRent.  Ex. B at ¶¶ 34-37.[8]

---

[7] Only the issue of "completeness" under 1681k(a) is presently before the Court, as Plaintiffs' "accuracy" claim under § 1681e(b) (Count II) has been pled only on an individual basis, and its resolution has been deferred until Phase II of this case under the Court's Scheduling Order.  (*See* Dkt. No. 48.).  NBD denies that is has any liability under § 1681e(b), and will address Count II at the appropriate time.

[8] The absence of SSNs from a majority of NBD's search results reflects the fact that such information is generally excluded from the public record pursuant to rule, statute, regulation, order, and/or policy directive and not made available.  *See, e.g.,* Ark. Sup. Ct. Adm. Order No. 19 § 7 ("The following information in case records is excluded from public access and is confidential absent a court order to the contrary . . . (4) SSNs . . . ."); Alaska R. of Admin. 37.8; Ark. Sup. Ct. Adm. Order No. 19 § 7; Cal. R. Ct. 2.507; Supreme Court of Colorado, Chief Justice Directive 05-01 § 4.60(e) (Apr. 27, 2005); N.C. Gen. Stat. § 132-1.10(b); Vt. Pub. Acc. Ct. Rec. Rule 6(b) (among many, many others).

Indeed, as pointed out to Plaintiffs during the briefing of their initial motion for class certification, Plaintiffs' own expert declarants at McGladrey, LLP acknowledged that the "Results Returned" database of records sold by NBD included a "SSN" field for the return of SSNs, Pltfs' Mem. at Ex. 8-A, and in fact contained ████████████████ of instances where NBD returned SSNs in response to search queries.  ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

The absence of SSNs in the records returned in response to the two queries conducted by ADP and Verifications, which is apparently the basis for Plaintiffs' baseless factual contention regarding SSNs, was not the result of any systematic practice of suppression by NBD.  Ex. B at ¶¶ 40-43.  It was the result of nothing more than the fact that none of the criminal record data that were returned for those specific search queries contained SSNs.  *Id.*  In fact, the data disputed by Plaintiffs Henderson and Hines in this lawsuit originated from Pennsylvania and Indiana.  Yet, the Pennsylvania Code, as an "exception" to the "public records" that are normally subject to disclosure by request, prohibits the dissemination to a third-party "requester" of a "record containing all or part of a person's Social Security number."[9]  65 P.S. § 67.708(B)(6)(i)(A).  Likewise, in Indiana, the following "public records" "[can]not be disclosed by a public agency," which includes the "judiciary": "[a] Social Security Number contained in the records of a public agency."  Ind. Code 5-14-3-4(a)(12).  That proves the point.

NBD's active solicitation of SSNs, and its transmission of SSNs whenever they are made available, *see* Ex. B at ¶¶ 34-37, means that NBD failed to transmit such information *only* when it was not made a part of the "public record," which alone defeats any claim under § 1681k(a).

---

[9] Thus, to the extent that Plaintiff Henderson was able to obtain records from Westmoreland County Clerk's Office bearing the SSN of another individual, the relevant employee in that jurisdiction acted in an anomalous manner contrary to Pennsylvania law.

16

*Id.* (governing only reporting of "items of information on consumers which are matters of *public record*") (emphasis added); *see also State ex rel. Beacon Journal Publ'g Co. v. City of Akron*, 70 Ohio St. 3d 605, 607 (Ohio 1994) ("We must next determine whether SSNs, while being 'records,' are also 'public records' for purposes of the Public Records Act.  For the following reasons, we conclude that they are not public records."); *Sloan v. S.C. Dep't of Pub. Safety*, 355 S.C. 321, 324-25 (2003) ("The legislature specified SSNs, photographs, signatures, or digitized images from a driver's license or personal identification card are not public records."); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at p. 11836 (3d ed. 1993) (defining "public" as "accessible or visible to all members of the community").

Seeking to backstop that failed argument, Plaintiffs contend that NBD's results also are incomplete because, even "if the SSN information is unavailable to NBD, Defendant could so advise" its customers of that fact.  (Pltfs' Mem. at p. 10.)  Again, NBD's systems return any SSNs provided by the sources that are responsive to the search criteria entered.  When no SSN is present in the data sent to SafeRent, however, no SSN field is present in the results returned.  Ex. B at ¶¶ 40-43.[10]  Plaintiff is, therefore, arguing that NBD's records are "incomplete" even when there is no publicly-available SSN to return because NBD does not affirmatively indicate to the CRA through a blank field that no SSN is available.  Yet, the transmission of a "complete" record does not require the delivering party to itemize all theoretical data points that were absent in the public record.  The text of § 1681k(a) imposes no such requirement.

**b. Plaintiffs' additional arguments regarding the "incompleteness" of the data are all without merit.**

In addition to their SSN suppression tale, Plaintiffs argue that "[t]here simply is no way that a public record item can be 'complete' without the inclusion of . . . the full set of identifiers

---

[10] Put another way, the SSN field is dynamic; populated when a SSN is present, but not shown when there is no SSN to report.  *Id.*  In the latter circumstance, the absence of an SSN is, of course, obvious.

provided within the criminal public records." (Pltfs' Mem. at p. 11.) That vague and conclusory argument is without merit. Plaintiff never explains what relevant "identifiers" were lacking in NBD's results, let alone in the records of the 1.7 million other class members.

Finally, Plaintiffs argue that SafeRent's contracts with its governmental sources disclaim the "completeness" or reliability of the information being provided by the "court agencies." (Pltfs' Mem. at pp. 9-10.) That is incorrect. Rather, those contracts simply contain a boilerplate disclaimer of any *warranty* of completeness. (*See* Pltfs' Mem. at Exs. 12-18.) They do not state the data is incomplete. Indeed, such a generic disclaimer of warranty is itself often accompanied by representations that the data being transmitted "is data that is of public record, that is kept in the Clerk's ordinary course of business," *see* Ex. 18 (CL-H010044), that the data has "been prepared by the Circuit Courts from original sources and data believed to be reliable," *see* Ex. 17 (CL-H010100), and that the data is coming directly from the governmental source's "database." *See, e.g.*, Ex. 16 (CL-H010086). Nor would such high-level warranty disclaimers, even if construed as implying that incomplete records might perhaps occasionally be transmitted, *globally* prove "incompleteness" for each of the ██████████ of criminal records in question.

████████████████████████████████████████████████████

████████████████. Ex. B at ¶ 7. And, although attempting to plead a wide-ranging class across *all* of SafeRent's sources, Plaintiffs cite a mere seven contracts out of SafeRent's ████

████████████████ The disclaimers of warranty that are highlighted by Plaintiffs have no application whatsoever as to the vast majority of the records at issue.[11]

---

[11] The same is true with respect to NBD's contract with Verifications, where NBD disclaimed any warranty of completeness for liability purposes. (Plts' Mem. at Ex. 27 (CL-H0028887, ¶ 6).) Contrary to Plaintiffs' claims that such a passage was an acknowledgement of the transmission of "incomplete" data, that paragraph is merely a reminder that, although NBD itself is transmitting the complete public records made available to it, those public records may themselves lack certain identifying information, and is also a reminder that further investigation is needed by Verifications to eliminate "false positives when [it] uses a broad selection criteria" for searching. *See id.* (CL-H002888, ¶ 11(b)). Plaintiffs likewise invoke the

All told, Plaintiffs' proffered bases for systematically showing that NBD's data is not "complete and up to date" all fail.  What is left is the exact same type of individualized inquiry the court in *Farmer* recognized is incapable of certification.  The Court's analysis can end here.

### B.   Plaintiffs failed to limit their class definition to results returned to a "user."

Plaintiffs' proposed class definition also makes no mention whatsoever of how HR Plus, ADP, or Verifications purportedly "used" the records returned by NBD.  A claim under § 1681k(a) only exists where the information at issue was transmitted to a "user."  Both the FTC and the judicial decisions have concluded that the term "use" requires decision-making authority and action.  *See, e.g.*, *Nat'l Auto. Dealers Ass'n v. FTC*, 864 F. Supp. 2d 65, 74 (D.D.C. 2012) (adopting the interpretation of "use" that required both "action and implementation"); *Gonzalez-Bencon v. Doral Bank*, 759 F. Supp. 2d 229, 237 n.4 (D.P.R. 2010) ("A user of a consumer report is a person that takes action on the basis of information contained in consumer reports.").

Plaintiffs' class definition, however, does not account for the nature of any action taken (or not taken) by the recipient of NBD's data.  That is further legal error.  Hence, it is overbroad and must be amended to include only situations where the retailer CRA *used* the results returned to make an employment-related decision.  (As detailed below, any such amendment would defeat class certification, as NBD does not sell data to users, and plaintiffs have presented no evidence that ADP, Verifications, or HR Plus made any employment-related decision for *anyone*.)

