IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TYRONE HENDERSON, et al.,
On behalf of themselves
and others similarly
situated

    Plaintiffs,

v.                                    Civil Action No. 3:12cv97

CORELOGIC NATIONAL
BACKGROUND DATA, LLC
f/k/a NATIONAL
BACKGROUND DATA, LLC,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF THE SECOND AMENDED COMPLAINT (Docket No. 201). For the reasons set forth herein, the motion will be denied.

## FACTUAL BACKGROUND

CoreLogic National Background Data, LLC ("NBD") is a company that provides its customers access to a database ("The Multistate Database" or "the Database") of criminal record information. (Defendant's Memorandum in Support of its Renewed Motion for Partial Summary Judgment on Count I of the Second Amended Complaint ("Def. Mem.," ECF No. 195), Statement of

Undisputed Facts ("SOF") ¶ 18). NBD's customers, which in this instance are credit reporting agencies ("CRAs"), pay to search the Multistate Database by way of the Internet. The Multistate Database then returns results (such as arrest records) that match the search criteria entered by NBD's customer. Id.

The Multistate Database is owned and managed by CoreLogic SafeRent, LLC ("SafeRent"), a sister company to NBD. Id. SafeRent obtains most of the criminal record data in the Database electronically from governmental sources, although approximately ten percent of the data is purchased from a third party vendor. Id. ¶ 19. SafeRent buys criminal records in bulk, formats the records it purchases so that they can be properly incorporated into the Multistate Database, and updates the records at varying intervals. Id. ¶¶ 20-24. Because SafeRent purchases criminal record data in bulk, the public records in the Multistate Database typically contain only limited identifying information. For example, public records purchased in bulk rarely, if ever, contain Social Security Numbers ("SSNs"). Id. ¶¶ 16-17. Based on the reports generated by NBD in response to queries regarding the Named Plaintiffs, it is clear that the records often also lack other identifying data such as middle names or addresses. (ECF No. 196 Exs. 13, 14). Therefore, the portions of the public records that are in the Multistate Database are not always sufficient to identify the

2

particular consumer to whom the records pertain. Def. Mem. SOF ¶¶ 5-6.

SafeRent oversees all formatting, updating, and maintenance of the Multistate Database; NBD merely acts as an intermediary between SafeRent and the customer CRAs, and transmits this data to its customers without change. The contracts between NBD and its customers obligate the customers to independently verify the records returned in response to their search queries before providing consumer reports to their clients. Id. ¶¶ 8-15.

The Named Class Plaintiffs Tyrone Henderson ("Henderson") and James O. Hines, Jr. ("Hines") present factually similar cases. Specifically, Henderson and Hines were denied employment based on allegedly inaccurate and incomplete criminal history information supplied by NBD. Henderson applied for a job at Interstate Brands Corporation ("Interstate") in August or September of 2009. (Second Amended Complaint ("SAC") (ECF No. 191) ¶ 19). Interstate made Henderson a conditional offer of employment, and subsequently requested a background check on Henderson from Verifications, Inc. ("Verifications), a third party CRA. Id. ¶ 21. As part of the background check process, Verifications conducted a search of the Multistate Database by inputting Henderson's last name, the first three letters of his first name, and his date of birth. Def. Mem. SOF ¶ 29. The results of this search correctly included Henderson's criminal

history, but the search results also contained several records, including felony convictions, belonging to at least one other individual who had the same first and last name and date of birth as Henderson. SAC ¶¶ 24-26. In the background check that it provided to Interstate, Verifications included multiple criminal records that were incorrectly attributed to Henderson by NBD. Id. ¶ 27. As a result of the incorrect information, Interstate withdrew its conditional offer of employment. Id.

Hines applied for a position as a physical therapist with CareSouth Homecare Professionals ("CareSouth") in May 2011. Id. ¶ 39. As part of its consideration of Hines for that position, CareSouth purchased a consumer report from ADP Screening and Selection Services ("ADP"), a CRA similar to Verifications. Id. ¶¶ 41-42. As part of the compilation of this report, ADP conducted a search of the Multistate Database by inputting Hines' first and last names and his date of birth. Def. Mem. SOF ¶ 41. These search results contained criminal records correctly attributed to Hines, but also contained records belonging to at least one other individual with the same first name, last name, and date of birth, including an Indiana record indicating that Hines was a registered sex offender. SAC ¶¶ 42-45. ADP included this incorrect information in the consumer report it provided to CareSouth. As a result of the incorrect

4

information, Hines was not hired for the position at that time. Id. ¶ 5.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when there is no genuine issue as to any material fact in the case such that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). Once the moving party properly files and supports its motion for summary judgment, the opposing party must show that a genuine issue of fact exists. See Matsushita Elec. Indus. Co v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

A fact is material if the existence or non-existence thereof could lead a jury to different resolutions of the case. See Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). A genuine issue of material fact only exists when the opposing party has presented sufficient evidence upon which a reasonable jury could return a verdict in its favor. Id. This means that "summary judgment is only appropriate when, after discovery, the non-moving party has failed to make a 'showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" BM v. Chesterfield County School Dist., 2010 WL 145661, at *1 (E.D. Va. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). In considering motions for summary

judgment, the court must consider the evidence in the light most favorable to the non-moving party.  Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1985).

## PROCEDURAL POSTURE

As relevant to this motion, Plaintiffs claim in Count I of the SAC that NBD, a qualifying consumer reporting agency as defined in the preamble to 15 U.S.C. § 1681k, failed to satisfy the requirements thereof because:  (1) NBD never sent notices to consumers when it provided criminal background information to its customers; and (2) NBD failed to satisfy the alternative provision[1] of § 1681k(a)(2) due to "the manner in which it obtains and furnishes" criminal records.  SAC ¶ 66.

