IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TYRONE HENDERSON, et al.,

     Plaintiffs,

v.                          Civil Action No.: 3:12CV97

CORELOGIC NATIONAL
BACKGROUND DATA, LLC,

     Defendant.

### MEMORANDUM OPINION

This matter is before the Court on PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION (ECF No. 281). For the reasons set forth herein, the motion will be denied.

### BACKGROUND

On July 16, 2015, Plaintiffs Tyrone Henderson ("Henderson") and James Hines ("Hines") (collectively, "Plaintiffs") filed a Second Amended Class Action Complaint on behalf of themselves and all others similarly situated, alleging that Defendant National Background Data, LLC ("NBD") had violated the Fair Credit Reporting Act ("FCRA"). (Second Amended Complaint ("SAC"), ECF No. 191). The SAC alleges two Counts under the FCRA. Count One alleges, on behalf of a putative nationwide class, that NBD violated the FCRA by failing to "maintain strict procedures" to ensure that the public records it provided to its

customers were "complete and up to date" and by failing to notify consumers when such records were provided about them, in violation of 15 U.S.C § 1681k(a).   Count Two, an individual claim on behalf of Henderson and Hines, alleges that NBD failed to use reasonable procedures to assure maximum accuracy of its reports, in violation of U.S.C. § 1681e(b).

Plaintiffs now seek to certify the following class:

> All natural persons residing in the United States (a) who were the subject of a report sold by NBD to Verifications, ADP or HR Plus, (b) where NBD's Results Returned database indicates that it was furnished for an employment purpose (Code 6), (c) where NBD's Results Returned database showed that the report contained at least one adverse criminal record "Hit," (d) within five years next preceding the filing of this action and during its pendency...[excluding] any employees, officers, directors of Defendant, any attorney appearing in this case, and any judge assigned to hear this action.

(ECF No. 282).

Plaintiffs also contend that, should the Court find that the foregoing class does not meet the requirements of Fed. R. Civ. P. 23, the Court should certify one or more of Plaintiffs' three proposed subclasses, defined as follows:

> SUBCLASS 1: (i) NBD's Results Returned database shows a criminal record hit from a Virginia General District Court; (ii) NBD did not return a SSN to its customers; and (iii) the computer database of the Executive Secretary of the Supreme Court of Virginia contains a SSN or Drivers License number associated with that criminal record.

> SUBCLASS 2: (i) NBD's Results Returned database shows a criminal record hit from a [Pennsylvania] General District Court; (ii) NBD did not return a SSN to its customers; and (iii) the computer database of the Pennsylvania Administrative Office of Pennsylvania Courts (AOPC) contains a SSN associated with that criminal record.
>
> SUBCLASS 3: (i) NBD's Results Returned database show [sic] a criminal record hit from a state Sex Offender Registry; (ii) where the age and/or date of birth provided for that consumer by Verifications, ADP or HR Plus did not match the age and/or date of birth contained in that State's publically accessible Sex Offender Registry.

Id.

Because Plaintiffs failed to provide NBD with notice of some important evidence underlying the subclasses, NBD was denied the opportunity to conduct discovery necessary to fully brief that issue. Therefore, Plaintiffs' motion will be denied without prejudice as to the three subclasses, and the parties will be given an opportunity to conduct expedited discovery as to the viability of the subclasses. However, for the reasons set forth below, Plaintiffs' motion will be denied with prejudice as to the putative nationwide class.

**FACTUAL BACKGROUND**

NBD is a company that provides its customers access to a database ("The Multistate Database" or "the Database") of criminal record information. (Defendant's Memorandum in Support

3

of its Renewed Motion for Partial Summary Judgment on Count I of the Second Amended Complaint (ECF No. 195), Statement of Undisputed Facts ("SOF") ¶ 18).  NBD's customers, which in this instance are consumer reporting agencies ("CRAs"), pay to search the Multistate Database by way of the Internet.  The Multistate Database then returns results (such as arrest records) that are responsive to the search criteria entered by NBD's customer. Id.

The Multistate Database is owned and managed by CoreLogic SafeRent, LLC ("SafeRent"), a sister company to NBD.  Id. SafeRent obtains most of the criminal record data in the Database electronically from governmental sources, although approximately ten percent of the data is purchased from a third party vendor.  Id. ¶ 19.  SafeRent buys criminal records in bulk, formats the records it purchases so that they can be properly incorporated into the Multistate Database, and updates the records at varying intervals.  Id. ¶¶ 20-24.  Because SafeRent purchases criminal record data in bulk, the public records in the Multistate Database often contain only limited identifying information.  For example, public records purchased in bulk rarely, if ever, contain Social Security Numbers ("SSNs").  Id. ¶¶ 16-17.  Based on the reports generated by NBD in response to queries regarding Plaintiffs, it is clear that the records sometimes also lack other identifying data such as

4

middle names or addresses. (ECF No. 196 Exs. 13, 14). Therefore, the portions of the public records that are in the Multistate Database often are not sufficient to link the data supplied with the particular consumer to whom the records pertain. ECF No. 195, SOF ¶¶ 5-6.

SafeRent oversees all formatting, updating, and maintenance of the Multistate Database; NBD merely acts as an intermediary between SafeRent and the customer CRAs, and transmits this data to its customers without change. The contracts between NBD and its customers obligate the customers independently to verify the records returned in response to their search queries before providing consumer reports to their clients. Id. ¶¶ 8-15.