In an effort to avoid this conclusion, Plaintiffs contend that Verifications was a "user" with respect to Henderson and all of the other 154,000 Verifications class members.  Plaintiffs' basis for that contention is a misreading of an allegation in a third-party *complaint* by Interstate

---

terms of a 2005 contract between ADP and NBD for the claim that NBD's reports do not comply with § 1681k(a)(2).  (Pltfs' Mem. at p. 24.)  As a threshold matter, that contract was six years old and had been supplanted at the time that ADP conducted the search at issue for CareSouth.  *See id.*  Therefore, it has no relevance to the proposed class members.  In any event, this court must assess compliance by reference to the facts in the record, not descriptions in outdated contracts.

Brands against Verifications (also involving Henderson). (*See* Pltfs' Mem. at p. 23 n. 20.)[12]   A complaint is not admissible evidence to seek certification. That allegation also says nothing more than that Verifications "controlled" the screening process for Interstate Brands for Plaintiff Henderson, which is not in dispute. *Id.* Even more, that third-party complaint also makes clear, just three paragraphs after the one cited by Plaintiffs, that it was *Interstate Brands* that made the employment decision as to Henderson. *See* 3:11cv507, Dkt. No. 13 ¶ 22 ("Once [Verifications] completes the background check, it sends the report to [Interstate Brands]. [Interstate Brands] then reviews the report" and makes the "potentia[l] disqualification" decision). In reality, there is no evidence that Verifications made any employment decision for Henderson, let alone for anyone else, and the adverse action letter from Interstate Brands (which is actual evidence) makes clear that *Interstate Brands* (not Verifications) made the employment decision. *See* **Exhibit I**. Plaintiffs cannot certify a 1.7 million member class through such gloss, non-evidence, hearsay, and misrepresentations.

### C. Section 1681k(a) requires individualized adjudication of whether a record is "likely adverse" to a consumer's ability to obtain initial employment.

Plaintiffs admit that if NBD's interpretation of § 1681k(a) is correct – that the determination of whether the data is "likely adverse" depends on an individualized assessment of the circumstances of each consumer – then "certification of a § 1681k(a) claim would be very difficult, if not impossible." (Pltfs' Mem. at p. 18.) As show below, that admission is a statement of the obvious, given that if the term "likely adverse" requires individualized fact finding then the class would be swamped by the need to engage in millions of individual adjudications, raising fundamental typicality, commonality, superiority and predominance problems preventing certification.

---

[12] Of course, even this weak argument for Verifications based on a hearsay pleading says nothing about the complete lack of proof for ADP or HR Plus.

A lynchpin argument to Plaintiffs' attempt to achieve class certification, therefore, is their assertion that the application of § 1681k(a) does not depend on the facts of any particular consumer, but instead focuses on the overall activities of the reporting entity.  (Pltfs' Mem. at pp. 18-23.)  Plaintiff argues that if an entity ever provides any public records that could theoretically adversely affect *any* consumer, then the entity must comply with § 1681k(a)(1) or § 1681k(a)(2) for *every* record it supplies – regardless how unlikely that a specific record could affect employment prospects of a specific applicant.  Plaintiffs thus seek to define the class to cover any instance where HR Plus, Verifications, or ADP entered a query that resulted in the return of *any* of the over ████████████████ in the Multistate Database.  (Pltfs' Mem. at p. 18.)

Plaintiffs' statutory argument invites this Court to commit legal error.  Plaintiffs focus on *only* the preface of § 1681k(a), ignoring its two subsections, and thereby violating one of the most fundamental maxims of statutory construction: that statutes must be construed as a whole. *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015).  Moreover, Plaintiffs' argument reads out of the statue critical terms qualifying the application of the statute, both in the preface and the subsections, and it ignores the definitions of specific terms under the FCRA.  When § 1681k(a) is read as a whole, it is clear that the statute applies only when a specific record is reported about a specific consumer that is "likely" to affect that consumers' ability to obtain employment.  Individualized assessment is the essence of § 1681k(a).

The analysis that follows is what common sense dictates.  Liability under the FCRA is determined on the facts of specific consumers.  It is not a statute of theoretical application. *E.g.*, *Dreher v. Experian Info. Solutions, Inc.*, 2013 U.S. Dist. LEXIS 76166, at *7 n.4 (E.D. Va. May 30, 2013) (addressing § 1681e(b), a close analog to § 1681k(a) and holding: "Dreher also complains that Experian failed to 'establish' such procedures, but the FCRA does not require

reporting agencies to establish such procedures.  A court assesses objective reasonableness on a case-by-case basis, without regard for consistency from one situation to another.")

    **i.**    **The prefatory text of § 1681k(a) requires a case-by-case analysis.**

Plaintiffs' argument addresses only the opening text of § 1681k(a).  (Pltfs' Mem. at pp. 18-20.)  That prefatory text alone, however, requires the rejection of Plaintiffs' argument.

First, § 1681k(a) uses a number of defined terms under the FCRA, none of which are acknowledged by Plaintiffs, but all of which refer to singular reports.  Section 1681k(a) repeatedly uses the term "consumer," which the FCRA unambiguously defines as "*an individual.*"  15 U.S.C. § 1681a(c).  The statute also uses the term "consumer report," which is defined as a "communication" of information "bearing on *a consumer's* credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing *the consumer's* eligibility for: . . . employment purposes."  15 U.S.C. § 1681a(d)(1).  The prefatory paragraph of § 1681k(a) further provides that the statute only applies to information that is likely adverse to "*a* consumer's ability to obtain employment."  15 U.S.C. § 1681k(a).  In sum, the text of the prefatory language expressly, specifically and repeatedly contemplates that § 1681k(a) is potentially triggered by a report on singular "a consumer."

Those terms, however, are not the only ones within the text of the preface demonstrating that § 1681k(a) is not an abstraction that is divorced from the circumstances of individual human beings.  As set forth in the opening paragraph, a threshold requirement for the application of § 1681k(a) is that the information sent must be "likely adverse" to a consumer's ability to obtain employment.  Hence, the applicability of § 1681k(a) again turns on the nature of the information returned on a particular consumer and the nature of the job that individual has applied for.  That is shown by Congress's intentional use of the word "likely," which requires a "high probability"

of adversity, as opposed to the word "potentially," which would be much broader.  *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at p. 674 (1993) ("likely" means "having a high probability of occurring or being true: very probable").  In sum, "likely" requires assessment of how a report would affect that singular, specific consumer.

These parts of the prefatory language fit neatly with the provisions of § 1681k(a)(1) and § 1681k(a)(2) that, as shown below, demonstrate that the obligations of § 1681k(a) are only triggered  when a public record is likely to adversely affect a specific consumer.  Reading § 1681k(a) as a whole and giving effect to every part of § 1681k(a), as the Court must, yields only one permissible result:  § 1681k(a) requires individualized assessment of "likely."

### ii.    The subsections of § 1681k requires a case-by-case analysis.

Plaintiffs' other fundamental mistake is to construe only the prefatory text of § 1681k(a) in isolation, ignoring the further provisions of the subsections § 1681k(a)(1) and § 1681k(a)(2).

Under § 1681k(a)(1), a notification letter is due (absent compliance with § 1681k(a)(2)) "at the time such public record information is reported."   The word "such" clearly and unambiguously refers back to the definition of the records described in the prefatory text of § 1681k(a) and that definition is limited to records likely to have a negative impact on a specific individual -- items of public record that "are likely to have an adverse effect upon a consumer's ability to obtain employment."  Indeed, as noted above, "a consumer" is expressly defined as "an individual," not as a representative or hypothetical person.  15 U.S.C. § 1681a(c).  Thus, § 1681k(a)(1) only applies "at the time" that the consumer reporting agency reports an item of public record that is "likely to have an adverse effect upon ['an individual's'] ability to obtain employment."   It is not triggered based on the general nature of the reporting entity nor by whether the records might be presumed to negatively impact some hypothetical person.

To accept Plaintiffs' argument would be to read the word "such" out of the statute. "Such" has a well recognized meaning: it refers the reader back to a noun already mentioned. *Spartan Petroleum Co. v. Federate Mut. Ins. Co.*, 162 F.3d 805, 809 (4th Cir. 1998) ("such property" refereed back to the last mentioned "property" in the contract). The noun here is the type of record already mentioned: an item of public record that is "likely to have an adverse effect upon a consumer's ability to obtain employment."