NBD seeks summary judgment on Count I, brought under 15 U.S.C. § 1681k(a).  That section provides:

> A consumer reporting agency which furnishes
> a consumer report for employment purposes
> and which for that purpose compiles and
> reports items of information on consumers
> which are matters of public record and are
> likely to have an adverse effect upon a
> consumer's ability to obtain employment
> shall—

---

[1] The Fourth Circuit has held that, "when a consumer reporting agency furnishes a report, the agency is not obligated to notify the consumer and maintain strict procedures." Brown v. Lowe's Companies, Inc., 52 F. Supp. 3d 749, 758 (W.D.N.C. 2014) (citing Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 417 (4th Cir. 2001)).  Most interpreting courts have reached the same conclusion.  Thus, NBD need only satisfy one of the two subsections of § 1681k(a).

> **(1)** at the time such public record information is reported to the user of such consumer report, notify the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported; or
>
> **(2)** maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date. For purposes of this paragraph, items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported.

15 U.S.C. § 1681k(a).

NBD's arguments in support of summary judgment fall into two categories. First, NBD argues that § 1681k does not apply to its business model at all, because it offers only "wholesale data" and does not provide "consumer reports" for "employment purposes" that are "likely adverse" to "a" consumer's "ability to obtain employment." (Def. Mem. at 11-18). Second, NBD contends that, even if § 1681k does apply, § 1681k(a)(2) is satisfied because there is no dispute of material fact that NBD maintained "strict procedures" to insure that its reports were "complete and up to date," and those reports were, in fact, complete and up to date. Id. at 20-26. Each of these arguments will be addressed in turn.

## DISCUSSION

**A.   Does Section 1681k(a) Apply to NBD?**

NBD's first ground for summary judgment is that § 1681k(a) does not apply to it because its "wholesale results are not 'consumer reports'" furnished for "employment purposes" that are "'likely' to have an adverse effect on a consumer's ability to obtain employment." (Def. Mem. at 11-18). This argument may be separated into several components. First, NBD contends that the criminal history records it provides are not "consumer reports" within the scope of the FCRA because the data "do[es] not relate to 'a' specific consumer." Id. at 11. Second, NBD asserts that § 1681k(a) is inapplicable because "NBD did not deliver data for 'employment purposes.'" Id. at 17-20. Finally, NBD argues that the "data returned by NBD's system was not 'likely' adverse to Plaintiffs." Id. at 14-17.

Each facet of NBD's argument lacks merit. Each is addressed in turn.

**1.   The Search Results that NBD Provides To Its Customers Constitute "Consumer Reports."**

NBD first asserts that the reports that it sells to its customers are not "consumer reports" within the meaning of the

8

FCRA because NBD "provides data in its 'raw' form," which is "not descriptive about any one person," but rather is simply a "movement of data" in response to the search queries provided by its customers. (Def. Mem. at 11-12) (emphasis added). NBD adds that it is the "contractual and legal requirement" of the CRAs to whom NBD sells information to match the "raw data" that NBD provides to a specific individual. Id. at 13. The linchpin of NBD's argument is that "criminal record data cannot bear on 'a consumer' unless and until it is later linked to a specific individual by the recipient CRA." Id. at 14. Therefore, NBD concludes, the search results that it provides are not "consumer reports."

The FCRA defines a "consumer report" as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used in whole or in part for the purposes of serving as a factor in establishing the consumer's eligibility for:...employment purposes[.]" 15 U.S.C. § 1681a(d). This statutory definition is considered to have "three fundamental elements." Yang v. Govt. Emp. Ins. Co., 146 F.3d 1320, 1323 (11th Cir. 1998). The first element is the "communication"

9

element, which requires that a consumer reporting agency[2] communicate information. Id. The second element is the "information" element, which requires that the information communicated bear on "a consumer's credit worthiness, character, general reputation, personal characteristics, or mode of living." Id. The third element is the "purpose clause." Id. The "purpose clause" requires that the information communicated must be "used or expected to be used or collected in whole or in part" for one of the enumerated purposes, which in this case is for "employment purposes." NBD does not dispute that the first element of this definition is satisfied. The third element is addressed in more detail later in this opinion.

As to the second element, NBD does not dispute that "public record information relating to records of arrest...or the institution or disposition of...criminal proceedings, bears on one or more of [the enumerated] characteristics." FED. TRADE COMM'N, FORTY YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT: AN FTC STAFF REPORT WITH SUMMARY OF INTERPRETATIONS 20-21 (2011). Therefore, the only question to be resolved as to the second element is whether the search results provided by NBD bear on "a" particular consumer, even though those results include criminal records of multiple consumers.

---

[2] NBD does not argue that it is not a consumer reporting agency. Rather, its position is that its business product is not a "consumer report."

The answer is that the search results do pertain to a particular consumer. Indeed, simply because the search results provided by NBD include information about several, indeed many, consumers, it does not necessarily follow that the search results do not "bear[] on" the reputation and character of "a" specific consumer. Those results relate to a number of particular consumers, including, most importantly, the one about whom the search query is initiated.

The undisputed facts reveal that, when a customer of NBD submits a search query, typically consisting of a first name or partial first name, the last name, and the date of birth, NBD's customer is seeking to obtain information about "a" specific consumer. And, when NBD provides a response to the query, the criminal history included in the response "bear[s] on" the character and reputation of the individual as to whom the customer inquired. That the response also includes criminal records belonging to individuals other than the subject consumer does not mean that the posited request and the returned information do not bear on the particular individual about whom the query was made in the first instance; it merely reveals that the search query and results were overly broad.