Henderson and Hines present factually similar cases. Specifically, Henderson and Hines were denied employment based on allegedly inaccurate and incomplete criminal history information supplied by NBD. Henderson applied for a job at Interstate Brands Corporation ("Interstate") in August or September of 2009. (SAC ¶ 19). Interstate made Henderson a conditional offer of employment, and subsequently requested a background check on Henderson from Verifications, Inc. ("Verifications), a third party CRA. Id. ¶ 21. As part of the background check process, Verifications conducted a search of the Multistate Database by inputting Henderson's last name, the first three letters of his first name, and his date of birth.

(ECF No. 195, SOF ¶ 29). The results of this search correctly included Henderson's criminal history, but the search results also contained several records, including felony convictions, belonging to at least one other individual who had the same first and last name and date of birth as Henderson. (SAC ¶¶ 24-26). In the background check that it provided to Interstate, Verifications included multiple criminal records that were incorrectly attributed to Henderson by NBD. Id. ¶ 27. As a result of the incorrect information, Interstate withdrew its conditional offer of employment. Id.

Hines applied for a position as a physical therapist with CareSouth Homecare Professionals ("CareSouth") in May 2011. Id. ¶ 39. As part of its consideration of Hines for that position, CareSouth purchased a consumer report from ADP Screening and Selection Services ("ADP"), a CRA similar to Verifications. Id. ¶¶ 41-42. As part of the compilation of this report, ADP conducted a search of the Multistate Database by inputting Hines' first and last names and his date of birth. (ECF No. 195, SOF ¶ 41). These search results contained criminal records correctly attributed to Hines, but also contained records belonging to at least one other individual with the same first name, last name, and date of birth, including an Indiana record indicating that Hines was a registered sex offender. (SAC ¶¶ 42-45). ADP included this incorrect information in the consumer

6

report that it provided to CareSouth.  As a result of the
incorrect information, Hines was not hired for the position at
that time.  Id. ¶ 5.

## CLASS CERTIFICATION DISCUSSION

To obtain class certification, a plaintiff must satisfy the
four requirements of Fed. R. Civ. P. 23(a).  Additionally, the
proposed class must be consistent with at least one of the types
of class actions delineated in Fed. R. Civ. P. 23(b), and must
meet the corresponding prerequisites for certification.
However, before the Court undertakes the Rule 23 analysis, there
are three threshold disputes to be resolved.

## A.    Standing

To begin, NBD contends that "Plaintiffs cannot establish
Article III standing for the absent class members."
(Defendant's Memorandum in Opposition to Plaintiffs' Renewed
Motion for Class Certification ("Def. Mem. in Opp.," ECF No.
296) at 19).  More specifically, says NBD, every class member
must "establish that any return of incomplete records by NBD
caused him or her 'concrete' and 'particularized' harm
sufficient to establish Article III standing."  Id. (citing
Spokeo v. Robins, 136 S. Ct. 1540 (2016)).  Before proceeding to
the merits of the motion, the Court must first resolve any
issues relating to standing because that issue affects the
Court's subject matter jurisdiction.

7

The Court need not delve into the issue of absent class members' standing here, however, because NBD's argument simply misapprehends the role of constitutional standing in the class action context. There is no dispute that the named plaintiffs-- that is, Henderson and Hines--have standing; therefore, there is a justiciable case and controversy between the parties before the Court. That is all that Article III requires. See, e.g., ProEnglish v. Bush, 70 F. App'x 84, 87 (4th Cir. 2003) (quoting Harris v. Evans, 20 F.3d 1118, 1121 (11th Cir. 1994)) (observing that the "'central purpose of the standing requirement [is] to ensure that the parties before the court have a concrete interest in the outcome of the proceedings such that they can be expected to frame the issues properly.'") (emphasis added).

Thus, given that Henderson and Hines indisputably have standing, NBD's argument concerning whether, and to what extent, the absent class members have suffered harm is more aptly characterized as identifying perceived differences between the named plaintiffs' claims and the claims of the absent class members: in other words, NBD's standing argument really presents issues that are pertinent to the questions of predominance, typicality, and adequacy of representation, which must be analyzed under Fed. R. Civ. P. 23.

The leading class action treatise has succinctly explained this distinction, noting that, although the constitutional

requirement of standing and the statutory prerequisites of Rule 23(a) "appear related as they both aim to measure whether the property party is before the court to tender the issues for litigation," "whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy but depends on meeting the prerequisites of Rule 23 governing class actions." Alba Conte & Herbert Newberg, Newberg on Class Actions § 2:6 (5th ed. 2013) (hereafter "Newberg § ____"). Therefore, Rule 23, rather than Article III, is the appropriate rubric for evaluating these differences because, "while standing doctrine is primarily concerned with ensuring that a real case or controversy exists, Rule 23(a)'s requirements are designed precisely to address concerns about the relationship between the class representative[s] and the class." Id. Accordingly, to the extent that injury (or lack thereof) to absent class members is relevant to the Rule 23 analysis, it is addressed in more detail below.

**B. Incompleteness is a Required Element of Plaintiffs' Claim.**

Much of Plaintiffs' brief in support of their motion for class certification is premised on the position that they need not show that class members' reports were incomplete or outdated to successfully pursue their claim under § 1681k(a), notwithstanding the recent holding to the contrary in the

Memorandum Opinion denying NBD's motion for summary judgment. See Henderson v. CoreLogic Nat'l Background Data, LLC, 2016 WL 1574048 (E.D. Va. Apr. 18, 2016). Because this issue affects the analysis of all of the Rule 23 factors, and because the parties did not bring this issue to the fore when NBD's summary judgment motion was briefed, it is helpful here to explain the reasoning behind that conclusion in more depth.