Turning next, as the Court also must, to § 1681k(a)(2), the text is again clear. The defendant must maintain strict procedures (absent compliance with § 1681k(a)(1)) that apply "whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported." Rather than using "such" to refer back to the records defined by the prefatory text of § 1681k(a), § 1681k(a)(2) achieves exactly the same effect by restating the description in toto. Therefore, § 1681k(a)(2) only applies at the time ("whenever") the defendant reports an item of public record that is "likely to have an adverse effect upon a consumer's ability to obtain employment." Plaintiffs' argument would read "whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment" out of § 1681k(a)(2). That is not allowed. *Wilson v. Flaherty*, 689 F.3d 332, 337 (4th Cir. 2012) (rejecting a proposed interpretation of a statute that would effectively "read out" certain statutory language).

In sum, even if NBD's conduct satisfied the definition in the prefatory text of § 1681k(a), as argued by Plaintiffs (but disagreed with by NBD above), NBD has no obligations to do anything unless those obligations can be found in § 1681k(a)(1) and § 1681k(a)(2). The Court is required to give effect to all parts of a statute, and is not permitted to read out of the statute qualifying language to make a statue of specific applicability to one of more general import. *See, e.g., St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1025 (8th Cir. 2015) (rejecting a proposed

"confined" reading of the statute that failed to account for the limitations imposed by the "subsection directly following" the paragraph invoked by the appellant). And those two subparts only impose obligations when the entity reports "public record information which is likely to have an adverse effect on *a consumer's* ability to obtain employment." Individualized adjudication of "likely" is mandated by the statute, thereby precluding class certification here.[13]

### iii. Plaintiffs' position is contrary to FTC authority and caselaw, would lead to absurd results, and would require the Court to rewrite § 1681k(a) .

Due to the text of § 1681k(a), it is unsurprising that the FTC has itself squarely rejected Plaintiffs' position, stating that "[t]he applicability of Section [1681k(a)] will turn on the nature of the information *on a particular applicant*." Foster, FTC INFORMAL STAFF OPINION LETTER, May 5, 1999 (emphasis added). Courts have also stressed that liability under § 1681k(a), as well as under like FCRA provisions, is determined on a consumer-by-consumer basis. *See, e.g.*, *Farmer*, 285 F.R.D. at 703 (for liability to exist under § 1681k(a), "each consumer will need to prove that the adverse information in the report defendant furnished about that consumer was either incomplete or not up to date."); *Dreher*, 2013 U.S. Dist. LEXIS 76166, at *7 n.4 (FCRA liability is determined "on a case-by-case basis"). Adopting Plaintiffs' approach would be contrary to every case and piece of regulatory guidance to address the issue.

Fundamentally, Plaintiffs' approach reads the word "likely" out of the provision, along with all of the other consumer-specific language therein and mentioned above. Embracing Plaintiffs' position would radically restructure § 1681k(a) and change its text along the following lines, with the yellow highlighting added and the blue highlighting stripped from the text:

---

[13] This interpretation, which is required by the text of the statute, will not somehow render incorrect the Court's decision in *Williams v. LexisNexis Risk Mgmt.*, 2007 U.S. Dist. LEXIS 62193 (E.D. Va. Aug. 23, 2007), as argued by Plaintiffs. (Pltfs' Mem. at p. 18.) The parties in *Williams* agreed that the only issue in the case was the timing of the notices sent by the defendant, as LexisNexis itself had internally coded certain public record items as "likely adverse" to consumers' employment prospects. *Id.* at *3 n.2, *5. Thus, there was no dispute that the statutory trigger was satisfied for each member of the class. Nor was this interpretative argument ever considered by the Court.

A consumer reporting agency which furnishes ~~a~~ consumer report~~s~~ for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and could potentially ~~are likely to~~ have an adverse effect upon ~~a consumer's~~ any hypothetical consumers' ability to obtain employment shall

(1) at the time ~~such~~ public record information is reported to any ~~the~~ user of a ~~such~~ consumer report, notify ~~the consumer~~ consumers of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom ~~such~~ information is being reported; or

(2) maintain strict procedures designed to insure that whenever public record information which could possibly ~~is likely to~~ have an adverse effect on a hypothetical consumer's ability to obtain employment is reported it is complete and up to date. For purposes of this paragraph, items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time the report is reported.

That is not allowed. *See, e.g., Wilson*, 689 F.3d at 337.[14]

For the many reasons set forth below, the individualized approach required by the plain text of § 1681k(a) compels the denial of certification in this case.

**D. Plaintiffs failed to limit their class definition to individuals who were seeking to "obtain employment," as opposed to other "employment purposes."**

Even apart from the issue of whether § 1681k(a) is applied categorically or with respect to individual consumers, Plaintiffs also seek to certify a class consisting of every instance where NBD reported results for a search query that was marked by HR Plus, Verifications, or ADP as

---

[14] Plaintiffs' approach would also lead to absurd interpretative results. For instance, their categorical reading of the statute would require a defendant to comply with § 1681k(a) even when a charge and/or conviction *will not* be considered "likely" adverse – or even considered adverse at all – to a specific job applicant's chances of obtaining employment, including because it is a minor offense (*e.g.*, a traffic offense or civil judgment); is too dated; does not intersect with the job responsibilities at issue; does not satisfy the employer-provided adjudication criteria; the defendant has been informed as such by the employer, etc.

These issues are particularly acute in the wholesale context, where NBD is aware that its data is used only as a starting point by its customers and may well never be included in a consumer repot to an employer. Plaintiffs' position would also require a wholesaler to send notice even when the data cannot be reported to the prospective employer due to prohibitions of the state where employment is sought. *See, e.g.*, Fla. Stat. § 112.011; La. Rev. Stat. § 37:2950; Wash. Rev. Code §§ 9.96A.020, 9.96A.030, 9.96A.060 (all restricting the type of criminal record information that can potentially be considered by employers). Yet, through their statutory position, Plaintiffs would still require a defendant to send notice to the consumer in all of the above circumstances.

26

being performed for "employment purposes." (Pltfs' Mem. at p. 15.)  But, a class covering any employment purpose is contrary to the plain text of the statute, which only relates to searches conducted for consumers seeking to "obtain employment," 15 U.S.C. § 1681k(a), a far narrower subset of the many types of "employment purposes" under the FCRA.  That is further legal error.

"Congress is presumed to have used words according to their ordinary meaning unless a different use is clearly indicated." *United States v. Tracy*, 456 Fed. App'x. 267, 270 (4th Cir. 2011).  And, it is established that "different terms conjunctively used in the same statute should be given different meanings." *Wachovia Bank v. Schmidt*, 388 F.3d 414, 420 (4th Cir. 2004).

With these principles in mind, although § 1681k(a) relates to reports issued for "employment purposes," the requirements of § 1681k(a) are triggered only with respect to consumers who are in the process of "obtaining employment," *i.e.*, consumers seeking *initial* employment.  18 OXFORD ENGLISH DICTIONARY at p. 1002 (2d ed. 1989) (defining "obtain" as "to acquire, get"); *accord Houston v. TRW Information Services, Inc.*, 707 F. Supp. 689, 694 (S.D.N.Y. 1989) ("[S]ection 1681k(a)(2) does not apply because Houston was not applying for employment.").  That fact is also confirmed by the legislative history of § 1681k(a), where the Congressional Record notes that the provision concerns instances where "adverse public record information . . . [is] being reported to a ***potential*** employer."  *See* 116 Cong. Rec. 36,573 (Conference Report on H.R. 15073, attached as **Exhibit J**) (emphasis added).

The purpose of "obtaining employment" is, however, only a subset of the range of "employment purposes" for which consumer reports may be obtained under the FCRA.  15 U.S.C. § 1681a(h) ("The term 'employment purposes' when used in connection with a consumer report means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee.").  Most of those stated purposes have no relation whatsoever to an individual's first "obtaining" employment, as is required to trigger § 1681k(a).

27

Failing to engage this critical distinction in their brief, Plaintiffs seek to certify a class that covers any instance where NBD's CRA customer informed NBD that criminal records were being sought for "employment purposes." Hence, Plaintiffs' class definition is overbroad and must be narrowed to include only individuals who were seeking to "obtain" initial employment at the time the search query was submitted to NBD. But, as detailed below, that required narrowing will also independently defeat class certification.

## II.   A properly-defined Count I class is not ascertainable.[15]

"A class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *EQT*, 764 F.3d at 358. Hence, if determining class membership would require a person-by-person adjudication, the class should not be certified. *Id.* As detailed above, Plaintiffs' proposed class definition is overbroad and untethered from the elements of a § 1681k(a) claim in multiple ways. But, if it were amended to try and track the elements of § 1681k(a), each of those required boundaries would give rise to a class that is not ascertainable under the established facts of this case.