Henderson's predicament concretely illustrates this reality. When Interstate requested a background check from Verifications, and when Verifications requested a background

check from NBD, both Verifications and Interstate were concerned with the employment eligibility of a specific individual: Tyrone Bennett Henderson, Sr.   That the search results returned by NBD included criminal records belonging to several individuals does not change the fact that those search results "b[ore] on" Henderson's character and reputation, and were used "as a factor in establishing [Henderson's] eligibility for" employment, as evidenced by Interstate's ultimate withdrawal of Henderson's offer of employment based on those search results. Therefore, NBD's argument that its reports are not "consumer reports" because they do not pertain to individual consumers must fail.[3]

More importantly, NBD's argument that its search results are not consumer reports is squarely at odds with its own documents, wherein it acknowledges that it resells <u>consumer reports</u>. <u>See, e.g.</u>, Plaintiffs' Memorandum in Opposition to

---

[3] Other district courts have also held, without much discussion, that analogous search results, that are provided in response to similar queries and that contain criminal records belonging to multiple consumers, are "consumer reports" within the meaning of the FCRA. <u>See, e.g.</u>, <u>Smith v. LexisNexis Screening Sol., Inc.</u>, 76 F. Supp. 3d 651 (E.D. Mich. 2014) ("<u>Smith I</u>") (background check containing criminal records pertaining to multiple consumers other than plaintiff, provided in response to query consisting of first name, last name, and date of birth, was a consumer report governed by the FCRA); <u>see also</u> <u>Smith v. E-Backgroundchecks.com, Inc.</u>, 81 F. Supp. 3d 1342 (N.D. Ga. 2015); <u>Lopez v. Nat'l Credit Reporting, Inc.</u>, 2013 WL 1999624 (N.D. Cal. May 13, 2013).

Defendant's Motion for Summary Judgment ("Pl. Mem. in Opp.," ECF No. 205) Ex. A, NBD Basic FCRA/FACTA Training June 2007, at CL-H000625 ("NBD is essentially a Reseller of consumer information and reports") (emphasis added); Ex. F, NBD-ADP Reseller Services Agreement, at CL-H288 ("The Data Services will consist of consumer report information with respect to individuals ('Consumers')[...] Each access of the [NBD] Data Services by Reseller [ADP] shall be considered a procurement of a consumer report for resale by Reseller."); Ex. H, NBD Standard Reseller Agreement, at CL-H2775-78 ("Solution Provider [e.g., ADP or Verifications] may request and NBD may provide to Solution Provider Consumer Reports ('Report' or 'Reports') for employment and/or tenant screening purposes only, as defined under the Fair Credit Reporting Act").[4] On this record, the undisputed documentary evidence from NBD establishes that, in practice, NBD has freely recognized that the background checks that it provides are indeed "consumer reports" pertaining to individual

---

[4] Furthermore, NBD has stipulated that discovery of its customers would allow Plaintiffs "to identify (including, without limitation, by name, address, date of birth, social security number and other identifiers) the individual of interest that was the subject of a particular search query submitted to CoreLogic National Background Data LLC by its customers." (ECF No. 56, at ¶ 3) (emphasis added). This further undermines NBD's assertions in its briefs that NBD has no way of discerning the individual consumer whom a particular search query concerns, and further supports the inescapable conclusion that not only do NBD's reports do pertain to "a" consumer as contemplated by the FCRA, but also, NBD is fully aware of that fact.

consumers within the meaning of the FCRA.[5] That further undercuts the argument that NBD makes here.[6] On this record, NBD is not entitled to partial summary judgment on the ground that it does not provide "consumer reports."

### 2. NBD's Consumer Reports Are Provided "For Employment Purposes."

NBD next argues that the data packages that it sells are not for "employment purposes." (Def. Mem. at 17). The definition of "employment purposes," NBD contends, requires that a consumer report be "used" by its recipient. Id. Moreover,

---

[5] Interestingly, in a case that is currently pending in the Northern District of Illinois, SafeRent has not disputed that the "wholesale" criminal records it provides are consumer reports. Oses v. CoreLogic SafeRent, LLC, Case No. 1:13-cv-06096, Docket No. 75 (N.D. Ill. Aug. 21, 2015). Of course, SafeRent's acknowledgment in other litigation that it provides consumer reports is by no means dispositive in this case, but it does further undermine NBD's argument, given that it appears that NBD directly relays its customers' queries to SafeRent and then relays the criminal records it receives from SafeRent to its customers without any material change.

[6] Fiscella v. Intelius, Inc., 2010 WL 2405650 (E.D. Va. June 10, 2010), which NBD contends supports its position, is inapposite. In that case, the plaintiff requested all of Intelius' Virginia records containing the name "Edward Fiscella," and sought to have the records of other individuals named "Edward Fiscella" removed from the defendant's database. The court dismissed the case without deciding whether those search results constituted a "consumer report," because the plaintiff failed to allege that those search results constituted a "file" on the plaintiff, and failed to allege that "any information produced or held by Intelius in connection with him is inaccurate," as required to state a claim under § 1681i(a) for failure to reinvestigate disputed information. 2010 WL 2405650, at *4. Thus, neither the facts nor the legal contentions presented in Fiscella provide guidance here.

NBD says, "use" in this context entails only the actual hiring decision.  Id. at 18-19.  Because Verifications and ADP did not themselves "evaluate" potential job applicants, says NBD, but merely "verified" criminal record data before providing it to potential employers, NBD's reports were not "used" for "evaluating" a potential employee.  Id.  Therefore, NBD concludes, § 1681k does not apply because NBD did not provide any consumer reports "to the user[s] of such consumer report[s]" for "employment purposes."  Id.

In response, Plaintiffs point out that, again, this position is directly contradicted by NBD's documents:  NBD's contracts with both SafeRent and its customers specify that the data NBD obtains from SafeRent and provides to its clients shall be used for one of a limited number of "permissible purposes" as defined by the FCRA, including "employment purposes."  Id. at 16.  Plaintiffs further argue that it is immaterial whether ADP or Verifications "used" NBD's reports to make a hiring decision because "the 'permissible purpose' and 'use' of the report travels and extends [sic] from reseller through to the originating consumer reporting agency."  Id. at 17.  Moreover, Plaintiffs add, because NBD sells consumer reports, it must have a permissible purpose for doing so under § 1681b.  Thus, say the Plaintiffs, if NBD did not furnish its reports for "employment purposes," it would effectively be "confess[ing] an intentional

15

violation of this alternate section--impermissibly furnishing every single report it has ever sold." (Pl. Mem. in Opp. at 15) (footnote omitted).

The FCRA provides that the term "employment purposes, when used in connection with a consumer report means a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee." 15 U.S.C. § 1681a(h). As set forth in Part A.1 above, the FCRA's definition of the term "consumer report" includes any communication of qualifying information by a CRA "which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for" certain enumerated purposes, including "employment purposes."