The few courts to have addressed this issue in any detail have unanimously concluded that, "absent a showing that the information obtained by [a defendant CRA] was inaccurate or incomplete...[a] plaintiff's claim under § 1681k must fail." Haro v. Shilo Inn, 2009 WL 2252105 (D. Or. July 27, 2009); see also Farmer v. Phillips Agency, Inc., 285 F.R.D. 688 (N.D. Ga. 2012); Obabueki v. Int'l Bus. Mach. Corp., 145 F. Supp. 2d 371, 396 (S.D.N.Y. 2001) (noting that "the logical starting point for an analysis of Section 1681k is whether the information provided was complete and up to date. If this is so, then an inquiry into the agency's procedures is unnecessary."). Indeed, several courts have required a plaintiff claiming a § 1681k violation to allege sufficient facts to support an inference that the subject reports were incomplete or not up to date to satisfy the plausibility pleading requirements of Fed. R. Civ. P. 12(b)(6). E.g., Speers v. Pre-Employ.com, Inc., 2014 WL 2611259, at *6 (D. Or. May 13, 2014); Haley v. TalentWise, Inc., 9 F. Supp. 3d

1188, 1194 (W.D. Wash. 2014) (denying the defendant's motion to dismiss a § 1681k claim because (1) plaintiff sufficiently alleged that she did not receive § 1681k(a)(1) notice, and (2) plaintiff alleged that her consumer report was outdated).   Of course, opinions of other district courts are not binding authority; however, the reasoning of those opinions is persuasive, for several reasons.

First, the second sentence of § 1681k(a)(2) clearly demonstrates that whether the information in a record is up to date is crucial for proving a violation of that section.   That sentence provides that:

> [f]or purposes of this paragraph, items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported.

15 U.S.C. § 1681k(a)(2).   "This establishes a precise standard for showing when information is 'considered up to date'" for purposes of this subsection.   Farmer, 285 F.R.D. at 696.   "Such a standard would be necessary only if § 1681k(a)(2) required a CRA to furnish up-to-date reports," because the alternate reading advanced by Plaintiffs "would render over 50% of § 1681k(a)(2) meaningless."   Id.   And, it is "a cardinal principal of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause,

11

sentence, or word shall be superfluous, void, or insignificant." Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 489 n.13 (2004).

Second, this interpretation is supported by commentary from the Federal Trade Commission ("FTC"), which provides persuasive guidance to the Court. Milbourne v. JRK Residential Am., 92 F. Supp. 3d 425, 431 (E.D. Va. 2015) (noting that FTC opinion letters are persuasive authority, even though they are not binding). The FTC has stated in a staff opinion letter that § 1681k(a)(2) "require[s]...that each item reported be complete and up to date. For example, if the CRA reports an indictment, it must also report any dismissal or acquittal available on the public record as of the date of the report." Fed. Trade Comm'n Staff Opinion Letter, 1999 WL 33932137, at *1 (Dec. 16, 1999) (emphasis in original). The FTC went on to say that, "[b]ecause we read Section [1681k(a)(2)] as being item-specific...we believe the CRA complies with that provision if its report is 'complete and up to date' in the sense that it includes the current public record status each [sic] individual item reported." Id.

Third, the language and the alternative structure of § 1681k make clear that the ultimate harm that Congress sought to prevent was damage to consumers' employment prospects caused by reporting of incomplete or out-of-date public records. To

12

further that objective, Congress offered CRAs two options; they could either: (1) "maintain strict procedures" to minimize the reporting of incomplete or out-of-date public records; or (2) alert the consumer to the existence of the report so that the consumer himself could remedy any mistakes in the report before adverse employment action occurred. Thus, the CRA is required to provide notice to the consumer only if it does not take its own steps to ensure the completeness and currency of the public records it furnishes. The fact that this subsection allows the CRA to choose whether it will review the records itself or alert the consumer to the existence of the report to allow him or her the opportunity to review it reveals that transmission of complete and up-to-date public records is the ultimate goal of this subsection.[1]

This reading is further underscored by the legislative history of § 1681k(a). That section arose out of Congress' concern that:

> Most credit bureaus systematically compile public record information such as records of suits, tax liens, arrests, indictments, convictions, bankruptcies, judgments and the like. This information is then included on a person's report when he applies for credit, or in some cases when he applies for employment. Unfortunately, the information

---

[1] That self-regulatory structure is, as Plaintiffs point out, an impediment to the effectuation of the Congressional goal. But that is a matter for Congress to address, and is not redressable by judicial decision.

13

> cannot always be kept up to date because it
> is costly or because the correct information
> is simply not available…Because public
> record information is reported to employers
> as well as creditors, a consumer's future
> employment career could be jeopardized
> because of an incomplete credit report.

S. Rep. No. 91-517 at 4.

Therefore, where a consumer does not receive notice as contemplated by § 1681k(a)(1), and a CRA does not maintain strict procedures as required by § 1681k(a)(2), but the consumer's report contains only complete and up-to-date public records, the injury that this section is designed to prevent has not occurred. In other words, the purpose of § 1681k(a) "is not furthered unless a plaintiff suffers the harm the procedures are meant to prevent." Washington v. CSC Credit Servs., Inc., 199 F.3d 263, 267 (5th Cir. 2000). Thus, requiring plaintiffs to plead, and to prove, that their reports were incomplete or outdated to prevail on a claim under this section best serves the intent of Congress, as evidenced by the structure and text of the statute itself as well as its legislative history.