### A.   Whether each item of data is "incomplete" would require a file-by-file review.

To state a claim under § 1681k(a), each class member would be required, as an element of his or her claim, to demonstrate that the public record data returned by NBD's systems was incomplete. *See, e.g.*, *Farmer*, 285 F.R.D. at 703. Yet, SafeRent always requests from its sources, and NBD's systems then always return, all available public record data responsive to CRA search queries; meaning that the data NBD returns is complete and up to date. Ex. B at ¶¶

---

[15] Plaintiffs take substantial liberties in their brief regarding the nature of the stipulations agreed to by NBD. (*See* Pltfs' Mem. at pp. 7-8, 20.) NBD stipulated only that extensive third-party discovery could ultimately reveal the identity of the consumer that was the subject of the employer's background screening request. (*See* Dkt. No. 56 pp. 1-2.) Any contention that NBD stipulated to anything further than that basic fact is false. NBD in no way stipulated to Plaintiffs' ability to globally ascertain any of the many factual issues that are the subject of this section of its opposition, which were laid out in detail in NBD's discovery responses.

8-20.   At the very least, however, because NBD does not suppress any data, including SSNs, there is no way to assess the incompleteness of the data returned absent a file-by-file review at the courthouse of the information contained in the underlying public record.

Thus, to *answer* the "common" questions that Plaintiffs claim to be present in the context of a statue that requires as an element of the claim records that are not "complete and up to date" the Court will have to review "literally millions of [results]" to determine whether these results were incomplete.  *Dukes*, 131 S. Ct. at 2552.  That is inherently an individual issue.  *See, e.g.*, *Lanzarone v. Guardsmark Holdings, Inc.*, 2006 U.S. Dist. LEXIS 95785, at *13-14 (C.D. Cal. Sept. 7, 2006) ("Because the Court would have to address each of these issues on a one by one basis for all of the officers in the proposed class, Plaintiff cannot meet his burden under Rule 23(b)(3).").  Finding incompleteness in one report will do nothing "to drive the resolution of the litigation" as a whole.  *Dukes*, 131 S. Ct. at 2551.

Plaintiffs' problems also would only increase from there.  To establish liability under § 1681k(a), Plaintiffs and the class must prove that NBD passed along incomplete "items of information on consumers which are *matters of public record*."  15 U.S.C. § 1681k(a) (emphasis added).  Yet, the definition of a "public record" varies widely across states and localities, and state and local governments and courts have myriad restrictions and statutory exceptions as to the information in a court file that can be made "public."  *See, e.g.*, Ark. Sup. Ct. Adm. Order No. 19 § 7 (listing twelve broad categories of information, which themselves reference other bodies of law, "in case records [that are] excluded from public access"); Vt. Pub. Acc. Ct. Rec. Rule 6(b) (listing 36 pieces of information in "case records" that are excluded from "public access"); I.C.A.R. Rule 32(e)(2) (listing 29 categories of information in court records that "are exempt from disclosure" to the public).  Therefore, in addition to checking the results returned by NBD against millions of underlying court files to assess whether there was an anomalous instance of

29

"incompleteness" in NBD's returned data, the Court would also then need to cross-reference the contents of the court file against each law, regulation, and/or order to determine whether any piece of information that was missing from NBD's results was a part of the "public record," as limited by applicable law.  Ascertainability is absent on multiple levels.

But those are not the only glaring ascertainability problems vis-à-vis the required showing of "incompleteness."  Even accepting the false premise of Plaintiffs' principal argument to show incompleteness" (*i.e.*, that NBD somehow had an obligation to go beyond the "public record" and somehow obtain SSNs even when their public dissemination was proscribed by law), the class definition would still be based on the assumption that the public record information being returned by NBD even contained a SSN in the first instance.  Indeed, the absence of a SSN in the physical court file for any given conviction is not simply theoretical.  To use but one of what will be an untold number of like examples, the criminal records of the 2004 conviction that were gathered by Plaintiff Henderson from the Pennsylvania clerk and challenged by him in this lawsuit lacked a SSN within the court file.  *See* **Exhibit K** (the records produced by Henderson that lack any SSN in the field where it could have been entered).

Accordingly, Plaintiffs have been forced to take radical positions in this case, including through statements such as the following: "*It does not matter what the courts have in their file or whether or not they are able to provide Defendant with a full social security number*.  The question is whether or not a record without a social security number is complete . . . ." (Dkt. No. 155 p. 4) (emphasis added).  Clearly, NBD cannot be faulted for failing to transmit "complete" "public records" by not reporting data points that are not a part of the "public record" in the first place, as that term is defined by applicable state law.  And, NBD certainly cannot be held liable for failing to report a data point that does not even exist in the record *at all*.

**B. Whether NBD's customer reported records as to a consumer seeking to "obtain employment" would require file-by-file review.**

While NBD's customers can indicate that they are seeking criminal record information for certain purposes, including "employment purposes," NBD is not made aware of and does not track the *specific* employment purpose for which a report is sought, *e.g.*, obtaining employment versus evaluating an existing employee.  Ex. A at ¶ 12; Ex. B at ¶ 22.  And, NBD processes search queries for CRAs seeking data on individuals that are seeking initial employment, as well as current employees.  *See* Ex. A at ¶ 8.  Only individual inquiry of the ultimate employer could determine whether the records returned concerned an individual trying to *obtain* employment.

NBD's records would not, therefore, allow a sorting of reports into those that were used for purposes of initial hires, as opposed to the many *other* permissible employment purposes. Instead, it would require a file-by-file review of third party data.  Count I straightwardly fails for reasons of ascertainability.  *See, e.g., Supler v. FKAACS, Inc.*, 2012 U.S. Dist. LEXIS 159210, at *4-9 (E.D.N.C. Nov. 6, 2012) (where "defendant called debtors using multiple autodialer machines but did not record which autodialer called which debtor," and "only one of defendant's autodialers was leaving the allegedly illegal messages," it was "not administratively feasible to identify members of the putative class besides plaintiff").

**C. Whether NBD's customers, including ADP, HR Plus, and Verifications, "used" the data returned is not subject to a systematic determination.**

Finally, the issue of whether ADP, Verifications, or HR Plus "used" the records that were returned by NBD to make an employment-related decision, as is required by the text of § 1681k(a), is not an issue that is capable of classwide adjudication in favor of Plaintiffs.  To be absolutely clear, there is *no evidence* that any of those entities made any sort of employment-related decision for any of the class members or even the named Plaintiffs.  To the contrary, the screening reports transmitted by ADP and Verifications contain no employment decision or

recommendation for either Plaintiff.[16]  *See* Ex. D; Ex. E.  (Plaintiffs also conducted no discovery of HR Plus during the discovery period.[17])  The report from Verifications contained a listing of criminal records from Virginia and Pennsylvania without any recommendation or adjudication.  *See* Ex. D pp. 18-19.  The same is true for the ADP report, which merely listed the identified records, including the records now challenged by Hines from Indiana.  *See* Ex. E at pp. 1-9.  The pre-adverse action letter sent by Interstate to Henderson is also explicit that Verifications "did not make the employment decision."  Ex. I at p. 1.  And, even if ADP, Verifications, or HR Plus ever made an employment decision for any putative class member, that would not answer the question for any other class member.  In fact, there is no evidence that such a practice was ever made, let alone that it was systemic or even common.  Nor does NBD have any records or knowledge of such use.  (Plaintiffs, however, also failed to take any discovery of ADP, HR Plus, or Verifications in this case, including on that issue.)

### D. Whether the results returned by NBD were "likely adverse" to a consumer's ability to obtain employment cannot be determined in a systematic way.

In addition to taking the flawed position that the application of § 1681k(a) is categorical and divorced from the facts of a specific consumer's screening, Plaintiffs further fail to describe the independent investigation and subsequent filtering of records that is routinely conducted by NBD's CRA customers before any records are reported to employers.  Yet, such filtering, as well as the (also unmentioned) exceptional diversity of data at issue, gives rise to a class that is not ascertainable under the correct interpretation of § 1681k(a).

---

[16] The mere fact that Verifications identified itself (through hearsay) as a "user" on NBD's search form in 2009 for the Henderson-related screening does not mean that the *legal issue* under the FCRA is somehow resolved relative to the prevailing judicial and subsequently-articulated FTC interpretation of that term, especially when there is no evidence in the record to suggest that ADP, Verifications, or HR Plus made any employment-related decision for either Plaintiff.  Plaintiffs have no actual proof.

[17] HR Plus was not mentioned until the filing of the Second Amended Complaint in July 2015.  Even then, no detail about the search was provided.