When these two definitions are considered together, the statutory text reveals that NBD's reading of the definition of "employment purposes" is incorrect, for several reasons. First, to read the word "use" into the phrase "employment purposes" "would violate settled statutory construction principles by ignoring subsection [1681a(d)]'s structure and grammar and in so doing" render surrounding clauses "virtually superfluous." Bloate v. United States, 559 U.S. 196, 208 (2010). Specifically, NBD's proposed reading would render the final clause of the definition of "consumer report" ("which is used or

expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for...") both substantively and grammatically redundant. Thus, when placed in context, it becomes clear that the "purpose" of a consumer report actually refers to the purpose for which the report is "used or expected to be used or collected" (emphasis added), which, in this case, is "the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee." Therefore, § 1681k(a) applies whenever a consumer reporting agency "furnishes a consumer report for [the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee][7]

---

[7] Moreover, NBD's argument conflates the purpose for which a report is furnished and the purpose for which it is used. Of course, typically these purposes are identical, but their occasional divergence reveals the fallacy of the assumption, on which NBD implicitly relies in its interpretation of the definition of "employment purposes," that the purpose for which NBD furnished reports necessarily depends on how and by whom those reports were used. Decisional law interpreting § 1681(b), which imposes liability on CRAs who furnish reports for "impermissible purposes," demonstrates this distinction: to show that a report was "furnished" for a permissible purpose, e.g., employment purposes, a CRA need only show that it had "reason to believe" that the report would be used for that purpose, and obtained appropriate certifications from its customers that the report would be used only for that purpose. See 15 U.S.C. § 1681b; 15 U.S.C § 1681e; Harris v. Database Mgmt. & Marketing Inc., 609 F. Supp. 2d 509, 514-515 (D. Md. 2009); Korotki v. Atty. Servs. Corp., 931 F. Supp. 1269 (D. Md. 1996). That is, a permissible purpose will be attributed to a CRA so long as that CRA had "reason to believe" that it was providing reports only for that purpose. This further

and which for that purpose compiles and reports" qualifying "items of information on consumers[.]"

Second, the text of both § 1681a(d) and § 1681a(h) is in the passive voice: "the actor who is using, expecting to use or collecting the report is neither limited nor specified." Ernst v. Dish Network, LLC, 49 F. Supp. 3d 377, 383 (S.D.N.Y. 2014). Similarly, § 1681k(a) applies to every "consumer reporting agency which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers..." This clause neither mandates nor implies a particular recipient of the consumer report. This means that if anyone uses the information for employment purposes, and the CRA providing the information reasonably anticipated that use, the "employment purposes" component of § 1681k(a) is satisfied. Id. As one court put it, rejecting an argument similar to NBD's:

> Even though [Defendant] itself did not intend to contract with those parties [e.g., potential employers] directly, but instead contracted with other entities such as [an intermediary] to provide that access, such an arrangement does not save [Defendant]. All that is required is that [Defendant] expected the information to be used or collected, in whole or in part, for employment or insurance purposes.

undermines NBD's argument that the definition of "employment purposes" necessarily turns on the "use" of the reports.

Lewis v. Ohio Prof'l Elec. Network LLC, 190 F. Supp. 2d 1049, 1059 (S.D. Ohio 2002) (emphasis added).

Third, the FCRA neither states explicitly nor implies that only consumer reports provided directly to an end-user (here, a potential employer) fall within the definition of reports provided for "employment purposes." In fact, the statute specifically refers to "end-users" in several other sections. See §§ 1681e(e)(1)(A); 1681e(e)(1)(B); 1681e(e)(2)(A)(i); 1681e(3); 1681g(a)(3)(A). Thus, if Congress had wished to somehow limit the definition of "employment purposes" to reports provided only directly to "end-users," it clearly could have done so. See, e.g., Soliman v. Gonzales, 419 F.3d 276, 283 (4th Cir. 2008) (noting that "where Congress includes particular language in one section of a statute but omits it in another provision of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion" (internal citation omitted)). Read as a whole, the statutory text then does not support NBD's unfounded assertion that "the definition of 'employment purpose further provides that the information must be 'used' by the recipient entity." (Def. Mem. at 18) (emphasis added).

Here, the record permits a finding that the information in NBD's reports was collected, expected to be used and was actually used to evaluate Plaintiffs for suitability as

page

potential employees.   First, there is evidence that NBD expected the reports at issue in this case to be used for employment purposes because, when the customer requested a report on a particular consumer, the customer certified that it was requesting the data for employment purposes.   See Pl. Mem. in Opp. Ex. FF, Declaration of Thomas Burtner,[8] at ¶¶ 7, 20-21. NBD's request archives actually reflect, with respect to the queries pertaining to Henderson and Hines, a "user supplied code" that indicated the use was for an employment purpose. (Pl. Mem. in Opp. Exs. J-K).   Similarly, NBD's Reseller Agreements with ADP and Verifications provide that those companies "may request and NBD may provide to Solution Provider[s] Consumer Reports ('Report' or 'Reports') for employment and/or tenant screening purposes only, as defined under the Fair Credit Reporting Act."   (Pl. Mem. in Opp. Ex. H, at CL-H2775-2778) (emphasis added).

Moreover, NBD's data licensing agreement with SafeRent demonstrates that it also collected data from SafeRent with the expectation that the data would be used for employment purposes. That contract provides that NBD will request data from SafeRent

---

[8] Defendants opposed this declaration on the grounds that it is actually a declaration of an expert witness, rather than a fact witness, as Plaintiffs claim, and Plaintiffs failed to provide notice thereof in a timely manner.   For reasons set forth in a separate opinion (ECF No. 240), the affidavit will be considered.

"solely for one or more of the Permissible Purposes, as defined herein, including consumer inquiries <u>in connection with...employment purposes (e.g., hiring, promotion, transfer or security-related issues)</u>[.]" (Pl. Mem. in Opp. Ex. G, SafeRent/NBD Data Licensing Agreement, at CL-H546) (emphasis added).