Fourth, and relatedly, as numerous courts have recognized, § 1681k(a)(2) closely parallels § 1681e(b) which requires that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." See, e.g., Dalton v. Capital

14

Assoc. Indus., Inc., 257 F.3d 409, 417 (4th Cir. 2001); Obabueki, 145 F. Supp. 2d at 396. And, in the context of § 1681e(b), it is well-settled that inaccuracy is a necessary element of the claim because the harm the FCRA envisions is actual inaccurate or improper disclosures, not the mere risk of inaccuracy. See, e.g., Dalton, 257 F.3d at 415 (citing Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329, 1333 (9th Cir. 1995)); Washington, 199 F.3d at 267 n.3; Philbin v. Trans Union Corp., 101 F.3d 957, 964 (3d Cir. 1996); Spence v. TRW, Inc., 92 F.3d 380, 382 (6th Cir. 1996); Henson v. CSC Credit Servs., 29 F.3d 280, 284 (7th Cir. 1994); Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1156 (11th Cir. 1991); Thomas v. Gulf Coast Credit Servs., Inc., 214 F. Supp. 2d 1228, 1233 (M.D. Ala. 2002). These cases read the "reasonable procedures" requirement of § 1681e(b) as a limit on liability that might otherwise attach for inaccurate reports, rather than as an affirmative basis for a claim. See, e.g., Henson, 29 F.3d at 284 ("[T]he credit reporting agency is not automatically liable even if the consumer proves that it prepared an inaccurate report because the FCRA does not make reporting agencies strictly liable for all inaccuracies. A credit reporting agency is not liable under the FCRA if it followed 'reasonable procedures to assure maximum possible accuracy,' but nonetheless reported inaccurate information in the consumer's credit report.") (quotations and

citation omitted); Washington, 199 F.3d at 267 (holding in the context of related subsection § 1681e(a) that "the actionable harm the FCRA envisions is improper disclosure, not the mere risk of improper disclosure that arises when 'reasonable procedures' are not followed and disclosures are made."). In sum, in the absence of some showing of inaccuracy, the harm that § 1681e(b) is intended to prevent has not occurred. For the reasons set forth above, the same is true of § 1681k(a): without some showing that a CRA has furnished an incomplete or out-of-date public record, the harm that § 1681k(a) is intended to prevent has not occurred.

Plaintiffs argue that the Court should reject the reasoning of every other court to have decided this issue and forge its own path. In the absence of any judicial or administrative authority to lend support to their position, Plaintiffs simply state that it "makes no sense" to "impose an implied requirement that a challenged report must itself be incomplete...merely because the section shares a comparable objective with another provision that also uses the word 'procedures.'" (Plaintiffs' Memorandum in Support of Renewed Motion for Class Certification ("Pl. Mem.," ECF No. 282) at 3). That ipse dixit is unpersuasive. Moreover, as set forth above, the analogy that several courts have correctly drawn between § 1681e(b) and § 1681k(a) runs far deeper than the presence of the word

16

"procedures;" as set forth above, the basis for that analogy is the linkage between a valid claim and the harm that those respective sections were intended to prevent.

Plaintiffs also argue that Congress' use of the words "maintain" and "ensure" implies that § 1681k(a)(2) is primarily concerned with a CRA's procedures, not whether it actually provides complete or up-to-date reports. (Pl. Mem. at 2-3). And, relatedly, Plaintiffs contend that "§ 1681k(a)(2) cannot be read as ends-determined because it imposes a CRA [sic] to decide before issuing the report whether it needs to send the § 1681k(a)(1) notice." (Pl. Mem. at 5). As an initial matter, the latter premise is simply not true; the § 1681k(a)(1) notice must be provided "at the time" that the adverse public record information is reported, not before. More importantly, both arguments miss the point: if no incomplete or out-of-date report has been issued, even if the CRA lacks "strict procedures" designed to ensure completeness, there is no harm to the consumer. In that scenario, the consumer does not even have standing to bring suit. See Witt v. CoreLogic SafeRent LLC, 2016 WL 4424955, at *8-*10 (E.D. Va. Aug. 18, 2016). The Court agrees with Plaintiffs that "strict procedures" are an "ex ante" requirement insofar as a CRA must have strict procedures in place at the time that it sends an erroneous report to take advantage of § 1681k(a)(2); however, it does not necessarily

17

follow, as Plaintiffs would have it, that a plaintiff is not required to show that the report was incomplete or out-of-date to pursue a claim under this subsection.

Thus, for the reasons above and as set forth in the Court's previous Memorandum Opinion, Plaintiffs are required to show that NBD's reports are incomplete or not up to date in order to prove liability under § 1681k(a)(2).

## C. 1681k(a) applies to reports furnished for all "employment purposes."

Much of NBD's brief also suffers from a structural misconception concerning the elements that the statute requires. NBD takes the view that "Section 1681k(a) is limited to pre-employment screenings" because "the requirements of § 1681k(a) are triggered only with respect to consumers who are in the process of 'obtaining employment,' i.e., consumers seeking initial employment," and therefore Plaintiffs' proposed class must be limited only to those class members whose background reports were procured in connection with an application for initial employment. (Def. Mem. in Opp. at 26). The catch, however, is that such narrowing is impossible because NBD is unaware which of the reports that it furnished for "employment purposes" related to an initial application for employment as opposed to any other employment purpose, such as promotion or termination. Id.