### i. The fact that NBD's customers frequently use NBD's data as an initial, investigatory tool precludes class certification.

It is not possible to determine from NBD's records whether the information NBD sold to HR Plus, ADP, or Verifications "likely" would have had an adverse effect on a consumer's ability to obtain employment because the data provided by NBD to the customer may not have been the same information provided to the employer. NBD counsels the CRAs that it is the CRA's obligation, including under the FCRA, to review the results obtained and to then eliminate any criminal record data that does not relate to the person about whom the CRA is preparing a report. Ex. A at ¶ 16. Consistent with those instructions, NBD does not know what data the CRA will eliminate prior to providing a report to an employer. Ex. B at ¶ 26. Nor is NBD privy to any filtering restrictions imposed by employers (such as any direction from the employer to the retailer CRA to include/exclude certain records from the report due to time, severity level, etc.). *See* Ex. A at ¶¶ 16-17. Thus, NBD does not know whether the information it provided would be transmitted to the employer or prospectively filtered out by its customer. *See* Ex. B at ¶ 16. In fact, both ADP and Verifications conducted their own research, including through the use of a third-party vendor, *see* Ex. C, which resulted in their filtering out the majority of data returned by NBD's systems. *See* Exs. D, E. That is yet another reason why the assessment of whether § 1681k(a) applies in this wholesale context cannot be made on a classwide basis.

In trying to preempt this argument, Plaintiffs state "there is no requirement in the statute that NBD's report be provided verbatim (or otherwise) to an employer before § 1681k(a)(1) would govern." (Pltfs' Mem. at p. 22.) Plaintiffs' straw man argument misses the point, which is that it is not possible to assess whether a record is likely to adversely affect an applicant's ability to obtain employment *in this wholesale context* without knowing whether that record will even be provided to the employer. Thus, the widespread filtering that occurs (and which is, in

33

fact, required of NBD's customers under the FCRA) with respect to the records returned by NBD prevents the Court from assessing whether any record(s) returned by NBD were "likely" to affect employment absent a review of each consumer's circumstances.

### ii.    Variations in the "use" of records prevents certification.

Plaintiff has conceded that if the Court does not accept their "categorical" interpretation of § 1681k(a), then class certification is inappropriate in this case. (*See* Pltfs' Mem. at p. 18.)

### a.  State law varies as to whether and how a record can be considered.

NBD is not made aware of the state where the consumer is seeking employment. Ex. B at ¶ 23. Yet, state laws vary regarding the offenses an employer may consider when making decisions. For example, California law provides that no employer shall "seek from any source whatsoever, or utilize, as a factor in determining any condition of employment . . . any record of arrest or detention that did not result in conviction." *See* Cal. Labor Code § 432.7. Similarly, Florida law dictates that public employment cannot be denied "solely because" of a conviction. Fla. Stat. § 112.011. Florida, Louisiana, New Mexico, and Washington have laws preventing public employers from considering any felony convictions in employment decisions unless the conviction specifically relates to the position sought.[18]   Arizona, Connecticut, and Kentucky have extended this qualification to any conviction, and Hawaii, Kansas, New York, Pennsylvania, and Wisconsin have further extended their laws to encompass the private sector, in addition to the public sector.[19]   As a result of these different statutes, it is not possible without individual inquiry to determine the effect of a record on a consumer's ability to obtain employment, as that same record may itself be filtered out under governing law.

---

[18] *See* Fla. Stat. § 112.011; La. Rev. Stat. § 37:2950; N.M. Stat. §§ 28-2-3 through 28-2-6; Wash. Rev. Code §§ 9.96A.020, 9.96A.030, 9.96A.060.

[19] *See* Ariz. Rev. Stat. § 13-904(E); Conn. Gen. Stat. § 46a-80; Ky. Rev. Stat. § 335B.020; *see also* Haw. Rev. Stat. § 378-2.5(a); Kan. Stat. Ann. § 22-4710(f); N.Y. Exec. Law § 296(15); N.Y. Correct. Law §§ 750 to 753; 18 Pa. Cons. Stat. § 9125; Wis. Stat. § 111.335.

### b. Employer adjudication criteria vary widely across industries and positions, including as advised under federal law.

The variations across states are exponentially multiplied across employers. For instance, only 26% of respondents in the construction industry reported a policy prohibiting a person with a felony from being hired, while 80% of respondents in the retail and sales sectors prohibit such a hiring. *See* Oster-Aaland, L., K. Thompson, and E. Thompson, 2010 SURVEY OF NDSU EMPLOYERS. Varying standards also can exist within the same organization for different positions, including over time and based on the status of the labor market. "*Background Checking: Conducting Criminal Background Checks,*" Society for Human Resource Management, January 22, 2010. Thus, unlike Plaintiffs' class definition, it cannot be said that *any* return of any type of conviction/charge from *any* date with *any* type of disposition "likely" precludes employment for *all* positions within *all* companies.

### c. The variety of data in public records prevents an objective, formulaic assessment of whether an offense is "likely adverse."

Even if NBD knew what records were provided by the employer, and also knew the employers' policies on how the records would be evaluated, the wide variation in the information included in the records cannot be evaluated formulaically to identify those records that are likely to have an adverse effect on an individual's ability to obtain employment.

### 1. Varying/non-specific offense descriptions permeate the data.

██████████████████████████████████████████████████████████

██████████████████████. Ex. B at ¶ 8. The substance of that criminal record data, which was received from more than ██████████████████, is not altered by NBD. Ex. B at ¶ 11. Hence, the extensive variation in the data received from these sources appears in equal measure in the information transmitted by NBD to its CRA customers in response to a search

35

query. ███████████████████████████████████

███████████████████████. Ex. B at ¶ 30.

These many descriptions defy ready or objective categorization. ████████████



███████████████████████ As a result, whether the unknown substance of the offense

would rise to the level of "likely" being influential to an employer's decision-making process

requires individual investigation.

### 2.   Varying severity in offenses precludes a systematic assessment of the "likely" adversity of any data returned by NBD.

In addition to the varying offense descriptions, state laws also vary significantly in terms

of what specific conduct constitutes a particular offense. ████████████████████

████████████████████████████. Ex. B at ¶ 30.  However, state

definitions of "robbery" can include crimes of different severity that may be significant to an

employer.  To use but one example, New York's penal code includes three degrees of robbery,

ranging from a class B violent offense against a person to a class D non-violent offense involving

property.  N.Y. Pen. Law § 160.05; N.Y. Pen. Law § 160.15.  These state-by-state variations

prevent an objective assessment of how an employer in any given state would view any reported

offense.

**3.    Variations in disposition information prevent a classwide assessment of the "likely" adversity of data returned by NBD.**

As detailed above, the disposition of the varying offenses reported by NBD is a relevant data point in assessing whether a record would "likely" affect a consumer's ability to obtain employment under § 1681k(a). ███████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████. Ex. B at ¶ 32.  Without any ability to systemically decode such dispositions, there can be no objective assessment of potential adversity of any given record.

**iii.    Plaintiffs' experiences exemplify the wide variation in data in the Multistate Database and in employer adjudication criteria.**

The Court need not look any further than the reports of the Plaintiffs and their putative employers at Interstate Brands and CareSouth as proof of the foregoing conclusions.  For one, ADP and Verifications applied their own filtering and matching to the data returned by NBD and eliminated most of the items that had been returned by NBD.  *Compare* Ex. F; Ex. G; *with* Ex. B at ¶¶ 40 (Exhibit 1), 42 (Exhibit 2).

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████

Consistent with the above, CareSouth's Vice President of Human Resources testified that, among other factors, the following variables would bear on whether an applicant was likely to be denied employment based on the return of a criminal record: (1) the nature of the offense;

(2) the recency of the offense; (3) the disposition of the offense; (4) the overall qualifications of the applicant; (5) the circumstances surrounding the offense; and (6) the employment position applied for by the consumer.  Fundamentally, this led him to testify to the following conclusion:

> Q.   So would you be able to determine *without looking at any particular application or applicant as a whole* whether a conviction for a non-barrier offense would *likely prevent* an applicant from getting a job with CareSouth?
>
> A.   No.  I think we would have to, again, take a look at it *on a case by case basis as we do now, sir.*

Ex. F pp. 100:23-101:7.  This reality forecloses certification of the proposed class in the context of a statute triggered by the "likely" outcome of each consumer's employment application.

### E.  A rigorous analysis concludes that a properly-defined class is not ascertainable.

NBD's retained expert, Dr. Keeley, has independently reviewed the nature of NBD's business and the databases, as well as researched the affect of criminal records on the labor market.  Based on that extensive research and review, he stated as follows in his report:

- It is not possible to ascertain without individualized inquiry whether a given criminal record provided by NBD was for the specific purpose of seeking to "obtain employment."  Dr. Keeley notes that NBD's data does not indicate whether that employment purpose is considering a consumer's effort to "obtain employment."  Ex. G at ¶¶ 20, 52-53.