It is also clear that NBD's reports were ultimately "used" for employment purposes. In particular, with respect to Hines and Henderson, both ADP and Verifications used the results obtained from NBD as a starting point for their own reports, and both companies included several of the results provided by NBD in their reports to Interstate and Caresouth. Plaintiffs' potential employers then used the ADP and Verification reports to determine Plaintiffs' suitability for employment. Thus, the data provided by NBD was used, expected to be used, and collected for employment purposes.

Finally, NBD's position on this point, if accepted, would lead to absurd results. It would be illogical and unrealistic to conclude that the purpose for which a report was furnished depends entirely on whether the report goes through a "middleman," such as ADP or Verifications. Under NBD's proposed reading, any credit reporting agency could relieve itself of all responsibility under the FCRA merely by ensuring that its reports moved through an intermediary. Theoretically, that

intermediary could then enlist another intermediary to relieve itself of FCRA liability, and so forth and so on, ad infinitum. That, of course, would defeat a principal purpose of the FCRA. And, courts should not interpret a law so as to defeat its purpose.

Moreover, when considered in context, the authority that NBD cites for this proposition does not actually provide any support for the reading of the statute that NBD urges here. First, NBD relies heavily on the FTC's interpretation of "use" as adopted in Nat'l Auto. Dealers Ass'n v. F.T.C., 864 F. Supp. 2d 65 (D.D.C. 2012). (Def. Mem. at 16-20). In the context of that record, the court deferred to the FTC's decision that a creditor who relied on a third party's interpretation of a consumer report was a "user" of that consumer report, even though the initial creditor never actually physically possessed the report.

NBD's reliance on Nat'l Auto. Dealers is misplaced, for several reasons. First, the evidence in this record permits a finding that NBD both expected that its reports would be used for employment purposes, and that it collected the data from SafeRent for that purpose. Second, the record permits a finding that the reports provided by NBD were ultimately "used" for employment purposes. Third, based on NBD's own assertions, ADP and Verifications clearly do more than "physically possess"

NBD's reports. NBD's own brief states that "Verifications conducted a search of the public records...through a field researcher, before any such information was included in the background investigation report provided to [Henderson's potential employer]." (Def. Mem. at 15). NBD cannot, on the one hand, argue that it is the sole responsibility of its customers to "filter" and "independently review" NBD's reports to ensure the accuracy thereof, and, at the same time, that the use of the report by those same entities amounts to no more than "physical possession."

Finally, NBD relies on the Tenth Circuit's affirmance of the district court's decision in Owner-Operator Indep. Drivers Ass'n v. USIS Commercial Servs., 537 F.3d 1184, 1192 (10th Cir. 2008). In the part of the decision cited by NBD, the Tenth Circuit briefly notes that "the district court determined that, because USIS did not intend to evaluate the consumer, it did not procure the [TRF] reports for 'employment purposes.'" Id. However, as Plaintiffs point out, the sentence that NBD cites is merely a "general statement summarizing the issues considered in the court below." (Pl. Mem. in Opp. at 19 n.1). Neither NBD's briefing nor the Tenth Circuit's opinion provides any context for this statement, and it does not appear that the district court issued a written decision on the issue. Furthermore, it appears that that case ultimately turned on the exclusion in 15

U.S.C. § 1681a(d)(2)(A)(i), which exempts from FCRA coverage "reports limited to transactions or experiences between the consumer and the entity making the report." Id. at 1192. Thus, Owner-Operator is of no real significance here.

In any event, as explained above, the record contains evidence that would permit a jury to find that the consumer reports prepared by NBD were produced for "employment purposes" under the FCRA. Thus, summary judgment cannot be granted on the premise that the reports were not prepared for that purpose.

### 3. NBD's Reports Are "Likely" Adverse To A Consumer's Ability To Obtain Employment.

It is NBD's next contention that the data returned by its system was not categorically "likely" adverse to Plaintiffs because:

> its customers, [ADP and Verifications] filtered the data that they obtained from NBD; and (2) neither ADP nor Verifications made any employment related decision, such that NBD's return of data had no prospect of being 'likely' adverse to anything at the time of its reporting.

Def. Mem. at 15. Not so, say the Plaintiffs, because the "phrase 'likely to adversely effect' is a categorical description. It means a type of public record." (Pl. Mem. in Opp. at 12 (emphasis in original)). Therefore, Plaintiffs contend, whether a record is "likely to adversely affect" a consumer's employment prospects depends on the record itself,

rather than whether and to what extent an employer actually relied on the record in denying a consumer's application for employment.

NBD's argument must fail, for several reasons. To begin, the interpretation urged by the Plaintiffs is supported by the plain text of the statute, which provides, in pertinent part:

> A consumer reporting agency which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment . . . .

15 U.S.C. § 1681k(a). The statute requires that the "items of information" that are compiled and reported be "matters of public record that are likely to have an adverse effect upon a consumer's ability to obtain employment..." Read as a whole, it is rather clear that the clauses "which are matter of public record" and "which...are likely to have an adverse effect upon a consumer's ability to obtain employment" modify the type of "information on consumers" that a CRA "compiles and reports." Thus, one looks at the type of information to see if it is "likely" to have the kind of effect that calls § 1681k(a) into play. One does not look at how a particular record affects an individual plaintiff.

The plain text of § 1681k(a)'s opening paragraph is underscored by the text of § 1681k(a)(2), which enumerates several types of public records that fall within the scope of § 1681k(a). Specifically, § 1681k(a)(2) points to such records as "arrests, indictments, convictions, suits, tax liens and outstanding judgments." This list provides guidance respecting the category of items in public records that are "likely to have an adverse effect upon a consumer's ability to obtain employment." See also FTC Informal Staff Letter (May 5, 1999) (explaining that "a criminal history that indicates that the consumer has been convicted would be adverse to the consumer's ability to obtain employment, and would be covered by § 613 [§ 1681k(a)].").