18

The analysis begins with the text of the statute. It is true that, as NBD points out, the preamble to § 1681k(a) references a consumer's "ability to obtain employment." However, NBD's argument takes that phrase out of context. Section 1681k(a) begins: "A consumer reporting agency which furnishes a consumer report <u>for employment purposes</u> and which <u>for that purpose</u> compiles and reports items of information on consumers..." 15 U.S.C. § 1681k(a) (emphasis added). The FCRA defines the term "employment purposes" when used in connection with a consumer report as "a report used for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee." 15 U.S.C. § 1681a(h). And, of course, "[w]hen a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." <u>Stenberg v. Carhart</u>, 530 U.S. 914, 942 (2000) (internal citations omitted). The use of the statutorily defined term "employment purposes" in the opening sentence of § 1681k makes clear that Congress intended § 1681k to apply to any consumer reporting agency which furnishes consumer reports "for the purpose of evaluating a consumer for employment, promotion, reassignment or retention as an employee." Conversely, had Congress meant to limit the application of § 1681k(a) to initial applications for employment, it would not have used the statutorily defined term "employment purposes."

The reference to the consumer's "ability to obtain employment" later in the preamble of § 1681k does not alter this result. The restrictive clause "which are likely to have an adverse effect on a consumer's ability to obtain employment" merely describes the nature of the "items of information on consumers" with which § 1681k(a) is concerned when they are reported for "employment purposes." 15 U.S.C. § 1681k(a). A consumer reporting agency may sell an item of information that is of the sort that is "likely to have an adverse effect on a consumer's ability to obtain employment" for any employment purpose, and § 1681k(a) would still apply.[2]

That reading is confirmed by administrative guidance. The FTC's informal commentary on the FCRA explicitly states that "[a] CRA that furnishes public record information for employment purposes must comply with either subsection (a)(1) or (a)(2)" of § 1681k(a). Federal Trade Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR

---

[2] NBD claims that this result is "incongruous" because under this reading, the statute would apply "to pre and post-employment screenings, but only for the types of information that would be 'likely adverse' in a pre-employment context." (Def. Mem. in Opp. at 27). NBD does not specify why or how it believes that information that is "'likely adverse' in a pre-employment context" would not also qualify as "likely adverse" in any other employment context, nor does it cite any authority to support its argument that this distinction actually carries with it any meaningful difference. That is unsurprising, because no court has recognized this distinction and, in fact, this Court has already applied § 1681k in the context of post-employment background screenings. See Williams v. LexisNexis Risk Mgmt., Inc., 2007 WL 2439463 (E.D. Va. Aug. 23, 2007).

20

CREDIT REPORTING ACT: AN FTC STAFF REPORT WITH SUMMARY OF INTERPRETATIONS 81 (2011) (hereafter "40 Years Staff Report __") (emphasis added). Similarly, the FTC has repeatedly advised inquiring parties that § 1681k(a) "imposes obligations on consumer reporting agencies...that include public record information in the consumer reports they make to clients for employment purposes." Fed. Trade Comm'n Staff Opinion Letter, 1998 WL 34323738 (June 12, 1998) (emphasis added); see also Fed. Trade Comm'n Staff Opinion Letter, 1999 WL 33932137 (Dec. 16, 1999) (same). Thus, the FTC's commentary underscores that § 1681k(a) applies to all employment purposes, not only the initial application for employment.

For the foregoing reasons, § 1681k applies whenever a consumer reporting agency furnishes a consumer report for any employment purpose that contains adverse public records, and it is not limited only to consumers seeking to "obtain employment." Therefore, the fact that "NBD is not made aware of the specific employment purpose for which a report is sought," Def. Mem. in Opp. at 27, does not affect the analysis herein.

Having resolved those threshold issues, the Court turns to the question whether Plaintiffs' proposed class satisfies the conditions set forth in Fed. R. Civ. P. 23.

**D.  Rule 23**

21

A proposed class must satisfy the four requirements of Fed. R. Civ. P. 23(a). Those requirements are that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the representative's claims or defenses are typical of those of the class; and (4) the representative will fairly and adequately represent the interests of the class. See Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 337 (4th Cir. 1998). To secure class certification, the plaintiff bears the burden of proving all requirements of Rule 23. Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 146 (4th Cir. 2001).

Additionally, the proposed class must be consistent with at least one of the types of class actions delineated in Fed. R. Civ. P. 23(b), and must meet the corresponding prerequisites for certification. Here, Plaintiffs move for certification under Rule 23(b)(3). Certification under Rule 23(b)(3) is appropriate where the Court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

As the Fourth Circuit has explained, courts are not required "to accept plaintiffs' pleadings when assessing whether a class should be certified." Gariety v. Grant Thornton, LLP,

368 F.3d 356, 365 (4th Cir. 2004). Rather, "the district court must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006) (quoting Gariety, 368 F.3d at 365). "Such findings can be necessary even if the issues tend to overlap into the merits of the underlying case," but "[t]he likelihood of the plaintiffs' success on the merits...is not relevant to the issue of whether certification is proper." Id. (internal citations omitted).

The Supreme Court recently elaborated further upon the factual determinations at the class certification stage in Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011). In Dukes, the Supreme Court explained:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule - that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc. We recognized in Falcon that 'sometimes it may be necessary for the court to prove behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'

131 S. Ct. at 2551 (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160-61 (1982) (emphasis in original)). "Frequently

23

that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." 131 S. Ct. at 2551.