- It is not possible to ascertain without individualized inquiry whether a given criminal record provided by NBD to its customer was, in turn, reported to the employer requesting the background screening.  Dr. Keeley noted that NBD counsels its customers to verify whether a given record actually concerns the individual of interest to the employer and that such further filtering and investigation is prevalent in the industry.  Ex. G at ¶¶ 21-22, 55-57.

- It is not possible to ascertain without individualized inquiry what criteria the employer will use to assess an individual's suitability for employment.  Dr. Keeley noted that different employers have markedly different adjudication criteria.  The same variations exist under state laws, which often limit what types of criminal record can even be considered by employers.  Dr. Keeley also found that NBD's data varies greatly, which prevents any systematic assessment of potential adversity.  Therefore, identifying whether a given report would likely have an adverse effect upon an individual's ability to obtain employment requires a case-by-case assessment.  Ex. G at ¶¶ 23-24, 58-73.

- Dr. Keeley concluded that if a report provided to an employer includes a criminal record that prevents the individual from being hired, but the information is accurate, then there is no economic harm from the alleged conduct.  Also, Dr. Keeley notes that hiring decisions are driven by a multitude of factors, such that any given criminal record may not have affected the hiring decision.  Dr. Keeley thus concludes that an individualized inquiry is required to determine the impact of any report on the hiring decision.  Ex. G at ¶¶ 26, 74-92.

*See also generally* Ex. G.

### III.    A Count I class fails for lack of typicality, commonality and predominance.

"[T]he Supreme Court's recent decision in [*Dukes*] has transformed the Rule 23(a)(2) commonality standard from a 'low bar' to a far more searching inquiry." *Loef v. First Am. Title Ins. Co.*, 2012 U.S. Dist. LEXIS 174313, at *13 (D. Me. Dec. 10, 2012).  To satisfy commonality under Rule 23(a)(2), a plaintiff needs to identify a common question; to satisfy the predominance standard of Rule 23(b)(3), however, that common question must "predominate" over individual ones.  *See* Fed. R. Civ. P. 23.   Under either rubric, *Dukes* clarified that raising a common "question" is not enough.  The chief concern is "the capacity . . . to generate common answers" that have the capacity to resolve "each of the claims in one stroke."  *Dukes*, 131 S. Ct. at 2551.

As detailed above, Plaintiffs' class definition is deficient in numerous ways, and any amendment to cure those defects would give rise to a class that is not ascertainable.  In addition to posing fatal ascertainability problems, however, the elements of § 1681k(a) also give rise to a class where there is no common method for generating common answers.

### A. If a genuine dispute of material fact exists on the issue, whether NBD's procedures comply with § 1681k(a)(2) requires an individualized inquiry.

Under § 1681k(a)(2), no liability is possible unless Plaintiffs establish that NBD failed to maintain "strict procedures" to insure that the data supplied is "complete and up to date."  *Id.*  All parties agree that disproving a defendant's compliance with § 1681k(a)(2) is <u>an element</u> of

Plaintiffs' claim.  *See, e.g.*, *Henderson v. InfoMart*, No. 1:14-cv-01609, Dkt. No. 59 at p. 16 (N.D. Ga. Aug. 8, 2014); *Dalton*, 257 F.3d at 416-17.

As set forth in its pending Motion for Partial Summary Judgment, NBD complies with § 1681k(a)(2) as a matter of law because the data within the Multistate Database is maintained using strict procedures as to recentness and completeness.  Plaintiffs' argument that § 1681k(a)(2) categorically cannot apply absent a contemporaneous, manual verification of a record at a courthouse is not the law.  Indeed, this argument has been repeatedly rejected. However, Plaintiffs' motion for certification hinges on this flawed premise because, to grant the motion, the court must necessarily adopt Plaintiffs' extreme interpretation of § 1681k(a)(2).  Any fact question as to the strictness of NBD's procedures will be inherently individualized based on NBD's business practices, as applied to the specific data that was returned by NBD in response to each of the more than 1.7 million search queries at issue.

    **i.    SafeRent's electronic collection of governmental data, as opposed to going to the courthouse, does not negate NBD's compliance with § 1681k(a)(2) .**

In an attempt to override the fact-specific nature of the § 1681k(a)(2) analysis, Plaintiffs contend that the carefully-balanced, alternative compliance option available under § 1681k(a)(2) is categorically "unavailable" to NBD.  All such "global" arguments fail.

First, Plaintiffs assert that "§ 1681k(a)(1) applies to CRAs that sell reports from a stored database, [§] 1681k(a(2) applies to CRAs that perform contemporaneous manual verifications at the actual courthouse."  (Pltfs' Mem. at p. 8.)  That incredible *ipse dixit* statement is not the law. Instead, courts have held that § 1681k(a)(2) is satisfied through the electronic collection of data from governmental databases, just as SafeRent and NBD do here.  *See, e.g., Haro v. Shilo Inn, Bend LLC*, 2009 U.S. Dist. LEXIS 65562, at *7-9 (D. Or. July 24, 2009) (dismissing claim under § 1681k(a) where the defendant obtained court records from the "Oregon Judicial Information Network website" and its electronic "database," where "plaintiff does not contest the accuracy of

40

the information [defendant] obtained from OJIN or present legal authority that a reporting agency may not rely on OJIN"); *see also Rodriguez v. Equifax Info. Servs., LLC*, 2015 U.S. Dist. LEXIS 93560, at *21 (E.D. Va. July 17, 2015) ("[T]he record is wholly insufficient to establish that Equifax's violation of § 1681e(b) was willful or negligent when it included in Plaintiff's report to OPM the civil judgment, obtained from Experian's database, or the collection account, obtained from TransUnion's database.").[20]

Indeed, Plaintiffs' argument was recently rejected in yet another case involving Plaintiff Henderson, where the court addressed a § 1681k(a) claim against a CRA (not a wholesale data provider like NBD) that included the allegation that a defendant cannot claim to have "strict procedures" if it did not contact the "clerk" of court "before furnishing a report." *Infomart, Inc.*, No. 1:14-cv-01609, Dkt. No. 59 at p. 16 (N.D. Ga. Aug. 8, 2014).  In dismissing that claim under Rule 12(b)(6) as not being supported by any authority, the court stated that § 1681k(a)(2) "does not require that a consumer reporting agency contact the 'original source' of public records information immediately before furnishing a report, as Plaintiffs suggest." *Id.* at 18.  Thus, the extreme position advanced by Plaintiffs has been repeatedly rejected.

<u>Second</u>, Plaintiffs contend that NBD cannot claim "strict procedures" because the procedures are actually those of "a third party," SafeRent.  (Pltfs' Mem. at p. 8.)  As a threshold matter, Plaintiffs have not raised this contention in the long history of this case and cannot do so for the first time now.  **Exhibit L** (Plaintiffs' responses to NBD's interrogatories addressing § 1681k(a)(2)); Fed. R. Civ. P 37(c).  The argument is also unprincipled.  There is no dispute that the procedures actually applied to the data in question, which is the concern of § 1681k(a)(2).  In

---

[20] Notably, affirmatively invoking the reliability and completeness of such databases, Plaintiffs' attorneys recently sought and secured class certification before this Court through the use of electronic court data and databases.  *See Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183 (E.D. Va. 2015) (granting class certification based on whether "the computer database of the Executive Secretary of the Supreme Court of Virginia shows that the person was the defendant in a Virginia General District Court civil action or judgment").

41

fact, the provision makes plain that the strict procedures are to be "maintained" relative to the "public record information" in question; there is no requirement that the defendant itself be the entity that institutes the procedures. 15 U.S.C. § 1681k(a)(2). And, of course, Plaintiffs do not advance any authority for their "form over substance" contention, as none exists. To the contrary, courts have repeatedly assessed a defendant's procedures by reference to the actions of involved third parties. *See, e.g.*, *Dalton*, 257 F.3d at 416; *Farmer*, 285 F.R.D. at 690.

### ii. The data collection and updating policies at issue are divergent and would require an individual assessment of records.

Assessing NBD's compliance with § 1681k(a)(2) would require an evaluation of whether NBD's procedures for data intake and transmission qualify as "strict" as to the results returned for each of the 1.7 million queries put at issue by the class definition.