Furthermore, criminal record data, such as that sold by NBD, is the paradigmatic example of information that is "likely adverse" to a consumer's employment prospects. Cases applying this section uniformly acknowledge that reality. See, e.g., Brown v. Lowe's Companies, Inc., 52 F. Supp. 3d 749, 758 (W.D.N.C. 2014) ("[Defendant] does not contest that...Plaintiffs' criminal history was reported for employment purposes, the criminal history was a matter of public record, and it was likely to have an adverse effect on each Plaintiff"); Farmer v. Phillips Agency, Inc., 285 F.R.D. 688, 695 (N.D. Ga. 2012) (noting the "undisputed" fact that Defendant's reports,

based on reports obtained from NBD, "were likely to have an adverse effect on the consumer's ability to obtain employment"); Christensen v. Axicom Info. Sec. Servs., Inc., 2009 WL 2424453, at *2 (W.D. Ark. Aug. 6, 2009) ("there is no dispute that the consumer report in question [containing erroneous criminal convictions] was likely to have an adverse effect upon [plaintiff's] ability to obtain employment").

Finally, NBD's own documents confirm that the records that it compiles and reports are likely to adversely affect consumers' employment prospects. For example, NBD points out that its business model is beneficial because it allows employers to avoid hiring potentially dangerous applicants. (Def. Mem. at 30, n.11; Defendant's Reply in Support of its Renewed Motion for Partial Summary Judgment ("Def. Reply", ECF No. 222) at 20). NBD does not argue that it provides any information to its customers other than criminal record data. Thus, NBD's description of the utility of its product actually concedes that the results it provides are "likely to have an adverse effect upon a consumer's ability to obtain employment": its information precludes the hiring of dangerous people, i.e., those with criminal records. In NBD's own view, its raison d'etre is to provide information that is likely to have an adverse effect on an employment application.

Whether an employer ultimately relies on or even receives any given criminal record provided by NBD does not alter that acknowledged state of affairs. Again, NBD's contention is directly contradicted by the text of the statute: Section 1681k(a) simply does not require that a particular public record *actually* adversely affect a particular consumer's employment prospects. Rather, this section governs items of information that are "likely" to have an adverse effect. There is no indication that Congress intended "likely," as used in this section, to have anything other than its ordinary meaning: "of such a nature or so circumstanced as to make something more probable." Webster's Third New International Dictionary 1310 (2002). The decisions above, as well as NBD's own documents, reflect a unanimous understanding that criminal history data, whether correctly attributed or not, makes it "more probable" that a consumer will be denied employment.

Moreover, the reasoning set forth in part A.2 above applies with equal force here. Accepting NBD's position would mean that a CRA could escape its responsibilities under § 1681k(a) entirely simply by requiring its reports to pass through an intermediary CRA. And, if the application of § 1681k(a) were to depend on an employer's evaluation of a particular record, a CRA could never know, *ex ante*, whether it is subject to this section. Thus, NBD's position flies in the face of the axiom

that the boundaries of permissible conduct set out in a valid statute "do not require reference to later actions by a third party." City of Chicago v. Morales, 527 U.S. 41, 58-59 (1999). Therefore, "the better interpretation is that the status of a[n item of information] is static," Ernst, 49 F. Supp. 3d at 384, and depends on the type and content of the public records at issue, rather than whether or to what extent the information actually affects a particular consumer's job prospects.

For the foregoing reasons, NBD is not entitled to summary judgment on the theory that the reports it provides are not "likely to have an adverse effect on a consumer's ability to obtain employment" within the meaning of § 1681k.

**B.  NBD Is Not Entitled To Summary Judgment On § 1681k(a)(2)**

Section 1681k(a) provides that a consumer reporting agency that satisfies the threshold definitional requirements set forth above may comply with that section by providing notice to consumers under § 1681k(a)(1), which NBD concedes it has not done, or it may "maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date." The few courts that have had occasion to interpret this section have agreed that "[t]he logical starting point for an analysis of Section 1681k is whether the information provided was complete and up to date.

If this is so, then an inquiry into the specific procedures is unnecessary." Obabueki v. Int'l Bus. Mach. Corp., 145 F. Supp. 2d 371, 396 (S.D.N.Y. 2001). That is, in order to show a violation of this subsection, a plaintiff must show that: "(1) a CRA furnished a consumer report for employment purposes compiled from public records containing adverse information; (2) the CRA failed to maintain strict procedures designed to insure that the information in that report was complete and up to date; and (3) the consumer report was either incomplete or not up to date." Farmer, 285 F.R.D. at 700. Therefore, "absent a showing that the information obtained by [a defendant CRA] was inaccurate or incomplete...[a] plaintiff's claim under § 1681k must fail[.]" Haro v. Shilo Inn, 2009 WL 2252105, at *3 (D. Ore. July 27, 2009); see also Farmer, 285 F.R.D. at 698 (noting that "courts have uniformly read [largely parallel provision] § 1681e(b) as requiring a CRA to both maintain reasonable procedures and disclose an accurate report.") (internal citations omitted). Thus, this analysis proceeds from the premise that the question whether NBD maintained strict procedures is only reached if its reports are not complete and up to date.

1. **NBD Has Failed To Show That, As A Matter Of Law, Its Reports Are "Complete And Up To Date."**

NBD contends that there is no genuine dispute of material fact as to whether its reports are "complete and up to date"

30

because "there is no dispute that the results that NBD returned to ADP and Verifications reflected the existing public record status of the listed convictions and charges at the time of reporting." (Def. Mem. at 23).

The analysis begins with the statute. Section 1681k(a)(2) provides that "items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported." 15 U.S.C. § 1681k(a)(2). However, "the act does not define 'complete.'" Poore v. Sterling Testing Sys. Inc., 410 F. Supp. 2d 556, 572 (E.D. Ky. 2006).