After Dukes, which "laid the groundwork for the heightened 'rigorous analysis' required of a class certification petition that 'will entail some overlap with the merits of the plaintiff's underlying claim,'...the Supreme Court issued a pair of 2013 opinions clarifying the extent to which a court can address merits issues at the class certification stage." Timothy Coughlin & Barbara A. Lum, Digging Deeper: Mass Toxic Tort Class Certification After Dukes, Comcast, and Amgen, 80 Def. Couns. J. 428, 432 (Oct. 2013). The first of these decisions was Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 113 S. Ct. 1184 (2013). In Amgen, the Court clarified that,

> [a]lthough we have cautioned that a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent--but only to the extent--that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

Id. at 1194-95 (internal citations omitted). Thus, Amgen and Dukes demonstrate that a court's factual determinations at the

24

class certification stage should go only as far as necessary and no farther. That is, "Amgen appears to limit inquiry into a case's merits where the class certification inquiry touches upon an indispensable element of the claim and on which a failure of proof would end the case." Coughlin & Lum, at 432 (internal citations omitted).

The second class certification case of 2013 was Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013). In Comcast, the Supreme Court further clarified "that the 'rigorous analysis' required for class certification reaches not only to issues of liability, but also to damages and causation." Coughlin & Lum, at 432. This position "reaffirms Dukes' pronouncement that district courts considering motions for class certification often must look beyond the pleadings to issues that overlap with the merits. But again, the extent to which a court must delve into the merits remains undefined." Id. at 433.

Newberg on Class Actions also analyzed two of the latest Supreme Court decisions, noting that although Dukes seems to "encourage merits review at certification," a different majority in Amgen cautions against "free-ranging merits inquiries at the certification stage", and stating that merits questions "may be considered to the extent--but only to the extent--that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Newberg § 7:23.

Keeping in mind the Supreme Court's views in Dukes, Amgen, and Comcast, we examine the definition of the proposed classes. Based on the current record, the Court has serious concerns about whether the proposed class satisfies Rule 23(a), and particularly the requirement of typicality, because although it appears that Henderson and Hines were the subjects of incomplete reports, Plaintiffs have yet to persuade the Court that that is typical of other members of the proposed class. Nevertheless, for purposes of this motion only, the Court assumes that all Rule 23(a) prerequisites are satisfied and addresses only Rule 23(b).[3]

### 1. Predominance

Under Rule 23(b)(3), questions common to the class "must predominate over any questions affecting only individual members." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615

---

[3] It is unclear as to some of NBD's arguments whether they are addressed to the requirements of predominance or ascertainability; NBD's brief frequently intermingles those analyses. However, the crux of most of NBD's ascertainability arguments is that Plaintiffs' proposed class is not viable because the class definition does not sufficiently tether the criteria for class membership to the elements that Plaintiffs must prove in order to prevail on their claim under § 1681k(a). Put slightly differently, NBD seems to argue that, if the Court were to certify the class as proposed by Plaintiffs (according to NBD), individualized inquiries would predominate because the proposed definition does not lend itself to a class-wide determination of liability. Therefore, the Court addresses NBD's arguments, to the extent appropriate, in the context of the predominance analysis. See part D.1 infra.

(1997). Whether common questions predominate over individual questions "is a separate inquiry, distinct from the requirements found in Rule 23(a)." Ealy v. Pinkerton Gov't Servs., 514 F. App'x 299, 305 (4th Cir. 2013) (citing Dukes, 131 S. Ct. at 2556). This requirement is "even more demanding than Rule 23(a)," Comcast, 133 S. Ct. at 1432, and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," Amchem, 521 U.S. at 623. This is not simply a matter of counting common versus noncommon questions and checking the final tally. "Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." Stillmock v. Weis Markets, Inc., 385 F. App'x 267, 272 (4th Cir. 2010) (citing Gunnells v. Healthplan Servs., 348 F.3d 417, 429 (4th Cir. 2003)). In other words, Rule 23(b)(3) "compares the quality of the common questions to those of the noncommon questions." Newberg § 3:27.

If the "qualitatively overarching issue" in the litigation is common, a class may be certified notwithstanding the need to resolve individualized issues. See Ealy, 514 F. App'x at 305 ("Indeed, common issues of liability may still predominate even when some individualized inquiry is required."). For example, if "common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." Stillmock,

385 F. App'x at 273 (citing Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 40 (1st Cir. 2003)). This is because class certification in such cases will still "achieve economies of time, effort, and expense, and promote...uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Gunnells, 348 F.3d at 424 (citing Amchem, 521 U.S. at 615); see also id. at 426 ("Proving these issues in individual trials would require enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and relitigation of many similar, and even identical, legal issues. Consolidation of these recurring common issues will also conserve important judicial resources.").

Plaintiffs contend that questions of law or fact common to the members of the class predominate over individual issues primarily because "the question of whether a CRA follows § 1681k 'strict procedures' is not an idiosyncratic case-by-case inquiry." (Pl. Mem. at 29-30). Second, Plaintiffs contend that § 1681k(a)(2) does not require any individualized proof because "class members would not be required to prove causation or actual damages in order to obtain statutory damages." Id. at 30.