As noted in NBD's motion for summary judgment on this issue,



. In the event that summary judgment is not granted on the issue, this issue is not "capable of classwide resolution . . . in one stroke," *Dukes*, 131 S. Ct. at 2551, because NBD's updating procedures varied over the 300 sources of the records reported. The Court may not extrapolate from Plaintiffs' claims on a classwide basis because each class member's claim would depend on the circumstances of how NBD reported information to its CRA customers, including the sources implicated by the criminal record data and/or the age of the data relative to the updating cycles.

---

[21] For example, the data from Virginia's Administrative Office of the Courts are updated monthly, data from North Carolina's Office of the Courts are updated daily, and data from the San Diego Superior Court Index and the Pennsylvania court system are updated weekly. Ex. B at ¶ 10. Moreover, even when a source provides updates on a less-than-daily basis, if the record had been generated at the very end of an update cycle, the record itself may only be a day old at the time of its transmission to SafeRent.

The court in *Farmer* recognized this same issue, holding that given the "broad range" of defendants' data sources, under § 1681k(a)(2), "the court would need to determine the source of each piece of adverse information in a consumer's report and then evaluate the quality of that source. This will necessarily entail individualized inquiry for many reports, even if some of the record sources may be common to many potential class members." 285 F.R.D. at 702-03.

Likewise, in *Soutter*, the Fourth Circuit addressed variations in data collection methods on a CRA's procedures, where "LexisNexis used . . . at least three different means of collecting" records. 2012 U.S. App. LEXIS 24891, at *12-13 (E.D. Va. Dec. 3, 2012). The court held, given that variation, that "proof that Equifax's behavior was unreasonable because of the manner in which LexisNexis collected data from the Richmond General District Court in Soutter's case does not 'advance' the claim of a class member whose judgment was from a circuit court in 2010." *Id.* Here, there are not three methods of collection, there are ███████████.[22]

## B.    The amount of statutory damages is an individual issue.

Statutory damages are sought for each class member under Count I.[23] However, upon a finding of liability, the amount of statutory damages any given class member should receive is an individual issue. That measure will vary for each consumer based on class-member-specific considerations, within the statutory range of $100 to $1,000 under the FCRA. *See* 15 U.S.C. § 1681n(a)(1)(A).

---

[22] Plaintiffs invoke the terms of a 2005 contract between ADP and NBD for the claim that NBD's reports do not comply with § 1681k(a)(2). (Pltfs' Mem. at p. 18.) That dated contract had been supplanted at the time that ADP conducted the search at issue for CareSouth. *See id.* Therefore, it has no relevance to this case. This Court must also assess compliance by reference to the facts in the record, and not accompanying descriptions of law in outdated contracts with third parties. *Williams v. Lockheed Martin Corp.*, 2011 U.S. Dist. LEXIS 115091, at *6-7 (S.D. Cal. Oct. 5, 2011) ("The relevant concern is the job duties actually performed by NDCAs, not how they are described in third party contracts."). ███████████████████████████████. Ex. B at ¶¶ 12-18.

[23] Plaintiffs seek only statutory and punitive damages for Count I; no actual damages are claimed.

Statutory damages are awarded on a "per consumer" basis, and not "per violation." *Stillmock v. Weis Mkts., Inc.*, 385 Fed. Appx. 267, 273 (4th Cir. 2010). Therefore, setting statutory damages is an individual issue. *Campos v. ChoicePoint, Inc.*, 237 F.R.D. 478, 486 n.20 (N.D. Ga. 2006) (individual issues precluding class certification included "the determination of the proper amount of statutory damages to impose for each violation").

In *Souter*, the Fourth Circuit held that calculating statutory damages focuses on the individual circumstances of the putative "class members." *See* 2012 U.S. App. LEXIS 24891, at *13 ("[B]ecause statutory damages are intended to address harms that are small or difficult to quantify, evidence about particular class members is highly relevant to a jury charged with this task."). For that reason, statutory damages "typically require an individualized inquiry" into the amount of alleged harm suffered by the consumer. *Id.* Generally, therefore, "businesses deserve at least the opportunity to argue that certain individuals should receive statutory damages at the low end of the range." *Stillmock*, 385 Fed. App'x at 277. That is especially true when the class proposed to be certified is massive, with the $900 difference in the per-consumer statutory range affecting the requested liability to the order of over 1.5 billion dollars.

Fundamentally, as the Supreme Court recently emphasized, to claim, as Plaintiffs do, that "any method of [damages] measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be . . . would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1433 (2013). That approach has underpinnings in due process. There is no principled basis to pick a single statutory damages amount and then award that number to every single class member, especially given that the Fourth Circuit has clarified that "evidence about particular class members is highly relevant" to that inquiry. *Souter*, 2012 U.S. App. LEXIS 24891, at *13.

**C.  Plaintiffs have not demonstrated they are typical of the proposed class members.**

The typicality requirement ensures a representative "possess[es] the same interest and suffer[s] the same injury as the class members." *Falcon*, 457 U.S. at 156.  The representatives must show no "meaningful differences" between their claims and the class.  *Deiter*, 436 F.3d at 466-67.  Hence, a "typicality of the class representative may be defeated if the class representative is subject to unique defenses.  *In re Computer Scis. Corp. Secs. Litig.*, 2012 U.S. Dist. LEXIS 181450, at *30 (E.D. Va. Dec. 19, 2012).

As detailed above, Plaintiffs' class definition fails to account for any "use" that was or not made of any of the data returned by NBD's systems in making an employment decision, which is an element of any claim under § 1681k(a).  NBD also detailed how there was *no evidence* that HR Plus, ADP, or Verifications made any employment-related decision (*i.e.*, "used" the data) for any of the 1.7 million proposed class members.  Plaintiffs took no discovery of any of those entities.  Yet, apart from that global failure of proof, and even assuming a proper class definition that incorporates this definition of "use," Plaintiffs have failed to demonstrate that they are typical class representatives.  Plaintiffs are plainly subject to a defense due to the fact that there is no evidence that ADP, Verifications, or HR Plus actually "used" the records returned by NBD to make any employment-related decision.  *See* Exs. D, E.  In fact, the opposite is true.  Plaintiffs have failed to prove they are typical class representatives, as they are subject to defenses that require the dismissal of their claims.  *Thompkins*, 2015 U.S. Dist. LEXIS 35470, at *28-29 (plaintiff must produce evidence on each Rule 23(a) factor).

**D.  Plaintiffs' transparent attempt to discard their claims for actual damages and to represent a class seeking only statutory and punitive damages renders them inadequate and atypical representatives.**

Plaintiffs do not seek actual damages in Count I, even though they claim actual damages under their individual claims based on the same pattern of conduct.  This strategic attempt to

avoid pleading actual damages only with respect to their class claim under § 1681k(a)(1) is a transparent effort to jettison claims Plaintiffs would otherwise contend are viable in an effort to support certification.  Indeed, in the recently settled action by Henderson against Verifications, an "actual damages" settlement fund of $750,000 was created for class members whose claim under § 1681k(a) resulted in "tangible injury" to the consumer.  3:11cv514 (Dkt. No. 39-1 p. 13).

"[B]asic due process requires" that Plaintiffs "possess undivided loyalties to absent class members" to be an adequate class representative, and any "conflict in remedial interests" renders their representation inadequate under Rule 23(a)(4).  *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 339 (4th Cir. 1998).  Assuming *arguendo* that Plaintiffs' claims are typical of the proposed class, the class members would have also suffered actual damages, all of which are being waived by the self-serving election to pursue only statutory damages.  Such a "conflict in remedial interests" renders representation inadequate.[24]  *Id.*

**IV.  Adjudicating this case as a class threatens NBD with ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮, which makes the class action device an inferior method of adjudication.**

To justify certification, Plaintiffs must prove that the class mechanism is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Superiority requires that use of a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

**A.  NBD is threatened with bankruptcy because of an indisputably novel claim.**

Count I presses a novel claim that raises myriad factual and legal issues.  Yet, Plaintiffs seek class treatment for Count I while seeking statutory and punitive damages on behalf of 1.7 million or more as-yet-unidentified consumers, which threatens ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[24] Nor can Plaintiffs avoid this conclusion because class members with actual damages can opt out of the class.  Class certification precedes the opt-out process, and the named plaintiff must be adequate and typical, even on the assumption that no class member will opt out.  *See Colindreas v. QuietFlex*, 235 F.R.D. 347, 376 (S.D. Tex. 2006).

██████████████████████████████████████████████████████████

███████████████████████████████████. Ex. H at ¶¶ 4-6.