In attempting to determine the "plain meaning" of the word "complete," the court in Poore noted that "Webster's Dictionary defines 'complete' as 'having all necessary parts.' Webster's Collegiate Dictionary 235 (10th ed. 1998)." Id. Unfortunately, that definition is not particularly helpful because there is a dearth of authority concerning which specific items of information comprise the "necessary parts" of a public record in this context. Courts have sidestepped this particular question either by conflating the concepts of "accuracy" and "completeness," or by merging the inquiries of "completeness" and "strict procedures." The parties have not cited, nor has the Court found, a decision determining whether a consumer

report can be "complete" when it includes adverse public record items that pertain to consumers other than the subject consumer. Even the FTC's analysis is only marginally more informative:

> This section requires that each "item of [public record] information" reported be complete and up to date. For example, if the CRA reports an indictment, it must also report any dismissal or acquittal available on the public record as of the date of the report. Similarly, if the CRA reports a conviction, it must report a reversal that has occurred on appeal. In some cases, often at an employer's request, a report may deliberately omit data such as arrest or probation data. Although the report is not a "complete" reflection of every single piece of public record information, because the requirement to report complete and up-to-date information is item-specific, the CRA complies if its report includes the current, complete, and up-to-date public record status of each individual item reported.

Fed. Trade Comm'n, Forty Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations 81 (2011).

An assessment of the FRCA's statutory purpose provides some help in analyzing the "complete and up to date" issue. As explained by the United States Court of Appeals of the Ninth Circuit in Guimond v. Trans Union Credit Info. Co., "[t]he legislative history of the FCRA reveals that it was crafted to protect the consumers from the transmission of inadequate information about them, and to establish credit reporting practices that utilized accurate, relevant, and current information in a confidential and responsible manner." 45 F.3d

32

1329, 1333 (9th Cir. 1995). In light of the purposes of the FCRA, it seems that the "necessary parts" of a public record must be sufficient to connect a particular public record to a particular consumer. In other words, a record is "complete" if it contains identifying information that is sufficient to link the record to the consumer to whom the record belongs. A "complete" record permits a user to either link the record to the consumer who was the subject of the search query or exclude that consumer as the source of the record. Conversely, then, any record that does not contain sufficient identifying information to verify the identity of the originating consumer is incomplete.

As NBD's own arguments confirm (see Part A.1 above), its search results miss that mark rather significantly because those results include conviction records that belong to any number of individuals having the same first and last names and date of birth as the specific consumer as to whom the search is really directed. That NBD faithfully transmits the parts of the records that are available for purchase in bulk is insufficient to demonstrate, as a matter of law, "completeness."

Thus, because NBD disseminates only the portions of criminal records that the public entities from whom SafeRent purchases its data choose to provide in bulk, NBD, by its own admission, appears not to be compiling or reporting "complete"

33

items of information. Moreover, the record in this case shows that NBD is capable of obtaining, from its customers and from its governmental sources, sufficient information to determine the specific consumer to whom a particular public record pertains. See, e.g., Def. Mem. Ex. A, at ¶ 18 ("In response to [Hines' complaint] NBD contacted the clerk of court and confirmed by reference to Plaintiff Hines's Social Security Number...that the charge was attributed to him."); Pl. Mem. in Opp. Ex. Q, Internal Henderson Report Showing Manual Corrections; Ex. DD, at CL-H000483 (detailing process for removing incorrectly attributed criminal cases by attaching the consumer's SSN to the record). That fact, if proved, would permit a finding in the Plaintiffs' favor on the "completeness" issue.

The Plaintiffs take the view that the necessary linkage can be made by obtaining social security numbers in the court records directly from governmental sources. NBD takes the view that that is not possible when only bulk data is purchased. That may be true. However, true or not, that inability does not exempt NBD from the "completeness" requirement of § 1681k(a)(2), when it has chosen not to provide the notices mandated by § 1681k(a)(1). It simply is not complete under the FCRA to say that "someone named Bill Jones has a conviction record, but whether this is the Bill Jones you are inquiring about, I do not

know."  Yet, that is precisely what NBD acknowledges to be the result that it provides.

Whether social security numbers are necessary for completeness is not, as Plaintiffs would have it, a matter of law.  Rather, that is a matter of fact.  The record is neither clear nor settled respecting the availability of such information or whether social security numbers are essential to provide completeness.  In that circumstance, and in light of the uncertainty inherent in this record, summary judgment is inappropriate.  That is especially inappropriate where, as here, NBD acknowledges that its provisions in its contracts with resellers disclaim any warranty of completeness or accuracy.

   2.   **NBD Has Failed To Show That, As A Matter Of Law, It Followed "Strict Procedures" To Insure That Its Reports Were Complete And Up To Date.**

NBD contends that it is entitled to summary judgment on Count I because "Plaintiffs developed no actual evidence in discovery that could be used to challenge the nature of NBD's procedures and to negate its compliance with § 1681k(a)(2)." (Def. Mem. at 24).  NBD relies entirely on SafeRent's "quality control" procedures to satisfy its summary judgment burden on this element.  (Def. Mem. at 24-27).  NBD reports that SafeRent "receives approximately 300 separate updates of [the data in the Multistate Database] each month," and "more than 85% of the records in the Multistate Database are updated at least

35

monthly[.]"  Id. Ex. B, at ¶¶ 14-15.  NBD also adds that SafeRent conducts periodic reviews to ensure that its data is formatted correctly and matches the text of the records received from its sources (primarily "electronic governmental sources," although SafeRent also uses a third party commercial vendor to obtain records of registered sex offenders).  Id. at ¶¶ 16-22.

In response, Plaintiffs contend that it is exactly this faithful verbatim transcription that makes SafeRent's (and, consequently, NBD's) procedures inadequate.  (Pl. Mem. in Opp. at 24-26).  Plaintiffs argue that NBD must conduct a manual review of the public record data information that it reports in order to satisfy § 1681k(a)(2).  Id. at 24.