28

NBD proffers numerous arguments in response.  First, NBD argues that determining whether a particular public record is "complete and up to date" creates insurmountable individualized issues.  (Def. Mem. at 9-13).  Second, NBD contends that "the analysis of the strictness of NBD's procedures will be individualized based on its business practices, as applied to the data returned in response to each of the more than 1.7 million queries."[4]    Id. at 22.    Third, NBD argues that

---

[4] This argument can be quickly disposed of, because NBD is not entitled to rely on procedures maintained exclusively by SafeRent, a legally independent entity, to satisfy its obligations under § 1681k(a)(2), for several reasons.  First, the statute, on its face, applies to any CRA "which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment[.]"  15 U.S.C. § 1681k(a).  That is, any CRA that meets this threshold definition must either comply with § 1681k(a)(1) or § 1681k(a)(2).  Second, the FTC has explicitly stated that "CRAs that provide reports for employment purposes must comply with this section, even if they are merely resellers of consumer reports obtained from other CRAs."  40 Years Staff Report 81; see also id. (noting that a "CRA that furnishes consumer reports for employment purposes based on previously acquired public record information (purchased periodically from a third party) must verify that any such information is complete and up to date, in order to comply with subsection (a)(2).").  Finally, the Fourth Circuit has made clear that a CRA may not satisfy the "reasonable procedures" requirement of § 1681e(b) or, by extension, the "strict procedures" component of § 1681k(a) as a matter of law by relying entirely on its vendors to provide complete, up-to-date, and reliable information.  Dalton, 257 F.3d at 417-418.  Therefore, NBD itself has a responsibility to comply with § 1681k(a), and may not avoid liability by relying on procedures of another entity elsewhere in the chain of transmission.

Plaintiffs' proffered five-year statute of limitations creates the potential for insurmountable individualized inquiries.[5] Fourth, NBD contends that whether the data that it returned in response to customers' queries was "likely adverse" to class members' employment prospects cannot be determined without individualized inquiry.[6] Id. at 28. Finally, NBD asserts that the Court would have to determine whether NBD's customers were "users" of the reports sold by NBD, and that also would necessitate individualized factual inquiries.

---

[5] Plaintiffs respond that a five-year statute of limitations is uniquely appropriate in this case because the subjects of reports sold by NBD are never made aware of NBD's role in the preparation of their employment-purposed consumer reports. (Reply in Support of Plaintiffs' Motion for Class Certification ("Pl. Reply," ECF No. 305) at 23-24). The record is undeveloped on that point, so the Court need not resolve that issue here; however, even assuming that NBD is correct that the proposed five-year limitations period creates individualized issues, the problem could be remedied by limiting the class period to the two years preceding the filing of this action. Therefore, the statute of limitations issue does not, alone, defeat certification.

[6] The Court has already explicitly rejected NBD's two final arguments in its Memorandum Opinion denying NBD's motion for summary judgment. (ECF No. 277). However, NBD, undeterred, contends that class certification is improper because the Court's interpretation of the law as expressed in its previous opinion was incorrect. (Def. Mem. at 28-29). The Court has already thoroughly analyzed those arguments in deciding both NBD's motion for summary judgment and its motion for reconsideration of the Court's decision on summary judgment, and has declined to adopt NBD's view on those matters. Therefore, those arguments are not addressed further herein.

Certainly, Plaintiffs are correct that some important issues are common. For example, NBD does not dispute that its non-compliance with § 1681k(a)(1) is subject to generalized proof, because it "has acknowledged that, as a matter of policy, it never provides notice to the subjects of the consumer reports it prepares." Farmer, 285 F.R.D. at 688. Non-compliance with § 1681k(a)(2), however, is much more complicated.

First, as set forth in part B above and contrary to Plaintiffs' position, the Court does not reach the question of "strict procedures" unless and until Plaintiffs have shown that NBD reported incomplete or out-of-date records. Plaintiffs have not specified how the records provided by NBD were not complete, not up-to-date, or both, except to assert that the vast majority of those records lacked Social Security numbers ("SSN"). However, the Court has concluded that, for several reasons, the failure to include SSN's does not, as a matter of law, render a record incomplete or not up-to-date. Therefore, that question would have to be resolved as a factual matter. Thus, to the extent that NBD's records do not include SSNs (which, as Plaintiffs acknowledge, is not universally true), it is still necessary to determine whether an SSN was actually available for that record and whether the record was nonetheless "complete" despite the absence of the SSN. This, in turn, means that on the Plaintiffs' key theory of liability, for the proposed

31

nationwide class, the individual issues central to liability
will predominate.

Furthermore, as to the putative nationwide class, the
Plaintiffs have provided no meaningful alternative theory of
liability respecting how the records provided by NBD are neither
complete nor up-to-date.   To show that NBD's reports are
systemically incomplete, Plaintiffs primarily rely on NBD's
arguments that NBD does not know the identity of the consumer at
issue when it furnishes a report. (Pl. Mem. at 9-11). However,
completeness of the public records that NBD furnishes is
independent of whether NBD knows (or should know) the identity
of the consumer to whom the report is addressed.   And, in any
event, NBD's arguments are not evidence.   Moreover, although
Plaintiffs have generally alleged that NBD provides only
"partial record[s]," they have not demonstrated or even argued
with any specificity (other than the absence of SSNs) any way in
which those records are uniformly incomplete or out-of-date such
that completeness would be amenable to class-wide proof.   Thus,
under Plaintiffs' theory, determining NBD's liability would
require predominantly individualized inquiries.