Allowing novel claims carrying enormous aggregated statutory damages to proceed as a class action creates enormous settlement pressure and threatens to ensure that the merits of novel claims such as Plaintiffs' are not tested.  *Stillmock*, 385 Fed. Appx. at 281 ("[T]here is a serious concern with forcing these defendants to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability."); *Young v. Ray Brandt Dodge*, 176 F.R.D. 230, 234 (E.D. La. 1997) ("[W]hen a plaintiff's theory is novel and untested, class certification is not a superior method of adjudication.").

The class action mechanism is not a tool to force settlements on defendants who "may seek to settle early and often to avoid litigation costs and the risk of getting hit with a large verdict at trial."  *Malack v. BDO Seidman, LLP*, 617 F.3d 743, 755 (3d Cir. 2010).  Such "exponential expansion of statutory damages through the aggressive use of the class action device" could never have been contemplated by the drafters of Rule 23.  *Stillmock*, 385 Fed. App'x at 276; *see also London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 (11th Cir. 2003) (doubting plaintiff could demonstrate superiority when "defendants' potential liability would be enormous and completely out of proportion to any harm").

### B.  Plaintiffs have repeatedly demonstrated that individual actions are viable.

The class action mechanism is not superior here because individual suits under the FCRA are a practical and realistic alternative to a sprawling and novel class action.  For instance, rather than limiting plaintiffs to actual damages, Congress provided the alternative of statutory damages within a $100-$1,000 range, anticipating that amounts will vary with consumer-specific evidence.  15 U.S.C. § 1681n(a)(1)(A).  Congress further incentivized individual FCRA actions by authorizing attorneys' fees for plaintiffs in "any successful action" brought under the FCRA

and providing for punitive damages on top of statutory damages for willful violations.  15 U.S.C. §§ 1681n(a)(2), (a)(3); 1681o(a)(2).  In these circumstances, the FCRA's statutory scheme ensures that individual suits are a meaningful alternative to class actions.[25]

Furthermore, "[c]hief among the justifications for [the class action] device is its efficiency: It . . . saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion." *Thorn*, 445 F.3d at 318.  There is nothing "economical" about proceeding here by a class action.  As explained above, even deciding who is in the class will require substantial work.  Things will then only get more complicated, for the Court will have to engage in a review of 1.7 million search results, cross-matched against ███████████████████.  That task would be as incomprehensibly taxing as it is inconsistent with Rule 23.

## V.   Plaintiffs' five-year proposed class period is impermissibly broad.

Apart from the substantive inability to certify any class in this action, the proposed class definition in Count I suffers from an incurable procedural defect.  The proposed class alleges FCRA violations that occurred "within five years next preceding the filing of this action and during its pendency[.]"  (Pltfs' Mem. at p. 15.)  In so pleading, Plaintiffs invoke the FCRA's limitations provision, while ignoring the qualifier for the invocation of that five-year provision.  Specifically, the FCRA sets forth a "hybrid" limitations period, with the statute providing:

> An action to enforce any liability created under this title may be brought . . . not later than the earlier of – (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation that is the basis for such liability occurs.

---

[25] Indeed, the litany of civil actions that have been filed by Henderson and Hines in this Court and the substantial settlement received demonstrate the feasibility of FCRA individual actions as an appropriate means of redress, including individual actions under § 1681k(a).  *See* 3:11cv507; 3:11cv514; 3:12cv109; 3:12cv589; 3:12cv730; 3:13cv29; 3:13cv578; 3:13cv812; 3:14cv82; 3:14cv208; 3:14cv221; 3:14cv678; 3:14cv679; 3:15cv386.

15 U.S.C. § 1681p.  Plaintiffs' proposed class period thus overlooks the fact that an individual's discovery of an alleged violation shortens the limitations period to two years from the date of discovery.  *Id.*  Accordingly, certification of any five-year class should be denied.

The Fourth Circuit has noted that even when the limitations period analysis has the mere potential for individual inquiries, certification is erroneous.  As the court in *Broussard* held, if a defendant's statute of limitations defense "may depend on facts peculiar to each plaintiff's case," such as what each class member "knew about Meineke's operation . . . and when he knew it," then "certification is erroneous."  155 F.3d at 339.

In a subsequent decision, *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 438 (4th Cir. 2003), the court emphasized the categorical nature of its holding in *Broussard*:

> [W]e have *flatly held* that "when the defendants' affirmative defenses . . . may depend on facts peculiar to each plaintiff's case, class certification is erroneous." *Broussard*, 155 F.3d at 342 . . . .  *Although it is difficult to determine with any precision*, it appears that here the Agents' affirmative defenses are not without merit and would require individualized inquiry *in at least some cases*.

*Id.* (emphases added).  In short, class certification is improper even when a statute of limitations defense "may depend" on individual facts "in at least some cases."  *Id.*; *accord EQT*, 764 F.3d at 370 (in the context of discovery rule statutes of limitation, "a plaintiff's knowledge typically requires individual evidence, which will frequently defeat Rule 23's requirements.").

In fact, Plaintiffs themselves fully demonstrate discovery within the five year period is possible.  Plaintiff Hines brought suit less than one-and-a-half years after the alleged violation.

Consistent with this authority, courts have rejected five-year FCRA classes due to the two-year discovery period.  *E.g.*, *Molina v. Roskam Baking Co.*, 2011 U.S. Dist. LEXIS 136460, at *3, 13-14 (W.D. Mich. Nov. 29, 2011); *Holman v. Experian Information Solutions, Inc.*, 2012 U.S. Dist. LEXIS 59401, at *42-43 (N.D. Cal. April 27, 2012) (limiting proposed FCRA class to two years because to assess "liability to . . . more than 4,000 putative class members whose

credit reports were disclosed more than two years before January 12, 2011, would require a determination of whether the class member . . . learned of Experian's disclosure."); *Domonoske v. Bank of Am., N.A.*, 2010 U.S. Dist. LEXIS 7242, at *13 n.3 (W.D. Va. Jan. 27, 2010).  Thus, if somehow certified, the class must be limited to two-years.

**VI.     Dismissal with prejudice is appropriate because amendment of the class definition to comport with the elements of § 1681k(a) would be futile.**

No doubt Plaintiffs will request leave to amend Count I in light of the foregoing deficiencies.  But, as set forth above, amendment would be futile because each element of the class claim pled under § 1681k(a) requires individualized analyses, so such a claim is not amenable to class treatment.  The same is true as to Plaintiffs' status as atypical and inadequate representatives, as well as the superiority of individual litigation under the circumstances here.

## <u>CONCLUSION</u>

WHEREFORE, Defendant, CoreLogic National Background Data, LLC, respectfully requests that the Court: (1) deny Plaintiffs' Renewed Motion for Class Certification with prejudice; and (2) grant NBD any other relief the Court deems appropriate.

**CORELOGIC NATIONAL BACKGROUND DATA, LLC f/k/a NATIONAL BACKGROUND DATA, LLC**


By:/s/ David. N. Anthony_____

                Of Counsel

Alan D. Wingfield (VSB No. 27489)
David N. Anthony (VSB No. 31696)
Timothy J. St. George (VSB No. 77349)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia  23219
Telephone: (804) 697-1200
Facsimile:  (804) 698-1339
alan.wingfield@troutmansanders.com
david.anthony@troutmansanders.com
tim.stgeorge@troutmansanders.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of September 2015, I filed a true and correct copy of the foregoing on the Court's Electronic Filing System, which will send a Notice of Electronic Filing to:

Leonard A. Bennett, Esq.
Susan M. Rotkis, Esq.
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd, Suite 1A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@cox.net
*Counsel for Plaintiffs*

David A Searles, Esq.
DONOVAN SEARLES LLC
1845 Walnut St., Ste 1100
Philadelphia, PA 19103
Telephone: 215-732-6067
Facsimile: 215-732-8060
*Counsel for Plaintiffs*

Matthew J. Erausquin, Esq.
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Rd
Suite 600
Alexandria, VA 22314
Telephone: (703) 273-7770
Facsmile: (888) 892-3512
Email: matt@clalegal.com
*Counsel for Plaintiffs*

Dale W. Pittman, Esq.
THE LAW OFFICE OF DALE W.
PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb St.
Petersburg, VA 23803
Telephone: (804) 861-6000
Facsimile: (804) 861-3362
Email: dale@pittmanlawoffice.com
*Counsel for Plaintiffs*

James Arthur Francis, Esq.
FRANCIS & MAILMAN PC
Land Title Building
100 S Broad Street, 19th Floor
Philadelphia, PA 19110
Telephone: 215-735-8600
Facsimile: 215-940-8000
Email: jfrancis@consumerlawfirm.com
*Counsel for Plaintiffs*

/s/ David N. Anthony
David N. Anthony (VSB Bar No. 31696)
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-1254
Facsimile: (804) 698-6013
david.anthony@troutmansanders.com

26934094v1

52