The FCRA does not define "strict procedures."  Poore, 410 F. Supp. 2d at 571.  However, federal courts have noted that "strict procedures" are "necessarily a more stringent standard" than the "reasonable procedures" standard of § 1681e(b).[9]  Id. at 572.  In construing § 1681e(b), the Fourth Circuit has held that it is the plaintiff's burden to show that the defendant did not follow reasonable procedures, but that this burden is relatively minimal, and that "the issue of whether the agency failed to follow 'reasonable procedures' will be a 'jury question in the

---

[9] Section 1681e(b) provides that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

overwhelming majority of cases.'" Dalton, 257 F.3d at 415-416 (quoting Guimond, 45 F.3d at 1333); see also Sarver v. Experian Info. Sol., 390 F.3d 969, 971 (7th Cir. 2004) (finding that the reasonableness of a CRA's procedures is "normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question."). In Dalton, the Fourth Circuit held that a jury could find it unreasonable that the defendant "had no procedures governing the sources that a subvendor could rely on in collecting information for a criminal background report." Id. at 417. The Court of Appeals also found that, because there was a genuine dispute of material fact as to whether the agency maintained reasonable procedures, there was "necessarily" a factual dispute over whether it followed strict procedures, but "[left] for another day the determination of what constitutes 'strict' as opposed to 'reasonable procedures.'" Id. at 417 (internal citations omitted).

Several district courts have held the inaccurate attribution of criminal records constitutes sufficient evidence to permit the question of "reasonable procedures" to go to a jury, even where, as here, the defendant attempted to avoid liability by pointing to a disclaimer or other contractual delegation of responsibility. See, e.g., Smith v. E-Backgroundchecks.com, Inc., 81 F. Supp. 3d at 1358-1359 (holding that reasonableness of procedures was a jury question, despite

37

disclaimer of accuracy and completeness provided by defendant, because defendant inaccurately attributed criminal records to plaintiff); Adams v. Nat'l Eng'g Serv. Corp., 620 F. Supp. 2d 319, 333 (D. Conn. 2009) (denying summary judgment because a reasonable jury could conclude that Verifications' inaccurate attribution of a criminal record to Plaintiff--the result of a report obtained from NBD--despite having the means to verify that record, was neither reasonable nor strict); Fahey v. Experian Info. Sol., 571 F. Supp. 2d 1082, 1091 (E.D. Mo. 2008) (a reasonable jury could conclude that Experian's reporting procedures were unreasonable because it failed to require sufficient identifying information to correctly match criminal records to specific consumers); Poore, 410 F. Supp. 2d at 571 (denying summary judgment because "the Court ha[d] no evidence that [reseller CRA] employed any procedures to ensure the accuracy of its consumer reports at all other than relying on [a sub-vendor]. The Court cannot rule as a matter of law that such reliance was reasonable.").

The only decision cited by NBD or found by the Court in which summary judgment was granted in favor of a consumer reporting agency on the issue of strict procedures is Moore v. First Advantage Screening Corp., 2013 WL 1662959, at *6 (N.D. Ohio Apr. 17, 2013). In Moore, the district court held that, as

a matter of law, defendant First Advantage maintained strict procedures because:

> The undisputed evidence show[ed] that First Advantage took three separate steps before it reported that Plaintiff was convicted[.] First, First Advantage searched its database for potential records. Second, First Advantage engaged a third part [sic] contractor to confirm the existence of those records. Third, when there was a discrepancy between the information provided by the third party contractor and the results of the database search, First Advantage personnel spoke directly with the court.

The court in Moore distinguished Dalton on the ground that, in Dalton, the defendant agency accepted the "legal opinion that the clerk independently offered," rather than asking the clerk of court "to simply read information captured in the court record," as First Advantage did in Moore. Id. at *7. The facts of Moore are entirely different than those in this record, because here it does not appear that NBD took any steps to confirm the correctness of the convictions attributed to Plaintiffs.[10]

In this case, Plaintiffs have presented sufficient evidence to allow a jury to find that NBD failed to maintain "strict procedures" to insure the completeness of its reports. As noted

---

[10] Moore also did not address whether the report was "complete," apparently deciding that it was unnecessary to reach that question in light of the finding that First Advantage maintained strict procedures to ensure accuracy and completeness.

39

above, NBD relies entirely on the frequency of SafeRent's updates--which, NBD admits, sometimes do not occur for months for a given public record--to satisfy this requirement. It appears that SafeRent inputs court records verbatim into the Multistate Database, and NBD then transmits the records that match a particular search query verbatim to its customers. See Def. Mem. at 7, ¶ 26 ("During each step of the process, SafeRent does not alter the data, and it is placed into the Multistate Database using the exact text in which it was supplied"); Def. Mem. Ex. B ("NBD supplies criminal record public information from...the Multistate Database...owned and managed by CoreLogic SafeRent, LLC[.]"); Ex. A ("NBD contractually engages and permits third-party background screening companies to access the public-record information that is stored by CoreLogic SafeRent, LLC ("SafeRent").).

NBD only investigates the accuracy or completeness of court records when a consumer initiates an inquiry. (Def. Mem. Ex. A, at ¶ 18 ("In response to [Hines' complaint] NBD contacted the clerk of court and confirmed by reference to Plaintiff Hines's Social Security Number...that the charge was attributed to him.")). In fact, NBD's brief and exhibits are completely devoid of any evidence from which the Court could infer that NBD has any sort of quality control procedures of its own in place. Moreover, it is undisputed that NBD provided results to

Verifications and ADP in response to their queries concerning Henderson and Hines that contained criminal record data that did not relate to Plaintiffs.   As discussed above, incorrect attribution of criminal records, particularly where "a review of the report would have uncovered the discrepanc[ies]," has been found sufficient to allow the question of <u>reasonable</u> procedures to go to the jury, and the standard for "strict procedures" is unquestionably higher.   <u>See, e.g.</u>, <u>Smith v. LexisNexis Screening Sol., Inc.</u>, -- F. Supp. 3d --, 2015 WL 5719675 (E.D. Mich. Sept. 30, 2015).

Because the Plaintiffs have presented sufficient evidence to allow the question of whether NBD maintained "strict procedures" in accordance with § 1681k(a)(2) to be decided by the jury, summary judgment on that issue is inappropriate.

### CONCLUSION

For the reasons set forth above, DEFENDANT'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF THE SECOND AMENDED COMPLAINT (Docket No. 194) will be denied.

It is so ORDERED.

/s/   _REV_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: April 18, 2016