Plaintiffs contend that requiring proof that every class
member's report was incomplete or out-of-date imposes on them
the impossible task of "'proving a negative'--showing that no
complete reports were ever furnished.   But at this stage if not

32

far earlier, Defendant should have come forward with proof to the contrary." (Pl. Mem. at 22). Plaintiffs have put themselves in this predicament because they have chosen to pursue class certification, rather than individual actions, and their proposed class is premised on the assumption that NBD never furnished a complete report, yet they have refused to limit the class to reports that were incomplete or outdated in a specific, objective, and verifiable way. Unsurprisingly, then, Plaintiffs must offer proof to support their contention before certification is warranted. They have not done so.

The two cases that Plaintiffs cite in support of this proposition are distinguishable. The certification of classes in both cases was based on the plaintiffs' proof that Trans Union had inaccurately labeled many thousands of class members as "terrorists" based on nothing more than a name-only match. Patel v. Trans Union, LLC, 308 F.R.D. 292 (N.D. Cal. 2015); Ramirez v. Trans Union, LLC, 301 F.R.D. 408 (N.D. Cal. 2014). Under those unusual circumstances, the district court held that it was "reasonable to infer at [that] stage that there [was] not a fraction [of the class] accurately tagged as potential terrorists that destroys predominance." Patel, 308 F.R.D. at 308; accord Ramirez, 301 F.R.D. at 422. By contrast, in this case, as in numerous other cases distinguished by the court in Patel where certification was denied on a similar theory, the

predominance inquiry necessarily "involve[s] the reporting of data that varies markedly by individual." Id. at 309. Thus, the decisions in Patel and Ramirez are not instructive here.

For the foregoing reasons, Plaintiffs have not met their burden of proving that common questions will predominate over individualized inquiries at trial. Therefore, certification of the proposed class is inappropriate.

### 2. Superiority

Superiority requires that use of a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority "'depends greatly on the circumstances surrounding each case,'" and "'[t]he rule requires the court to find that the objectives of the class-action procedure really will be achieved.'" Stillmock, 385 F. App'x at 274 (internal citation omitted). When making a "determination of whether the class action device is superior to other methods available to the court for a fair and efficient adjudication of the controversy...[the court should] not contemplate the possibility that no action at all might be superior to a class action." Brown v. Cameron-Brown Co., 92 F.R.D. 32, 49 (E.D. Va. 1981). In determining whether the class action mechanism is truly superior, the court should consider "the class members' interest in individually controlling the prosecution or defense of

34

separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing the class action." Fed. R. Civ. P. 23(b)(e)(A)-(D).

Plaintiffs contend that the superiority requirement is satisfied because "statutory damages under the FCRA are 'too slight to support individual suits.'" (Pl. Mem. at 30) (citation omitted). Second, Plaintiffs assert that class adjudication is superior because "class members would never think to bring individual claims because they are unaware even of the existence of NBD or that their rights have been violated--having little lay knowledge of the complex blanket of FCRA protections." Id.

NBD responds that "[t]he novelty of Plaintiffs' claims, particularly in combination with the enormous statutory damages sought, renders class treatment an inferior method of adjudication." (Def. Mem. in Opp. at 30) (citations omitted). Second, NBD asserts that "individual suits under the FCRA are a practical and realistic alternative to a sprawling and novel class action." Id. Finally, NBD points out that the judicial economy contemplated by the class action device is not realized

35

here because of the daunting nature of the individualized inquiries necessary to determine liability. Id. at 31.

Neither side has hit the mark with their arguments concerning superiority. But, a class action is nonetheless not superior given the manageability issues created by the individual inquiries discussed in the preceding section on predominance. In other words, superiority is not satisfied because "[t]he potential efficiencies of a class action are not realized where an individual assessment of each putative class member's claims must be made." Klotz v. Trans Union, LLC, 246 F.R.D. 208, 217 (E.D. Pa. 2007).

Moreover, individual actions are feasible under the circumstances presented here. In fact, individual actions under § 1681k are quite common. See, e.g., Oses v. Corelogic SafeRent, LLC, -- F. Supp. 3d --, 2016 WL 1106857 (N.D. Ill. Mar. 22, 2016); Lang v. First Advantage Background Servs. Corp., 2016 WL 740288 (N.D. Ohio Feb. 24, 2016); Williams v. First Advantage LNS Screening Sol, Inc., 155 F. Supp. 3d 1233 (N.D. Fla. 2015); Cox v. ScreeningOne, Inc., 2015 WL 413812 (N.D. Ohio Jan. 30, 2015); Maiteki v. Knight Trans., Inc., 2015 WL 328250 (D. Colo. Jan. 23, 2015); Smith v. E-Backgroundchecks.com, Inc., 81 F. Supp. 3d 1342 (N.D. Ga. 2015). Furthermore, both named Plaintiffs are currently pursuing claims for actual damages in this case for alleged violations of § 1681e(b) which arise out

of the same course of events as their § 1681k(a) claim; they could easily have brought plausible individual claims under § 1681k as well. Finally, the viability of individual actions is aptly demonstrated by the litany of individual claims that these Plaintiffs and their counsel have brought under the FCRA in other actions before this Court alone. See, e.g., 3:11-cv-514; 3:12-cv-589; 3:12-cv-730. Therefore, under the circumstances of this case, individual actions are a viable and preferable alternative to a huge, unwieldy, and unmanageable class.

For all of the foregoing reasons, Plaintiffs have failed to demonstrate that a class action is a superior method of adjudication in this case.

## CONCLUSION

For the reasons set forth above, PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION (ECF No. 281) will be denied.

It is so ORDERED.

/s/ REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: September __/__, 2016

37